**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
In re:                                                                                    **FOR PUBLICATION**

　　　　　IOVATE HEALTH SCIENCES                          Chapter 15
　　　　　INTERNATIONAL INC., *et al.,*
                                                                                             Case No. 25-11958 (MG)

　　　　　　　　　Debtors in a Foreign Proceeding.
-------------------------------------------------------------------------x

## MEMORANDUM OPINION GRANTING MOTION FOR PROVISIONAL RELIEF

*A P P E A R A N C E S:*

PACHULSKI STANG ZIEHL & JONES LLP
*Attorneys for Foreign Representative*
1700 Broadway, 36th Fl.
New York, New York 10019
By:　　Steven W. Golden, Esq.
　　　　Jeffrey M. Dine, Esq.
　　　　Mary F. Caloway, Esq.
　　　　Victoria A. Newmark, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

　　　　The Court has already entered an order (ECF Doc. # 20) granting the motion ("Motion,"

ECF Doc. # 7) for provisional relief brought by Iovate Health Sciences International Inc.

("Iovate International"), in its capacity as the authorized foreign representative (the "Foreign

Representative") of itself, Iovate Health Sciences USA Inc. ("Iovate USA"), and Northern

Innovations Holding Corp. ("Northern Innovations") (collectively, the "Debtors").  The Court

now writes separately to explain its reasoning in granting provisional relief.  This is the third

recent Chapter 15 case before this Court in recent months which has involved Canadian entities

in a Canadian insolvency proceeding where one of the entities in the debtor group was an

American corporation and the Court determined that COMI of the American companies was in

Canada. *See In re Giftcraft Ltd.*, No. 25-11030 (MG), 2025 WL 1583480, at *1 (Bankr. S.D.N.Y. June 4, 2025); *Oak and Fort and Affiliated Entities*, Case No. 25-11282, ECF Doc. # 13. The Court writes to address a recurrent issue: when the presumption that an entity's COMI is in the jurisdiction of its registered office can be overcome.

In support of its Motion, counsel for the (proposed) Foreign Representative submitted two declarations by Wesley Parris, CEO of the proposed foreign representative, in support of the motions for provisional and final relief ("Parris Decl. 1," ECF Doc. # 5, and "Parris Decl. 2," ECF Doc. # 16); and a declaration by Harvey Chaiton, a partner at Chaitons LLP, concerning Canadian insolvency law ("Chaiton Decl.," ECF Doc. # 6). All declarations were admitted into evidence during the September 10, 2025 hearing on the Motion. The Foreign Representative also filed a recognition motion ("Recognition Motion," ECF Doc. # 4) seeking, among other things, recognition of the Canadian Proceeding (defined *infra*) as the foreign main proceeding (or, in the alternative, the foreign nonmain proceeding) of each of the Debtors. No one challenged the Motion for provisional relief.

For the following reasons, the Court has found that the Foreign Representative has shown that the foreign (Canadian) insolvency proceeding is likely to be found to be the foreign main proceeding for each of the Debtors; that failing to grant the provisional relief would have resulted in imminent irreparable harm to the Debtors; that the balance of harms tipped in favor of the Debtors; and that the public interest weighed in favor of granting the relief.

## I.    BACKGROUND

### A.  Company Background

The Debtors, together with their non-debtor affiliates (together, "Iovate Group"), comprise a health and wellness business based in Oakville, Ontario, Canada, specializing in

active nutrition and weight management products, specifically supplements and vitamins. (Parris Decl. 1 ¶ 4.) Initially headquartered in Mississauga, Ontario, the Iovate Group began as a direct-to-consumer mail order business, and eventually expanded; now, its products are distributed in over 90 countries. (*Id.* ¶ 5.) The Iovate Group manufactures and distributes its products through third-party co-manufacturers and a network of domestic and international distribution partners. (*Id.* ¶ 6.) Its products are shipped from facilities in Canada, the United States, Belgium, and Australia, and are sold through retail, online, and distributor channels globally. (*Id.*)

As of the date of filing of their Chapter 15 cases (September 9, 2025), Iovate International leases its corporate head office in Oakville, Ontario, Canada (the "Oakville Headquarters"). (*Id.* ¶ 7.) None of the Debtors lease any other real property. (*Id.*) Parris and the Debtors' other management work out of the Oakville Headquarters. (*Id.*) Iovate International employs approximately 165 people in Canada and two people in the United Kingdom. (*Id.*) (Parris also states that all of Iovate International's employees are located in Ontario. (*Id.*)) Most of Iovate Group's operations are conducted through Iovate International. (*Id.* ¶ 8.) Iovate Group's inventory and raw materials are owned by Iovate International (as is most of Iovate Group's cash, non-United States accounts receivables, and other assets other than intellectual property) and its intellectual property is owned by Northern Innovations. (*Id.*) Iovate International is an Ontario corporation governed by the *Ontario Business Corporations Act* and its registered office is located in Oakville, Ontario, Canada. (*Id.* ¶ 9.)

Iovate USA employs approximately 11 people in the United States, most of whom are salespeople. (*Id.* ¶ 7.) Iovate USA, generally speaking, is responsible for overseeing warehousing and third-party logistics for Iovate Group's non-Canadian customers and maintains Iovate Group's relationships with United States-based customers. (*Id.* ¶ 8.) Iovate USA's

3

principal asset is accounts receivable from United States-based customers, which are deposited into New York-based bank accounts with HSBC USA but swept daily into Iovate International's Toronto-based concentration account with Royal Bank of Canada ("RBC").  (*Id.*)  Iovate USA is a Delaware limited liability company with its registered office in Wilmington, Delaware.  (*Id.* ¶ 9.)

Northern Innovations does not have any employees.  (*Id.*)  It is an Ontario corporation governed by the *Ontario Business Corporations Act* and its registered office is in Oakville, Ontario, Canada.  (*Id.* ¶ 9.)

All of the Debtors are headquartered in Canada at the Oakville Headquarters.  (*Id.*)  The Debtors' officers and senior management are all located in either Canada or China.  (*Id.* ¶ 11.) Iovate International centrally manages all corporate activities of the Iovate Group from the Oakville Headquarters outside of Toronto.  (*Id.* ¶ 10.)  Iovate International's CEO, Parris, is primarily responsible for the direction of the Debtors' corporate, management, legal, investment, and strategic functions, all of which he manages from the Oakville Headquarters.  (*Id.*)  The Debtors' operations are highly integrated and share management and headquarters in Oakville, Ontario, Canada.  (*Id.* ¶ 12.)  All accounting, finance, and human resource functions for the Debtors are centralized and managed from the head office in Oakville, where payroll is also processed for all Canadian and U.S. operations.  (*Id.*)  Specifically, Parris states that: the Debtors' senior management team has historically been located in Canada; all creative, strategic, and key operating decisions and key policy decisions are made by and/or subject to approval from the Iovate Group's senior management located in Canada; key human resources decisions pertaining to, *inter alia*, payroll budgets and augmentation or reduction of employee headcount are subject to the approval of the Debtors' senior management located in Canada; key accounting

4

decisions and all plans, budgets, and financial projections are subject to the approval of the
Debtors' senior management located in Canada; planning, budgeting, management of tax,
treasury, and cash management functions, and preparation of financial projections for the
Debtors is done from the Oakville Headquarters; all material and/or long-term contracts and
expenses are subject to the approval of senior management located in Canada; marketing and
business development initiatives are overseen from the Oakville Headquarters; corporate
governance and regulatory compliance for the Debtors is overseen from its management team
located at the Oakville Headquarters; and meetings for management and senior staff of the
Debtors, are regularly held at the Oakville Headquarters; and senior management and all sales
and operations staff report to their respective senior executives, who, ultimately, report to the
senior management of the Debtors located at the Oakville Headquarters.  (*Id.* ¶ 36.)

An extract of the Iovate Group's organizational chart (including both Debtors and non-
Debtors) is as follows:



(*Id.* ¶ 12.)  Iovate USA wholly owns seven Delaware limited liability companies, none of which
are debtors at this time, but which counsel for the Foreign Representative indicated may become

debtors before the current Debtors' proceedings are over.[1]  Apart from *de minimis* cash holdings,

these Delaware subsidiaries do not have assets or liabilities.  (*Id.* ¶ 13.)  However, some of them

have agreed to terms of service with Amazon.com as third party sellers and are actively selling to

Amazon thereunder.  (*Id.*)  The Debtors' parent company, Xiwang Iovate Holdings Company

Limited ("Xiwang Iovate"), is a Canadian corporation that directly has a one-hundred percent

ownership interest in the common stock of the Debtors.  (*Id.* ¶ 36.)

### B.  Debtors' Capital Structure

1.  <u>Secured Debt</u>

Iovate International entered into an amended and restated credit agreement dated June 30,

2021 (as amended, the "Credit Agreement"), with HSBC Bank Canada (now Royal Bank of

Canada ("RBC")), as administrative agent (in such capacity, the "Administrative Agent"), and

HSBC Bank Canada, the Toronto-Dominion Bank, Bank of China (Canada), Bank of Montreal,

National Bank of Canada, Canadian Western Bank, and the Bank of Nova Scotia, as syndicated

lenders (together, the "Lenders").  (*Id.* ¶ 14.)  The Credit Agreement has been amended ten

times, most recently by an amendment dated February 28, 2025.  (*Id.*)  The Credit Agreement

provides for a revolving credit facility and a term loan facility (together, the "Credit Facilities").

(*Id.*)  During the hearing on the Motion, counsel for the Foreign Representative stated that the

Credit Agreement is governed by Canadian law.  As security for the obligations under the Credit

Agreement, the Debtors and related affiliates granted the Lenders a comprehensive security

package.  (*Id.* ¶ 15.)  As of August 31, 2025, approximately USD $100,606,023 of principal was

owing under the term loan facility, USD $14,000,000 was owing under the revolving loan

---

[1]      Each of those non-debtor entities are incorporated in the U.S.  The COMI of each of those entities will have
to be evaluated if they become debtors in the Canadian proceedings and Chapter 15 recognition is sought here.

facility, and an additional USD $1,179,465 of default interest had accrued month-to-date for a total amount owing of USD $115,785,488.  (*Id.* ¶ 16.)

        2.  <u>Unsecured Debt</u>

Iovate International is an obligor on a series of unsecured promissory notes (the "Unsecured Notes") dated between March 31, 2022 and June 20, 2025.  (*Id.* ¶ 17.)  As of the Petition Date, Iovate International owes approximately CAD $13.8 million to Xiwang Foodstuffs (Qingdao) Co., Ltd. and approximately CAD $13.5 million to XW Foodstuffs Co., Ltd.  (*Id.*)

        3.  <u>Trade Payables</u>

As of September 5, 2025, the Debtors estimate that they owe approximately CAD $33.8 million to trade creditors, of which approximately CAD $2.5 million is owed by Iovate USA.  (*Id.* ¶ 18.)

### C.  Events Leading to Canadian Insolvency Proceeding

On July 8, 2024, Iovate International, the Administrative Agent and the Lenders entered into a default agreement (as amended, the "Default Agreement") following Iovate International's failure to make a scheduled principal payment of approximately USD $3.27 million that had become due on June 30, 2024.  (*Id.* ¶ 19.)  The Default Agreement did not constitute a waiver of the default under the Credit Agreement but confirmed that the Lenders reserved all of their rights and remedies under the Credit Agreement and related security documents.  (*Id.*)  Iovate International, the Administrative Agent, and the Lenders entered into a forbearance agreement dated September 24, 2024, which forbearance agreement was subsequently amended a number of times.  (*Id.* ¶ 20.)  Iovate International is in default under the Forbearance Agreement.  (*Id.*)

The Debtors are parties to various lawsuits in the U.S. and Canada, both as plaintiffs and as defendants.  (*Id.* ¶ 21.)  The most significant suit is litigation brought by Orgain, Inc. in the

United States District Court for the Central District of California and in other courts in the U.S. and Canada (the "Orgain Litigation"). (*Id.*) On April 17, 2024, judgment was granted in favor of Orgain against Iovate International and Iovate USA in the amount of USD $10,035,481 in damages, together with costs. (*Id.* ¶ 22.) The parties subsequently entered into settlement negotiations, which resulted in a May 3, 2024 agreement in principle regarding the settlement terms; however, disputes later arose regarding whether a binding settlement had been reached. (*Id.*) On August 30, 2024, Orgain brought a motion to enforce the settlement agreement. (*Id.* ¶ 23.) The California district court granted that motion and, on November 17, 2024, issued an Amended Judgment awarding Orgain USD $12,500,000 in satisfaction of its claims (the "Amended Judgment"). (*Id.*) Iovate International and Iovate USA are jointly and severally liable for payment of the Amended Judgment. (*Id.*) Since entry of the Amended Judgment, Orgain has since sought its enforcement against the Debtors by attempting to garnish receivables from certain of the Debtors' major customers, including Walmart, Amazon, GNC, and Vitamin Shoppe. (*Id.* ¶ 24.) In particular, on June 27, 2025, Orgain obtained a writ of garnishment against Walmart Inc. ("Walmart"), which writ was not served upon Walmart until August. (*Id.* ¶ 25.) On August 25, 2025, Iovate International and Iovate USA were unsuccessful in obtaining an order of the Circuit Court of Benton County, Arkansas (the "Arkansas Court") quashing Orgain's writ of garnishment issued to Walmart. (*Id.*) Walmart has been withholding payments to Iovate since about August 4, 2025; payments from Walmart to Iovate have averaged about $5.8 million per month (year to date) and, as of September 5, 2025, the outstanding accounts receivable from Walmart to the Debtors is approximately $15.4 million. Payments remitted by Walmart are a critical element of Debtors' cash flow as well as collateral for the secured Credit Facility. (Parris Decl. 2 ¶ 4.) Walmart remits payments owed to the Debtors to an Iovate USA

8

bank account in New York for both Walmart and Sam's Club purchases. The Debtors use the payments from Walmart to fund a significant portion of their day-to-day operations, including payroll and accounts payable. (*Id.* ¶ 5.) And the Debtors' Credit Facility is secured by a first-priority lien on essentially all of their assets, including accounts receivable from Walmart and other customers—hence the Lenders' statement that their collateral is prejudiced in light of the Arkansas court's refusal to quash Orgain's writ. (*Id.* ¶ 6.)

On August 27, 2025, the Debtors received letters from the Lenders (the "Demand Letters") which asserted that several Events of Default under the Credit Agreement had occurred, demanded immediate repayment of the outstanding indebtedness under the Credit Agreement, and delivered notices of intention to enforce security under Section 244 of Canada's Bankruptcy and Insolvency Act ("BIA"). (Parris Decl. 1 ¶ 26.) In the Demand Letters, the Lenders stated that, as a result of the Arkansas Court's refusal to quash the writ, they had concluded that their collateral is, or may be, prejudiced to the full extent of the amount of the Orgain writ; they claimed that such diminution of their collateral was untenable. (*Id.* ¶ 27.) The Lenders made it clear that a restructuring filing was necessary. (*Id.* ¶ 28.)

Following extensive discussion with key stakeholders, including the Lenders, the Debtors determined that it was in the best interests of their stakeholders to commence a proceeding under the BIA ("Canadian Proceeding") before the Ontario Superior Court of Justice (Commercial List (the "Canadian Court") to pursue an orderly restructuring under the supervision of the Canadian Court, and to seek recognition thereof in the United States. (*Id.* ¶ 29.) The Canadian Proceeding provided the Debtors with a stay of proceedings that is necessary to preserve the Debtors' enterprise value, protect their relationships with key customers, and allow for the development of a restructuring proposal for the benefit of all stakeholders. (*Id.*)

### D.  Canadian Proceeding

On September 5, 2025, Iovate International, Iovate USA, and Northern Innovations each filed a Notice of Intention to Make a Proposal (an "NOI") pursuant to section 50.4 of the BIA. (*Id.* ¶ 30.)  KSV Restructuring Inc. ("KSV") was appointed as the Debtors' proposal trustee (the "Proposal Trustee").  (*Id.*)  That same date, the Office of Superintendent of Bankruptcy Canada issued for each Debtor a *Certificate of Filing of a Notice of Intention to Make a Proposal Subsection 50.4* (the "Certificates of Filing") which, pursuant to subsection 69(1) of the BIA, stayed all proceedings against the Debtors (the "Canadian Stay").  (*Id.*)

On September 9, 2025, the Canadian Court granted an order (the "Foreign Representative Order") that, among other things, authorized and empowered Iovate International to act as foreign representative of the Debtors.  (*Id.* ¶ 31.)

Parris testifies that each of the Debtors has property in the U.S. in the form of a retainer in counsel's NY trust account, and all of Iovate USA's cash (including payments made to the Iovate Group by U.S.-based customers) is held in NY bank accounts with HSBC USA, which cash is swept into the Iovate Group's Canadian bank accounts on a daily basis.  (*Id.* ¶ 33.)

### E.  Provisional Relief Motion

The Foreign Representative requested as interim relief, among other things, that this Court immediately order the application of sections 361, 362, and 365(e) of the Bankruptcy Code to these Chapter 15 Cases, because absent such relief, the Debtors may be exposed to a potentially adverse action in the United States by a judgment creditor seeking enforcement of a substantial judgment in disregard of the priority and rights of other creditors.  (Motion ¶ 2.)  In particular, Orgain is seeking to enforce a $12.5 million (plus interest) judgment in state court proceedings in Arkansas (and other places); Orgain's efforts have already caused Walmart, one

of Debtors' largest customers, to withhold millions of dollars of payments it owes to Debtors. (*Id.* ¶ 3.)

Additionally, the Debtors face the threat of payment demands from the Lenders. On August 27, 2025, the Debtors received letters from the Lenders that asserted several Events of Default under the Credit Agreement had occurred, demanded immediate repayment of the outstanding indebtedness under the Credit Agreement, and delivered notices of intention to enforce security under section 244 of the BIA. (*Id.* ¶ 17.) And the Debtors' commencement of the Canadian Proceeding and these Chapter 15 Cases may trigger an event of default under certain of the Debtors' critical executory contracts, which contain arguably unenforceable provisions permitting termination upon the Debtors' filing of a case under any section or chapter of the Bankruptcy Code. (*Id.* ¶ 18.) The provisional relief requested by the Debtors is, they claim, required to prevent individual creditors from acting to frustrate the purpose of the Canadian Proceedings by disregarding the Canadian Stay. (*Id.* ¶ 4.)

The Foreign Representative argues that the sought-after provisional relief is necessary to retain the status quo until the Court rules on the recognition motion. (*Id.* ¶¶ 21–23.) It also argues that the relief is urgently needed because, without the limited application of section 362, there is a real and significant risk that Orgain will use the writ of garnishment procedure in Arkansas to appropriate assets of the Debtors that are needed for its operations and that are within its Lenders' United States-perfected security interests. These acts would interfere with Debtors' operations and with the Canadian Court's ability to adjudicate the Canadian Proceeding, which would not only hinder the orderly administration of the Debtors' affairs but threaten to unravel the restructuring that the Debtors seek to implement pursuant thereto. (*Id.* ¶ 25.)

The Foreign Representative claims that it is likely that the Canadian proceeding will be recognized as a foreign main proceeding, for reasons discussed in its motion for recognition (discussed below).  For the reasons discussed above, the Foreign Representative argues that the Debtors will suffer irreparable harm absent the provisional relief, that the balance of the hardships cuts in favor of the Debtors, and that the creditors as a whole will benefit from the grant of the relief because the relief will preserve the Debtors' estates.  And the Foreign Representative states that the public interest favors granting relief because it will promote cooperation between jurisdictions in cross-border insolvencies.

The Motion was not contested.

### F.  Recognition Motion

The Recognition Motion is relevant insofar as it concerns the likelihood of the Foreign Representative's success at showing that the Canadian Proceeding is each Debtor's foreign main (or nonmain) proceeding.

The Foreign Representative argues that each of the Debtors is eligible to be a debtor under section 109(a) of the Code because each has property in the U.S. in the form of a retainer in counsel's New York trust account in the amount of $150,000.  (Recognition Motion ¶ 39.)

It also argues that the Canadian Proceeding is a "foreign proceeding" because, as set out in the Chaiton Declaration, it meets the requirements of section 101(23) of the Code and caselaw interpreting it.  (*Id.* ¶¶ 41–52.)

It claims that the Canadian Proceeding is the foreign main proceeding because each debtor's COMI is in Canada—specifically, Oakville, Ontario—for the reasons set forth in the Parris Declaration having to do with the location of the Debtors' management.  (*Id.* ¶ 54.)  The

Foreign Representative does not address the fact that a foreign debtor's COMI is presumed to be in the place of incorporation and that one of the Debtors is incorporated in the U.S.

The Foreign Representative argues in the alternative that the Canadian proceeding should be recognized as a foreign nonmain proceeding, as the Debtors all have establishments in Canada. By "establishment," the Foreign Representative means a place of operations where the debtor carries out non-transitory economic activity—*i.e.*, has a local place of business. (*Id.* ¶ 57.)

The Foreign Representative also asserts that it falls within the definition of "foreign representative" under section 1517 of the Code because it is a "person or body . . . authorized by" the Canadian court "to administer the reorganization" of the Debtors, including by filing C15 petitions. (*Id.* ¶¶ 59–60.)

## II.   <u>LEGAL STANDARD</u>

### A.  Eligibility to File Under Chapter 15

The Second Circuit has held that foreign debtors seeking Chapter 15 relief must satisfy the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247–51 (2d Cir. 2013). Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor" under the Code. 11 U.S.C. § 109(a). Section 109(a) does not address how much property must be present or when or how long property must have a situs in the United States. "As a general matter, courts that have construed the 'property' requirement in Section 109 'with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States.'" *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288,

294 (Bankr. S.D.N.Y. 2018) (citing *In re Aerovias Nacionales de Colombia S.A.*, 303 B.R. 1, 8–9

(Bankr. S.D.N.Y. 2003)); *see also* 8 COLLIER ON BANKRUPTCY ¶ 1517.01 (16th 2018)

("Following the Barnet ruling, bankruptcy courts within the Second Circuit have found that it

takes very little to satisfy the section 109(a) requirement.").  "It would be contrary to the plain

meaning of the statute to impose a quantum of property or a requirement that such property be

'substantial.'"  *In re B.C.I. Finances Pty Ltd.*, 583 B.R. at 294 (internal citation omitted).

"Several courts have held that nominal amounts of property in the United States enable a foreign

corporation to qualify as a debtor under Section 109(a) of the Bankruptcy Code."  *In re Yukos*

*Oil Co.*, 321 B.R. 396, 407 (Bankr. S.D. Tex. 2005) (collecting cases).

As this Court explained in *In re U.S. Steel Canada Inc.*, No. 17-11519 (MG), 571 B.R.

600 (Bankr. S.D.N.Y. 2017):

> Some courts, including this one, have held that an undrawn retainer in a United
> States bank account qualifies as property in satisfaction of section 109(a).  *See, e.g.*,
> *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–73 (Bankr. S.D.N.Y. 2014)
> ("There is a line of authority that supports the fact that prepetition deposits or
> retainers can supply 'property' sufficient to make a foreign debtor eligible to file in
> the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr.
> S.D.N.Y. 2003)); *see also In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82
> (Bankr. S.D.N.Y. 2015) ("The Court is satisfied that the retainer provides a
> sufficient basis for eligibility in this case."); *In re Global Ocean Carriers Ltd.*, 251
> B.R. 31, 39 (Bankr. D. Del. 2000) (holding that a $400,000 retainer paid on behalf
> of the debtors to bankruptcy counsel in that case qualifies as sufficient property in
> the United States under section 109(a)).

*Id*. at 609–11; *see also In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017)

(collecting cases holding that a retainer in the United States bank account constitutes property in

the United States); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 412–13 (Bankr. S.D.N.Y.

2014) (concluding that establishment of a bank account in New York prior to commencement of

the Chapter 15 proceeding was sufficient to satisfy section 109(a)); *In re B.C.I. Finances Pty*

*Ltd.*, 583 B.R. at 293–96 (finding that retainers constitute property for purposes of section 109

eligibility and support debtor status in the Chapter 15 context); *In re Agro Santino, OOD*, 653 B.R. 79, 88 (Bankr. S.D.N.Y. 2023) ("It is well settled that a retainer account is 'property' for purposes of section 109(a)."); *In re Poymanov*, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017) ("A debtor's funds held in a retainer account in the possession of counsel to a foreign representative constitute property of the debtor in the United States and satisfy the eligibility requirements of section 109(a)."). While courts often identify multiple U.S.-based pieces of property when determining whether a foreign debtor satisfies the section 109(a) requirements, this Court has, on at least two occasions, held that a retainer *alone* is sufficient. *See In re B.C.I. Finances Pty Ltd*., No. 17-11266 (PB), 2025 WL 1874418, at *3–4 (Bankr. S.D.N.Y. July 8, 2025) (holding that "a Chapter 15 debtor's creation of a retainer in the U.S. to pay the fees of its Chapter 15 counsel was sufficient to satisfy section 109(a)" and noting that courts have "uniformly held" that the "text of section 109(a) is unambiguous" and "merely requires that the debtor have property— some property, no matter how small and no matter when or why acquired—in the U.S. at the time it files its petition"); *In re Poymanov*, 571 B.R. at 30–31 (holding that funds held in a retainer in the U.S. are sufficient to satisfy the section 109(a) requirement; discussing whether claims asserted in the U.S. also constitute property of the debtor, but noting that it was unnecessary to determine whether such claims satisfied the property requirement in section 109(a) because "the Retainer Account satisfies the eligibility requirements of section 109(a), [so] the Court need not consider whether the SDNY Claims are an additional basis for satisfying the section 109(a) eligibility requirements").

Causes of action held by a foreign debtor, though intangible, can also constitute "property" under section 109(a), depending on (among other things) the law governing the cause

of action, questions of administrative ease and equity, and the location of the parties involved.

*See In re Octaviar Admin. Pty Ltd*, 511 B.R. 361, 370–72 (Bankr. S.D.N.Y. 2014).

### B.  Appropriate Venue for Chapter 15

28 U.S.C.A. § 1410 governs venue for cases under Chapter 15, and provides that Chapter

15 proceedings may be "commenced in the district court of the United States for the district--(1)

in which the debtor has its principal place of business or principal assets in the United States; (2)

if the debtor does not have a place of business or assets in the United States, in which there is

pending against the debtor an action or proceeding in a Federal or State court; or (3) in a case

other than those specified in paragraph (1) or (2), in which venue will be consistent with the

interests of justice and the convenience of the parties, having regard to the relief sought by the

foreign representative."  Section 1410 establishes a "hierarchy of choices."  1 ALAN N. RESNICK

& HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 4.04[1] (16th ed. 2014) ("Collier")

(quoting H.R. REP. NO. 109–31, at 119 (2005)).  "If the debtor maintains its principal place of

business or principal assets in the United States in a particular district, venue must be placed in

that district; if not, we turn to subparagraph two.  If there is no litigation pending against the

debtor in a district, subparagraph three then applies."  *In re Suntech Power Holdings Co., Ltd.*,

520 B.R. 399, 414 (Bankr. S.D.N.Y. 2014).

### C.  Availability of Interim Relief under Section 1519

Section 1519 of the Bankruptcy Code permits the Court to grant certain forms of

provisional relief "where relief is urgently needed to protect the assets of the debtor or the

interests of the creditors."  11 U.S.C. § 1519(a).  Specifically, section 1519 provides, among

other things, that the court may grant "any relief referred to in paragraph (3), (4) or (7) of section

1521(a)."  11 U.S.C. § 1519(a)(3).  In relevant part, paragraphs (4) of section 1521(a) provides

16

that upon recognition of a foreign proceeding, whether main or nonmain, a court may grant any

appropriate relief at the request of the foreign representative "providing for the examination of

witnesses, the taking of evidence or the delivery of information concerning the debtor's assets,

affairs, rights, obligations or liabilities." 11 U.S.C. §§ 1521(a)(4).

In deciding whether to grant provisional relief in a Chapter 15 case under section 1519(a)

of the Bankruptcy Code, a court will apply the "standards, procedure, and limitations" applicable

for the entry of a preliminary injunction. 11 U.S.C. § 1519(e); *see also In re Beechwood Re*, No.

19-11560 (MG), 2019 WL 3025283, at *2 (Bankr. S.D.N.Y. July 10, 2019) ("[T]he Court applies

the standards for issuance of a preliminary injunction to determine whether the provisional relief

should be granted."). Therefore, in the context of a Chapter 15 proceeding, provisional relief is

warranted when: (1) there is a likelihood of success on the merits (i.e., obtaining recognition of

the foreign proceeding); (2) there is risk of "imminent irreparable harm" in the absence of relief;

(3) the balance of the harms tips the movant's favor; and (4) the public interest weighs in favor

of an injunction. *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 181 (Bankr. S.D.N.Y.

2022) (quoting *Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. (In re Lyondell Chem.

Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009)). A showing of irreparable harm is "the

single most important prerequisite for the issuance of a preliminary injunction." *Faiveley

Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). To

satisfy this element, the plaintiff must demonstrate that, absent the injunction, it "will suffer an

injury that is neither remote nor speculative, but actual and imminent, and one that cannot be

remedied if a court waits until the end of trial to resolve the harm." *Id.*

In addition, section 1522 of the Bankruptcy Code "states that relief can be granted,

modified or terminated under section 1519, as the case may be, only if the interests of creditors

17

and other interested parties are sufficiently protected."  1 COLLIER ON BANKRUPTCY ¶ 13.06

(16th ed. 2022).  "A court may (but is not required to) condition relief on the posting of some

form of security or a bond."  *Id.*

### D.  Section 1517(a): Recognition of Foreign Proceeding

Section 1517(a) of the Bankruptcy Code establishes three requirements for the

recognition of a foreign proceeding under Chapter 15.  In order to recognize the foreign

proceeding, a court must conclude that:

> (1) The foreign proceeding constitutes a "foreign main proceeding" or a "foreign
> nonmain proceeding" as defined under section 1502;
> (2) The foreign representative applying for recognition is a person or body; and
> (3) The petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

Recognition of the foreign proceeding is statutorily mandated if the three requirements of

section 1517(a) are met, and no exception is applicable.  *See In re Millard*, 501 B.R. 644, 651

(Bankr. S.D.N.Y. 2013).

### 1.  Section 1517(b)(1): Recognition of Foreign Main Proceeding

Section 1517(a) of the Bankruptcy Code distinguishes between "foreign main" and

"foreign nonmain" proceedings.  Section 1517(b) establishes conditions for recognition of each.

In relevant part, section 1517(b)(1) states that a foreign proceeding shall be recognized

"as a foreign main proceeding if it is pending in the country where the debtor has the center of its

main interests."  11 U.S.C. § 1517(b)(1).  Section 1502(4) uses the same language to define

"foreign main proceeding."  11 U.S.C. § 1502(4).

### a. "Foreign Proceeding"

Section 101(23) defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).  Based on this definition, courts have held that a "foreign proceeding" requires:

> (i) [the existence of] a proceeding;
> (ii) that is either judicial or administrative;
> (iii) that is collective in nature;
> (iv) that is in a foreign country;
> (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts;
> (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and
> (vii) which proceeding is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018); *In re Agro Santino, OOD*, 653 B.R. 79 (Bankr. S.D.N.Y. 2023).

### b. "Center of Main Interests"

The Bankruptcy Code does not define the term "center of main interests" (COMI). However, section 1516(c) provides that, in the absence of an objection or evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests."  11 U.S.C. § 1516(c); *see also In re Olinda Star I*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 705 (Bankr. S.D.N.Y. 2017); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) (internal citations omitted).  The relevant temporal anchor for the determination of

the location of the debtor's COMI is the date on which the Chapter 15 petition is filed.  S*ee*

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir.

2013) (hereinafter "*Fairfield Sentry*").

        In assessing whether a movant challenging the registered office presumption has

overcome that presumption, courts in this District have applied a list of non-exclusive factors,

including: (i) the location of the debtor's headquarters; (ii) the location of those who actually

manage the debtor; (iii) the location of the debtor's primary assets; (iv) the location of the

majority of the debtor's creditors, or a majority of the creditors who would be affected by the

case; and (v) the jurisdiction whose law would apply to most disputes.  *Fairfield Sentry*, 714

F.3d at 137 (citing *In re SPhinX, Ltd*., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).  While these

factors offer a "helpful guide" in determining a debtor's COMI, they are not exclusive,

consideration of these specific factors is "neither required nor dispositive," and courts are

cautioned against their "mechanical application."  *Id.*

        Additionally, in determining a debtor's COMI, the Second Circuit and this Court have

examined the expectations of creditors and other interested parties, as a company's COMI must

be "ascertainable by third parties."  *See Fairfield Sentry,* 714 F.3d at 136–38; *In re Millennium*

*Global Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93 (S.D.N.Y. 2012).  As the Second

Circuit has explained, by examining factors "in the public domain," courts are able to evaluate

whether a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical

removal."  *See Fairfield Sentry*, 714 F.3d at 136–37.  The expectations of creditors can be

assessed through examination of the public documents and information available to guide

creditor understanding of the nature and risks of their investments."  *In re Oi Brasil Holdings*

*Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017).  In practice, courts evaluate

20

creditor expectations by reviewing has disclosures in offering memoranda, indentures, and similar documentation. *See id*. at 228–32 (analyzing noteholder expectations, as set forth in offering memorandum, as part of COMI inquiry).

As discussed, the determination of a debtor's COMI should be based on facts available at or around the time the Chapter 15 petition is filed. *Fairfield Sentry,* 714 F.3d at 137. The Second Circuit in Fairfield Sentry clarified that "the factors that a court may consider in this analysis are not limited and may include the debtor's liquidation activities." *Id*. at 138; see also *In re Modern Land (China) Co., Ltd*., 641 B.R. 768, 783 (Bankr. S.D.N.Y. 2022) (finding that a Cayman Islands court's supervision of a debtor's scheme of arrangement established the Cayman Islands as the debtor's COMI, despite the debtor's real estate investments in China and the United States, when creditor expectations were considered). Pre-filing restructuring efforts may shift a debtor's COMI, particularly where the debtor is an entity with such limited operations that restructuring activity constitutes its "primary business activity" prior to the filing of the Chapter 15 petition. *Modern Land*, 641 B.R. at 789–90.

Material pre-filing restructuring efforts may include the negotiation and/or execution of a restructuring framework or support agreement, organization of creditor meetings, or facilitation of related operational or liquidation activities or administrative functions. *See, e.g., Oi Brasil*, 578 B.R. at 222 (citing *In re Creative Fin*., 543 B.R. 498, 517 (Bankr. S.D.N.Y. 2016)); *Modern Land*, 641 B.R. at 778–81, 789–90. However, courts may undertake a "holistic analysis" to consider whether a debtor has manipulated COMI in bad faith prior to the filing of a Chapter 15 petition in the debtor's preferred locale. *Ocean Rig*, 570 B.R. at 704. Potential indicators of "opportunistic" COMI-shifting may include "insider exploitation, untoward manipulation, [and] overt thwarting of third party expectations." *Fairfield Sentry*, 440 B.R at 66.

2.  <u>Section 1517(b)(2): Recognition of Foreign Non-Main Proceeding</u>

The Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign nonmain proceeding" if the debtor has an "establishment" in the country in which the foreign proceeding is pending.  11 U.S.C. §§ 1502(5). 1517(b)(2).  An "establishment" is "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502(2).  Courts have held that the location should:

> constitute a 'seat for local business activity' for the debtor. The terms 'operations' and 'economic activity' require a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property.

*Creative Fin.*, 543 B.R. at 520.

3.  <u>Section 1517(a)(2): Recognition of Foreign Representative</u>

The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

4.  <u>Section 1517(a)(30): Section 1515 and Rule 1007 Requirements</u>

Section 1515 separately imposes the following procedural requirements:

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
(b) A petition for recognition shall be accompanied by—
> (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
> (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
> (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515. Additionally, Bankruptcy Rule 1007 imposes additional procedural requirements, including the filing of a corporate disclosure statement. FED. R. BANKR. P. 1007.

### III.    DISCUSSION

For the following reasons, the Foreign Representative has met its burden for provisional relief under Section 1519 of the Code.

### A.  Eligibility Under Section 109(a) of the Code

The CEO of the Foreign Representative has testified that each of the Debtors has a retainer with their New York-based law firm. This is sufficient for the Debtors to meet the definition of "debtor" under section 109(a) of the Code. Section 109(a) of the Code imposes no requirements on the amount or kind of property a debtor must hold in the U.S., and years' worth of caselaw in and outside of this Circuit shows that retainers qualify as "property" under section 109(a). *See supra*; *see also In re B.C.I. Finances Pty. Ltd.*, 2025 WL 1874418, at *1–3 (holding that a retainer alone suffices to meet section 109(a)).

In addition, Iovate USA has a separate New York-based bank account. This also satisfies the "property in the United States" eligibility requirement, but just for Iovante USA. *See In re Berau Cap. Res. Pte Ltd*, 540 B.R. at 82.

The Debtors *may* have other intangible property in the U.S. in the form of claims, as Parris testified that the Debtors are plaintiffs in some proceedings in the U.S. and in Canada. However, the Court does not at present have sufficient information about these lawsuits (starting with whether the Debtors are even bringing any in the U.S.) to determine whether they hold such

23

intangible property in the U.S.  Since the Debtors have provided no evidence to support a finding

that they have any other property in the U.S. (*e.g.*, their Credit Agreement is governed by

Canadian law), the Court relies solely on the retainers to find that the Debtors qualify under

section 109(a).

As the only known American property of any of the debtors that is located in New York,

this district is the right venue for the Chapter 15 proceedings.

### B.  The Canadian Proceeding is Likely a "Foreign Main Proceeding" for Each of the Debtors

#### 1.  Canadian Proceeding is Likely a "Foreign Proceeding"

The Debtors' Canadian law declarant, Harvey Chaiton, explained that the Canadian

proceeding is a judicial proceeding overseen by a foreign (Canadian) court, authorized under

various relevant Canadian insolvency statutes, including the Bankruptcy and Insolvency Act,

which is collective in nature, and subjects the Debtors' assets and affairs to the supervision of the

foreign court.  (*See generally* Chaiton Decl.)  The Canadian proceeding almost certainly

constitutes a "foreign proceeding" as a threshold matter.

#### 2.  Each Debtor's COMI as of the Petition Date is Likely Canada

This Court has recently faced the question of whether to grant preliminary relief to a set

of foreign debtors which included multiple American companies.  *See In re Giftcraft Ltd.*, No.

25-11030 (MG), 2025 WL 1583480, at *9–10 (Bankr. S.D.N.Y. June 4, 2025).  In *Giftcraft*, this

Court granted such relief upon finding that the American entities' COMIs were *likely* in Canada

(the jurisdiction of the foreign proceeding) and that the foreign representative would be able to

overcome the registered office presumption.  Relevant facts which helped the foreign

representative in that case overcome the presumption included, but were not limited to: where

the companies maintained office space, where they stored books and records and inventory,

where managerial activities took place, and the fact that a Canadian receiver had been put in charge of the assets and operation of the entire foreign debtor group. *Id.*

As in *Giftcraft*, the Court finds that the Foreign Representative made a sufficient showing of likelihood of success on the merits, *i.e.*, has shown that it is likely that the Debtors' COMI is in Canada.

The analysis is straightforward for Iovate International and Northern Innovations. Iovate International and Northern Innovations have their registered offices in Ontario, Canada, so the presumption cuts in favor of finding their COMIs to be in Canada. They also have no operations directly in the U.S. It is clear that the Canadian proceeding is the foreign main proceeding for these two entities.

The Foreign Representative has also shown by a preponderance of the evidence that the Canadian proceeding is the foreign main proceeding for Iovate USA as well, despite it being incorporated in Delaware and having its registered office there. Iovate USA, while it employs 11 people in the U.S. and its principal asset is accounts receivable from U.S.-based customers (which are deposited into New York-based bank accounts), is run out of Ontario, along with the rest of the Iovate Group. Iovate USA's three officers/senior managers are either in China or in Canada. And Parris testified that the Debtors' operations are all highly integrated and share management, headquarters, and accounting/finance/HR functions, all of which occur in Canada. The Foreign Representative has therefore established a likelihood of success on the merits.

### C.  Irreparable Harm Will Result from Denial of Motion

In the cross-border insolvency context, courts have recognized that irreparable harm
exists where local actions could hinder the orderly process of a foreign proceeding and the goal
of the fair distribution of assets.  *See In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y.
2003) ("[A]s a rule, therefore, irreparable harm exists whenever local creditors of the foreign
debtor seek to collect their claims or obtain preferred positions to the detriment of the other
creditors."); *In re Berau Capital Res. PTE Ltd.*, No. 15-11804 (MG) (Bankr. S.D.N.Y. Aug. 6,
2015) (ECF Doc. # 20) at 3 (granting provisional relief to prevent potential interference with
foreign debtor's "efforts to administer its estate and restructure its operations pursuant to the
[f]oreign [p]roceeding" and "undermining the [f]oreign [r]epresentative's efforts to achieve an
equitable result for the benefit of all of the [f]oreign [d]ebtor's creditors and interest holders" in
the absence of the requested relief); *In re Banco Nacional de Obras y Servicios Publicos, S.N.C.*,
91 B.R. 661, 664 (Bankr. S.D.N.Y. 1988) (finding injunctive relief necessary "to prevent
individual American creditors from arrogating to themselves property belonging to the creditors
as a group"); *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) (concluding that "the
premature piecing out of property involved in a foreign liquidation proceeding constitutes
irreparable injury").

The Foreign Representative has provided uncontested testimony supporting a finding of
likely irreparable harm in the absence of the relief requested.  As counsel for the Foreign
Representative explained at the hearing for this Motion, the clock was ticking on Orgain's ability
to perfect its security interest in the writ of garnishment, which would have further interfered
with the Debtors' ability to repay their preexisting obligations.  The risk of Orgain perfecting its
security interest and potentially seizing or otherwise impairing the Lenders' collateral (and

impeding the Debtors' cashflow), and of the Lenders maneuvering around the Canadian

Proceeding and Canadian stay in an attempt to recover from the Debtors in the U.S., absent the

requested interim relief, was great.

### D.  Balance of Harms Favors Provisional Relief

The balance of harms favors the Foreign Representative.  The Foreign Representative has

explained how the interim relief will protect the Debtors' estates and thereby serve the creditor

body.  And the creditors can seek to submit a claim in the Canadian proceeding, if they wish.

### E.  Granting Relief is in the Public Interest

Granting relief is in the public interest and is consistent with the policies underlying the

Bankruptcy Code and Chapter 15.   It would prevent the erosion of the Debtors' estates via an

international workaround to the Canadian stay, and would ensure the equitable treatment of

creditors.  Moreover, it would minimize interjurisdictional inconsistencies and enable

cooperation between this Court and the Canadian court.

### F.  Sufficient Protection

As required under section 1522(a) of the Bankruptcy Code, all parties are "sufficiently

protected" such that this Court may grant the Provisional Relief.  11 U.S.C. § 1522(a); *see*

*SPhinX*, 351 B.R. at 112–13 (holding that section 1522 provides that the court may grant or

modify interim relief under section 1519 only if the interests of all parties are "sufficiently

protected").  Relief under section 1519 of the Bankruptcy Code should be denied for a lack of

sufficient protection only "if it is shown that the foreign proceeding is seriously and unjustifiably

injuring United States creditors."  H.R. Rep. No. 109-31, pt.1, at 116 (2005).  Here, there is no

indication that affected parties will not be able to go to the Canadian court in connection with the

Debtors' Canadian insolvency proceeding.  All parties potentially impacted by the Provisional

Relief will have access to courts in both Canada and the United States, and are therefore
sufficiently protected.

### G. Security

No security is required here.  "[A] temporary restraining order or preliminary injunction
may be issued on application of a debtor, trustee, or debtor in possession without compliance
with Rule 65(c)['s requirement to give security]").  *See* FED. R. BANKR. P. 7065.  The Court has
"wide discretion to set the amount of a bond [under Rule 65(c)], and even to dispense with the
bond requirement."  *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997).  Accordingly,
the Court may, but is not required to, mandate that the Foreign Representative provide security.
The Foreign Representative maintains that such security requirements are unnecessary.  (Motion
¶ 35.)  There is no reason to impose a bond on the Debtors.

### IV.    <u>CONCLUSION</u>

For the reasons explained above, the Court granted the Foreign Representative's Motion
for provisional relief.  A separate order granting the relief has already been entered (*see* ECF
Doc. # 20).

Dated:    September 12, 2025
          New York, New York

                              *Martin Glenn*
                              MARTIN GLENN
                    Chief United States Bankruptcy Judge

28