**LOWENSTEIN SANDLER LLP**
Eric S. Chafetz
Kelly E. Moynihan
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: echafetz@lowenstein.com
      kmoynihan@lowenstein.com

-and-

**GRAY ROBINSON LLP**
Steven J. Solomon (*pro hac vice* admission pending)
333 S.E. 2nd Avenue
Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
Email: steven.solomon@gray-robinson.com

*Counsel to Kenco Logistic Services, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 15 |
| IOVATE HEALTH SCIENCES INTERNATIONAL INC., *et al.*, | Case No. 25-11958 (MG) |
| Debtors in a Foreign Proceeding.[1] | (Jointly Administered) |

**KENCO LOGISTIC SERVICES LLC'S EMERGENCY MOTION**
**FOR RELIEF FROM THE AUTOMATIC STAY OR IN THE**
**ALTERNATIVE FOR ADEQUATE PROTECTION OF ITS SECURED CLAIM**

---

[1] The Debtors in the Canadian Proceeding, along with the last four digits of each Debtors' United States Tax Identification Number or Canadian Business Number, as applicable, are as follows: (i) Iovate Health Sciences International Inc. (0696); (ii) Iovate Health Sciences U.S.A., Inc. (3542); and (iii) Northern Innovations Holding Corp. (3909) (collectively, the "Debtors").

Kenco Logistic Services, LLC ("Kenco"), by and through its undersigned counsel, respectfully moves (the "Motion"), on an emergency basis, for this Court's entry of an Order granting relief from the automatic stay pursuant to section 362(d)(1) of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code") to permit Kenco to exercise its bargained-for contractual rights to suspend services and refuse delivery of goods owned by debtor Iovate Health Sciences U.S.A. Inc. ("Iovate") until payment of all amounts due under the parties' Services Agreement (defined herein). In the alternative, Kenco seeks entry of an Order pursuant to section 361(1) of the Bankruptcy Code conditioning maintaining the automatic stay on immediate advance payment or functionally equivalent adequate protection for any further outbound movements of goods from the Kenco Warehouse (defined herein). In support of the Motion, Kenco respectfully submits the declaration of Frank Loewen, attached hereto as **Exhibit A**. In further support of this Motion, Kenco states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated February 1, 2012. Kenco confirms its consent to the Court entering a final order in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 361(1) and 362(d) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 4001, and Local Rule 4001-1.

## **BACKGROUND**

4.      On September 9, 2025 (the "Petition Date") the Debtors commenced a foreign insolvency proceeding in Canada and filed these Chapter 15 cases in this Court together with a motion for joint administration and a supporting declaration of the Debtors' Chief Executive Officer, as amended (Dkt. No. 25), describing liquidity pressures and an orderly wind-down of operations.

5.      On September 10, 2025, this Court entered an Order Granting Provisional Relief imposing an automatic stay with respect to each of the Debtors and the property of each of the Debtors that is within the territorial jurisdiction of the United States, applying the protections of section 362 of the Bankruptcy Code, and expressly preserving the right of parties in interest to seek relief from the stay in accordance with section 362(d) of the Bankruptcy Code.

6.      Debtors are Canadian-based developers and distributors of branded nutritional supplements and related consumer health products. Its products are sold through major U.S. retailers and distributed through its U.S. subsidiary Iovate. In support of this business, Debtors rely on third-party logistics providers to store, manage, and distribute millions of units of finished goods into the U.S. retail market.

7.      Kenco is a third-party logistics provider operating over 100 facilities across North America.

8.      On April 27, 2023, Debtors and Kenco entered into a *Warehousing & Logistics Services Agreement* (the "Services Agreement") (attached hereto as **Exhibit B**). Under this Services Agreement, Kenco dedicated significant square footage of its facility located at 250 River Ridge Parkway, Jeffersonville IN 47130 (the "Kenco Warehouse") and associated labor, equipment, and racking to store, handle, and ship Debtors' products (the "Services"). Debtors also

contractually appointed Kenco as the exclusive provider of the Services at the Kenco Warehouse
*See* Ex. B, § 3.1.

9.      The Services Agreement expressly grants Kenco a general warehouseman's lien:
"[o]n Products in Supplier's possession it ***shall have a general warehouseman's lien*** for any
unpaid charges in addition to any claims for money advanced, interest, transportation, labor,
fulfilment, legal fees and other charges." *Id.* § 6.2 (emphasis added). This provision further
authorizes Kenco to "require advance payment of all charges ***prior to shipment of Products***" in
order to protect its contractual lien. *Id.* (emphasis added).

10.     The Services Agreement also provides that "***[u]pon termination of the business
relationship, Supplier may refuse to deliver the Products until it has been fully paid for all
charges due under the Agreement then due it.***" *Id.* § 5.5 (emphasis added).  This bargained-for
right is triggered once termination occurs, regardless of ordinary course or contractual payment
terms.

11.     Prior to the Petition Date, on or around July 2, 2025, Debtors first notified Kenco
of its intent to terminate the Services Agreement, vacate the Kenco Warehouse, and move all goods
to the custody of another warehouse operator.  More specifically, Debtors terminated the business
relationship with Kenco, invoked the contractual termination for convenience provision, and
entered into negotiations to implement a wind-down of the parties' relationship. ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████          *See* Ex. C, Schedule 1.

12.     Critically, an email and accompanying chart exchanged after the Petition Date (the "Exit Email," attached here to as **Exhibit D**) confirms the Debtors' exit plan: (i) cease or drastically curtail inbound receipts of goods into Kenco; (ii) pull inventory from the Kenco Warehouse and transfer the goods to a competitor's warehouses (referred to as "RJW", which is RJW Logistics Group); and (iii) be fully vacated from the Kenco Warehouse by late October 2025. The chart quantifies the accelerating outbound movements of goods relative to the minimal inbound volume of goods, and identifies transfers that are not customer shipments but inter-warehouse relocations to the aforementioned competitor's warehouse.  In short, the Exit Email shows a deliberate strategy to rapidly and irreversibly deplete the collateral base securing Kenco's warehouse lien.

13.     Each outbound movement of goods diminishes Kenco's collateral and the value of its lien (contractual and statutory, both as discussed in more detail herein).  Once the goods leave Kenco's possession, the possessory aspect of Kenco's lien is released (Ex. B, § 6.2).  Per the Exit Email, by October 27, 2025, Debtors intend to be completely out of the Kenco Warehouse, leaving Kenco with no collateral securing millions in charges, ███████████████████████ ██████████████████████████████████████.

14.     The Debtors' own admissions demonstrate that the business relationship has been terminated within the meaning of section 5.5 of the Services Agreement.

15.     Without the Court's intervention, Kenco's secured position will erode daily, leaving it unfairly exposed and inadequately protected as the Debtors monetize the very goods that secure Kenco's secured claims.

16.     Accordingly, as set forth more fully below, Kenco seeks relief from the automatic stay under section 362(d)(1) of the Bankruptcy Code for cause—including lack of adequate protection—to allow Kenco to exercise its rights under sections 5.5 and 6.2 of the Services

Agreement to suspend Services, withhold shipment, and protect its lien rights, including its right to recover attorneys' fees and enforcement costs. In the alternative, Kenco seeks an order conditioning any further outbound movement of goods from Kenco's facility on advance payment that neutralizes the ongoing diminution of Kenco's secured position and secures payment of Kenco's accrued fees and charges, including attorneys' fees, as expressly provided for in the Services Agreement.

## ARGUMENT

I.      **Kenco Holds a Valid Statutory and Contractual Warehouse Lien.**

17.     Under Indiana's Uniform Commercial Code section 7-209, a warehouse has a statutory lien against the bailor on goods in its possession "for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods." Ind. Code § 26-1-7-209(a). The lien secures all such charges so long as the goods remain in the warehouse's custody.[2]

18.     In addition to this statutory lien, the Services Agreement independently grants Kenco a general warehouseman's lien: "[O]n Products in Supplier's possession it shall have a general warehouseman's lien for any unpaid charges in addition to any claims for money advanced, interest, transportation, labor, fulfilment, legal fees and other charges, which lien is released by delivering the Products and/or payment of the charges." Ex. B, § 6.2.

19.     Section 6.2 of the Services Agreement is broad. It secures not only storage and handling charges, but also attorneys' fees and other charges arising from the agreement. This lien is expressly released only by delivery of the goods "and/or payment of the charges." *Id*. By

---

[2] The Services Agreement is governed by the laws of the State of Indiana. Ex. B, § 27.

continuing to move product out of Kenco's warehouse without paying the amounts due, Debtors

are steadily eroding this lien and depriving Kenco of the very collateral that secures its claim.

## II.    Debtors Terminated the Services Agreement, Triggering Kenco's Right to Withhold Delivery Until Paid

20.    Section 12.1 of the Services Agreement allows either party to terminate the

agreement in its entirety without cause, "for convenience," on 180 days' written notice. Ex. B, §

12.1. Debtors invoked this termination weeks before the bankruptcy filings by notifying Kenco

of its intent to exit the facility, ███████████████████████████████████████

███████████████ and laying out the terms of the business relationship's end. Ex. C.

21.    Section 5.5 of the Services Agreement governs the consequences of termination:

"Upon termination of the business relationship for any reason, Supplier may refuse to deliver the

Products until it has been fully paid for all charges due under the Agreement then due it regardless

of the payment terms otherwise applicable to such charges." Ex. B, § 5.5.

22.    The communications attached to this Motion confirm that Debtors have already

embarked on this wind-down, ceasing meaningful inbound shipments of goods, transferring goods

to competitors' facilities, and projecting a full exit by October 27, 2025. *See* Ex. D. These actions

evidence termination of the relationship within the meaning of section 5.5, entitling Kenco to

suspend deliveries until it is fully paid.

## III.    Cause Exists for Relief from the Automatic Stay Under § 362(d)(1).

23.    Section 362(d)(1) of the Bankruptcy Code authorizes stay relief "for cause,

including the lack of adequate protection. . ." 11 U.S.C. § 362(d)(1).  Cause exists where the

debtor's use of property results in the erosion of a secured creditor's collateral position without

adequate protection. *See*; *In re Armenakis*, 406 B.R. 589, 620-21 (Bankr. S.D.N.Y. 2009) (finding

a creditor lacked adequate protection where it proved its collateral suffered a decline or threat of

decline in value); *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)
("Accordingly, the secured creditor lacks adequate protection if the value of its collateral is
declining as a result of the stay. It must, therefore, prove this decline in value—or the threat of a
decline—in order to establish a *prima facie* case."); *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 1997
U.S. Dist. LEXIS 12858, at *19 (S.D.N.Y. Aug. 27, 1997) ("[D]espite the existence of an equity
cushion, a Bankruptcy Court could find a lack of adequate protection based on a threatened decline
in the value of the collateral.").

24.     Here, each outbound shipment of goods from Kenco's facility diminishes the
collateral securing Kenco's lien, while Debtors simultaneously cease replenishment of inventory.
*See* Ex. D.

25.     Specifically, Debtors confirmed that all customers other than Amazon and iHerb
would have their "last orders to be shipped from Kenco" on September 26, 2025, with "final
shipments out of Kenco" completed the following week. *Id*. Thereafter, Amazon and iHerb orders
were scheduled to cease by October 10, 2025, with "final shipments" the week of October 17. *Id*.
The final two weeks of October would then be "focused on clearing remaining inventory." *Id*.

26.     This schedule is not consistent with an ongoing contractual relationship in the
ordinary course of business; it is instead an express exit plan. By Debtors' own admission,
inbounds would be "reduced to critical items only," and the overwhelming focus was on removing
inventory from Kenco's possession and transferring it elsewhere. *Id*. These facts are directly
relevant to the cause standard under section 362(d)(1) of the Bankruptcy Code because they
demonstrate that the lien securing Kenco's claim will be depleted to zero within weeks absent
judicial intervention. By October 27, 2025, the lien collateral will be gone. Meaning, that forcing
Kenco to continue releasing goods without payment erodes its secured interest daily and leaves

Kenco unsecured, precisely the harm section 362(d)(1) of the Bankruptcy Code is designed to prevent.

27.     Adequate protection requires more than speculative promises of repayment; it requires assurance that the secured creditor's bargained-for position will not be diminished. See *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (explaining that the goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interests); *In re Beker Industries Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) ("The concept of 'adequate protection' is . . . left to the vagaries of each case, . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."). Without stay relief, Kenco's lien will effectively vanish as Debtors empty the warehouse of its goods.

28.     In addition, the magnitude of Kenco's secured claim is not speculative—it is quantified. As of the August 25, 2025 termination date, the Debtors' obligations to Kenco include (i) ongoing operational costs associated with warehousing, labor, and related services, (ii) reduction-in-force ("RIF") costs Kenco was forced to incur in connection with downsizing the workforce dedicated to Debtors, and (iii) ███████████████████████████████ ███████████████. These figures collectively demonstrate the breadth of "charges then due" within the meaning of section 5.5 of the Services Agreement and the "unpaid charges" expressly secured under section 6.2. Kenco's calculation of Debtors' owed payments, attached hereto as **Exhibit E**, is best explained in three categories.

29.     *First*, Debtors' Operational Cost Breakdown shows that, on a run-rate basis, Kenco's Jeffersonville facility was carrying approximately $777,426 in monthly costs, for a total of $4,664,554 across a 180-day period, for services provided to Debtors. These amounts reflect

salaried labor (\$██████), hourly labor (\$████████), rent (\$██████), and other operating
expenses (\$███████).  *See* Ex. E.  These figures represent the core fixed and variable costs of
servicing Debtors' account and are precisely the types of charges—storage, labor, rent, and related
expenses—secured by Kenco's warehouseman's lien.  *See* Ex. B, § 6.2.

30.    *Second*, Kenco incurred RIF costs totaling \$208,209 to wind down the workforce
that had been dedicated to Debtors' account.  This included severance for hourly employees
(\$██████ operations management (\$██████), and salaried support (\$██████), as well as a
\$██████ retention bonus to ensure continuity during the transition.  *See* Ex. E.  These RIF Costs
were a direct and foreseeable consequence of Debtors' termination of the Services Agreement, and
fall squarely within the category of "labor, fulfilment, [and] legal fees and other charges" secured
by section 6.2.

31.    *Third*, 

32.    In total, Debtors' termination-related obligations to Kenco exceed \$8.5 million
(\$4.66 million in operational costs, \$208,209 in RIF Costs, and \$3.7 million in TSA Obligations).
These amounts are accruing even as Debtors accelerate the outbound transfer of goods away from
Kenco's facility to competitor warehouses.  Based on the Debtors' on exit plan, without relief from

the automatic stay, Kenco's collateral—the products in its possession—will be depleted to zero by October 27, 2025, leaving Kenco with millions in unpaid charges and no collateral to secure them.

33.     Lastly, section 6.2 of the Services Agreement expressly provides that Kenco's lien secures "legal fees" along with other charges.  Ex. B, § 6.2.  This contractual term entitles Kenco to recover its attorneys' fees as part of its secured claim.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Kenco respectfully requests that this Court enter an order, substantially in the form attached hereto as **Exhibit F**, (i) pursuant to section 362(d)(1) of the Bankruptcy Code, granting Kenco relief from the automatic stay for cause to permit Kenco to exercise its contractual and statutory rights under sections 5.5 and 6.2 of the Services Agreement, including the right to suspend Services and withhold delivery of products until Kenco is paid in full all charges due and owing under the Agreement (including attorneys' fees and costs secured by its warehouseman's lien), or (ii) in the alternative, conditioning any further outbound shipments from Kenco's facility on (a) advance payment, or (b) the establishment of an escrow account or letter of credit of equivalent effect, sufficient to neutralize the ongoing diminution of Kenco's secured position; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: September 23, 2025       **LOWENSTEIN SANDLER LLP**
New York, New York               _/s/ Eric S. Chafetz_____
                                 Eric S. Chafetz
                                 Kelly E. Moynihan
                                 1251 Avenue of the Americas
                                 New York, New York 10020
                                 Telephone: (212) 262-6700
                                 Facsimile: (212) 262-7402
                                 Email: echafetz@lowenstein.com
                                       kmoynihan@lowenstein.com

-and-

**GRAY ROBINSON LLP**

Steven J. Solomon (*pro hac vice* admission pending)
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
Email: steven.solomon@gray-robinson.com

*Counsel to Counsel to Kenco Logistic Services, LLC*

## EXHIBIT A

**Loewen Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>IOVATE HEALTH SCIENCES INTERNATIONAL, INC., *et al.*,[1]<br><br>Debtors in a Foreign Proceeding. | Chapter 15<br><br>Case No. 25-11958 (MG)<br><br>(Jointly Administered) |

### DECLARATION OF FRANK LOEWEN IN SUPPORT OF KENCO LOGISTIC SERVICES, LLC'S EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR IN THE ALTERNATIVE FOR ADEQUATE PROTECTION OF ITS SECURED CLAIM

Pursuant to 28 U.S.C. § 1746, I, Frank Loewen, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.       I am a Senior Vice President of Logistics Operations of Kenco Logistic Services, LLC ("Kenco").   I submit this declaration (the "Declaration") in support of *Kenco Logistic Services, LLC's Emergency Motion for Relief from the Automatic Stay or in the Alternative for Adequate Protection of its Secured Claim* (the "Stay Relief Motion").[2]

2.       Except where specifically noted, the statements in this Declaration are based on my personal knowledge, belief, or opinion; information that I have received from Kenco's employees or advisors working directly with me or under my supervision, direction, or control; or from Kenco's records maintained in the ordinary course of its business.

---

[1] The Debtors in the Canadian Proceeding, along with the last four digits of each Debtor's United States Tax Identification Number or Canadian Business Number, as applicable, are as follows: (i) Iovate Health Sciences International Inc. (0696); (ii) Iovate Health Sciences U.S.A. Inc. (3542); and (iii) Northern Innovations Holding Corp. (3909).

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Stay Relief Motion.

3.      I believe the relief requested by Kenco in the Stay Relief Motion is appropriate and necessary for the reasons stated therein.

4.      I believe that "cause" exists here to grant the relief sought in the Stay Relief Motion. The Debtors terminated the Services Agreement with Kenco prior to the Petition Date and have since embarked on a rapid wind-down of services and relocation of goods.  *See* Services Agreement § 6.2, attached to the Stay Relief Motion as **Exhibit B**.  The Exit Email confirms that inbound activity has been halted, outbound movements are accelerating, and by October 27, 2025, the Debtors intend to vacate the Kenco Warehouse entirely.  *See* Exit Email, attached to the Stay Relief Motion as **Exhibit D**.

5.      In total, Debtors' termination-related obligations to Kenco exceed $8.5 million ($4.66 million in operational costs, $208,209 in RIF Costs, and $3.7 million in TSA Obligations). *See* Kenco's calculation of Debtors' owed payments, attached to the Stay Relief Motion as **Exhibit E**.  These amounts are accruing even as Debtors accelerate the outbound transfer of goods away from Kenco's facility to competitor warehouses.  Based on the Debtors' exit plan, without relief from the automatic stay, Kenco's collateral—the products in its possession—will be depleted to zero by October 27, 2025, leaving Kenco with millions in unpaid charges and no collateral to secure them.

6.      Accordingly, I believe that cause exists to grant the relief sought in the Stay Relief Motion, which requests authority for Kenco to exercise its contractual and statutory lien rights under sections 5.5 and 6.2 of the Services Agreement, including the right to suspend services and withhold delivery until paid in full all charges then due, including attorneys' fees and enforcement costs.  I further believe that, if such relief is not granted outright, any continued outbound shipments from Kenco's facility should be conditioned on advance payment or a comparable

mechanism—such as an escrow or letter of credit—that ensures Kenco's secured position is not diminished while Debtors continue to remove inventory.

7.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 23, 2025

*Frank Loewen*
Frank Loewen

**<u>EXHIBIT B</u>**

**Services Agreement**

## WAREHOUSING & LOGISTICS SERVICES AGREEMENT

### COMMERCIALLY CONFIDENTIAL

**BACKGROUND:**

A.  Iovate is a manufacturer of active nutrition and weight management supplements.

B.  The Supplier is experienced in the provision of warehousing services and Iovate wishes to appoint the Supplier to provide such services.

C.  The parties have agreed that Iovate will appoint the Supplier as a provider of warehousing services, and the Supplier accepts such appointment, subject to the terms and conditions of this Agreement, and the parties have signed the below to indicate such an agreement.

| Effective Date: | April 27, 2023 |
| --- | --- |

| Details of Iovate company entering this Agreement ("Iovate") | | Details of the other company/person entering this Agreement (the "Supplier") | |
| --- | --- | --- | --- |
| Company Name: | Iovate Health Sciences U.S.A. Inc | Company Name: | Kenco Logistic Services, LLC |
| Contact Address & Postcode: | 381 North Service Road West Oakville ON, L6M 0H4 Canada | Address & Postcode: | 2001 Riverside Drive, Chattanooga, TN 37406 |
| Signed for and on behalf of Iovate: | Name: Kelly Albert  Title: COO | Signed for and on behalf of the Supplier: | Name: David Caines  Title: COO |

I

**Contract Particulars**

| | | |
|---|---|---|
| **Warehouse:** | 250 River Ridge Parkway, Jeffersonville IN 47130 | |
| **Invoice Date:** | Monthly | |
| **Expiration Date:** | 5 years post Effective Date, subject to earlier termination in accordance with Agreement terms. | |
| **First line dispute resolution (pursuant to clause 19.3(a)):** | **Pete Wilson:  Director of Warehousing** | |
| **First line dispute resolution (pursuant to clause 19.3(a)):** | Jason Minghini, Group Vice President  David Caines, Chief Operating Officer | |
| **Iovate address for notices (see clause 26.9):** | **Notice:** | Attn: Sachin Kanabar |
| | **Iovate Address:** | 381   North  Service  Road   West  Oakville   ON,   L6M   0H4  Canada |
| | **Copy:** | ATTN: Mattew VanKlink  381    North     Service    Road    West  Oakville          ON,       L6M        0H4  Canada |
| **Supplier   address   for notices (see clause 26.9):** | **Notice:** | Attn: VP Consumer Operations |
| | **Supplier Address:** | Kenco Logistic Services, LLC  2001 Riverside Drive, Chattanooga, TN 37406 |
| **Supplier  address  for  notices (see clause 26.9):** | **Copy:** | |
| | | Kenco Logistic Services, LLC  2001      Riverside       Drive,  Chattanooga, TN 37406 |

## CONTENTS

| | | |
|---|---|---|
| 1. | **DEFINITIONS AND INTERPRETATION** | 5 |
| 2. | **TERM** | 12 |
| 3. | **SERVICES** | 13 |
| 4. | **CHARGES** | 16 |
| 5. | **PAYMENT** | 17 |
| 6. | **OWNERSHIP** | 18 |
| 7. | **PRODUCT RECEIPT AND INVENTORY** | 18 |
| 8. | **INDEMNIFICATION AND LIMITATION OF LIABILITY** | 22 |
| 9. | **INSURANCE** | 25 |
| 10. | **VARIATIONS TO THE SERVICES** | 27 |
| 11. | **REPORTING AND JOINT REVIEW MEETINGS** | 28 |
| 12. | **TERMINATION** | 28 |
| 13. | **CONSEQUENCES OF TERMINATION** | 30 |
| 14. | **PACKAGING/STORAGE** | 32 |
| 15. | **CONFIDENTIALITY AND INTELLECTUAL PROPERTY RIGHTS** | 33 |
| 16. | **FORCE MAJEURE** | 34 |
| 17. | **SUB-CONTRACTING AND USE OF RESOURCES** | 35 |
| 18. | **EMPLOYMENT** | 35 |
| 19. | **DISPUTE RESOLUTION** | 36 |
| 20. | **AUDIT RIGHTS** | 37 |
| 21. | **COMPUTER SOFTWARE AND DATA OWNERSHIP** | 38 |
| 22. | **ANTI-BRIBERY** | 39 |
| 23. | **ASSIGNMENT** | 40 |
| 24. | **RECALL.** | 41 |
| 25. | **GENERAL** | 41 |
| 26. | **LAW AND JURISDICTION** | 43 |
| 27. | **IMPORT AND EXPORT** | 43 |
| | **SCHEDULE 1** | 45 |
| | **SCHEDULE 1** | 45 |
| | Shipping Guideline: | 45 |
| | Receiving Guidelines: | 46 |

Storage:................................................................................................47

Flexibility: ..........................................................................................47

Customer Service & Administration.....................................................48

Physical inventory:.............................................................................48

General:..............................................................................................48

Inventory Control: ..............................................................................50

Storage of Goods and Warehouse Cleanliness: ...............................51

Returns:..............................................................................................51

Waste Management: ..........................................................................52

Material Handling Equipment..............................................................52

Reporting: ..........................................................................................52

Miscellaneous Requests: ...................................................................53

## 1. DEFINITIONS AND INTERPRETATION

1.1.   In this Agreement the following expressions shall have the following meanings unless the context otherwise requires:

**"Abnormal Occurrences"**   means any of the following events or occurrences: (a) any incident associated with the provision of the Services, which results in a personal injury or fatality; (b) acute illness requiring medical treatment which is related to the provision of the Services; (c) any explosion or fire which results in the interruption of normal work; (d) any non-contained release of any substance which has the potential to cause harm to human health or to the environment; or (e) any unexplained or abnormal occurrence associated with the provision of the Services;

**"Agreed Number of Stock Checks"**   means the number of Stock Checks per Contract Year stated in the respective SOP;

**"Affiliate"**   means, in relation to any company, any legal entity Controlling, Controlled by or under common Control with, the company in question. "Control" means ownership of more than 50% of shares or being entitled to appoint the board of directors (and the terms controlled or controlling shall be construed accordingly);

**"Agreement"**   means this Agreement, the Contract Particulars and all schedules, appendices and any other documents expressly incorporated by reference;

**"Applicable Laws"**   means: (a) any applicable statute, regulation, by law or subordinate legislation in force from time to time, in the United Sates of America including, but not limited to, all applicable Environmental, Health & Safety Laws and Food & Drug Safety Laws as defined in clause 3.9 of this Agreement; (b) the common law and laws of

5

equity as applicable from time to time; (c) any applicable binding court order, judgment or decree; (d) any applicable industry code, policy or standard enforceable by law; or (e) any applicable direction, policy, rule or order that is binding on a party and that is made or given by any regulatory body having jurisdiction over a party or any of that party's assets, resources or business, in each case, as it applies to the performance of each party's obligations under this Agreement;

**"Business Continuity Plan"**      means the business continuity and disaster recovery plan set out in Schedule 6, as may be amended by the parties from time to time;

**"Charges"**      means the charges set out in Schedule 2;

**"Confidential Information"**      means any trade secrets, know how, confidential or proprietary information and material or data of a technical, operational, administrative, financial or business nature (whether oral, written, or in some other tangible form) of either party or of a third party which is not publicly available (exempting from this definition such information becoming publicly available through a confidentiality breach under this Agreement), including but not limited to information relating to software, data, systems, processes, methodologies, plans, specifications, know-how, ideas or other business, commercial or financial information;

**"Contractors"**      means independent contractor persons or firms (e.g., agents (other than Employees) and subcontractors) directly contracted by the Supplier to be involved in the performance of the Supplier's obligations under this Agreement from time to time;

6

**"Contract Particulars"**   means the table of contract particulars with the heading Contract Particulars set out on page 2 of this Agreement;

**"Contract Year"**   means the twelve month period commencing on the Effective Date and each subsequent period of twelve consecutive months (or shorter where this Agreement is terminated other than on an anniversary of the Effective Date) commencing on an anniversary of the Effective Date;

**"Core Warehouse Services"**   has the meaning ascribed to it in Part 2 of Schedule 1;

**"Dispute Resolution Procedure"**   means the procedure for resolving disputes set out in clause 19;

**"Effective Date"**   means the date written in the Effective Date section set out on the cover of this Agreement;

**"Employees"**   means the persons employed directly by Supplier that are involved in the performance of the Supplier's obligations under this Agreement from time to time;

**"Employee Liabilities"**   means, in relation to the employment of any Employee, all claims, demands, actions, proceedings and damages, loss, costs and expenses (including legal costs) related in any manner to termination including severance pay, termination pay and common law entitlements, unlawful deduction of wages, unfair, wrongful or constructive dismissal compensation, compensation for unlawful discrimination, equal pay; compensation for less favourable treatment of part-time or fixed workers; failure to pay any wages or other compensation owing; and/or payments made by way of settlement, and costs and expenses reasonably incurred in connection with a claim;

7

**"Force Majeure Event"**     means in relation to any party to this agreement, any
                              circumstances defines as: acts of God, acts that would
                              be illegal under any law, order, rule or regulation of
                              any governmental or other authority, acts of any
                              governmental or super-national authority, war or
                              national emergency, riots, civil commotion, acts of
                              terrorism, fire, explosion, flood, pandemic, epidemic.

**"Forecast"**                means the volume forecast, including inbound cases
                              and outbound cases, that Iovate will provide to the
                              Supplier.

**"Good Faith"**              means acting honestly and diligently and using
                              reasonable care in connection with any obligation or
                              act.

**"Group"**                   means a party to this Agreement and its Affiliates,
                              collectively;

**"HST"**                     means value added tax or other service tax
                              chargeable under applicable law and any similar
                              replacement tax.

**"Incoming Product Issue"**  means, at the point they are delivered into the
                              Supplier's care in accordance with clause 7.2:

                              (a) any shortfall in the number of Products as
                              compared with the advised number despatched as
                              identified on the applicable shipping documentation;
                              or (b) any difference in the Products as compared with
                              the advised nature of Products despatched; or (c) any
                              damage to, or destruction of, the Products that is
                              apparent on visual inspection of the outer packaging
                              when received or collected by the Supplier;

**"Intellectual Property Rights"**  means all patents, rights to inventions, utility models,
                              copyright and related rights, trademarks, service
                              marks, trade, business and domain names, rights in

8

trade dress or get up, rights in goodwill or to sue for passing off, unfair competition rights, rights in designs, rights in computer software, database right, topography rights, moral rights, rights in confidential information (including know how and trade secrets) and any other intellectual property rights, in each case whether registered or unregistered and including all applications for and renewals or extensions of such rights, and all similar or equivalent rights or forms of protection in any part of the world;

**"Invoice Date"**                means the period stated in Contract Particulars, by which the Supplier shall invoice Iovate pursuant to clause 5.1;

**"Iovate Policies"**             means Iovate's policies, protocols, rules, and/or training procedures as made available to the Supplier in writing from time to time and agreed to in writing by Supplier.  All costs incurred by Supplier associated with compliance with Iovate's policies, protocols, rules and training procedures shall be reimbursed by Iovate, subject to Supplier's provision of evidence reasonably satisfactory to Iovate in support of such costs

**"Key Performance Indicators"**  means all service level goals set out in the Schedules that   measure aspects of the performance of the Services by the Supplier.

**"Period of Care"**              means the period commencing when the  Products are put in the care and possession of the Supplier or the Supplier's agents and ending when the Products leave the care and poession of the Supplier or the Supplier's agents.

**"Product Handling Allowance"**  means the calendar year financial credit provided by Iovate to Supplier for Product Loss or Damage and Product Shortage, or a pro rata portion of such credit

9

in the case of a period of less than a full calendar year, as described in clause 7.7.

"Product Information"  means the most current and pertinent information concerning any special characteristics of the Products, including (but not limited to) safety and health information, toxicological information, environmental data, material safety data sheets (MSDS), labelling and transportation information and the procedures known to or developed by Iovate with respect to the receiving, storing, handling, shipping, transporting and/or disposing of the Products.

"Product Loss or Damage"  means Products which have incurred physical loss (including Product Theft), damage or destruction during the Period of Care excluding loss that falls under the definition of Product Shortage or as otherwise addressed in this Agreement.

"Products"  means the range of products set out in Part 1 of Schedule 1 and such other products that Iovate may in writing require the Supplier to provide the Services in relation to from time to time (provided that such other products are within the scope/product classification of the products set out in Part 1 of Schedule 1), subject to Iovate providing Supplier with all applicable documentation and Product specifications prior to shipping Product to the Warehouse;

"Product Shortage"  means Products which cannot be accounted for (loss) by means of an inventory reduction during the Period of Care as determined at the conclusion of a Stock Check or as otherwise addressed in this Agreement.

"Product Theft"  means the physical loss of Products caused by or resulting from dishonest or criminal acts of Supplier's Employees or its Contractors.

10

**"Ramp Up Period"**  means three months beginning on the date of the start up of Iovate's warehouse management system

**"Reasonable Care"**  means the skill, care and diligence that could reasonably be expected to be provided by a warehouse provider offering the same or similar services under like circumstances carried out in accordance with all relevant laws, regulations, codes of practice and all requirements of any regulatory authorities.

**"Resources"**  means the Employees, equipment and manpower

**"Security Standards"**  means the security standards set out in Schedule 8.

**"Services"**  means the Warehousing Services to be provided by the Supplier at the Warehouse;

**"Stock Check"**  means the inventory management process of physically counting all those Products held by the Supplier at a specified moment in time and all those Products that have been handled by the Supplier during the Period of Care since the previous Stock Check as set out in clause 7.10;

**"Term"**  has the meaning ascribed to it in clause 2.1;

**"Throughput"**  means the volume of Product being moved, handled, stored or otherwise managed by the Supplier.



| | |
|---|---|
| **"VAT"** | means value added taxes or other service taxes chargeable under applicable law and any similar replacement tax. |
| **"Warehouse"** | means the distribution centre(s) whose address(es) is/are stated in the Contract Particulars; |
| **"Warehousing Services"** | means the services described in Part 2 of Schedule 1 which may be amended from time to time by written agreement of the parties. |
| **"White Wood Pallets"** | means pallets used by Kenco. |

1.2.    In this Agreement the masculine shall include the feminine and the neutral and the singular shall include the plural and vice versa.

1.3.    The expression "person" means any individual, firm, company, unincorporated association, partnership, government, state or agency of a state and joint venture.

1.4.    The headings to the clauses and Schedules and paragraphs in Schedules of this Agreement shall not affect its construction.

1.5.    Any reference to a statute or statutory provision shall be construed as a reference to the same as from time to time amended, consolidated, modified, extended, re-enacted or replaced.

## 2.  TERM

2.1.    This Agreement shall commence on the Effective Date and shall, subject always to earlier termination in accordance with its terms, remain in effect through and until July 31, 2028 ("Term") and shall thereafter automatically renew on a year-to-year basis. For clarity, Services shall commence on September 1, 2023. In no event shall this Agreement continue beyond five (5) years from July 31, 2023 unless agreed otherwise by the parties in writing.

## 3. SERVICES

3.1.   Iovate appoints the Supplier to be the exclusive provider of the Services at the
       Warehouse located at 250 River Ridge Parkway, Jeffersonville IN 47130, in respect
       of the Products throughout the Term and any incidental services, functions and
       responsibilities not expressly specified in this Agreement and within the scope of the
       Supplier's responsibilities but which are reasonably and necessarily required for, or
       related to the performance and provision of the Services as mutually agreed by the
       parties. Iovate shall be permitted to treat the Supplier's appointment as being non-
       exclusive during a Force Majeure Event by serving written notice to the Supplier.
       Further, in the event written notice of termination of this Agreement is received by
       Supplier, nothing in this section shall preclude Iovate from entering into discussions
       during the remainder of the Term with any of Supplier's competitors regarding
       performance of replacement services. In the event of written termination of this
       Agreement, Iovate shall not be allowed to employ a third party operator in the
       Warehouse at any time. Notwithstanding the foregoing, Supplier shall continue to
       comply with its obligations under this Agreement until the Agreement is terminated.

3.2.   Commencing on the Effective Date and throughout the Term, the Supplier shall
       perform the Services in accordance with:

       a.   all Applicable Laws, and Supplier  providing a Warehouse that allows for the
            Supplier's compliance with such laws and regulations. Supplier shall provide a
            Warehouse that is conducive to the storage of the Products. Without limiting
            Supplier's obligation to comply with Applicable Laws, Supplier shall use
            reasonable efforts to notify Iovate of potential regulatory concerns pertaining to
            storage of the Products in the Warehouse that are readily apparent to Supplier
            or of which Supplier becomes aware;

       b.   all Iovate Policies as provided by Iovate and as agreed to in writing by Kenco;

       c.   Iovate's reasonable written instructions and;

       d.   the terms and conditions of this Agreement.

3.3.   Without prejudice to the generality of clause 3.2, the Supplier shall meet the Key
       Performance Indicators in its performance of the Services

13

3.4.    The Supplier shall promptly notify Iovate in writing of any relevant changes, which
        may be subject to additional fees, to its business that may impact, whether directly or
        indirectly, on the performance of the Services or its other obligations under this
        Agreement.

3.5.    The Supplier warrants, represents and undertakes:

        a.    that it is a duly incorporated company validly existing under the laws of its
              jurisdiction of incorporation and has full capacity and authority and has and will
              maintain at its own cost all necessary licences, permits and consents to enter
              into and perform the Services and this Agreement;

        b.    that this Agreement is executed by a duly authorised representative of the
              Supplier;

        c.    to use qualified Employees all of whom have been trained in accordance with
              the SOPs as defined in clause 8.5;

        d.    that it is not, as at the Effective Date, subject to any litigation or investigation
              and is not aware of any threat of litigation or investigation that could impact on
              its ability to provide the Services and that it will promptly notify Iovate if, after
              the Effective Date, it becomes subject to or is threatened with such litigation or
              investigation;

        e.    that the provision of the Services and Iovate's receipt of the same shall not
              infringe the Intellectual Property Rights of any third party;

        f.    that no computer viruses, Trojan horses, worms, software bombs or similar
              items or computer program will be knowingly introduced by the Supplier into
              systems upon which Iovate relies and Supplier will use protective measures
              consistent with industry standards in an effort to avoid such;



14

3.6.    Iovate shall keep the Supplier advised of matters that may affect the Supplier's ability
        to provide the Services, such as Product Throughput, Applicable Laws related to the
        handling and storage of Products and Iovate activity levels in order that the Supplier
        can manage its provision of the Services; provided, however, that any volumes,
        forecasts, Throughput predictions or activity levels provided by Iovate before or
        following the Effective Date are Iovate's best estimate of its likely requirement for the
        Services and save as expressly stated in this Agreement or otherwise agreed in
        writing, including those volumes in any agreed RFP, nothing in this Agreement shall
        be deemed to form a commitment by Iovate to purchase a certain quantity of Services
        (or any Services at all).

3.7.    Iovate shall use reasonable efforts to provide all Products delivered to the Supplier
        from Iovate's suppliers in order for the Supplier to provide the Services.

3.8.    The Supplier also undertakes that it will enter into and execute a Quality Agreement
        that will be similar in format to that attached in Schedule 7 on or around the Effective
        Date.

3.9.    For purposes of this Agreement, the term Applicable Laws includes, but is not limited
        to, all applicable Environmental, Health & Safety Laws and Food & Drug Safety Laws.

        a.  "Environmental, Health & Safety Laws" means all federal, state and local laws,
            statutes, rules, regulations, orders and ordinances or legally enforceable
            requirements, now or hereafter in effect, relating to the protection of human
            health (Occupational Safety and Health Administration (OSHA) and the
            National Institute for Occupational Safety and Health (NIOSH)) or the
            environment, including the generation, storage, handling, transportation and
            disposal of Hazardous Materials., "Hazardous Materials" means any
            substance that is designated, defined or classified as a hazardous material,
            hazardous substance, hazardous waste, pollutant, contaminant or toxic
            material, or that is otherwise regulated under any Environmental, Health &
            Safety Law.

        b.  "Food & Drug Safety Laws" means all federal, state and local laws, statutes,
            rules, regulations, orders and ordinances or legally enforceable requirements,
            now or hereafter in effect, relating to food and drug safety, including but not
            limited to the Food and Drugs Act and associated regulations.

15

        **c.** The Supplier's compliance with all Applicable Laws in its performance of the Services shall also include, but not be limited to, its development and implementation of all required safety programs, policies, training, inspections and recordkeeping procedures required.

3.10. Damaged or unsaleable Products are to be dealt with in accordance with Iovate-provided SOPs. If non-hazardous waste is generated from the Products, then Supplier shall dispose of the same. For any waste that is generated from the Products during Supplier's performance of the Services that is deemed hazardous or regulated material under Applicable Law, Iovate shall be considered the waste generator and waste transporter. Subject to the terms of this Agreement, Supplier's obligations with respect to waste or regulated material shall be limited to preparing such waste for pickup at the Warehouse in accordance with Iovate's procedures for pickup and disposal by an Iovate-approved and licensed carrier or transporter under contract with Iovate and/or Kenco for disposal at a permitted and licensed disposal site. Notwithstanding the foregoing, in the event Supplier causes a spill of such waste and fails to meet the standard of Reasonable Care outlined under this Agreement, Supplier shall bear the cost of clean up.

## 4. CHARGES

4.1. The Charges shall be calculated as set out in Schedule 2 throughout the Term.

4.2. The currency applicable to this Agreement is stated in United States Dollars **("Currency")**, and all Charges are expressed in United States Dollars.

4.3. Charges Review. The Charges shall be reviewed and agreed to in writing, within the forth-quarter of a calendar year. The agreed to changes will become active on the next billing cycle in the immediately proceeding January's service. In either the event of an increase or decrease, neither party shall unreasonably withhold their approval. An adjustment to all wages charges will be triggered in the event the year-on-year percent change in the Employment Cost Index, while all other charges will be triggered by the CPI and/or landlord's gross rent escalation schedule. Proposed adjustments to the charges shall be subject to agreement by the parties, and will be

16

savings. Kenco understands they need to bring forth continuous improvement methodolgies or process changes.

4.4. 

4.5. Any Charge adjustment agreed by the parties shall be reflected in an amendment to the Agreement, dated and signed by each party.

## 5. PAYMENT

5.1. The Supplier shall invoice Iovate monthly on the 10th business day of each month for the Charges payable in respect of Services provided in the previous month. Iovate shall pay the Supplier's correctly submitted invoices which are not in reasonable dispute within forty-five (45) days.

5.2. Supplier shall submit backup documentation in PDF format with its invoices to Iovate.

5.3. If an invoice is reasonably disputed by Iovate within fifteen (15) days of the date of the invoice, then the Supplier will place the invoice on hold until a resolution is reached not to exceed the payment terms stated in Section 5.1. If the invoice dispute cannot be resolved within the payment terms stated in Section 5.1, Iovate must file a claim and pay the applicable late fees (1.5%) without waiving their right to bring a claim. Iovate shall only be required to pay the applicable late fees pursuant to this Section 5.3 if the claim was invalid.

5.4. Any potential claims, including but not limited to claims for loss or damage to Products, shall not be deducted from invoices, but shall be handled separately. In the event of two (2) consecutive late payments of more than five (5) business days, Supplier reserves the right to modify the billing terms and conditions to demand immediate payment.

5.5. Upon termination of the business relationship for any reason, Supplier may refuse to deliver the Products until it has been fully paid for all charges due under the Agreement then due it regardless of the payment terms otherwise applicable to such charges. Supplier's right to refuse to deliver the Products is limited to the amounts

17

owed by lovate for all charges due under the Agreement.  The value of the Products is determined by what they can be sold for in a commercially reasonable sale.

## 6. OWNERSHIP

6.1.     lovate Material. lovate may provide Supplier with information, policies, training materials, guidelines and other materials and physical assets, which may include lovate intellectual property, to enable Supplier to carry out the Services (collectively, the "**lovate Material**").  Any and all lovate Material shall be deemed Confidential Information of lovate and handled as such.

6.2.     Title in all Products and lovate Material shall (as between the Supplier and lovate) remain with lovate at all times.. Notwithstanding, on Products in Supplier's possession it shall have a general warehouseman's lien for any unpaid charges in addition to any claims for money advanced, interest, transportation, labor, fulfilment, legal fees and other charges,  which lien is released by delivering the Products and/or payment of the charges.  In order to protect its lien, Supplier reserves the right to require advance payment of all charges prior to shipment of Products. Supplier's right to require advance payment of all charges prior to shipment of Products is limited to the amounts owed by lovate for all charges due under the Agreement.  The value of the Products is determined by what they can be sold for in a commercially reasonable sale.  Unless expressly stated otherwise in writing, Supplier will not subordinate its lien to any lender, financial institution, or any other third party.

## 7. PRODUCT RECEIPT AND INVENTORY

7.1.     This clause 7 sets out the general operating provisions between the Supplier and lovate with respects to Products throughout the Term.

### PRODUCT RECEIPT

7.2.     Products shall be presumed to be under the Supplier's responsibility for the Period of Care, unless:

    a.     the Supplier has noted to lovate by email, any apparent Product Issue on the delivery documents and/or as part of the receiving process; and

    b.     Loss or damage to Products was concealed and/or within internal packaging.

18

7.3.    Where Products are damaged prior to their delivery to the Supplier and/or the Supplier has complied with clause 7.2, Iovate may (at its discretion and at reasonable cost and liability to Iovate) instruct the Supplier to repackage such damaged Products or assist Iovate in facilitating the disposal of such damaged Products in a manner first approved by Iovate which instruction shall be provided in a timely manner and which shall be done in compliance with all Applicable Laws.

7.4.    If the Products are damaged and the damage is directly caused by Supplier's failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances, or the damage is directly caused by wilful misconduct of Supplier's Employees or Contractors, the Supplier shall, at Iovate's election, either:

   a.    dispose of such damaged Products in a manner first approved by Iovate, subject to the liability cap identified in clause 8.12; or

   b.    salvage the damaged Products, provided Iovate reasonably determines that such Products are salvageable. Supplier shall pay such costs solely in the event that: (i) Supplier has exceeded its monthly Product Handling Allowance set forth in Section 7.7; and (ii) such costs to salvage the Product do not exceed the Transfer Price of the Products. Notwithstanding the foregoing, in the event Supplier pays such costs to salvage damaged Product, Supplier shall not be liable to pay Iovate for the Transfer Price of such damaged Products.

7.5.    Iovate shall not ship or cause Products to be shipped to Supplier as consignee. If Products are shipped with Supplier as the named consignee, then Iovate shall notify the carrier in writing prior to shipment that the named consignee is a warehouseman and that Supplier has no beneficial title or interest in the Product.

7.6.    Iovate represents and warrants to Supplier that there are no known potential health, safety and/or environmental hazards associated with the storage and handling of such Products. Iovate will provide Supplier with information and guidance concerning the stored Products which is current, accurate, complete and sufficient to allow Supplier to comply with all laws and regulations concerning the storage, handling, shipping, disposal (if applicable) and transporting (if applicable) of the stored Products. Iovate will indemnify and hold Supplier harmless from all loss, costs, penalty and expense (including reasonable attorney fees) which Supplier pays or incurs as a result of Iovate's failure to fully discharge this obligation. Iovate shall be responsible for reimbursing Supplier for all costs associated with compliance with applicable laws. If,

19

as a result of the quality or condition of the Products of which Iovate had no notice at the time of deposit, and/or the Products are a hazard to other property or to the warehouse or to persons, Supplier shall immediately notify Iovate, and Iovate shall promptly remove the Products from the warehouse. Pending such disposition, Supplier may remove the Products from the warehouse and shall incur no liability by reason of such removal.

7.7. Supplier shall not be liable for demurrage, detention or delays in unloading inbound cars or vehicles, or detention or delays in obtaining and loading cars or vehicles for outbound shipment unless such is directly attributable to Supplier's failure to use reasonable care.

## PRODUCT INVENTORY

7.8. The Supplier shall conduct reconciliation of net inventory overages and shortages daily and report the results of such reconciliation to Iovate's Warehouse contact person weekly. The Supplier shall use reasonable care to ensurehat all transactions are accurately entered into the warehouse management system serving the Warehouse, and shall use reasonable care to minimize Product Loss or Damage and Product Shortage. Supplier shall be responsible for installation and maintenance of the warehouse management system, labor management system, and training of Supplier personnel on use of the system(s) and related equipment as outlined in Schedules 1 and 2 to this Agreement. Supplier will provide unique sign-on identification for all users with time / date stamp of all inventories, receiving and shipping transactions.

7.9. The Monthly Handling Allowance will be equal to 0.05% of the total monthly Throughput landed cost of Product units. The Product Handling Allowance will be applied/credited against any amounts owed by or on behalf of Supplier to Iovate as outlined in clauses 7.8 and 8.12.

7.10. Supplier shall maintain a perpetual inventory system and utilize the system to record stock of Products held by it in each full or partial calendar year during the Term. The Supplier shall carry out a cycle count program and/or the Agreed Number of Stock Checks of Products each Contract Year per Iovate's requirements set out in the relevant SOP. Iovate also reserves the right to request additional Stock Checks during the Contract Year should an audit or reasonable inventory dispute with Supplier

20

or Iovate customer occur, with such additional audit only being authorized if agreed to in writing by Supplier and with costs of such audit being solely borne by Iovate.

a.   Following each such Stock Check the Supplier shall give Iovate details of the stocks of Products shown as held by it. If Iovate requests, it and/or its auditors may be present at any such Stock Check, if agreed to in writing by Supplier,and the Supplier shall permit Iovate and/or its auditors to have access (at a reasonable time as agreed to by Supplierand on provision of reasonable notice to the Supplier and provided that any external auditors are escorted by Supplier personnel when onsite) to the Warehouse to undertake their own stock checks which shall be reconciled with Supplier in the event of any discrepancy.

b.   The Supplier shall allow Iovate access to all stock records that the Supplier has in its possession or under its control so far as such records relate to the Warehouse Services and to audit the Supplier's stock records and procedures.

c)   Following each full Stock Check and for the purposes of Product Handling Allowance, Product Loss or Damage and Product Shortage computations, Iovate will provide the Supplier with the Transfer Price for the Products (such information being (without limitation) Iovate's Confidential Information). Claims associated with Product Loss or Damage shall be credited on the Supplier invoice proceeding the month in which the reconciliation was completed and shall be paid pursuant to the shrinkage allowance as defined in Section 7.9 of this Agreement.

## CUSTOMER CLAIMS

7.11.   Claims by Iovate relating to Product Loss or Damage and Product Shortage must be presented in writing to Supplier within: (i) one hundred and twenty (120) days after shipment of Product from Supplier's facility Iovate becomes aware (or reasonably should have become aware upon notice by Supplier) that Product Loss or Damage or Product Shortage has occurred, Iovate becomes aware (or reasonably should have become aware upon notice by Supplier) that Product Loss or Damage or Product Shortage has occurred, (ii) one hundred and twenty (120) days after Iovate receives written notice from Supplier that Product Loss or Damage or Product Shortage has occurred, or (iii) one hundred and twenty (120) days after Iovate receives the results of the year-end physical inventory or the final Stock Count, whichever occurs first. Such written notice from Iovate shall contain facts sufficient to identify the Products

21

involved, assert liability for alleged loss or damage and make claim for the credit of a specified or determinable amount of money

7.12.   No action may be maintained by Iovate against Supplier for loss or damage to the Products unless timely written notice of claim has been given as provided in Section 7.11 above, and unless such action is commenced either within twenty-four (24) months after the date of delivery by Iovate, or within twenty-four (24) months after Iovate is notified by Supplier that loss or damage to the Products has occurred, whichever time is shorter.

7.13.   If the Supplier receives a direct claim or complaint from a customer, the Supplier shall, in Good Faith, handle the complaint in a professional manner, inform Iovate promptly of the complaint or claim and provide such assistance as Iovate may reasonably require in satisfying, disputing, and/or resolving the claim or complaint, in accordance with Section 8 below.

## 8.   INDEMNIFICATION and LIMITATION OF LIABILITY





8.2.   **Exclusions.**  Each party's (the "Indemnitor") indemnification obligations hereunder



8.3.   **Conditions.** Indemnitor's obligation to defend  and indemnify any Indemnitee in
       relation to any third party Claim is conditional on the following (the **"Conditions"**):

       a.  Indemnitee promptly notifying the Indemnitor of the service of process or the
           receipt of actual notice of any third party Claim and the extent and nature of
           same, provided that the failure to so notify the Indemnitor shall not relieve the
           Indemnitor of its obligations hereunder except to the extent that such failure
           causes actual prejudice to the Indemnitor;

       b.  Indemnitor having the obligation  to defend the third party Claim, subject to
           the Indemnitee's right, at its option and own expense, to participate in the
           defense of the third party Claim;

       c.  Indemnitor having the sole right to settle or otherwise dispose of the third party
           Claim, except that the Indemnitor shall make no admission of fault in the
           settlement or disposition of a third party Claim that specifically names or

23

directly affects the Indemnitee without the Indemnitee's prior written consent;;
and

Indemnitee co-operating with the Indemnitor in the defense of the third party
Claim upon the request of the Indemnitor, acting reasonably.



8.7.   **NO LIABILITY FOR CONSEQUENTIAL DAMAGES.   Except in respect of a
party's indemnification obligations as set out above, <u>neither</u> party shall be
liable to the other party for any indirect, consequential, exemplary or punitive
damages of any kind, including lost profits, loss of business or loss of
goodwill; penalties, damages and/or claims for which a party is liable to their
customer; or the costs and expenses in providing or securing substitute
revenues or substitute service providers, regardless of whether such party has
been advised of the possibility thereof.**

8.8.    Nothing in this Agreement shall exclude or restrict, and the limitations on liability set
forth in this clause 8 will not apply to, a party's liability for:

       a.     any liability which cannot be excluded or limited under Applicable Law.





9.3.    The Supplier shall provide evidence that Iovate's interest is noted on the policies of
insurance as an additional insured (commercial general liability) and loss payee

(warehouse legal liability), sufficient to allow Iovate to obtain the associated coverage benefit of the policy or recover proceeds pursuant to its interest from the insurer in the event that a claim is filed under the policy.,

9.4.    The Supplier shall provide to Iovate certificates referred to in clause 9.1 or other evidence confirming the existence and extent of the cover given by such policies within seven (7) days of the date of last signature of this Agreement. The Supplier shall provide upon request updated insurance certificates to Iovate thirty (30) days, or as soon as available, prior to the expiry of any insurance policy and certificates.

9.5.    The Supplier shall promptly notify Iovate of any material changes to the level, type or other material provisions of the above mentioned insurance policies.

9.6.    Each party shall give the other party notification within thirty (30) days after any material claim by it arising from this Agreement on any policy of insurance required by this clause 9 and accompanied by full details of the incident giving rise to the claim as associated with the Iovate account/operation.

9.7.    Where the Supplier engages any subcontractor, the Supplier shall ensure that the relevant subcontractor holds such, insurance coverage as is reasonable taking into account the extent of the Services to be provided by the subcontractor. For the avoidance of doubt, the Supplier shall remain liable to Iovate for any and all services provided by Contractors providing Core Warehouse Services.

9.8.    Neither the failure to comply nor full compliance with this clause 9 shall relieve the Supplier of its liabilities and obligations under this Agreement. For the avoidance of doubt, the provisions of this clause 9 are subject to any limitation or exclusion of liability set out in this Agreement.

9.9.    Where the policies concerned are subject to deductibles, Iovate shall not be liable to the Supplier for any costs, losses, damages and expenses suffered or incurred by the Supplier as a result of the occurrence of any of the risks covered by any of such policies to the extent that they fall within any such deductibles.

9.10.   The provisions of this clause 9 shall survive the expiry or sooner termination of this Agreement.

26

## 10.   VARIATIONS TO THE SERVICES

10.1.   If, at any time during the Term, either party wishes to vary or improve the Services it shall notify the other party in writing, giving as much detail as reasonably possible of such proposed change or improvement and in any event set out the proposed change or improvement in sufficient detail to enable the parties to identify the information specified in clause 10.2.

10.2.   Within a reasonable time of the date of a notice under clause 10.1 (and in any event no more than twenty eight (28) days from the date of receipt of such notice), the recipient of the notice shall notify the notice provider in writing whether it is prepared to implement such proposed improvement or accept such proposed variation in the Services or not or whether an extension is required.   If the recipient of the notice is prepared to implement such proposed improvement or accept such proposed variation then, irrespective of which party initially provided the notice, the Supplier shall formally notify Iovate (such notice being a **"Variation Notice"**) of the following matters in detail:

   a.   the resulting variation in the Charges if any;

   b.   any amendment to this Agreement that is required as a result of such proposed change or improvement;

   c.   any impact on the provision of the Services; and

   d.   the timescale for implementing the proposed change or improvement.

10.3.   As soon as reasonably possible after Iovate receives a Variation Notice, the Supplier and Iovate shall discuss and agree the Variation Notice and the appropriate variations to this Agreement to encompass all elements of that agreed Variation Notice.   Once a Variation Notice is agreed in writing by both parties and is signed by duly authorised signatories of both parties this Agreement shall be amended by such Variation Notice. Without prejudice to the generality of clause 10, the Supplier shall not be permitted to vary the location of the Warehouse unless the process set out in clause 10 has been followed and Iovate agrees to such varied location in writing.

27

## 11.   REPORTING AND JOINT REVIEW MEETINGS

11.1.   By the 10th working day of the month following the month to which it relates, the Supplier shall deliver to Iovate a report for the preceding calendar month containing the information, and set out in the form, shown in Schedule 5 (the "Monthly Report"). Iovate shall own all Intellectual Property Rights in the reports and the data from Kenco's warehouse management system used by Supplier to create such reports and provided to Iovate in the performance of this Agreement.

11.2.   Iovate and Supplier shall agree a timetable for regular Joint Review Meetings (to be held no less frequently than once in each month) at which they will discuss the performance of the Services with a view to ensuring that the Services are performed in an efficient manner and to an acceptable standard and that the parties are operating within the spirit of the terms of this Agreement.

11.3.   At these regular Joint Review Meetings, the Supplier and Iovate shall also consider the following matters:

a)   the contents of the Monthly Reports;

b)   the Supplier's performance of the Service including (without limitation) its performance against the Key Performance Indicators;

c)   ways of improving the Services;

d)   any other matters that either party wishes to raise in relation to the Services and/or the performance of this Agreement.

## 12.   TERMINATION

12.1.   Either party may terminate this Agreement in its entirety for convenience (without prejudice to its other rights and remedies) by giving no less than one hundred and eighty (180) days' written notice to the other party.

12.2.   Either party (the "notifying party") may terminate this Agreement (without prejudice to its other rights and remedies) with immediate effect by written notice to the other party if such other party commits either (i) a material breach of any of its obligations under this Agreement (excluding only violations of the KPIs and the Ramp Up Period, which

28

are addressed under Section 12.3 below) or (ii) a persistent breach (excluding only violations of the KPIs which are addressed under Section 12.5 below) of any of its obligations under this Agreement during a rolling twelve (12) month period which collectively constitute a material breach, provided the notifying party has notified the other party in writing of each breach within thirty (30) days of each occurrence; and, for both (i) and (ii),fails to remedy it within thirty (30) days of the date of a notice from the notifying party specifying the breach and requiring it to be remedied.

12.3.     Iovate may terminate this Agreement immediately on notice if the Supplier fails to meet the "Breach" level of the same Key Performance Indicator ("KPI") identified in Schedule 4:

a)     in any three (3) consecutive calendar months

Notwithstanding the foregoing, Supplier shall not be required to meet any KPI during the Ramp Up Period which shall not count or otherwise be considered as a "breach" of any KPI. In the event that Iovate notifies the Supplier that Iovate intends to terminate this Agreement pursuant to this clause 12.3 and the Supplier notifies Iovate within twenty (20) working days of receiving Iovate's notice that the Supplier disputes such action on the ground that the failure to meet the Key Performance Indicator was caused by a change in the volume, forecast accuracy, business profile, or mix of the Products and not the Supplier's inefficiency, the parties shall resolve such dispute in accordance with clause 19; provided, however, that in any mediation under clauses 19.4 and 19.5, the mediator must possess expertise in the matter under dispute.

12.4.     Whenever Iovate has a right to terminate this Agreement immediately on notice, it may instead terminate this Agreement on up to six (6) months' prior written notice to the Supplier subject to any termination fees, and in this event throughout the notice period the Supplier shall continue to provide the Services in accordance with this Agreement.  Such termination in accordance with this clause 12.5 shall not be deemed a waiver of Iovates rights in relation to such immediate termination right.

12.5.     Without prejudice to the foregoing, this Agreement may be terminated pursuant to and in accordance with clause 2.1, or 24.1.

12.6.     The termination of this Agreement howsoever arising is without prejudice to the rights, duties and liabilities of all parties accrued prior to termination.  For avoidance of doubt, Iovate shall be subject to any past, present or future costs or amounts due and

owing to Supplier for Services provided.   The clauses in this Agreement which expressly or impliedly have effect after termination shall continue to be enforceable notwithstanding termination which shall include, without limitation, clauses 5, 6, 7, 8, 9, 12.7, 13, 15, 18, 19 and 20.

## 13.   CONSEQUENCES OF TERMINATION

13.1.   During the period between service of notice to terminate this Agreement and the date of termination, the Supplier shall continue to provide the Services and further provide to Iovate at no higher Charges unless otherwise agreed to in writing by the parties:

   a)   the Termination Assistance in accordance with Schedule 9 (*Termination Assistance*) until the end of the Termination Assistance Period to ensure the organised and timely run-down and handover of the Services to Iovate;

   b)   reasonable assistance to Iovate and its servants, agents or contractors in the activities described in this clause 13.

13.2.   In the event that the Supplier lays-off or otherwise terminates the employment of any Employees or Contractors at the Warehouse for any reason whatsoever, including but not limited to the termination of this Agreement by either party, the Supplier will be solely responsible for all Employee Liabilities, including the payment of any severance and other termination payments payable to such Employees or Contractors under any applicable agreements or under Applicable Laws. Notwithstanding the foregoing, Iovate shall have responsibility for agreed employee expenses that are evidenced by documents including a retention bonus letter or a separation agreement. ("Agreed Employee Expenses"),   in an event of early termination of this Agreement by Iovate, regardless of whether the U.S. Worker Adjustment and Retraining Notification Act (WARN Act) or state equivalent apply, and Supplier will take all reasonable actions to mitigate Agreed Employee Expenses. Agreed Employee Expenses solely include the following:

   a.   Retention bonuses.

   i.      In the event the Supplier can comply with the WARN Act or state equivalent based upon the termination conditions, retention bonuses will be required to incentivize employees to remain employed by Supplier to perform the services.

b. Employee Wages and Benefits.

   i.    In the event the Supplier is not able to comply with the WARN Act or state equivalent based upon the termination conditions, Supplier will be required to pay employees the wages and benefits for the hours not worked up to the WARN Act or state equivalent's termination notice period.

c. Exempt employee severance.

   i.    In the event the Supplier cannot reassign an exempt employee and must terminate their employment with the Supplier, a severance payment is provided based upon 2 weeks for every year of employment with Supplier.

d. Unused earned Paid Time Off ( PTO).

   i.    In the event Supplier cannot reassign any employee and must terminate their employment with the Supplier, unused earned Paid Time Off (PTO) is paid to the employee.

13.3.   If this Agreement is terminated by Iovate pursuant to clause 12.1, or by the Supplier pursuant to clause 12.3 or 12.4 or by either party pursuant to clause 4.8, 16.3 or 25.1, or if this Agreement expires pursuant to clause 2.1, then Iovate shall purchase any applicable capital assets and equipment at their remaining book value at the time of termination or expiration and assume applicable leases for equipment in accordance with Schedule 9 and shall indemnify the Supplier against any liability for rental payments and other obligations arising under such leases after the Agreement termination date, provided Supplier complies with the terms of this section 13.3. If any equipment lease is not so assumable, Iovate shall reimburse the Supplier for its rental costs and other obligations thereunder as they arise, provided that prior to entering into such non-assumable lease, the Supplier advised Iovate that the lease was non-assumable and obtained Iovate's written approval. Upon Supplier's receipt of payment for any such purchased capital equipment, all right, title and interest in and to such equipment shall vest in Iovate, and the Supplier shall execute such documents and provide such assistance as Iovate may reasonably request to confirm Iovate's ownership of such equipment. If this Agreement is terminated by the Supplier pursuant to clause 12.2 or by Iovatepursuant to clause 12.3, 12.4, 12.5,

31

12.6, or 17.1, then Iovate will have the option, but not the obligation, to purchase the capital assets and material handling equipment and assume leases for material handling equipment in accordance with Schedule 2, and Iovate will not be obligated to reimburse the Supplier for other unamortized costs.

13.4.    If Iovate terminates this Agreement for convenience, in addition to any further obligations in this Section 13, Iovate shall reimburse Supplier for evidenced associated management fees and general and administrative expenses (G&A fees).

13.5.    If Iovate terminates this Agreement for any reason, Iovate  is not entitled to the termination year rebate and rebates cannot be prorated.

13.6.    Upon the termination of this Agreement for any reason or its expiration,  Iovate agrees to pay to Supplier the balance, if any, of any unamortized Start-Up Costs as of the date of termination or expiration as determined pursuant to the amortization schedule set forth on Schedule 2. Such amounts shall be payable on or before the date of termination or expiration, unless otherwise agreed to by the parties in writing.

13.7.    Upon termination of the business relationship for any reason, Supplier may refuse to ship the Products limited to the amounts due under the Agreement until it has been fully paid for all charges then due it regardless of the payment terms otherwise applicable to such charges. Supplier's right to refuse to ship the Products is limited to the amounts owed by Iovate for charges due under the Agreement.  The value of the Products is determined by what they can be sold for in a commercially reasonable sale.

### 14.    PACKAGING/STORAGE

14.1.    Iovate shall procure that the Products delivered to the Supplier are securely and correctly packaged in accordance with all Applicable Laws.

14.2.    The Supplier shall be liable for the storage of the Products in accordance with this Agreement .

14.3.    The Supplier and  Iovate each warrant to each other that they have such rights in the Products as are required to authorise and allow the Supplier to store the Products in accordance with this Agreement.

32

**15.    CONFIDENTIALITY AND INTELLECTUAL PROPERTY RIGHTS**





## 16.   FORCE MAJEURE

16.1.   Neither party shall be liable to the other for default in the performance or discharge of
any duty or obligation under this Agreement, except for Iovate's obligation to pay for
Services rendered by Supplier, when caused by Force Majeure Event.   Upon the
occurrence of such a Force Majeure Event, the party seeking to rely on this provision
shall promptly give written notice to the other party of the nature and consequences
of the cause. If the cause is one which nevertheless requires Supplier to continue to
protect the Goods, Iovate agrees to pay the storage or similar charges associated
with the Supplier's  obligation during the continuance of the force majeure.

34

## 17.    SUB-CONTRACTING AND USE OF RESOURCES

17.1.    The Supplier shall maintain reasonably accurate and complete records of all sub-contractors and the work that they carry out on its behalf, which records shall be made available to Iovate promptly upon request with reasonable advanced notice, subject to Section 20.3. .

17.2.    The Supplier may use any of the Resources and/or Employees elsewhere in its business provided that such use does not interfere with the provision of the Services and Iovate has received prior notification from the Supplier of any use of the Resources and/or Employees elsewhere in the Supplier's business.

## 18.    EMPLOYMENT

18.1.    The Employees are or will be employed by the Supplier and the Supplier shall continue to have liability for Employees in accordance with all laws, regulations and rules relating to the employment of persons.  No contract of employment between Iovate and any Employee shall be made as a result of this Agreement, and no Employee will be deemed an employee of Iovate. The Supplier shall be solely responsible for directing and supervising the Employees and for withholding all income, payroll, unemployment, workers' compensation and any other applicable employment taxes. The Supplier shall not represent itself, and will cause each of the Employees not to represent himself or herself, as an agent or employee of Iovate. None of the benefits provided by Iovate to its employees, including, without limitation, health insurance, retirement plan benefits, workers' compensation insurance and unemployment compensation insurance, will be available to any of the Employees. The Supplier shall perform reasonable background checks on the Employees.

Any of Iovate's employees, agents, or contractors that work at, are on-site, or otherwise present at the Warehouse shall be the full and sole responsibility of Iovate. Iovate will indemnify and hold Supplier harmless from all loss, costs, penalty and expense (including reasonable attorney fees) which Supplier pays or incurs arising from any negligence, careless, or fraudulent acts, omissions or willful misconduct by Iovate's employees.

## 19.   DISPUTE RESOLUTION

19.1. Except for any claim for which it is unlawful for the parties to agree, on a predispute basis, all claims must be arbitrated, any claim, controversy, or dispute between the parties, or arising out of or relating to the relationship between the parties (but excluding any request for equitiable or other injunctive relief, which may be brought exclusively in an appropriate court in Indiana), whether arising before or after this Agreement is signed (together, "Claims") must be submitted to final and binding arbitration to be administered by the American Arbitration Association ("AAA"). For the avoidance of doubt, Claims include but are not limited to claims (i) arising out of or relating to any acts, omissions, conditions, or events taking place during the term of this Agreement; or (ii) of breach of contract, tort, fraud, and any cause of action arising under the statutes, regulations, or common law of any governmental authority, whether local, state, federal, or foreign.  The arbitration must be conducted in accordance with the Commercial Arbitration Rules (but any request for equitable or other injunctive relief will be brought exclusively in an appropriate court in Indiana ) of the AAA, copies of which are available online at www.adr.org. The parties agree the arbitration is governed by the Federal Arbitration Act, and the arbitration will be heard and determined by one (1) arbitrator.  The arbitrator shall be selected by agreement of the parties. If the parties cannot agree to an arbitrator, the arbitrator shall be selected pursuant to the AAA Rules within twenty (20) days of one of the parties making the request to the AAA case manager to appoint an arbitrator. THE PARTIES AGREE THEY ARE WAIVING THEIR RIGHT TO A JURY TRIAL. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,. IF AT ANY POINT THIS PROVISION IS DETERMINED TO BE UNENFORCEABLE, THE PARTIES AGREE THAT THIS PROVISION SHALL BE SEVERABLE.  The location of the arbitration shall be in a city mutually agreed to by the parties or, absent such agreement, in Indianapolis , Indiana.  An arbitrator shall decide all issues arising out of or relating to the interpretation or application of this Section 19, including the enforceability, revocability, or validity of this Section 19 or any portion of it.

19.2. At least 60 days before filing a demand for arbitration, the party with a Claim shall provide written notice to the other party clearly identifying the claimant, the factual support for the Claims, and the relief to be requested.  Iovate and Supplier shall attempt in good faith to resolve the Claim(s).

19.3. Except to the extent applicable law provides otherwise, the parties agree to keep confidential and not to disclose (and shall make all reasonable best efforts to cause

36

their employees, agents, and attorneys to keep confidential and not to disclose) the existence and/or terms of any decision (whether final or otherwise) issued by an arbitrator concerning a Claim except (i) as authorized in writing by the non-disclosing party; (ii) as required by law; (iii) as ordered by a court, administrative, or governmental entity, or (iv) to the party's attorney.

## 20.   AUDIT RIGHTS





**21.   BUSINESS CONTINUITY**

21.1.   The Supplier shall ensure that it is able to implement the provisions of the Business
Continuity Plan at any time in accordance with its terms.

21.2.   The Supplier shall test the Business Continuity Plan  once in every Contract Year for
Warehouse Services.  Iovate shall be entitled to participate in such tests as it may
reasonably require.

21.3.   Following each test, the Supplier shall send to  Iovate a written report summarising
the results of the test and shall promptly implement any actions or remedial measures
that Iovate considers to be necessary as a result of those tests.

21.4.   The Supplier shall implement the Business Continuity Plan in the event that the
Services are not available for more than the number of hours stated in the Business
Continuity Plan.

**22.   COMPUTER SOFTWARE and DATA OWNERSHIP**

22.1.   The Services shall be provided by Supplier's designated software solution.

22.2.   The Supplier will use commercially reasonable efforts for the installation,
maintenance, and general operating reliability of the hardware in support of the

software solution. Notwithstanding the foregoing, Supplier makes no representations or warranties as to the uptime or performance of the software solution.

22.3. Supplier will grant Iovate access to the systems reporting environment. The warehouse management system ("WMS") is to be hosted and kept reasonably secure on the Supplier's systems, and will be accountable for ensuring the WMS uptime does not impact the Suppliers ability to perform Core Warehouse Services. Should the WMS experience unplanned downtime, the Supplier is still expected to deliver the agreed to KPIs, as no exemption in performance reporting will be granted except to the extent that they are the result of a Force Majeure Event or otherwise out of the control of Supplier.

22.4. Supplier agrees to use commercially reasonable efforts to support and manage all WMS related maintenance, updates, and related integration testing. From time to time the Supplier will be requested to support Iovate with ERP related updates and modifications in respect to WMS integration testing. Any such requests will be made by Iovate to Supplier with reasonable written notice and will only be provided to the extent that it is necessary and commercially reasonable for the purpose of the Services.

22.5. Ownership of all Intellectual Property Rights shall remain the exclusive property of the party owning the rights, and no party shall acquire any right, title, or interest in any other party's Intellectual Property Rights save as expressly provided in this Agreement, including without limitation clause 15.1. All transactional history within the WMS as it relates to inventory, item master, receiving, shipping, pick profile, and order line details will remain the property of Iovate. In the event of termination of this Agreement, the raw WMS data will be provided to Iovate within 30 Days, in Iovate's defined format at a reasonable market cost rate, agreed to in writing by both parties. Any additional WMS data requests will be provided to Iovate at a reasonable market cost rate, agreed to in writing by both parties.

## 23.   ANTI-BRIBERY

The parties hereby acknowledge and agree that Supplier and its employees shall act in a manner consistent with the Iovate Policies then currently in effect. The Supplier warrants that it has not and it will not, in connection with the transactions and/or services contemplated under this Agreement, make or promise to make any payment or transfer anything of value, directly or indirectly: (a) to anyone working in an official

39

capacity for a government or any government department, office, board or other governmental, judicial, administrative, legislative or tax authority (including employees of government corporations) or a public international organization; (b) to any political party, official of a political party or candidate; (c) to an intermediary for payment to any of the foregoing; or (d) to any other person or entity if such payment or transfer would potentially violate the U.S. Foreign Corrupt Practices Act or any Applicable Laws.    Breach of this clause by the Supplier shall be regarded as a material breach of this Agreement.

## WORKPLACE HEALTH AND SAFETY

23.1.    The Supplier will ensure that any premises from which it provides the Services comply with the Security Standards, which shall be provided in writing and agreed to by Suppliers.

23.2.    The Supplier shall at all times comply with all Applicable Laws and Iovate Policies relating to health and safety, which may affect or relate to the performance of the Services as specified elsewhere in this Agreement. The Iovate Policies relating to health and safety shall be provided in writing and agreed to by Supplier.

23.3.    The Supplier is responsible for the safety and security of all Employees and Resources under its control.

23.4.    The Supplier shall promptly notify Iovate of any health and safety hazards that are apparent or that come to the Supplier's attention, which may arise in connection with the performance of the Services, and shall notify Iovate immediately after making sure that Kenco employees or anyone else is not in any danger, in the event of any Abnormal Occurrences at the Warehouse (or otherwise arising in connection with the Services), which could result in injury to persons.

### 24.    ASSIGNMENT

24.1.    Neither party may assign, novate or otherwise transfer this Agreement, or delegate any of its obligations under this Agreement, without the prior written consent of the other party, and any purported or attempted assignment or novation without the other party's prior written consent or transfer by operation of law shall give the other party the right to terminate this Agreement immediately on written notice.

40

24.2.    For avoidance of doubt, Iovate shall specifically not assign or sublet its interest or obligations herein, including, but not limited to, the assignment of any monies due and payable, without the prior written consent of Supplier.

    **25.    Recall.** In the event a recall, field alert, product withdrawal or field correction (together, "Recall") may be necessary with respect to any Products provided under this Agreement, Iovate shall immediately notify Supplier in writing. Supplier will not act to initiate a Recall without the express prior written approval of Iovate unless otherwise required by applicable laws. The cost of any Recall shall be borne by Iovate.

### 26. GENERAL

26.1.    This Agreement sets out the entire agreement between the parties with respect to the subject matter covered by it and supersedes and replaces all prior communications, drafts, agreements, representations, warranties, stipulations, undertakings and agreements of whatsoever nature, whether oral or written, between the parties relating to the subject matter of this Agreement.

26.2.    The parties acknowledge that in entering into this Agreement they are not relying upon any representation, warranty, promise or assurance made or given by any other party or any other person, whether or not in writing, at any time prior to the execution of this Agreement which is not expressly set out in this Agreement. Nothing in this Agreement shall operate to limit or exclude any liability for fraud.

26.3.    In the event of any conflict between the terms of the main body of this Agreement and the Schedules, the former shall take precedence to the extent of such conflict.

26.4.    No variation to this Agreement shall be effective unless in writing and signed by duly authorised representatives of each of the parties.

26.5.    If any clause or part of this Agreement is found by any court, tribunal, administrative body or authority of competent jurisdiction to be illegal, invalid or unenforceable then that provision will, to the extent required, be severed from this Agreement and will be ineffective without, as far as is possible, modifying any other clause or part of this Agreement and this will not affect any other provisions of this Agreement which will remain in full force and effect. This Agreement will not be construed against either party as the author or drafter of this Agreement.

41

26.6.    The forbearance, failure or delay by any party in exercising any right, power or remedy
of that party under this Agreement shall not in any circumstances impair such right,
power or remedy nor operate as a waiver of it.  The single or partial exercise by any
party of any right, power or remedy under this Agreement shall not in any
circumstances preclude any other or further exercise of such right, power or remedy
or the exercise of any other right, power or remedy. Any waiver of a breach of, or
default under, any of the terms of this Agreement shall not be deemed a waiver of
any subsequent breach or default and shall in no way affect the other terms of this
Agreement.

26.7.    At all times in connection with this Agreement the parties shall be independent
contractors and nothing in this Agreement shall create a relationship of agency,
partnership or joint venture as between the parties and accordingly, save as
otherwise expressly permitted by the terms of this Agreement, the Supplier shall have
no authority to bind Iovate nor shall it hold itself out to third parties as having authority
to enter into or incur any commitments, expenses, liabilities or obligations of any
nature on behalf of Iovate.

26.8.    The parties do not confer any rights or remedies upon any person other than the
parties to this Agreement and their respective successors and permitted assigns.

26.9.    Any notice to be given under this Agreement shall be given in writing and shall be
delivered 1) by hand, or, 2) by pre-paid first class mail, or 3) by a nationally recognized
overnight courier (e.g. Federal Express), to the contact details set out in the Contract
Particulars for the party to be served or as otherwise notified in accordance with this
clause 26.9.

26.10.   Any such notice shall be deemed to have been served if it has been sent to each of
the parties' stated addresses indicated in this Agreement and:

   a)    if delivered by hand or sent by nationally recognized overnight courier, at the
         time of delivery; or

   b)    if sent certified mail at the expiration of four business days after the envelope
         containing the same shall have been put in the mail.

Where, pursuant to clause 26.10, any notice would be deemed to have been received
on a day other than a working day, or where the actual time of receipt of any notice is

42

after 17.00 hours local time at the recipient's premises, then in either case that notice shall be deemed to have been received on the next following working day.

## 27.    LAW AND JURISDICTION

This agreement shall be construed by the laws of the State of Indiana without regard to the conflicts of law provisions thereof.  All disputes will be determined through arbitration pursuant to Section 19, however the parties each agree that any application for equitable reflief, including any application for an injunction, shall be exclusivly determined  by  the courts of Indiana.

## 28. IMPORT AND EXPORT

Notwithstanding anything in the Agreement to the contrary, and unless otherwise agreed by the parties in writing, the scope of Supplier's Services hereunder with respect to import or export of Products, shall be limited to: (i) the receipt of imported Products at the Warehouse, and (ii) the processing of outbound orders for receipt outside of United States. Iovate or designated party shall provide all required import and/or export documentation for such orders and shall be deemed the importer and exporter of record.

**IN WITNESS WHEREOF**

the parties to this Agreement have executed this Agreement on the date stated at the beginning of this Agreement.Signed for and on behalf of **Iovate Health Sciences International Inc.** by:

Signature: _Kelly Albert (Apr 27, 2023 16:34 EDT)_

Full name: Kelly Albert

Director/Authorised Signatory

Position/Title: Chief Operating Officer

Date: 27/04/2023

43

| | | |
|---|---|---|
| Signed for and on behalf of | ) | Signature: |
| Kenco Logistic Services, LLC | ) | |
| by: | ) | |
| | ) | |
| | ) | Full name: |
| | ) | David Caines |
| | ) | Director/Authorised Signatory |
| | ) | |
| | ) | Position/Title:   C D D |
| | ) | |
| | ) | Date:   4-28-23 |

## SCHEDULE 1

### PART 1, THE PRODUCTS

Below is a non-exclusive list of Iovate's range of Products to be handled by the Supplier.

Dietary Supplements

Protein and Creatine Powders

Pills

Gummies

RTD's ( Ready To Drink)

Clothing

During the Term of the Agreement new products will be inserted in the market by Iovate which materially changes the equipment, storage, operating model or warehouse requirements, (i) Iovate shall provide with 120 days notice of all new products the Supplier with all relevant details (including but not limited to SKU code, volumes, storage requirements, services required, dimensions, weights, label requirements, pallet configuration and, in case of hazardous product: UN number, ADR class and safety data sheet). New products which materially changes the equipment, storage, operating model or warehouse requirements will require approval by Kenco and/or the landlord. In the case of any modifications to the warehouse or surrounding property for any reason in order to receive, store, pick, pack and or ship the goods, Iovate will be responsible for paying invoices for all costs, charges, certifications, and inspections to ready the warehouse and or property for the goods. Kenco is not responsible for modification time delays or for modifications requiring longer than 90 days.

### SCHEDULE 1

### PART 2, CORE WAREHOUSE SERVICES

## Shipping Guideline:

All orders must ship by the scheduled pickup dates and times, subject to the KPI obligations set forth in Schedule 5 and with the exception of any established observed Supplier holiday, during which the Supplier has the sole and exclusive right to choose not to ship orders or otherwise process any orders or goods without being in breach of any provision of this Schedule or Agreement, or any KPI. The Supplier must hold themselves accountable to

45

meeting the carrier pickup appointment at all times. All transactions for shipping are expected to be entered and transacted in conjunction with the physical work being completed. All loads will ship *"Shippers load and count"* (i.e. Supplier is responsible for loading the truck and making sure the truck is loaded with the right amount of Products and that the Products/load are properly secured in accordance with the loading guideline specifications provided by Iovate in writing at the customer level or as otherwise advised to Supplier by Iovate). The Supplier must maintain a procedure to ensure all required carrier appointment times are recorded in the WMS or a desinated system/portal. The Supplier must ensure the dock scheduling is updated consistently to reflect the reality of the day's trucklog. Other items to be completed by the Supplier are:

- Manage carriers and trucks which miss their schedule appointments to the best Kenco's ability due to live unloading and Iovate pickups (CPU's)
- Manage yard and dock doors
- The loading of all Products onto outbound trailers and the processing of all shipping documents, including sending required EDIs to Iovate's ERP , based on Iovate specific requirements set forth in the agreed SOPs.
- Shipping of all Products on the correct pallet type (Grade A White Wood unless otherwise informed)
- Shipping all loads in compliance with customer Level requirements as provided in writing to Supplier.
- All loading and BOL activities completed in a reasonable time frame.
- All live loads must be completed and shipped according to the agreed SOPs. Later arriving drivers will be loaded as soon as possible, and Supplier will endeavor to accommodate drivers that arrive late to meet Iovate delivery appointments.
- All shipping to be done in compliance with all Applicable Laws including hazardous materials requirements, as provided by Iovate.
- The printing and application of all labels required for outbound orders, including LTL and parcel shipments.
- Record carriers arrival time
- The printing of all packing lists and BOL's for Iovate orders.
- Maintain, store, and ensure a record of all BOL and Packing Lists for a period of 5 years
- Provide copies of BOL and Packing Lists as reasonably requested by Iovate
- Kenco shall print Iovate provided customs documentation for export orders and Supplier shall support export orders in accordance with Section 28 of the Agreement.
- Load pallets in accordance with customer/ Iovate requirements provided to Supplier in writing.
- Notify Iovate of non-compliant trailers.
- Generation of all shipping documents, including labelling and transporter system entry of final load details will be the responsibility of the Supplier.

Receiving Guidelines:

46

Iovate deliveries are to be managed through a process and procedure to keep information close to real-time. The Supplier must maintain an updated dock schedule. The Supplier must consistently monitor for changes or requests impacting the dock schedule. All Products scheduled to be received daily are expected to be received, put away and accounted for in the WMS systems real-time, subject to the KPI obligations set forth in Schedule 5. The Supplier will need to complete an inbound audit checking for damages and Product integrity. It will be a requirement that paperwork and submissions of any discrepancies are maintained by the Supplier. Other items to be covered by the Supplier are:

- Schedule all inbound loads for next available appointment time.
- Supplier to provide inbound truck schedule to Iovate.
- Record actual arrival time and appointment time.
- If carrier arrives late, Supplier shall unload at next available slot.
- Manage all labor for unloading pallet and stretch wrapping, if required
- Receipts are received approximately 100% on pallets.
- LPN / SSCC pallet labels must be applied to inbound loads as required.
- Verify counts vs. expected, and perform all SOP and requested visual exterior apparent pallet/exterior pallet case damage checks on all inbound Product .
- For palletized Product, highlight if any pallet quality issues as defined by Iovate, and transfer to appropriate pallet.
- Conduct regular inspection of Product to insure receipt quantity accuracy.
- Make corrections to the information contained within the WMS to reflect ERP.
- Report all inbound variances to Iovate, overs, shortages, damages, and any over defect that Iovate should be made aware of.
- Deflate re-useable air bags, and store until needed for outbound usage.
- Reception of all Products into the Warehouse that is in quarantine status.
- Management of all aspects of quality/hold release process within established SOP's provided by Iovate in writing.

Storage:

- Store all Products in accordance with MSD Sheets and Master Data, giving priority to MSD, provided by Iovate.
- Stack Products in compliance with master data guidelines provided in writing from Iovate to Supplier.
- Manage all aspects of the physical and logical movement of Products within the Warehouse. This includes moving stock back and forth from general storage locations to case pick area.
- Ensure all gummy products are stored in cool room area. The cool room area shall be kept between 60 degrees F and 80 degrees F.

Flexibility:

Being an active player in the Fast Moving Consumer Goods market, Iovate needs a supplier that recognizes the effects this market has on the requirements that are asked of the Warehouse. Iovate will make every effort to provide ample notice of anticipated volume fluctuations. It is required of the supplier to make commercially reasonable efforts in addressing these fluctuations in volume.

Customer Service & Administration

As part of the service provided for this Warehouse, Iovate expects the supplier to act as the first point of contact for the different Iovate appointed transporters & haulers. In case of delays on the warehouse side, notification must be communicated to Iovate's customer service team and transportation 3PL.

In addition to these admin activities, it's also expected from the warehouse managing party that they take full charge of the pallet management for this site. Iovate will provide a forecast to ensure the appropriate levels are on hand in the Warehouse to cover business requirements. Supplier will be responsible for the management of all one-way pallets; ensuring scrap wood is removed in a timely manner.

Supplier will also be responsible for ordering and maintaining all Warehouse consumables. Supplier shall bill Iovate for all Warehouse consumables, providing proof of purchase, plus applicable fees, taxes, and shipping costs.

Supplier shall provide reports to Iovate regarding daily inbound and outbound shipping schedules, and will provide communications of any changes.

Physical inventory:

Iovate requires a minimum of one physical wall to wall inventory count per year, at Iovates' expense. Further inventory counts may be required as per the Agreement. In the case of inventory imbalances which involve large quantity discrepancies, lot variances, rotation issues, improper month end cut-off reconciliation's, etc. Iovate will require a further physical inventory count as a final verification of accuracy. The Supplier shall make all attempts to achieve cycle counting metrics, accuracy requirements, and recording to work towards eliminating the physical inventory requirements in working with Iovate auditors. One cycle count per location per month is required until inventory accuracy numbers enable bimonthly counts.

General:

Supplier will be required to:

- Operate a warehouse on behalf of Iovate, forming an integral part of Iovate's supply chain.

- Manage manpower levels to cover all peaks in demand from month end activities or, otherwise forecasted by Iovate

- Basic hours of operation are Monday to Friday 7am – 10pm. Supplier will observe holidays as follows: New Years Day, MLK Day, Good Friday, Memoria Day, July 4th, Labour Day, Thanksgiving Day, Day after Thanksgiving, Christmas Eve,and

Christmas Day.). In the event the parties agree Supplier shall operate during a
holiday, Supplier shall bill Iovate the aligned rate, agreed to in writing.

- The operation will run 16 hours per day, 5 days per week. If weekend shifts are
  required, the parties will agree in writing what is required to execute all Warehouse
  demands of Iovate. If there is a material change in the business, prior to any such
  change in work hours of operation, the Supplier and Iovate shall meet and determine
  if there are any changes to pricing such as adding or subtracting management or
  other personnel changes and equipment required to properly support the new hours
  of operation. Should any changes be required, Supplier and Iovate agree to adjust
  the fixed or variable rates to reflect the agreed to change in writing.

- Provide all Material Handling Equipment to handle all of the activities in relation to this
  Agreement.

- Provide all manpower to handle all of the activities in relation to this Agreement.

- Ensuring data contained within the WMS accurately reflects the information contained
  within Iovate's ERP

- Follow all SOP's provide by Iovate in writing .

- Conduct and keep current training of Supplier's personnel.

- Conduct and keep current training of Supplier's personnel in good practices ("GxP"),
  as required by the agreed SOP's, and maintains all documentation in accordance
  with GxP requirements.
- Facilitate and support contractor visits for Warehouse repairs/maintenance, audit, or
  landlord requirements.

Order Processing:

- Supplier will be required to: conduct daily load planning per SOPs provided by Iovate, ensuring Iovate orders are picked and ready to ship at the scheduled collection time agreed with the carrier, subject to the KPI obligations set forth in Schedule 5.

- Handle all aspects of order picking

- Process rush and load rush orders when notified by Iovate in writing by the agreed upon cut off time per day.

- Apply customized Iovate labels as appropriate, and as required by customer.

- Perform dock operation audits, to ensure accuracy and quality of outbound shipments. Communicate results of audits to Iovate on a weekly basis. Supplier will check 10% of weekly outbound volume, and will take direction from Iovate on which customers to target if applicable.

- Notify Iovate representatives of any shipping delays to orders, for any reason in accordance with the agreed SOPs.

- Ongoing, proactive communication with Iovate with respect to order status and stock inventory levels. Notify Iovate representatives of any cuts to orders due to inventory shortages, and obtain written permission from Iovate to make the cut.

- Responsible for consolidating outbound pallets on dock wherever possible, optimizing the number of pallets per outbound order.

- Adhere to FEFO requirements, ensuring proper stock rotation practices are maintained at all times.

Inventory Control:

- Timely and accurate monitoring of all inventory held in the Warehouse.
- Inventory accuracy is controlled and measured at a location level.
- Careful review of all inventory transactions processed in the Warehouse, including receipts, adjustments, returns, and order processing.
- Follow cycle count process and frequency in accordance with the agreed SOPs.
- Cycle count results to be updated by Supplier upon final reconciliation. Iovate representative to be notified of any discrepancy with value in excess of $500.
- All inventory adjustments to be documented and filed if appropriate.

- Special cycle counts may be required when responding to Iovate shortage complaints.
- Supplier is responsible for re-warehousing engineering and slotting strategy to ensure Warehouse utilization.

Employees: The Supplier shall supply all labour, equipment, training, and Employee supplies required for the performance of the Services and all of its obligations hereunder. The Supplier's status under this Agreement is that of an independent contractor, and all persons assisting the Supplier in the performance of this Agreement shall be deemed to be employees of the Supplier, and not that of Iovate. The Supplier shall be soley responsible for directing and supervising its employees providing the Services contained within the Agreement and the Schedules. The Supplier shall be responsible for all and any related employee compensations or other applicable employment payments as further set out in the Agreement. The Supplier shall never make any commitment on Iovate's behalf to any third party.

Inventories: The Supplier shall co-operate with Iovate in investigating and resolving all variances related between the ERP and WMS.

Storage of Goods and Warehouse Cleanliness:

- Products must be stored in the appropriate Warehouse location, which fits Iovate's requirements set forth in the WMS as approved by Supplier .
- The Warehouse areas in which Supplier operates must be consistently maintained in a clean, well organized manner. All areas must be kept free of debris, including shrink wrap, broken pallets and other materials. It is expected that 5S practices will be implemented.
- Support of Warehouse tours and visits conducted by Iovate's leadership, Iovate will provide Supplier 48 hours notice of tours and visits.
- All walkways should be kept clear of obstructions.
- Sanitation logs must be kept up to date and available to Iovate upon request.

Returns:

- Scheduling of any inbound deliveries from carriers.
- Unloading of any inbound deliveries in preparation for processing and sorting.
- Proper management and processing of returned goods, in compliance with the agreed SOP's.
- Timely, efficient and neat receiving of returned goods into segregated areas for Product sorting and and processing.

- Management of asset recovery and donations of returned and past-date code stock, and transmitting the appropriate stock moves per instructions from Iovate.
- Accurate and timely processing of all returns.
- Entries of reusable quantities into the WMS system based on authorized RMA number issued.
- Place Product back into stock, where appropriate both physical and systematic.
- Accurate, neat storage of goods destined for re-cycling/destruction.
- Weekly summary of Product returns processed to be sent to Iovate.
- Iovate shall provide Supplier with a return authorization number in advance of the return for processing.

Waste Management:

Supplier will perform waste management requests from Iovate as agreed in writing by the parties or as agreed by SOP.

- Storage of goods destined for re-cycling/destruction shall be stored neatly and correctly identified.
- Pick expired stock from warehousing, and sort into the appropriate handling streams (e.g.,-waste).
- Sort any warehouse damage, or carton fatigue into the required waste stream.
- Supplier will order and maintain all supplies required for managing any waste generated from the Warehouse.
- Supplier shall pick, load, and prepare all paperwork related to Product destruction pickups.
- Iovate will promptly provide resolution of products waste management areas.

Material Handling Equipment

- Supplier will provide all equipment necessary to operate the Warehouse, including, without limitation, the pieces of material handling equipment ("MHE") set forth in Schedule 12. All costs associated with maintenance of this equipment will be covered by the Supplier. Notwithstanding the foregoing, the parties acknowledge that revisions to the number and mix of MHE may be appropriate, and the parties will review and mutually agree in writing such revisions, including changes to the Charges, from time to time as circumstances warrant.

Reporting:

- KPI reports will include details on the quality of Iovate shipments.
- Comprehensive monthly reports on all aspects of Warehouse performance are expected. Monthly reviews will take place with Iovate Manager.

52

- Standard reports provided by Kenco's WMS.
  Kenco agrees to implement Supplier's engineered standards and related tracking
  systems

### Communication:

The following prompt communication is expected, but not limited to from Supplier to Iovate:

- Any request to cut Product from orders, due to availability of Product, or Product hold, should be made to Iovate before shipping that day. No cut shall be made to an order without Iovate approval. Iovate to provide after hours contacts and procedure in writing to not delay shipments.
- Any delays to inbounds, due to capacity.
- Any deviations and non-conformances with respect to GxP compliance in the Warehouse including but not limited to, facility changes, or pest issues
- Open, timely, accurate communication flow is expected at all times. The Warehouse must communicate any issues with order status, order delay, Product levels, Supplier issues and carrier issues as soon as is practicable. This communication will be directed to but not limited to: Transportation, Customer Service, Demand Planning, and site management.

### Miscellaneous Requests:

- Supplier will perform miscellaneous requests from Iovate as agreed in writing by the parties. The following is an incomplete list of some examples that could be requested:
    1. Support in the loading of destruction loads per the Transportation of Dangerous Goods legal requirements.
    2. Receive in marketing event materials.
    3. Receive in shipment test Product from suppliers and co-packers.

- Email bills of lading ("BOLs") or other required shipping documents to customers in advance of order delivery date as reasonably requested by Iovate.
- Adhere to reasonable customer special palletization requests and as directed by Iovate.

### Recall Requirements:

- The Supplier must be able to provide records and transactional history for all Products received and shipped to and from the Warehouse by item, date and lot code using the system. Iovate will require periodic mock recalls to test tracing and tracking

53

capabilities. Supplier must be able to complete mock recalls within an agreed
timeframe.

### QA Requirements:

- The Supplier will follow all Iovate's Quality Assurance, procedures and guidelines,
  including placing and releasing Products on hold and marking Products for disposal.

### Regulatory Inspection Requirements:

- Kenco will be responsible for maintaining Products, the building and the grounds and
  to ensure compliance with all country and local regulatory and or governmental
  agencies and laws, including but not limited to independent auditors.
- The Supplier shall promptly notify Iovate if a government authority or other relevant
  regulatory authority contacts Supplier. If at any time Products produced for Iovate are
  sampled by a regulatory authority or agency, the Supplier shall facilitate a sample
  process.

### Pest Control and Housekeeping:

- Housekeeping is considered by Iovate as an indicator of the value that the Supplier
  places on the account. It is expected and required that Iovate Products shall be kept
  clean, dry and dust free. Warehouse personnel should use care in handling, stacking,
  picking and staging, and ensuring that the Products are clean before shipping.

- Kenco shall be responsible for maintaining a pest control program at the Warehouse.

54

## SCHEDULE 2, THE CHARGES

### 1. Rates and Charges:

Iovate and Supplier agreed to a Cost Plus Model, that has the estimated rates below. These rates will be paid to the Supplier but remain subjected to Section 4.0 ("CHARGES") and it's respective sub-sections. The Year One Rebate is aligned at five-hundered thousand ( $500,000) USD. Year(s) 2 – 4 will have a rebate of one-hundered thousand ($100,000) USD. Annual rebates will be paid only if (i) Iovate is in full contractual compliance, (ii) volumes, business profile, and operating budgets are approved and in full effect, and (iii) neither party has served a termination notice. At no time will annual rebates be prorated for partial years.  After a period of eight (8) months post operational go-live, the parties will review a fixed variable pricing model which will be negotiated in good faith. The effective date of the fixed variable arrangement would be the first business day of year two (2) of this Master Service Agreement. The parties must mutually agree to change from the cost plus model to fixed variable pricing model.

Table A below does not include yard services, returns processing costs, transportation services of any kind, physical inventories and product waste management.

Table A: Year One (1) Estimated Charges with 45 day payment terms:



**PERSONNEL EXPENSES**

| Management | Annual Base Wage | Staff Quantity | Annual Cost |
|---|---|---|---|
| Director of Operations | | | |
| General Manager | | | |
| Inventory Manager | | | |
| IT Support | | | |
| Central Planning | | | |
| Quality | | | |
| Supervisors | | | |
| Operations Manager | | | |
| Shift Supervisor | | | |
| Office Manager | | | |
| Supervisors | | | |
| Sub-Total | | 4.3 | $499,668 |

| Clerical Support | Base Hourly Wage | Annual Hours | Staff Quantity | Annual Cost |
|---|---|---|---|---|
| Clerical Support | | | | |
| Order Wave | | | | |
| Shipping Clerical | | | | |
| Quality Clerical | | | | |
| Customer Service Clerical | | | | |
| Payroll Clerical | | | | |
| Other Clerical | | | | |
| Sub-Total | | | 3.0 | $184,039 |

| Fixed Warehouse | Base Hourly Wage | Annual Hours | Staff Quantity | Annual Cost |
|---|---|---|---|---|
| Quality Tech | | | | |
| Inventory Count | | | | |
| Security | | | | |
| Misc Site Support | | | | |
| Kitting Scheduler | | | | |
| Workflow Planner | | | | |
| Other (list job title) | | | | |
| Sub-Total | | | 7.0 | $424,302 |



| Variable Warehouse | Base Hourly Wage | Annual Hours | Staff Quantity | Annual Cost |
|---|---|---|---|---|
| Lead | | | | |
| Material Handler (LTO) | | | | |
| Warehouse Worker | | | | |
| Kitting Worker | | | | |
| Refresh | | | | - |
| Auditor | | | | - |
| Temp Agency (Bill Rate) | | | | - |
| Sub-Total | | | 41.7 | $2,467,279 |

| Other Expenses | Incentive | Overtime | Benefits, Taxes, Workers Comp | Total Uplift |
|---|---|---|---|---|
| Management | | | | 0.0% |
| Clerical Support | | | | 0.0% |
| Fixed Warehouse | | | | 0.0% |
| Variable Warehouse | | | | 0.0% |

| PERSONNEL SUMMARY TOTALS | Annual Wage Totals | Annual Uplift | Annual Costs |
|---|---|---|---|
| Management | | - | |
| Clerical Support | | - | |
| Fixed Warehouse | | - | |
| Variable Warehouse | | - | |
| Total | $3,575,289 | - | $3,575,289 |

**OPERATING EXPENSES**

| Facility Costs | Total Square Footage > | | Annual Cost |
|---|---|---|---|
| Base Rent | Cost per square foot | $ | |
| NNN Charges | Cost per square foot | $ | |
| Building Improvements Amortization | | | |
| Utilities | | | |
| Security | | | |
| Sub-Total | | | $2,582,245 |



| Material Handling Equipment | Annual Cost per Unit | Quantity of Units | Annual Cost |
|---|---|---|---|
| **Leased Equipment** | | | |
| Center Rider - DBL | $ | | |
| Reach DBL - ELE | $ | | |
| Scrubber | $ | | |
| Sitdown - ELE | $ | | |
| Scissor Lift | $ | | |
| | | | |
| **Rental Equipment** | | | |
| Center Rider - DBL | $ | | |
| Reach DBL - ELE | $ | | |
| Sitdown - ELE | $ | | |
| Order Picker - ELE | $ | | |
| Type 5 (list description) | $ | | |
| Sub-Total | | 115143.4 | $368,370 |

| Capital Investment Costs | Annual Cost |
|---|---|
| Racking - Depreciation | |
| Racking - Maintenance | |
| Automation Equipment - Depreciation | |
| Automation Equipment - Maintenance | |
| Sub-Total | $752,885 |

| Technology Costs | Annual Cost |
|---|---|
| WMS Hardware Depreciation | |
| WMS / Software | |
| Office Equipment / PC's / Phones | |
| Data Communications Costs | |
| Timekeeping System | |
| Other IT Costs - explain | |
| Sub-Total | $596,185 |

| Miscellaneous Operating Costs | Annual Cost |
|---|---|
| Supervisory Visits | |
| Office Cleaning | |
| Recycling | |
| Pest Control | |
| Office Supplies | |
| Professional Fees | |
| Insurance | |
| Other 1 - explain | |
| Other 2 - explain | |
| Sub-Total | $1,174,646 |

| OPERATING EXPENSE SUMMARY TOTALS | Annual Costs |
|---|---|
| Facility Costs | $2,582,245 |
| Material Handling Equipment | $368,370 |
| Capital Investments | $752,885 |
| Technology | $596,185 |
| Miscellaneous Operating Costs | $1,174,646 |
| Total | $5,474,331 |

**TOTAL SUMMARY**

| TOTAL OPERATION BUDGET | | Annual Costs |
|---|---|---|
| Personnel Costs | | $3,575,289 |
| Operating Expenses | | $5,474,331 |
| Management Fee | Percent Markup > | $361,985 |
| **Grand Total** | | $9,411,605 |
| Correction for G&A and Cost of Working Capital without Management Fee | | ($107,207) |
| **Corrected Total** | | $9,304,398 |
| Year 1 Startup Budget Rebate | | ($500,000) |
| **Estimated Year 1 Grand Total with Rebate** | | $8,804,398 |

If all expenses for any operating month in Year 1 prior to applying management fee, G&A, and cost of working capital, are below $487,600 USD, Iovate will be invoiced the $487,600

57

███████████████████████████████                This dollar amount may be adjusted for each
budgeted year under this Agreement.

## 2. Over time Charges

Iovate will provide a reasonably accurate rolling monthly volume forecast the first business day of each month. ("Weekly Forecast"). Supplier agrees it will staff the Warehouse to meet the levels set out in the Weekly Forecast at all times. Overtime shall be managed on a weekly basis by Supplier, who may charge Iovate for direct labor and clerical labor overtime costs for the week, approved by Iovate's operations management personnel.

## 3. Extra Charges

From time to time, Iovate may request the Supplier to carry out services that are not covered under the term of this Agreement. In this instance, the Supplier may, upon agreement in writing to provide such additional services, invoice Iovate at cost ███████. This would also include the purchase of any pre-authorised materials for use in the operation which will be passed to Iovate with the applicable fees. The Supplier must obtain the approval from Iovate in writing before proceeding with the completion of the work and equipment/materials purchases to be Invoiced to and paid by Iovate.

## 4. Assets and Capital Items:

Supplier will acquire and/or otherwise provide equipment and other assets and capital items to support the performance of the Services, as mutually agreed in writing by the parties. Such assets and capital items will be leased and/or purchased and, if purchased, shall be depreciated either over the life of the asset using GAAP standards or over the remaining term of the Agreement, as mutually agreed in writing by the parties. Purchased assets and capital leases shall incur an applicable interest charge on the Net Book Value (NBV) balance as defined by an amortization schedule which will match the depreciable life of the asset (ex. 3 yrs, 5 yrs, etc).

An asset list will be updated from time to time, with all leases, depreciation and interest charges, and payments for assets and capital items included as part of the implementation budget and/or included in subsequent annual operating budgets. Supplier will provide a listing of all assets and capital items estimated to perform the Services before the go live date.

Section 13 of the Agreement sets out the parties' respective obligations upon termination as they pertain to leased/amortized assets and capital items.

Supplier equipment and other Supplier capital assets:

## 5. Start-up Costs:

Supplier will incur certain estimated costs and expenses related to the start-up activities for the Warehouse ("Start-Up Costs"). Iovate agrees to compensate the Supplier for the Start-Up Costs. Which Supplier shall bill as incurred to Iovate. Any expenses for startup services which may be incurred exceeding the four-hundred and ninety-one

58

thousand, four-hundred and ninety-three dollars ($491,493 USD) will require prior approval by Iovate.

| Operations Staffing | # Weeks Prior to Launch | # FTE's | Avg Weekly Rate | Total Cost |
|---|---|---|---|---|
| Management | 2.6 | 4.3 | $ 10,628 | $ 119,988 |
| Hourly Labor | 2.0 | 46.6 | $ 978 | $ 91,125 |
| Project Management | 14.0 | 1.0 | $ 6,435 | $ 90,083 |
| Estimated Travel Budget | | | | $ - |
| Sub-Total | | | | $ 301,196 |

| Technology Staffing | # Weeks Prior to Launch | # FTE's | Avg Weekly Rate | Total Cost |
|---|---|---|---|---|
| IT Project Management | 20.0 | 1.0 | $ 3,690 | $ 73,800 |
| Integration and Testing | 20.0 | 1.0 | $ 2,400 | $ 48,000 |
| Professional Services | - | - | $ - | $ - |
| Estimated Travel Budget | | | | $ - |
| Sub-Total | | | | $ 121,800 |

| Capital Investments | | | | Total Cost |
|---|---|---|---|---|
| Racking | | | | $ - |
| Automation | | | | $ - |
| Other MHE - please explain | | | | $ - |
| Technology hardware | | | | $ 7,500 |
| Technology software | | | | $ - |
| Sub-Total | | | | $ 7,500 |

| Facility and Equipment Prior to Launch | # Weeks Prior to Launch | # Units | Avg Weekly Rate | Total Cost |
|---|---|---|---|---|
| Rental, NNN, Utilities, Security, Etc. | - | $ - | - | $ - |
| Leased Equipment | - | $ - | - | $ - |
| Rental Equipment | - | $ - | - | $ - |
| Other Equipment | - | $ - | - | $ - |
| Sub-Total | | | | $ - |

| Other Start-Up Costs - please explain | Description | | | Total Cost |
|---|---|---|---|---|
| Hiring (testing/screening/recruitment) | | | | $ 50,807 |
| Startup Supplies | | | | $ 10,190 |
| Category 3 | | | | $ - |
| Category 4 | | | | $ - |
| Sub-Total | | | | $ 60,997 |

| ESTIMATED STARTUP BUDGET | | | | Annual Costs |
|---|---|---|---|---|
| Operations Staffing | | | | $ 301,196 |
| Technology Staffing | | | | $ 121,800 |
| Capital Investments | | | | $ 7,500 |
| Facility and Equipment Prior to Launch | | | | $ - |
| Other Startup Costs | | | | $ 60,997 |
| Sub-Total | | | | $ 491,493 |
| Management Fee | Percent Markup > | 0.0% | | $ - |
| ESTIMATED Budget | | | | $ 491,493 |

## SCHEDULE 3 – RESOURCES

The Resources may be amended from time to time by mutual agreement in writing of the parties. The annual straightline of estimated  headcount is idendified in Section 2, Table A.

## SCHEDULE 4 – KEY PERFORMANCE INDICATORS





## SCHEDULE 5, FORM OF MONTHLY REPORT

The standard reports that the Supplier shall provide to Iovate are based on reports set up in Kenco's WMS, or like reporting system and will be made available to Iovate by the 5th working day of the month that follows the month of activity. Required reports include, but are not limited, to the data elements listed below in the attached form. The parties will review existing reports and will jointly determine the formats and delivery methods to meet existing reporting needs as well as jointly define any new

reports that will be developed from the WMS. Supplier and Iovate will develop a standard report format prior to going live.

## SCHEDULE 6 - BUSINESS CONTINUITY PLAN ("BCP")

Iovate has ID CODE #: SOP-OP-BC prepared as part of the agreed SOPs. It is the expectation of Iovate that the Supplier on Effective Date, will have a BCP in place and agreed to in writing.

### SCHEDULE 7 Form of Quality Agreement





## Appendices

**Appendix 1:** Supplier - Company Contact List



**Appendix 2:** Iovate Health Sciences U.S.A Inc.Contact Listing



**Appendix 3:** Revision History

| DATE | ISSUE NUMBER | REASON FOR CHANGE |
|------|--------------|-------------------|
|      | 1.0          | Original issue    |

## SCHEDULE 8 SECURITY STANDARDS

Supplier Responsibilities:



## SCHEDULE 9 TERMINATION ASSISTANCE

The following additional definitions are used in this Schedule 9:

- **"Material"** means any document, methodology or process, documentation, data or other material in whatever form, including without limitation any reports, specifications, business rules or requirements, user manuals, user guides, operations manuals, training materials and instructions, excluding those specific to the Supplier's proprietary practices.

- **"Iovate Data"** means all data and/or information developed, received or acquired by the Supplier in the course of performing the Services which relates to Iovate or an Iovate Affiliate, and any of their respective employees, customers or sub-contractors who make use of the Services, and in respect of all of the above, their respective operations, facilities, customers, clients, employees, assets and programs in whatever form that information may exist;

- **"Iovate Equipment"** means Equipment belonging to Iovate or an Iovate Affiliate;

- **"Replacement Services"** means the Services as defined in Schedule 1 Part 2 and which Iovate procures in substitution for the Services following the termination of this Agreement, whether those services are provided by Iovate internally and/or or by any Replacement Supplier;

- **"Replacement Supplier"** means any third party supplier of Replacement Services appointed by Iovate;

- **"Termination Assistance"** means the services that are to be provided by the Supplier in order to ensure the organised and timely run down and handover of the Services to Iovate or any Replacement Supplier during the Termination Assistance Period, as set out in Schedule 9.

· **"Termination Assistance Period"** means the period commencing on the date on which notice is served terminating this agreement and ending on expiry or termination of this Agreement (or such other date after expiry or termination as may be reasonably requested by Iovate and as agreed to by the Parties in writing (save that the Termination Assistance Period may not continue for more than 5 months after the date of expiry or termination)

· **1.     OBJECTIVES**
· 1.1     The purpose of the Termination Assistance is:
· 1.1.1   to enable the Supplier to cease providing the Services which are to be terminated, and for Iovate or the Replacement Supplier to undertake Replacement Services from the end of the Termination Assistance Period; and
· 1.1.2   to eliminate or minimise any disruption or deterioration of the Services, or failure to achieve the Key Performance Indicators, during and as a result of the handover from the Supplier and the commencement of the Replacement Services.

· **2.     EQUIPMENT AND ASSETS**
· 2.1     The Warehousing Agreement shall control any and all termination obligations, including the direction on the disposition of the assets. Within a reasonable amount of time, following the service of the termination notice , the Supplier shall provide Iovate with a list of such assets, together with such accompanying information as may be relevant or as Iovate may reasonably require. If Iovate purchases assets and/or assumes outstanding lease obligations, Supplier will promptly do all such things as may be reasonably required to assign title in such assets to Iovate as applicable. The amount payable by Iovate for such non-leased assets shall be based on the book value at the end of the Termination Assistance Period or, if the assets are fully paid for, no further payments are due.

· **3.     DATA AND MATERIALS**
· 3.1     The Supplier shall, where reasonably necessary, assist Iovate in transporting, loading and running any Iovate Data and Iovate Material.
· 3.2     The Supplier will, on Iovates reasonable written request and subject to the terms of the Agreement, return or destroy any Iovate-related Confidential Information and any Iovate Data.

· **4.     EMPLOYEE AND SUBCONTRACTORS**
· 4.1     The Supplier shall assist Iovate by liaising with Iovate designated sub-contractors in order to provide termination assistance in accordance with the obligations under the Agreement. In the event that such assistance is not included in the annual operating budget, any costs associated with this assistance during the Termination Assistance Period will be borne by Iovate at mutually agreed upon rates in writing.
· 4.2     Subject to the other provisions of this schedule and the Agreement generally, the Supplier shall as soon as reasonably practical after a request, provide information and instruction to all Employees which could reasonably be expected to enable Iovate , to provide the Replacement Services with minimum disruption and in reasonable accordance with service levels similar to the Key Performance Indicators.

· **5.     OPERATIONAL TRANSITION**
· 5.1     The Supplier shall perform all activities reasonably required to assist in a smooth transfer of operational responsibilities for the Replacement Services, which shall as a minimum include the following:

· 5.1.1   participation in workshops convened by Iovate to plan how Iovate will continue to operate without the Supplier's performance of this Agreement;

66

- 5.1.2 documenting and delivering to Iovate all Work Products and any other documentation as agreed by the parties in writing, Equipment and Materials used to provide the Services, provided that any documentation constituting the Supplier's business records may be maintained by the Supplier;
- 5.1.3 providing work volumes, staffing requirements, actual performance against Key Performance Indicators and information on historical performance for each service component, over the preceding twelve (12) months (or such shorter period during which the Services may actually have been provided);
- 5.1.4 with respect to work in progress as at the end of the Termination Assistance Period, documenting the current status and stabilising for continuity during transition;
- 5.1.5 providing information and raw data for reports, as required; and
- 5.1.6 providing Iovate and its servants, agents or contractors (with or without equipment and machinery) with reasonable access to any of the Supplier's premises from which the Services are performed, for the purposes of continuing for a reasonable period of time any of the Services the Supplier is unable or unwilling to provide.
- 5.1.7 In the event that such operational transition activities are not included in the annual operating budget, any costs associated with these activities during the Termination Assistance Period will be borne by Iovate at mutually agreed upon rates in writing.

### SCHEDULE 10 STANDARD OPERATING PROCEDURES ("SOPs")

The provided list of SOPs set forth in the table below are for reference only and Supplier has not received or reviewed any of the documents below from Iovate. Supplier must approve all SOPs in writing. SOPs are living documents subject to revision, and creation of new SOPs is part of the overall process to ensure adherence to regulations and to address changing business needs. This list is not intended to serve as a complete list of all written SOPs applicable throughout the lifetime of this Agreement.





4872-9607-9200, v. 2

## <u>EXHIBIT C</u>

**Cooperation Agreement**

**FILED UNDER SEAL**

**EXHIBIT D**

**Exit Email**

**From:** Pawel Tylkowski <Pawel.Tylkowski@iovate.com>
**Sent:** Monday, September 15, 2025 9:52 AM
**To:** Vickers, Matt <Matt.Vickers@kencogroup.com>; Dragoo, Bill <Bill.Dragoo@kencogroup.com>
**Cc:** Tara Snell <Tara.Snell@iovate.com>
**Subject:** [Caution: External]RE: Planning

**Caution:** This email originated outside of Kenco. Do not reply, click links, or open attachments unless you recognize the sender and know the content is safe.

Hi Matt, Bill,

Ahead of our upcoming meeting, I'd like to share our transition plan to help with your team's planning. This is aligned with the exit timeline agreed between Frank and Chris (10/31).

We will be reducing inbounds to critical items only (required to fulfill customer orders) and shifting customers in two phases:

1) All customers other than Amazon and iHerb
   - Last orders to be shipped from Kenco: Friday, 9/26
   - Final shipments out of Kenco: week of 9/29
2) Amazon and iHerb
   - Last orders expected: by 10/10
   - Final shipments: week of 10/17
3) Final two weeks
   - Focus will be on clearing remaining inventory.

Attached below is the high-level inventory movement plan (pallets). Please note this does not include inbounds.

| Week of | 15-Sep | 22-Sep | 29-Sep | 6-Oct | 13-Oct | 20-Oct | 27-Oct |
|---|---|---|---|---|---|---|---|
| Start Balance | 6,559 | 5,790 | 4,876 | 4,048 | 2,898 | 1,662 | 622 |
| Transfers to RJW | 400 | 200 | 480 | 400 | 960 | 1,040 | 622 |
| Sales | 369 | 714 | 348 | 750 | 276 | | |
| Ending balance | 5,790 | 4,876 | 4,048 | 2,898 | 1,662 | 622 | 0 |

Looking forward to discussing this further in our meeting and aligning on next steps.

Regards,

**Pawel Tylkowski**
Senior Director, Customer Supply Chain

Iovate Health Sciences International Inc.
381 North Service Road West, Oakville, ON L6M0H4 Canada
P: 905.678.4038| TF: 1.888.334.4448 x4038
Iovate.com | pawel.tylkowski@iovate.com
Our Mission: To inspire active lives through nutrition and wellness for a healthier tomorrow.

**From:** Pawel Tylkowski
**Sent:** Thursday, September 11, 2025 1:37 PM
**To:** 'Vickers, Matt' <Matt.Vickers@kencogroup.com>
**Cc:** bill.dragoo@kencogroup.com
**Subject:** RE: Planning

Hi Matt,

Could we do it next Thursday after the 9am meeting? 9:30-10am?

Regards,

**Pawel Tylkowski**
Senior Director, Customer Supply Chain

Iovate Health Sciences International Inc.
381 North Service Road West, Oakville, ON L6M0H4 Canada
P: 905.678.4038| TF: 1.888.334.4448 x4038
Iovate.com | pawel.tylkowski@iovate.com
Our Mission: To inspire active lives through nutrition and wellness for a healthier tomorrow.

---

**From:** Vickers, Matt <Matt.Vickers@kencogroup.com>
**Sent:** Thursday, September 11, 2025 8:52 AM
**To:** Pawel Tylkowski <Pawel.Tylkowski@iovate.com>
**Cc:** bill.dragoo@kencogroup.com
**Subject:** Planning

**EXTERNAL**

Good morning, Pawel.

I would like to put something on the calendar for Thursday or Friday next week. If possible, would you be available on Thursday 0830a? If not, please let me know when best works for you. Please invite anyone that you would like to the meeting. What I would like to discuss is what the next 60 days looks like for both Iovate and Kenco.

Respectfully,



**Matthew Vickers**
Sr. Site OM

250 River Ridge Pkwy, Jeffersonville IN 47130
Mobile: 910-546-0306



The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

## EXHIBIT E

**Kenco's Calculation of Claim**

| Iovate Operational Cost Breakdown | | |
|---|---|---|
| | **Monthly** | **6 Month Total** |
| Salaried Labor | $ | $ |
| Hourly Labor | $ | $ |
| Rent | $ | $ |
| Other Operating Expenses | $ | $ |
| **Total Operating Expenses** | **$      777,426** | **$      4,664,554** |

* YTD Monthly Average was assumed.

* Lease obligations are excluded from the Monthly and 6 Month Totals since they are captured in the TSA Obligations Table.

| TSA Obligations | |
| --- | --- |
| Cost Category | Cost (USD) |
| Lease Obligations | $ |
| Notes Receivables (building, IT, Security costs, etc.) | $ |
| **Transition Fee Total** | **$** |
| CH Robinson Integration | $ |
| **Grand Total** | **$ 3,700,404** |

*Transition Fee Total referenced in "Terms and Conditions" 2a of the TSA.
Grand Total includes CH Robinson Integration that is included in Schedule 1 of the TSA.

| Headcount and Severance | | |
|---|---|---|
| **Employee Type** | **Headcount** | **Severance** |
| Hourly FT | ███ | $ |
| Ops Management | ███ | $ |
| Salaried Support | ███ | $ |
| **Subtotal** | | $ |
| Retention Bonus | | $ |
| **Total RIF Cost** | | **$ 208,209** |

\* Employees get full pay calculated 2 week per full year of service. Minimum 4 weeks, maximum 26 weeks. No Cobra/other benefits paid for by Kenco during severance period. $2k Retention bonus per hourly employee.

## **EXHIBIT F**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 15 |
| IOVATE HEALTH SCIENCES INTERNATIONAL INC., *et al.*, | Case No. 25-11958 (MG) |
| Debtors in a Foreign Proceeding.[1] | (Jointly Administered) |

**ORDER GRANTING KENCO LOGISTIC SERVICES, LLC'S EMERGENCY MOTION**
**FOR RELIEF FROM THE AUTOMATIC STAY OR IN THE ALTERNATIVE**
**FOR ADEQUATE PROTECTION OF ITS SECURED CLAIM**

Upon Kenco Logistic Services, LLC's motion (the "Motion")[2] pursuant to sections 361(1)

and 362(d) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 4001, and Local Rule

4001-1 for entry of an order granting Kenco relief from the automatic stay or in the alternative

adequate protection of its secured claim; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and

the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that

the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and this Court having determined that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is hereby **ORDERED THAT**:

---

[1] The Debtors in the Canadian Proceeding, along with the last four digits of each Debtors' United States Tax Identification Number or Canadian Business Number, as applicable, are as follows: (i) Iovate Health Sciences International Inc. (0696); (ii) Iovate Health Sciences U.S.A., Inc. (3542); and (iii) Northern Innovations Holding Corp. (3909) (collectively, the "Debtors").

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to section 362(d) of the Bankruptcy Code, the automatic stay is lifted to permit Kenco to exercise its contractual and statutory rights under sections 5.5 and 6.2 of the Services Agreement, including the right to suspend Services and withhold delivery of products until Kenco is paid in full all charges due and owing under the Agreement (including attorneys' fees and costs secured by its warehouseman's lien).[Any further outbound movement of goods by the Debtors from the Kenco Warehouse shall be conditioned upon advance payment of Kenco's accrued fees and charges, including attorneys' fees, as expressly provided for in the Services Agreement.]

3.      Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

4.      Kenco is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

5.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Order.


Date: September ___, 2025        _____

                                 THE HONORABLE MARTIN GLENN
                                 CHIEF UNITED STATES BANKRUPTCY JUDGE