Steven W. Golden
Jeffrey M. Dine
Mary F. Caloway (admitted *pro hac vice*)
Victoria A. Newmark (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
1700 Broadway, 36th Floor
New York, New York 10019
Telephone: 212-561-7700
Facsimile:  212-561-7777

*Counsel to the Foreign Representative*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>IOVATE HEALTH SCIENCES<br>INTERNATIONAL INC.,[1] et al.<br><br>Debtors in a Foreign Proceeding. | Chapter 15<br><br>Case No. 25-11958 (MG)<br><br>(Jointly Administered) |

## SUPPLEMENTAL BRIEF IN SUPPORT OF
## MOTION FOR (I) RECOGNITION OF FOREIGN
## MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
## AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

---

[1] The Debtors in the Canadian Proceeding, along with the last four digits of each Debtor's United States Tax Identification Number or Canadian Business Number, as applicable, are as follows: (i) Iovate Health Sciences International Inc. (0696), (ii) Iovate Health Sciences U.S.A. Inc. (3542), and (iii) Northern Innovations Holding Corp. (3909).

Iovate Health Sciences International Inc., in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned foreign debtors (collectively, the "Debtors") in respect of that certain insolvency proceeding (together with any successor proceeding, the "Canadian Proceeding") commenced pursuant to section 50.4 of Canada's Bankruptcy and Insolvency Act (R.S.C. 1985, c. B-3) (the "BIA"), pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), by and through its undersigned counsel, respectfully submits this supplemental brief (this "Supplemental Brief") in support of the *Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 4] (the "Recognition Motion")[2] for recognition of the Canadian Proceeding with respect to each of the Debtors as a "foreign main proceeding" and certain related relief. In support of the Recognition Motion, the Foreign Representative hereby submits the *Third Declaration of Wesley Parris in Support of (I) Verified Chapter 15 Petitions, (II) Foreign Representative's Motions for Orders Granting Provisional Relief and Final Relief in Aid of Canadian Proceeding, and (III) Certain Related Relief* (the "Third Parris Declaration"), the *Declaration of Steven W. Golden in Support of (I) Verified Chapter 15 Petitions, (II) Foreign Representative's Motions for Orders Granting Provisional Relief and Final Relief in Aid of Canadian Proceeding, and (III) Certain Related Relief* (the "Golden Declaration"), and the *Declaration of Michael De Lellis in Support of (I) Verified Chapter 15 Petitions, (II) Foreign Representative's Motions for Orders Granting Provisional Relief and Final Relief in Aid of Canadian Proceeding, and (III) Certain Related Relief* (the "De Lellis Declaration"), each filed contemporaneously herewith and incorporated herein by reference. In further support of this Recognition Motion, the Foreign Representative respectfully

---

[2] Capitalized terms used but not defined herein are intended to have the meanings ascribed to them in the Recognition Motion.

represents as follows:

## I.    INTRODUCTION[3]

1.    As set forth in the Recognition Motion, the Canadian Proceeding should be recognized as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code.  As a result of such recognition, the Foreign Representative and the Debtors are entitled to the protections of section 1520 of the Bankruptcy Code and should be afforded all relief contemplated by section 1521 of the Bankruptcy Code.

2.    Notwithstanding the Court's entry of the Provisional Relief Order, Walmart has not yet remitted over $21 million (and growing) of the Walmart Receivable to the Debtors because Orgain wrongly asserts that it cannot or should not do so.  Unless the Walmart Receivable—which is indisputably the Debtors' asset, albeit one that is subject to liens and security interests—is immediately turned over to the Foreign Representative, the Debtors' entire existence, much less their prospects for a value-maximizing restructuring for the benefit of all stakeholders, is in grave jeopardy.

3.    Therefore, the Foreign Representative seeks entry of an order (the "Amended Proposed Order"), attached hereto as **Exhibit A**, that makes explicit, consistent with this Court's decision in *In re Atlas Shipping A/S*,[4] that the Walmart Receivable must be immediately turned over to the Foreign Representative[5] and administered through the Canadian Proceeding.  Orgain— the Debtors' competitor—cannot be permitted to interfere any longer with the Debtors'

---

[3]    Capitalized terms used but not defined in this Introduction are intended to have the meanings ascribed to them *infra*.

[4]    404 B.R. 726 (Bankr. S.D.N.Y. 2009).

[5]    In the ordinary course prior to the Petition Date, Walmart remitted the Walmart Receivable to Iovate USA through a United States-based bank account that was swept daily into Iovate International's Canada-based concentration account.  For the avoidance of doubt, the Amended Proposed Order makes clear that continuation of this ordinary course process satisfies Walmart's obligations under section 1521 of the Bankruptcy Code.

restructuring through the Canadian Proceeding and these Chapter 15 Cases.

## II.    SUPPLEMENTAL FACTS

### A.    <u>The Walmart Receivable</u>

4.      The Iovate Group develops, markets, and sells performance nutrition and weight-management products under key brands (collectively, "<u>Brands</u>") including MuscleTech™, Hydroxycut™, Six Star®, and Purely Inspired®, which are distributed in over ninety countries. The Iovate Group's products are sold in thousands of physical stores in Canada, the United States, and elsewhere.  The Iovate Group's largest customer is Walmart Inc. and its affiliates (collectively, "<u>Walmart</u>"), which accounts for a significant amount of the Debtors' receipts.

5.      The Debtors and Walmart are party to various agreements (collectively, the "<u>Walmart Agreements</u>"), including (a) that certain *Walmart Supplier Agreement*, effective as of July 23, 2025, between Walmart Inc. and Iovate USA; (b) that certain *Supplier Agreement*, effective as of October 15, 2018, between Wal-Mart Canada Corp. and Iovate International; and (c) that certain *Walmart Luminate Master Services Agreement*, effective as of July 1, 2023, between Walmart Inc. and Iovate USA.

6.      The Debtors use the payments from Walmart (the "<u>Walmart Receivable</u>") to fund a significant portion of their day-to-day operations, including payroll and accounts payable. Payments from Walmart to the Debtors have averaged about USD $5.8 million per month (year to date) and, as of October 3, 2025, the outstanding Walmart Receivable is approximately USD $21.5 million, with approximately $14.7 million of the Walmart Receivable due and owing to the Debtors in accordance with Walmart's regular payment terms as of October 10, 2025.  However, as a result of the Arkansas Proceeding (discussed in more detail below), Walmart has been withholding payments to Iovate since about August 4, 2025.

7.      On September 11, 2025, Osler, Hoskin & Harcourt LLP ("<u>Osler</u>"), as counsel to

the Proposal Trustee in the Canadian Proceeding, sent a letter to Walmart (the "Walmart Letter")[6] informing them of the ongoing Canadian Proceeding and these Chapter 15 Cases and requesting that Walmart pay the outstanding Walmart Receivable to the Debtors and continue to pay further trade obligations to the Debtors in the ordinary course of business.  On September 17, 2025, following a conversation between Osler (as counsel to the Proposal Trustee) and Walmart's counsel, Walmart's Arkansas counsel sent an email to Orgain's Arkansas counsel seeking a consensual path forward with respect to the Walmart Receivable "in a manner that doesn't expose Walmart to double liability."  Among the solutions suggested by Walmart's counsel was for Orgain to agree that "the money is property of the estate and should be turned over to the debtor"—an option that Orgain's counsel rejected out of hand without explanation.  On September 18, 2025, Walmart's counsel advised Osler (with a copy to Orgain's counsel) that Walmart would "continue to hold the garnished funds to preserve the status quo unless someone demands that we do something different, in which case we will likely seek clarity from the New York bankruptcy court."[7]

8.      As a result of Walmart's continued retention of the Walmart Receivable—due to Orgain's spurious claim to its ownership discussed in detail below—the Debtors face a dire situation that poses an imminent and existential threat not only to their business, but to their ability to maximize value through the Canadian Proceeding for the benefit of all stakeholders.  Walmart is the Iovate Group's single largest customer, with a total Walmart Receivable of approximately $21.5 million as of October 3, 2025.  Without immediate access to the Walmart Receivable (which is indisputably the Debtors' property), the Debtors' management will be forced to take drastic

---

[6]      A true and correct copy of the Walmart Letter is attached to the Third Parris Declaration as **Exhibit A**.

[7]      *See* **Exhibit A** to the De Lellis Declaration.

measures to preserve liquidity, including steps that could undermine the Iovate Group's operations and long-term prospects at a time when it is working toward effectuating a successful restructuring.

9.      Based on current forecasts, the Debtors will exhaust all available liquidity by mid-November 2025 if the Walmart Receivable is not remitted to the Debtors.  Today, the uncertainty as to the timing of the receipt of the Walmart Receivable is already negatively affecting the Debtors' business, but without its receipt (and the continued receipt of ordinary course receivables from Walmart), the Debtors will be unable to continue funding operations by mid-November, risking an abrupt and disorderly collapse.

## B.      The Debtors' Senior Secured Debt

10.      On November 22, 2016, Iovate International and Xiwang Iovate Health Science International Inc. (which later amalgamated into Iovate International), each as borrowers, entered into a credit agreement (as amended, the "Original Credit Agreement"),[8] with HSBC Bank Canada ("HSBC") as administrative agent (in such capacity, the "Administrative Agent").  On June 30, 2021, the Original Credit Agreement was amended and restated (as amended, the "A&R Credit Agreement" and, together with the Original Credit Agreement, the "Credit Agreement"),[9] with HSBC (now Royal Bank of Canada ("RBC")) as Administrative Agent and HSBC, the Toronto-Dominion Bank, Bank of China (Canada), Bank of Montreal, National Bank of Canada, Canadian Western Bank, and the Bank of Nova Scotia, as syndicated lenders (collectively, the "Lenders").  The Credit Agreement has been amended ten times, most recently by an amendment dated February 28, 2025 ("Amending Agreement No. 10").[10]  The Credit Agreement provides for a

---

[8]      A true and correct copy of the Original Credit Agreement is attached to the Third Parris Declaration as **Exhibit B**.

[9]      A true and correct copy of the A&R Credit Agreement is attached to the Third Parris Declaration as **Exhibit C**.

[10]      A true and correct copy of Amending Agreement No. 10 is attached to the Third Parris Declaration as **Exhibit D**.

revolving credit facility and a term-loan facility (together, the "Credit Facilities").

11.    As security for the obligations under the Credit Agreement, the Debtors and related affiliates granted the Lenders a comprehensive security package.  Among other things, the Debtors' obligations under the Credit Agreement are secured by first-priority liens in all of their then-existing and after-acquired real and personal property, including accounts receivable.[11]

12.    As of August 31, 2025, approximately USD $100,606,023 of principal was owing under the term-loan facility, USD $14,000,000 was owing under the revolving loan facility, and an additional USD $1,179,465 of default interest had accrued month to date, for a total amount owing under the Credit Facilities of USD $115,785,488.

13.    HSBC Bank Canada, as administrative agent under the Credit Agreement ("HSBC"), filed and recorded an "all asset" UCC-1 financing statement against Iovate International in the District of Columbia on December 19, 2016 (the "Iovate International UCC-1").  On June 28, 2021, HSBC filed a UCC-3 continuation statement as to the Iovate International UCC-1 in the District of Columbia (the "2021 Iovate International UCC-3").  After replacing HSBC as administrative agent under the Credit Agreement, on April 24, 2024, RBC filed a UCC-3 amendment as to the Iovate International UCC-1 (as continued by the 2021 Iovate International UCC-3) in the District of Columbia (the "2024 Iovate International UCC-3" and, together with the Iovate International UCC-1 and the 2021 Iovate International UCC-3, the "Iovate International UCC Filings").[12]

14.    HSBC Bank Canada, as administrative agent under the Credit Agreement

---

[11]    *See, e.g.,* (a) *General Security Agreement* dated as of December 21, 2016, a true and correct copy of which is attached to the Third Parris Declaration as **Exhibit E**; and (b) the *Security Agreement* dated as of December 21, 2016, a true and correct copy of which is attached to the Third Parris Declaration as **Exhibit F**.

[12]    True and correct copies of the Iovate International UCC Filings are attached to the Gooding Affidavit (as defined below) as Exhibit 2.

("HSBC"), filed and recorded an "all asset" UCC-1 financing statement against Iovate USA in

Delaware on December 16, 2016 (the "Iovate USA UCC-1"). On June 28, 2021, HSBC filed a

UCC-3 continuation statement as to the Iovate USA UCC-1 in Delaware (the "2021 Iovate USA

UCC-3"). After replacing HSBC as administrative agent under the Credit Agreement, on April

24, 2024, RBC filed a UCC-3 amendment as to the Iovate USA UCC-1 (as continued by the 2021

Iovate USA UCC-3) in Delaware (the "2024 Iovate USA UCC-3" and, together with the Iovate

USA UCC-1 and the 2021 Iovate USA UCC-3, the "Iovate USA UCC Filings").[13]

      **C.**    **The Arkansas Proceeding**

    15.    On April 29, 2025, Orgain filed the Amended Judgment with the Circuit Court of

Benton County, Arkansas (the "Arkansas Court"), commencing *Orgain, Inc. v. Iovate Health*

*Sciences International, Inc.*, No. 04CV-25-1607 (the "Arkansas Proceeding").[14] Days later, on

May 1, 2025, counsel to RBC sent a letter to counsel to Orgain (the "Cease & Desist Letter"),

demanding that Orgain "immediately cease all judgment enforcement efforts that interfere with

the Agent's and the Lenders' rights with respect to Iovate, its subsidiaries, and their assets,"

specifically including "accounts receivable and their proceeds, including amounts owed to Iovate

or subsidiaries by Walmart Inc. and others."[15]

    16.    Approximately two months later, on June 27, 2025, Orgain filed the *Writ of*

*Garnishment* (the "Writ of Garnishment")[16] and the *Allegations and Interrogatories* (the

"Interrogatories"),[17] each directed to Walmart as garnishee, in the Arkansas Proceeding.

---

[13]    True and correct copies of the Iovate USA UCC Filings are attached to the Gooding Affidavit as Exhibit 1.

[14]    A true and correct copy of the *Notice of Filing of Foreign Judgment* is attached to the Golden Declaration as **Exhibit A**.

[15]    *See* Ex. 4 to Gooding Affidavit.

[16]    A true and correct copy of the Writ of Garnishment is attached to the Golden Declaration as **Exhibit B**.

[17]    On August 22, 2025, Orgain filed a second set of these documents, identical to the Writ of Garnishment and Interrogatories, but it is not clear whether they were served on Walmart.

17.    On August 12, 2025, Iovate International and Iovate USA (collectively, the "Iovate Defendants") filed the *Defendants' Emergency Motion to Quash the Writ of Garnishment Directed to Walmart Inc.* (the "Motion to Quash"), together with a supporting brief (the "Motion to Quash Brief") and affidavits of Douglas R. Gooding (the "Gooding Affidavit") and Tanya Mistry (the "Mistry Affidavit").[18]  In seeking to quash the Writ of Garnishment, the Iovate Defendants argued, among other things, that the Walmart Receivable is not properly subject to Orgain's attempt at garnishment "due to the prior, perfected, presently executable, and therefore superior interest of Iovate's secured lenders."[19]

18.    On August 13, 2025, RBC, as administrative agent for the Lenders, filed *Royal Bank of Canada's Motion to Intervene* (the "Motion to Intervene"), together with a supporting brief (the "Motion to Intervene Brief").[20]  By the Motion to Intervene, RBC sought to intervene in the Arkansas Proceeding "to prevent Orgain, a junior creditor of Iovate, from interfering with RBC's superior rights in the accounts receivable from Walmart."[21]  In its *Response to Royal Bank of Canada's Motion to Intervene* (the "Intervention Response")[22] filed on August 27, 2025, Orgain opposed the Motion to Intervene.  On September 8, 2025, RBC filed a reply in support of the Motion to Intervene (the "Intervention Reply").[23]

19.    On August 21, 2025, Orgain filed their *Response to Defendants' Emergency Motion to Quash the Writ of Garnishment Directed to Walmart Inc.* (the "Orgain MTQ Objection"),

---

[18]    True and correct copies of the Motion to Quash, the Motion to Quash Brief, the Gooding Affidavit, and the Mistry Affidavit are attached to the Golden Declaration as **Exhibits C-1, C-2, C-3,** and **C-4**, respectively.

[19]    Motion to Quash ¶ 5.

[20]    True and correct copies of the Motion to Intervene and the Motion to Intervene Brief are attached to the Golden Declaration as **Exhibits D-1** and **D-2**, respectively.

[21]    Motion to Intervene ¶ 4.

[22]    A true and correct copy of the Intervention Response is attached to the Golden Declaration as **Exhibit E.**

[23]    A true and correct copy of the Intervention Reply is attached to the Golden Declaration as **Exhibit F**.

together with a supporting brief (the "Orgain MTQ Objection Brief").[24]  The next day, the Iovate

Defendants filed a reply (the "Iovate Reply")[25] and RBC filed a reply (the "RBC Reply"), together

with a supporting affidavit of Andrew O'Coin (the "O'Coin Affidavit"),[26] each in support of the

Motion to Quash.

20.     After a hearing held on August 25, 2025, the Arkansas Court denied the Debtors'

Motion to Quash by order dated September 3, 2025 (the "Order Denying MTQ").[27]  RBC was not

permitted to participate in that hearing because its Motion to Intervene was not scheduled to be

heard.  The Arkansas Court has not entered any order on the Motion to Intervene.  However, the

Arkansas Court made clear that although she was not quashing the Writ of Garnishment, "that

money will sit where it is" pending a determination of "how to release the money and to whom."[28]

21.     On September 5, 2025, Walmart filed *Walmart Inc.'s Answer to Writ of

Garnishment* (the "Walmart Answer") and *Walmart Inc.'s Answers to Allegations and

Interrogatories* (the "Walmart ROG Answer").[29]

22.     After the Court entered the Provisional Relief Order on September 10, 2025, the

Iovate Debtors filed a *Notice of Commencement of Chapter 15 Cases and Entry of Provisional

Relief Order* in the Arkansas Proceeding.  Thereafter, on September 25, 2025, the Arkansas Court

---

[24]     True and correct copies of the Orgain MTQ Objection and Orgain MTQ Objection Brief are attached to the
Golden Declaration as **Exhibits G-1** and **G-2**, respectively.

[25]     A true and correct copy of the Iovate Reply is attached to the Golden Declaration as **Exhibit H**.

[26]     True and correct copies of the RBC Reply and the O'Coin Affidavit (except for Exhibit B thereto, which is
a copy of Amending Agreement No. 10) are attached to the Golden Declaration as **Exhibits I-1** and **I-2**,
respectively.

[27]     A true and correct copy of the Order Denying MTQ is attached to the Golden Declaration as **Exhibit J**.

[28]     *See* Aug. 25, 2025 Hearing Tr. at 26:18 – 24, attached to the Intervention Reply.

[29]     True and correct copies of the Walmart Answer and the Walmart ROG Answer are attached to the Golden
Declaration as **Exhibit K** and **Exhibit L**, respectively.

entered an order (the "Closing Order")[30] closing the Arkansas Proceeding "until the bankruptcy proceedings of the Defendants are resolved."

> ### D.    The Canadian Proceeding

23.    On September 30, 2025, the Debtors submitted a motion (the "NOI Extension Motion") with the Canadian Court, seeking an extension of the period for the Debtors to file a proposal under the BIA to and including November 4, 2025.  On October 1, 2025, the Proposal Trustee submitted the *Second Report of KSV Restructuring Inc. as Proposal Trustee* (the "Second Report").[31]  After a hearing on October 3, the Canadian Court granted the NOI Extension Motion by Order (the "NOI Extension Order").[32]

## III.    SUPPLEMENTAL BASIS FOR RELIEF

> ### A.    The Walmart Receivable Is the Debtors' Asset[33]

24.    The Walmart Receivable is comprised solely of funds Walmart owes to the Debtors pursuant to the Walmart Contracts.  But for Orgain's filing and serving the Writ of Garnishment, Walmart would have (and indeed, did) turned over the Walmart Receivable to the Debtors in the ordinary course of business.

25.    The Foreign Representative concedes that under Arkansas law, when Orgain served the Writ of Garnishment on Walmart, Orgain obtained a lien on the Walmart Receivable.[34]  This

---

[30]    A true and correct copy of the Closing Order is attached to the Golden Declaration as **Exhibit M**.

[31]    A true and correct copy of the Second Report is attached to the De Lellis Declaration as **Exhibit B**.

[32]    A true and correct copy of the NOI Extension Order is attached to the De Lellis Declaration as **Exhibit C**.

[33]    The Foreign Representative submits that there is (and can be) no bona fide dispute as to the ownership of the Walmart Receivable.  To the extent that Orgain attempts to argue to the contrary, under the Second Circuit's decisions in *J.P. Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418 (2d Cir. 2005), and *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.* (*In re Koreag*), 961 F.2d 341 (2d Cir. 1992), it is this Court that would properly make such "a threshold determination regarding ownership." *Atlas Shipping*, 404 B.R. at 734 n.5.

[34]    *See, e.g., James v. Planters Bank* (*In re James*), 257 B.R. 673, 676, 679 (BAP 8th Cir. 2000) ("under Arkansas law, service of the garnishment writ . . . created a perfected lien . . . at the time the writ was served"); *Equifax v. Luster*, 463 F. Supp. 352, 357 (E.D. Ark. 1978) ("Under Arkansas law . . . service of a writ of garnishment

lien is a "continuing lien" and continues until the judgment is paid or satisfied—or, as here, when a bankruptcy intervenes.[35]  But "[a] lien created by a writ of garnishment is no different than any other lien.  Creation of a garnishment lien does not mean that a debtor loses her interest in the encumbered property."[36]

26.     The Writ of Garnishment neither divested the Debtors of their ownership in the Walmart Receivable nor conveyed any ownership interest therein to Orgain.  Arkansas law is clear—entry of a judgment against a garnishee (like Walmart) is earliest point at which a lien creditor (like Orgain) could conceivably argue it either obtained an ownership interest or that the Debtors had been divested of their interest in garnished property (like the Walmart Receivable).[37] The Arkansas Court has not entered a judgment against Walmart and, indeed, made clear at the hearing on the Motion to Quash that the status quo was being maintained.  The commencement of the Canadian Proceeding, the stay issued by the Canadian Court, and entry of the Provisional Relief Order by this Court all prevented Orgain from proceeding to obtain a judgment *against Walmart* as garnishee.

---

establishes a lien in favor of the garnishor against whatever the garnishee has in his possession belonging to the debtor."), *aff'd*, 604 F.2d 31 (8th Cir. 1979); *see also* Ark. Code Ann. §§ 16-110-410, 411.100–411.

[35]     *James*, 257 B.R. at 676.

[36]     *Seigfried v. Board* (*In re Seigfried*), 2014 Bankr. LEXIS 5092, *5 (Bankr. D.N.M. Dec. 19, 2014) (citations omitted).  *See also In re Aughenbaugh*, 2002 Bankr. LEXIS 1922, *17–21  (Bankr. D. Idaho Sep. 9, 2002). *Cf. Rodriguez v. First Am. Bank (In re Rodriguez)*, 278 B.R. 749 (Bankr. N.D. Tex. 2002) (holding that an argument that a writ of garnishment alone "divested Debtors of all interest in the garnished funds 'makes sense only in a state which would recognize execution of the original writ of garnishment as accomplishing the complete end to the debtor's legal and equitable rights' in the garnished property") (quoting *In re Carlsen*, 63 B.R. 706, 709 (Bankr. C.D. Cal. 1986)).

[37]     *See, e.g., Longley Bros v. McCann*, 119 S.W. 268, 269 (Ark. 1909) ("Service of a writ of garnishment only gives the plaintiff, *at least before judgment is rendered against the garnishee*, a specific right, which is in the nature of a lien . . . .") (emphasis added); *James,* 257 B.R at 679 ("'a writ of garnishment is a suit directed to a third party to determine whether the garnishee is indebted to the judgment debtor, and *to obtain a judgment* that such money be paid to the judgment creditor'") (quoting *Morry v. Quadras, Inc*., 970 S.W.2d 275, 277 (Ark. 1998); emphasis added).

27.     Had Orgain obtained a judgment against Walmart in the Arkansas Proceeding, it could have had the effect of releasing Walmart from all responsibility to the Debtors in relation to the Walmart Receivable.[38]  In other words, only entry of a judgment against Walmart in favor of Orgain could terminate the Debtors' interest in the Walmart Receivable.[39]  However, even if the judgment had been entered, the Lenders' interest in the accounts receivable would continue.[40] Regardless, since Orgain has no judgment against Walmart, the Walmart Receivable remains the Debtors' property, subject to Orgain's lien.[41]

**B.     The Walmart Receivable Should Be Turned over to the Foreign Representative Under Sections 1521(a)(5), 1521(b), and 1522(a)**

28.     Upon recognition of a foreign proceeding as either a foreign main proceeding or foreign nonmain proceeding, section 1521 of the Bankruptcy Code authorizes this Court to grant certain discretionary relief to the foreign representative where such relief is "necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor."[42]

29.     Among the available relief, pursuant to section 1521(a)(5) of the Bankruptcy Code, this Court may "entrust[ ] the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative . . . ."  Section 1521(b) further provides that upon recognition, the Court may "entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative . . . provided

---

[38]     *James*, 257 B.R. at 679.

[39]     *Id*.

[40]     *See Navient Sols., LLC v. BPG Off. Partners XIII Iron Hill LLC*, 315 A.3d 1164, 1180-81 (Del. Super. 2024) (collecting authority on the "trace and recapture" theory that "after a default, where the secured creditor has not taken action with respect to its collateral when the writ of garnishment is served, the lien creditor may collect the funds, but the funds are subject to the secured party's lien [such that the secured creditor does not lose its rights.]")

[41]     *See, e.g., M&A Supply Co., Inc. v. Comfort Tech. Servs. LLC*, 2023 Ark. Cir. LEXIS 28737 (17th Jud. Cir. Mar. 17, 2023) (garnished funds were property of the debtor's estate and garnishee ordered to return them to judgment debtor following commencement of debtor's chapter 7 bankruptcy case).

[42]     *In re ENNIA Caribe Holding N.V.*, 596 B.R. 316, 318 (Bankr. S.D.N.Y. 2019).

that the court is satisfied that the interests of creditors in the United States are sufficiently protected." For its part, section 1522 of the Bankruptcy Code provides that the court "may grant relief under [section 1521] only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."

30.    In *Atlas Shipping*, this Court ordered that "garnished funds [be] turned over to the foreign representative subject to administration in the [foreign] bankruptcy proceeding,"[43] summarizing these provisions of chapter 15 as follows:

> There are two forms of discretionary entrustment a court can order under § 1521. Section 1521(a)(5) permits the court to order "entrusting the administration or realization of all or part of the debtor's assets" in the United States to the foreign representative.
>
> In addition, under § 1521(b), the foreign representative may be entrusted with "the distribution of all or part of the debtor's assets located in the United States" . . . if the interests of local creditors are sufficiently protected.[44]

Accordingly, section 1521(a)(5) allows a foreign representative to collect a debtor's property located in the United States, and 1521(b) allows the foreign representative to use such property in accordance with the foreign proceeding, provided that creditors in the United States are sufficiently protected pursuant to sections 1521(b) and 1522(a) of the Bankruptcy Code.

31.    This Court's decisions in *ENNIA Caribe* and *Atlas Shipping* are instructive. In *ENNIA Caribe*, the foreign representative requested that this Court entrust it with the administration, realization, and distribution of funds held in accounts in the debtors' names at Merrill Lynch in New York. Merrill Lynch had imposed an administrative freeze on the accounts

---

[43]    *Atlas Shipping*, 404 B.R. at 730.

[44]    *Id.* at 740 (quoting 11 U.S.C. § 1521); *see also ENNIA Caribe*, 596 B.R. at 322 ("The Court's authority to grant the requested relief is subject to two conditions: the relief must be 'necessary to effectuate the purposes of [chapter 15] and to protect the assets of the debtor; and the Court must be satisfied that 'the interests of creditors and other interested entities, including the debtor, are sufficiently protected.'").

that prevented the debtors from accessing the funds.  The debtors' owner objected to the requested relief on the grounds that its interests were not sufficiently protected.  This Court found that the debtors faced a pressing liquidity issue and that the foreign representative's access to the funds in the Merrill Lynch accounts—which were the debtors' most liquid assets—was necessary to resolve the liquidity crunch and allow the debtors to remain operating.  As such, this Court concluded that the relief requested was "clearly necessary" to effectuate the purpose of chapter 15 and to protect the Debtors' assets.[45]  The Court also found that the interests of creditors and interested entities, including the objecting owner, were sufficiently protected.  Access to the funds in the Merrill Lynch accounts would be used to finance the debtors' business and pay certain intercompany claims; all parties would benefit from the increase in liquidity.[46]

32.    Similarly, in *Atlas Shipping*, this Court vacated maritime garnishments that were restraining millions of dollars of the debtor's funds, entrusting the funds to the foreign representative for removal from the United States and administration in accordance with the previously recognized Danish insolvency proceeding.  The Court concluded that the interests of creditors were sufficiently protected because they could assert their rights, if any, to the attached funds in the Danish proceeding. Additionally, the Court determined that ordering turnover of the restrained funds pursuant to subsections 1521(a)(5) and 1521(b) to the foreign representative

---

[45]    *ENNIA Caribe*, 596 B.R. at 323.

[46]    *Id.*

would be more economical and efficient in that it would "permit all of [the debtor's] creditors worldwide to pursue their rights and remedies in one court of competent jurisdiction."[47]

33.       As was the case in both *ENNIA Caribe Holding* and *Atlas Shipping*, the Foreign Representative is properly entrusted with the administration, realization, and distribution of the Walmart Receivable.

34.       ***First***, such relief is necessary to effectuate the purpose of chapter 15 of the Bankruptcy Code and to protect the Debtors' assets.  Entrusting the Walmart Receivable to the Foreign Representative will further the goals and purpose of chapter 15 by enabling an orderly, centralized process via the Canadian Proceeding.  Moreover, Walmart's retention of the Walmart Receivable due to Orgain's continued interference with its release has strained the Debtors' liquidity to the breaking point.  Quite simply, the Walmart Receivable represents a critical component of the Debtors' liquidity and is necessary for them to meet ongoing working capital needs, including payroll and accounts payable.  As was the case in *ENNIA Caribe*, and as described above, without timely access to the Walmart Receivable, the Debtors will soon lack the liquidity necessary to meet their ongoing operating expenses and may not be able to continue as a going concern.  All (but one) of the Debtors' creditors and parties in interest will suffer if the Debtors are unable to continue operating in the ordinary course and continue to pursue a value-maximizing restructuring process through the Canadian Proceeding.  As the Debtors' direct competitor, Orgain alone stands to benefit from Walmart's continued withholding of the Walmart Receivable.

35.       ***Second***, the interests of creditors and other interested parties are sufficiently protected.  A determination of sufficient protection "'requires a balancing of the respective parties'

---

[47]       *Atlas Shipping*, 404 B.R. at 743.

interests.'"[48]   As in *ENNIA Caribe*, the increased liquidity (and ability to operate as a going concern) provided by the Debtors' access to the Walmart Receivable will sufficiently protect the interests of the Debtors' local creditors.  The Debtors will be able to continue operating and pay expenses in the ordinary course while they explore their restructuring options in the Canadian Proceeding.

36.    For its part, Orgain's interests are sufficiently protected.    The Foreign Representative concedes that Orgain presently has a lien on the Walmart Receivable.  That lien, however, is junior to the Lenders' previously perfected first-priority lien.  Under Arkansas law, a lien creditor[49] (such as Orgain) only takes priority over a secured creditor if it "becomes a lien creditor before . . . the time: (A) the security interest . . . is perfected."[50]  The "well established rule is that the priority of liens is generally determined by the maxim, first-in-time, first-in-right."[51] As evidenced by the Iovate USA UCC Filings and Iovate International UCC Filings, the Lenders' security interests in all of the Debtors' assets (necessarily including the Walmart Receivable) have

---

[48]    *ENNIA Caribe*, 596 B.R. at 322 (quoting *In re AJW Offshore*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013)); *see also Atlas Shipping,* 404 B.R. at 740 ("sufficient protection" embodies three basic principles: "'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'") (quoting *In re Artimm*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005)).

[49]    Ark. Code Ann. § 4-9-102(a)(52) (defining "lien creditor" to mean "a creditor that has acquired a lien by attachment, levy, or the like").

[50]    *Id.* § 4-9-317(a)(2).

[51]    *Searcy Farm Supply, LLC v. Merchants & Planters Bank*, 256 S.W.3d 496, 501 (Ark. 2007); *see also Niedermeier v. Cent. Prod. Credit Ass'n*, 777 S.W.2d 210, 211 (Ark. 1989) ("The first in time, first in right rule prevails" when determining the priority of  conflicting security interests.).  This concept was enshrined in the Uniform Commercial Code, which Arkansas adopted.  *See* Ark. Code Ann. § 4-9-322(a)(1) ("Conflicting perfected security interests . . . rank according to priority in time of filing or perfection.").

been perfected since 2016.  Orgain did not even *file* the Arkansas Proceeding, much less become a lien creditor, until nearly a decade later.

37.     As in *Atlas Shipping*, Orgain's interests are sufficiently protected by its ability to participate in the Canadian Proceeding, including pursuing its claims and asserting its junior liens over the Walmart Receivable.  Courts in the United States have routinely concluded that Canada's statutory insolvency schemes foster reorganization in a manner that is consistent with fundamental principles and policies of the United States.[52]  A centralized process through the Canadian Proceeding will ensure just treatment of all claim holders.

38.     In contrast, denying the Foreign Representative the authority to realize, administer, and distribute the Walmart Receivable would harm the interests of the Debtors and their creditors for the reasons outlined above and would not foster the purpose of chapter 15.  As this Court aptly stated in *Atlas Shipping*, "depriving the foreign representative of funds that he may realize in the United States would not further the goals of chapter 15."[53]

*[Remainder of page intentionally left blank]*

---

[52]     *See Cornfeld v. Invs. Overseas Servs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) ("The fact that the foreign country involved is Canada is significant. . . . Canada is 'a sister common law jurisdiction with procedures akin to our own,' and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings.") (quoting *Clarkson v. Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976)), *aff'd*, 614 F.2d 1286 (2d Cir. 1979).

[53]     *Atlas Shipping*, 404 B.R. at 742.

## IV.     CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests entry of the Amended Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.[54]

Dated: October 7, 2025                    PACHULSKI STANG ZIEHL & JONES LLP

                                          */s/ Steven W. Golden*
                                          Steven W. Golden
                                          Jeffrey M. Dine
                                          Mary F. Caloway
                                          Victoria A. Newmark
                                          1700 Broadway, 36th Floor
                                          New York, New York 10019
                                          Telephone:  212-561-7700
                                          Facsimile:  212-561-7777

                                          *Counsel to the Foreign Representative*

---

[54]     For the avoidance of all doubt, the Foreign Representative reserves all rights with respect to whether Orgain's actions and inactions constitute violations of the Provisional Relief Order and/or the automatic stay.  *See, e.g., In re Newberry*, 604 B.R. 37 (Bankr. E.D. Mich. 2019).