**<u>EXHIBIT I-1</u>**

ELECTRONICALLY FILED
Benton County Circuit Court
Brenda DeShields, Circuit Clerk
2025-Aug-22  14:38:10
04CV-25-1607
C19WD05 : 16 Pages

## IN THE CIRCUIT COURT OF BENTON COUNTY, ARKANSAS
### CIVIL DIVISION

ORGAIN, INC.                                             **PLAINTIFF**

VS.                         **CASE NO. 04CV-25-1607**

IOVATE HEALTH SCIENCES INTERNATIONAL,
INC. AND IOVATE HEALTH SCIENCES INTERNATIONAL
U.S.A., INC.                                          **DEFENDANTS**

## ROYAL BANK OF CANADA'S REPLY IN FURTHER SUPPORT OF ITS OBJECTION AND MOTION TO QUASH WRIT OF GARNISHMENT

### I.    INTRODUCTION

Proposed intervenor Royal Bank of Canada ("RBC" or the "Agent")[1] moved to intervene in this case on August 13, 2025, on the grounds that it has a significant stake in the outcome because Orgain is seeking to garnish property to which RBC has a superior right. Although that motion is still pending, RBC submits this reply to Orgain's Response to Defendants' Emergency Motion to Quash the Writ of Garnishment Directed to Walmart, Inc. ("Orgain's Response"), and further asks that this reply be treated as an additional pleading setting out the claim or defense for which intervention is sought, in accordance with Arkansas Rule of Civil Procedure 24. The filing of this reply is necessitated by arguments in Orgain's Response that directly implicate RBC's position in this case and impugn its conduct.

---

[1]    Capitalized terms not defined herein have the same meanings as in the Brief in Support of Royal Bank of Canada's Objection and Motion to Quash Writ of Garnishment ("RBC's Mot.").

## II.    <u>FACTUAL BACKGROUND</u>

As discussed in RBC's previous brief, Iovate and its Lenders entered into a Credit Agreement in 2016; in accordance with a contemporaneous Security Agreement, the Agent acquired, for the benefit of the Lenders and to secure the loans, a first-priority lien on substantially all of Iovate's assets, including the receivable that Orgain seeks to garnish in this action. The Agent's security interest in the Collateral was perfected as early as December 19, 2016. This was long before Orgain obtained its judgment against Iovate in California. RBC's security interest in the receivable is thus senior to any interest Orgain may have. RBC's Mot. at 2–3.

No later than July 8, 2024, Iovate defaulted on the Credit Agreements, which resulted in RBC having an immediate right to possess the Collateral. *See* Ark. Code Ann. § 4-9-609(a) ("After default, a secured party . . . [m]ay take possession of the collateral."). Since that time, RBC and the Lenders have been actively and continuously trying to address Iovate's defaults, including through extensive discussions with Iovate. Supplemental Declaration of Andrew O'Coin ("<u>O'Coin Suppl. Decl.</u>") ¶ 4. The Lenders and RBC made a determination that liquidating the Collateral at this stage would destroy value, while allowing Iovate to continue operating its business as a going concern would preserve value and maximize recoveries. *Id.* ¶ 5. As such, on September 24, 2024, Iovate entered into a forbearance agreement with RBC (the "<u>Forbearance Agreement</u>"). *Id.* ¶ 6; *see also* Ex A.

The Forbearance Agreement was heavily negotiated and the product of extensive back-and-forth between the parties. *Id.* ¶ 7. Under the Forbearance

Agreement, RBC and the Lenders agreed temporarily to refrain from enforcing rights and remedies under the Credit Agreement. *Id.* They also permitted a transaction that otherwise would have been prohibited by the Credit Agreement, but that Iovate believed would help it comply with regulatory requirements without negatively affecting its liquidity. *Id.*

In exchange, RBC and the Lenders received multiple significant concessions from the borrower. *Id.* ¶ 8. Iovate expressly acknowledged its multiple existing events of default under the Credit Agreement. *Id.* And the parties agreed that nothing in the Forbearance Agreement would constitute a consent to, or waiver of, the existing events of default by the Lenders and Agent. *Id.* Among other things, the parties agreed to various amendments of the Credit Agreement, that Iovate would pay the Lenders' costs and expenses incurred in connection with the agreement, and that Iovate would release the Lenders and RBC from claims relating to the Credit Agreement. *Id.* ¶ 9.

The parties made clear that forbearance would not be limitless. *Id.* ¶ 10. The Forbearance Agreement expressly provides that the Lenders' forbearance would terminate automatically if, among other possibilities, "any Person takes any steps to collect or enforce the Orgain Judgment." *Id.*; *see also* Ex. A at § 6.1(c). If that were to occur, RBC and the Lenders would be entitled, "immediately and without any further notice of any kind," to accelerate the loans and exercise all their rights and remedies. O'Coin Suppl. Decl. ¶ 10; *see also* Ex. A. at § 6.2.

No later than February 5, 2025, Orgain sought a writ of execution in California. O'Coin Suppl. Decl. ¶ 12. In response to this action, on February 28, 2025, the Lenders and Iovate entered into Amending Agreement No. 10 to the Credit Agreement (the "Amending Agreement"). *Id.* The Amending Agreement, among other things, served to bring the Forbearance Agreement back into effect, set out financial milestones Iovate would have to meet in 2025, and add that any further collection or enforcement efforts by Orgain would constitute an additional event of default. *Id.* ¶ 13. In the Amending Agreement, Iovate again confirmed that events of default had occurred and were continuing. *Id.* The Amending Agreement did not change the fact that if subsequent efforts were made to enforce the Orgain judgment, the Lenders' forbearance obligations would immediately terminate.

Orgain thereafter continued its attempts to enforce its judgment against Iovate by applying for writs of garnishment in various jurisdictions, including in this Court. *Id.* ¶ 14. The forbearance therefore has terminated. *Id.* As of today, Iovate continues to operate at the grace of the Lenders, not because of any contractually imposed forbearance.

On April 30, 2025, RBC issued a reservation of rights letter to Iovate (the "Rights Letter"), stating that as a result of Orgain's conduct, the Forbearance Agreement had terminated and RBC and the Lenders "are now in a position to enforce all of their rights and remedies." *Id.* ¶ 15; Ex. C at 1. The Rights Letter further acknowledged that Iovate had authorized RBC to send Orgain a cease-and-desist letter, subject to Iovate's agreement to absolve RBC of all liability in connection with

doing so. O'Coin Suppl. Decl. ¶ 15; Ex. C at 1. The Rights Letter reserved all rights and remedies of the Agent and Lenders, "including without limitation the right to take enforcement steps against the Credit Parties and all property subject to the Security Documents, without further notice." O'Coin Suppl. Decl. ¶ 15; Ex. C at 2. The Rights Letter also stated that default interest was accruing on the loans. O'Coin Suppl. Decl. ¶ 15; Ex. C at 2. Iovate countersigned the Rights Letter, indicating that it "accepted and agreed" to its contents. O'Coin Suppl. Decl. ¶ 15; Ex. C at 3.

As of today, Iovate owes the Lenders upwards of $114.6 million in outstanding principal amount. O'Coin Suppl. Decl. ¶ 16; Ex. B at § 2.5, Schedule 2.1. With regard to payment obligations in the very near term, Iovate has an interest payment coming due the week ending August 29, 2025, in the amount of at least $1,188,602; another interest payment coming due the week ending October 3, 2025, in the amount of at least $1,150,260; and a principal repayment obligation coming due the week ending October 3, 2025, in the amount of at least $750,000. O'Coin Suppl. Decl. ¶ 16; Ex. B at §§ 2.7(2), 2.9(a).

The Lenders are not receiving principal repayment in accordance with the initial Credit Agreement. O'Coin Suppl. Decl. ¶ 17. Principal repayments were deferred under the Forbearance Agreement because Iovate did not have adequate cash flow to service the secured debt. *Id.* The Lenders had to forgo principal payments that came due in June and September of 2024. *Id.* Since then, principal payments from Iovate have been substantially below what was required under the initial Credit Agreement. *Id.*

The Lenders and RBC continue to believe that allowing Iovate to operate as a going concern is the best path to maximizing recoveries. *Id.* ¶ 18. The Lenders and RBC have engaged in additional efforts to ensure that Iovate continues operating, including informing Orgain of the prior perfected lien by letter and by moving to intervene in this action to oppose garnishment. *Id.*

If Orgain succeeds in its effort to garnish the Walmart receivable, the Lenders and RBC will be forced to reevaluate how to proceed. *Id.* ¶ 19. They may be put in a position of having to take further steps to exercise remedies and protect their Collateral. *Id.* The Lenders have sought to avoid this outcome to date, since they believe that a liquidation of Iovate's property, and a shuttering of its business, will mean that the Lenders will be paid substantially less than they are owed. *Id.* ¶ 20.

Orgain therefore is benefiting from the Lenders' decision not to liquidate. *Id.* If the Lenders are not repaid in full, Orgain would be entitled to nothing, since it is a junior creditor. *Id.* Because the Lenders are permitting Iovate to continue as a going concern, all creditors, including Orgain, have a better chance of being paid. Id.

In all events, RBC and the Lenders currently expect that if Orgain is permitted to garnish, they will pursue Orgain for claims and remedies arising out of this conduct. *Id.* ¶ 21.

### III.    <u>ARGUMENT</u>

**A.    Orgain does not and cannot dispute that RBC has a prior perfected first-priority security interest in the Walmart receivable.**

Orgain does not dispute that RBC has a prior perfected lien on the receivable Orgain seeks to garnish, that RBC's property interest is superior to any right Orgain may have, or that Iovate has defaulted on its obligations under the Credit Agreement. Nor could it.

These concessions are fatal. As RBC explained in its opening brief, the existence of another person's senior security interest in the property to be garnished is sufficient grounds for denying the writ. RBC's Mot. at 6–7 (citing *Gossett v. Merchs. & Planters Bank*, 361 S.W.2d 537, 538 (Ark. 1962); *Wulco, Inc. v. O'Gara Grp., Inc.*, 228 N.E.3d 167, 171–72 (Ohio Ct. App. 2023)).

In *Wulco*, for example, Wulco sought to garnish a bank account of its judgment debtor O'Gara. 228 N.E.3d at 169. Meanwhile, Monroe claimed to have a prior perfected lien, and the court allowed it to intervene in the garnishment proceedings. *Id.* The evidence demonstrated that Monroe had executed a credit agreement and a security agreement with O'Gara, that O'Gara had defaulted on the loans, and that the security agreement granted Monroe a continuing security interest in all of O'Gara's deposit accounts, including the account Wulco sought to garnish. *Id.* at 169–70. The court concluded that Wulco could not garnish the account because Monroe had a security interest that was first in time, and therefore senior to Wulco's judgment lien. *Id.* at 171–72. "[I]f the secured creditor establishes that, under the law, it has priority to the garnished funds, the garnishor judgment creditor's claim to

the funds is defeated. Thus, Monroe presented a valid defense to garnishment, because if established, the bank account funds cannot be used to satisfy O'Gara's debt to Wulco." *Id.* at 172.

The same reasoning applies here. Just as in *Wulco*, RBC has a prior perfected lien on the receivable Orgain seeks to garnish, and it has a present right to possess the receivable in light of Iovate's admitted defaults. This means Orgain's right to garnish "is defeated."

### B.    RBC and the Lenders have not waived their right to contest garnishment.

Trying to avoid this straightforward logic, Orgain argues that RBC has "taken no affirmative steps to enforce its interest," and that this should preclude RBC from contesting garnishment. It relies on *Frierson v. United Farm Agency, Inc.*, 868 F.2d 302 (8th Cir. 1989), for the proposition that a lender loses the right to prevent a junior creditor from garnishing collateral when the lender does not take steps to enforce its security interest in advance. This is unavailing.

### 1.    RBC and the Lenders have pursued the remedy they believe will maximize value.

Orgain's argument is based on a false factual predicate, and *Frierson* is therefore distinguishable. Unlike in *Frierson*, it cannot be said here that the Agent and Lenders "did not declare [the loans] in default," that they did not "follow procedures required by the loan agreement to enforce its U.C.C. and contract rights," or that they do not have a "present right to the funds" that are the subject of this action. *Id.* at 303. To the contrary, the Lenders and Agent have spent the past year actively managing the default situation in which they found themselves. They have

engaged in extensive discussions with Iovate and entered into the Forbearance Agreement and the Amending Agreement, which contained provisions allowing Iovate to engage in value-maximizing transactions that otherwise were contractually prohibited, an admission of default by Iovate, amendments to the Credit Agreement, legal and economic concessions in the Lenders' favor, and an express condition that forbearance would terminate if Orgain sought to enforce its judgment. As a direct consequence of Orgain's actions, that forbearance has now terminated, such that the Agent presently has an immediate right to enforce and possess the Collateral. The *Frierson* case was completely different.[2]

It is entirely appropriate that the Lenders, up to this point, have determined not to *liquidate* their collateral. They reasonably determined that pursuing that remedy would harm their recoveries, while allowing Iovate to continue its operations would be the best means of maximizing value. That was a legitimate choice for which they cannot be punished. Just because the Lenders chose not to liquidate — merely

---

[2] Orgain's other cited cases on this subject are similarly distinguishable. In *Shales v. Pipe-Liners, Ltd.*, 2012 WL 4793499 (N.D. Ill. Oct. 9, 2012), the secured party "took no action" until after the judgment creditor had commenced discovery to locate the debtor's assets, and even then, it "merely sent a letter" to the debtor to demand payment on notes that had already matured. *Id.* at *3. This is a far cry from the active engagement RBC and the Lenders have had with Iovate to manage the default and try to maximize recoveries. In *S.E.I.U. Local No. 4 Pension Fund v. Pinnacle Health Care of Berwyn LLC*, 560 F. Supp. 2d 647 (N.D. Ill. 2008), the secured party demonstrated that the debtor "technically defaulted on its loan," but did not declare a default or follow other procedures to enforce. *Id.* at 651. Here, by contrast, RBC obtained Iovate's written admission that defaults exist, and exchanged numerous other forms of consideration in response to those defaults in an extensively negotiated forbearance agreement.

one option available to them — does not mean they are on the same footing as the secured party in *Frierson*.

Especially instructive, and far more on point than *Frierson*, is *System Soft Technologies, L.L.C. v. Artemis Technologies, Inc.*, 837 N.W.2d 449 (Mich. Ct. App. 2013). There, System Soft sought to garnish receivables owed to its judgment debtor, Artemis. *Id.* at 451. Summit moved to intervene and quash the writ on the basis that it had a prior perfected lien on the account that secured defaulted loans, and that this lien was senior to System Soft's judgment lien. *Id.* Following the default and an acceleration of the loan, Summit entered into a forbearance agreement with Artemis. *Id.* at 455. System Soft argued, citing *Frierson*, that Summit could not prevent System Soft from trying to recover on its judgment through garnishment because Summit had chosen to forbear. *Id.* at 455–56. The court disagreed and concluded that *Frierson* was inapposite. *Id.* at 456. It recognized that Summit had "allowed defendant to continue to operate its business and generate income in order for defendant to repay its loan balances," and that this approach "was appropriate given that liquidating defendant's assets would have purportedly resulted in Summit . . . being repaid only approximately 20 percent of what it was owed." *Id.* at 455. In these circumstances, "Summit was entitled to enter into the forbearance agreement with defendant *as a remedy for defendant's default*." *Id.* (emphasis added).

In other words, *System Soft* teaches that entering into a forbearance agreement is a form of exercising remedies. By making that deliberate choice, a secured party

*does* take affirmative steps to protect its collateral, unlike the secured party in *Frierson*, which did nothing at all.

Orgain faults Iovate for not showing why "the funds presently held by Walmart are needed to service Iovate's debt." Orgain's Response at 1. For one thing, Orgain is conjuring requirements that do not exist. No authority supports the contention that this must be proved for the Lenders' rights to be preserved. For another, Orgain is wrong: the Lenders are owed well over $100 million as of today, have had to forgo several repayments, and are owed millions more just over the course of the next few weeks.

More fundamentally, however, Orgain misses the point. What matters is not whether the funds held by Walmart are needed to make immediately upcoming payments to the Lenders. It is that Iovate's business might fail altogether (which apparently is exactly what Orgain wants) if the company is denied access to $8 million of liquidity, and this outcome will greatly prejudice the Lenders' ability to receive repayment in full. The Lenders are well within their rights to prefer to see the money go to Iovate to help it continue operating, and servicing its debt, indefinitely into the future.

### 2.    Arkansas law does not require a secured party to pursue any particular remedy to preserve its rights.

This conclusion is bolstered by the language of Arkansas's Uniform Commercial Code. Under the statute, there is no requirement that a secured party take any particular action to maintain its security interest or the priority of its lien. Section 4-9-601(a)(1) provides that "[a]fter default, a secured party has the rights

provided in this part and . . . those provided by agreement of the parties. A secured party . . . *may* reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure." Ark. Code Ann. § 4-9-601(a)(1) (emphasis added). Additionally, section 4-9-607(a)(1) provides: "If so agreed, and in any event after default, a secured party . . . *may* notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party." *Id.* § 4-9-607(a)(1) (emphasis added). And section 4-9-610(a) says that "[a]fter default, a secured party *may* sell, lease, license, or otherwise dispose of any or all of the collateral." *Id.* § 4-9-610(a) (emphasis added)

Meanwhile, the Security Agreement in this case provides that if an event of default has occurred, the Agent may, in its discretion, "[e]xercise against any or all Debtors all of the rights and remedies granted to secured parties under . . . any . . . applicable statute, or otherwise available to the Agent by contract, at law or in equity." RBC's Mot., Ex. B at § 10(a). Beyond this general authorization, the Security Agreement gives specific examples of remedies that the Agent can pursue, including permitting the use of the Collateral and consenting to the carrying on of the business of Iovate. RBC's Mot., Ex. B § 10(b)–(e). Consenting to Iovate's continuing to run its business is therefore a contractually specified remedy.

Moreover, the Security Agreement goes on to provide that if RBC declines to pursue any particular remedy, it shall not "be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of

any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof." *Id.* at § 27.

These examples of permissive language throughout the statute and the Credit Agreement make clear that the Lenders and Agent cannot lose a right to choose what happens to their Collateral simply by deciding not to take one particular action or by pursuing some remedy other than liquidation. And they underscore that letting Iovate continue to operate is a form of exercising remedies unto itself. Orgain thus asks the Court to find a waiver in circumstances where the legislature and the parties agreement have said there will not be one. As the *System Soft* court held after reviewing substantively similar statutory and contractual language, "the UCC does not *require* a secured party to foreclose, to order an account debtor to pay the secured party, or to enforce the claim by judicial procedure." 837 N.W.2d at 455 (emphasis in original).

This point recently was emphasized again by a Delaware court in *Navient Solutions, LLC v. BPG Office Partners XIII Iron Hill LLC*, 315 A.3d 1164 (Del. Super. Ct. 2024). The court rejected the theory that a secured party waives its security interest if it does not exercise remedies before a judgment creditor tries to garnish. *Id.* at 1180. Such an outcome, the court held, "is inconsistent with the UCC," and contrary to the terms of the loan documents, because it "imposes a requirement on the secured party which is not mandated by Article 9." *Id.*

If the Court were to agree with Orgain, it would establish a dangerous precedent. It would disincentivize secured parties from forbearing, even when that is in their best interests and will maximize value, simply because a junior creditor has decided that it wants to liquidate the debtor's property instead. That would lead to more value destruction. And it would represent an inversion of priorities, giving junior creditors a greater say over the fate of collateral compared with senior creditors. As in *System Soft*, the Court should decline the invitation to create such a perverse system.

### 3. Permitting Orgain to garnish will lead to a waste of party and judicial resources.

If the writ of garnishment is not quashed, Orgain must take possession of the assets subject to RBC's superior interest. RBC's Mot. at 7–8. The law is clear that the existing lien on the funds will continue in Orgain's hands. *See Hardisty v. Jones*, No. 78-203, 1979 WL 774, at *3 (Ark. Apr. 2, 1979) (garnishing creditor takes their subject to the existing liens and may recover only after prior secured claims are paid). And RBC then will have the right to "recapture" the Collateral from Orgain and sue on theories such as conversion if Orgain refuses to relinquish the funds. *See, e.g.*, *Navient Sols.*, 315 A.3d at 1180–81 (if judgment creditor succeeds in garnishing, it takes subject to existing lien and right of secured party to "trace and recapture" collateral); *see also* Ark. Code Ann. § 4-9-609 (cmt. § 5) ("Normally, a junior who refuses to relinquish possession of collateral upon the demand of a secured party having a superior possessory right to the collateral would be liable in conversion."). The

Lenders and Agent expect that they will pursue these rights if Orgain is successful in this action. O'Coin Suppl. Decl. ¶ 21.

This will mean more lawsuits, more expenditure of time and money by the parties, and more consumption of judicial resources—all to restore the status quo that exists today. There is no reason to make the parties go through this process, or to burden another court with another proceeding, just to achieve what can be accomplished today by denying Orgain relief. The correct, and far more elegant, solution is to quash the writ of garnishment.

## III.    <u>CONCLUSION</u>

For the reasons above, in RBC's previous submissions, and in Iovate's briefs, the Court should quash the writ of garnishment. In the alternative, RBC respectfully requests that the Court order the garnishee to remit the funds directly to RBC or, at minimum, order Orgain to segregate any funds that it receives from the garnishee and turn them over immediately to RBC.

Respectfully submitted,

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL: abaker@wlj.com; jfair@wlj.com

By   /s/ Jacob P. Fair
    Adrienne L. Baker (2007159)
    Jacob P. Fair (2015167)

MILBANK LLP

55 Hudson Yards
New York, NY 10001-2163
Phone: (212) 530-5000
Fax: (212) 530-5219
alees@milbank.com
mfrieda@milbank.com
Alexander B. Lees (admitted *pro hac vice*)
Michael T. Frieda (admitted *pro hac vice*)

*Attorneys for Royal Bank of Canada*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, I electronically filed the foregoing

with the Clerk of the Court using the Arkansas Judiciary Electronic Filing System,

which shall send notification of such filing to the attorneys of record in this case.


/s/ Jacob P. Fair
Jacob P. Fair