## EXHIBIT I-2

ELECTRONICALLY FILED
Benton County Circuit Court
Brenda DeShields, Circuit Clerk
2025-Aug-22  14:38:10
04CV-25-1607
C19WD05 : 8 Pages

# UNIFORM COVER PAGE

[To be used when required by Administrative Order No. 2 (g)★]

COURT: ___CIRCUIT___ COURT OF ___BENTON___ COUNTY

Docket/Case Number: ___04-CV-25-1607___

CASE NAME:
PLAINTIFF/
PETITIONER:            ORGAIN, INC.

DEFENDANT/
RESPONDENT:            IOVATE HEALTH SCIENCES INTERNATIONAL, INC. AND
                       IOVATE HEALTH SCIENCES INTERNATIONAL U.S.A., INC.

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):     Supplemental Declaration of Andrew O'Coin to Brief

★Administrative Order No 2.

(g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).

(2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.

**IN THE CIRCUIT COURT OF BENTON COUNTY, ARKANSAS**
**CIVIL DIVISION**

**ORGAIN, INC.**                                                     **PLAINTIFF**
**VS.**                                     **CASE NO. 04CV-25-1607**

**IOVATE HEALTH SCIENCES**                          **DEFENDANTS**
**INTERNATIONAL, INC. and**
**IOVATE HEALTH SCIENCES**
**INTERNATIONAL U.S.A., INC.**


## SUPPLEMENTAL DECLARATION OF ANDREW O'COIN

I, Andrew O'Coin, hereby declare as follows:

1.  I make this supplemental declaration in support of Royal Bank of Canada's Reply Brief in Further Support of its Objection and Motion to Quash Writ of Garnishment, submitted concurrently with this declaration.

2.  As referenced in my declaration of August 13, 2025, by no later than July 8, 2024, Iovate defaulted under the terms of the Credit Agreement.

3.  The Lenders are owed approximately $114.6 million under the Credit Agreement today.

4.  Since Iovate's default, RBC and the Lenders have been actively and continuously trying to address Iovate's defaults, including through extensive discussions with Iovate.

5.  The Lenders and RBC made a determination that liquidating the Collateral at this stage would destroy value, while allowing Iovate to continue operating its business as a going concern would preserve value and maximize recoveries.

6.  As such, on September 24, 2024, Iovate entered into a forbearance agreement with RBC (the "<u>Forbearance Agreement</u>"). Attached hereto as Exhibit A is a true and correct copy of the Forbearance Agreement.

7.  The Forbearance Agreement was heavily negotiated and the product of extensive back-and-forth between the parties. Under the Forbearance Agreement, RBC and the Lenders agreed temporarily to refrain from enforcing rights and remedies under the Credit Agreement. Ex. A at Recital C. They also permitted a transaction that otherwise would have been prohibited by the Credit Agreement, but that Iovate believed would help it comply with regulatory requirements without negatively affecting its liquidity. *Id.* at Recital F–G.

8.  In exchange, RBC and the Lenders received multiple significant concessions from Iovate. Iovate expressly acknowledged its multiple existing events of default. *Id.* at Recital B and § 1.5. The parties agreed that nothing in the Forbearance Agreement would constitute a consent to, or waiver of, the existing events of default by the Lenders and Agent. *See id.* at §§ 5.1(g)–(h).

9.  Among other things, the Lenders and Iovate agreed to various amendments of the Credit Agreement, *id.* at § 1.1, that Iovate would pay the Lenders' costs and expenses incurred in connection with the agreement, *id.* at § 8.1, and that Iovate would release the Lenders and RBC from claims relating to the Credit Agreement. *Id.* at § 8.2.

10.    The parties made clear that forbearance would not be limitless. The parties agreed that the Lenders' forbearance would terminate automatically if, among other possibilities, "any Person takes any steps to collect or enforce the Orgain Judgment." *Id.* at § 6.1(c). If that were to occur, RBC and the Lenders would be entitled, "immediately and without any further notice of any kind," to accelerate the loans and exercise all of their rights and remedies. *Id.* at § 6.2.

11.    The Forbearance Agreement was amended on November 14, 2024, December 24, 2024, and January 31, 2025. Such amendments, among other things, served to extend the Forbearance Agreement's term and memorialize further developments concerning Orgain and the judgment it had obtained against Iovate.

12.    No later than February 5, 2025, Orgain sought a writ of execution in California as a means of enforcing its judgment. In response to this action, on February 28, 2025, the Lenders and Iovate entered into Amending Agreement No. 10 to the Credit Agreement (the "<u>Amending Agreement</u>"). Attached hereto as Exhibit B is a true and correct copy of the Amending Agreement.

13.    The Amending Agreement, among other things, served to bring the Forbearance Agreement back into effect, Ex. B at § 3.2, set out financial milestones Iovate would have to meet in 2025, *id.* at § 5.1(f), and add that any further collection or enforcement efforts by Orgain would constitute an additional event of default. *Id.* at Recital C. In the Amending Agreement, Iovate again confirmed that events of default had occurred and were

continuing. *Id.* at § 4.1(d). The Amending Agreement did not change the fact that if subsequent efforts were made to enforce the Orgain judgment, the Lenders' forbearance obligations would immediately terminate.

14.    Orgain thereafter continued its attempts to enforce its judgment against Iovate, including by applying for writs of garnishment in various jurisdictions. These actions resulted in an additional event of default under the Credit Agreement, and the forbearance was terminated. *See* Ex. A at § 6.1(c).

15.    On April 30, 2025, RBC issued a reservation of rights letter to Iovate (the "Rights Letter"), stating that as a result of Orgain's conduct, the Forbearance Agreement had terminated and RBC and the Lenders "are now in a position to enforce all of their rights and remedies." The Rights Letter further acknowledged that Iovate had authorized RBC to send Orgain a cease-and-desist letter, subject to Iovate's agreement to absolve RBC of all liability in connection with doing so. The Rights Letter reserved all rights and remedies of the Agent and Lenders, "including without limitation the right to take enforcement steps against the Credit Parties and all property subject to the Security Documents, without further notice." The Rights Letter also stated that default interest was accruing on the loans. Iovate countersigned the Rights Letter, indicating that it "accepted and agreed" to its contents. Attached hereto as Exhibit C is a true and correct copy of the countersigned Rights Letter.

16.   As of today, Iovate owes the Lenders upwards of $114.6 million in outstanding
principal amount. Ex. B at Schedule 2.1. With regard to payment obligations
in the very near term, Iovate has an interest payment coming due the week
ending August 29, 2025, in the amount of at least $1,188,602; another interest
payment coming due the week ending October 3, 2025, in the amount of at
least $1,150,260; and a principal repayment obligation coming due the week
ending October 3, 2025, in the amount of at least $750,000. *Id.* at §§ 2.7(2),
2.9(a).

17.   The Lenders are not receiving principal repayment in accordance with the
initial Credit Agreement. Principal repayments were deferred under the
Forbearance Agreement because Iovate did not have adequate cash flow to
service the secured debt. The Lenders had to forgo principal payments that
came due in June and September of 2024. Since then, principal payments from
Iovate have been substantially below what was required under the initial
Credit Agreement.

18.   The Lenders and RBC continue to believe that allowing Iovate to operate as a
going concern is the best path to maximize recoveries. They have engaged in
additional efforts to ensure that Iovate continues operating, including sending
a cease-and-desist letter to Orgain and informing it of the prior perfected lien,
as well as by moving to intervene in this action to oppose garnishment. But
Orgain's efforts to collect on its judgment will negatively affect Iovate's
business and interfere with the Lenders' preferred course of recovering on their

loans and realizing on their Collateral. Walmart currently is withholding millions of dollars. And as Iovate continues to ship product to Walmart, it is expected that Walmart will withhold additional funds into the future. This is depriving, and will continue to deprive, Iovate of much-needed working capital.

19. If Orgain succeeds in its effort to garnish the Walmart receivable, the Lenders and RBC will be forced to reevaluate how to proceed. They may be put in a position of having to take further steps to exercise remedies and protect their Collateral.

20. The Lenders have sought to avoid this outcome to date, since they believe that a liquidation of Iovate's property, and a shuttering of its business, will mean that the Lenders will be paid substantially less than they are owed. Orgain therefore is benefiting from the Lenders' decision not to liquidate. If the Lenders are not repaid in full, Orgain would be entitled to nothing, since it is a junior creditor. Because the Lenders are permitting Iovate to continue as a going concern, all creditors, including Orgain, have a better chance of being paid.

21. In all events, RBC and the Lenders currently expect that if Orgain is permitted to garnish they will pursue Orgain for claims and remedies arising out of this conduct.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information, and

belief.

      Dated:  August 22, 2025
      Toronto, Ontario

                        /s/ *Andrew O'Coin*
                             Andrew O'Coin

ELECTRONICALLY FILED
Benton County Circuit Court
Brenda DeShields, Circuit Clerk
2025-Aug-22  14:38:10
04CV-25-1607
C19WD05 : 44 Pages

# UNIFORM COVER PAGE

[To be used when required by Administrative Order No. 2 (g)★]

COURT: ___CIRCUIT___ COURT OF ___BENTON___ COUNTY

Docket/Case Number: ___04-CV-25-1607___

CASE NAME:
PLAINTIFF/
PETITIONER:  ORGAIN, INC.

DEFENDANT/
RESPONDENT:  IOVATE HEALTH SCIENCES INTERNATIONAL, INC. AND
IOVATE HEALTH SCIENCES INTERNATIONAL U.S.A., INC.

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):  Exhibit A to Supplemental Declaration of Andrew O'Coin to Brief

★Administrative Order No 2.

(g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).

(2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.

# Exhibit A

*Execution Version*

# FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** (together with the Confirmation appended hereto, being this "**Agreement**") is made as of September 24, 2024 between the parties to the Credit Agreement (as hereinafter defined).

**WHEREAS:**

A.    Reference is made to the amended and restated credit agreement dated as of June 30, 2021 between, *inter alios*, Iovate Health Sciences International Inc., as borrower (the "**Borrower**"), Royal Bank of Canada (as successor to HSBC Bank Canada by way of amalgamation), as administrative agent (the "**Administrative Agent**"), and the financial institutions party thereto, as lenders, as amended by amending agreement no.1 dated as of March 31, 2022, by amending agreement no. 2 dated as of April 14, 2022, by amending agreement no. 3 dated as of December 30, 2022 , amending agreement no.4 dated as of March 7, 2024, amending agreement no. 5 dated as of March 28, 2024, amending agreement no. 6 dated as of April 30, 2024 and the default agreement dated as of July 8, 2024 (the "**Default Agreement**") (collectively, the "**Credit Agreement**").

B.    Events of Default have occurred under the Credit Agreement as a result of (i) failure of the Borrower to cause Holdco to maintain a Fixed Charge Coverage Ratio of not less than 1.10x with respect to the period from July 1, 2023 to June 30, 2024 in accordance with Section 5.1(12)(a), (ii) failure of the Borrower to cause Holdco to maintain an Adjusted EBITDA of not less than U.S.$22,349,000 with respect to the period from July 1, 2023 to June 30, 2024 in accordance with Section 5.1(12)(c)"), and (iii) the maintenance by certain Credit Parties of bank accounts with affiliates of the former HSBC Bank Canada without a blocked account agreement (collectively, the "**Existing Events of Default**").

C.    The Borrower has requested that the Lenders (a) forbear from enforcing its and their respective rights under the Credit Agreement, Security Documents and other Loan Documents in respect of the Existing Events of Default from the date hereof until the earlier of (i) the occurrence or existence of any Termination Event (as hereinafter defined), and (ii) December 31, 2024 (the "**Forbearance Period**"), and (b) make certain amendments to the Credit Agreement to, inter alias, prevent certain future Events of Default, and the Lenders have agreed to do so in accordance with the terms and conditions hereof.

D.    In 2023 five Cure Contributions totalling 76,860,000 RMB (equivalent U.S.$10,692,063 at the time of making such Cure Contributions) were made by Xiwang Foodstuffs Co. Ltd. ("**Parent Co.**"), through its intermediary Xiwang Group Finance Company ("**Finance Co.**"), to Holdco.

E.    Pursuant to regulations of the Central Bank of the People's Republic of China (the "**Central Bank**"), such funds must be returned to the People's Republic of China within one year, as such deadline may be extended from time to time.

F.    In order to comply with such regulations without impacting the Borrower's liquidity, the Borrower proposes that:

(a)     Parent Co. (via its intermediary Shandong Xiwang Foodstuffs Co., Ltd.) shall make loans to Holdco in the aggregate amount of U.S.$10,692,063 (or such substantially similar amounts as may be dictated by foreign exchange rates) by way of deposits to Holdco's RMB account with Bank of China (Canada) (the "**New Subordinated Indebtedness**"); and

(b)     on a same-day basis, the U.S. Dollar proceeds of the New Subordinated Indebtedness shall be converted to RMB, and payments in the aggregate amount of 78,860,000 RMB (or such substantially similar amounts as may be dictated by foreign exchange rates) (the "**Subject Payments**") shall be sent by Holdco from its RMB account with Bank of China (Canada) to Parent Co. (via its intermediary Finance Co.) for application against other Subordinated Indebtedness held by Parent Co..

G.     The making of the Subject Payments by Holdco would constitute the making of a Restricted Payment prohibited by Section 6.1(9).

H.     The acceptance of the Subject Payments by Parent Co. would be prohibited under the terms of the subordination agreement granted by Parent Co. in favour of the Secured Parties dated as of September 30, 2022 (the "**Parent Co. Subordination Agreement**").

I.     The Borrower has requested that the Lenders consent to the Subject Payments, and they have agreed to do so on the terms and conditions set out herein.

**NOW THEREFORE THIS AGREEMENT WITNESSES** that, in consideration of the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## INTERPRETATION

**1.1     One Amending Agreement**. This Agreement amends the Credit Agreement. This Agreement and the Credit Agreement shall be read, interpreted, construed and have effect as, and shall constitute, one agreement with the same effect as if the amendments made by this Agreement had been contained in the Credit Agreement as of the date of this Agreement.

**1.2     Defined Terms**. In this Agreement, unless something in the subject matter or context is inconsistent:

(a)     terms defined in the description of the parties or in the recitals have the respective meanings given to them in the description or recitals, as applicable; and

(b)     all other capitalized terms have the respective meanings given to them in the Credit Agreement as amended by Article 2 of this Agreement (collectively, the "**Amended Credit Agreement**").

**1.3    Headings**. The headings of the Articles and Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**1.4    References**. All references to Articles, Sections, Exhibits and Schedules, unless otherwise specified, are to Articles, Sections, Exhibits and Schedules of the Credit Agreement

**1.5    Recitals**. The Borrower confirms that the facts set out in the recitals to this Agreement are true and correct, and their accuracy shall constitute a representation hereunder.

**ARTICLE 2**
**AMENDMENTS**

**2.1    New Definitions**. The following new definitions are added to Section 1.1 in alphabetical order:

"**Adjusted Cash**" means, with respect to any Fiscal Quarter and Holdco on a Consolidated basis, an amount in U.S. Dollars equal to:

(a)    cash and Cash Equivalents on hand at the end of such Fiscal Quarter; less

(b)    the amount of Cure Contributions paid by Holdco to the Borrower during such Fiscal Quarter; adjusted for

(c)    any change (an increase being added, a decrease being deducted) in Working Capital from the first day of such Fiscal Quarter to the last day of such Fiscal Quarter (except to the extent such change was permanent such as by way of (i) a paydown of overdue Related Party accounts receivable, (ii) a paydown of overdue accounts receivable in the Middle East North Africa region not previously included in the CFF; or (iii) other events of a non-recurring nature).

"**Baseline CFF**" means the CFF for the period from September 7, 2024 to January 3, 2025 previously delivered to the Agent and Lenders on September 13, 2024, a copy of which is appended as Schedule 1.1(C).

"**Bi-Weekly Date**" means each second Friday commencing with October 4, 2024; provided that if a Bi-Weekly Date is not a Business Day, then the Bi-Weekly Date in question shall be the first immediately preceding Business Day.

"**CFF**" means, as at any Bi-Weekly Date, a weekly Consolidated cash flow forecast of Holdco for thirteen calendar week period commencing on the immediately preceding Saturday, together with:

(a)    a report (a "**Historical Variance Report**") on actual versus forecast cumulative cash receipts and disbursements for the period from September 7, 2024 to the Friday immediately preceding such Bi-Weekly Date (each such period being a "**Testing Period**") with explanations for key variances as against the Baseline CFF, and

- 4 -

(b)    an explanation of the key forecast variances in comparison to the CFF provided at the previous Bi-Weekly Date.

Each CFF shall be in a form consistent with the Baseline CFF.

"**Excess Cash Flow**" means, with respect to any Fiscal Quarter, an amount equal to:

(a)    Adjusted Cash as at the end of such Fiscal Quarter; less

(b)    Adjusted Cash as at the end of the immediately preceding Fiscal Quarter.

"**Excess Cash Flow Available**" means, with respect to any Fiscal Quarter, an amount equal to 25% of:

(a)    Excess Cash Flow with respect to such Fiscal Quarter; less

(b)    U.S.$2,000,000.

"**Termination Event Date**" means the date of occurrence of any Termination Event, as such term is defined in the Forbearance Agreement dated as of September 24, 2024 between the parties to the Credit Agreement.

**2.2**    **Current Assets**.  The definition of "Current Assets" in Section 1 is deleted in its entirety and replaced with the following:

"**Current Assets**"  means, at any time, all assets of Holdco determined on a Consolidated basis which, under GAAP, would be classified as current assets, other than cash or Cash Equivalents.

**2.3**    **Repayment of Term Credit**.  Section 2.7(2) is amended by deleting the table set out therein and replacing it with the following:

| Date | Amount* |
| --- | --- |
| On June 30, 2024 and September 30, 2024. | $0 |
| On the Termination Event Date. | U.S$6,619,654.94 |
| On December 31, 2024 | U.S.$9,929,482.42, being 9.375% of the principal amount of the Term Loans outstanding on March 28, 2024 less any amount paid on the Termination Event Date. |
| On the Maturity Date. | The remaining unpaid amount of the Term Loans. |

    * subject always to Section 2.9(2)

        *Iovate Forbearance Agreement*

For the avoidance of doubt, the failure of the Borrower to make a principal payment of U.S.$3,276,494.14 on June 30, 2024 is no longer an Event of Default.

**2.4     Mandatory Loan Prepayments**. Sections 2.9(2)(a) is deleted in its entirety and replaced with the following:

(a)     On the last day of each Fiscal Quarter, commencing with the Fiscal Quarter ending September 30, 2024 (which payments shall, for the avoidance of doubt but without limitation, be in addition to those set out in Section 2.7(2)) the Borrower shall prepay an aggregate principal amount of Term Loans of U.S.$250,000 as a minimum sweep.  Within 15 days after the delivery of the financial statements under Section 5.1(1)(b) in respect of each Fiscal Quarter, commencing with the Fiscal Quarter ended September 30, 2024, the Borrower shall (x) deliver to the Administrative Agent a certificate signed by a Responsible Officer of the Borrower, setting out in reasonable detail the calculation of Excess Cash Flow Available for such Fiscal Quarter, and (y) prepay an aggregate principal amount of Term Loans equal to the amount, if any, by which Excess Cash Flow Available for such Fiscal Quarter exceeds U.S.$250,000.  Such prepayments under this Section 2.9(2)(a) may be reduced in the sole discretion of the Administrative Agent (on behalf of the Lenders).

Section 2.9(2)(d) is amended by adding "(a)," immediately before "(b) or (c)".

**2.5     Financial Statements and Other Information**.  Section 5.1(1) is amended by deleting the "and" immediately after clause (p), replacing "." with ";" immediately at the end of clause (q), and adding the following new clauses (r) through (x) immediately thereafter:

(r)     not later than November 1, 2024, an updated restructuring plan for the period from the date of such plan until December 31, 2025 which shall include:

(i)     a weekly cash flow forecast for the period beginning from the date of such plan until March 31, 2025 reflecting, among other things, the ongoing payment of interest and repayment of the Loans required hereunder when due; and

(ii)     an updated business plan for the Fiscal Year ending December 31, 2025, prepared on a monthly basis and reflecting margin enhancement and cost cutting initiatives, plan for the repayment of the Loans, an international receivable risk mitigation strategy and revisions to key assumptions contained in the prior business plan delivered to the Administrative Agent

all in form and substance satisfactory to the Required Lenders;

(s)     not later than November 1, 2024, a contingency plan which shall address (i) any liquidity shortfalls anticipated for the Fiscal Year ending December 31, 2025, (ii) failure to obtain all regulatory approvals from the State Administration of Foreign

Exchange in respect of overdue Restricted Sales receivables for the Fiscal Year ending December 31, 2025, and (iii) commodity price risk;

(t)     on each Bi-Weekly Date, a CFF;

(u)     within ten (10) days after the end of each calendar month, commencing September 2024, an update report on all developments with respect to ongoing discussions with Kenco Logistic Services LLC ("**Kenco**"), including updates on (i) treatment of the disputed payments for the Fiscal Year ended December 31, 2023; (b) ongoing issues in respect of the Fiscal Year ending December 31, 2024 and remedies taken to address ongoing issues with Kenco services; and (c) contingency plan being pursued to mitigate concentration risk with Kenco as the sole third party logistics provider;

(v)     within ten (10) days after the end of each calendar month, commencing September 2024, updates on all developments with respect to ongoing discussions with Orgain Inc. pertaining to any potential settlements and/or proposed payment plans in respect of the Orgain Judgment;

(w)     within ten (10) days after the end of each calendar month, commencing September 2024, updates on strategic alternatives being pursued by the Borrower to refinance its business or strategic sales of certain of its divisions or assets; and

(x)     such additional reporting and information upon the request of the Administrative Agent, from time to time and acting reasonably.

**2.6     Fixed Charge Coverage Ratio.** Section 5.1(12)(a) is deleted in its entirety and replaced with:

(a)     [Intentionally Deleted.]

**2.7     Minimum Adjusted EBITDA.** Section 5.1(12)(c) is amended by deleting it in its entirety and replacing it with the following:

(c)     *Adjusted EBITDA.* Maintain Adjusted EBITDA with respect to each Fiscal Quarter listed below of not less than 85% of the amount shown opposite such Fiscal Quarter:

| Fiscal Quarter Ended | Adjusted EBITDA |
|---|---|
| September 30, 2024 | ███████ |
| December 31, 2024 | ███████ |

**2.8     Minimum Liquidity.** Section 5.1(14) and Schedule A to Exhibit F is amended by deleting the reference to "6,000,000" and replacing it with "2,000,000" in each instance.

**2.9     New Positive Covenants.** Article 5 is amended by adding the following as a new Section 5.1(15) and Section 5.1(16):

- 7 -

(15)    *SAFE Approval*. Not later than October 31, 2024, Holdco shall have received all required approvals from the State Administration of Foreign Exchange to permit the payment of all Restricted Sales receivable then overdue, all certified by a Responsible Officer of Holdco, such deadline as extended by the Required Lenders acting reasonably.

(16)    *Restricted Sales*. Not later than October 31, 2024, the Credit Parties shall have received additional aggregate cash payments in respect of Restricted Sales of not less than U.S.$3,700,000 into bank accounts maintained with the Administrative Agent.

**2.10    Transactions with Affiliates**. Section 6.1(10)(a) is amended by deleting it in its entirety and replacing it with the following:

(a)    in the ordinary course of business at prices and on terms and conditions not less favourable to the Borrower or such other Group Party than could be obtained on an arm's-length basis from unrelated third parties; <u>provided that</u>, no Restricted Sales are permitted except those (i) made in accordance with this Agreement prior to September 24, 2024, or (ii) which have been prepaid in full prior to delivery of the inventory or other property to the Affiliate which is the counterparty to such Restricted Sale where such Restricted Sale is not recognized in revenue prior to such time, excluding any royalty revenues which are recorded as a result of tax and transfer pricing regulations;

**2.11    Disbursements**. Article 6 is amended by adding the following as a new Section 6.1(17):

(17)    *Disbursements.* The Borrower shall not, and shall cause each Credit Party and Holdco not to, make any disbursements except on account of line items set out in the Baseline CFF.

**2.12    Events of Default**.  Section 7.1 is amended by deleting clause (p) thereof and replacing the "or" immediately after clause (p) and adding the following immediately after clause (q):

(r)    the Borrower shall fail to deliver any materials required pursuant to Section 5.1(t), (u) or (v) within two (2) Business Days of the applicable Bi-Weekly Date; or

(s)    a negative variance of more than 15% of actual cumulative disbursements vs forecast cumulative disbursements for any Testing Period, as set out in a Historical Variance Report,

**2.13    Baseline CFF**.  Exhibit A hereto is added as Schedule 1.1(C).

**2.14    Bank Accounts**.  Schedule 3.1(23) is deleted in its entirety and replaced with Schedule 3.1(23) attached hereto.  The Borrower hereby undertakes to (i) use all commercially reasonable efforts to deliver a blocked account agreement with respect to those bank accounts identified as requiring same in such Schedule, and (ii) close the Australian bank account identified in such Schedule as no longer being required, in each case as soon as reasonably practicable.

**2.15    Conversion or Rollover of Borrowings**. Notwithstanding Section 2.3(3) of the Credit Agreement, during the Forbearance Period (a) a Canadian Prime Loan may be converted (or subsequently rolled) into a CORRA Loan having a one-month Interest Period, and (b) a Base Rate Loan may be converted (or subsequently rolled) into a SOFR Loan having a one-month Interest Period; underlined provided that, in any case, no Interest Period shall extend beyond the Maturity Date. For the avoidance of doubt, default interest as contemplated by Section 2.5(3) shall continue to apply to such Loans.

**2.16    Consent.** Notwithstanding Section 6.1(9) and the Parent Co. Subordination Agreement, the Lenders irrevocably consent to the Subject Payments provided that:

(a)     the Subject Payments are made on the same or following Business Day as the New Subordinated Indebtedness is incurred;

(b)     the Subject Payments are funded exclusively with the converted proceeds of the New Subordinated Indebtedness; and

(c)     prior to making the Subject Payments:

(a)     Holdco has made the Cure Contribution required pursuant to Section 5.1(12)(e)(i)(B) into a bank account of the Borrower maintained with the Administrative Agent; and

(b)     since September 12, 2024 the Credit Parties have received aggregate cash payments in respect of Restricted Sales of not less than U.S.$821,474 into bank accounts maintained with the Administrative Agent.

Parent Co. shall be a third-party beneficiary of such consent.

## ARTICLE 3
## FORBEARANCE

**3.1    Forbearance.**  Subject to the conditions set out in Section 7.1 below, and the rights of the Administrative Agent and the Lenders upon the occurrence of a Termination Event, and notwithstanding the terms and conditions of the Credit Agreement, during the Forbearance Period, the Administrative Agent and the Lenders will refrain from enforcing any rights and remedies under the Credit Agreement, the Security Documents, any other Loan Document and/or under applicable Laws as a result of the Existing Events of Default.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

**4.1    Confirmation of Representations**. The Borrower represents and warrants that, as at the date of this Agreement and assuming that the amendments made to the Credit Agreement by this Agreement have become effective:

(a)     this Agreement and the Confirmation appended hereto has been duly authorized, executed and delivered by each Credit Party;

(b)     the Credit Agreement, as amended hereby, constitutes a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditor's rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(c)     this Agreement constitutes a legal, valid and binding obligation of the Borrower and each of Holdco and the other Credit Parties signatory hereto, and is enforceable against each such party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditor's rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(d)     no Default or Event of Default has occurred and is continuing other than the Existing Events of Default;

(e)     the representations and warranties contained in Article 3 (other than those that are made with respect to a specific date) are true and correct as if made on the date hereof;

(f)     the receipt, possession, or conversion (as these acts are described in recital F of this Agreement) of any part of the funds constituting the New Subordinated Indebtedness will not cause the Borrower, Holdco, or any of the Lenders to violate any applicable Laws, which for greater certainty includes the Criminal Code of Canada; and

(g)     the Subject Payments shall (i) not violate applicable Laws in any respect, and (ii) bring the Credit Parties into compliance with all foreign currency regulations of the Central Bank and China's State Administration of Foreign Exchange.

## ARTICLE 5
## CONFIRMATIONS

**5.1**    **Confirmation**. The Borrower confirms, acknowledges and agrees that:

(a)     the recitals set out above are true, correct and are hereby incorporated into this Agreement;

(b)     the Secured Liabilities owing by the Borrower to the Lenders under the Credit Agreement as at September 24, 2024 is set out in **Schedule "A"** hereto and none of the Borrower, Holdco or the Guarantors have any rights of compensation, off-set, defenses, claims or counterclaims with respect to any of the Secured Liabilities;

(c)     except as specifically stated herein, the Credit Agreement and the other Loan Documents shall continue in full force and effect in accordance with the provisions thereof;

(d)     the Security Documents and the Liens granted thereunder continue in full force and effect in accordance with their terms notwithstanding this Agreement and the amendments to the Credit Agreement effected hereby;

(e)     the secured liabilities described in the Security Documents include indebtedness, liabilities and obligations arising under or in relation to the Amended Credit Agreement, and the Liens granted thereunder extend thereto;

(f)     all Secured Liabilities under the Credit Agreement shall be continuing with only the terms thereof being modified as provided in this Agreement, and this Agreement shall not evidence or result in a novation of such Secured Liabilities;

(g)     the Existing Events of Default have occurred and are continuing;

(h)     notwithstanding anything in this Agreement or the Lenders' willingness to forbear in accordance with the terms of this Agreement, the Lenders do not, in any way, waive any of the Existing Events of Default nor do they renounce any of their respective rights pursuant to the Loan Documents or release any Liens in respect of the Security Documents and expressly reserves their respective rights in respect thereof such that nothing herein shall be interpreted as constituting such a waiver, renunciation or release;

(i)     except as provided for under this Agreement, neither the Administrative Agent nor any Lender has made any representation to any Credit Party with respect to any other accommodation in connection with the Credit Agreement or any of the other Loan Documents;

(j)     no further Revolving Loans (including Swingline Loans) are available under the Credit Agreement; and

(k)     based on the Total Leverage Ratio, the Applicable Margin applicable to Loans is at "Level VII" as per the chart set out in the definition of "Applicable Margin" in the Credit Agreement. For greater certainty, default interest as contemplated by Section 2.5(3) has accrued from and after July 2, 2024 and shall continue to do so during the Forbearance Period.

## ARTICLE 6
## TERMINATION EVENTS

**6.1     Termination Event**. The forbearance contained in Section 3.1 hereof shall, without any further notice of any kind to any Credit Party or any other Person, terminate upon the occurrence of any one or more of the following events (individually, a "**Termination Event**"):

(a)     if any Credit Party fails to comply with any of the terms and conditions of this Agreement, including the covenants set out in this Agreement, which failure in every case shall not, notwithstanding any provision in the Credit Agreement or any other Loan Document to the contrary, be subject to any cure period;

(b)      if any other Event of Default (other than the Existing Events of Default) occurs under the Credit Agreement; or

(c)      if any Person takes any steps to collect or enforce the Orgain Judgment.

**6.2**    **Remedies**. Upon the occurrence of a Termination Event the Forbearance Period shall automatically be terminated, and the Administrative Agent and Lenders shall be entitled, immediately and without any further notice of any kind to any Credit Party or any other Person, to terminate the Credits, accelerate the Secured Liabilities and enforce the Security Documents exercise all of their rights and remedies against the Credit Parties in accordance with the Credit Agreement and Loan Documents and applicable Law.

### ARTICLE 7
### CONDITIONS

**7.1**    **Conditions Precedent**. The amendments set out in Article 2 shall become effective if and only if there is receipt by the Administrative Agent of:

(a)      a counterpart of this Agreement executed by the Borrower, the Administrative Agent and the Lenders;

(b)      a counterpart of the Confirmation appended to this Agreement, executed by each Guarantor;

(c)      payment of an amendment and forbearance fee of Cdn.$100,000 to the Administrative Agent for the pro rata account of the Lenders (the "**Amendment Fees**");

(d)      payment of all reasonable fees and documented out-of-pocket expenses of FTI Consulting Inc., the financial consultant to the Administrative Agent, invoiced to date (the "**Consultant Fees**"); and

(e)      payment of all reasonable and documented legal fees of the Administrative Agent invoiced to date by its counsel (together with the Amendment Fees and the Consultant Fees, the "**Fees**").

**7.2**    **Payment**. The Administrative Agent may debit any Canadian Dollar operating account maintained by the Administrative Agent in the name of the Borrower in an aggregate amount equal to the sum of the Fees in order to effect the payment thereof; provided that the Borrower shall have been provided the invoice related to the Fees no less than two Business Days (or such shorter time period as agreed by the Borrower) prior to such debiting and a Responsible Officer of the Borrower has consented in writing to such debiting (which written consent may be by electronic communication).

- 12 -

# ARTICLE 8
# GENERAL

**8.1** **Expenses**. Notwithstanding, and in addition to any like provision in the Credit Agreement, the Security Documents or any other Loan Document, the Borrower shall pay all of the Administrative Agent and Lenders' reasonable and out-of-pocket costs, charges and expenses (including, without limitation, legal fees on a full indemnity basis) in connection with the negotiation, preparation of, registration or amendment of this Agreement, the perfection, opposability or preservation of the Security Documents or any other Loan Document, the enforcement by any means of any of the provisions hereof or under the Security Documents or the exercise of any rights, powers or remedies hereunder or under the Security Documents or any other Loan Document, including, without limitation, all such costs, charges and expenses in connection with taking possession of any of the collateral granted pursuant to the Security Documents in support of the Secured Liabilities, carrying on the Borrower's business, collecting the Borrower's accounts and taking custody of, preserving, repairing, processing, preparing for disposition and disposing of any of the collateral granted pursuant to the Security Documents in support of the Secured Liabilities, together with interest on such costs, charges and expenses from the dates incurred to the date of payment at the rate stated in the Credit Agreement.

**8.2** **Release**. In consideration of the agreement of the Lenders to forbear and other covenants under this Agreement and for other good and valuable consideration (the receipt and adequacy of which are hereby acknowledged), each of the Credit Parties, on behalf of itself, its subsidiaries and all of their respective officers, directors, employees, Administrative Agents, successors and assigns and anyone claiming through or under them (collectively, the "**Releasors**") do hereby release, remise and forever discharge the Administrative Agent and the Lenders (including its affiliates, associates, holding bodies corporate and subsidiaries and all officers, directors, employees, Administrative Agents, successors and assigns and anyone claiming through or under it) of and from any and all claims and demands of every nature and kind at law or in equity or under any statute, actions, causes of action, suits, debts, dues, sums of money, damages, losses, indemnities and costs, which the Releasors or any one or more of them now have or ever had, can, shall or may have in respect of or in any way arising out of or related to the dealings or transactions in respect of the Credit Agreement, the Security Documents, any other Loan Document, this Agreement, and any dealings with any of the Releasors relating to the Secured Liabilities and the Security Documents, prior to the date hereof except for any obligations arising out of or related to this Agreement (collectively, the "**Released Claims**"), provided that such Released Claims shall not include any claims and demands to the extent they are determined by a court of competent jurisdiction by final and non-appealable judgement to have resulted from the gross negligence or wilful misconduct of the Administrative Agent or any Lender. The releases granted under this Section shall survive the termination of this Agreement.

**8.3** **Reservation of Rights**. Except as expressly set forth herein, this Agreement shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of Lenders or Administrative Agent under the Credit Agreement or any other Loan Document. Nothing herein shall be deemed to entitle any Credit Party to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in

similar or different circumstances.  For the avoidance of doubt, nothing herein shall constitute a consent to, or waiver of, the Existing Events of Default.

**8.4     Interpretation**. All references to the "this Agreement" or the "Credit Agreement" and all similar references in any of the other Loan Documents shall hereafter include, mean and be a reference to the Amended Credit Agreement without any requirement to amend such Loan Documents. This Agreement shall constitute a "Loan Document" under, and as defined in, the Credit Agreement.

**8.5     Binding Nature**. This Agreement shall enure to the benefit of and be binding upon the Borrower, the Administrative Agent and the Lenders and their respective successors and permitted assigns.

**8.6     Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**8.7     Conflicts**. If, after the date of this Agreement, any provision of this Agreement is inconsistent with any provision of the Credit Agreement or any other Loan Document, the relevant provision of this Agreement shall prevail.

**8.8     Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**8.9     Counterpart and Facsimile**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

**8.10     Expenses**. Notwithstanding, and in addition to any like provision in the Credit Agreement, the Security Documents or any other Loan Document, the Borrower shall pay all of the Administrative Agent and Lenders' reasonable and out-of-pocket costs, charges and expenses (including, without limitation, legal fees on a full indemnity basis) in connection with the negotiation, preparation of, registration or amendment of this Agreement, the perfection, opposability or preservation of the Security Documents or any other Loan Document, the enforcement by any means of any of the provisions hereof or under the Security Documents or the exercise of any rights, powers or remedies hereunder or under the Security Documents or any other Loan Document, including, without limitation, all such costs, charges and expenses in connection with taking possession of any of the collateral granted pursuant to the Security Documents in support of the Secured Liabilities, carrying on the Borrower's business, collecting the Borrower's accounts and taking custody of, preserving, repairing, processing, preparing for disposition and disposing of any of the collateral granted pursuant to the Security Documents in support of the

Secured Liabilities, together with interest on such costs, charges and expenses from the dates incurred to the date of payment at the rate stated in the Credit Agreement.

**8.11    Release**. In consideration of the agreement of the Lenders to forbear and other covenants under this Agreement and for other good and valuable consideration (the receipt and adequacy of which are hereby acknowledged), each of the Credit Parties, on behalf of itself, its subsidiaries and all of their respective officers, directors, employees, Administrative Agents, successors and assigns and anyone claiming through or under them (collectively, the "**Releasors**") do hereby release, remise and forever discharge the Administrative Agent and the Lenders (including its affiliates, associates, holding bodies corporate and subsidiaries and all officers, directors, employees, Administrative Agents, successors and assigns and anyone claiming through or under it) of and from any and all claims and demands of every nature and kind at law or in equity or under any statute, actions, causes of action, suits, debts, dues, sums of money, damages, losses, indemnities and costs, which the Releasors or any one or more of them now have or ever had, can, shall or may have in respect of or in any way arising out of or related to the dealings or transactions in respect of the Credit Agreement, the Security Documents, any other Loan Document, this Agreement, and any dealings with any of the Releasors relating to the Secured Liabilities and the Security Documents, prior to the date hereof except for any obligations arising out of or related to this Agreement (collectively, the "**Released Claims**"), provided that such Released Claims shall not include any claims and demands to the extent they are determined by a court of competent jurisdiction by final and non-appealable judgement to have resulted from the gross negligence or wilful misconduct of the Administrative Agent or any Lender.  The releases granted under this Section shall survive the termination of this Agreement.

**8.12    Reservation of Rights**.  Except as expressly set forth herein, this Agreement shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of Lenders or Administrative Agent under the Credit Agreement or any other Loan Document.  Nothing herein shall be deemed to entitle any Credit Party to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in similar or different circumstances.  For the avoidance of doubt, nothing herein shall constitute a consent to, or waiver of, the Existing Events of Default.

**8.13    Interpretation**. All references to the "this Agreement" or the "Credit Agreement" and all similar references in any of the other Loan Documents shall hereafter include, mean and be a reference to the Amended Credit Agreement without any requirement to amend such Loan Documents. This Agreement shall constitute a "Loan Document" under, and as defined in, the Credit Agreement.

**8.14    Binding Nature**. This Agreement shall enure to the benefit of and be binding upon the Borrower, the Administrative Agent and the Lenders and their respective successors and permitted assigns.

**8.15    Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the

- 15 -

remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**8.16    Conflicts**. If, after the date of this Agreement, any provision of this Agreement is inconsistent with any provision of the Credit Agreement or any other Loan Document, the relevant provision of this Agreement shall prevail.

**8.17    Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**8.18    Counterpart and Facsimile**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

[signatures on the following pages]

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.

**ROYAL BANK OF CANADA**, as
Administrative Agent

By: _____
Name:    Casey Clark
Title:     Associate Director


By: _____
Name:
Title:

*Iovate Forbearance Agreement*

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.


**ROYAL BANK OF CANADA**, as Lender

By: _____

Name:    Brian Pettit, Senior Director

Title:


By: _____

Name:

Title:

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.

**THE TORONTO-DOMINION BANK**, as Lender

By: _____

Name: Daryl Coelho

Title: Director, Financial Restructuring Group

By: _____

Name: Anthony Cherubin

Title: Associate Director, FRG

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.

**BANK OF CHINA (CANADA)**, as Lender

By: _____

Name:    David Liang

Title:    Senior Manager, Corporate Banking Dept.


By: _____

Name:

Title:

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.

**BANK OF MONTREAL**, as Lender

By: _____

Name:    Shehryar Syed

Title:     Director


By: _____

Name:

Title:

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.


**NATIONAL BANK OF CANADA**, as
Lender

By: _Sonia de Lorenzi_

Name: Sonia de Lorenzi

Title:       Senior Manager


By: _Caroline Podsiadlo_

Name: Caroline Podsiadlo

Title:       Senior Director

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.


**CANADIAN WESTERN BANK**, as
Lender


By:  *Dean Chan*
Name:  Dean Chan
Title:  VP SAMU


By:
Name:  Karen Gordon
Title:  Manager, Credit, SAMU

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.

**THE BANK OF NOVA SCOTIA**, as Lender

By: _____

Name: Nick Stewart
Title: Director, Special Accounts Management

By: _____

Name: Neel Chopra
Title: Director, Special Accounts Management

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.

**IOVATE HEALTH SCIENCES INTERNATIONAL INC.**

By: _____

Name: Di Wang

Title: Director


By: _____

Name: Xiyao Michael Liu

Title: Director

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date set out on the first page.

**IOVATE HEALTH SCIENCES**
**INTERNATIONAL INC.**

By: _____
Name: Di Wang
Title: Director

By: _____
Name: Xiyao Michael Liu
Title: Director

# CONFIRMATION

Each undersigned Guarantor acknowledges and irrevocably consents to the terms of the Agreement. Each Guarantor further represents, warrants, and confirms to the Administrative Agent for the benefit of each Secured Party that:

(a)    guarantees and indemnities granted under the Loan Documents continue in full force and effect in accordance with their terms notwithstanding the Amending Agreement and the amendments to the Credit Agreement effected thereby;

(b)    such guarantees and indemnities extend to the indebtedness, liabilities and obligations of the Borrower under the Amended Credit Agreement;

(c)    the Security Documents and the Liens granted thereunder continue in full force and effect in accordance with their terms notwithstanding the Amending Agreement and the amendments to the Credit Agreement effected thereby;

(d)    the secured liabilities described in the Security Documents include indebtedness, liabilities and obligations arising under or in relation to the Amended Credit Agreement, and the Liens granted thereunder extend thereto; and

(e)    all references to the "this Agreement" or the "Credit Agreement" and all similar references in any of the other Loan Documents shall hereafter mean and be a reference to the Amended Credit Agreement without any requirement to amend such Loan Documents.

The undersigned Parent Co. confirms and independently makes the representation set out in Section 4.1(f) of this Agreement.

**XIWANG IOVATE HOLDINGS COMPANY LIMITED**

By: _____
Name: Di Wang
Title: Director


By: _____
Name: Xiyao Michael Liu
Title: Director

                *Iovate Forbearance Agreement*

## CONFIRMATION

Each undersigned Guarantor acknowledges and irrevocably consents to the terms of the Agreement. Each Guarantor further represents, warrants, and confirms to the Administrative Agent for the benefit of each Secured Party that:

(a)    guarantees and indemnities granted under the Loan Documents continue in full force and effect in accordance with their terms notwithstanding the Amending Agreement and the amendments to the Credit Agreement effected thereby;

(b)    such guarantees and indemnities extend to the indebtedness, liabilities and obligations of the Borrower under the Amended Credit Agreement;

(c)    the Security Documents and the Liens granted thereunder continue in full force and effect in accordance with their terms notwithstanding the Amending Agreement and the amendments to the Credit Agreement effected thereby;

(d)    the secured liabilities described in the Security Documents include indebtedness, liabilities and obligations arising under or in relation to the Amended Credit Agreement, and the Liens granted thereunder extend thereto; and

(e)    all references to the "this Agreement" or the "Credit Agreement" and all similar references in any of the other Loan Documents shall hereafter mean and be a reference to the Amended Credit Agreement without any requirement to amend such Loan Documents.

The undersigned Parent Co. confirms and independently makes the representation set out in Section 4.1(f) of this Agreement.

**XIWANG IOVATE HOLDINGS
COMPANY LIMITED**

By:  _____
Name: Di Wang
Title: Director

By:  _____
Name: Xiyao Michael Liu
Title: Director

*Iovate Forbearance Agreement*

**IOVATE HEALTH SCIENCES
INTERNATIONAL INC.**

By: _____
Name: Di Wang
Title: Director


By: _____
Name: Xiyao Michael Liu
Title: Director

S-11

**IOVATE HEALTH SCIENCES
INTERNATIONAL INC.**

By: _____
Name: Di Wang
Title: Director

By: _____
Name: Xiyao Michael Liu
Title: Director

S-12

**IOVATE HEALTH SCIENCES U.S.A. INC.**

By:
Name: Di Wang
Title: Director


By: _____
Name: Xiyao Michael Liu
Title: Director

**IOVATE HEALTH SCIENCES U.S.A. INC.**


By: _____
Name: Di Wang
Title: Director


By: _____
Name: Xiyao Michael Liu
Title: Director

**NORTHERN INNOVATIONS
HOLDING CORP.**

By: _____
Name: Di Wang
Title: Director


By: _____
Name: Xiyao Michael Liu
Title: Director

**NORTHERN INNOVATIONS
HOLDING CORP.**

By: _____
Name: Di Wang
Title: Director

By: _____
Name: Xiyao Michael Liu
Title: Director

**IOVATE HEALTH SCIENCES
AUSTRALIA PTY LTD**

By: _____
Name: Xiyao Michael Liu
Title: Director


By: _____
Name: Tanya Mistry
Title: Director

**IOVATE HEALTH SCIENCES
AUSTRALIA PTY LTD**

By: _____
Name: Xiyao Michael Liu
Title: Director

By: _____
Name: Tanya Mistry
Title: Director

**XIWANG FOODSTUFFS CO. LTD.**

By: _____

Name: Hui Wang

Title:   Chairman


By: _____

Name:

Title:

## SCHEDULE "A"

### SECURED LIABILITIES

### (as at September 24, 2024)

| Credit | Amount* |
|---|---|
| Term Credit | U.S.$104,847,812.48 |
| Revolving Credit | U.S.$14,000,000 |

* together with all accrued interest thereon at the rate(s) determined in accordance with the Credit Agreement, and all costs, fees, expenses, charges, and other amounts whatsoever, including without limitation, all legal and consultant fees and expenses of the Administrative Agent and Lenders, that are payable by the Borrower under the Credit Agreement, the Security Documents, and other Loan Documents, incurred and unpaid as at September 24 2024.

**EXHIBIT "A"**

**BASELINE CFF**

[see attached]

**Xiwang Iovate Holdings Company Limited (British Columbia) (the "Company")**
**Projected Weekly Cash Flow**
**For the 17-week period ending**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 17 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending (in $USD) | 13-Sep | 20-Sep | 27-Sep | 4-Oct | 11-Oct | 18-Oct | 25-Oct | 1-Nov | 8-Nov | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | |
| **Receipts** | | | | | | | | | | | | | | | | | | |
| Collections | 3,392,465 | 4,587,829 | 5,253,357 | 6,764,384 | 3,804,611 | 3,930,591 | 6,265,255 | 5,409,466 | 3,776,732 | 7,087,186 | 4,170,367 | 3,953,530 | 4,181,593 | 4,219,603 | 4,219,603 | 4,219,603 | 4,219,603 | 79,455,779 |
| Equity Cure Injections | - | - | 2,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2,000,000 |
| Other | - | - | - | - | - | 480,000 | - | - | - | - | - | - | - | - | - | - | - | 480,000 |
| **Total Receipts** | 3,392,465 | 4,587,829 | 7,253,357 | 6,764,384 | 3,804,611 | 4,410,591 | 6,265,255 | 5,409,466 | 3,776,732 | 7,087,186 | 4,170,367 | 3,953,530 | 4,181,593 | 4,219,603 | 4,219,603 | 4,219,603 | 4,219,603 | 81,935,779 |
| **Disbursements** | | | | | | | | | | | | | | | | | | |
| Operating Expenses | (7,033,684) | (3,966,112) | (4,259,630) | (7,461,292) | (8,741,755) | (5,537,185) | (4,727,089) | (4,488,751) | (3,832,385) | (4,155,250) | (4,658,160) | (4,265,887) | (3,763,985) | (3,326,309) | (4,141,681) | (3,227,926) | (3,244,652) | (80,831,734) |
| Payroll & Benefits | (357,925) | (357,925) | (357,925) | (657,925) | (357,925) | (356,043) | (352,779) | (352,779) | (351,774) | (344,429) | (344,429) | (340,593) | (340,477) | (336,869) | (335,749) | (335,749) | (334,936) | (6,216,232) |
| Insurance | - | - | (882,234) | (88,117) | - | - | - | (88,117) | - | - | - | - | (88,117) | - | - | - | (88,117) | (1,234,702) |
| Rent & Property Taxes | - | - | - | (100,000) | - | - | - | (100,000) | - | - | - | - | (100,000) | - | - | (100,000) | - | (400,000) |
| Capital Expenditure | - | - | - | (232,000) | - | - | - | (179,000) | - | - | - | - | (161,000) | - | - | - | - | (572,000) |
| Professional Fees | - | (71,293) | - | (71,293) | - | (71,293) | - | (71,293) | - | (71,293) | - | (71,293) | - | (71,293) | - | (71,293) | - | (570,346) |
| Taxes | - | - | - | (322,746) | (15,000) | - | 39,522 | (20,000) | - | - | - | - | (71,000) | - | - | (322,746) | (35,000) | (746,970) |
| Interest | - | - | - | (1,296,226) | - | - | - | (1,296,226) | - | - | - | - | (1,212,598) | - | - | (1,338,039) | (1,250,000) | (5,143,089) |
| Excess Cash Flow Sweep / Forbearance Fe | - | - | - | (350,000) | - | - | - | - | - | - | - | - | - | - | - | (250,000) | - | (600,000) |
| **Total Disbursements** | (7,391,609) | (4,395,331) | (5,922,636) | (10,171,853) | (9,099,680) | (5,964,521) | (5,040,347) | (6,596,166) | (4,184,159) | (4,570,972) | (5,002,588) | (4,777,773) | (5,637,177) | (3,734,471) | (4,477,430) | (4,057,715) | (6,290,745) | (96,315,073) |
| **Net Cash Flow** | (3,999,144) | 192,499 | 1,330,821 | (3,407,469) | (5,295,069) | (1,553,931) | 1,224,908 | (1,186,700) | (407,426) | 2,516,214 | (832,221) | (824,243) | (1,455,585) | 485,132 | (257,827) | 161,888 | (1,071,142) | (14,379,294) |
| **Opening Balance** | 18,653,371 | 14,654,227 | 14,846,726 | 16,177,546 | 12,770,078 | 7,475,009 | 5,921,078 | 7,145,987 | 5,959,286 | 5,551,860 | 8,068,074 | 7,235,853 | 6,411,609 | 4,956,025 | 5,441,157 | 5,183,330 | 5,345,219 | 18,653,371 |
| Net Operating Cash Flow | (3,999,144) | 192,499 | 1,330,821 | (3,407,469) | (5,295,069) | (1,553,931) | 1,224,908 | (1,186,700) | (407,426) | 2,516,214 | (832,221) | (824,243) | (1,455,585) | 485,132 | (257,827) | 161,888 | (1,071,142) | (14,379,294) |
| **Ending Balance** | 14,654,227 | 14,846,726 | 16,177,546 | 12,770,078 | 7,475,009 | 5,921,078 | 7,145,987 | 5,959,286 | 5,551,860 | 8,068,074 | 7,235,853 | 6,411,609 | 4,956,025 | 5,441,157 | 5,183,330 | 5,345,219 | 4,274,077 | 4,274,077 |

**SCHEDULE 3.1(23)**

**BANK ACCOUNTS**

| Status | Account | Bank | Street | City | Prov/State | Postal Code/ZIP | Country | Telephone | Currency | Account Type | Account # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BAA required | Iovate Health Sciences International Inc. | HSBC | 60 Queen Victoria Street | London | | EC4N 4TR | UK | 7920081470 | GBP | Disbursement | 401160-90104205 |
| BAA required | Iovate Health Sciences International Inc. | HSBC | 60 Queen Victoria Street | London | | EC4N 4TR | UK | 7920081470 | EUR | Both | 401276-77792425 |
| Account no longer required | Iovate Health Sciences International Inc. | HSBC | 28 Bridge Street | Sydney | NSW | 2000 | Australia | 61292552988 | AUD | Both | 342-011-493921-001 |
| Already subject to BAA | Iovate Health Sciences Australia Pty | HSBC | 333 George Street | Sydney | NSW | 2000 | Australia | 61292552988 | AUD | Both | 342-011-607231-001 |
| Already subject to BAA | Iovate Health Sciences Australia Pty | HSBC | 333 George Street | Sydney | NSW | 2000 | Australia | 61292552988 | NZD | Both | 342-011-607231-159 |
| Already subject to BAA | Iovate Health Sciences Australia Pty | HSBC | 333 George Street | Sydney | NSW | 2000 | Australia | 61292552988 | USD | Both | 342-011-607231-160 |
| Now with RBC | Iovate Health Sciences International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 002-623781-001 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Now with RBC | Iovate Health Sciences International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | USD | Current Account | 002-623781-070 |
| Now with RBC | Xiwang Iovate Health Science International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | USD | Current Account | 002-799987-071 |
| Unclear if still open following RBC acquisition due to currency | Xiwang Iovate Health Science International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CNY | Commercial Savings | 002-799987-270 |
| Now with RBC | Northern Innovations Holding Corp. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 102-1446880-001 |
| BAA required | Iovate Health Sciences U.S.A Inc. | HSBC Bank USA | 425 Fifth Avenue | New York | NY | 10018 | USA | 212-525-4641 | USD | Current Account | 104035579 |
| BAA required | Iovate Health Sciences U.S.A Inc. | HSBC Bank USA | 425 Fifth Avenue | New York | NY | 10018 | USA | 212-525-4641 | USD | Current Account | 104035587 |
| BAA not required | Iovate Health Sciences International Inc. | Royal Bank of Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 02705-1013721 |
| BAA not required | Iovate Health Sciences International Inc. | Royal Bank of Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | USD | Current Account | 02705-4004149 |
| BAA not required | Northern Innovations Holding Corp. | Royal Bank of Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 02705-1031426 |

| BAA not required | Xiwang Iovate Health Science International Inc. | Royal Bank of Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 02705-4007738 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exempt from BAA requirement | Iovate Health Sciences U.S.A Inc. | Morgan Stanley Private Wealth Management | 225 Asylum St. 14th Floor | Hartford | Connecticut | 06103 | USA | 1-860-275-0723 | USD | Brokerage Account | 612-080418-088 |
| Already subject to BAA | Xiwang Iovate Holdings Co. Ltd. | Bank of China (Canada) | Unit 33, 1170 Burnhamthorpe Road West | Mississauga | Ontario | L5C 4E6 | Canada | 905-275-8118 | CNY | RMB Saving Account | 00072-100300201454232 |

ELECTRONICALLY FILED
Benton County Circuit Court
Brenda DeShields, Circuit Clerk
2025-Aug-22  14:38:10
04CV-25-1607
C19WD05 : 5 Pages

# UNIFORM COVER PAGE

[To be used when required by Administrative Order No. 2 (g)★]

COURT: _____CIRCUIT_____ COURT OF _____BENTON_____ COUNTY

Docket/Case Number: ____04-CV-25-1607_____

CASE NAME:
PLAINTIFF/
PETITIONER:          ORGAIN, INC.
                     _____

DEFENDANT/           IOVATE HEALTH SCIENCES INTERNATIONAL, INC. AND
RESPONDENT:          IOVATE HEALTH SCIENCES INTERNATIONAL U.S.A., INC.
                     _____

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"          Exhibit C to Supplemental Declaration of Andrew O'Coin to Brief
(example, part 1 of 2)):          _____

★Administrative Order No 2.
    (g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).
    (2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.

# Exhibit C

April 30, 2025

VIA E-MAIL

Iovate Health Sciences International Inc.
381 North Service Road West
Oakville, ON L6M 0H4
tanya.mistry@iovate.com

Attention: Tanya Mistry and Wes Parris

**Re:   Default Under Credit Agreement**

Dear Ms. Mistry and Mr. Parris:

We refer to the amended and restated credit agreement dated as of June 30, 2021 between, inter alios, Iovate Health Sciences International Inc., as borrower (the "**Borrower**"), HSBC Bank Canada, as administrative agent (the "**Administrative Agent**"), and the financial institutions party thereto, as lenders, as amended by amending agreement no.1 dated as of March 31, 2022, amending agreement no. 2 dated as of April 14, 2022, amending agreement no. 3 dated as of December 30, 2022, amending agreement no.4 dated as of March 7, 2024, amending agreement no. 5 dated as of March 28, 2024, amending agreement no. 6 dated April 30, 2024, the Forbearance Agreement (as hereinafter defined), amending agreement no. 7 dated November 14, 2024, amending agreement no. 8 dated December 24, 2024, amending agreement no. 9 dated January 31, 2025 and amending agreement no. 10 dated February 28, 2025 (collectively, the "**Credit Agreement**"). Further reference is made to the forbearance agreement dated as of September 24, 2024 between, inter alios, the Borrower, the Administrative Agent, and the financial institutions party thereto, as lenders, as amended by amending agreement no. 7 dated November 14, 2024, amending agreement no 8. dated December 24, 2024, amending agreement no 9. dated January 31, 2025 and amending agreement no. 10 dated February 28, 2025 (collectively, the "**Forbearance Agreement**").  All capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Credit Agreement.

This letter is to confirm that, in respect of the Orgain Judgement, (a) on March 21, 2025, the Borrower was served with a process notification in respect of the Orgain Judgement being assigned to the Superior Court of Washington for the County of King, (b) on March 25, 2025, Orgain, Inc. ("**Orgain**") filed court materials with the United States District Court Central District of California giving notice that they plan to depose one or more officers of the Borrower and Iovate Health Sciences U.S.A., Inc. and requesting the production of certain documents and responses to interrogatories, and (c) a notice of levy was served on Walmart Inc. on March 24, 2025 (together with any other notice of levy served on other customers of Credit Parties, the "**Levies**").  Each of the matters described in (a), (b) and (c) above (the "**Specified Orgain Events**") constitutes both an Event of Default and a Termination Event (as defined in the Forbearance Agreement). As a result, the Forbearance Period (as defined in the Forbearance Agreement) has ended, and the Administrative Agent and the Lenders are now in a position to enforce all of their rights and remedies against the Credit Parties.

In response to the Specified Orgain Events, we understand that the Borrower requests that the Administrative Agent, on behalf of the Lenders, take the following actions:

(1)   send Orgain a cease-and-desist letter in respect of taking any further action to enforce the Orgain Judgment; and

1377-8756-8406.7

Page 2

(2) in coordination with counsel to the Credit Parties, participate in the Credit Parties' court action in the United States Court for the Central District of California,

(collectively, together with all actions reasonably ancillary thereto, the "**Requested Actions**").

The Borrower hereby irrevocably: (a) consents to and authorizes the Administrative Agent to take the Requested Actions, at the Borrower's sole cost and expense, (b) waives Section 9.16 of the Credit Agreement in such regard, and (c) confirms in favour of the Administrative Agent that this letter shall be the Administrative Agent's sole authority to undertake the Requested Actions.  The Borrower acknowledges that nothing herein shall (i) oblige the Administrative Agent to take any or all of the Requested Actions, or (ii) dictate the manner in which they are taken.  The Borrower hereby absolves the Administrative Agent, the Lenders, and their counsel from any liability resulting from taking or not taking the Requested Actions, and agrees that its indemnification obligations under the Credit Agreement extend to any liabilities incurred by them as a result of taking any or all of the Requested Actions. Where, in the sole discretion of the Administrative Agent, it is determined to be prudent or practical to provide drafts of any third-party correspondence forming part of the Requested Actions to the Credit Parties or their counsel, the Administrative Agent shall use commercially reasonable efforts to do so, however the Borrower hereby agrees and acknowledges that the Administrative Agent shall have not obligation to share drafts of any third party correspondence prior to finalizing and sending same.

The Administrative Agent and the Lenders hereby reserve all of their rights and remedies, including without limitation the right to take enforcement steps against the Credit Parties and all property subject to the Security Documents, without further notice. Without limiting the foregoing discretion, the Administrative Agent and Lenders may exercise remedies with respect to the Existing Events of Default (as defined in the Forbearance Agreement), the Specified Orgain Events or any further Event of Default, regardless of any cooperation of the Borrower. For the avoidance of doubt, default interest as contemplated by Section 2.5(3) of the Credit Agreement shall continue to accrue upon the Secured Liabilities, and no further CORRA Loans or SOFR Loans shall be made available.

Nothing in this letter shall be, nor be deemed to be, (a) a modification or an alteration of the terms, conditions or covenants of the Credit Agreement, the Forbearance Agreement or any other Loan Document, all of which remain in full force and effect; or (b) a waiver, release or limitation upon the Administrative Agent's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved; nor shall anything in this letter relieve or release the Credit Parties in any way from any of their obligations, covenants or agreements under the Loan Documents, or from the consequences of any Existing Event of Default, any Specified Orgain Event or any other Event of Default.  The Administrative Agent expressly reserves all of its rights and remedies under the Loan Documents with respect to the recovery of its costs of enforcement, in respect of which the Credit Parties are liable under the terms of the Loan Documents.

Very truly yours,

**ROYAL BANK OF CANADA,** as Administrative Agent

By: _____
Name: Sabrina Wang
Title: Deal Manager

Page 3

Accepted and agreed to as of the date first written above.

**IOVATE HEALTH SCIENCES INTERNATIONAL INC.**

By: _____
Name: Tanya Mistry
Title:    VP, Finance