## EXHIBIT B

**Execution Version**

# CREDIT AGREEMENT

dated as of

**November 22, 2016**

among

**XIWANG IOVATE HEALTH SCIENCE INTERNATIONAL INC. and IOVATE HEALTH
SCIENCES INTERNATIONAL INC.**

as Borrowers

and

**THE LENDERS FROM TIME TO TIME PARTIES HERETO**

as Lenders

and

**HSBC BANK CANADA**

as Administrative Agent, Issuing Bank, Joint Lead Arranger and Joint Bookrunner

and

**THE TORONTO-DOMINION BANK**

as Syndication Agent, Joint Lead Arranger and Joint Bookrunner

and

**BANK OF CHINA (CANADA)** and **BANK OF MONTREAL**

as Co-Documentation Agents

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS .................................................................................................. 1

1.1    Definitions. ........................................................................................... 1

1.2    Classification of Loans and Borrowings. ......................................... 40

1.3    Terms Generally. .............................................................................. 40

1.4    Québec Matters. ............................................................................... 41

1.5    Accounting Terms; GAAP. .............................................................. 42

1.6    Time. ................................................................................................. 42

1.7    Third Party Beneficiaries. ................................................................ 42

ARTICLE 2 THE CREDITS ............................................................................................... 43

2.1    Commitments. ................................................................................... 43

2.2    Loans and Borrowings. .................................................................... 44

2.3    Requests for Borrowings. ................................................................ 45

2.4    Funding of Borrowings. ................................................................... 46

2.5    Interest and Acceptance Fees. ....................................................... 47

2.6    Termination and Reduction of Commitments. ................................. 49

2.7    Repayment of Loans. ....................................................................... 50

2.8    Evidence of Debt. ............................................................................ 50

2.9    Prepayments. ................................................................................... 51

2.10   Fees. ................................................................................................ 53

2.11   Bankers' Acceptances. .................................................................... 55

2.12   Alternate Rate of Interest. ............................................................... 57

2.13   Increased Costs; Illegality. .............................................................. 58

2.14   Break Funding Payments. ............................................................... 59

2.15   Taxes. .............................................................................................. 59

2.16   Payments Generally; Pro Rata Treatment; Sharing of Set-offs. .... 61

2.17   Currency Indemnity. ........................................................................ 64

2.18   Mitigation Obligations; Replacement of Lenders. ........................... 64

2.19   Letters of Credit. .............................................................................. 65

2.20   Swingline Loans. .............................................................................. 68

2.21   Defaulting Lenders. ......................................................................... 70

ARTICLE 3 REPRESENTATIONS AND WARRANTIES ................................................. 72

3.1    Representations and Warranties of the Borrowers. ........................ 72

ARTICLE 4 CONDITIONS ................................................................................................ 79

4.1    Effective Date. ................................................................................. 79

4.2    Closing Date. ................................................................................... 79

4.3    Each Credit Event. ........................................................................... 81

**TABLE OF CONTENTS**

(continued)

Page

ARTICLE 5 AFFIRMATIVE COVENANTS ...................................................................... 82

   5.1    Covenants ................................................................................................... 82

ARTICLE 6 NEGATIVE COVENANTS ............................................................................ 89

   6.1    Negative Covenants. ................................................................................... 89

ARTICLE 7 EVENTS OF DEFAULT ................................................................................ 95

   7.1    Events of Default. ....................................................................................... 95

ARTICLE 8 THE ADMINISTRATIVE AGENT ................................................................ 98

   8.1    Appointment of Administrative Agent. ...................................................... 98

   8.2    Secured Parties. ......................................................................................... 98

   8.3    Limitation of Duties of Administrative Agent. .......................................... 99

   8.4    Lack of Reliance on the Administrative Agent .......................................... 99

   8.5    Certain Rights of the Administrative Agent. ............................................ 100

   8.6    Reliance by Administrative Agent. .......................................................... 100

   8.7    Indemnification of Administrative Agent. ............................................... 100

   8.8    The Administrative Agent in its Individual Capacity. .............................. 101

   8.9    May Treat Lender as Owner. .................................................................... 101

   8.10   Successor Administrative Agent. ............................................................. 101

   8.11   No Independent Legal Action. .................................................................. 102

   8.12   Arranger. .................................................................................................. 102

   8.13   Québec Security. ...................................................................................... 102

ARTICLE 9 MISCELLANEOUS ..................................................................................... 103

   9.1    Notices. ..................................................................................................... 103

   9.2    Waivers; Amendments. ............................................................................ 104

   9.3    Expenses; Indemnity; Damage Waiver. ................................................... 106

   9.4    Successors and Assigns. ........................................................................... 108

   9.5    Anti-Money Laundering Legislation. ....................................................... 110

   9.6    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. .................... 111

   9.7    Survival. ................................................................................................... 111

   9.8    Counterparts. ............................................................................................ 111

   9.9    Entire Agreement. .................................................................................... 112

   9.10   Severability. ............................................................................................. 112

   9.11   Right of Set Off ........................................................................................ 112

   9.12   Governing Law. ........................................................................................ 112

   9.13   Attornment. .............................................................................................. 112

   9.14   Service of Process. ................................................................................... 113

   9.15   WAIVER OF JURY TRIAL ..................................................................... 113

   9.16   Confidentiality. ......................................................................................... 113

22969328.24

*Iovate Credit Agreement*

## TABLE OF CONTENTS

(continued)

**Page**

9.17   No Strict Construction. ................................................................................................. 114

9.18   Paramountcy. ................................................................................................................ 114

9.19   Excluded Swap Obligations. ......................................................................................... 114

9.20   LIMITATION OF LIABILITY. ................................................................................... 114

9.21   Releases of Guarantees and Liens ............................................................................... 115

22969328.24

*Iovate Credit Agreement*

## TABLE OF CONTENTS
### (continued)

**Page**

**Exhibits:**

| | | |
|---|---|---|
| Exhibit A | - | Form of Additional Commitment Agreement |
| Exhibit B | - | Form of Borrowing Request |
| Exhibit C | - | Form of Compliance Certificate |
| Exhibit D | - | Form of Assignment and Assumption Agreement |
| Exhibit E | - | Form of Subordination Agreement for Permitted Shareholder Indebtedness |
| Exhibit F | - | Form of Group Guarantee |
| Exhibit G | - | Form of GSA |

**Schedules:**

| | | |
|---|---|---|
| Schedule 1.1(A) | - | Initial Security Documents |
| Schedule 1.1(B) | - | Existing Liens |
| Schedule 2.1 | - | Lenders and Commitments |
| Schedule 3.1(3) | - | Governmental Approvals; No Conflicts |
| Schedule 3.1(5) | - | Litigation |
| Schedule 3.1(10) | - | Real Property |
| Schedule 3.1(11) | - | Permitted Liens |
| Schedule 3.1(12) | - | Pension Plans |
| Schedule 3.1(14) | - | Subsidiaries |
| Schedule 3.1(17) | - | Environmental Matters |
| Schedule 3.1(18) | - | Employee Matters |
| Schedule 3.1(23) | - | Bank Accounts |
| Schedule 5.1(8) | - | Post-Closing Requirements |
| Schedule 5.1(11) | - | Security Principles |
| Schedule 6.1(1) | - | Existing Indebtedness |
| Schedule 9.1(1) | - | Lender and Issuing Bank Contact Information |

*Iovate Credit Agreement*

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** dated as of November 22, 2016 is made among Xiwang Iovate Health Science International Inc. and Iovate Health Sciences International Inc., as Borrowers, the Lenders from time to time parties hereto, as Lenders, HSBC Bank Canada, as Administrative Agent and Issuing Bank, HSBC Bank Canada and The Toronto-Dominion Bank, as Joint Lead Arrangers and Joint Bookrunners, and Bank of China (Canada) and Bank of Montreal, as Co-Documentation Agents.

### RECITALS

**WHEREAS** the Lenders have agreed to provide certain credit facilities to the Borrowers;

**NOW THEREFORE** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each party hereto, the parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1    **Definitions.**

In this Agreement:

"**Acceptance Fee**" means a fee payable by the applicable Borrower to the Administrative Agent for the account of a Lender in Canadian Dollars with respect to the acceptance of a B/A or the making of a B/A Equivalent Loan, calculated on the face amount of the B/A or the B/A Equivalent Loan at a rate per annum equal to the Applicable Margin from time to time in effect on the basis of the actual number of days in the applicable Contract Period (including the date of acceptance and excluding the date of maturity) and a year of 365 days, (it being agreed that the Applicable Margin in respect of a B/A Equivalent Loan is equivalent to the Applicable Margin otherwise applicable to the B/A Borrowing which has been replaced by the making of such B/A Equivalent Loan pursuant to Section 2.11(8)).

"**Acquisition**" means any transaction, or any series of related transactions, consummated after the Closing Date, by which any Group Party directly or indirectly, by means of a takeover bid, tender offer, amalgamation, merger, purchase of assets or otherwise:

(a)    acquires any business (including any division of a business) or all or substantially all of the assets of any Person engaged in any business;

(b)    acquires control of securities of a Person engaged in a business representing more than 50% of the ordinary voting power for the election of directors or other governing position if the business affairs of such Person are managed by a board of directors or other governing body;

(c)    acquires control of more than 50% of the ownership interest in any Person engaged in any business that is not managed by a board of directors or other governing body; or

(d)    otherwise acquires Control of a Person engaged in a business.

"**Acquisitionco**" means Xiwang Iovate Health Science International Inc., a corporation incorporated under the laws of the Province of British Columbia and existing as at the Closing Date.

"**Acquisition Notice**" means a notice from the Borrowers to the Administrative Agent:

(a)     stating the intention of a Group Party to make an Acquisition;

(b)     stating whether shares or assets (or both) are proposed to be acquired;

(c)     setting forth the name, address and jurisdiction of incorporation or other organization of the Person whose shares or assets (or both) are proposed to be acquired (the "**Target**"); and

(d)     executed by a Responsible Officer of the Borrowers.

"**Additional Commitment**" has the meaning set out in Section 2.1(3)(a).

"**Additional Commitment Agreement**" means an agreement substantially in the form of Exhibit A or any other form approved by the Administrative Agent, appropriately completed.

"**Additional Lender**" has the meaning set out in Section 2.1(3)(b).

"**Adjusted EBITDA**" means, with respect to any Rolling Period:

(a)     EBITDA; less

(b)     Cash Income Tax Expense; less

(c)     Unfunded Capital Expenditures; less

(d)     management fees paid to the Sponsors by the Term Borrower on a Consolidated basis; less

(e)     cash dividends, distributions and returns of capital paid by the Term Borrower to Holdco; less

(f)     payments made by the Term Borrower to Holdco on account of the purchase, redemption, or other acquisition of any of its Equity Securities or any warrants, options or similar rights with respect to its Equity Securities.

in each case with respect to such Rolling Period.  It is agreed that, subject to the second proviso at the end of the defined term "EBITDA", Adjusted EBITDA for the Fiscal Quarter ended (i) September 30, 2016 shall be $17,237,833, (ii) June 30, 2016 shall be $ 25,730,516, (iii) March 31, 2016 shall be $ 12,678,269, (iv) December 31, 2015 shall be $28,005,950, and (v) September 30, 2015 shall be $11,277,315.

"**Administrative Agent**" means HSBC Bank Canada, in its capacity as administrative agent for the Lenders hereunder, or any successor Administrative Agent appointed pursuant to Section 8.10.

"**Administrative Questionnaire**" means an administrative questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with, such Person.

"**Aggregate Spend Amount**" means, at any time, the aggregate amount of cash paid with respect to Unfunded Capital Expenditures and Unfunded Permitted Acquisitions since the Closing Date.

"**Agreement**" means this credit agreement and all the Exhibits and the Schedules attached hereto.

"**Amalco**" means Iovate Health Sciences International Inc., the corporation resulting from the Transaction Amalgamation.

"**Amortization Payments**" means, collectively, the mandatory repayments of the Term Loans required to be made pursuant to Section 2.7(2).

"**AML Legislation**" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), The Patriot Act and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" applicable Laws, whether within Canada or elsewhere, including any regulations, guidelines or orders thereunder.

"**Annual Spend Amount**" means, at any time during a Fiscal Year, the aggregate amount of cash paid with respect to Unfunded Capital Expenditures and Unfunded Permitted Acquisitions during such Fiscal Year.

"**Annual Spend Cap**" means, with respect to any Fiscal Year, an amount equal to the sum of:

(a)         U.S.$30,000,000; and

(b)         the amount (if any) by which the Annual Spend Amount in the immediately preceding Fiscal Year was less than U.S.$30,000,000.

"**Anti-Corruption Laws**" means all laws, rules and regulations of any jurisdiction applicable to the Group Parties from time to time concerning or relating to bribery or corruption, including without limitation the *Corruption of Foreign Public Officials Acts* (Canada) and the *U.S. Foreign Corrupt Practices Act*.

"**Applicable Lender**" means, with respect to any Borrowing of (a) Revolving Loans, each Revolving Credit Lender, and (b) Term Loans, each Term Credit Lender.

"**Applicable Margin**" means the applicable rate per annum, expressed as a percentage, set out in the relevant column and row of the table below, based on the Total Leverage Ratio as at the most recent Quarterly Date with respect to which the Term Borrower has delivered financial information to the Administrative Agent pursuant to Section 5.1(1)(a) or (b).

| Level | Total Leverage Ratio | B/A Borrowing, LIBO Rate Loan or Financial Letter of Credit | Canadian Prime Loan or Base Rate Loan | Non-Financial Letter of Credit | Standby Fee |
|---|---|---|---|---|---|
| I | < 1.75x | 225 bps | 100 bps | 150 bps | 56.25 bps |
| II | ≥ 1.75x but < 2.25x | 275 bps | 150 bps | 183.33 bps | 68.75 bps |
| III | ≥ 2.25x but < 2.75x | 325 bps | 200 bps | 216.66 bps | 81.25 bps |
| IV | ≥ 2.75x | 375 bps | 250 bps | 250 bps | 93.75 bps |

As of the Closing Date, the initial Applicable Margin shall be based upon Level IV.  Thereafter, the Applicable Margin shall change (to the extent necessary, if any) on the fifth Business Day after the date on which the financial statements and Compliance Certificate of the Term Borrower are delivered to the Administrative Agent pursuant to Section 5.1(1) (or, with respect to any LIBOR Loan or B/A Borrowing, the commencement of the first Interest Period or Contract Period, respectively, after delivery of such financial statements and Compliance Certificate) to reflect any change in the Total Leverage Ratio effective as of the date of such financial statements, based upon the financial statements for the immediately preceding Rolling Period. Notwithstanding the foregoing, if at any time the Term Borrower fails to deliver financial statements and the certificate of the Term Borrower as required by Sections 5.1(1)(a), (b) or (c) on or before the date required pursuant to such Sections (without regard to grace periods), the Applicable Margin shall be the highest margins provided for in the above grid from the date such financial statements are due pursuant to the applicable Section  (without regard to grace periods) through the date the Administrative Agent receives all financial statements and certificates that are then due pursuant to Sections 5.1(1)(a), (b) and (c).

"**Applicable Percentage**" means, in respect of any Lender at any time, with respect to a Credit Facility or all Credit Facilities, the percentage of such Credit Facility or of all Credit Facilities, as the case may be, which such Lender has agreed to make available to the applicable Borrower at such time, determined by dividing such Lender's Commitment in respect of such Credit Facility or of all Credit Facilities, as the case may be, by the aggregate of all of the Lenders' Commitments with respect to such Credit Facility or all Credit Facilities, as the case may be. If any Commitments have terminated or expired, the Applicable Percentages in respect of the terminated or expired Commitments shall be determined based upon the relevant Commitments most recently in effect (prior to their termination or expiry), giving effect to any assignments.

"**Arrangers**" means, collectively, HSBC Bank Canada and The Toronto-Dominion Bank.

"**Asset Disposition**" means, with respect to any Person, the sale, lease, license, transfer, assignment or other disposition of, or the expropriation, condemnation, destruction or other loss of, all or any portion of its business, assets, rights, revenues or property, real, personal or mixed, tangible or intangible (including any issuance of Equity Interests to effect a sale, transfer or other disposition of assets, which sale transfer or other disposition would otherwise constitute an Asset Disposition), whether in one transaction or a series of transactions, other than (a) inventory sold in the ordinary course of business upon customary credit terms, (b) sales of worn-out, scrap, surplus or obsolete material or equipment in the ordinary course of business, (c) dispositions of

cash or Cash Equivalents in the ordinary course of business, (d) sales, transfers or other dispositions of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business consistent with past practice and not as part of any accounts receivables financing transaction, (e) dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property, (f) dispositions to the extent such disposition constitutes an Investment permitted hereunder, (g) leases of real property or personal property (under which such Person is lessor) entered into in the ordinary course of business to the extent that they do not materially interfere with the business of any Group Party, (h) licenses granted to third parties in the ordinary course of business, (i) the sale, expiration, abandonment, cancellation, non-renewal or discontinuance of use or maintenance of immaterial intellectual property or rights relating thereto that the Term Borrower determines in its reasonable judgment to be desirable to the conduct of its business and not materially disadvantageous to the interests of the Lenders and (j) transactions between Group Parties (provided that such carve-out from this definition shall not serve to otherwise excuse compliance with any other provision of this Agreement).

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.4), and accepted by the Administrative Agent, substantially in the form of Exhibit D or any other form approved by the Administrative Agent.

"**Authorization**" means, with respect to any Person, any authorization, order, permit, approval, grant, licence, consent, right, franchise, privilege, certificate, judgment, writ, injunction, award, determination, direction, decree, by-law, rule or regulation of any Governmental Authority having jurisdiction over such Person, whether or not having the force of Law.

"**B/A Borrowing**" means a Borrowing comprised of one or more Bankers' Acceptances or, as applicable, B/A Equivalent Loans. For greater certainty, unless the context requires otherwise, all provisions of this Agreement which are applicable to Bankers' Acceptances are also applicable, *mutatis mutandis*, to B/A Equivalent Loans.

"**B/A Equivalent Loan**" has the meaning set out in Section 2.11(8).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankers' Acceptance**" and "**B/A**" mean an instrument denominated in Canadian Dollars, drawn by a Borrower and accepted by a Lender in accordance with this Agreement, and includes a "depository note" within the meaning of the *Depository Bills and Notes Act* (Canada) and a bill of exchange within the meaning of the *Bills of Exchange Act* (Canada).

"**Bank Products**" means any services or facilities provided to any Credit Party by any Lender or any Lender Affiliate on account of (a) each Secured Hedge Arrangement, (b) leasing (but only to the extent that the Credit Party furnishing such lease notifies the Administrative Agent in writing

that such leases are to be deemed Bank Products hereunder), and (c) factoring arrangements, but excluding Cash Management Services.

"**Base Rate**" means, on any day, the annual rate of interest equal to the greater of (a) the annual rate of interest announced by the Administrative Agent and in effect as its base rate at its principal office in Toronto, Ontario on such day for determining interest rates on U.S. Dollar-denominated commercial loans made in Canada, and (b) the Federal Funds Effective Rate plus 0.50%.

"**Base Rate Borrowing**" means a Borrowing comprised of one or more Base Rate Loans.

"**Base Rate Loan**" means a Loan denominated in U.S. Dollars which bears interest at a rate based upon the Base Rate.

"**Benefit Plans**" means any retirement, savings, profit sharing, health, medical, dental, disability, life insurance, welfare or other employee benefit plan, program, policy or practice, whether written or oral, funded or unfunded, registered or unregistered, which is sponsored, maintained or contributed to or required to be contributed to by any Credit Party or under which any Credit Party has any actual or potential liability, other than a Pension Plan.

"**BIA**" means the *Bankruptcy and Insolvency Act* (Canada).

"**Borrowers**" means:

(a)         prior to the Transaction Amalgamation, the Term Borrower and the Revolving Borrower in their capacities as borrowers, and "Borrower" means any one of them;

(b)         from and after the Transaction Amalgamation, Amalco in its capacity as borrower, and "Borrowers" shall be read in the singular as the context may require.

"**Borrowing**" means any availment of any of the Credits, and includes any Loan, the issuance of a Letter of Credit (or any amendment thereto or renewal or extension thereof) and a rollover or conversion of any outstanding Loan.

"**Borrowing Request**" has the meaning set out in Section 2.3(1).

"**Business Day**" means any day that is not (a) a Saturday, Sunday or holiday (as defined in the *Interpretation Act* (Canada)) in Toronto, Ontario and (b) in the case of any U.S. Dollar-denominated Borrowing, any other holiday on which commercial banks in New York, New York are authorized or required by law to close; <u>provided</u> that with respect to LIBO Rate Loans, such day is also a day for trading by and between banks in U.S. Dollar deposits in the London interbank eurodollar market (and is not a holiday on which commercial banks in London, England are authorized or required by law to close).

"**Canadian Dollars**" and "**Cdn.$**" refer to lawful money of Canada.

"**Canadian Prime Borrowing**" means a Borrowing comprised of one or more Canadian Prime Loans.

"**Canadian Prime Loan**" means a Loan denominated in Canadian Dollars which bears interest at a rate based upon the Canadian Prime Rate.

*Iovate Credit Agreement*

"**Canadian Prime Rate**" means, on any day, the annual rate of interest equal to the greater of (a) the annual rate of interest announced by the Administrative Agent and in effect as its prime rate at its principal office in Toronto, Ontario on such day for determining interest rates on Canadian Dollar-denominated commercial loans in Canada, and (b) the annual rate of interest equal to the sum of (i) the one-month CDOR Rate in effect on such day, plus (ii) 1.00%.

"**Capital Adequacy Guideline**" means the capital adequacy requirements from time to time specified by the Office of the Superintendent of Financial Institutions (or any successor Canadian Governmental Authority performing the functions and exercising the powers performed and exercised by the Office of the Superintendent of Financial Institutions) and published by it as one or more guidelines for Canadian banks.

"**Capital Expenditures**" means, with respect to any Person for any period, all expenditures (whether paid in cash or accrued as a liability, including the portion of Capital Lease Obligations originally incurred during such period that are capitalized) of such Person during such period that, in conformity with GAAP, are included in "capital expenditures", "additions to property, plant or equipment" or comparable items.

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided that, for the avoidance of doubt, any obligations relating to a lease that was accounted for by such Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by such Person shall be accounted for as obligations relating to an operating lease and not as Capital Lease Obligations.

"**Cash Balance**" means, at any time, the aggregate amount of unrestricted cash and Cash Equivalents at such time held by the Credit Parties with, or subject to a control agreement in favour of, the Administrative Agent, up to a maximum aggregate amount of U.S.$20,000,000.

"**Cash Equivalents**" means any of the following:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the Government of Canada or of any Canadian province (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the Government of Canada or of such Canadian province), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of Canada, any Canadian province, the United States or any state thereof which has a combined capital surplus and undivided profits of not less than U.S.$1,000,000,000;

(c)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the Government of the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of

*Iovate Credit Agreement*

the Government of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(d)     commercial paper of an issuer rated at least R-1 (middle) from DBRS, A-1 by S&P or P-1 by Moody's, and maturing within 180 days from the date of acquisition;

(e)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clauses (a) or (c) above and entered into with a financial institution satisfying the criteria described in clause (b) above;

(f)     money market funds that (i) are rated AAA by S&P, Aaa by Moody's or AAA by DBRS, and (ii) have portfolio assets of at least $1,000,000,000;

(g)     interests in any investment company or money market fund that invests 95% or more of its assets in instruments of the type specified in clauses (a) through (f) above; or

(h)     deposits in bank accounts made in the ordinary course of business and otherwise permitted hereunder.

"**Cash Income Tax Expense**" means, with respect to any period, the amount paid in cash during such period on account of Income Tax Expense.

"**Cash Interest Expense**" means, with respect to any period, the amount paid in cash during such period on account of Interest Expense.

"**Cash Investment Basket Amount**" means, at any time, the aggregate amount of Unfunded Investments made by Group Parties in cash since the Closing Date (other than Investments in Credit Parties or Investments by Non-Credit Party Subsidiaries in other Non-Credit Party Subsidiaries), less the aggregate amount of dividends, distributions, returns of capital, principal paid and Net Proceeds received, in each case in cash, with respect to such Unfunded Investments since the Closing Date.

"**Cash Management Services**" means any one or more of the following types of services or facilities provided to any Credit Party by a Lender or any Lender Affiliate (a) ACH transactions, (b) cash management services, including controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit card processing services, (e) credit or debit cards, and (f) purchase cards (but only to the extent that, prior to the occurrence and continuance of any continuing Default or Event of Default, the Borrowers notify the Administrative Agent in writing that such purchase cards are to be deemed Cash Management Services hereunder).

"**CCAA** means the *Companies' Creditors Arrangement Act* (Canada).

"**CDOR Rate**" means, on any day and for any period, an annual rate of interest equal to the average rate applicable to Canadian Dollar bankers' acceptances for the applicable period appearing on the Reuters Screen CDOR Page, rounded to the nearest 1/100th of 1% (with .005% being rounded up), at approximately 10:00 a.m., on such day, or if such day is not a Business Day, then on the immediately preceding Business Day, provided that if such rate does not appear on the Reuters Screen CDOR Page on such day as contemplated, then the CDOR Rate on such day shall be calculated as the average of the rates for such period applicable to Canadian Dollar bankers' acceptances quoted by the banks listed in Schedule I of the *Bank Act* (Canada) as of

10:00 a.m., on such day or, if such day is not a Business Day, then on the immediately preceding Business Day, provided further that if the rate in question is less than zero then the CDOR Rate shall be deemed to be zero.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holdco**" means a Subsidiary that has no material assets other than equity interests in and/or indebtedness of, each as determined for U.S. federal income tax purposes, one or more Subsidiaries that are CFCs, including the indirect ownership of such equity interests or indebtedness through one or more CFC Holdcos that have no other material assets.

"**Change in Control**" means (a) any loss of Control of the Term Borrower by the Permitted Holders or (b) Holdco ceasing to own, legally and beneficially, equity securities representing at least 80% on a fully diluted basis of the aggregate ordinary voting power represented by the issued and outstanding shares of the Term Borrower. For the avoidance of doubt, but without limitation, a Change in Control shall occur where the Permitted Holders cease to own, directly or indirectly, legally and beneficially, equity securities representing at least 62.5% on a fully-diluted basis of the aggregate ordinary voting power represented by the issued and outstanding shares of Holdco.

"**Change in Law**" means (i) the adoption or taking effect of any new Law after the Effective Date, (ii) any change in any existing Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Effective Date, or (iii) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law, but in the case of a request, guideline or directive not having the force of law, being a request, guideline or directive with which persons customarily comply) by any Governmental Authority made or issued after the Effective Date.

"**Closing Date**" means the date on which the conditions set forth in Section 4.2 are satisfied or waived.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means the property described in and subject to the Liens purported to be created by any Security Document.

"**Commitment**" means, with respect to each Lender, the Revolving Credit Commitment or Term Credit Commitment of such Lender hereunder.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, any successor statute and any regulations promulgated thereunder from time to time.

"**Compliance Certificate**" means a certificate of the Term Borrower substantially in the form attached hereto as Exhibit C, signed by a Responsible Officer of the Term Borrower.

"**Confidential Information Memorandum**" means the Confidential Information Memorandum dated September 8, 2016 distributed by the Administrative Agent on behalf of the Acquisitionco in connection with the syndication of the Credits.

*Iovate Credit Agreement*

"**Consolidated**" means, when used with respect to any financial term, financial covenant, financial ratio or financial statement, such financial term, financial covenant, financial ratio or financial statement calculated, prepared or determined, as applicable, for the Term Borrower (or, in the case of Subject EBITDA or Subject Net Income, the applicable Person) on a consolidated basis in accordance with GAAP consistently applied.

"**Contract Period**" means the term of a B/A Borrowing selected by the applicable Borrower in accordance with Section 2.3(1)(v) commencing on the date of such B/A Borrowing and expiring on a Business Day which shall be either one month, two months, three months or, if available, as determined by the Administrative Agent in good faith, six months thereafter (or such other terms as may be requested by the applicable Borrower and approved unanimously by the Lenders); provided that (a) subject to clause (b) of this definition, each such period shall be subject to such extensions or reductions as may be determined by the Administrative Agent to ensure that each Contract Period will expire on a Business Day, and (b) no Contract Period shall extend beyond the Maturity Date.

"**Control**" means, in respect of a particular Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Cover**", when required by this Agreement for LC Exposure, shall be effected by paying to the Administrative Agent in immediately available funds, to be held by the Administrative Agent in a collateral account maintained by the Administrative Agent at its Payment Office and collaterally assigned as security, an amount equal to, as applicable, the maximum amount of LC Exposure available for drawing at such time.  Such amount shall be retained by the Administrative Agent in such collateral account until such time as the applicable Letters of Credit shall have expired or matured and Reimbursement Obligations, if any, with respect thereto shall have been fully satisfied; provided that if any such Reimbursement Obligations are not satisfied when due hereunder, the Administrative Agent may apply any amounts in such collateral account against such Reimbursement Obligations.

"**Credit Parties**" means, collectively, the Borrowers and the Guarantors, and "**Credit Party**" means any one of them.

"**Credits**" means, collectively, the Revolving Credit and the Term Credit, and "**Credit**" means any one of the Credits.

"**Cure Contribution**" has the meaning set out in Section 5.1(12)(c).

"**Cure Repayment**" has the meaning set out in Section 5.1(12)(c).

"**Currency Excess Amount**" has the meaning set out in Section 2.9(1).

"**Current Assets**" means, at any time, all assets of the Term Borrower (other than cash and Cash Equivalents) at such time determined on a Consolidated basis which, under GAAP, would be classified as current assets**.**

"**Current Liabilities**" means, at any time, all liabilities of the Term Borrower at such time determined on a Consolidated basis which, under GAAP, would be classified as current liabilities, other than:

(a)      the current portion of Funded Debt; and

(b)      Revolving Loans (including Swingline Loans).

"**DBRS**" means Dominion Bond Rating Service Limited, or its successor.

"**Default**" means any event or condition that constitutes an Event of Default or that, upon notice, lapse of time or both, would, unless cured or waived, become an Event of Default.

"**Defaulting Lender**" means any Lender that (a) has failed to fund any portion of the Borrowings or perform its obligations under Section 5.1 within three Business Days of the date it is required to do so, unless the failure has been cured, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it under this Agreement within three Business Days of when due, unless the payment is the subject of a good faith dispute or unless the failure has been cured, (c) has been determined by a court of competent jurisdiction or regulator to be insolvent or is unable to meet its obligations or pay its debts as they generally become due, (d) is the subject of a bankruptcy or insolvency proceeding, (e) is subject to or is seeking the appointment of an administrator, regulator, conservator, liquidator, receiver, trustee, custodian or other similar official over any portion of its assets or business or (f) becomes the subject of a Bail-In Action.

"**Defined Benefit Plan**" means a pension plan registered under the Income Tax Act, the *Pension Benefits* Act (Ontario) or any other applicable pension standards legislation which contains a "defined benefit provision", as such term is defined in subsection 147.1(1) of the Income Tax Act.

"**Depreciation Expense**" means, with respect to any period, the collective depreciation, depletion impairment and amortization expense of the Term Borrower for such period (including amortization of goodwill, other intangibles and financing fees and expenses, all in  accordance with GAAP), determined on a Consolidated basis.

"**Discount Proceeds**" means, for any B/A (or, as applicable, any B/A Equivalent Loan), an amount (rounded to the nearest whole cent, and with one-half of one cent being rounded up) calculated on the applicable date of Borrowing by multiplying:

(a)      the face amount of the B/A (or, as applicable, the undiscounted amount of the B/A Equivalent Loan); by

(b)      the quotient of one divided by the sum of one plus the product of:

     (i)      the Discount Rate (expressed as a decimal) applicable to such B/A (or as applicable, such B/A Equivalent Loan); multiplied by

     (ii)      a fraction, the numerator of which is the Contract Period of the B/A (or, as applicable, the B/A Equivalent Loan) and the denominator of which is 365,

with such quotient being rounded up or down to the nearest fifth decimal place, and with .000005 being rounded up.

"**Discount Rate**" means, with respect to either a B/A for a particular Contract Period being purchased by a Lender on any day or a B/A Equivalent Loan being made by a Lender on any day,

- 12 -

(a) for any Lender which is a Schedule I bank under the *Bank Act* (Canada), the CDOR Rate on such day for such Contract Period, and (b) for any other Lender, the lesser of:

    (i)      the CDOR Rate on such day for such Contract Period, plus 0.10%; and

    (ii)     the percentage discount rate quoted by such Lender as the percentage discount rate at which such Lender would, in accordance with its normal practices, at or about 10:00 a.m. on such date, be prepared to purchase Bankers' Acceptances or make B/A Equivalent Loans having a face amount and term comparable to the face amount and term of such B/A or B/A Equivalent Loan.

"**Disqualified Equity Security**" means any Equity Security that, by its terms (or by the terms of any security or other Equity Security into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Securities), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the occurrence of the Lender Termination Date), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Securities and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the occurrence of the Lender Termination Date), in whole or in part, (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Security that would constitute a Disqualified Equity Security, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**EBITDA**" means, for any period, an amount equal to Net Income for such period minus, to the extent included in such Net Income (but without duplication):

(a)      any non-cash income and gains (including unrealized mark-to-market gains under Hedging Arrangements), other than any such non-cash items to the extent that it will result in the receipt of cash payments in any future period;

plus, to the extent deducted from such Net Income (but without duplication):

(b)      Interest Expense;

(c)        Income Tax Expense;

(d)        Depreciation Expense;

(e)        non-recurring cash expenses relating to the Transactions and the Initial Acquisition of not more than U.S.$ 8 million;

(f)        non-recurring cash expenses relating to Permitted Acquisitions other than the Initial Acquisition;

(g)        any other non-cash expenses and losses (including compensation issued in Equity Securities and unrealized mark-to-market losses under Hedging Arrangements); and

(h)        management fees paid to the Sponsor,

all determined on a Consolidated basis; provided that, notwithstanding GAAP, Undistributed RJV Earnings included in Net Income for any period  may not account for more than 5% of EBITDA for such period and shall be capped accordingly;

provided further that if a Material Acquisition or Material Disposition shall have occurred during the relevant period, EBITDA shall be determined as if such Material Acquisition or Material Disposition had been consummated at the beginning of such period.

It is agreed that, subject to the immediately preceding proviso, EBITDA for the Fiscal Quarter ended (i) September 30, 2016 shall be $ 18,998,603, (ii) June 30, 2016 shall be $ 28,934,657, (iii) March 31, 2016 shall be $ 23,286,790, (iv) December 31, 2015 shall be $28,604,691, and (v) September 30, 2015 shall be $12,034,993.

"**Effective Date**" means November 22, 2016, being the date on which this Agreement is executed and delivered by the parties hereto and the conditions set forth in Section 4.1 are satisfied or waived.

"**Environmental Laws**" means all applicable Laws relating to the protection of the environment (including with respect to the generation, use, handling, collection, treatment, storage, transportation, recovery, recycling, release, threatened release or disposal of any Hazardous Material), the preservation or reclamation of natural resources, or to the extent relating to exposure to harmful or deleterious substances, the protection of human health and safety.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Credit Party directly or indirectly resulting from or based upon (a) the violation of any Environmental Laws,  including with respect to the generation, use, handling, collection, treatment, storage, transportation, recovery, recycling or disposal of any Hazardous Materials, (b) exposure to any Hazardous Materials, (c) the Release or threatened Release of any Hazardous Materials into the environment, or (d) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Securities**" means, with respect to any Person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting and non-voting) of, such Person's capital, whether outstanding on the Effective Date or issued after the Effective Date, including any interest in a partnership, limited partnership or other similar Person

and  any beneficial interest in a trust, and any and all rights, warrants, debt securities, options or other rights exchangeable for or convertible into any of the foregoing.

"**Equivalent Amount**" means, with respect to any specified amount of currency other than United States Dollars, the amount of United States Dollars that may be purchased with such amount of other currency at the spot wholesale transactions buying rate of the Administrative Agent for the purchase of United States Dollars with such other currency in effect as of 11:00 a.m. on the Business Day with respect to which such computation is required for the purpose of this Agreement or, in the absence of such a buying rate on such date, using such other rate as the Administrative Agent may reasonably select.  Notwithstanding the foregoing, with respect to any specified amount of Loans and Letters of Credit denominated in Canadian Dollars, the conversion rate shall be based upon the Bank of Canada monthly average rate quoted on the first Business Day of each month with respect to the previous month.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

 "**Events of Default**" has the meaning set out in Section 7.1.

"**Excess Cash Flow**" means, with respect to any period, an amount equal to **the sum of**:

(a)     Net Income;

(b)     to the extent deducted in calculating Net Income (but without duplication), any non-cash expenses and losses (including compensation issued in Equity Securities and unrealized mark-to-market losses under Hedging Arrangements);

(c)     the excess, if any, of Working Capital at the beginning of such period over Working Capital at the end of such period;

(d)     the excess, if any, of the Cash Investment Basket Amount at the beginning of such period over the Cash Investment Basket Amount at the end of such period;

**minus** (but without duplication):

(a)     scheduled principal payments made on the Loans;

(b)     payments made on account of the principal portion of Capital Lease Obligations by a Group Party;

(c)     Unfunded Capital Expenditures;

(d)     Unfunded Permitted Acquisitions;

(e)     the excess, if any, of the Cash Investment Basket Amount at the end of such period over the Cash Investment Basket Amount at the beginning of such period;

(f)      the amount of Permitted Holdco Reimbursements made;

(e)     to the extent included in such Net Income (but without duplication), any non-cash income and gains (including unrealized mark-to-market gains under Hedging Arrangements); and

(g)     the excess, if any, of Working Capital at the end of such period over Working Capital at the beginning of such period,

in each case for such period.

**"Excluded Swap Obligation"** means, with respect to any Guarantor, (a) any Swap Obligation if, and to the extent that all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a Lien to secure, as applicable, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof), including by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such Lien becomes effective with respect to such Swap Obligation or (b) any other Swap Obligation designated as an "Excluded Swap Obligation" of such Guarantor as specified in any agreement between the Term Borrower or the relevant Guarantors and the counterparty applicable to such Swap Obligations, and agreed by the Administrative Agent.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or Lien is or becomes illegal.

**"Excluded Taxes"** means, with respect to the recipient (the **"Recipient"**) of any payment to be made by or on account of any obligation of a Credit Party hereunder, (i) income, franchise (in lieu of income) or branch profits taxes imposed on (or measured by) its net income, in each case, (a) imposed by the laws of the jurisdiction (or any political subdivision thereof) under which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, or (b) that are imposed as a result of a present or former connection between the Recipient and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein  (other than any such connection arising solely from the Recipient having executed, delivered, become a party to or performed its obligations or received a payment under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced, or sold or assigned an interest in or otherwise in connection with, this Agreement or any other Loan Document), (ii) in the case of a Lender, Taxes that are U.S. federal withholding taxes imposed on amounts payable to a Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date (a) such Lender acquires such interest in the Loan or Commitment or (b) such Lender changes its lending office, except to the extent that such Lender's assignor (if any) was entitled, immediately prior to such assignment, to receive additional amounts or indemnification from a Credit Party with respect to such U.S. federal withholding taxes pursuant to Section 2.15, (iii) Taxes attributable to a Recipient's failure to comply with Section 2.15(5), and (iv) any U.S. federal withholding Taxes imposed under FATCA.

 **"Fair Market Value"** means (a) with respect to any asset or group of assets (other than a marketable security) at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, or, if such asset shall have been the subject of a relatively contemporaneous appraisal by an independent third party appraiser, the basic assumptions underlying the value which have not materially changed since its date, the value set out in such appraisal, and (b) with respect to any marketable security at any date, the closing sale price of such marketable security on the Business Day next preceding such date, as appearing on any nationally recognized securities exchange or, if there is no such closing sale price of such marketable

security, the final price for the purchase of such marketable security at face value quoted on such Business Day by a financial institution of recognized standing selected by the Administrative Agent which regularly deals in securities of such type.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into to implement such Sections of the Code and any laws, fiscal or regulatory legislation, rules, guidance notes and practices adopted by a non-U.S. jurisdiction to effect any such intergovernmental agreement.

"**Federal Funds Effective Rate**" means, for any day, the per annum rate equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System of the United States of America arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Board of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.   If such rate is less than zero, then the Federal Funds Effective Rate shall be deemed to be zero.

"**Fee Letter**" means the letter dated as of September 29, 2016 among the Arrangers and Acquisitionco.

"**Financial Letter of Credit**" means a Letter of Credit that serves as a payment guarantee of a Group Party's financial obligations and is treated as a direct credit substitute for the purposes of the Capital Adequacy Guideline.  For the avoidance of doubt, any Letter of Credit which serves as a guarantee of a Group Party's performance obligations (other than financial obligations) and is treated as a transaction-related contingency for purposes of the Capital Adequacy Guideline shall not be a Financial Letter of Credit.

"**Fiscal Quarter**" means any fiscal quarter of the Term Borrower.

"**Fiscal Year**" means any fiscal year of the Term Borrower.

"**Fixed Charge Coverage Ratio**" means, with respect to any Rolling Period, the ratio of (a) Adjusted EBITDA for such Rolling Period, to (b) Fixed Charges for such Rolling Period.

"**Fixed Charges**" means, with respect to any period, the sum (without duplication) of:

(a)        the aggregate amount of all scheduled principal payments on Indebtedness made (or required to be made) by any Group Party other than (i) to another Group Party, or (ii) where such principal amount is refinanced during such period pursuant to Indebtedness permitted under Section 6.1(1);

(b)        Cash Interest Expense; and

(c)        without duplication of (a), the aggregate amount of all payments made on Capital Lease Obligations by the Term Borrower on a Consolidated basis;

in each case for such period. It is agreed that Fixed Charges for the Fiscal Quarter ended (i) September 30, 2016 shall be $222,496, (ii) June 30, 2016 shall be $351,992, (iii) March 31, 2016 shall be $403,391, (iv) December 31, 2015 shall be $931,669, and (v) September 30, 2015 shall be $2,901,083.

"**Funded Capital Expenditures**" means Capital Expenditures that are not Unfunded Capital Expenditures.

"**Funded Debt**" means, as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrowers, Indebtedness in respect of the Loans.

"**GAAP**" means, with respect to any Person, generally accepted accounting principles in Canada as in effect from time to time with respect to such Person, including International Financial Reporting Standards.

"**Governmental Authority**" means the Government of Canada, the United States, any other nation or any political subdivision thereof, whether provincial, state, territorial or local, and any agency, authority, instrumentality, regulatory body, court, central bank, fiscal or monetary authority or other authority regulating financial institutions, and any other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including the Bank Committee on Banking Regulation and Supervisory Practices of the Bank of International Settlements.

"**Group Guarantee**" means the unlimited multi-party guarantee, substantially in the form of Exhibit F, and dated as of the Closing Date in favour of the Administrative Agent with respect to the debts, liabilities and obligations of the Credit Parties under the Transaction Documents.

"**Group Parties**" means, collectively, the Credit Parties and all of their Subsidiaries, and "Group Party" means any one of them**.**

"**GSA**" means the multi-party general security agreement (Ontario law) substantially in the form of Exhibit G and dated as of the Closing Date between each Credit Party from time to time party thereto and the Administrative Agent for the benefit of the Secured Parties constituting a first-priority Lien (subject to Permitted Liens) over all present and future property (both real and personal) of each grantor, including all Equity Securities in which each grantor has any right, title or interest.

"**Guarantee**" of or by any Person (in this definition, the "**guarantor**") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (in this definition, the "**primary credit party**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect:

(a)      to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the

purchase of) any security for the payment thereof (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise);

(b)      to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof;

(c)      to maintain working capital, equity capital solvency, or any other balance sheet, income statement or other financial statement condition or liquidity of the primary credit party so as to enable the primary credit party to pay such Indebtedness or other obligation; or

(d)      as an account party in respect of any letter of credit or letter of guarantee issued to support such Indebtedness or other obligation.

The term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee in respect of Indebtedness shall be deemed to be an amount equal to the stated or determinable amount of the related Indebtedness (unless the Guarantee is limited by its terms to a lesser amount, in which case to the extent of such amount) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guarantor in good faith**.** The amount of any other Guarantee shall be deemed to be zero unless and until the amount thereof has been (or in accordance with GAAP should be) quantified and reflected or disclosed in the Consolidated financial statements (or notes thereto)) of the guarantor.

"**Guarantor**" means any Person that has entered into, or acceded to, the Group Guarantee, in its capacity as a guarantor thereunder. On the Closing Date, the Guarantors shall include Initial Target, Opco, Iovate Health Sciences USA Inc., Old Iovate International Inc., Old Northern Innovations Corp., Lakeside Innovations Holding Corp. and Northern Innovations Holding Corp.

"**Hazardous Materials**" means any substance, product, liquid, waste, pollutant, chemical, contaminant, insecticide, pesticide, gaseous or solid matter, organic or inorganic matter, fuel, micro organism, ray, odour, radiation, energy, vector, plasma, constituent or material which (a) is or becomes listed, regulated or addressed under any Environmental Laws or (b) is, or is deemed to be, alone or in any combination, hazardous, hazardous waste, toxic, pollutant, a deleterious substance or a contaminant under any Environmental Laws, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes or any nature regulated pursuant to any Environmental Laws.

"**Hedge Arrangement**" means any derivative transaction entered into in connection with protection against, or benefit from, fluctuation in any rate or price. For the avoidance of doubt, the entry into a Master ISDA Agreement and the schedules thereto shall not in and of themselves constitute a Hedge Arrangement, but each trade documented pursuant to a confirmation entered into thereunder shall.

"**Hedge Exposure**" of a Person means all obligations of such Person arising under or in connection with Hedge Arrangements; provided that:

(a)      when calculating the value of a Hedge Arrangement only any actual amount that is due from such Person as a result of the termination or close-out of such Hedge Arrangement) shall be taken into account; and

(b)     the Hedge Exposure with respect to any counterparty shall be calculated on an aggregate net basis after taking into account all amounts owing by such counterparty to such Person under Hedge Arrangements.

"**Holdco**" means Xiwang Iovate Holdings Company Limited, a British Columbia corporation.

"**Hostile Acquisition**" means a proposed Acquisition by any Group Party in circumstances in which the Target shall not have, as of the date of the Acquisition Notice in respect of such Acquisition, evidenced its agreement or agreement in principle to such Acquisition by means of (a) a definitive agreement of purchase and sale, (b) a letter of intent in respect thereof, or (c) any other document, instrument, opinion or other writing satisfactory to the Lenders.

"**ICE Benchmark Administration Interest Settlement Rate**" means, with respect to any period, the London interbank offered rate for U.S. Dollar deposits with maturities comparable to such period administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate).

"**Income Tax Act**" means the *Income Tax Act* (Canada) and the regulations thereunder, as amended from time to time.

"**Income Tax Expense**" means, with respect to any period, the aggregate of all taxes on income of the Term Borrower for such period, whether current or deferred and net of any incentive or similar tax credits, determined on a Consolidated basis.

"**Indebtedness**" of any Person means, without duplication:

(a)     all obligations of such Person for borrowed money or with respect to deposits or advances of any kind;

(b)     all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(c)     all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

(d)     all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business);

(e)     all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed;

(f)     all Guarantees by such Person of Indebtedness of others;

(g)     all Capital Lease Obligations of such Person;

(h)     all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guarantee that would constitute a Financial Letter of Credit if issued hereunder;

(i)        all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

(j)        all Hedge Exposure to the extent due and payable; and

(k)        the liquidation value of all mandatorily redeemable preferred Equity Securities of such Person, to the extent redeemable prior to the Maturity Date.

The Indebtedness of any Person shall (i) include the Indebtedness of any other entity (including any partnership in which such Person is a partner, general partner or limited partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, and (ii) for the avoidance of doubt, not include reserves for deferred taxes or general contingencies or client advances or deposits, in each case incurred in the ordinary course of business.

"**Indemnified Taxes**" means all Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning specified in Section 9.3(2).

"**Initial Acquisition**" means the acquisition pursuant to the Initial Acquisition Agreement by Acquisitionco of 80% of the issued and outstanding Equity Securities of Initial Target on the Closing Date (as defined in the Initial Acquisition Agreement).

"**Initial Acquisition Agreement**" means the share purchase agreement between Xiwang Foodstuffs Co., Ltd., The Toronto Oak Trust and Initial Target dated as of June 12, 2016, as amended by the First Amendment to the Share Purchase Agreement, dated as of August 17, 2016, among Xiwang Foodstuffs Co., Ltd., The Toronto Oak Trust and Initial Target, and the Second Amendment to Share Purchase Agreement, dated as of September 12, 2016, among Xiwang Foodstuffs Co., Ltd., Acquisitionco, The Toronto Oak Trust, the Vendor and the Initial Target.

"**Initial Acquisition Indebtedness**" means Indebtedness owing by the Term Borrower in respect of obligations under the Initial Acquisition Agreement.

"**Initial Acquisition Take-up**" means the acquisition pursuant to the Initial Acquisition Agreement by Acquisitionco of all issued and outstanding Equity Securities of Initial Target not acquired in the Initial Acquisition, whether in one or more steps.

"**Initial Equity Investment**" means the indirect investment by the Sponsors in Acquisitionco, by way of causing the Holdco to subscribe for and purchase Equity Securities of Acquisitionco, in an amount that, when aggregated with the value of the equity in the Initial Target not acquired by Acquisitionco in the Initial Acquisition, is of an amount not less than 50% of the total book capitalization of the Initial Target as of the date of consummation of the Initial Acquisition.

"**Initial Target**" means Kerr Investment Holdings Corp., an Ontario corporation existing at the Closing Date.

"**Initial Security Documents**" means the materials described in Schedule 1.1(A).

"**Interim Amalco**" means Iovate Health Sciences International, Inc., the corporation resulting from the Interim Amalgamation.

"**Interim Amalgamation**" means the amalgamation after the Closing Date between Initial Target, Old Iovate International Inc. and Opco under the *Business Corporations Act* (Ontario) to form Iovate Health Sciences International, Inc.

"**Insolvent Defaulting Lender**" means any Defaulting Lender that (a) has been adjudicated as, or determined by an Governmental Authority having regulatory authority over such Person or its assets to be, insolvent, (b) becomes the subject of an insolvency, bankruptcy, dissolution, liquidation or reorganization proceeding, or (c) becomes the subject of an appointment of a receiver, receiver and manager, monitor, trustee or liquidator under the *Bank Act* (Canada) or any applicable bankruptcy, insolvency or similar law now existing or hereafter enacted; provided that a Lender shall not be an Insolvent Defaulting Lender solely by virtue of the ownership or acquisition by a Governmental Authority of an instrumentality thereof of any Equity Securities in such Lender or a parent company thereof.

"**Interest Expense**" means, with respect to any period, the interest expense of the Term Borrower for such period (including the amortization or writeoff of debt discount and debt issuances costs and commissions, discounts and other fees and charges associated with Indebtedness, all in accordance with GAAP), determined on a Consolidated basis.

"**Interest Payment Date**" means, (a) in the case of any Canadian Prime Loan or Base Rate Loan, the third Business Day following the last day of each month and (b) in the case of a LIBO Rate Loan, the last day of each Interest Period relating to such LIBO Rate Loan, provided that if an Interest Period for any LIBO Rate Loan is of a duration exceeding 90 days, then "**Interest Payment Date**" shall also include each date which occurs at each 90-day interval during such Interest Period.

"**Interest Period**" means, with respect to a LIBO Rate Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is 30, 60 or 90 days (or, with the consent of each Lender, 180 days) thereafter, as the applicable Borrower may elect; provided that (a) any Interest Period commencing on the Closing Date may (subject to clause (b) below), at the election of the applicable Borrower, end on the first Quarterly Date ending after the Closing Date, (b) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the immediately succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, (d) no Interest Period shall extend beyond any date that any principal payment or prepayment is scheduled to be due unless the aggregate principal amount of (i) Canadian Prime Borrowings and Base Rate Borrowings and (ii) B/A Borrowings and LIBO Rate Borrowings which have Interest Periods or Contract Periods which will expire on or before such date, minus the aggregate amount of any other principal payments or prepayments due during such Interest Period is equal to or in excess of the amount of such principal payment or prepayment, and (e) no Interest Period shall extend beyond the Maturity Date.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a converted or continued Borrowing, thereafter shall be the effective date of the most recent conversion or rollover of such Borrowing.

"**Investment**" means, as applied to any Person (the "**investor**"), any direct or indirect:

(a)      purchase or other acquisition by the investor of Equity Securities of any other Person or any beneficial interest therein;

(b)      purchase or other acquisition by the investor of bonds, notes, debentures or other debt securities of any other Person or any beneficial interest therein;

(c)      loan or advance to any other Person, other than (i) advances to employees for expenses incurred in the ordinary course of business, and (ii) accounts receivable arising from sales or services rendered to such other Person in the ordinary course of the investor's business; and

(d)      capital contribution by the investor to any other Person,

provided that an Acquisition shall not constitute an Investment.

The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment <u>minus</u> any amounts (i) realized upon the disposition of assets comprising an Investment (including the value of any liabilities assumed by any Person other than a Credit Party in connection with such disposition), (ii) constituting repayments of Investments that are loans or advances or (iii) constituting returns of principal or capital thereon (including any dividend, redemption or repurchase of equity that is accounted for, in accordance with GAAP, as a return of principal or capital).

"**Investment Basket Amount**" means, at any time, the aggregate amount of Investments made by Group Parties since the Closing Date (other than Investments in Credit Parties or Investments by a Non-Credit Party Subsidiary in another Non-Credit Party Subsidiary), less the aggregate amount of dividends, distributions, returns of capital and principal paid with respect to such Investments since the Closing Date.

"**Issuing Bank**" means HSBC Bank Canada, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.19(9).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "**Issuing Bank**" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"**Laws**" means all federal, provincial, municipal, foreign and international statutes, acts, codes, ordinances, decrees, treaties, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards or any provisions of the foregoing, including general principles of common and civil law and equity, and all legally binding policies, practices and guidelines of any Governmental Authority binding on the Person referred to in the context in which such word is used (including, in the case of tax matters, any accepted practice or application or official interpretation of any relevant taxation authority); and "**Law**" means any one or more of the foregoing.

"**LC Cover**" (a) in respect of any remaining Currency Excess Amount, shall be effected by paying to the Administrative Agent in immediately available funds, to be held by the Administrative Agent in a collateral account maintained by the Administrative Agent at its Payment Office and collaterally assigned as security, an amount equal to the remaining Currency Excess Amount and (b) in respect of any Letter of Credit maturing on or after the Maturity Date, shall be effected by Letter of Credit Collateralization of such Letter of Credit. Amounts in respect

*Iovate Credit Agreement*

of clause (a) shall be retained by the Administrative Agent in such collateral account until such time as the Revolving Credit Exposure of the Lenders no longer exceeds the aggregate Revolving Credit Commitments and cash collateral provided in respect of clause (b) shall be retained by the Administrative Agent (or such other Person) in such collateral account until the applicable Letter of Credit expires, is terminated or is otherwise backstopped or addressed in a manner satisfactory to the Issuing Bank.

"**LC Disbursement**" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, at any time, the sum of (a) the U.S.$ Amount of the aggregate undrawn amount of all outstanding Letters of Credit at such time, plus (b) the U.S.$ Amount of the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Revolving Borrower at such time. The LC Exposure of any Revolving Credit Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"**Lender Affiliate**" means, (a) with respect to any Lender, (i) an Affiliate of such Lender, or (ii) any Person that is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or an Affiliate of such Lender, and (b) with respect to any Lender that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Lenders**" means the Persons listed as lenders on Schedule 2.1 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption or an Additional Commitment Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption. Unless the context otherwise requires, the term "**Lenders**" includes the Swingline Lender and the Issuing Bank.

"**Lender Termination Date**" means the first date on which:

(a)      all Commitments have expired or been terminated;

(b)      the principal of and interest on each Loan and all fees, indemnities and other amounts payable hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall have been paid in full; and

(c)      all Letters of Credit shall have either (x) expired or terminated and all LC Disbursements shall have been reimbursed or (y) in the case of contingent Reimbursement Obligations, Letter of Credit Collateralization shall have been provided.

"**Letter of Credit**" means any standby or documentary letter of credit or letter of guarantee issued pursuant to this Agreement.

"**Letter of Credit Collateralization**" means, in respect of any Letter of Credit, either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to the Administrative Agent), to be held by the Administrative Agent for the benefit of the Revolving Credit Lenders in an amount equal to 103% of the then existing LC Exposure in respect of such Letter of Credit, (b) delivering to Administrative Agent documentation executed by all beneficiaries under such Letter of Credit, in form and substance reasonably satisfactory to Administrative Agent and Issuing Bank, terminating all of such beneficiaries' rights under such

Letter of Credit, or (c) providing Administrative Agent with a standby letter of credit, in form and substance reasonably satisfactory to Administrative Agent, from a commercial bank reasonably acceptable to Administrative Agent in an amount equal to 103% of the then existing LC Exposure in respect of such Letter of Credit.

"**LIBO Rate Borrowing**" means a Borrowing comprised of one or more LIBO Rate Loans.

"**LIBO Rate Loan**" means a Loan denominated in U.S. Dollars which bears interest at a rate based upon the LIBO Rate.

"**LIBO Rate**"  means, with respect to any LIBO Loan for any Interest Period, either

(a)    the applicable ICE Benchmark Administration Interest Settlement Rate as at 11:45 a.m. London, England time (subject to any intra-day refixing and republication) two Business Days prior to the first day of such Interest Period; or

(b)    if the rate in paragraph (a) of this definition is not available for any particular day, the interest rate per annum offered to the Administrative Agent for London interbank deposits of U.S. Dollars, for delivery in immediately available funds on the first day of such Interest Period, of amounts comparable to the principal amount of the LIBOR Loan to which such LIBOR Rate is to apply with maturities comparable to the Interest Period for which such LIBO Rate will apply as of approximately 11:45 a.m. (London, England time) two Business Days prior to the first day of such Interest Period,

and if, in either case, that rate is less than zero, the LIBO Rate shall be deemed to be zero.

"**Lien**" means, (a) with respect to any asset, any mortgage, deed of trust, lien (statutory or otherwise), deemed trust, pledge, hypothec, hypothecation, encumbrance, charge, security interest, royalty interest or right of set-off in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, title retention agreement or consignment agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to any asset, (c) any purchase option, call or similar right of a third party with respect to such assets, and (d)  any other arrangement having the effect of providing security.

"**Limited Credit Party**" means each Credit Party which (a) is incorporated or otherwise organized under the laws of a jurisdiction having foreign exchange controls imposed by a Governmental Authority, including restrictions on the amount of currency that may be imported into or exported out of such jurisdiction, or (b) due to local law limitations and, in accordance with the Security Principles, is unable to provide Liens over its assets, property and undertaking satisfactory to the Administrative Agent, acting reasonably.

"**Limited Recourse Guarantors**" means, collectively, Holdco and Vendor, and "Limited Recourse Guarantor" means any of them.

"**Loan**" means any loan made by the Lenders to a Borrower pursuant to this Agreement, and includes any B/A accepted (and any B/A Equivalent Loan advanced) by any Lender hereunder.

"**Loan Documents**" means this Agreement, the Security Documents, the Borrowing Requests, and the Fee Letter, together with any other document, instrument or agreement (other than participation, agency or similar agreements among the Lenders or between any Lender and any

other bank or creditor with respect to any indebtedness or obligations of any Credit Party (as applicable) hereunder or thereunder) now or hereafter entered into in connection with this Agreement (excluding any document, instrument or agreement with respect to any Secured Hedge Arrangement and Secured Cash Management Services), as such documents, instruments or agreements may be amended, modified or supplemented from time to time.

"**Longstop Date**" means January 31, 2017.

"**Material Acquisition**" means any Acquisition or series of related Acquisitions by any Group Party that involves the payment of consideration (including obligations in respect of deferred purchase price (including obligations under any purchase price adjustment, as estimated in good faith by the Term Borrower, but excluding earnout, contingent payment or similar payments)) by the Group Parties in excess of U.S.$1,000,000.

"**Material Adverse Effect**" means a material adverse effect on:

(a)     the business, operations, properties, assets, liabilities (actual or contingent) or condition (financial or otherwise) of the Credit Parties taken as a whole;

(b)     the validity or enforceability of any of the Loan Documents or the priority of the Liens created thereby, in each case taken as a whole;

(c)     the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents; or

(d)     the ability of the Credit Parties to perform their material obligations under the Loan Documents.

"**Material Disposition**" means any disposition of property or series of related dispositions of property by any Group Party of (a) assets comprising all or substantially all of an operating unit of a business or that constitutes all or substantially all of the common stock of a Person and (b) where the gross proceeds of the Group Parties in respect thereof (including in respect of deferred sale price (including in respect of any sale price adjustment, as estimated in good faith by the Term Borrower, but excluding earnout, contingent or similar payments)) exceeds U.S.$1,000,000.

"**Material Indebtedness**" means any Indebtedness (other than hereunder) of any one or more Group Parties in an aggregate principal amount exceeding U.S.$7,500,000.

"**Material Leasehold Interest**" means any leasehold interest of a Credit Party in real property that is material to, or necessary in, the manufacturing or production operations of such Credit Party which such Credit Party cannot replace within a reasonable period of time with an alternative lease having comparable commercial terms.

"**Material Subsidiary**" means:

(a)     Initial Target, Opco, Iovate Health Sciences USA Inc., Old Iovate International Inc., Old Northern Innovations Corp., Lakeside Innovations Holding Corp., and Northern Innovations Holding Corp.;

(b)     such other Subsidiaries as are required to ensure that:

(i)    the aggregate Subject EBITDA of all Material Subsidiaries for their most recent fiscal years exceeds 95% of EBITDA for the most recent Fiscal Year; and

(ii)    the aggregate assets of all Material Subsidiaries as of the end of the most recent Fiscal Year exceed an amount equal to 95% of the assets of the Term Borrower determined on a Consolidated basis as of the end of the most recent Fiscal Year, and

(c)    any other Subsidiary that holds Equity Securities of a Material Subsidiary.

In determining which Subsidiaries are required to become Material Subsidiaries in order to meet such tests, inclusion shall occur in the order of their respective Subject EBITDA from most to least.  Once a Subsidiary becomes it a Material Subsidiary then it shall remain a Material Subsidiary at all times, regardless of whether it is subsequently required to satisfy such tests.

"**Maturity Date**" means the fifth anniversary of the Closing Date (or, if such fifth anniversary is not a Business Day, the next Business Day thereafter).

"**Moody's**" means Moody's Investors Service, Inc.

"**Net Income**" means, with respect to any period, the net income of the Term Borrower for such period, determined on a Consolidated basis.

"**Net Proceeds**" means, with respect to any Asset Disposition, the gross amount of cash proceeds received by any Credit Party from such Asset Disposition, including proceeds of any insurance policies received by any Credit Party in connection with such Asset Disposition and amounts received by any Credit Party pursuant to any expropriation proceeding or condemnation proceeding in connection with such Asset Disposition, including any cash received in respect of non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or instalment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, minus the sum of (a) the amount, if any, of all Taxes paid or payable by any Credit Party directly resulting from such Asset Disposition (including the amount, if any, estimated by the Borrowers in good faith at the time of such Asset Disposition for Taxes payable by any Credit Party on or measured by net income or gain resulting from such Asset Disposition) assuming the application of any Tax losses or credits available (or to be available) to any Credit Party at the time such Taxes are payable that are not used to offset other income or gains), (b) the reasonable out-of-pocket costs and expenses incurred by any Credit Party in connection with such Asset Disposition (including reasonable brokerage fees paid to a Person other than an Affiliate of any Credit Party, but excluding any fees or expenses paid to an Affiliate of any Credit Party) and (c) amounts required to be applied to repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Disposition (other than any Lien pursuant to a Security Document).

"**Net Total Indebtedness**" means, at any time, an amount equal to Total Indebtedness less the Cash Balance, in each case as at such time.

"**Non-Consenting Lender**" means a Lender that has not provided its consent to a waiver of, or amendment to, any provision of the Loan Documents where requested to do so by Borrower or the Administrative Agent if (a) such waiver or amendment requires the consent of all the Lenders, and (b) the Required Lenders have consented to such waiver or amendment.

*Iovate Credit Agreement*

"**Non-Credit Party Subsidiary**" means any Group Party other than a Credit Party.

"**Non-Defaulting Lender**" has the meaning set out in Section 2.21(f).

"**Non-Financial Letter of Credit**" means any Letter of Credit other than a Financial Letter of Credit.

"**Non-Party Beneficiary**" means any Secured Party or Indemnitee that is not a Party.

"**Opco**" means Iovate Health Sciences International Inc., an Ontario corporation existing as at the Closing Date.

"**Participant**" has the meaning set out in Section 9.4(5).

"**Party**" means a party to this Agreement, and reference to a Party includes its successors and permitted assigns and "Parties" means every Party.

"**The Patriot Act**" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"**Payment Office**" means the Administrative Agent's office located at 70 York Street, 6th Floor, Toronto, ON, M5J 1S9, Attention: Agency Administrator (or such other office or individual as the Administrative Agent may hereafter designate in writing to the other parties hereto).

"**Pension Plan**" means a "registered pension plan", as such term is defined in subsection 248(1) of the Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to, by any Credit Party or under which any Credit Party has or may incur any actual or contingent liability.

"**Permitted Acquisition**" means any Acquisition by any Group Party (other than Acquisitionco):

(a)    with respect to which an Acquisition Notice has been delivered not less than 10 Business Days in advance of such Acquisition;

(b)    where no Default or Event of Default has occurred and is continuing or would be caused thereby;

(c)    which is of a Person carrying on a business which is the same as or related, ancillary or complementary to the business carried on by any Group Party (or if an asset Acquisition, is of assets used or useful in a business which is the same as or related, ancillary or complementary to the business carried on by any Group Party);

(d)    of a Target organized under the laws of, or assets located in, a country that is a member of the Organisation for Economic Co-operation and Development;

(e)    in respect of which the Borrowers have provided a copy of the purchase agreement and any other agreements or documents relating to such Acquisition;

(f)    in respect of which the Borrowers have provided a third-party financial due diligence report satisfactory to the Administrative Agent, acting reasonably, where the aggregate purchase price (including any deferred purchase price (including obligations under any purchase price adjustment, as estimated in good faith by the Term Borrower, but

*Iovate Credit Agreement*

excluding earnout, contingent payment or similar payments)) is greater than U.S.$7,500,000;

(g)     in respect of which the Borrowers have provided the audited financial statements of the Target for the previous 3 fiscal years that have ended at least 120 days prior to such Aquisition, which audited financial statements shall demonstrate that such Target had normalized positive Subject EBITDA for its most recent fiscal year unless the Total Leverage Ratio (determined both an actual and *pro forma* basis) is less than 2.00 for the two most recent Rolling Periods for which financial statements were delivered to the Administrative Agent pursuant to Section 5.1(1)(a) or (b);

(h)     in respect of which the Target and the other Credit Parties are able to make the representations set out in Section 3.1 immediately following such Acquisition, subject to any updates to Schedule 3.1(12) required to reflect such Acquisition;

(i)     subject to the Security Principles, in respect of which the Lenders will have (within 30 days of such Permitted Acquisition (which date may be extended by the Administrative Agent if it, acting in good faith, believes that the extension will enable the Borrower and the Credit Parties to comply with the requirements of this clause (i) and such extension will not have a material adverse effect upon the Lenders)):

  (i)     if such Acquisition is an Acquisition by a Credit Party of assets other than Equity Securities, a first-priority Lien (subject only to Permitted Liens) over such assets; and

  (ii)     if such Acquisition is an Acquisition by a Credit Party of Equity Securities of any Person:

    (A)     a full recourse guarantee (by way of accession to the Group Party Guarantee) from such Person and its subsidiaries;

    (B)     a first-priority Lien (subject only to Permitted Liens) over the assets of, such Person and its subsidiaries; and

    (C)     where less than all of the issued and outstanding Equity Securities of such Person are acquired, a limited recourse guarantee and pledge from all Persons holding the balance of such Equity Securities;

(j)     in respect of which the Borrowers have certified that, after giving effect to such Acquisition on a *pro forma* basis, the Term Borrower will be in compliance with the financial covenants in Section 5.1(12) as at the date of such Acquisition;

(k)     which, if such Acquisition is an Acquisition of Equity Securities of any Person, is an Acquisition of not less than 60% of the Voting Equity Securities of such Person;

(l)     which does not cause the (i) consideration paid since the Closing Date in respect of Permitted Acquisitions for Equity Securities of a Person that has not become (and, as at the date of determination, is not required hereunder to become) a Guarantor and (ii) without duplication, consideration paid since the Closing Date in respect of Permitted Acquisitions for assets acquired by a Non-Credit Party Subsidiary to exceed, in the aggregate, U.S.$15,000,000;

*Iovate Credit Agreement*

(m)    which does not cause the Annual Spend Amount to exceed the Annual Spend Cap; and

(n)    which does not cause the Aggregate Spend Amount to exceed U.S.$150,000,000;

provided that, notwithstanding the foregoing:

(o)    the Initial Acquisition shall be a Permitted Acquisition; and

(p)    a Hostile Acquisition shall not be a Permitted Acquisition

"**Permitted Cure Securities**" means any Equity Securities of the Term Borrower other than Disqualified Equity Securities.

"**Permitted Hedge Payment**" means any cash payment under or in connection with any Secured Hedge Arrangement made when no Event of Default has occurred and is continuing; <u>provided that</u>:

(a)    the payment of any Early Termination Amount (as defined in the applicable Master ISDA Agreement); or

(b)    any other payment of a similar nature or economic effect, whether voluntary or mandatory;

shall cease to be a Permitted Hedge Payment if an Event of Default shall occur within 12 months after the time of such payment, such that it shall become subject to the sharing provisions of Section 2.16(4).

"**Permitted Holders**" means the Sponsors and any and all Persons which are directly or indirectly Controlled by either of them or are under common Control with either of them.

"**Permitted Holdco Reimbursements**" means payments to Holdco to fund:

(a)    fees and expenses required to maintain the existence of Holdco, the customary salary, bonus and other benefits (including indemnification, insurance and insurance premiums) payable to, and indemnities provided on behalf of, officers and directors of Holdco, and the general corporate operating and overhead expenses of Holdco;

(b)    costs (including all professional fees and expenses) incurred by Holdco in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any governmental or regulatory body; and

(c)    taxes required to be paid by Holdco as a result of permitted payments made to Holdco in respect of Permitted Shareholder Indebtedness.

"**Permitted Intercompany Investments**" means:

(a)    an Investment by a Group Party in a Credit Party (other than an Investment by a Non-Credit Party Subsidiary in Equity Securities of a Credit Party or an Investment by a Non-Credit Party Subsidiary in a Credit Party by way of a capital contribution);

(b)    an Investment by a Non-Credit Party Subsidiary in another Non-Credit Party Subsidiary; and

(c)     Investments by Credit Parties in Non-Credit Party Subsidiaries in an aggregate outstanding amount (taking into account the aggregate amount of dividends, distributions, returns of capital, principal and Net Proceeds paid to Credit Parties with respect to such Investments) not to exceed U.S.$5,000,000 at any time.

"**Permitted Liens**" means:

(a)     Liens in favour of the Administrative Agent for the benefit of the Secured Parties for the obligations of any Credit Party under or pursuant to the Transaction Documents;

(b)     Liens (i) granted by a Group Party in favour of a Credit Party in order to secure any of the Indebtedness of such Group Party to such Credit Party; provided that such Liens are subject to assignment arrangements reasonably satisfactory to the Administrative Agent; provided further that if such Liens are granted by a Credit Party, they are subject to postponement arrangements reasonably satisfactory to the Administrative Agent, and (ii) granted by a Non-Credit Party Subsidiary in favour of another Non-Credit Party Subsidiary in order to secure any of the Indebtedness of such first Non-Credit Party Subsidiary to such other Non-Credit Party Subsidiary;

(c)     Purchase Money Liens securing Indebtedness to the extent permitted by Section 6.1(1)(d) and Liens to secure Capital Lease Obligations to the extent permitted by Section 6.1(1)(d);

(d)     Liens securing Indebtedness to the extent permitted by Section 6.1(1)(n);

(e)     Liens imposed by any Governmental Authority for Taxes not yet due and delinquent or which are being contested in good faith and by appropriate proceedings in compliance with Section 5.1(3), and, during such period during which such Liens are being so contested, such Liens shall not be executed on or enforced against any of the assets of any Credit Party, provided that such Credit Party shall have set aside on its books reserves deemed adequate therefor and not resulting in qualification by auditors;

(f)     carrier's, warehousemen's, mechanics', materialmen's, repairmen's, construction and other like Liens arising by operation of applicable Law, arising in the ordinary course of business and securing amounts (i) which are not overdue for a period of more than 30 days, or (ii) which are being contested in good faith and by appropriate proceedings and, during such period during which amounts are being so contested, such Liens shall not be executed on or enforced against any of the assets of any Credit Party, provided that such Credit Party shall have set aside on its books reserves deemed adequate therefor and not resulting in qualification by auditors;

(g)     undetermined or inchoate Liens and charges arising or potentially arising under statutory provisions which have not at the time been filed or registered in accordance with applicable Law or of which written notice has not been duly given in accordance with applicable Law or which although filed or registered, relate to obligations not due or delinquent, including without limitation statutory Liens incurred, or pledges or deposits made, under worker's compensation, employment insurance and other social security legislation;

(h)     surety bonds issued to secure the performance of obligations incurred in the ordinary course of business, together with any Lien over in the contract under which such

*Iovate Credit Agreement*

obligations arise granted as security for the indemnity obligations under such surety bonds;

(i) servitudes, easements, rights-of-way, restrictions and other similar encumbrances on real property imposed by applicable Law or incurred in the ordinary course of business and encumbrances consisting of zoning or building restrictions, easements, licenses, restrictions on the use of property or minor imperfections in title thereto which, in the aggregate, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any Credit Party;

(j) Liens arising from Cash Equivalents described in clause (e) of the definition of the term Cash Equivalents;

(k) judgment Liens in respect of judgments that do not constitute an Event of Default under Section 7.1(j);

(l) the rights reserved to or vested in Governmental Authorities by statutory provisions or by the terms of leases, licenses, franchises, grants or permits, which affect any land, to terminate the leases, licenses, franchises, grants or permits or to require annual or other periodic payments as a condition of the continuance thereof;

(m) securities to public utilities or to any municipalities or Governmental Authorities or other public authority when required by the utility, municipality or Governmental Authorities or other public authority in connection with the supply of services or utilities to the Group Parties;

(n) Liens or covenants restricting or prohibiting access to or from lands abutting on controlled access highways or covenants affecting the use to which lands may be put; provided that such Liens or covenants do not materially and adversely affect the use of the lands by any Credit Party;

(o) statutory Liens incurred or pledges or deposits made in favour of a Governmental Authority to secure the performance of obligations of any Group Party under Environmental Laws to which any assets of such Group Party are subject;

(p) banker's liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions and securities accounts and other financial assets maintained with a securities intermediary; provided that such deposit accounts or funds and securities accounts or other financial assets are not established or deposited for the purpose of providing collateral for any Indebtedness and are not subject to restrictions on access by any Group Party in excess of those required by applicable banking regulations;

(q) Liens granted by any Group Party to a landlord to secure the payment of arrears of rent in respect of leased properties in the Province of Quebec leased from such landlord, provided that such Lien is limited to the assets located at or about such leased properties;

(r) Liens arising by virtue of Uniform Commercial Code financing statements (or similar filings under applicable law) regarding operating leases entered into by any Group Party in the ordinary course of business;

(s)    Liens representing any interest or title of a licensor, lessor, sublicensor or sublessor, or a licensee, lessee, sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license, sublease, sublicense or concession agreement permitted by this Agreement;

(t)    in the case of any Restricted Joint Venture, or the Equity Securities of any Person that is not a Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Securities in such Person set forth in the organization documents of such Person or any related joint venture, shareholders' or similar agreement;

(u)    Liens solely on any cash money deposits, escrow arrangement or similar arrangements made by any Group Party in connection with any letter of intent or purchase agreement for a Permitted Acquisition or other transaction permitted hereunder;

(v)    Liens that are contractual rights of setoff granted in the ordinary course of business;

(w)    Liens existing on the Effective Date and set forth on Schedule 1.1(B); provided that (i) such Lien shall not apply to any other asset of any Group Party and (ii) such Lien shall only secure those obligations that it secures on the Effective Date and extensions, renewals, replacements and refinancings thereof so long as the principal amount of the obligations being extended, renewed, replaced or refinanced or, in the case of such obligations constituting Indebtedness, that are permitted under Section 6.1(1)(n) as Refinancing Indebtedness in respect thereof; and

(x)    any extension, renewal or replacement of any of the foregoing; provided, however, that the Liens permitted hereunder shall not be extended to cover any additional Indebtedness of the Group Parties or their property (other than a substitution of like property), except Liens in respect of Capital Lease Obligations and Purchase Money Liens as permitted by clause (c) of this definition and Liens permitted by clause (d) of this definition.

"**Permitted Shareholder Indebtedness**" means Subordinated Indebtedness owing by the Term Borrower to Holdco.

"**Person**" includes any natural person, corporation, company, limited liability company, trust, joint venture, association, incorporated organization, partnership, Governmental Authority or other entity.

"**Post-Closing Requirements**" has the meaning set out in Section 5.1(8).

"**Purchase Money Lien**" means a Lien taken or reserved in personal property to secure payment of all or part of its purchase price (or to secure financing to fund such purchase price), provided that such Lien (a) secures an amount not exceeding the lesser of the purchase price of such personal property and the Fair Market Value of such personal property at the time such Lien is taken or reserved, (b) extends only to such personal property and its proceeds, and (c) is granted prior to or within 270 days after the purchase of such personal property.

"**Quarterly Date**" means each of the last day of each of March, June, September, and December in each calendar year.

"**Quarterly Report**" has the meaning set out in Section 5.1(1)(k).

"**Reference Date**" means, as of any date, the date of the most recent Quarterly Report (or, prior to the first such Quarterly Report, the Closing Date).

"**Refinancing Indebtedness**" means, in respect of any Indebtedness (the "**Original Indebtedness**"), any Indebtedness that extends, renews or refinances such Original Indebtedness (or any Refinancing Indebtedness in respect thereof); provided that (a) the principal amount (or accreted value, if applicable) of such Refinancing Indebtedness shall not exceed the principal amount (or accreted value, if applicable) of such Original Indebtedness except by an amount no greater than accrued and unpaid interest with respect to such Original Indebtedness and any reasonable fees, premium and expenses relating to such extension, renewal or refinancing and (b) the stated final maturity of such Refinancing Indebtedness shall not be earlier than that of such Original Indebtedness.

"**Register**" has the meaning set out in Section 9.4(3).

"**Reimbursement Obligations**" means, at any date, the obligations of the Revolving Borrower then outstanding in respect of the Letters of Credit to reimburse the Issuing Bank for the amount paid by the Issuing Bank in respect of any drawings under the Letters of Credit.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Related Non-Party Beneficiaries**" means, with respect to any Party, (i) any Lender Affiliate with respect to such Party, (ii) any other Related Party with respect to such Party, and (iii) any assignee of the Persons identified in (i) or (ii).

"**Release**" means any discharge, deposit, spill, leak, pumping, pouring, emission, emptying, injection, escape, leaching, seepage or disposal of a Hazardous Material which is in breach of any Environmental Laws.

"**Relevant Agent**" means, with respect to a Group Party, any agent of such Group Party that will act in any capacity in connection with, or benefit from, the Credits.

"**Required Lenders**" means, at any time, Lenders having Revolving Credit Exposures, Term Credit Exposures and unused and uncancelled Commitments representing at least 66⅔% of the sum of the total Revolving Credit Exposures, Term Credit Exposures and unused and uncancelled Commitments at such time; provided that if there are only two Lenders having Revolving Credit Exposures, Term Credit Exposures and unused and uncancelled Commitments at such time, "Required Lenders" shall mean both such Lenders.

"**Responsible Officer**" means, with respect to any Person, the chairman, the president, the chief executive officer or the chief operating officer, and, in respect of financial or accounting matters, any chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**Restricted Joint Venture**" means a Subsidiary (other than a Wholly-Owned Subsidiary) that is prohibited from guaranteeing the Secured Liabilities pursuant to its organizational documents or any unanimous shareholder agreement, partnership agreement or other joint venture agreement binding upon it.

"**Restricted Payment**" means, with respect to any Person, any payment by such Person (whether in cash or in kind, and whether by way of actual payment, set-off, counterclaim or otherwise):

(a)     of any dividend, distribution or return of capital with respect to its Equity Securities;

(b)     on account of the purchase, redemption, retirement or other acquisition of any of its Equity Securities or any warrants, options or similar rights with respect to its Equity Securities;

(c)     of any principal of, or interest or premium on, any Subordinated Indebtedness of such Person**;**

(d)     of any principal of or interest or premium on any Indebtedness of such Person to a holder of Equity Securities of such Person or to an Affiliate of a holder of Equity Securities of such Person;

(e)     of any management, consulting or similar fee or any bonus payment or comparable payment, or by way of gift or other gratuity, to

     (i)     any director or officer of such Person (but excluding ordinary course wages and bonuses paid in the ordinary course of business and consistent with past practice);

     (ii)     any Affiliate of such Person or director or officer thereof; and

     (iii)     any Sponsor or director or officer thereof,

(f)     for the purpose of setting apart any property for a sinking, defeasance or other analogous fund for any of the payments referenced above.

"**Reuters Screen CDOR Page**" means the display designated as page "CDOR" on the Reuters Monitor Money Rates Service (or such other page which replaces the CDOR page on that service) for purposes of displaying Canadian dollar bankers' acceptance rates.

"**Revolving Borrower**" means:

(a)     initially, Opco;

(b)     from and after the Interim Amalgamation and until the Transaction Amalgamation, Interim Amalco; and

(c)     from and after the Transaction Amalgamation, Amalco.

"**Revolving Credit**" means the U.S.$40,000,000 revolving credit facility established in favour of the Revolving Borrower pursuant to the Revolving Credit Commitments of the Revolving Credit Lenders.

"**Revolving Credit Commitment**" means, as to any Lender, its commitment to make Revolving Loans and participate in Swingline Loans and Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Credit Commitment" opposite such Lender's name on Schedule 2.1 or in the Assignment and Assumption or Additional Commitment Agreement pursuant to which Lender shall have assumed or made its Revolving Credit Commitment, as applicable, as the same may be changed from time

to time pursuant to the terms hereof. The initial aggregate amount of the Revolving Credit Commitments is U.S.$40,000,000.

"**Revolving Credit Exposure**" means, with respect to any Lender at any time, the sum of (a) the U.S.$ Amount of the outstanding principal amount of such Lender's Revolving Loans at such time, and (b) such Lender's LC Exposure and Swingline Exposure at such time.

"**Revolving Credit Lender**" means any Lender having a Revolving Credit Commitment hereunder or a Revolving Loan outstanding hereunder.

"**Revolving Loan**" has the meaning set out in Section 2.1(1).

"**Rolling Period**" means each Fiscal Quarter taken together with the three immediately preceding Fiscal Quarters.

"**S&P**" means Standard & Poor's Financial Services LLC.

"**Sanctions**" means, at any time, economic or financial sanctions or trade embargoes imposed, administered or enforced by (i) the Office of Foreign Assets Control of the U.S. Department of Treasury or (ii) any other Governmental Authority that is applicable to any Party at such time.

"**Sanctioned Person**" means, at any time, any Person with whom any Party is prohibited or restricted from transacting or otherwise dealing under any Sanction, whether by reason of designation under such Sanction or otherwise.

"**Secured Cash Management Obligations**" means all indebtedness arising under or in connection with any Secured Cash Management Services.

"**Secured Cash Management Provider**" means any Lender or Lender Affiliate in its capacity as a provider of Cash Management Services.  For the avoidance of doubt, a Person that ceases to be a Lender or Lender Affiliate shall cease to be a Secured Cash Management Provider.

"**Secured Cash Management Service**" means any Cash Management Service provided by a Secured Cash Management Provider to a Credit Party.

"**Secured Hedge Arrangement**" means any Hedge Arrangement between a Credit Party and Person that is a Lender or Lender Affiliate at the time such Hedge Arrangement is entered into. For the avoidance of doubt, (i) any Hedge Arrangement entered into by a Credit Party with a Person after such Person ceases to be a Lender or Lender Affiliate shall not be a Secured Hedge Arrangement, and (ii) as at the Closing Date there are no outstanding Hedge Arrangements between any Credit Party and a Lender or Lender Affiliate.

"**Secured Hedge Counterparty**" means any Person party to Secured Hedge Arrangement other than a Credit Party, in such Person's capacity as a party thereto.  For the avoidance of doubt, (i) a Person shall remain a Secured Hedge Counterparty with respect to a Secured Hedge Arrangement if it ceases to be a Lender or a Lender Affiliate, and (ii) such Secured Hedge Arrangement shall continue to have the benefit of the Security.

"**Secured Hedge Obligations**" means all Hedge Exposure arising under or in connection with Secured Hedge Arrangements; provided that amounts owing to or from a Person under Hedge Arrangements that are not Secured Hedge Arrangements shall not be taken into account in

calculating Secured Hedge Obligations.  For the avoidance of doubt, no Guarantor shall be liable for Excluded Swap Obligations of such Guarantor.

"**Secured Liabilities**" means all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, mature or unmatured) of the Credit Parties or Limited Recourse Guarantors to the Secured Parties under, in connection with or with respect to the Transaction Documents (including Secured Cash Management Obligations and Secured Hedge Obligations), and any unpaid balance thereof.

"**Secured Parties**" means the Administrative Agent**,** the Lenders**,** the Secured Hedge Counterparties and the Secured Cash Management Providers.

"**Security Documents**" means the agreements or instruments described or referred to in Schedule 1.1(A) and Section 5.1(11) (including, to the extent such Section describes an amendment, the agreement or instrument amended thereby) and any and all other agreements or instruments now or hereafter executed and delivered by any Credit Party or Limited Recourse Guarantor as security (including by way of guarantee) for the payment or performance of all or part of the Secured Liabilities, as any of the foregoing may have been, or may hereafter be, amended, modified or supplemented.

"**Security Principles**" means the security principles set out in Schedule 5.1(11).

"**Sponsors**" means, collectively, Xiwang Foodstuffs Co. Ltd. and Chunhua Jingxi (Tianjin) Investment Center (Limited Partnership), and "Sponsor" means any one of them.

"**Subject EBITDA**" means, with respect to any Person, an amount equal to "**EBITDA**" with respect to such Person calculated as if such definition and all amounts referred to therein were determined with respect to such Person (as opposed to the Term Borrower) on a Consolidated basis.

"**Subject Flood Property**" means all real property:

(a)      in which a Credit Party has an interest that is subject to a mortgage in favour of the Administrative Agent;

(b)      that is located within the United States; and

(c)      is in an area designated by the Federal Emergency Management Agency as a special flood hazard area.

"**Subject Net Income**" means, with respect to any Person, an amount equal to "**Net Income**" with respect to such Person calculated as if such definition and all amounts referred to therein were determined with respect to such Person (as opposed to the Term Borrower) on a Consolidated basis.

"**Subordinated Indebtedness**" means Indebtedness of any Credit Party ranking in right of payment subordinate to any liability of such Credit Party under the Loan Documents and subject to a subordination agreement substantially in the form set out in Exhibit E.

*Iovate Credit Agreement*

"**subsidiary**" means, with respect to any Person (the "**parent**") at any date, any other Person (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Subsidiary**" means any subsidiary of Holdco.

"**Swap Obligation**" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Sweep Rate**" means:

(a)     50% if the Total Leverage Ratio as of the last day of the most recently ended Fiscal Year is equal to or greater than 2.50:1.00; and

(b)     0% if the Total Leverage Ratio as of the last day of the most recently ended Fiscal Year is less than 2.50:1.00.

"**Swingline Accounts**" means the Canadian Dollar and U.S. Dollar bank accounts maintained by the Administrative Agent in the name of the Revolving Borrower and designated as such by the Administrative Agent.

"**Swingline Commitment**" has the meaning set out in Section 2.20(1).  For the avoidance of doubt, the Swingline Commitment comprises part of, and is not in addition to, the Commitment of the applicable Revolving Credit Lender.

"**Swingline Exposure**" means, at any time, the U.S.$ Amount of the aggregate principal amount of all Swingline Loans outstanding at such time.  The Swingline Exposure of any Lender at any time shall be its Applicable Percentage of the total Swingline Exposure at such time.

"**Swingline Lender**" means HSBC Bank Canada, in its capacity as lender of Swingline Loans hereunder.

"**Swingline Loan**" has the meaning set out in Section 2.20(1).

"**Target**" means, with respect to any Acquisition, the Person whose shares or assets (or both) are proposed to be acquired.

"**Taxes**" means all taxes, charges, fees, levies, imposts and other assessments, including all income, sales, use, goods and services, harmonized sales, value added, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, real property and personal property taxes, and any other taxes, customs duties, fees, assessments, or similar charges in the nature of a tax, including Canada Pension Plan and provincial pension plan contributions, employment insurance payments and workers' compensation premiums, together with any instalments with respect thereto, and any interest, fines and penalties with respect thereto, imposed by any Governmental Authority (including federal, state, provincial, municipal and foreign Governmental Authorities), and whether disputed or not.

*Iovate Credit Agreement*

"**Term Borrower**" means:

(a)      prior to the Transaction Amalgamation, Acquisitionco; and

(b)      from and after the Transaction Amalgamation, Amalco.

"**Term Credit**" means the U.S.$266,500,000 term credit established in favour of the Term Borrower pursuant to the Term Credit Commitments of the Term Credit Lenders.

"**Term Credit Commitment**" means, as to any Lender, the obligation of such Lender, if any, to make Term Loans in a principal amount not to exceed the amount set forth under the heading "Term Credit Commitment" opposite such Lender's name on Schedule 2.1, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Credit Commitment, as applicable, as the same may be changed from time to time pursuant to the terms hereof.  The initial aggregate amount of the Term Credit Commitments is U.S.$266,500,000.

"**Term Credit Exposure**" means, with respect to any Lender at any time, the U.S.$ Amount of the outstanding principal amount of such Lender's Term Loans at such time.

"**Term Credit Lender**" means any Lender having a Term Credit Commitment hereunder or a Term Loan outstanding hereunder.

"**Term Loan**" has the meaning set out in Section 2.1(2).

"**Total Indebtedness**" means, at any time, the aggregate amount of Indebtedness of the Term Borrower at such time (other than Permitted Shareholder Indebtedness or other Subordinated Indebtedness), determined on a Consolidated basis.

"**Total Leverage Ratio**" means, at any time, the ratio of (a) Net Total Indebtedness at such time, to (b) EBITDA for the most recently completed Rolling Period for which financial statements were required to have been delivered pursuant to Section 5.1(1)(a) or (b).  By way of example and for the avoidance of doubt, the Total Leverage Ratio as at October 3, 2018 shall be equal to the ratio of (a) Net Total Indebtedness on October 3, 2018, to (b) EBITDA for the Rolling Period ended June 30, 2018 (i.e. the financial statements for September 30, 2018 would not have been delivered yet).

"**Transaction Amalgamation**" means the amalgamation to occur after the Closing Date between Acquisitionco, Initial Target, Old Iovate International Inc. and Opco (or, if the Interim Amalgamation has occurred, the amalgamation between Acquisitionco and Interim Amalco) under the Business Corporations Act (Ontario) to form Iovate Health Sciences International, Inc. For the avoidance of doubt, the Transaction Amalgamation may occur by way of three separate amalgamations effected one immediately after the other.

"**Transaction Documents**" means the Loan Documents together with any document, instrument or agreement with respect to any Secured Hedge Arrangement and Secured Cash Management Services, as such documents, instruments or agreements may be amended, modified or supplemented from time to time.

"**Transactions**" means the execution, delivery and performance by the Credit Parties and the Limited Recourse Guarantors of the Loan Documents, the borrowing of Loans and the use of the proceeds thereof, and the issuance of Letters of Credit.

"**Type**", (a) when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Canadian Prime Rate, the Base Rate, the LIBO Rate**,** or the CDOR Rate or whether such Borrowing takes the form of a Letter of Credit and (b) when used with respect to a Letter of Credit refers to whether such Letter of Credit is a Financial Letter of Credit or a Non-Financial Letter of Credit.

"**Undistributed RJV Earnings**" means, with respect to any Rolling Period, an amount equal to:

(a)     the aggregate Subject Net Income of all Restricted Joint Ventures; **less**

(b)     the amount of dividends, distributions, returns of capital and principal repayments made by all Restricted Joint Ventures to Group Parties (other than another Restricted Joint Venture),

in each case with respect to such Rolling Period.

"**Unfunded Capital Expenditures**" means, with respect to any period, Capital Expenditures made during such period by the Group Parties (or the relevant portion thereof) that were not funded directly (subject to intercompany funds flow) with the proceeds of:

(a)     the issuance of Equity Securities or Permitted Shareholder Indebtedness to Holdco by the Term Borrower;

(b)     a capital contribution made by Holdco to the Term Borrower;

(c)     Indebtedness permitted under Section 6.1(1); or

(d)     Asset Dispositions pursuant to Section 2.9(2)(b).

"**Unfunded Investments**" means, with respect to any period, Investments made during such period by the Group Parties (or the relevant portion thereof) that were not funded directly (subject to intercompany funds flow) with the proceeds of:

(a)     the issuance of Equity Securities or Permitted Shareholder Indebtedness to Holdco by the Term Borrower;

(b)     a capital contribution made by Holdco to the Term Borrower;

(c)     Indebtedness permitted under Section 6.1(1); or

(d)     Asset Dispositions pursuant to Section 2.9(2)(b).

"**Unfunded Permitted Acquisitions**" means, with respect to any period, Permitted Acquisitions (other than the Initial Acquisition) made during such period by the Group Parties (or the relevant portion thereof) that were not funded directly (subject to intercompany funds flow) with the proceeds of:

(a)     the issuance of Equity Securities or Permitted Shareholder Indebtedness to Holdco by the Term Borrower; or

(b)     a capital contribution made by Holdco to the Term Borrower.

*Iovate Credit Agreement*

"**U.S. Bankruptcy Law**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**U.S. Dollars**" and "**U.S.$**" refer to lawful money of the United States of America.

"**U.S.$ Amount**" means, on any day, in relation to any Loans or Letters of Credit, the sum of (a) the amount of all such Loans and Letters of Credit that are denominated in U.S. Dollars, and (b) the Equivalent Amount of all such Loans and Letters of Credit that are expressed in Canadian Dollars.

"**Vendor**" means 2158068 Ontario Inc., an Ontario corporation.

"**Voting Equity Securities**" means, at any time, Equity Securities of a Person entitled, at such time, to vote for the election of directors of such Person.

"**Wholly-Owned Subsidiary**" of a Person means any subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the equity or 100% of the ordinary voting power or 100% of the general partnership or membership interests are, at the time any determination is being made, owned, controlled or held by such Person or one or more subsidiaries of such Person or by such Person and one or more subsidiaries of such Person.

"**Working Capital**" means, at any time, Current Assets minus Current Liabilities, in each case at such time.

"**WURA**" means *Winding Up and Restructuring Act* (Canada).

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described EU Bail-In Legislation Schedule.

## 1.2    Classification of Loans and Borrowings.

For purposes of this Agreement, Loans may be classified and referred to by class (*e.g.*, a "Revolving Loan") or by Type (*e.g.*, a "LIBO Rate Loan") or by class and Type (*e.g.*, a "LIBO Revolving Loan"). Borrowings also may be classified and referred to by class (*e.g.*, a "Revolving Borrowing") or by Type (*e.g.*, a "LIBO Rate Borrowing") or by class and Type (*e.g.*, a "LIBO Rate Revolving Borrowing").

## 1.3    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "or" is disjunctive; the word "and" is conjunctive. The words "to the knowledge of" means, when modifying a representation, warranty or other statement of any Person, that the fact or situation described therein is known by such Person (or, in the case or a Person other than a natural Person, known by the Responsible Officer of such Person) making the representation, warranty or other statement, or with the exercise of reasonable due diligence under the circumstances (in accordance with the standard of what a reasonable Person in similar circumstances would have done) would have been known by such Person (or, in the case of a Person other than a natural

Person, would have been known by such Responsible Officer of such Person). For the purposes of determining compliance with or measuring status under any cap, threshold or basket hereunder denominated in United States Dollars, reference shall be had to the Equivalent Amount of any portion of the underlying component that is not denominated in United States Dollars. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or replaced (subject to any restrictions on such modifications set out herein), (b) any reference herein to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, restated or re-enacted from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement. Any reference herein to an action, document or other matter or thing being "satisfactory to the Lenders", "to the Lenders' satisfaction" or similar phrases, shall mean that such action, document, matter or thing must be satisfactory to Lenders constituting the Required Lenders, unless it is described in Section 9.2(2) (a)-(j), hereof, in which case it must be satisfactory to each Lender whose consent is required under the applicable clause.

**1.4     Québec Matters.**

For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim", "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the Uniform Commercial Code or a Personal Property Security Act shall include publication under the *Civil Code of Québec,* (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatary or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies, as applicable, (w) "leasehold interest" shall include a "valid lease", (x) "lease" shall include a "leasing contract" and (y)

"guarantee" and "guarantor" shall include "suretyship" and "surety", respectively.  The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated thereunder or relating thereto, including notices, may also be drawn up in the English language only.  *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

## 1.5    Accounting Terms; GAAP.

Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.  Except as otherwise expressly provided herein, all calculations of the components of the financial information for the purposes of determining compliance with the financial ratios and financial covenants contained herein shall be made on a basis consistent with GAAP in existence as at the Effective Date and used in the preparation of the Consolidated financial statements of the Term Borrower referred to in Section 5.1(1).  In the event of a change in GAAP or adoption of IFRS, the Borrowers and the Administrative Agent shall negotiate in good faith to revise (if appropriate) such ratios and covenants to give effect to the intention of the parties under this Agreement as at the Effective Date, and any new financial ratio or financial covenant shall be subject to approval by the Required Lenders.  Until the successful conclusion of any such negotiation and approval by the Required Lenders, (a) all calculations made for the purpose of determining compliance with the financial ratios and financial covenants contained herein shall be made on a basis consistent with GAAP in existence immediately prior to such adoption or change, and (b) financial statements delivered pursuant to Section 5.1(1) shall be accompanied by a reconciliation showing the adjustments made to calculate such financial ratios and financial covenants.  Any financial ratios required to be maintained by the Term Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed in this Agreement and rounding the result up or down to the nearest number (with a round-up if there is no nearest number) to the number of places by which such ratio is expressed in this Agreement.

## 1.6    Time.

All time references herein shall, unless otherwise specified, be references to local time in Toronto, Ontario.  Time is of the essence of this Agreement and the other Loan Documents.

## 1.7    Third Party Beneficiaries.

(1)    Except as set out in clause (2) below, this Agreement and the Security Documents are for the sole benefit of the Parties and nothing in them, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement or the Security Documents.

(2)    Each Non-Party Beneficiary shall be entitled to enjoy the benefit of those provisions of this Agreement and the Security Documents that, by their terms, are in favour of such Non-Party Beneficiary (including all Liens granted for its benefit as a Secured Party).   In furtherance thereof, each Party (i) accepts such provisions as agent and trustee for its Related Non-Party Beneficiaries, and (ii) shall be entitled to enforce such provisions on behalf of its Related Non-Party Beneficiaries. For the avoidance of doubt, any reference to a Permitted Lien shall not serve to subordinate or postpone any Lien created by any Security Document to such Permitted Lien.

(3)     Notwithstanding clause (2) above or any other term of this Agreement or any Security Document, the consent of any Non-Party Beneficiary or other Person who is not a Party is not required to amend, modify or supplement this Agreement or any Security Document.

## ARTICLE 2
## THE CREDITS

**2.1     Commitments.**

(1)     *Revolving Credit.*  Subject to the terms and conditions set forth herein, each Revolving Credit Lender commits to make Loans in Canadian Dollars or U.S. Dollars (each such Loan made under this Section 2.1(1), a "**Revolving Loan**") to the Revolving Borrower from time to time during the period commencing on the Closing Date and ending on the Maturity Date in an aggregate principal amount outstanding up to the amount of such Lender's Revolving Credit Commitment, provided that a Revolving Credit Lender shall not be required to extend further credit hereunder if such extension would result in (a) such Revolving Credit Lender's Revolving Credit Exposure exceeding such Revolving Credit Lender's Revolving Credit Commitment, or (b) the aggregate Revolving Credit Exposures exceeding the aggregate Revolving Credit Commitments.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Revolving Borrower may borrow, repay and reborrow Revolving Loans.

(2)     *Term Credit.*  Subject to the terms and conditions set forth herein, each Term Credit Lender commits to make a Loan in U.S. Dollars (each such Loan made under this Section 2.1(2), a "**Term Loan**") to the Term Borrower by way of a single advance prior to the Longstop Date in an aggregate principal amount up to the amount of such Lender's Term Credit Commitment.  Any undrawn portion of any Term Credit Commitment shall be cancelled immediately following the initial advance under the Term Credit.

(3)     *Additional Commitments.*

(a)     Subject to the terms and conditions hereof, at any time after the Closing Date, and provided that no Default or Event of Default has occurred and is continuing and that the Term Borrower is in pro forma compliance with the financial covenants in Section 5.1(12) (assuming the full incurrence and application of the new Indebtedness in question), the Revolving Borrower may request that the Lenders or any other Persons provide additional Revolving Credit Commitments (each, an "**Additional Commitment**") which shall serve to increase the Revolving Credit, such that further Revolving Loans become available thereunder upon identical terms and conditions.

(b)     Any Additional Commitment shall be documented pursuant to an Additional Commitment Agreement and executed by the Revolving Borrower, the Person providing the Additional Commitment (the "**Additional Lender**") and the Administrative Agent. Upon satisfaction of the conditions precedent set out therein, the Additional Commitment in question shall become effective, and the Agent shall promptly notify each Lender as to such agreement.

(c)     Notwithstanding anything to the contrary in this Agreement:

(i)     no Additional Commitment shall require the consent of any Lender other than the Additional Lender in question, but each Additional Lender shall (to the extent the approval of the Administrative Agent would be required for an assignment of

Revolving Credit Commitments to such Additional Lender) require the approval of the Administrative Agent, not to be unreasonably withheld;

(ii)     no Lender shall have any obligation to participate in any Additional Commitment unless it agrees to do so in its sole discretion;

(iii)    no Lender shall have the right to acquire any Additional Commitment or receive prior notice thereof, regardless of the fact that its share in the aggregate Revolving Commitments is reduced thereby;

(iv)    the aggregate amount of all Additional Commitments shall not exceed U.S.$20,000,000;

(v)     the aggregate amount of all Additional Commitments requested at any one time shall not be less than U.S.$5,000,000; and

(vi)    the Term Borrower may pay such up-front, arrangement or other fees as may be agreed by the Term Borrower and any Additional Lender in connection with the provision by such Additional Lender of an Additional Commitment.

(d)     For greater certainty, any Additional Lender shall be entitled to share pro rata in any prepayments made by the Revolving Borrower pursuant to Section 2.9, and the obligations of the Credit Parties under any such Additional Commitment shall be secured *pari passu* with the other obligations of the Credit Parties under the Loan Documents.

## 2.2    Loans and Borrowings.

(1)     *Loans.*  Each Revolving Loan shall be made as part of a Borrowing by the Revolving Borrower consisting of Revolving Loans made by the Revolving Credit Lenders rateably based upon their Applicable Percentages.  Each Term Loan shall be made as part of a Borrowing by the Term Borrower consisting of Term Loans made by the Term Credit Lenders rateably based upon their Applicable Percentages.  Each Swingline Loan shall be made in accordance with the procedures set forth in Section 2.20.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and (subject to the reallocation provisions of Section 2.21) no Lender shall be responsible for any other Lender's failure to make Loans as required.

(2)     *Composition of Borrowings.*  Subject to Section 2.20, each Revolving Borrowing shall be comprised of Canadian Prime Loans, Bankers' Acceptances, B/A Equivalent Loans, Base Rate Loans, LIBO Rate Loans or Letters of Credit as the Revolving Borrower may request in accordance herewith.  Each Term Loan shall be comprised of Base Rate Loans or LIBO Rate Loans as the Term Borrower may request in accordance herewith.  Each Lender may at its option make any LIBO Rate Loan by causing any domestic or foreign branch or Lender Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not result in any increased costs for a Borrower or affect the obligation of a Borrower to repay such Loan in accordance with the terms of this Agreement.

(3)     *Amount of Borrowings.*  At the commencement of each Interest Period for any LIBO Rate Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of U.S.$1,000,000.  At the time that each Canadian Prime Borrowing or Base Rate Borrowing is made (other than a Swingline Borrowing), such Borrowing shall be in an aggregate amount that is

an integral multiple of Cdn.$1,000,000 or U.S.$1,000,000, as the case may be; provided that a Canadian Prime Borrowing or a Base Rate Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total applicable Commitments or that is required to finance the reimbursement of an LC Disbursement. Borrowings of more than one Type and class may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 B/A Borrowings and 10 LIBO Rate Borrowings outstanding.

**2.3    Requests for Borrowings.**

(1)    *Requesting a Borrowing*. To request a Borrowing (other than a Swingline Loan), a Borrower shall notify the Administrative Agent of such request in writing substantially in the form of Exhibit B (each, a "**Borrowing Request**") (a) in the case of a LIBO Rate Borrowing, not later than 11:00 a.m. three Business Days before the date of the proposed Borrowing, (b) in the case of a B/A Borrowing, not later than 11:00 a.m. two Business Days before the date of the proposed Borrowing, or (c) in the case of a Canadian Prime Borrowing or a Base Rate Borrowing, not later than 11:00 a.m. time, one Business Day before the date of the proposed Borrowing; provided that any such notice of a Canadian Prime Borrowing or a Base Rate Borrowing to finance the reimbursement of an LC Disbursement shall not be given later than 10:00 a.m. on the date of the proposed Borrowing. Each Borrowing Request shall be irrevocable. The Administrative Agent and each Lender are entitled to rely and act upon any Borrowing Request given or purportedly given by a Borrower, and such Borrower hereby waives the right to dispute the authenticity and validity of any such request or resulting transaction once the Administrative Agent or any Lender has advanced funds, accepted a B/A or made a B/A Equivalent Loan based on such Borrowing Request. Each Borrowing Request shall specify the following information:

(i)    the aggregate amount of each requested Borrowing, and whether such Borrowing will consist of Revolving Loans or Term Loans;

(ii)    in the case of a Borrowing of Revolving Loans, the currency of such requested Borrowing (which shall be Canadian Dollars or U.S. Dollars);

(iii)    the date of such Borrowing, which shall be a Business Day;

(iv)    whether such Borrowing is to be a Canadian Prime Borrowing, a B/A Borrowing, a Base Rate Borrowing, a LIBO Rate Borrowing or a Letter of Credit;

(v)    in the case of a LIBO Rate Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "**Interest Period**", and in the case of a B/A Borrowing, the initial Contract Period to be applicable thereto, which shall be a period contemplated by the definition of the term "**Contract Period**"; and

(vi)    the location and number of the applicable Borrower's account to which funds are to be disbursed, which shall comply herewith.

(2)    *Default Terms*. If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be a Canadian Prime Borrowing (if denominated in Canadian Dollars) or a Base Rate Borrowing (if denominated in U. S. Dollars). If no currency is specified with respect to a Borrowing of Revolving Loans, the Borrowing shall be denominated in U.S. Dollars. If no Interest Period is specified with respect to any requested LIBO Rate Borrowing, then a Borrower shall be deemed to have selected an Interest Period of one month's duration. If no Contract

Period is specified with respect to any requested B/A Borrowing, then a Borrower shall be deemed to have selected a Contract Period of 30 days' duration. Promptly following receipt of a Borrowing Request in accordance with Section 2.3, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

(3)     *Conversion or Rollover of Borrowings.* Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request. Thereafter, a Borrower may elect to convert a Borrowing to a different Type or to rollover such Borrowing and, in the case of (a) a LIBO Rate Borrowing, may elect a new Interest Period therefor, or (b) a B/A Borrowing, may elect a new Contract Period therefor, all as provided in this Section 2.3(3). The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated rateably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. This Section 2.3(3) shall not apply to Swingline Borrowings, which may not be converted or continued. To make an election pursuant to this Section 2.3(3), a Borrower shall notify the Administrative Agent of such election by the time that a Borrowing Request would be required under Section 2.3(1) if such Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such request shall be irrevocable. In addition to the information specified in Section 2.3(1), each written Borrowing Request shall specify the Borrowing to which such request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing. Notwithstanding the foregoing, a Borrower is not entitled to elect a new Contract Period in respect of a B/A Borrowing or a new Interest Period in respect of a LIBOR Borrowing, or to convert a Borrowing of any Type into a LIBOR Borrowing, a B/A or B/A Equivalent Loan, if a Default has occurred and is continuing.

(4)     *Deemed Election to Convert.* In the absence of a timely and proper election with regard to (a) LIBO Rate Borrowings, a Borrower shall be deemed to have elected to convert such LIBO Rate Borrowings to Base Rate Borrowings on the last day of the Interest Period of the relevant LIBO Rate Borrowings, and (b) B/A Borrowings, a Borrower shall be deemed to have elected to convert such B/A Borrowings to Canadian Prime Borrowings on the last day of the Contract Period of the relevant B/A/ Borrowings.

**2.4     Funding of Borrowings.**

(1)     *Funding.* Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; provided that Swingline Loans shall be made as provided in Section 2.20. The Administrative Agent shall make such Loans available to a Borrower by promptly crediting the amounts so received, in like funds, to an account of such Borrower maintained with the Administrative Agent in Toronto and designated by such Borrower in the applicable Borrowing Request; provided that Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.19 shall be remitted by the Administrative Agent to the Issuing Bank.

(2)     *Each Lender's Share of Borrowing.* Unless the Administrative Agent has received written notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.4(1) and may, in reliance upon such assumption, make available to the applicable

Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the Administrative Agent shall seek repayment of such corresponding amount, firstly, from the applicable Lender and, secondly, from the applicable Borrower, if the applicable Lender does not immediately repay such corresponding amount. The applicable Lender agrees to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to the Administrative Agent, at the interest rate applicable to Canadian Prime Loans (if the unpaid amount is denominated in Canadian Dollars) or to Base Rate Loans (if the unpaid amount is denominated in U.S. Dollars). If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing. If such Lender's share of such amount is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing, the Administrative Agent shall be entitled to recover such amount with interest thereon at the rate per annum applicable to Revolving Loans that are Canadian Prime Loans (if the unpaid amount is denominated in Canadian Dollars) or to Base Rate Loans (if the unpaid amount is denominated in U.S. Dollars), on demand, from the applicable Borrower. Any payment by a Borrower shall be made without prejudice to any claim such Borrower may have against a Defaulting Lender.

**2.5    Interest and Acceptance Fees.**

(1)    *Interest.* The Loans comprising each Canadian Prime Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days or 366 days, as the case may be) at a rate per annum equal to the Canadian Prime Rate plus the Applicable Margin from time to time in effect. The Loans comprising each Base Rate Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days at a rate per annum equal to the Base Rate plus the Applicable Margin from time to time in effect. The Loans comprising each LIBO Rate Borrowing shall bear interest (computed on the basis of the actual number of days in the relevant Interest Period over a year of 360 days) at the LIBO Rate for the Interest Period in effect for such LIBO Rate Borrowing plus the Applicable Margin.

(2)    *Acceptance Fee.* The Loans comprising each B/A Borrowing shall be subject to the Acceptance Fee which shall be payable as set out in Section 2.11.

(3)    *Before and After Judgment Interest.* Notwithstanding the foregoing, if a Default or an Event of Default shall have occurred and be continuing, the Loans shall bear interest:

(a)    subject to Section 2.5(3)(b), at a rate per annum equal to 2% plus the rate otherwise applicable to such Loan or, in the case of any amount not constituting principal or interest on a Loan, at a rate equal to 2% plus the rate otherwise applicable to, in the case of Canadian Dollar amounts, Canadian Prime Loans, or in the case of U.S. Dollar amounts, Base Rate Loans;

(b)    if (i) a Security Document creates a mortgage on real property or a hypothec on immovables, or (ii) the rate provided for in Section 2.5(3)(a) is otherwise determined to be unenforceable, then, in either case, at a rate per annum equal to the rate otherwise applicable to such Loan or, in the case of any amount not constituting principal or interest on a Loan, at a rate equal to the rate otherwise applicable to, in the case of Canadian Dollar amounts, Canadian Prime Loans, or in the case of U.S. Dollar amounts, Base Rate Loans;

*Iovate Credit Agreement*

provided that, without limiting the effect of Section 2.5(3)(b)(ii), nothing in Section 2.5(3)(b)(ii) shall preclude the operation of Section 2.5(3) where:

  (c)  a Security Document that creates a mortgage on real property or a hypothec on immovables also creates a Lien on other property and assets; or

  (d)  the principal of or interest on any Loan or any fee or other amount payable by a Borrower hereunder is also secured by a Lien other than a mortgage on real property or a hypothec on immovables.

(4)  *Accrued Interest.*  Accrued interest on each Loan (other than B/A Borrowings) shall be payable in arrears on (a) each applicable Interest Payment Date and (b) in the case of Revolving Loans, upon termination of the Revolving Credit Commitments.  In addition, in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.  Interest on overdue amounts shall be payable upon demand.

(5)  *Days Interest Payable.*  All interest hereunder shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  Any Loan that is repaid on the same day on which it is made shall bear interest for one day.  The applicable Canadian Prime Rate, Base Rate, LIBO Rate or Discount Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(6)  *Yearly Rate of Interest.*  For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable.  The rates of interest under this Agreement are nominal rates, and not effective rates or yields.  The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(7)  *Criminal Interest.*  If any provision of this Agreement would oblige a Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by applicable Law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code* (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

  (a)  first, by reducing the amount or rate of interest or the amount or rate of any Acceptance Fee required to be paid to the affected Lender under Section 2.5; and

  (b)  thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the *Criminal Code* (Canada).

(8)  *Reconciliation for Additional Interest and Fees.*  Notwithstanding anything to the contrary contained in this Agreement, if, as a result of any restatement or other adjustment to the financial

statements delivered under this Agreement (including any adjustment to unaudited financial statements as a result of subsequent audited financial statements) or for any other reason, the Borrowers or the Lenders determine that the Total Leverage Ratio as of any applicable date was inaccurate and, as a result of such occurrence the Applicable Margins applicable to any Loans or any fees for any period were lower or higher than would otherwise be the case, then (a) in the case where the Applicable Margins were lower, the Borrowers shall immediately and retroactively be obligated to pay to the Administrative Agent for the account of the applicable Lenders, promptly on demand by the Administrative Agent (or, if an Event of Default pursuant to Sections 7.1(f) and (g) shall have occurred and be continuing, automatically and without further action by the Administrative Agent), an amount equal to the excess of the amount of interest and fees that should have been paid by the Borrowers for such period over the amount of interest and fees actually paid by the Borrowers for such period, plus interest on such amount at the rate otherwise applicable herein and (b) in the case where the Applicable Margins were higher, the Lenders shall be obligated to pay to the Borrower, promptly on demand by the Borrower) an amount equal to the excess of the amount of interest and fees actually paid by the Borrowers for such period over the amount of interest and fees that should have been paid by the Borrowers for such period, plus interest on such amount at the Base Rate (if such Loans are denominated in U.S. Dollars) or the Canadian Prime Rate (if such Loans are denominated in Canadian Dollars). The Borrowers' obligations under this Section 2.5(8) shall survive the termination of the Commitments and the repayment of all Indebtedness hereunder.

**2.6     Termination and Reduction of Commitments.**

(1)     *Maturity Dates.*  Unless previously terminated, the Revolving Credit Commitments shall terminate on the Maturity Date.

(2)     *Cancellation of Unused Credit.*  (a) The Revolving Borrower may, upon three Business Days prior written notice to the Administrative Agent, permanently cancel any unused portion of the Revolving Credit, without penalty.  The Administrative Agent shall promptly notify each Revolving Credit Lender of the receipt by the Administrative Agent of any such notice.  Any such cancellation shall be applied rateably in respect of the Revolving Credit Commitments of each Revolving Credit Lender.  Each notice delivered by the Revolving Borrower pursuant to this Section 2.6(2) shall be irrevocable; provided that each such notice may state that such notice is conditioned upon the effectiveness of other credit facilities, incurrence of other Indebtedness or consummation of another transaction (such as a Change in Control), in which case (but subject to Section 2.14) such notice may be revoked by the Revolving Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(b) The Term Borrower may, upon three Business Days prior written notice to the Administrative Agent, permanently cancel any unused portion of the Term Credit Commitments, without penalty.  The Administrative Agent shall promptly notify each Term Credit Lender of the receipt by the Administrative Agent of any such notice.  Any such cancellation shall be applied rateably in respect of the Term Credit Commitments of each Term Credit Lender.  Each notice delivered by the Term Borrower pursuant to this Section 2.6(2) shall be irrevocable; provided that each such notice may state that such notice is conditioned upon the effectiveness of other credit facilities, incurrence of other Indebtedness or consummation of another transaction (such as a Change in Control), in which case (but subject to Section 2.14) such notice may be revoked by the Term Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**2.7    Repayment of Loans.**

(1)    *Repayment of Revolving Credit.*  The Revolving Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Revolving Credit Lenders the outstanding principal amount of the Revolving Loans on the Maturity Date; provided that on each date that a Revolving Borrowing is made, the Revolving Borrower shall repay all Swingline Loans then outstanding.

(2)    *Repayment of Term Credit.*  The Term Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Term Credit Lenders the outstanding principal amount of the Term Loans in instalments in the amounts and on the dates set forth below (in each case as reduced by the application of any prepayments made pursuant to Section 2.9) with such payments to be applied on a pro rata basis to the Term Loans of each Term Credit Lender based upon its Applicable Percentage at the time of such payment:

| Date | Amount |
|---|---|
| March 31, 2017, June 30 2017, September 30, 2017 and December 31, 2017. | 1.25% of the principal amount of the Term Loans on the Closing Date |
| March 31, 2018, June 30, 2018, September 30, 2018, December 31, 2018, March 31, 2019, June 30, 2019, September 30, 2019 and December 31, 2019. | 1.875% of the principal amount of the Term Loans on the Closing Date |
| March 31, 2020, June 30, 2020, September 30, 2020, December 31, 2020, March 31, 2021, June 30, 2021 and September 30, 2021. | 2.5% of the principal amount of the Term Loans on the Closing Date |
| On the Maturity Date. | The remaining unpaid amount of the Term Loans |

**2.8    Evidence of Debt.**

(1)    *Accounts of Indebtedness.*  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Borrowing made by such Lender hereunder, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(2)    *Account Details.*  The Administrative Agent shall maintain accounts in which it shall record (a) the amount of each Borrowing made hereunder, the class and Type thereof and, in the cases of Bankers' Acceptances and LIBO Rate Loans, the relevant Contract Period or Interest Period, applicable thereto, (b) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder, and (c) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(3)    *Accounts Conclusive.*  The entries made in the accounts maintained pursuant to Sections 2.8(1) and (2) shall be conclusive evidence (absent manifest error) of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of a Borrower to repay the Borrowings in accordance with the terms of this Agreement.  In the event

of a conflict between the records maintained by the Administrative Agent and any Lender, the records maintained by the Administrative Agent shall govern.

(4)     *Promissory Notes.*  Any Lender may request that Loans (other than B/As) made by it be evidenced by a promissory note.  In such event, the applicable Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.4) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**2.9    Prepayments.**

(1)     *Currency Fluctuations.*  If at any time the Revolving Credit Exposure of any Lender exceeds its Revolving Credit Commitment as notified to the Borrower by the Administrative Agent (any such excess being referred to in this Section 2.9(1) as a "**Currency Excess Amount**"), then the Revolving Borrower shall pay to the Administrative Agent, for the account of such Lender, an amount equal to the Currency Excess Amount with respect to such Lender to be applied (a) as a prepayment of the Loans and Reimbursement Obligations outstanding to such Lender, and (b) thereafter as LC Cover to such Lender for its LC Exposure under the Revolving Credit in an amount of such remaining Currency Excess Amount. If any Currency Excess Amount with respect to any Lender is equal to or greater than 3% of the Revolving Credit Commitment of such Lender, then the repayment of the Currency Excess Amount to such Lender shall be made by the Revolving Borrower no later than the third Business Day after the Administrative Agent requests such repayment. If any Currency Excess Amount with respect to any Lender is less than 3% of the Revolving Credit Commitment of such Lender, then the repayment of the Currency Excess Amount to such Lender shall be made no later than the third Business Day after the next Quarterly Date. The Administrative Agent shall request repayment of any Currency Excess Amount forthwith upon request therefor by any Lender, but neither the Administrative Agent nor the Borrower is otherwise required to monitor Currency Excess Amount levels and absent any such request, the Administrative Agent is not required to request repayment thereof and the Borrower is not required to make repayment thereof.

(2)     *Mandatory Loan Prepayments.*

(a)     On or before the 120th day after the last day of each Fiscal Year ending on or after December 31, 2017, the Term Borrower shall deliver to the Administrative Agent a certificate signed by a Responsible Officer of the Term Borrower, setting out in reasonable detail the calculation of Excess Cash Flow for the most recent completed Fiscal Year.  On the later of the third Business Day after delivery of the notice provided above and the 120th day after the last day of the applicable Fiscal Year, the Borrowers shall prepay (by payment to the Administrative Agent for the account of the Lenders) an aggregate principal amount of Term Loans equal to the excess of (i) the Sweep Rate multiplied by such Excess Cash Flow over (ii) optional principal payments made on the Loans in such Fiscal Year to the extent, in the case of Revolving Loans (including Swingline Loans), that the Revolving Credit Commitments are permanently reduced by the amount of such optional principal payments.

(b)     In the event of an Asset Disposition by any Credit Party, the Borrowers shall, within five Business Days of such Asset Disposition, prepay (by payment to the Administrative

Agent for the account of the Lenders) an aggregate principal amount of Loans equal to the amount of Net Proceeds; provided that this prepayment requirement shall not apply:

(i)     to that portion of such Net Proceeds which, when aggregated with the Net Proceeds from any other Asset Disposition made in the same Fiscal Year in respect of which payment has not been made pursuant to Section 2.9(2), is less than U.S.$7,500,000; or

(ii)    to that portion of such Net Proceeds used by a Credit Party to acquire or repair assets useful in a Credit Party's business within 365 days of such Asset Disposition (or 548 days where a binding commitment to purchase or repair such assets is entered into within 365 days of such Asset Disposition) if, within two Business Days of such Asset Disposition, the Borrowers have notified the Administrative Agent of their intention to apply the Net Proceeds in such manner.

(c)     The Borrowers shall, within five Business Days of any sale or issuance of any Equity Securities pursuant to a Cure Contribution or an initial public offering of any Credit Party, prepay (by payment to the Administrative Agent for the account of the Lenders) an aggregate principal amount of Loans equal to 100% of the net cash proceeds received by any Credit Party in respect of any such sale or issuance or contribution.

(d)     Prepayments of the Loans pursuant to Section 2.9(2)(a) shall be applied to the permanent prepayment of the Amortization Payments required to be made in respect of the Term Credit, in inverse order of maturity. Prepayments of the Loans pursuant to Section 2.9(2)(b) and (c) shall be applied (i) first, to the permanent prepayment of the Amortization Payments required to be made in respect of the Term Credit, in inverse order of maturity, and (ii) second, to the prepayment of amounts outstanding under the Revolving Credit and, in the case of prepayments made pursuant to Section 2.9(2)(c), the permanent cancellation of a corresponding portion of the Revolving Credit. In the case of any prepayment pursuant to any of Sections 2.9(2)(a), (b) or (c), the Borrowers shall, to the extent practicable, provide to the Administrative Agent written notice of such prepayment at least three Business Days prior to the date such prepayment is to be made; provided that any failure to do so shall not relieve the Borrowers of the prepayment obligation in question.

(3)     *Voluntary Prepayments*. The Term Borrower may, at its option, at any time and from time to time, prepay the Term Loans, in whole or in part, without premium or penalty (subject to Section 2.14), upon giving three Business Days' prior written notice to the Administrative Agent. The Revolving Borrower may, at its option, at any time and from time to time, prepay the Revolving Loans or Swingline Loans, in whole or in part, without premium or penalty (subject to Section 2.14), upon giving three Business Days' prior written notice to the Administrative Agent, provided that no such notice shall be required with respect to any Swingline Loan. Each such notice shall specify the date and amount of prepayment, whether the Loans to be prepaid are Term Loans or Revolving Loans and whether the prepayment is of Canadian Prime Loans, Base Rate Loans, LIBO Rate Loans, B/As (or B/A Equivalent Loans) or any combination thereof, and, in each case if a combination thereof, the principal amount allocable to each. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein. Prepayment of the Term Loans pursuant to this Section 2.9(3) shall be applied against the Amortization Payments in the inverse order of maturity unless the Total Leverage Ratio, after giving effect to such prepayment, is less than 2.50:1.00, in which case such prepayment shall be

applied against the Amortization Payments in the order directed by the Term Borrower. Each partial voluntary prepayment of any Canadian Dollar-denominated Loan shall be in a minimum principal amount of Cdn.$1,000,000 and in an integral multiple of Cdn.$1,000,000, and each partial voluntary prepayment of any U.S. Dollar-denominated Loan shall be in a minimum principal amount of U.S.$1,000,000 and in an integral multiple of U.S.$1,000,000. No such prepayment of a Term Loan may be reborrowed.

(4)     *Notice by Borrower*. Each notice provided by the Borrowers hereunder in respect of any prepayment hereunder shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; <u>provided</u> that each such notice may state that such notice is conditioned upon the effectiveness of other credit facilities, incurrence of other Indebtedness or consummation of another transaction (such as a Change in Control), in which case (subject to Section 2.14) such notice may be revoked by the applicable Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(5)     *Notice by Administrative Agent*. Upon receipt of a notice of prepayment pursuant to Section 2.9, the Administrative Agent shall promptly notify each Applicable Lender of the contents thereof and of such Lender's share of such prepayment based upon its Applicable Percentage

(6)     *General*. Any amount required to be prepaid on a date pursuant to Section 2.9 shall be due and payable together with any amount payable pursuant to Section 2.14 and accrued interest to such date on such amount in accordance with Section 2.5(4). For the avoidance of doubt, any prepayment of a B/A (or B/A Equivalent Note) shall be applied against the face amount (or undiscounted amount) thereof. Any prepayment pursuant to Sections 2.9(1) or (2) shall be applied within a Credit in the manner designated by the applicable Borrower. No prepayment of any Term Loan may be reborrowed.

**2.10    Fees.**

(1)     *Standby and Ticking Fees.*

(a)     The Revolving Borrower shall pay to the Administrative Agent for the account of and distribution to each Revolving Credit Lender a standby fee for the period commencing on the Closing Date to and excluding the Maturity Date (or such earlier date as the Revolving Credit Commitments shall have been terminated entirely) computed at a rate per annum equal to the Applicable Margin on the daily excess amount of the Revolving Credit Commitment of such Revolving Credit Lender over its Revolving Credit Exposure. Such standby fee shall be payable in arrears in respect of the most recently ended Fiscal Quarter on the third Business Day following each Quarterly Date, commencing on the third Business Day after the first Quarterly Date to occur after the Closing Date, and on the date on which the Revolving Credit Commitments terminate.

(b)     The Term Borrower shall pay to the Administrative Agent for the account of and distribution to each Term Credit Lender a ticking fee for the period commencing on January 1, 2017 to and excluding the Closing Date (or such earlier date as the Term Credit Commitments shall have been terminated entirely) computed at a rate per annum equal to 0.25% on the Term Credit Commitment of such Term Credit Lender. Such ticking fee shall be payable in arrears on the earlier of (i) the date on which the Term Credit Commitments terminate entirely and (ii) the Closing Date.

(c)     The Revolving Borrower shall pay to the Administrative Agent for the account of and distribution to each Revolving Credit Lender a ticking fee for the period commencing on January 1, 2017 to and excluding the Closing Date (or such earlier date as the Revolving Credit Commitments shall have been terminated entirely) computed at a rate per annum equal to 0.25% on the Revolving Credit Commitment of such Revolving Credit Lender. Such ticking fee shall be payable in arrears on the earlier of (i) the date on which the Revolving Credit Commitments terminate entirely and (ii) the Closing Date.

(d)     The standby and ticking fees set out in this section 2.10(1) shall be computed daily on the basis of a year of 365 or 366 days, as the case may be, and shall be payable for the actual number of days elapsed (with respect to the standby fee, including the first day of the applicable Fiscal Quarter (or, in respect of the first such payment, the Closing Date) and including the last day of the applicable period).

(2)     *Participation and Fronting Fees.*  The Revolving Borrower shall pay:

(a)     to the Administrative Agent for the account of each Revolving Credit Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the Applicable Margin for Letters of Credit of such Type on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Revolving Credit Commitment terminates and the date on which such Lender ceases to have any LC Exposure; and

(b)     to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.25% per annum on the daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements and that portion attributable to the LC Issuer) during the period from and including the Closing Date to but excluding the later of the date of termination of the Revolving Credit Commitments and the date on which there ceases to be any LC Exposure, as well as the Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.

Participation fees and fronting fees shall be (a) payable quarterly in arrears in respect of the most recently ended Fiscal Quarter on the third Business Day following each Quarterly Date and on the date on which the Revolving Credit Commitments terminate, and (b) computed daily on the basis of a year of 365 days or 366 days, as the case may be, and shall be payable for the actual number of days elapsed (including the first day of the applicable Fiscal Quarter (or, in respect of the first such payment, the Closing Date) and including the last day of the applicable period).  Participation and fronting fees accruing after the date on which the Revolving Credit Commitments terminate shall be payable on demand.

(3)     *Fees to Administrative Agent.*  The Borrowers shall pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in the Fee Letter.

(4)     *Payment of Fees.*  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent (or to the Issuing Bank, in the case of fees payable to it) for distribution, in the case of standby and participation fees, to the Lenders.  Fees paid shall not be refundable except in the case of manifest error in the calculation of any fee payment.

*Iovate Credit Agreement*

- 55 -

**2.11    Bankers' Acceptances.**

(1)    *Request for B/A Borrowings.*  Subject to the terms and conditions of this Agreement, a Borrower may request a Borrowing by presenting drafts for acceptance and purchase as B/As by the Lenders.  A Borrower shall not be entitled to obtain or roll over any B/A Borrowings or B/A Equivalent Loans at any time that a Default or an Event of Default has occurred and is continuing.

(2)    *Contract Period.*  No Contract Period with respect to a B/A to be accepted and  purchased hereunder shall extend beyond the Maturity Date.

(3)    *Lender as Power of Attorney.*  To facilitate availment of B/A Borrowings, each Borrower hereby appoint each Lender as its attorney to sign and endorse on its behalf (in accordance with a Borrowing Request relating to a B/A Borrowing), in handwriting or by facsimile or mechanical signature as and when deemed necessary by such Lender, blank forms of B/As in the form requested by such Lender. Each Lender shall maintain an adequate supply of blank forms of B/As for acceptance under this Agreement.  Each Borrower recognizes and agrees that all B/As signed or endorsed by a Lender on behalf of such Borrower shall bind such Borrower as fully and effectually as if signed in the handwriting of and duly issued by the proper signing officers of such Borrower.  Each Lender is hereby authorized (in accordance with a Borrowing Request relating to a B/A Borrowing) to issue such B/As endorsed in blank in such face amounts as may be determined by such Lender; provided that the aggregate amount thereof is equal to the aggregate amount of B/As required to be accepted and purchased by such Lender.  No Lender shall be liable for any damage, loss or other claim arising by reason of any loss or improper use of any such instrument except the gross negligence or wilful misconduct of the Lender or its officers, employees, agents or representatives.  Each Lender shall maintain a record with respect to B/As (a) received by it in blank hereunder, (b) voided by it for any reason, (c) accepted and purchased by it hereunder, and (d) cancelled at their respective maturities.  On request by or on behalf of a Borrower, a Lender shall cancel all forms of B/A which have been pre-signed or pre-endorsed on behalf of such Borrower and which are held by such Lender and are not required to be issued in accordance with such Borrower's irrevocable notice.  Alternatively, each Borrower agrees that, at the request of the Administrative Agent, such Borrower shall deliver to the Administrative Agent a "depository note" which complies with the requirements of the *Depository Bills and Notes Act* (Canada), and consents to the deposit of any such depository note in the book-based debt clearance system maintained by the Canadian Depository for Securities.

(4)    *B/A Signatory.*  Drafts of a Borrower to be accepted as B/As hereunder shall be signed as set out in Section 2.11(3).  Notwithstanding that any person whose signature appears on any B/A may no longer be an authorized signatory for any Lender or the applicable Borrower at the date of issuance of a B/A, such signature shall nevertheless be valid and sufficient for all purposes as if such authority had remained in force at the time of such issuance and any such B/A so signed shall be binding on such Borrower.

(5)    *B/A Amounts.*  Promptly following receipt of a Borrowing Request specifying a Borrowing by way of B/As, the Administrative Agent shall so advise the Lenders and shall advise each Lender of the aggregate face amount of the B/As to be accepted by it and the applicable Contract Period (which shall be identical for all Lenders).  In the case of B/A Borrowings under the Revolving Credit, the aggregate face amount of the B/As to be accepted by the Lenders shall be in a minimum aggregate amount of Cdn.$1,000,000 and shall be a whole multiple of Cdn.$100,000, and such face amount shall be in the Revolving Credit Lenders' pro rata portions of such Borrowing, provided that the Administrative Agent may, in its sole discretion, increase or reduce any Revolving Credit Lender's portion of such B/A Borrowing to the nearest Cdn.$100,000 without reducing the overall Revolving Credit Commitments.  In the case of B/A Borrowings under the Term Credit, the aggregate face amount of the B/As to be accepted by the Term Credit Lenders shall be in a minimum aggregate amount of Cdn.$1,000,000 and shall be a

whole multiple of Cdn.$100,000, and such face amount shall be in the Term Credit Lenders' pro rata portions of such Borrowing, provided that the Administrative Agent may in its sole discretion increase or reduce any Term Credit Lender's portion of such B/A Borrowing to the nearest Cdn.$100,000 without reducing the overall Term Credit Commitments.

(6)      *Acceptance of B/A.*  Upon acceptance of a B/A by a Lender, such Lender shall purchase, or arrange for the purchase of, each B/A from the applicable Borrower at the Discount Rate for such Lender applicable to such B/A accepted by it and provide to the Administrative Agent the Discount Proceeds therefor for the account of the applicable Borrower.  The Acceptance Fee payable by a Borrower to a Lender under Section 2.5 in respect of each B/A accepted by such Lender shall be set off against the Discount Proceeds payable by such Lender under Section 2.11.

(7)      *Lender's Rights Re B/A.*  Each Lender may at any time and from time to time hold, sell, rediscount or otherwise dispose of any or all B/As accepted and purchased by it.

(8)      *B/A Equivalent Loans.*  If a Lender notifies the Administrative Agent in writing that it is unable or unwilling to accept Bankers' Acceptances, such Lender shall, instead of accepting and purchasing Bankers' Acceptances, make a Loan (a "**B/A Equivalent Loan**") to the applicable Borrower in the amount and for the same term as the draft which such Lender would otherwise have been required to accept and purchase hereunder.  Each such Lender shall provide to the Administrative Agent the Discount Proceeds of such B/A Equivalent Loan for the account of the applicable Borrower.  Each such B/A Equivalent Loan shall bear interest at the same rate which would result if such Lender had accepted (and been paid an Acceptance Fee) and purchased (on a discounted basis) a Bankers' Acceptance for the relevant Contract Period (it being the intention of the parties that each such B/A Equivalent Loan shall have the same economic consequences for the Lenders and the applicable Borrower as the Bankers' Acceptance which such B/A Equivalent Loan replaces).  All such interest shall be paid in advance on the date such B/A Loan is made, and shall be deducted from the principal amount of such B/A Equivalent Loan in the same manner in which the Discount Proceeds of a Bankers' Acceptance would be deducted from the face amount of the Bankers' Acceptance.  Subject to repayment requirements, on the last day of the relevant Contract Period for such B/A Equivalent Loan, the applicable Borrower shall be entitled to convert each such B/A Equivalent Loan into another type of Loan, or to roll over each such B/A Equivalent Loan into another B/A Equivalent Loan, all in accordance with the applicable provisions of this Agreement.

(9)      *Notice of Intention to Issue B/As.*  With respect to each B/A Borrowing, at or before 10:00 a.m. two Business Days before the last day of the Contract Period of such B/A Borrowing, the applicable Borrower shall notify the Administrative Agent by irrevocable telephone notice, followed by a Borrowing Request on the same day giving notice of rollover, if such Borrower intends to issue B/As on such last day of the Contract Period to provide for the payment of such maturing B/A Borrowing.  If a Borrower fails to notify the Administrative Agent of its intention to issue B/As on such last day of the Contract Period, such Borrower shall provide payment to the Administrative Agent on behalf of the Lenders of an amount equal to the aggregate face amount of such B/A Borrowing on the last day of the Contract Period of thereof.  If a Borrower fails to make such payment, such maturing B/As shall be deemed to have been converted on the last day of the Contract Period into a Canadian Prime Loan in an amount equal to the face amount of such B/As.

(10)      *Upon Maturity of B/As.*  Each Borrower waives presentment for payment and any other defence to payment of any amounts due to a Lender in respect of a B/A accepted and purchased by it pursuant to this Agreement which might exist solely by reason of such B/A being held, at the maturity thereof, by such Lender in its own right, and no Borrower shall claim any days of grace if such Lender, as holder, sues such Borrower on the B/A for payment of the amount payable by such Borrower thereunder.  On the

last day of the Contract Period of a B/A, or such earlier date as may be required or permitted pursuant to the provisions of this Agreement, the applicable Borrower shall pay the Lender that has accepted and purchased such B/A the full face amount of such B/A and, after such payment, such Borrower shall have no further liability in respect of such B/A and such Lender shall be entitled to all benefits of, and be responsible for all payments due to third parties under, such B/A.

(11)    *Participation.*  If a Lender grants a participation in a portion of its rights under this Agreement to a Participant under Section 9.4(5), then, in respect of any B/A Borrowing, a portion thereof may, at the option of such Lender, be by way of Bankers' Acceptance accepted by such Participant.  In such event, the applicable Borrower shall upon request of the Administrative Agent or the Lender granting the participation execute and deliver a form of Bankers' Acceptance undertaking in favour of such Participant for delivery to such participant.

(12)    *Repayment of B/As.*  Any B/A Borrowing may be repaid by a Borrower in whole or in part prior to the expiry date of the Contract Period.  For the avoidance of doubt, the amount owing by a Borrower with respect to any B/A Borrowing shall unconditionally be the face amount of the B/As and/or undiscounted amount of the B/A Equivalent Loans in question, such that any prepayment shall not serve to reduce the prepaid interest cost of such B/A Borrowing.

## 2.12    Alternate Rate of Interest.

If prior to the commencement of any Interest Period for a LIBO Rate Borrowing or the commencement of any Contract Period for a B/A Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that:

(i)    adequate and reasonable means do not exist for ascertaining the LIBO Rate for such Interest Period; or

(ii)    there is no market for B/As; or

(b)    the Administrative Agent is advised by a Lender that:

(i)    the LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lender of making or maintaining its LIBO Rate Loans included in such Borrowing for such Interest Period; or

(ii)    the Discount Rate for such Contract Period will not adequately and fairly reflect the cost to such Lender of issuing or maintaining its B/As included in such Borrowing for such Contract Period,

then the Administrative Agent shall give written notice thereof to the Borrowers and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (A) any Borrowing Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a LIBO Rate Borrowing or B/A Borrowing, as applicable, shall be ineffective, and (B) if any Borrowing Request requests a LIBO Rate Borrowing or B/A Borrowing, as applicable, such Borrowing shall be made as a Base Rate Borrowing or Canadian Prime Borrowing, as applicable; provided that if the circumstances giving rise to such notice do not affect all the Lenders, then requests by a Borrower for LIBO Rate Borrowings or B/A Borrowings, as applicable, may be made to Lenders that are not affected thereby.

**2.13    Increased Costs; Illegality.**

(1)    *Compensation for Increased Costs.*  If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(b)    impose on any Lender or the Issuing Bank or the London interbank market any other condition affecting this Agreement (including the imposition on any Lender of, or any change to, any Indemnified Tax or other charge with respect to its Loans or any Letter of Credit or participation therein, or its obligation to make Loans or issue or participate in any Letter of Credit),

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrowers shall pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(2)    *Compensation for Reduced Rate of Return.*  If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's holding company or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital or liquidity adequacy and such Lender's desired return on capital), then from time to time the Borrowers shall pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered. Notwithstanding anything herein to the contrary, (a) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, and Basel Committee on Banking Supervision (or any successor or similar authority) or by United States, Canadian or foreign regulatory authorities, in each case pursuant to Basel III, and (b) the *Dodd-Frank Wall Street Reform and Consumer Protection Act* (United States) and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a Change in Law for purposes of this Section 2.13(2) regardless of the date enacted, adopted, issued or implemented.

(3)    *Certificate.*  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender as specified in Sections 2.13(1) or (2), together with a brief description of the Change of Law, shall be delivered to the Borrowers by such Lender, and shall be conclusive absent manifest error.  In preparing such certificate, a Lender shall be entitled to use averages and to make reasonable estimates, and shall not be required to "match contracts" or to isolate particular transactions. The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof. Notwithstanding anything to the contrary in this Section 2.13, (a) no Lender shall be entitled to receive any compensation pursuant to this Section 2.13 unless it shall be the general policy or

practice of such Lender to seek compensation from other similarly situated borrowers in the Canadian syndicated loan market with respect to its similarly affected loans under agreements with such borrowers having provisions similar to this Section 2.13 and (b) no Borrower shall be required to compensate a Lender pursuant to this Section for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect.

(4)    *Illegality.*  If any Lender determines that it is unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make or maintain any Loan (or to maintain its obligation to make any Loan), or to participate in, issue or maintain any Letter of Credit (or to maintain its obligation to participate in or to issue any Letter of Credit), or to determine or charge interest rates based upon any particular rate, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender with respect to the activity that is unlawful shall be suspended until such Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.  For the avoidance of doubt, such suspension shall occur notwithstanding that the activity in question was unlawful on the Closing Date.  Upon receipt of such notice, the applicable Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay (or, if conversion would avoid the activity that is unlawful, convert) any Loans, or take any necessary steps with respect to any Letter of Credit in order to avoid the activity that is unlawful.  Upon any such prepayment or conversion, the applicable Borrower shall also pay accrued interest on the amount so prepaid or converted.  Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

**2.14    Break Funding Payments.**

In the event of (a) the failure by a Borrower to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered by such Borrower pursuant hereto, (b) the payment or conversion of any LIBO Rate Loan other than on the last day of an Interest Period (including as a result of an Event of Default), or (c) the assignment of any Loan (including the assignment of any LIBO Rate Loan) other than on the last day of the Interest Period applicable thereto as a result of a request by a Borrower pursuant to Section 2.18, then, in any such event, the applicable Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a LIBO Rate Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest (excluding the Applicable Margin) which would have accrued on the principal amount of such Loan had such event not occurred, at the LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period and the interest rate which such Lender would bid were it to bid, at the commencement of such period, for U.S. Dollar deposits of a comparable amount and period from other banks in the eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.14 shall be delivered to the Borrowers by such Lender and shall be conclusive absent manifest error.  The applicable Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

**2.15    Taxes.**

(1)    *Gross-up for Taxes.*  Any and all payments by or on account of any obligation of a Borrower hereunder or under any Loan Document shall be made free and clear of and without deduction or

withholding for any Taxes except as required by applicable Laws; provided that if a Borrower or the applicable withholding agent shall be required to deduct or withhold any Taxes from such payments, then (a) in the case of Indemnified Taxes, the sum payable shall be increased as necessary so that, after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under Section 2.15), the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deduction or withholding been made, (b) such Borrower or the applicable withholding agent shall make such required deduction or withholding, and (c) such Borrower or the applicable withholding agent shall pay to the relevant Governmental Authority the full amount deducted or withheld in accordance with, and within the time limits prescribed by, applicable Law.

(2)      *Stamp and Other Taxes.*  In addition to the payments by a Borrower required by Section 2.15(1), such Borrower shall pay any and all present or future stamp or documentary Taxes or any other similar excise or property Taxes, charges or levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement to the relevant Governmental Authority in accordance with applicable Law.

(3)      *Indemnity for Taxes.*  Each Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of such Borrower hereunder or under any Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under Section 2.15(5)) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to a Borrower by a Lender or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(4)      *Evidence of Tax Payments.*  As soon as practicable after any payment of Indemnified Taxes described in Section 2.15(1) or (2) by a Borrower to a Governmental Authority, such Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(5)      *Certification.*

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to a Borrower, at the time or times reasonably requested in writing by such Borrower, such properly completed and executed documentation reasonably requested in writing by such Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested in writing by a Borrower, shall deliver such other documentation prescribed by applicable Law (which, for purposes of this Section 2.15, shall include FATCA) or reasonably requested in writing by the Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements, provided that notwithstanding any of the foregoing in this Section 2.15(5), no Lender shall be required to provide any documentation or information of any kind which it is not permitted to provide under applicable Law.

*Iovate Credit Agreement*

(ii)     If a payment made to a Lender under any Loan would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall, in each case, to the extent it is legally entitled to do so, deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 2.15(5)(ii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(6)     *Treatment of Certain Refunds.*  If any Lender determines in its sole discretion that it has received a refund of any Taxes as to which it has been indemnified by a Borrower or with respect to which a Borrower has paid additional amounts pursuant to this Section 2.15, it shall pay to such Borrower as promptly as reasonably practicable an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section 2.15 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Lender and applicable withholdings and other deductions, as the case may be, and without interest (other than any net after-Tax interest paid by the relevant Governmental Authority with respect to such refund); provided, however, that the Borrower, upon the written request of such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.15(6), in no event will any Lender be required to pay any amount to a Borrower pursuant to this Section 2.15(6) the payment of which would place the Lender in a less favourable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  Nothing in this Section 2.15(6) shall require any Lender to make available its tax returns or any other information that it deems to be confidential or to arrange its affairs in any particular manner.

**2.16    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.**

(1)     *Payments.*  Each Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, amounts payable under any indemnity contained herein, or otherwise hereunder) prior to 12:00 noon, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at the Payment Office, except that payments pursuant to Sections 2.10(2)(b), 2.13, 2.14, 2.15 and 9.3 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension, provided that, in the case of any payment with respect to a LIBO Rate Loan, the date for payment shall be advanced to the next preceding Business Day if the next succeeding

Business Day is in a subsequent calendar month.  All payments under Section 2.16 in respect of LIBOR Rate Loans and Base Rate Loans and in respect of U.S. Dollar denominated LCs shall be made in U.S. Dollars.  All other payments under Section 2.16 shall be made in U.S. Dollars.  Each Borrower hereby authorizes the Administrative Agent to debit the general operating bank account of such Borrower which is maintained with the Administrative Agent to effect any payment due to the Lenders or the Administrative Agent pursuant to this Agreement.

(2)     *Allocation of Insufficient Funds.*  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (a) first, towards payment of interest and fees then due hereunder, rateably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (b) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, rateably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(3)     *Allocation of Funds in Event of Default.*  If an Event of Default shall have occurred and be continuing, and the maturity of the Loans shall have been accelerated pursuant to Section 7.1, all payments or proceeds received by the Administrative Agent hereunder or under any other Transaction Document in respect of any of the Secured Liabilities (including, but not limited to, Secured Cash Management Obligations and Secured Hedging Arrangements that are owing to any Secured Cash Management Provider or Secured Hedge Counterparty, as applicable), including, but not limited to all proceeds received by the Administrative Agent in respect of any sale of, any collection from, or other realization upon, all or any part of the Collateral, shall be applied as follows:

(a)     first, to the payment of all reasonable and documented costs and expenses of such sale, collection or other realization, including reasonable and documented compensation to the Administrative Agent and its agents and outside counsel, and all other reasonable and documented expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith, and all amounts for which the Administrative Agent is entitled to indemnification hereunder or under any other Loan Document (in its capacity as Administrative Agent and not as a Lender), and to the payment of all reasonable and documented costs and expenses paid or incurred by the Administrative Agent in connection with the exercise of any right or remedy hereunder or under any other Loan Document, all in accordance with the terms hereof or thereof;

(b)     second, to the extent of any excess of such payments or proceeds, to the rateable payment of any accrued interest, fee or commission due but unpaid under this Agreement;

(c)     third, to the extent of any excess of such payments or proceeds, to the rateable payment of the Loans, Cover for Letters of Credit, the Secured Hedge Obligations and the Secured Cash Management Obligations;

(d)     fourth, to the extent of any excess of such payments or proceeds, to the payment of any other amount due but unpaid under the Transaction Documents; and

(e)     fifth, to the extent of any excess of such payments or proceeds, to the payment to or upon the order of the Borrowers or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

*Iovate Credit Agreement*

Notwithstanding the foregoing, in no event shall payments or proceeds received from a Guarantor or in respect of its Collateral be applied against Excluded Swap Obligations of such Guarantor.

(4)     *Sharing.*  If any Secured Party shall obtain payment in respect of any of its Secured Liabilities (including by way of set-off or counterclaim) resulting in such Secured Party receiving payment of a greater proportion of the aggregate amount of its Secured Liabilities than the proportion received by any other Secured Party on its Secured Liabilities, then the Secured Party receiving such greater proportion shall purchase (for cash at face value) participations in the Secured Liabilities owed to other Secured Parties (as applicable) to the extent necessary so that the benefit of all such payments shall be shared by the Secured Parties rateably in accordance with the aggregate amount of their respective Secured Liabilities; provided that (a) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (b) this Section 2.16(4) shall not apply to:

(i)     any payment made by a Borrower pursuant to and in accordance with the express terms of this Agreement;

(ii)    any payment obtained by a Lender as consideration for the assignment of, or sale of a participation in, any of its Loans (including participations in LC Disbursements and Swingline Loans);

(iii)   any payment made by a Borrower under or in connection with any Secured Cash Management Services when no Event of Default has occurred and is continuing;

(iv)    netting under or as between Secured Hedge Arrangements; and

(v)     any Permitted Hedge Payment.

The Borrowers hereby consent to the foregoing and agree, to the extent they effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.

(5)     *Assumption of Payment; Reimbursement of Agent.*  Unless the Administrative Agent shall have received written notice from a Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if a Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the applicable rate for Revolving Loans that are Canadian Prime Loans (if such amount is denominated in Canadian Dollars) or the applicable rate for Base Rate Loans (if such amount is denominated in U.S. Dollars).

(6)     *Failure of Lender to Make Payment.*  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.16(5), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section 2.16(5) until all such unsatisfied obligations are fully paid.

(7)    *No Deemed Obligation for Source of Funds.*  Nothing in this Agreement shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner

(8)    *Joint and Several Liability.*  Any amount hereunder that is stipulated as being payable by the Borrowers shall constitute a joint and several liability of the Term Borrower and the Revolving Borrower.

## 2.17    Currency Indemnity.

If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "**Judgment Currency**") any amount  due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given.  For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office in Toronto, Ontario.  In the event that there is a change in the rate of exchange prevailing between the Business Day immediately preceding the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrowers shall, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due.  If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrowers shall indemnify and save the Administrative Agent and the Lenders harmless from and against all loss or damage arising as a result of such deficiency.  This indemnity shall constitute an obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

## 2.18    Mitigation Obligations; Replacement of Lenders.

(1)    *Mitigation.*  If any Lender requests compensation under Section 2.13, or if a Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Lender Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future, and (b) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The Borrowers shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(2)    *Replacement of Lender.*  If any Lender requests compensation under Section 2.13, or if a Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense (including the processing and recording

fee contemplated by Section 9.4(2)) and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.4), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (a) if such assignee is not otherwise a Lender, such applicable Borrower shall have received the prior written consent of the Administrative Agent (and, if a Revolving Credit Commitment is being assigned, the Issuing Bank and Swingline Lender), which consent shall not unreasonably be withheld, (b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or such Borrower (in the case of all other amounts), and (c) in the case of any such assignment resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling a Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this Section 2.18(2) may be effected pursuant to an Assignment and Assumption executed by the Term Borrower, the Administrative Agent and the assignee, and that the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective.

**2.19    Letters of Credit.**

(1)      *General*.  Subject to the terms and conditions set out herein, the Revolving Borrower may request the issuance of Letters of Credit as an availment of the Revolving Credit Commitment, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time up to the Maturity Date.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Revolving Borrower to, or entered into by the Revolving Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall govern.

(2)      *Notice of Issuance, Amendment, Renewal, Extension, Certain Conditions*.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Revolving Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (at least five Business Days in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension, the date on which such Letter of Credit is to expire (which shall comply with Section 2.19(3)), the amount and currency (Canadian Dollars and U.S. Dollars only) of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.  If requested by the Issuing Bank, the Revolving Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit, the Revolving Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension, (a) the aggregate LC Exposure shall not exceed U.S.$5,000,000, and (b) the aggregate Revolving Credit Exposure shall not exceed the total Revolving Credit Commitments.

(3)      *Expiration Date*.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (a) the date that is one year after the date of the issuance of such Letter of Credit (or, in the case

of any renewal or extension thereof, one year after such renewal or extension) and (b) the date that is five Business Days prior to the Maturity Date; provided that a Letter of Credit for which LC Cover has been provided may expire at any time; provided further that any Letter of Credit may contain automatic renewal provisions agreed upon by the Revolving Borrower and the Issuing Bank pursuant to which the expiration date of such Letter of Credit shall automatically be extended for a period of up to 12 months (but, subject to the immediately preceding proviso, not later than the date set forth in clause (b) above), subject to a right on the part of the Issuing Bank to prevent any such renewal from occurring by giving notice to the beneficiary in advance of any such renewal.

(4)    *Participations*.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Revolving Credit Lender, and each Revolving Credit Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Revolving Credit Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Revolving Credit Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Revolving Borrower on the date due as provided in Section 2.19(5), or of any reimbursement payment required to be refunded to the Revolving Borrower for any reason.  Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.19(4) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(5)    *Reimbursement*.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Revolving Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon on the date that such LC Disbursement is made, if the Revolving Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m. on such date, or, if such notice has not been received by the Revolving Borrower prior to 10:00 a.m. on such date, then not later than 12:00 noon on (a) the Business Day that the Revolving Borrower receives such notice, if such notice is received prior to 10:00 a.m. on the day of receipt, or (b) the Business Day immediately following the day that the Revolving Borrower receives such notice, if such notice is not received prior to 10:00 a.m. on the day of receipt; provided that the Revolving Borrower may, subject to the conditions to borrowing set out herein, request in accordance with Section 2.3 that such payment be financed with a Canadian Prime Borrowing or a Base Rate Borrowing in an equivalent amount and, to the extent so financed, the Revolving Borrower's obligation to make such payment shall be discharged and replaced by the resulting Canadian Prime Borrowing, Base Rate Borrowing or Swingline Borrowing.  If the Revolving Borrower fails to make such payment when due, the Administrative Agent shall notify each Revolving Credit Lender of the applicable LC Disbursement, the payment then due from the Revolving Borrower in respect thereof and such Revolving Credit Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Revolving Credit Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Revolving Borrower, and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Revolving Credit Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Revolving Borrower pursuant to this Section 2.19(5), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Revolving Credit Lenders have made payments pursuant to this Section 2.19(5) to reimburse the Issuing Bank, then to such Revolving Credit Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Revolving Credit Lender pursuant to this Section 2.19(5) to reimburse the Issuing Bank for any LC

Disbursement (other than the funding of Canadian Prime Borrowings or Base Rate Borrowings as contemplated above) shall not constitute a Loan and shall not relieve the Revolving Borrower of its obligation to reimburse such LC Disbursement.

(6)    *Obligations Absolute*.  The Revolving Borrower's obligation to reimburse LC Disbursements as provided in Section 2.19(5) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (a) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein or herein, (b) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (c) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (d) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.19, constitute a legal or equitable discharge of, or provide a right of set-off against, the Revolving Borrower's obligations hereunder.  Neither the Administrative Agent, the Revolving Credit Lenders nor the Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Revolving Borrower to the extent of any direct damages (as opposed to indirect, special, punitive or consequential damages, claims in respect of which are hereby waived by the Revolving Borrower to the extent permitted by applicable Law) suffered by the Revolving Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or wilful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the Revolving Borrower and the Lenders agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(7)    *Disbursement Procedures*.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Revolving Borrower by telephone (confirmed in writing) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Revolving Borrower of its obligation to reimburse the Issuing Bank and the Revolving Credit Lenders with respect to any such LC Disbursement.

(8)    *Interim Interest*.  If the Issuing Bank shall make any LC Disbursement, then, unless the Revolving Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Revolving Borrower reimburses such LC Disbursement, at the rate then applicable to Revolving Loans that are Canadian Prime Loans (if in Canadian Dollars) or Base Rate Loans (if in U.S. Dollars).  Interest accrued pursuant to this Section

2.19(8) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Credit Lender pursuant to Section 2.19(5) to reimburse the Issuing Bank shall be for the account of such Revolving Credit Lender to the extent of such payment.

(9)  *Replacement of the Issuing Bank*.  The Issuing Bank may be replaced at any time by written agreement among the Revolving Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Revolving Credit Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Revolving Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank.  From and after the effective date of any such replacement, (a) the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter, and (b) references herein to the term "**Issuing Bank**" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(10)  *Cash Collateralization*.  If any Event of Default shall occur and be continuing, on the Business Day that the Revolving Borrower receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Lenders with LC Exposure representing greater than 50% of the total LC Exposure) demanding the deposit of Cover, the Revolving Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Revolving Credit Lenders, an amount in cash equal to the LC Exposure as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in Section 7.1(g), 7.1(h), or 7.1(i).  Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Revolving Borrower under this Agreement.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Revolving Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the Reimbursement Obligations at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Lenders with LC Exposure representing greater than 50% of the total LC Exposure), be applied to satisfy other obligations of the Borrowers under this Agreement.  If the Revolving Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Revolving Borrower within three Business Days after all Events of Default have been cured or waived or the total LC Exposure is reduced to nil.

**2.20    Swingline Loans.**

(1)  *General*.  Subject to the terms and conditions set out herein and as part of its Revolving Credit Commitment, the Swingline Lender commits to make Loans in Canadian Dollars or U.S. Dollars (each such Loan made under this Section 2.20, a "**Swingline Loan**") to the Revolving Borrower from time to time during the period commencing on the Closing Date and ending on the Maturity Date (such commitment being the "**Swingline Commitment**"), in an aggregate principal amount at any time

outstanding up to U.S.\$5,000,000; provided that the Swingline Lender shall not be required to extend further credit hereunder if such extension would result in (a) the Swingline Exposure at such time exceeding the amount of the Swingline Commitment, (b) the aggregate of the Revolving Credit Exposures exceeding the total Revolving Credit Commitments, or (c) a Swingline Loan refinancing an outstanding Swingline Loan. Within the foregoing limits and subject to the terms and conditions set out herein, the Revolving Borrower may borrow, prepay and reborrow Swingline Loans.

(2)     *Overdrafts*. Subject to the terms and conditions set out herein, the Revolving Borrower shall be entitled to obtain Swingline Loans by way of overdraft on the Swingline Accounts, and at any given time the US \$ Amount of the outstanding principal amount of all Swingline Loans shall be equal to the aggregate amount by which the Swingline Accounts are overdrawn. Swingline Loans shall bear interest at a rate per annum equal to the rate applicable to a Canadian Prime Borrowing (if in Canadian Dollars) or at a rate per annum equal to the rate applicable to a Base Rate Loan (if in U.S. Dollars). Interest shall be payable on such dates, not more frequent than monthly, as may be specified by the Swingline Lender and in any event on the Maturity Date. The Swingline Lender shall be responsible for invoicing the Revolving Borrower for such interest. The interest payable on Swingline Loans is solely for the account of the Swingline Lender (subject to Section 2.20(3) below).

(3)     *Participations in Swingline Loans.* The Swingline Lender may by written notice given to the Administrative Agent not later than 10:00 a.m. on any Business Day require the Revolving Credit Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Credit Lenders will participate. Promptly upon receipt of such notice, the Administrative Agent shall give notice thereof to each Revolving Credit Lender, specifying in such notice such Revolving Credit Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Credit Lender shall upon receipt of notice as provided above, pay to the Administrative Agent, for the account of the Swingline Lender, such Revolving Credit Lender's Applicable Percentage of such Swingline Loan or Loans. Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to Section 2.20 is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Revolving Credit Lender shall comply with its obligation under Section 2.20 by wire transfer of immediately available funds with respect to Loans made by such Revolving Credit Lender, and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Credit Lenders. The Administrative Agent shall notify the Revolving Borrower of any participations in any Swingline Loan acquired pursuant to Section 2.20, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Revolving Borrower (or other party on behalf of the Revolving Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent. Any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Credit Lenders that shall have made their payments pursuant to Section 2.20 and to the Swingline Lender, as their interests may appear. The purchase of participations in a Swingline Loan pursuant to Section 2.20 shall not relieve the Revolving Borrower of any default in the payment thereof. Notwithstanding the foregoing, a Revolving Credit Lender shall not have any obligation to acquire a participation in a Swingline Loan pursuant to this Section 2.20 if an Event of Default shall have occurred and be continuing at the time such Swingline Loan was made and such Lender shall have notified the Swingline Lender in writing, at least one Business Day prior to the time such Swingline Loan was made, that such Event of Default has occurred and that such Lender will not acquire participations in Swingline Loans made while such Event of Default is continuing.

**2.21    Defaulting Lenders.**

Notwithstanding any provision of this Agreement to the contrary, if any Lender is a Defaulting Lender, then the following provisions shall apply to such Lender for so long as it remains a Defaulting Lender:

(a)    fees shall cease to accrue pursuant to Section 2.10(1) on the unfunded portion of the Revolving Credit Commitment of such Defaulting Lender;

(b)    the Revolving Credit Exposure and Term Credit Exposure of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.2); provided that any waiver or amendment which affects such Defaulting Lender differently than other Lenders generally shall require the consent of such Defaulting Lender;

(c)    any amount owing by a Defaulting Lender to the Administrative Agent or another Lender that is not paid when due shall bear interest at the interest rate applicable to Canadian Prime Loans or Base Rate Loans under the Revolving Credit, as applicable;

(d)    any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender other than in respect of the assignment of such Defaulting Lender's Loans and Commitments) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated account and, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second, pro rata, to the payment of any amounts owing by such Defaulting Lender to the Issuing Bank or Swingline Lender hereunder, (iii) third, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, (iv) fourth, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement (the amount of such cash collateral not to exceed the Revolving Credit Commitment of such Defaulting Lender minus the outstanding principal amount of such Defaulting Lender's Revolving Loans), (v) fifth, to the payment of any other amounts owing to the Lenders or the Issuing Bank or the Swingline Lender hereunder, (vi) sixth, to the payment of any amounts owing to a Borrower as a result of any judgment of a court of competent jurisdiction obtained by such Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and (vii) seventh, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a prepayment of the principal amount of any Loans or Reimbursement Obligations in respect of Letters of Credit with respect to which a Defaulting Lender has funded its participation obligations, such payment shall be applied solely to prepay the Loans of, and Reimbursement Obligations owed to, all Lenders other than Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans, or Reimbursement Obligations owed to, any Defaulting Lender;

(e)    if a Defaulting Lender is an Insolvent Defaulting Lender, any amount payable to such Defaulting Lender hereunder may, in lieu of being distributed pursuant to Section 2.21(d), be retained by the Administrative Agent to collateralize indemnification and

Reimbursement Obligations of such Defaulting Lender hereunder in an amount determined by the Administrative Agent, acting reasonably;

(f)      If any Swingline Loans or Letters of Credit are outstanding at the time a Lender becomes a Defaulting Lender, then:

(i)      all or any part of the pro rata share of such Defaulting Lender in respect of the outstanding Swingline Loans and Letters of Credit shall be reallocated among the Revolving Lenders which are not Defaulting Lenders ("**Non-Defaulting Lenders**") in accordance with their respective Revolving Credit Commitments, provided that any such reallocation shall not cause any Non-Defaulting Lender to exceed its Revolving Credit Commitment;

(ii)     if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Revolving Borrower shall within five (5) Business Days following notice by the Agent (x) first, prepay such outstanding Swingline Loans, and (y) second, cash collateralize for the benefit of the Issuing Bank the Revolving Borrower's obligations corresponding to such Defaulting Lender's pro rata share of the outstanding Letters of Credit (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 2.21(h), for so long as such Letters of Credit are outstanding;

(iii)    upon any reallocation pursuant to clause (i) above, the fees payable to the Lenders pursuant to Section 2.10(2)  shall be adjusted in accordance with such Non-Defaulting Lenders' Revolving Credit Commitment; and

(iv)     if all or any portion of such Defaulting Lender's pro rata share of the outstanding Letters of Credit is neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of the Issuing Bank or any other Lender hereunder, all fees payable under Section 2.10(2) with respect to such Defaulting Lender's pro rata share of the outstanding Letters of Credit shall be payable to the Issuing Bank until and to the extent that such LC Exposure is reallocated and/or cash collateralized.

(g)      So long as any Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure and the Defaulting Lender's then outstanding pro rata share of the outstanding Letters of Credit will be 100% covered by the Revolving Credit Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Revolving Borrower in accordance with Section 2.21(h), and participating interests in any such newly made Swingline Loan or any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.21(f) (and such Defaulting Lender shall not participate therein);

(h)      If required by Section 2.21(f)(ii), the Revolving Borrower shall deposit in an account with the Agent, in the name of the Administrative Agent and for the benefit of the Revolving Credit Lenders (the "**LC Collateral Account**"), an amount in cash equal to such Defaulting Lender's pro rata share of the outstanding Letters of Credit (after giving effect to any partial reallocation pursuant to Section 2.21(f)(i)). Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the

Obligations of the Revolving Borrower under the Loan Documents. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Revolving Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the Reimbursement Obligations at such time or, if the maturity of the Loans has been accelerated (and (i) only if, after giving effect thereto, the remaining cash collateral shall be less than the aggregate LC Exposure of all of the Defaulting Lenders and (ii) subject to the consent of the Issuing Bank) be applied to satisfy other obligations of the Revolving Borrower under this Agreement. Such deposit shall be returned to the Borrower as promptly as practicable to the extent that, after giving effect to such return, the Issuing Bank shall not have any exposure in respect of any outstanding Letters of Credit that is not fully covered by the Revolving Credit Commitments of Non-Defaulting Lenders and/or the remaining cash collateral.

(i)    If the Administrative Agent, the Revolving Borrower, the Swingline Lender and the Issuing Bank each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure and Letter of Credit Exposure of the Revolving Credit Lenders shall be readjusted to reflect the inclusion of such Revolving Credit Lender's Commitment and on such date such Revolving Credit Lender shall purchase at par such of the Loans of the other Revolving Credit Lenders (other than the Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Revolving Credit Lender to hold such Revolving Credit Loans in accordance with its Revolving Credit Commitment.

Except as otherwise expressly provided in this Section 2.21, no Revolving Credit Commitment of any other Lender shall be increased or otherwise affected, and performance by a Revolving Borrower of its obligations hereunder and the other Loan Documents shall not be excused or otherwise modified as a result of any Lender becoming a Defaulting Lender. The rights and remedies against a Defaulting Lender under this Section 2.21 are in addition to other rights and remedies which a Borrower may have against such Defaulting Lender as a result of it becoming a Defaulting Lender and which the Administrative Agent or any other Lender may have against such Defaulting Lender with respect thereto.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

### 3.1    Representations and Warranties of the Borrowers.

In order to induce the Administrative Agent and the Lenders to enter into this Agreement, to make any Loans hereunder and to issue any Letters of Credit hereunder, the Borrowers represent and warrant to the Administrative Agent and each Lender the following on the date of each Borrowing (other than a rollover or conversion), subject to updates as provided in Section 5.1(1)(k).

(1)    *Organization; Powers*. Each Credit Party (a) is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction) in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to

result in a Material Adverse Effect, is qualified to do business in, and (to the extent the concept is applicable in such jurisdiction) is in good standing in, every jurisdiction where such qualification is required.

(2)    *Authorization; Enforceability*.  The Transactions to be entered into by each Credit Party are within the Credit Parties' corporate or partnership powers and have been duly authorized by all necessary corporate, partner and shareholder action, as applicable.  This Agreement and the other Loan Documents have been duly executed and delivered by each Credit Party party thereto and constitute legal, valid and binding obligations of each such Credit Party, enforceable against each such Credit Party in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(3)    *Governmental Approvals; No Conflicts*.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except as disclosed in Schedule 3.1(3) and except for filings necessary to perfect Liens created under the Loan Documents, (b) will not violate any applicable Law or the charter, by-laws or other organizational documents of any Credit Party or any order of any Governmental Authority, except with respect to applicable Law or order of any Government Authority and the use of proceeds of Loans, to the extent any such violations would be immaterial, (c) will not violate or result in a default under any indenture or agreement governing Indebtedness or other material instrument binding upon any Credit Party or their respective assets, or give rise to a right thereunder to require any payment to be made by any Credit Party, except to the extent any such defaults or violations, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect and (d) will not result in the creation or imposition of any Lien on any asset of any Credit Party, except for any Lien arising in favour of the Administrative Agent, for the benefit of the Secured Parties, under the Loan Documents.

(4)    *Financial Condition; No Material Adverse Effect.*

(a)    The Term Borrower has furnished to the Lenders the consolidated balance sheets and statements of income, retained earnings and changes in financial position of the Initial Target (i) as of and for the Fiscal Years ended December 31, 2014 and December 31, 2015, reported on by its auditors, and (ii) as of and for the Fiscal Quarters and the portion of the Fiscal Year ended March 31, 2016 and June 2016.  Such financial statements present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of the Initial Target as of the applicable dates and for the applicable periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited statements.

(b)    Any subsequent financial statements delivered pursuant to Section 5.1(1) will present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of the Term Borrower as of the applicable dates and for the applicable periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited statements.

(c)    Since December 31, 2015, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(d)    Neither the Confidential Information Memorandum nor any of the other reports, financial statements, certificates or other written information furnished by or on behalf of any Group Party to any Arranger, the Administrative Agent or any Lender in connection with

the negotiation of this Agreement or any other Loan Document, included herein or therein or furnished hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made; <u>provided</u> that with respect to forecasts and financial information, each Borrower represents only that such information was prepared in good faith based upon assumptions believed by it to be reasonable at the time so furnished and, if such projected financial information was furnished prior to the Closing Date, as of the Closing Date (it being understood and agreed that any such projected financial information may vary from actual results and that such variations may be material).

(e)     The Term Borrower has delivered to the Lenders the unaudited consolidated balance sheet and statements of income of the Initial Target, accompanied by a sources and uses of funds for the Transaction on the Effective Date.

(5)     *Litigation.*

(a)     Except as disclosed in Schedule 3.1(5), and except for environmental-related matters (which are dealt with in Section 3.1(17)), there are no actions, suits or proceedings (including any Tax-related matter) by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened in writing against or affecting any of the Group Parties (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than as described in Schedule 3.1(17)), or (ii) that involve this Agreement, any other Loan Document or the Transactions.

(b)     Since the Effective Date, there has been no change in the status of the matters described in Schedule 3.1(17) that, individually or in the aggregate, has resulted in a Material Adverse Effect.

(6)     *Compliance with Laws.*  Each Group Party is in compliance with all Laws applicable to it or its property except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(7)     [Reserved].

(8)     *No Default.*  No Default has occurred and is continuing.

(9)     *Taxes.*  Each Group Party has filed or caused to be filed when due all material Tax returns and reports required to have been filed and has paid or caused to be paid when due all material Taxes required to have been paid by it (including all instalments with respect to the current period) and has made adequate provision for Taxes for the current period, except Taxes that are being contested in good faith by appropriate proceedings and for which such Group Party, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

(10)     *Titles to Real Property.*  The Group Parties have indefeasible fee simple title to their respective owned real properties, and with respect to leased real properties, good title to the leasehold estate with respect thereto, pursuant to valid and enforceable leases, free and clear of all Liens except

Permitted Liens. Set forth on Schedule 3.1(10) is (a) all real property owned by a Credit Party as of the most recent Reference Date with a Fair Market Value of U.S.$1,000,000 or more and (b) all Material Leasehold Interests as of the most recent Reference Date.

(11)    *Titles to Personal Property.* The Group Parties have title to their respective owned personal properties, and with respect to leased personal properties, title to the leasehold estate with respect thereto, pursuant to valid and enforceable leases, free and clear of all Liens except Permitted Liens. All registrations listed in Schedule 3.1(11) pertain to Permitted Liens.

(12)    *Pension Plans.*

(a)    Each Pension Plan is duly registered under the Income Tax Act and applicable pension standards legislation and has been administered in all material respects in accordance with applicable Law and the terms of such plan. All material obligations of each Credit Party (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Pension Plans and the funding agreements thereunder have been performed on a timely basis. There are no outstanding disputes concerning the assets of any Pension Plan and there have been no improper withdrawals of any assets of the Pension Plans. All assessments owed to the Pension Benefits Guarantee Fund established under the *Pension Benefits Act* (Ontario), or other assessments or payments required under similar legislation in any other jurisdiction have been paid when due in respect of each Pension Plan.

(b)    In respect of each Pension Plan that is a Defined Benefit Plan, (i) with respect to any such Defined Benefit Plan, the plan's name, registration number and jurisdiction of registration are disclosed on Schedule 3.1(12), (ii) a copy of the most recently prepared actuarial valuation report for the plan has been provided by the Borrowers to the Administrative Agent and the Lenders, (iii) no changes have occurred since the date of the most recently prepared actuarial valuation report for the plan or are reasonably expected to occur which would materially adversely affect the conclusion set out in the most recently prepared actuarial valuation report, and (iv) no events have occurred which could reasonably be expected to result in a wind-up or termination of the plan, in whole or in part.

(c)    All employee and employer contributions (including special payments and any other payments in respect of any funding deficiencies or shortfalls) or premiums required to have been remitted to the Pension Plans under the terms of the applicable plan and applicable Law have been properly withheld and remitted to the funding arrangement for the plan in a timely manner.

(d)    None of the Credit Parties has incurred any liability with respect to a pension plan subject to Title IV of United States Employee Retirement Income Security Act of 1974, as amended (including as a result of its affiliation with an entity required to be aggregated with any Credit Party pursuant to Section 414(b) of the Code) which could reasonably be expected to result in a Material Adverse Effect.

(13)    [Reserved.]

(14)    *Subsidiaries.* As of the Closing Date, Schedule 3.1(14) correctly sets forth:

(a)     the legal name of each Group Party and its form of legal entity and jurisdiction of organization;

(b)     the Equity Securities issued and outstanding by each Group Party, and the registered and beneficial owners thereof;

(c)     the Equity Securities owned by each Group Party; and

(d)     a corporate organizational chart of Holdco and its subsidiaries.

Except as described in Schedule 3.1(14), as of the Closing Date, no Group Party owns any Equity Securities or debt securities which are convertible into, or exchangeable for, Equity Securities of any other Person.  Unless otherwise indicated in Schedule  3.1(14), as of the Closing Date, there are no outstanding options, warrants or other rights to purchase Equity Securities of any Group Party, and all such Equity Securities so owned are duly authorized, validly issued and fully paid and non-assessable, and are free and clear of all Liens, except for Permitted Liens.

(15)     *Insurance*.  The Group Parties maintain insurance policies and coverage in compliance with Section 5.1(9).  Such insurance coverage is provided under valid, outstanding and enforceable policies.  The certificate of insurance delivered to the Administrative Agent pursuant to Section 4.2(6) contains an accurate and complete description in all material respects of all material policies of insurance owned or held by each Group Party on the Closing Date.

(16)     *Solvency*.  The Group Parties, taken as a whole and after giving effect to the Transactions, are not insolvent on the Closing Date.

(17)     *Environmental Matters*.  Except as disclosed to the Lenders in Schedule 3.1(17):

(a)     *Environmental Laws, Etc*.  Neither any property of the Group Parties nor the Group Parties' operations conducted thereon violate any applicable Environmental Laws, which violation could reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(b)     *Notices, Permits, Etc*.  All notices, permits, licenses or similar authorizations, if any, required to be obtained or filed by the Group Parties in connection with the operation or use of any and all property of the Group Parties, including but not limited to past or present treatment, transportation, storage, disposal or Release of Hazardous Materials into the environment, have been duly obtained or filed, except to the extent the failure to obtain or file such notices, permits, licenses or similar authorizations could not reasonably be expected to have a Material Adverse Effect, or could not reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(c)     *Hazardous Substances Carriers*.  All Hazardous Materials generated at any and all properties of the Group Parties have been treated, transported, stored and disposed of while under the ownership, direction or control of any Credit Party only by carriers maintaining valid permits under Environmental Laws applicable to them, except to the extent the failure to have such Hazardous Materials transported, treated or disposed of by such carriers could not reasonably be expected to have a Material Adverse Effect, and

only at treatment, storage and disposal facilities maintaining valid permits under applicable Environmental Laws, which carriers and facilities have been and are operating in compliance with such permits, except to the extent the failure to have such Hazardous Materials treated, transported, stored or disposed of at such facilities, or the failure of such carriers or facilities to so operate, could not reasonably be expected to have a Material Adverse Effect or could not reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(d)     *Hazardous Materials Disposal*.  To the knowledge of the Borrowers, no Hazardous Materials have been disposed of or otherwise released and there has been no threatened Release of any Hazardous Materials on or to any property of the Group Parties other than in compliance with Environmental Laws, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect or which could not reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(e)     *No Contingent Liability*.  The Group Parties (to the knowledge of the Borrowers in the case of any period prior to the Closing Date) have no material contingent liability by contract or, to the knowledge of the Borrowers, by operation of law, in connection with any Release or threatened Release of any Hazardous Materials into the environment except contingent liabilities which could not reasonably be expected to result in a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Release or threatened Release.

(18)    *Employee Matters.*

(a)     Except as set out in Schedule 3.1(18), as of the most recent Reference Date none of the Credit Parties is party to any collective bargaining agreement with respect to their respective employees.  There are no strikes, slowdowns or work stoppages pending or, to the best knowledge of the Borrowers, threatened against the Group Parties, or their respective employees, which could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)     Each of the Group Parties has (to its knowledge in the case of any period prior to the Closing Date) withheld from each payment to each of their respective officers, directors and employees the amount of all Taxes, including income tax, Canada or Quebec Pension Plan contributions, as applicable, employment insurance premiums and other payments and deductions required to be withheld therefrom, and has paid the same to the proper taxation or other receiving authority in accordance with applicable Law, except where the failure to make such withholdings and/or payments would not be material.  No Group Party is subject to any claim by or asserted liability to any of their respective officers, directors or employees for salary (including vacation pay) or benefits which would rank in whole or in part pari passu with or prior to the Liens created by the Security Documents.

(19)    *Fiscal Year*.  The Fiscal Year ends on  December 31st of each calendar year, and the Fiscal Quarters end on the last day of each of March, June, September and December of each calendar year.

(20)    *Intellectual Property Rights.*  Except as could not reasonably be expected to have a Material Adverse Effect, each Group Party is the registered and beneficial owner of, with good and marketable title, free of all Liens other than Permitted Liens to, or has a valid license to use  all patents, patent applications, trade marks, trade mark applications, trade names, service marks, copyrights, industrial designs, integrated circuit topographies, or other proprietary rights with respect to the foregoing and other similar property, necessary for the conduct of its business.  Except as could not reasonably be expected to have a Material Adverse Effect, as of the Closing Date, no material claim has been asserted and is pending by any Person with respect to the use by any Group Party of any intellectual property or challenging or questioning the validity, enforceability or effectiveness of any intellectual property necessary for the conduct of the business of any Group Party.   Except as could not reasonably be expected to have a Material Adverse Effect, (a) each Group Party has the exclusive right to use the intellectual property which such Credit Party owns, (b) all applications and registrations for such intellectual property are current, and (c) to the knowledge of the Borrowers, the conduct of each Group Party's business does not infringe the intellectual property rights of any other Person.

(21)    *Residency of Borrower for Tax Purposes.*  Each Borrower is a resident of Canada for the purposes of the Income Tax Act.

(22)    *"Know Your Customer" Information*. All materials and written information provided to each of the Lenders in connection with applicable "know your customer" and AML Legislation is true and correct in all material respects as of the Closing Date.

(23)    *Bank Accounts.*  Schedule 3.1(23) lists (i) all banks and other financial institutions at which any Credit Party maintains lock boxes, deposit or other accounts as of the most recent Reference Date, and (ii) the complete lock box address or account number therefor and the address and telephone number of each such institution, which in the case of clause (ii) shall be true and correct in all material respects.

(24)    [Reserved]

(25)    *Anti-Corruption Laws and Sanctions.*  Each Group Party has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by such Group Party and its directors, officers and employees with applicable Anti-Corruption Laws and Sanctions.  Each Group Party and, to the knowledge of the Borrowers, its directors, officers and employees is in material compliance with applicable Anti-Corruption Laws and Sanctions.  No Group Party or, to the knowledge of the Borrowers, any of its directors, officers or employees is a Sanctioned Person or is engaged in any activity that would reasonably be expected to result in such Group Party being designated as a Sanctioned Person.  No Borrowing or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate applicable Anti-Corruption Laws or Sanctions.

(26)    *Initial Acquisition Agreement.*  The Term Borrower has delivered to the Administrative Agent a complete and correct copy of the Initial Acquisition Agreement (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).

(27)    *Investment and Holding Company Status.*  No Group Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

(28)    *Margin Stock.*  No Group Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Federal Reserve Board), and no proceeds of any Borrowing will be used to purchase or carry any margin stock or to extend credit

to others for the purpose of purchasing or carrying any margin stock in contravention of Regulation U or X of the Federal Reserve Board.

(29)    *EEA Financial Institution*.  No Group Party is an EEA Financial Institution.

# ARTICLE 4
## CONDITIONS

**4.1    Effective Date.**

The effectiveness of this Agreement shall be subject to the satisfaction of (or waiver pursuant to Section 9.2) of each of the conditions listed below.

(1)    *Credit Agreement*.  The Administrative Agent, each Lender, and the Issuing Bank shall have received from each party hereto a counterpart of this Agreement signed on behalf of each party hereto

(2)    *Corporate Certificates*.  The Administrative Agent shall have received:

    (a)    certified copies of the resolutions of the board of directors, general partner, or shareholders, as applicable, of each Borrower approving this Agreement and evidencing authorization with respect to this Agreement; and

    (b)    a certificate of a director of each Borrower, dated as of the Effective Date, and certifying (i) the name, title and true signature of each officer or director of each Borrower authorized to execute this Agreement and (ii) that attached thereto is a true and complete copy of the articles of incorporation and bylaws (where applicable) of each Borrower, as amended to date, and a recent certificate of status, certificate of compliance, good standing certificate or analogous certificate.

(3)    *"Know Your Customer" Information*.  The Administrative Agent and the Lenders shall have received, with respect to the Term Borrower, all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including AML Legislation and OFAC requested at least 5 Business Days prior to the Effective Date.

All materials required pursuant to this Section 4.1 may be delivered to the Administrative Agent (or its counsel) by way of facsimile or other means of electronic transmission, provided that such number of original copies as may be reasonably requested shall be delivered by or on behalf of the Borrowers to the Administrative Agent (or its counsel) within 7 days of the Effective Date.

**4.2    Closing Date.**

The obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless each of the conditions listed below is satisfied (or waived pursuant to Section 9.2) at or prior to 5:00 p.m. on the Longstop Date, and, in the event such conditions are not so satisfied or waived by such time, the Commitments shall terminate at such time.

(1)    *Initial Security Documents*.  The Administrative Agent shall have received the Initial Security Documents.

(2)     *Perfection of Liens*.  The Initial Security Documents shall have been registered (or arrangements for registration satisfactory to the Administrative Agent shall have been made) in all personal property offices in Canada in which, in the reasonable opinion of the Administrative Agent or its counsel, registration is necessary or of advantage to perfect or render opposable to third parties the Liens intended to be created thereby.  Each Uniform Commercial Code financing statement required by the Initial Security Documents in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, shall be in proper form for filing.

(3)     *Legal Opinions*.  The Administrative Agent shall have received a favourable written opinion of Torys LLP, Canadian counsel to the Borrowers, and local counsel reasonably acceptable to the Administrative Agent, covering such Canadian matters relating to the Credit Parties, this Agreement, the other Loan Documents, or the Transactions as the Lenders shall reasonably request (together with copies of all factual certificates and legal opinions delivered to such counsel in connection with such opinion upon which counsel has relied).  The Administrative Agent shall also have received favourable written opinions of Simpson Thacher& Bartlett LLP covering such United States matters relating to the Credit Parties, the Loan Documents or the Transactions as the Lenders shall reasonably request (together with copies of all factual certificates and legal opinions delivered to such counsel in connection with such opinion upon which such counsel has relied).  The Borrowers hereby request each such counsel to deliver such opinions and supporting materials.  All opinions and certificates referred to in this Section 4.2(3) shall be addressed to the Administrative Agent and the other Secured Parties and dated the Closing Date.

(4)     *Corporate Certificates*.  The Administrative Agent shall have received:

(a)     certified copies of the resolutions of the board of directors, general partner, or shareholders, as applicable, of each Credit Party approving, as appropriate, the Loans, this Agreement and the other Loan Documents to which such Credit Party is a party; and

(b)     a certificate of a director of each Credit Party, dated as of the Closing Date, and certifying (i) the name, title and true signature of each officer or director of such Person authorized to execute this Agreement and the other Loan Documents to which it is a party, (ii) the name, title and true signature of each officer or director of such Person authorized to provide the certifications required pursuant to this Agreement, including the certifications required pursuant to Section 5.1(1) and Borrowing Requests, and (iii) that attached thereto is a true and complete copy of the articles of incorporation and bylaws (where applicable) of each Credit Party, as amended to date, and a recent certificate of status, certificate of compliance, good standing certificate or analogous certificate.

(5)     *Fees*.  The Administrative Agent, the Lenders, and the Arrangers shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all legal fees and other out-of-pocket expenses required to be reimbursed or paid by the Term Borrower hereunder or under any other Loan Document.

(6)     *Insurance*.  The Administrative Agent shall have received a certificate of insurance coverage, dated not more than 30 days prior to the Closing Date, evidencing that the Credit Parties are carrying insurance in accordance with Section 5.1(9) hereof.

(7)     *Delivery of Financial Statements*.  The Administrative Agent and the Lenders shall have received the unaudited Consolidated financial statements in respect of the Initial Target with respect to any Fiscal Quarter ending more than 45 days prior to the Closing Date.

(8)    *Financial Projections*.  The Administrative Agent and the Lenders shall have received the financial projections of the Term Borrower for the next five (5) years including income statement, balance sheet, cash flow statement, capital expenditure budget, assumptions and financial covenants calculations.

(9)    *Compliance Certificate*.  The Administrative Agent shall have received a Compliance Certificate prepared on a *pro forma* basis after giving effect to the Loans to be made on the Closing Date and the consummation of the other Transactions.  Such initial Compliance Certificate shall demonstrate in reasonable detail that the Total Leverage Ratio is not more than 2.90:1.00 at such time.

(10)    *Xiwang Shareholder Approval.*  The borrowing of Loans and issuance of Letters of Credit hereunder and the performance of the obligations of the Credit Parties under the Loan Documents shall have been duly approved by the shareholders of Xiwang Foodstuffs Co. Ltd.

(11)    *"Know Your Customer" Information*.  The Administrative Agent and the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including AML Legislation and OFAC requested at least 5 Business Days prior to the Closing Date.

(12)    *Cancellation of Existing Credit Facilities*.  The Credit Parties shall have repaid (or made satisfactory arrangements for the repayment of) all Indebtedness outstanding under their credit facilities (including any commercial paper back-up lines), and such credit facilities (including such commercial paper back-up lines) shall have been cancelled permanently such that no Credit Party shall have any Indebtedness (or commitment therefor) that will survive the Closing Date except Indebtedness permitted under Section 6.1(1).

(13)    *Initial Equity Investment*.  The Initial Equity Investment shall have been completed.

(14)    *Consummation of Initial Acquisition*.  The Initial Acquisition shall have been consummated in accordance with the Initial Acquisition Agreement, and the Sponsors shall not have waived, amended or provided any consent with respect to any term or condition of the Initial Acquisition Agreement that, individually or in the aggregate, is or could reasonably be expected to materially and adversely affect the interests of the Lenders (it being understood that (i) any increase to the aggregate consideration payable thereunder shall not be considered adverse to the extent funded with additional equity and (ii) any reallocation of purchase price payments as between amounts to be provided at closing and the post-closing purchase price adjustment shall not be considered adverse).

All materials required pursuant to this Section 4.2 may be delivered to the Administrative Agent (or its counsel) by way of facsimile or other means of electronic transmission.

**4.3    Each Credit Event.**

The obligation of each Lender to make a Loan on the occasion of any Borrowing, and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    the representations and warranties of the Borrowers set out in this Agreement shall be true and on and as of the date of each such Borrowing as if made on such date (except where such representation or warranty is stated to be made as of a particular date);

(b)    at the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing;

(c)      the Administrative Agent shall have received a Borrowing Request in the manner and within the time period required by Section 2.3.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrowers on the date thereof as to the accuracy of the matters specified in Sections 4.3(a) and (b).  This requirement does not apply on the conversion or rollover of an existing Borrowing provided that the aggregate outstanding Borrowings will not be increased as a consequence thereof.

## ARTICLE 5
## AFFIRMATIVE COVENANTS

**5.1    Covenants.**

From (and including) the Closing Date until the Lender Termination Date, the Borrowers covenant and agrees with the Lenders as follows:

(1)      *Financial Statements and Other Information.*  The Borrowers shall furnish to the Administrative Agent for distribution to each Lender:

(a)      as soon as available and in any event within 120 days after the end of each Fiscal Year, the audited Consolidated balance sheet and related statements of income, retained earnings and changes in financial position of the Term Borrower as of the end of and for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by KPMG LLP or other independent auditors of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit (other than any such exception or explanatory paragraph (but not qualification) that is expressly solely with respect to, or expressly resulting from, (i) an upcoming maturity date of the credit facilities hereunder or other Indebtedness occurring within one year from the time such report is delivered or (ii) any potential inability to satisfy a financial maintenance covenant on a future date or in a future period)) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Term Borrower on a Consolidated basis;

(b)      as soon as available and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, the unaudited Consolidated balance sheet and related statements of income, retained earnings and changes in financial position of the Term Borrower as of the end of and for such Fiscal Quarter and the then elapsed portion of the Fiscal Year which includes such Fiscal Quarter, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by a Responsible Officer of the Term Borrower as presenting fairly in all material respects the financial condition and results of operations of the Term Borrower on a Consolidated basis, subject to normal year-end audit adjustments and the absence of certain footnotes;

(c)      concurrently with the financial statements required pursuant to Sections 5.1(1)(a) and (b), a Compliance Certificate;

(d)      concurrently with any delivery of financial statements under Section 5.1(1)(a) and (b), a management discussion and analysis that includes a comparison to the budget for the

period in question and a comparison of performance for such period to the corresponding period in the prior year;

(e)     promptly after a Borrower learns of the receipt or occurrence of any of the following, a certificate of the Borrowers, signed by a Responsible Officer of each Borrower, specifying (i) any event which constitutes a Default or Event of Default, together with a detailed statement specifying the nature thereof and the steps being taken to cure such Default or Event of Default, (ii) the receipt of any notice from, or the taking of any other action by, the holder of any Material Indebtedness of any Credit Party with respect to an actual or alleged default by such Credit Party in respect of such Indebtedness, (iii) [reserved], (iv) the creation, dissolution, merger, amalgamation or acquisition of any Group Party, (v) any event or condition not previously disclosed to the Administrative Agent, which violates any Environmental Laws and which could, in the Borrowers' judgment, reasonably be expected to have a Material Adverse Effect, and (vi) any other event, development or condition which may reasonably be expected to have a Material Adverse Effect;

(f)     on or before the 60th day after each Fiscal Year end (commencing with December 31, 2017), an annual budget of the Term Borrower setting forth in reasonable detail and on a quarterly basis the projected Consolidated revenues and expenses of the Term Borrower for the following Fiscal Year (it being recognized by the Lenders that projections as to future results are not to be viewed as fact and that the actual results for the period or periods covered by such projections may differ from the projected results), which budget shall be accompanied by a certificate of a Responsible Officer stating that such budget is based on reasonable estimates, information and assumptions;

(g)     on or before the 120th day after each Fiscal Year end commencing December 31, 2017, the calculation of Excess Cash Flow for the Fiscal Year then ended in accordance with Section 2.9(2)(a);

(h)     promptly after the occurrence thereof, notice of the institution (or written threat of the institution) of, or any material adverse development in, any action, suit or proceeding or any governmental investigation or any arbitration before any court or arbitrator or any Governmental Authority or official against any Group Party involving a claim of more than U.S$5,000,000;

(i)     concurrently with any delivery of financial statements under Section 5.1(1)(a) or (b) a certificate of a Responsible Officer of the Term Borrower identifying (i)  any change in GAAP or in the application thereof that has occurred since the date of the audited financial statements referred to in Section 5.1(1)(a) that has a material effect on the Term Borrower's financial reporting and specifying the effect of such change on the financial statements accompanying such certificate, (ii) all Subsidiaries acquired or formed since the end of the previous Fiscal Quarter and indicating, for each such Subsidiary, whether such Subsidiary is a Material Subsidiary or an Immaterial Subsidiary and (iii) any interest in real property or improvements thereto with a value exceeding U.S.$1,000,000 that have been acquired by any Credit Party since the end of the previous Fiscal Quarter;

(j)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Group Party, or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent may reasonably request; and

22969328.24

(k)        concurrently with the delivery of the financial statements under Section 5.1(1)(a) or (b), a report (a "**Quarterly Report**") supplementing each of Schedule 3.1(10), Schedule 3.1(18) and Schedule 3.1(23) with respect to any matter arising since the date of delivery of the most recent Quarterly Report (or, in the case of the first such Quarterly Report, the Closing Date) that, if existing or occurring on the Effective Date, would have been required to be set forth or described in such Schedule or that is necessary to correct any information in such Schedule (and such Schedule shall be appropriately marked to show the changes made therein);

(2)    *Existence; Conduct of Business*.  Each Borrower shall, and shall cause each other Group Party to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence (subject only to Section 6.1(3)), and except to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect, obtain, preserve, renew and keep in full force and effect any and all rights, licenses, permits, privileges and franchises material to the conduct of its business.

(3)    *Payment of Obligations*.  Each Borrower shall, and shall cause each other Group Party to, pay its material obligations, including material Tax liabilities, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) a Borrower or such Group Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

(4)    *Maintenance of Properties*.  Each Borrower shall, and shall cause each other Group Party to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(5)    *Books and Records; Inspection Rights*.  Each Borrower shall, and shall cause each other Group Party to, keep proper books of record and account in which full, true and correct entries in all material respects are made of all dealings and transactions in relation to its business and activities.  Each Borrower shall, and shall cause each other Group Party to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times; provided that all such visits, inspections and inquiries shall be co-ordinated through the Administrative Agent; provided further that unless an Event of Default has occurred and is continuing, no more than one such visit or inspection may occur in any Fiscal Year.

(6)    *Compliance with Laws*.

(a)        Each Borrower shall, and shall cause each other Group Party to, comply with all Laws and orders of any Governmental Authority applicable to it or its property and with all of its material contractual obligations, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)        Each Borrower shall, and shall cause each other Group Party and its and their respective directors, officers and employees to, comply with all Anti-Corruption Laws and Sanctions applicable thereto.

(7)    *Use of Proceeds and Letters of Credit*.  The proceeds of the Term Loans shall be used solely to repay Indebtedness of the Credit Parties and the fees, costs, expenses and liabilities incurred in connection with the Transactions and the Initial Acquisition.  The proceeds of the Revolving Loans shall be used for

working capital and other general corporate purposes of the Revolving Borrower, including the making of Acquisitions and Investments permitted hereunder.

(8)     *Further Assurances.*

(a)     Each Borrower shall, and shall cause each other Credit Party and the Limited Recourse Guarantors to, cure promptly any defects in the execution and delivery of the Loan Documents, including this Agreement.  Upon reasonable request by the Administrative Agent (and subject to the Security Principles), a Borrower shall, at its expense, as promptly as practical, execute and deliver to the Administrative Agent, all such other and further documents, agreements and instruments (and cause each other Credit Party or Limited Recourse Guarantor to take such action) in compliance with or performance of the covenants and agreements of such Borrower or any other Credit Party or Limited Recourse Guarantor in any of the Loan Documents, including this Agreement, or to further evidence and more fully describe the Collateral, or to correct any omissions in any of the Loan Documents, or more fully to state the security obligations set out herein or in any of the Loan Documents, or to perfect, protect or preserve any Liens created pursuant to any of the Loan Documents, or to make any recordings, to file any notices, or obtain any consents, all as may be necessary or appropriate in connection therewith, in the judgment of the Administrative Agent, acting reasonably.

(b)     Each Borrower shall, and shall cause each of the other Credit Parties to, perform and satisfy to the satisfaction of the Administrative Agent and its counsel each of the requirements (the "**Post-Closing Requirements**") listed in Schedule 5.1(8) on or before the date by which such Post-Closing Requirement is to be required to be performed pursuant thereto.  For greater certainty, each Borrower acknowledges and agrees that the Post-Closing Requirements expressly include the obligation of such Borrower to, and to cause each of the other Credit Parties to, co-operate fully and promptly with the Administrative Agent and its counsel with respect to the completion of each of the Post-Closing Requirements and the provision of all information, documents, matters and things as the Administrative Agent or its counsel, acting reasonably, may deem necessary or advisable (i) to determine what actions must be taken to fulfil each of the Post-Closing Requirements, (ii) to complete and fulfil each of the Post-Closing Requirements, and (iii) to confirm and assess whether all actions necessary to fulfil each of the Post-Closing Requirements have been taken.  The Administrative Agent, by instrument in writing and without any consent from any of the Lenders, may, in its sole and absolute discretion, extend any deadline for completion of a Post-Closing Requirement if the Administrative Agent acting in good faith believes that the extension will enable a Borrower and the Credit Parties to comply with such Post-Closing Requirement and such extension will not have a material adverse effect upon the Lenders.

(9)     *Insurance.*

(a)     Each Borrower shall, and shall cause each other Credit Party to, maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to their respective properties and business against such liabilities, casualties, risks and contingencies and in such types (including business interruption insurance and flood insurance) and amounts and with deductibles as are customary in the case of Persons engaged in the same or similar businesses and similarly situated and in accordance with any requirement of any Governmental Authority.

(b)     Each Borrower shall, and shall cause each other Credit Party to, maintain flood insurance on all Subject Flood Property from such providers, and on such terms and in such amounts, as required by the United States *Flood Disaster Protection Act* of 1973, as amended from time to time.

(c)     Each Borrower shall obtain endorsements to the policies pertaining to all physical properties in which the Administrative Agent shall have a Lien under the Loan Documents, naming the Administrative Agent as an additional insured (with respect to liability insurance only) and a loss payee and shall use commercially reasonable efforts to ensure that such endorsements contain (i) provisions that such policies will not be cancelled without 30 days prior written notice having been given by the insurance company to the Administrative Agent, and (ii) a standard non-contributory "mortgagee", "lender" or "secured party" clause, as well as such other provisions as the Administrative Agent may reasonably require to fully protect the Administrative Agent's interest in the Collateral and to any payments to be made under such policies.  All original policies or true copies thereof are to be delivered to the Administrative Agent, premium prepaid.

(d)     In the event the Borrowers fail to provide the Administrative Agent with timely evidence, acceptable to the Administrative Agent, of the maintenance of insurance coverage required pursuant to Section 5.1(9), or in the event that any Credit Party fails to maintain such insurance, the Administrative Agent may purchase or otherwise arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Administrative Agent's part for:  (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims. The insurance acquired by the Administrative Agent may, but need not, protect any Credit Party's interest in the Collateral, and therefore such insurance may not pay claims which a Credit Party may have with respect to the Collateral or pay any claim which may be made against a Credit Party in connection with the Collateral.  In the event the Administrative Agent purchases, obtains or acquires insurance covering all or any portion of the Collateral, the Borrowers shall be responsible for all of the applicable costs of such insurance, including premiums, interest (at the applicable interest rate for Revolving Loans that are Base Rate Loans), fees and any other charges with respect thereto, until the effective date of the cancellation or the expiration of such insurance.  The Administrative Agent may charge all of such premiums, fees, costs, interest and other charges to the Revolving Borrower's bank account.  Each Borrower hereby acknowledges that the costs of the premiums of any insurance acquired by the Administrative Agent may exceed the costs of insurance which such Borrower may be able to purchase on its own.  In the event that the Administrative Agent purchases such insurance, the Administrative Agent shall notify the Borrowers 10 Business Days prior to said purchase.

(e)     Upon the occurrence and continuance of an Event of Default and notice by the Administrative Agent to the Term Borrower (and without limiting any other rights of the Administrative Agent or the Lenders hereunder or under any other Loan Document), (i) the Administrative Agent shall, subject to the rights of any holders of Permitted Liens holding claims senior to the Administrative Agent, have the sole right, in the name of the Administrative Agent or any applicable Credit Party, to file claims under any insurance policies in respect of any Collateral, to receive any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection of any claims under any such insurance policies and (ii) all insurance proceeds in respect of any

Collateral shall be paid to the Administrative Agent (or, if paid to the applicable Credit Party, held in trust for the Administrative Agent). In such event, the Administrative Agent shall apply such insurance proceeds to the obligations of the Borrowers in accordance with Section 2.9(2)(d).

(10)    *Operation and Maintenance of Property*.  Each Borrower shall, and shall cause each other Credit Party to, manage and operate its business or cause its business to be managed and operated (a) in accordance with prudent industry practice, and (b) in compliance with all applicable Laws of the jurisdiction in which such businesses are carried on, and all applicable Laws of every other Governmental Authority from time to time constituted to regulate the ownership, management and operation of such businesses, except in each such case where a failure to so manage and operate would not have a Material Adverse Effect.

(11)    *Security Package.*

(a)    *Group Guarantee*.  In accordance with and subject to the Security Principles, each Borrower shall, and shall cause each present and future Material Subsidiary to, enter into or accede to the Group Guarantee, such that such Person guarantees in favour of the Administrative Agent, for the benefit of the Secured Parties, all Secured Liabilities of the other Credit Parties.  The obligation of a Person to accede to the Group Guarantee shall arise as soon as reasonably practicable after such Person becomes a Material Subsidiary.

(b)    *Liens*.  In accordance with and subject to the Security Principles, each Borrower shall, and shall cause each present and future Credit Party to, provide at all times in favour of the Administrative Agent, for the benefit of the Secured Parties, a first-priority Lien (subject only to Permitted Liens) over all present and future personal property and real property of such Credit Party as security for its Secured Liabilities, together with such supporting materials as may be required to ensure the perfection or priority of such Lien. The obligation of a Credit Party to provide any such Lien shall arise as soon as is reasonably practicable following such Person (i) becoming a Credit Party, or (ii) acquiring assets, property or undertaking that are not already subject to a Lien that complies with the Security Principles.

(c)    *Supporting Materials*.  In connection with the execution and delivery of any Security Document pursuant to Section 5.1(11), each Borrower shall, or shall cause the relevant other Credit Party to, deliver to the Administrative Agent such corporate resolutions, certificates, legal opinions and such other related documents as shall be reasonably requested by the Administrative Agent and consistent with the relevant forms and types thereof delivered on the Closing Date or as shall be otherwise reasonably acceptable to the Administrative Agent.

(12)    *Financial Covenants*.  The Borrower shall cause the Term Borrower to:

(a)    *Fixed Charge Coverage Ratio*.  Maintain a Fixed Charge Coverage Ratio with respect to each Rolling Period of more than 1.20:1:00.

(b)    *Total Leverage Ratio*.  Maintain a Total Leverage Ratio at all times during each period indicated below of not more than the ratio shown opposite such period:

| Period | Total Leverage Ratio |
|--------|----------------------|

| After the Closing Date | 3.75 |
|---|---|
| From the Closing Date to September 29, 2018 | 3.75 |
| From September 30, 2018 to September 29, 2019 | 3.50 |
| From September 30, 2019 to March 30, 2020 | 3.25 |
| From March 31, 2020 to March 30, 2021 | 3.00 |
| From March 31, 2021 to Maturity Date | 2.75 |

Notwithstanding the foregoing, no decrease in the prescribed Total Leverage Ratio shall be effective until the financial statements for the Rolling Period ended on the first day of the period in question have been, or were required to be, delivered pursuant to Section 5.1(a) or 9b).

(c)    *Equity Cure*.  In the event of a breach of the financial covenants set forth in this Section 5.1(12) the Term Borrower may cure such breach by way of the issuance of Permitted Equity Securities (a "**Cure Contribution**") such that the Net Proceeds therefrom shall be deemed to be included in the calculation of EBITDA for the most recent Fiscal Quarter; provided that:

(i)    the amount of any Cure Contribution shall not be greater than the amount required to cause the Term Borrower to re-establish financial covenant compliance;

(ii)    a Cure Contribution shall increase EBITDA solely for the purposes of determining compliance with such financial covenants at the end of the applicable Fiscal Quarter and any subsequent period that includes such Fiscal Quarter, and shall be disregarded in all other respects  under the Loan Documents (including the calculation of Applicable Margin, Excess Cash Flow and any other items governed by reference to EBITDA or that include EBITDA in the determination thereof in any respect);

(iii)    no more than four Cure Contributions may be made during the term of this Agreement;

(iv)    no more than two Cure Contributions may be made in any Fiscal Year;

(v)    Cure Contributions may not be made in consecutive Financial Quarters;

(vi)    the aggregate amount of all Cure Contributions shall not exceed U.S.$50,000,000;

(vii)    the proceeds of any Cure Contribution shall be applied in accordance with Section 2.9(2) (a "**Cure Repayment**"); and

(viii)    a Cure Repayment shall be ignored for purposes of determining the amount of Total Indebtedness until such time that the Cure Contribution ceases to be included in the calculation of EBITDA.

The Term Borrower shall provide written notice (a "**Cure Notice**") to the Administrative Agent of its intention to cause to be made a Cure Contribution on or prior to the date the financial statements are required to be delivered pursuant to Section 5.1(1) and shall make such Cure Contribution no later than 10 Business Days following the date the financial statements are required to be delivered pursuant to Section 5.1(1).  If, after giving effect to the recalculations set forth in this Section 5.12, the Term Borrower shall then be in compliance with the financial covenants, then the applicable breach or default of that had occurred shall be deemed cured for the purposes of this Agreement.  For the avoidance of doubt but without limitation, no Loans or Letters of Credit shall be made available hereunder between the time that the Cure Notice is delivered and the time that the corresponding Cure Contribution is made.

## ARTICLE 6
## NEGATIVE COVENANTS

**6.1    Negative Covenants.**

From (and including) the Closing Date until the Lender Termination Date, each Borrower covenants and agrees with the Lenders as follows:

(1)    *Indebtedness*.  The Borrowers shall not, and shall not permit any other Group Party to, create, incur, assume or permit to exist any Indebtedness, except:

    (a)    any Indebtedness created hereunder;

    (b)    any Indebtedness of any Group Party to any other Group Party where (i) any such Indebtedness owing by a Credit Party to a Non-Credit Party Subsidiary is Subordinated Indebtedness and (ii) any such Indebtedness owing by any Non-Credit Party Subsidiary to a Credit Party is permitted under Section 6.1(6)(c);

    (c)    any Guarantee by a Group Party of Indebtedness of any other Group Party if such Indebtedness is permitted under this Agreement;

    (d)    (i) Capital Lease Obligations and Indebtedness secured by Purchase Money Liens, provided that the aggregate principal amount of Indebtedness permitted by this Section 6.1(1)(d) shall not exceed $1,000,000 at any time and (ii) any Refinancing Indebtedness in respect of Indebtedness incurred or assumed pursuant to clause (i) above;

    (e)    Secured Hedge Obligations;

    (f)    Secured Cash Management Obligations;

    (g)    Initial Acquisition Indebtedness;

    (h)    any Indebtedness in respect of performance bonds, surety bonds, appeal bonds, completion guarantees or like instruments incurred in the ordinary course of business;

    (i)    Permitted Shareholder Indebtedness;

    (j)    Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of any Group Party in the ordinary course of business supporting

obligations under (i) workers' compensation, health, disability or other employee benefits, casualty or liability insurance, unemployment insurance and other social security laws and local state and federal payroll taxes, (ii) obligations in connection with self-insurance arrangements in the ordinary course of business and (iii) bids, trade contracts, leases, statutory obligations and obligations of a like nature (provided that such Indebtedness shall be incurred as Letters of Credit under this Agreement to the extent practicable);

(k)     Indebtedness of any Group Party in the form of purchase price adjustments (including in respect of working capital), earnouts, deferred compensation, indemnification or other arrangements representing acquisition consideration or deferred payments of a similar nature incurred in connection with any Permitted Acquisition or other Investments permitted under Section 6.1(6) or asset disposition not prohibited under this Agreement;

(l)     Indebtedness relating to premium financing arrangements for property and casualty insurance plans and health and welfare benefit plans (including health and workers compensation insurance, employment practices liability insurance and directors and officers insurance), if incurred in the ordinary course of business;

(m)     Indebtedness existing on the Effective Date and set forth on Schedule 6.1(1) and Refinancing Indebtedness in respect thereof; and

(n)     any other Indebtedness in an aggregate principal amount not exceeding U.S.$5,000,000 at any time outstanding.

(2)     *Liens*.  The Borrowers shall not, and shall not permit any other Group Party to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by the Group Parties except Permitted Liens.

(3)     *Corporate Changes*.  The Borrowers shall not, and shall not permit any other Credit Party to, merge into or amalgamate or consolidate with any other Person, or permit any other Person to merge into or amalgamate or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing:

(a)     any Credit Party may merge into, amalgamate or consolidate with any other Credit Party (other than a Limited Credit Party); and

(b)     any Credit Party may liquidate or dissolve if it is a Wholly-Owned Subsidiary of another Credit Party and all of its property passes to such other Credit Party,

provided that any transaction pursuant to Section 6.1(3)(a) shall not be permitted unless the merged, amalgamated or continuing corporation provides written confirmation satisfactory to the Administrative Agent, acting reasonably, that it is liable for the obligations of the relevant Credit Party under the Loan Documents; provided further that each of the Interim Amalgamation and the Transaction Amalgamation shall be permitted.

(4)     *Permitted Business*.  The Borrowers shall not, and shall not permit any other Group Party to, engage to any material extent in any material business other than businesses of the type conducted by the Group Parties on the Closing Date and businesses reasonably related, ancillary or complementary thereto.  The Borrowers shall not permit Holdco to (a) engage in any  business (other than non-operating business and management services, in each case typically conducted by a holding company), (b) own

any assets (other than bank accounts and Equity Securities issued by, or Indebtedness owing by, the Term Borrower), (c) incur any Indebtedness (other than the Secured Liabilities), or (d) incur any expenses other than customary and reasonable administrative expenses associated with maintaining its corporate existence. The Borrowers shall not permit Acquisitionco to (a) engage in any  business (other than non-operating business and management services, in each case typically conducted by a holding company), (b) own any assets (other than bank accounts and Equity Securities issued by, or Indebtedness owing by, the Initial Target), (c) incur any Indebtedness (other than the Secured Liabilities or Permitted Shareholder Indebtedness), or (d) incur any expenses other than customary and reasonable administrative expenses associated with maintaining its corporate existence.

(5)      *Asset Dispositions*.  The Borrowers shall not, and shall not permit any other Group Party to, make any Asset Disposition, except where the Net Proceeds therefrom are dealt with in accordance with Section 2.9(2)(b).

(6)      *Investments*.  The Borrowers shall not, and shall not permit any other Group Party to, make or permit to exist any Investment, except:

(a)      Investments existing as at the Closing Date;

(b)      Investments in Cash Equivalents;

(c)      Permitted Intercompany Investments;

(d)      Investments funded directly (subject to intercompany funds flow) with the proceeds of Equity Securities or Permitted Shareholder Indebtedness issued by the Term Borrower to Holdco; and

(e)      other Investments that would not cause the Investment Basket Amount to exceed U.S.$5,000,000.

For the avoidance of doubt, the Initial Acquisition Take-up shall only be permitted under subsection (d) above.

(7)      *Acquisitions*.  The Borrowers shall not, and shall not permit any other Group Party to, make or enter into any Acquisition other than Permitted Acquisitions.

(8)      *Hedge Arrangements*.  The Borrowers shall not, and shall not permit any other Group Party to, enter into any Hedge Arrangement, except:

(a)      Hedge Arrangements entered into in order to hedge or mitigate risks to which any Group Party has actual exposure (other than those in respect of Equity Securities); or

(b)      Hedge Arrangements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of any Group Party.

(9)      *Restricted Payments*.  The Borrowers shall not, and shall not permit any other Group Party to, declare, pay or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that, so long as no Default or Event of Default is continuing or would be caused thereby:

(a)     the Term Borrower may declare and pay any dividend, distribution or return of capital with respect to its Equity Securities payable solely in additional Equity Securities;

(b)     a Group Party may:

    (i)      declare and pay any dividend, distribution or return of capital with respect to its Equity Securities; and

    (ii)     pay any principal of, or interest or premium on, any of its Indebtedness,

  to any Credit Party (other than a Limited Credit Party);

(c)     a Non-Credit Party Subsidiary may:

    (i)      declare and pay any dividend, distribution or return of capital with respect to its Equity Securities; and

    (ii)     pay any principal of, or interest or premium on, any of its Indebtedness,

  to any Group Party;

(d)     a Group Party (other than the Term Borrower) may purchase, redeem, retire or acquire any of its Equity Securities or any warrants, options or similar rights with respect to its Equity Securities from a Credit Party (other than any such purchase, redemption, retirement or acquisition by a Credit Party from a Limited Credit Party);

(e)     a Non-Credit Party Subsidiary may purchase, redeem, retire or acquire any of its Equity Securities or any warrants, options or similar rights with respect to its Equity Securities from a Group Party;

(f)     the Term Borrower may pay interest on Permitted Shareholder Indebtedness to the extent that such interest is reinvested by Holdco in the Term Borrower on the same Business Day in the form of additional Permitted Shareholder Indebtedness or Equity Securities of the Term Borrower that is subject to a first-priority Lien in favour of the Administrative Agent;

(g)     the Term Borrower may complete the Initial Acquisition Take-up or any portion thereof;

(h)     the Credit Parties may pay management fees to the Sponsors of not more than U.S.$1,000,000 in any one Fiscal Year;

(i)     the Term Borrower may pay Permitted Holdco Reimbursements; and

(j)     a Group Party may declare, pay or make any other Restricted Payment at any time that the Total Leverage Ratio is, and would remain as a result thereof, less than 2.50:1.00.

(10)     *Transactions with Affiliates*.  The Borrowers shall not, and shall not permit any other Group Party to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of their Affiliates, except:

(a)    in the ordinary course of business at prices and on terms and conditions not less favourable to the Borrowers or such other Group Party than could be obtained on an arm's-length basis from unrelated third parties;

(b)    transactions between or among Group Parties involving both Credit Parties and Non-Credit Party Subsidiaries and on terms and conditions not less favourable to the Credit Parties party thereto than could be obtained on an arm's length basis from unrelated parties;

(c)    transactions not involving payments in excess of U.S.$1,000,000;

(d)    transactions between or among Credit Parties (other than Limited Credit Parties) not involving any of their other Affiliates;

(e)    transactions between or among Non-Credit Party Subsidiaries not involving any of their other Affiliates;

(f)    advances to employees for expenses incurred in the ordinary course of business; and

(g)    any Restricted Payment permitted by Section 6.1(9)) or Investment permitted by Section 6.1(6)(c).

(11)    *Pension Plan Compliance*.  The Borrower shall not, and shall not permit any other Group Party to, (a) terminate or wind-up or take any other action with respect to any Pension Plan which could reasonably be expected to result in any material liability of any Group Party, (b) fail to make full payment when due of all amounts which, under the terms of any Pension Plan or applicable Law, the Group Party is required to pay as contributions or premiums thereto or (c) establish, sponsor, administer, contribute to, participate in, or assume any liability (including any contingent liability) under any Defined Benefit Plan other than the Defined Benefit Plans listed on Schedule 3.1(12) (as supplemented in connection with a Permitted Acquisition).

(12)    *Capital Expenditures*.  The Borrowers shall not, and shall not permit any other Group Party to, make Capital Expenditures except:

(a)    Funded Capital Expenditures; and

(b)    other Capital Expenditures:

(i)    which do not cause the Annual Spend Amount to exceed the Annual Spend Cap with respect to the Fiscal Year in which such Acquisition is made; and

(ii)    which do not cause the Aggregate Spend Amount to exceed U.S.$150,000,000.

(13)    *Issuance of Shares*.  The Borrowers shall not, and shall not permit any other Group Party to, authorize or issue (other than, in respect of clauses (a) or (b) below, to effect any asset disposition not prohibited by this Agreement) any Equity Securities:

(a)    of a Credit Party that is a Wholly Owned Subsidiary to any Person other than another Credit Party;

(b)        of a Credit Party that is not a Wholly Owned Subsidiary to any Person other than where Equity Securities are concurrently issued to all of its existing shareholders on a *pro rata* basis (or to another Credit Party on a more than *pro rata* basis);

(c)        of the Initial Target to any Person other than the Term Borrower;

(d)        of the Term Borrower to any Person other than Holdco; or

(e)        having a mandatory redemption right (other than any redemption right solely for Equity Securities in such Person that would not violate this Section 6.1(13)) existing with regard thereto which could by its terms become operative on or before the Maturity Date (provided that (i) issuance of any Equity Security shall not violate this Section 6.1(13)(e) solely as a result of the terms thereof giving holders thereof the right to require such Group Party to redeem such Equity Securities upon the occurrence of an asset sale or a change of control (or similar event) if any such requirement becomes operative only after all the Lender Termination Date and (ii) Equity Securities of a Group Party that are issued to any employee or to any plan for the benefit of employees shall not violate this Section 6.1(13)(e) solely because it may be required to be repurchased by such Group Party or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations as a result of such employee's termination, death or disability.

(14)        *No Amendments to Constating Documents, etc*.  The Borrowers shall not, and shall not permit any other Group Party to, amend, its constating documents, by-laws, partnership agreement or operating agreement, as applicable, in a manner that would adversely affect the Administrative Agent or the Lenders or, in the case of any Credit Party, such Credit Party's duty or ability to repay the Secured Liabilities.

(15)        *Cash Management*.  From and after six months following the Closing Date, the Borrowers shall not, and shall not permit any other Credit Party to, open or maintain any bank or deposit account with any Person that is not the Administrative Agent, unless such Person, the applicable Credit Party and the Administrative Agent enter into a blocked account agreement in form and substance reasonably satisfactory to the Administrative Agent.  This Section 6.1(15) shall not apply with respect to (i) any bank or deposit account which is used solely for payroll, benefits, withholding tax, customs or other fiduciary purposes, in each case funded in the ordinary course of business and (ii) customer, custodial or escrow accounts so long as no funds or other property of any Credit Party is deposited in such account.

(16)        *Use of Proceeds*.  The Borrowers will not request any Borrowing or Letter of Credit, and the Borrowers shall not use, and shall procure that each other Group Party and its and their respective directors, officers, employees and Relevant Agents shall not use, the proceeds of any Borrowing or Letter of Credit to:

(a)        further an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws;

(b)        fund, finance or facilitate any prohibited activities, business or transaction of or with any Sanctioned Person; or

(c)        act in any other manner that would result in the violation of  any applicable Sanctions.

22969328.24

## ARTICLE 7
## EVENTS OF DEFAULT

**7.1**    **Events of Default.**

If any of the following events ("**Events of Default**") shall occur:

(a)    a Credit Party shall fail to pay any amount payable under any Transaction Document when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure shall continue unremedied for a period of 3 Business Days after written notice from the Administrative Agent;

(b)    any representation or warranty made or deemed made by or on behalf of any Credit Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed to be made;

(c)    the Term Borrower shall fail to observe or perform any financial covenant in Section 5.1(12) and the Cure Contribution has not been exercised within the allotted period;

(d)    a Credit Party or Limited Recourse Guarantor shall fail to observe or perform any covenant, condition or agreement contained in Article 6 (or in any comparable provision of any other Loan Document);

(e)    any Credit Party or Limited Recourse Guarantor shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in Section 7.1(a), (c) or (d)), and such failure shall continue unremedied for a period of 30 days after the earlier of (i) knowledge thereof by any Credit Party, or (ii) notice thereof from the Administrative Agent to the Borrowers (which notice shall be given at the request of any Lender);

(f)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (in each case after expiration of any applicable grace or cure period set forth in the agreement evidencing or governing such Material Indebtedness); provided that this Section 7.1(f) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness so long as the proceeds of such sale or transfer are sufficient to, and are applied to, reduce such secured Indebtedness to nil or after giving effect to such payment, such Indebtedness no longer constitutes Material Indebtedness;

(g)    any Credit Party or Limited Recourse Guarantor:

(i)    admits in writing that it is insolvent or unable to pay its liabilities as they generally become due;

(ii)     commits an act of bankruptcy under the BIA, files a voluntary assignment in bankruptcy under the BIA, makes a proposal (or files a notice of its intention to do so) under the BIA or seeks any other relief in respect of itself under the BIA;

(iii)    institutes any proceedings seeking relief in respect of itself under the CCAA;

(iv)    institutes any proceeding seeking relief in respect of itself under the WURA;

(v)     in addition to the foregoing, institutes any other proceeding, including pursuant to any U.S. Bankruptcy Law, seeking: (a) to adjudicate itself an insolvent person or a bankrupt; (b) to liquidate, dissolve or wind-up its business or assets; (c) to compromise, arrange, adjust or declare a moratorium in respect of the payment of, its debts; (d) to stay the rights of creditors generally (or any class of creditors); (e) any other relief in respect of itself under any federal, provincial or foreign applicable Law now or hereafter in effect relating to bankruptcy, winding-up, insolvency, receivership, restructuring of business, assets or debt, reorganization of business, assets or debt or protection of debtors from their creditors (such applicable Law includes any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt); or (f) any other relief which provides for plans or schemes of reorganization, plans or schemes of arrangement or plans or schemes of compromise, in respect of itself, to be submitted or presented to creditors (or any class of creditors);

(vi)    applies for the appointment of a receiver (either court or privately appointed), interim receiver, receiver/manager (either court or privately appointed), sequestrator, conservator, custodian, administrator, trustee, liquidator or other similar official in respect of it, or any substantial part of its property; or

(vii)   threatens to do any of the foregoing, or takes any action, corporate or otherwise, to approve, effect, consent to or authorize any of the actions described in this Section 7.1(g);

(h)     any petition is filed, application made or other proceeding instituted, including pursuant to any U.S. Bankruptcy Law, against or in respect of any Credit Party or Limited Recourse Guarantor:

(i)     seeking to adjudicate it an insolvent person;

(ii)    seeking a bankruptcy order against it under the BIA;

(iii)   seeking to institute proceedings against it under the CCAA;

(iv)    seeking to institute proceedings against it under the WURA;

(v)     seeking, in addition to the forgoing: (a) to adjudicate it an insolvent person or a bankrupt; (b) to liquidate, dissolve or wind-up its business or assets; (c) to compromise, arrange, adjust or declare a moratorium in respect of the payment of, its debts; (d) to stay the rights of creditors generally (or any class of creditors); (e) any other relief in respect of it under any federal, provincial or foreign applicable Law now or hereafter in effect relating to bankruptcy,

winding-up, insolvency, receivership, restructuring of business, assets or debt, reorganization of business, assets or debt, or protection of debtors from their creditors (such applicable Law includes any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt); or (f) any other relief which provides plans or schemes of reorganization, plans or schemes of arrangement or plans or schemes of compromise in respect of it, to be submitted or presented to creditors (or any class of creditors); or

(vi)    seeking the issuance of an order for the appointment of a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian, administrator, trustee, liquidator or other similar official in respect of it or any substantial part of its property,

and such petition, application or proceeding continues undismissed, or unstayed and in effect, for a period of 30 days after the institution thereof, provided that: (a) if the Credit Party or Limited Recourse Guarantor fails to contest such petition, application or proceeding the 30 day grace period shall cease to apply;  (b) if any of the relief sought in such proceeding is granted within the 30 day period, such grace period will cease to apply; or (c) if the Credit Party files an answer or other responding materials admitting the material allegations of a petition, application or other proceeding filed against it, such grace period will cease to apply;

(i)    any other event occurs which, under the Laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in either of Sections 7.1(g) or (h);

(j)    one or more judgments for the payment of money in a cumulative amount in excess of U.S.\$7,500,000 (or its then equivalent in any other currency) in the aggregate is rendered against any one or more of the Group Parties and they have not (i) provided for its discharge in accordance with its terms within 30 days from the date of entry thereof, or (ii) procured a stay of execution thereof within 30 days from the date of entry thereof and within such period, or such longer period during which execution of such judgment has not been stayed, appealed such judgment and caused the execution thereof to be stayed during such appeal, provided that if enforcement or realization proceedings are lawfully commenced in respect thereof in the interim, such grace period shall cease to apply;

(k)    this Agreement or any Security Document or any material obligation hereunder or thereunder at any time for any reason terminates or ceases to be in full force and effect and a legally valid, binding and enforceable obligation of any Credit Party or Limited Recourse Guarantor, is declared to be void or voidable or is repudiated, or the validity, binding effect, legality or enforceability hereof or thereof is at any time contested by any Credit Party or Limited Recourse Guarantor, or any Credit Party or Limited Recourse Guarantor denies that it has any or any further liability or obligation hereunder or thereunder (in each case other than as a result of the release of such Credit Party or Limited Recourse Guarantor thereunder in accordance with such Loan Document or this Agreement), or at any time it is unlawful or impossible for any Credit Party or Limited Recourse Guarantor to perform any of its material obligations hereunder or thereunder;

(l)    any Lien purported to be created by any Security Document shall cease to be, or shall be asserted by any Credit Party or a Limited Recourse Guarantor not to be, a valid, perfected, first- priority Lien (subject to Permitted Liens) in Collateral with a Fair Market

*Iovate Credit Agreement*

Value or book value (whichever is greater) in excess, individually or in the aggregate, of U.S.$1,000,000, except as a result of (i) the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents, (ii) the release thereof as provided in the applicable Security Document or this Agreement or (iii) as a result of the Administrative Agent's (A) failure to maintain control of any Collateral delivered to it under the Security Documents or (B) file Uniform Commercial Code continuation statements or *Personal Property Security Act* renewal statements; or

(m)      a Change in Control shall occur;

then, (A) and in every such event other than those described in (B), and at any time thereafter during the continuance of such event or any other such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (x) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (y) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind except as set out earlier in this paragraph, all of which are hereby waived by the Borrowers, and (B) in the case of any event with respect to a Borrower described in Section  7.1(g), (h) or (i), the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, and Cover for any outstanding Letters of Credit, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers.

## ARTICLE 8
## THE ADMINISTRATIVE AGENT

**8.1**    **Appointment of Administrative Agent.**

Each Lender hereby designates HSBC Bank Canada as Administrative Agent to act as herein specified and as specified in the other Loan Documents.  Each Lender hereby irrevocably authorizes the Administrative Agent to take such action on its behalf under the provisions of the Loan Documents and to exercise such powers and to perform such duties thereunder as are specifically delegated to or required of the Administrative Agent by the terms thereof and such other powers as are reasonably incidental thereto. The Administrative Agent may perform any of its duties hereunder by or through its agents or employees.

**8.2**    **Secured Parties.**

(a)      The Security Documents shall be in favour of the Administrative Agent for the benefit of the Secured Parties.

(b)      The Secured Hedge Obligations shall be secured by the Liens granted under the Security Documents and rank *pari passu* with the obligations of the Borrowers under this Agreement.

(c)    The Secured Cash Management Obligations shall be secured by the Liens granted under the Security Documents and rank *pari passu* with the obligations of the Borrowers under this Agreement.

(d)    Notwithstanding such common security, all decisions regarding the administration and enforcement of the Security Documents shall be made by the Lenders alone, and no Secured Hedge Counterparty or Secured Cash Management Provider shall have any voting rights under this Agreement or any other right whatsoever to participate in the administration or enforcement of the Security Documents.  For the avoidance of doubt but without limitation, any or all of the Security Documents or any rights contained therein may be amended or released by the Administrative Agent without the consent of any Secured Hedge Counterparty or Secured Cash Management Provider.

(e)    Each Lender that is or becomes a Secured Hedge Counterparty or Secured Cash Management Provider shall be bound as such by virtue of its execution and delivery of this Credit Agreement or an Assignment and Assumption, as applicable, notwithstanding that such capacity as Secured Hedge Counterparty or Secured Cash Management Provider may not be identified on its signature line.  Each Lender shall cause its Related Non-Party Beneficiaries to comply with the terms and conditions of the Transaction Documents applicable to them and pay and perform their debts, liabilities and obligations thereunder.

## 8.3    Limitation of Duties of Administrative Agent.

The Administrative Agent shall have no duties or responsibilities except those expressly set out with respect to the Administrative Agent in this Agreement and as specified in the other Loan Documents. None of the Administrative Agent, nor any of its Related Parties shall be liable for any action taken or omitted by it as such hereunder or in connection herewith, unless caused by its or their gross negligence or willful misconduct.  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have, by reason of this Agreement or the other Loan Documents, a fiduciary relationship in respect of any Secured Party.  Nothing in this Agreement or the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement except as expressly set out herein. The Administrative Agent shall be under no duty to take any discretionary action permitted to be taken by it pursuant to this Agreement or the other Loan Documents unless it is requested in writing to do so by the Required Lenders.

## 8.4    Lack of Reliance on the Administrative Agent.

(1)    *Independent Investigation*.  Independently, and without reliance upon the Administrative Agent, each Lender, to the extent it deems appropriate, has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of the Group Parties in connection with the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of the Group Parties, and, except as expressly provided in this Agreement and the other Loan Documents, the Administrative Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the consummation of the Transactions or at any time or times thereafter.

(2)    *Agents Not Responsible*.  The Administrative Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness,

validity, enforceability, collectability, priority or sufficiency of this Agreement or the other Loan Documents or the financial condition of the Credit Parties or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or the other Loan Documents, or the financial condition of the Credit Parties, or the existence or possible existence of any Default or Event of Default.

**8.5    Certain Rights of the Administrative Agent.**

If the Administrative Agent shall request instructions from the Lenders or the Required Lenders (as the case may be) with respect to any act or action (including the failure to act) in connection with this Agreement or the other Loan Documents, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received written instructions from the Lenders or the Required Lenders, as applicable, and the Administrative Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting under this Agreement and the other Loan Documents in accordance with the instructions of the Required Lenders, or, to the extent required by Section 9.2, all of the Lenders.

**8.6    Reliance by Administrative Agent.**

The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or facsimile message, electronic mail, cablegram, radiogram, order or other documentary teletransmission or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan or Borrowing that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (including counsel for the Borrowers), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

**8.7    Indemnification of Administrative Agent.**

To the extent the Administrative Agent is not reimbursed and indemnified by a Borrower, each Lender shall reimburse and indemnify the Administrative Agent, in proportion to its aggregate Applicable Percentage, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent in performing its duties hereunder, in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable to the Administrative Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence (it being acknowledged that ordinary negligence does not necessarily constitute gross negligence) or willful misconduct.

**8.8**     **The Administrative Agent in its Individual Capacity.**

With respect to its obligations under this Agreement and the Loans made by it, HSBC Bank Canada and The Toronto-Dominion Bank, each in its capacity as a Lender hereunder, shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not performing the duties, if any, specified herein; and the terms "**Lenders**", "**Required Lenders**", "**Revolving Credit Lenders**", "**Term Credit Lenders**" and any similar terms shall, unless the context clearly otherwise indicates, include each of HSBC Bank Canada and The Toronto-Dominion Bank in its capacity as a Lender hereunder.  The Administrative Agent and the Arrangers may accept deposits from, lend money to, and generally engage in any kind of banking, trust, financial advisory or other business with the Borrowers or any Affiliate of the Borrowers as if it were not performing the duties, if any, specified herein, and may accept fees and other consideration from the Borrowers for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

**8.9**     **May Treat Lender as Owner.**

The Borrowers, the Administrative Agent and the Issuing Bank may deem and treat each Lender as the owner of the Loans recorded on the Register maintained pursuant to Section 9.4(3) for all purposes hereof until a written notice of the assignment or transfer thereof shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who at the time of making such request or giving such authority or consent is the owner of a Loan shall be conclusive and binding on any subsequent owner, transferee or assignee of such Loan.

**8.10**     **Successor Administrative Agent.**

(1)     *Replacement of Administrative Agent*.  The Administrative Agent may resign at any time by giving written notice thereof to the Lenders, the Issuing Banks and the Borrowers.  Upon any such resignation the Required Lenders shall have the right, upon five Business Days' notice to the Borrowers, to appoint a successor Administrative Agent (who shall not be a non-resident of Canada within the meaning of the Income Tax Act), subject to the approval of the Borrowers where no Default or Event of Default has occurred and is continuing, such approval not to be unreasonably withheld.  If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation of the retiring Administrative Agent, then, upon five Business Days' notice to the Borrowers, the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent (subject to approval of the Borrowers where no Default of Event of Default has occurred and is continuing, such approval not to be unreasonably withheld), which shall be a financial institution organized under the laws of Canada having a combined capital and surplus of at least U.S.$1,000,000,000 or having a parent company with combined capital and surplus of at least U.S.$1,000,000,000.

(2)     *Rights, Powers, etc*.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Article 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

**8.11    No Independent Legal Action.**

Notwithstanding that any debt arising hereunder to a Lender shall be separate and independent debt, no Lender may take any independent legal action to enforce any obligation of the Borrowers hereunder.  Each Lender hereby acknowledges that, to the extent permitted by applicable Law, the Security Documents and the remedies provided thereunder to the Secured Parties are for the benefit of the Secured Parties collectively and acting together and not severally, and further acknowledges that each Secured Party's rights hereunder and under the Security Documents are to be exercised collectively, not severally, by the Administrative Agent upon the decision of the Required Lenders.  Accordingly, notwithstanding any of the provisions contained herein or in the Security Documents, each of the Lenders hereby covenants and agrees that it and its Related Non-Party Beneficiaries shall not be entitled to take any action hereunder or thereunder, including any declaration of default hereunder or thereunder, but that any such action shall be taken only by the Administrative Agent with the prior written agreement of the Required Lenders, provided that, notwithstanding the foregoing, in the absence of instructions from the Lenders (or the Required Lenders) and where in the sole opinion of the Administrative Agent the exigencies of the situation so warrant such action, the Administrative Agent may without notice to or consent of the Lenders (or the Required Lenders) take such action on behalf of the Secured Parties as it deems appropriate or desirable in the interests of the Secured Parties.  Each Lender hereby further covenants and agrees that upon any such written consent being given by the Required Lenders (or, to the extent required by Section 9.2, the Lenders), it and its Related Non-Party Beneficiaries shall co-operate fully with the Administrative Agent to the extent requested by the Administrative Agent, and each Lender further covenants and agrees that all proceeds from the realization of the Security Documents, to the extent permitted by applicable Law, are held for the benefit of all of the Secured Parties and shall be shared among them in accordance with this Agreement, and each Lender acknowledges that all costs of any such realization (including all amounts for which the Administrative Agent is required to be indemnified under the provisions hereof) shall be shared among the Lenders in accordance with this Agreement.  Each Lender covenants and agrees to do, and to cause its Related Non-Party Beneficiaries to do, all acts and things and to make, execute and deliver all agreements and other instruments, so as to fully carry out the intent and purpose of this Section 8.11, and each Lender hereby covenants and agrees that it and its Related Non-Party Beneficiaries shall not (i) from and after the Closing Date, seek, take, accept, receive or maintain any Lien (other than a right of set-off) or Guarantee for any of the Secured Liabilities other than is provided to the Administrative Agent, or (ii) enter into any other agreement with any of the Group Parties relating in any manner whatsoever to the Credits unless all of the Lenders shall at the same time obtain the benefit of any such agreement.  For the avoidance of doubt but subject always to Section 2.16, nothing in this Section 8.11 shall limit or otherwise affect the ability of any Secured Party to separately enforce its rights under any document, instrument or agreement with respect to any Secured Hedge Arrangement or Cash Management Services.

**8.12    Arranger.**

The Arrangers have no duties, liabilities or obligations hereunder.

**8.13    Québec Security.**

For the purposes of the grant of security under the laws of the Province of Quebec which may now or in the future be required to be provided by any Credit Party, the Administrative Agent is hereby irrevocably authorized and appointed by each of the Lenders hereto to act as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Quebec) for all present and future Lenders (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted under the laws of the Province of Quebec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and applicable Laws (with the power to delegate any

such rights or duties). The execution prior to the Closing Date by the Administrative Agent in its capacity as the Hypothecary Representative of any deed of hypothec or other security documents made pursuant to the laws of the Province of Quebec, is hereby ratified and confirmed.  Any Person who becomes a Lender or successor Administrative Agent shall be deemed to have consented to and ratified the foregoing appointment of the Administrative Agent as the Hypothecary Representative on behalf of all Lenders, including such Person and any Affiliate of such Person designated above as a Lender.  For greater certainty, the Administrative Agent, acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Administrative Agent in this Agreement, which shall apply mutatis mutandis.  In the event of the resignation of the Administrative Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Administrative Agent, such successor Administrative Agent shall also act as the Hypothecary Representative, as contemplated above.

## ARTICLE 9
## MISCELLANEOUS

**9.1    Notices.**

(1)    *Method and Contact Information.*  Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 9.1(2)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or e-mail in each case to the addressee, as follows:

(i)    if to the Borrowers or any other Credit Party:

Iovate Health Sciences International Inc.
381 North Service Road West
Oakville, ON L6M 0H4
Attention:    Tanya Mistry
E-mail:    tanya.mistry@iovate.com
Facsimile:    905-678-3402

(ii)    if to the Administrative Agent:

HSBC Bank Canada
70 York Street
Toronto, ON M5J 1S9
Attention: Agency Administrator
E-mail: cacmbagency2@hsbc.ca
Facsimile: 647-788-2185

With a copy in the case of each demand, notice, or communication to the Administrative Agent other than drawdown notices, conversion notices, rollover notices and repayment notices, to:

HSBC Bank Canada
70 York Street
Toronto, ON M5J 1S9
Attention: Philip Allen

E-mail: philip.a.allen@hsbc.ca

(iii)    if to any Lender or any Issuing Bank, to it at its address or e-mail address set out opposite its name on Schedule 9.1(1) or in the Assignment Agreement by which it becomes a Lender.

(2)    *Electronic Communications.*  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrowers may, in their discretion, agree to accept notices and other communication to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(3)    *Change of Address; When Notice Deemed Given.*  Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto in the manner provided in Section 9.1.  All notices and other communications given to any Party in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

**9.2    Waivers; Amendments.**

(1)    *Waiver.*  No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by a Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 9.2(2), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(2)    *Amendments.*  Subject to Section 9.2(3) and 9.2(4), neither this Agreement nor any other Loan Document (or any provision hereof or thereof) may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by each Credit Party to the relevant Loan Document and the Required Lenders or by each Credit Party party to the relevant Loan Document and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall:

(a)    increase the amount of any Commitment of any Lender;

(b)    extend the expiry date of any Commitment of any Lender;

(c)    reduce the principal amount of any Loan or reduce the rate of interest or any fee applicable to any Loan (provided that the Required Lenders may amend the definition of Total Leverage Ratio or any of its constituent definitions notwithstanding any effect on the Applicable Margin);

(d)    postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable in respect thereof, or reduce the amount of, waive or

excuse any such payment, or postpone the scheduled date of expiration of any Commitment (it being understood that modifications to, or waivers of, the mandatory prepayment provisions of Section 2.9(2) do not fall within this clause (d));

(e)    change Section 2.16 in a manner that would alter the sharing of payments required thereby;

(f)    change any of the provisions of Section 9.2 or the definition of "**Required Lenders**" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder;

(g)    change any of the provisions of Section 2.16(3) in a manner that would alter the order of the application of proceeds set forth therein;

(h)    contractually subordinate the payments obligation of the Credit Parties under the Loan Documents to any other payment obligation of such Credit Party;

(i)    contractually subordinate the priority of any Lien arising under the Security Documents; or

(j)    release any Credit Party from any material obligations under the Security Documents, release or discharge any of the Liens arising under the Security Document, or waive or forgo the delivery of any Security Documents required hereunder,

in each case without the prior written consent of each Lender, or in the case of the matters referred to in Section 9.2(2)(a), (b), (c), (d) and (e), without the prior written consent of each Lender directly affected thereby, and provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Issuing Bank or the Swingline Lender hereunder, as the case may be, without the prior written consent of the Administrative Agent, Issuing Bank or Swingline Lender (as applicable). Notwithstanding Section 9.2(2)(j), the Administrative Agent may release and discharge the Liens constituted by the Security Documents or a Guarantor from the Group Guarantee to the extent necessary to enable a Credit Party to complete any Asset Disposition or other sale, transfer, assignment or other disposition which is not prohibited by this Agreement or the other Loan Documents. The Administrative Agent may also subordinate the Liens constituted by the Security Documents to any Lien described in clause (c) of the definition of Permitted Lien. In addition to the forgoing, any increase, extension or renewal of the Credits shall be subject to the Administrative Agent and all U.S. federally regulated Lenders having received, with respect to any mortgaged real property located in the United States, a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination (and if any improvements on such mortgaged real property are located in a special flood hazard area, the Administrative Agent and all U.S. federally regulated Lenders having received (1) a notice about special flood hazard area status and flood disaster assistance duly executed by the applicable Credit Parties and (2) evidence of flood insurance required by Section 5.1(9)(b) of the Credit Agreement in form and substance reasonably satisfactory to them).

(3)    *Schedules*. Each of Schedule 3.1(10), 3.1(12), 3.1(14), 3.1(18) and 3.1(23) may be amended or supplemented prior to the Closing Date by written notice from the Term Borrower to the Administrative Agent no later than five Business Days prior to the Closing Date with respect to any matter arising after the Effective Date that, if existing or occurring at the Effective Date, would have been set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the

case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).

(4)      *Errors*. The Administrative Agent, with the consent of the Term Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document.

**9.3      Expenses; Indemnity; Damage Waiver.**

(1)      *Expenses*.  The Borrowers shall pay (a) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of one primary counsel and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and all applicable Taxes, in connection with the syndication of the credit facilities provided for herein (including all applicable Intralinks fees) and the preparation and administration of this Agreement and the other Loan Documents, (b) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of one primary counsel and, if necessary one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and all applicable Taxes, in connection with any amendments, modifications or waivers of the provisions hereof or of any of the other Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (c) all out-of-pocket expenses incurred by the Administrative Agent, the Arranger or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender and all applicable Taxes, in connection with the assessment, enforcement or protection of their rights in connection with this Agreement, including its rights under Section 9.3, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(2)      *Indemnity*.  The Borrowers shall indemnify the Arrangers, the Administrative Agent and each Lender, as well as each Related Party and each permitted assignee of any of the foregoing Persons (each such Person and each such assignee being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, cost recovery actions, damages, expenses and liabilities of whatsoever nature or kind and all reasonable and documented out-of-pocket expenses, including reasonable and documented fees, charges and disbursements of counsel (limited to reasonable fees, disbursements and other charges of one primary counsel for all Indemnitees, taken as a whole, and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all Indemnitees, taken as a whole (and, in the case of an actual or perceived conflict of interest, where an Indemnitee affected by such conflict informs the Term Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for such affected Indemnitee)) and all applicable Taxes (other than Excluded Taxes and consistent with Section 2.15 herein, but including all Taxes representing losses, claims or damages with respect to any non-Tax claim) to which any Indemnitee may become subject arising out of or in connection with (a) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder, and the consummation of the Transactions or any other transactions thereunder, (b) any Loan or Letter of Credit or any actual or proposed use of the proceeds therefrom, including any refusal by the Issuing Bank to honour a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, (c) any Environmental Liability, (d) any actual or prospective claim, litigation,

investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, (e) any other aspect of this Agreement and the other Loan Documents, or (f) the enforcement of any Indemnitee's rights hereunder and any related assessment, investigation, defence, preparation of defence, litigation and enquiries, in each case regardless of whether or not the Initial Acquisition is consummated; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence (it being acknowledged that ordinary negligence does not necessarily constitute gross negligence) or wilful misconduct of such Indemnitee, (B) result from a claim brought by any Group Party for a material breach of such Indemnitee's obligations under this Agreement or any other Loan Document if such Group Party has obtained a final and nonappealable judgment by a court of competent jurisdiction in such Group Party's favor on such claim or (C) result from a proceeding that does not involve an act or omission by a Borrower or any of its Affiliates and that is brought by an Indemnitee against any other Indemnitee (other than a proceeding that is brought against the Administrative Agent or an Arranger in its capacity as such).

(3)      *Lender Responsibility for Unpaid Expenses and Indemnity.*  To the extent that the Borrowers fail to pay any amount required to be paid under Sections 9.3(1) or (2), each Lender severally agrees to pay to the Administrative Agent, the Issuing Bank or the Swingline Lender (as applicable) such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Issuing Bank or the Swingline Lender, in its capacity as such.

(4)      *Inspections for Administration.*  Any inspection of any property of any Credit Party made by or through the Administrative Agent or any Lender shall be for purposes of administration of the Credits only, and no Credit Party shall be entitled to rely upon the same (whether or not such inspections are at the expense of the Borrowers).

(5)      *No Representation.*  By accepting or approving anything required to be observed, performed, fulfilled or given to the Administrative Agent or the Lenders pursuant to the Loan Documents, neither the Administrative Agent nor the Lenders shall be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by the Administrative Agent or the Lenders.

(6)      *Relationship Between Parties.*  The relationship between the Borrowers and the Administrative Agent and the Lenders is, and shall at all times remain, solely that of borrowers and lenders.  Neither the Administrative Agent nor the Lenders shall under any circumstances be construed to be partners or joint venturers of any Borrower or its Affiliates.  Neither the Administrative Agent nor the Lenders shall under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with any Borrower or its Affiliates, or to owe any fiduciary duty to any Borrower or its Affiliates.  Neither the Administrative Agent nor the Lenders undertake or assume any responsibility or duty to any Borrower or its Affiliates to select, review, inspect, supervise, pass judgment upon or inform any Borrower or its Affiliates of any matter in connection with their property or the operations of any Borrower or its Affiliates.  Each Borrower and its Affiliates shall rely entirely upon their own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by the Administrative Agent or the Lenders in connection with such matters shall be solely for the protection of the Administrative Agent and the Lenders, and no Borrower nor any other Person shall be entitled to rely thereon.

(7)     *Limitation of Liability.*  The Administrative Agent and the Lenders shall not be responsible or liable to any Person for any loss, damage, liability or claim of any kind relating to injury or death to Persons or damage to property caused by the actions, inaction or negligence of any Credit Party or its Affiliates, and the Borrowers hereby indemnify and holds the Administrative Agent and the Lenders harmless on the terms set out in Section 9.3(2) from any such loss, damage, liability or claim.

(8)     *Payment of Expenses and Indemnity.*  All amounts due under Section 9.3 shall be payable not later than 10 Business Days after written demand therefor.

**9.4     Successors and Assigns.**

(1)     *Successors and Assigns.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (a) no Borrower shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by a Borrower without such consent shall be null and void), and (b) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with Section 9.4.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(2)     *Assignment by Lenders.*  Any Lender may assign to one or more assignees (treating any fund that invests in bank loans and any other fund that invests in bank loans and is managed by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single assignee) all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitments and the Loans at the time owing to it); provided that (a) except in the case of an assignment to a Lender or a Lender Affiliate, the Term Borrower must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), and (b) except in the case of an assignment of (i) any Revolving Credit Commitment or any Term Credit Commitment prior to the Closing Date to an assignee that is a Lender immediately prior to giving effect to such assignment, the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed); (c) the Term Borrower's consent shall not be required with respect to any assignment made at any time after the occurrence and during the continuance of an Event of Default, (d) except in the case of an assignment to a Lender or a Lender Affiliate or an assignment of the entire remaining amount of the assigning Lender's Commitment, the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date on which the Assignment and Assumption relating to such assignment is delivered to the Administrative Agent) shall not be less than U.S.$5,000,000, unless each of the Term Borrower and the Administrative Agent otherwise consent in writing and the amount held by each Lender after each such assignment shall not be less than U.S.$5,000,000, unless each of the Term Borrower and the Administrative Agent otherwise consent in writing, (e) each partial assignment in respect of a Commitment and the related Loans shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement in respect of such Commitment and the related Loans, (f) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with (except in the case of an assignment to a Lender or a Lender Affiliate) a processing and recordation fee of U.S.$3,500, payable by the assigning Lender, (g) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, and (h) no assignment may be made to a Sponsor, any Group Party, any Affiliate of a Group Party or a Sponsor, or a Defaulting Lender.  The Administrative Agent shall provide the Term Borrower and each Lender with written notice of any

change in (or new) address of a Lender disclosed in an Administrative Questionnaire. Subject to acceptance and recording thereof pursuant to Section 9.4(4), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, shall have all of the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, and 2.15 and 9.3). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with Section 9.4 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.4(5).

(3)     *Register.* The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in Toronto, Ontario a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans (with interest rate) and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent, the Issuing Bank, and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers, the Issuing Bank and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(4)     *Acceptance and Recording of Assignments.* Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 9.4(2) and any written consent to such assignment required by Section 9.4(2), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 9.4(4).

(5)     *Participations.* Any Lender may, without notice to the Borrowers or the consent of the Borrowers, the Administrative Agent, the Issuing Bank or the Swingline Lender, sell participations to one or more Persons (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitment and the Loans owing to it); provided that (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (c) the Borrowers, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that (d) such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender shall not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.2(2) that affects such Participant, (e) the Participant shall agree to maintain the confidentiality of Information (as defined in Section 9.16) on terms and conditions substantively similar to those contained in Section 9.16, and (f) no sale of a participation may be made to a Sponsor, any Group Party, any Affiliate of a Group Party or a Sponsor, or a Defaulting Lender. Subject to Section 9.4(6), the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.3 (subject to the requirements and limitations therein, including the requirements under Section 2.15(5) (it being understood that any documentation required under Section 2.15(5) shall be delivered to the participating

Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.4(2).  To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 9.11 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.16(4) as though it were a Lender.

(6)      *Rights of Participant.*  A Participant shall not be entitled to receive any greater payment under Sections 2.13, 2.14, 2.15 and 9.3 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.

(7)      *Lender Pledge of Security.*  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and Section 9.4 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(8)      *Borrower's Obligations.*  Any assignment or grant of a participation pursuant to Section 9.4 shall constitute neither a repayment by the applicable Borrower to the assigning or granting Lender of any Loan included therein, nor a new advance of any such Loan to the applicable Borrower by such Lender or by the assignee or Participant, as the case may be.  The parties acknowledge that the applicable Borrower's obligations hereunder with respect to any such Loans shall continue and shall not constitute new obligations as a result of such assignment or participation.

**9.5      Anti-Money Laundering Legislation.**

(1)      *Information.*  Each Borrower acknowledges that, pursuant to AML Legislation, the Lenders and the Administrative Agent may be required to obtain, verify and record information regarding the Borrowers, their directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Borrowers, and the transactions contemplated hereby.  Each Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Administrative Agent, or any prospective assignee or participant of a Lender or the Administrative Agent, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(2)      *Role of Agent.*  If the Administrative Agent has ascertained the identity of a Borrower or any authorized signatories of a Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

          (a)      shall be deemed to have done so as an agent for each Lender, and this Agreement shall constitute a "written agreement" in such regard between each Lender and the Administrative Agent within the meaning of applicable AML Legislation; and

          (b)      shall provide to each Lender copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Lenders agrees that the Administrative Agent has no obligation to ascertain the identity of a Borrower or any authorized signatories of a Borrower on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from the Borrowers or any such authorized signatory in doing so.

**9.6**     **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the Parties, each Party acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**9.7**     **Survival.**

All covenants, agreements, representations and warranties made by the Borrowers herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as  the Commitments have not expired or terminated.   Sections 2.13, 2.14, 2.15, 9.3 and Article 8 shall survive and remain in full force and effect, regardless of the consummation of the Transactions, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

**9.8**     **Counterparts.**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument.  Counterparts may be executed either in original or faxed or other electronic form and the parties adopt any signatures received by a receiving fax machine or via e-mail as original signatures of the parties.

**9.9      Entire Agreement.**

This Agreement (together with the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent), constitutes the entire agreement between the parties pertaining to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written.  There are no conditions, warranties, representations or other agreements between the parties in connection with the subject matter of this Agreement (whether oral or written, express or implied, statutory or otherwise) except as specifically set out in this Agreement or in such other applicable agreements.

**9.10      Severability.**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.11      Right of Set Off.**

If an Event of Default shall have occurred and be continuing, each Secured Party is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Secured Party to or for the credit or the account of any Credit Party against any of and all of the obligations of the Credit Parties now or hereafter existing under the Transaction Documents held by such Secured Party, irrespective of whether or not such Secured Party shall have made any demand under any Transaction Document and although such obligations may be unmatured and regardless of the currency of the deposit; provided that, to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.  The rights of each Secured Party under this Section 9.11 are in addition to other rights and remedies (including other rights of set off) which such Secured Party may have.

**9.12      Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable in that Province and shall be treated, in all respects, as an Ontario contract.

**9.13      Attornment.**

Each party hereto agrees (a) that any action or proceeding relating to this Agreement may (but need not) be brought in any court of competent jurisdiction in the Province of Ontario, and for that purpose now irrevocably and unconditionally attorns and submits to the jurisdiction of such Ontario court, (b) that it irrevocably waives any right to, and shall not, oppose any such Ontario action or proceeding on any jurisdictional basis, including <u>forum</u> <u>non</u> <u>conveniens,</u> and (c) not to oppose the enforcement against it in any other jurisdiction of any judgment or order duly obtained from an Ontario court as contemplated by this Section 9.13.

**9.14    Service of Process.**

Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 9.1.  Nothing in this Agreement shall affect the right of any Party to serve process in any other manner permitted by Law.

**9.15    WAIVER OF JURY TRIAL.**

EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.15.

**9.16    Confidentiality.**

Each of the Administrative Agent, the Issuing Bank and each Lender shall maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to each of their Affiliates, Lender Affiliates (in the case of a Lender) directors, officers, employees, agents and advisors, including accountants, legal counsel and other advisors to the extent necessary to administer or enforce this Agreement and the other Loan Documents (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or other Governmental Authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under any Loan Document or any suit, action or proceeding relating to any Loan Document or the enforcement of rights thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or Participant in any of its rights or obligations under this Agreement, or (ii) any actual or prospective counterparty (or its advisors) to any Hedge Arrangement with a Group Party and its obligations, (g) to their auditors in connection with any audit, (h) with the prior written consent of the Borrowers, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 9.16, or (ii) becomes available to the Administrative Agent, the Issuing Bank, or any Lender on a non-confidential basis from a source other than a Group Party.  For the purposes of this Section 9.16, "**Information**" means all information received from any Credit Party relating to any Credit Party, any of their subsidiaries or Affiliates, or their respective business, other than any such information that is available to the Administrative Agent, the Issuing Bank, the Arranger, or any Lender on a non-confidential basis prior to disclosure by such Credit Party.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding the foregoing, the Secured Parties and the Credit Parties agree that Blake, Cassels & Graydon LLP may inform league table services, such as Thomson Financial and Bloomberg, and make mention in its promotional publications and the media generally of its representation of the Secured Parties with respect to the Transactions.  If the Administrative Agent or any Lender is requested or required to disclose any Information (other than by

any bank examiner) pursuant to or as required by Law or by a subpoena or similar legal process, the Administrative Agent or such Lender, as applicable, shall use its reasonable commercial efforts (to the extent permitted by Law) to provide the Borrowers with notice of such requests or obligation in sufficient time so that the Borrowers may seek an appropriate protective order or waive the Administrative Agent's or such Lender's, as applicable, compliance with the provisions of this Section, and the Administrative Agent and such Lender, as applicable, shall, to the extent reasonable, cooperate with the Borrowers in the Borrowers' obtaining any such protective order.

**9.17    No Strict Construction.**

The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favouring or disfavouring any Party by virtue of the authorship of any provisions of this Agreement.

**9.18    Paramountcy.**

In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any other Transaction Document then, notwithstanding anything contained in such other Transaction Document, the provisions contained in this Agreement shall prevail to the extent of such conflict or inconsistency and the provisions of such other Transaction Document shall be deemed to be amended to the extent necessary to eliminate such conflict or inconsistency, it being understood that the purpose of the other Transaction Documents is to add to, and not detract from, the rights granted to the Agent (for its own benefit and the benefit of the other Secured Parties) under this Agreement. If any act or omission of any or all Credit Parties is expressly permitted under this Agreement but is expressly prohibited under any other Transaction Document, such act or omission shall be permitted. If any act or omission is expressly prohibited under any other Transaction Document, but this Agreement does not expressly permit such act or omission, or if any act is expressly required to be performed under any other Transaction Document but this Agreement does not expressly relieve any or all Credit Parties from such performance, such circumstance shall not constitute a conflict or inconsistency between the applicable provisions of such other Transaction Document and the provisions of the Credit Agreement.

**9.19    Excluded Swap Obligations.**

Notwithstanding anything to the contrary contained herein or in any other Loan Document, any Excluded Swap Obligations of a Guarantor shall be excluded from:

(a)    the definition of "Secured Liabilities" in any Loan Document as it pertains to such Guarantor, and no Lien granted by a such Guarantor under any Loan Document shall secure any Excluded Swap Obligations; and

(b)    the definition of "Debtor Liabilities" in the Group Guarantee as it pertains to such Guarantor, and no Excluded Swap Obligations shall be guaranteed or indemnified by such Guarantor under any Loan Document.

**9.20    LIMITATION OF LIABILITY.**

NO CLAIM MAY BE MADE BY ANY CREDIT PARTY, ANY SECURED PARTY OR ANY OTHER PERSON AGAINST ANY INDEMNITEE ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS RESULT OF, ANY

LOAN DOCUMENT, THE TRANSACTIONS, OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH CREDIT PARTY AND SECURED PARTY HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL SUCH CLAIMS, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOUR.

**9.21    Releases of Guarantees and Liens.**

(1)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 9.2) to, and the Administrative Agent shall, take any action requested by the Term Borrower having the effect of releasing any Collateral or guarantee obligations (a) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 9.2 or (b) under the circumstances described in Section 9.21(2).

(2)    On the Lender Termination Date, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Credit Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

[signatures on the next following pages]

*Iovate Credit Agreement*

- S1 -

**XIWANG IOVATE HEALTH SCIENCE INTERNATIONAL INC.**, as Borrower

By: _____
   Name:   Di Wang
   Title:   Director

- S2 -

**IOVATE HEALTH SCIENCES INTERNATIONAL INC.**, as Borrower

By: _____

    Name:  Norm Vanderee
    Title:   Chief Financial Officer

- S3 -

**HSBC BANK CANADA**, as Administrative Agent, Joint
Lead Arranger and Joint Bookrunner

By: _____
Name: PHILIP ALLEY
Title: Managing Director

By: _____
Name:
Title: Aaron Toporowski
         Director

- S4 -

**THE TORONTO-DOMINION BANK**, as Joint Lead
Arranger, Joint Bookrunner and Syndication Agent

By: _____
    Name:    Andrew MacLellan
    Title:    Director
             National Accounts

By: _____
    Name:    Ashley Yantzi
    Title:    Manager Commercial Credit
             National Accounts

- S5 -

**HSBC BANK CANADA**, as Lender and Issuing Bank

By: _____

Name: RICHARD KINLOUGH

Title: MANAGING DIRECTOR

By: _____

Name: Jesse MacMasters

Title: Head Of Large Corporate - Ontario

*Signature Page*                                          *Iovate Credit Agreement*

- S6 -

**THE TORONTO-DOMINION BANK**, as Lender

By: _____

    Name:    **Andrew MacLellan**
    Title:      **Director**
                 **National Accounts**

By: _____

    Name:    **Ashley Yantzi**
    Title:      **Manager Commercial Credit**
                 **National Accounts**

- S7 -

**BANK OF CHINA (CANADA)**, as Co-Documentation
Agent and Lender

By: _____

Name: Liang Jiao

Title:    Senior Vice President

- S8 -

**BANK OF MONTREAL**, as Co-Documentation Agent
and Lender

By: _____

     Name: Andrew Gaew
     Title: Managing Director

Julia Davidson
Director

- S9 -

**CHINA MINSHENG BANKING CORP. LTD**, as
Lender

By: _____
Name: Gao Jian Xu
Title: China Minsheng Banking Corp. Ltd
Qingdao Branch Vice President

- S10 -

**BANK OF AMERICA, NATIONAL ASSOCIATION,**
as Lender

By: _____
   Name:  Jason Hoogenboom
   Title:  Senior Vice President

- S11 -

**NATIONAL BANK OF CANADA**, as Lender

By: _____

Name: **Zami Salaria**
Title: Director

**Paul Keast**
Associate Vice President

- S12 -

**CANADIAN WESTERN BANK**, as Lender

By: _____

Name:
Title:    Stan Seto
          Senior Manager


Richard Hallson
**Vice President
Corporate Lending**

- S13 -

**ICICI BANK CANADA**, as Lender

By: _____

Name:

Title:    **Leslie Mathew**
          **Assistant Vice President**
          **Corporate & Commercial Banking**
          **ICICI Bank Canada**

Anthony Coulthard
Senior Vice President
Legal & Corporate Secretary
ICICI Bank Canada

- S14 -

**LAURENTIAN BANK OF CANADA**, as Lender

By: _____

Name:
Title:      **Sophie Boucher**
            Vice President

**Guylaine Couture**
Assistant Vice President

**EXHIBIT A**

**FORM OF**
**ADDITIONAL COMMITMENT AGREEMENT**

HSBC Bank Canada
70 York Street
Toronto, ON M5J 1S9

Attention: Agency Administrator

Ladies and Gentlemen:

Reference is made to the credit agreement dated as of November 22, 2016 (as amended, supplemented or restated from time to time, the "**Credit Agreement**", the terms defined therein being used herein as therein defined) among, *inter alios*, Xiwang Iovate Health Science International Inc. and Iovate Health Sciences International Inc. (the "**Revolving Borrower**"), as borrowers the financial institutions from time to time party thereto, as lenders (the "**Lenders**"), and HSBC Bank Canada, as administrative agent (in its capacity as administrative agent, the "**Agent**").

1.       Each of the undersigned financial institutions (each, an "**Additional Lender**") hereby severally agrees to provide the Additional Commitment set forth opposite its name on **Annex I** (for each such Additional Lender, its "**Additional Commitment**"). Each Additional Commitment provided pursuant to this letter agreement (this "**Agreement**") shall be subject to all of the terms and conditions set forth in the Credit Agreement, including, without limitation, Section 2.1(3) thereof. Each Additional Lender agrees that, from and after the Effective Date (as defined below), such Additional Lender shall be obligated to make Loans under the Revolving Credit upon the terms, and subject to the conditions, set forth in the Credit Agreement and in this Agreement.

2.       Each party to this Agreement acknowledges and agrees that (i) the Additional Commitments provided pursuant to this Agreement shall constitute (and serve to increase) the Revolving Credit Commitments such that further Revolving Loans become available thereunder upon identical terms and conditions, (ii) with respect to the Additional Commitment provided by any Additional Lender pursuant to this Agreement, such Additional Lender shall receive from the Revolving Borrower such up-front, arrangement and/or other fees, if any, as may be separately agreed to in writing by the Revolving Borrower, the Agent and such Additional Lender, all of which fees shall be due and payable to such Additional Lender on the terms and conditions set forth in each such separate agreement, and (iii) from and after the Effective Date, each Additional Lender shall be a Revolving Credit Lender under and as defined in the Credit Agreement for the purposes of the Credit Agreement and for all of the Loan Documents and shall be bound by the terms, conditions and covenants and shall be entitled to the benefits thereof as if it were an original Revolving Credit Lender  and signatory with a Revolving Credit Commitment equal to such Additional Lender's Additional Commitment (plus, if such Additional Lender is already a Revolving Credit Lender, such Revolving Credit Lender's Revolving Credit Commitment immediately prior to giving effect to the increase thereof pursuant to this Agreement).

3.       Each Additional Lender, to the extent not already a party to the Credit Agreement as a Lender thereunder, acknowledges and agrees that (i) it is not a Defaulting Lender, (ii) it has received a copy of the Credit Agreement and the other Loan Documents, (iii) it has, independently and without reliance upon the Agent or any other Lender and on the basis of such documents and information as it deems appropriate, made its own credit analysis and decision regarding this Agreement and the Credit

Exhibit A – Page 1

Agreement, and (iv) except for documents referred to in the preceding clause (ii) (which it has already received) the Agent shall not have any duty to provide such Additional Lender with any credit or other information concerning the affairs, financial condition or business of the Revolving Borrower or any third party, except as specified in the Credit Agreement.

4.      The Revolving Borrower acknowledges and agrees that (i) it shall be liable for all indebtedness, obligations and other liabilities ("**Obligations**") with respect to the Additional Commitments provided hereby, including, without limitation, all Loans made pursuant thereto, and (ii) all such Obligations shall be entitled to the benefits of the Security Documents.

5.      The Revolving Borrower represents and warrants to the Agent and the Lenders that

(i)      no Default or Event of Default has occurred and is continuing and all of the representations and warranties contained in the Credit Agreement and in the other Loan Documents are true and correct on and as of the Effective Date as though made on and as of the Effective Date (except where made only as of an earlier date or as disclosed to and accepted by the Lenders prior to the Effective Date); and

(ii)      the Term Borrower is in *pro forma* compliance with the financial covenants contained in Section 5.1(12) of the Credit Agreement (assuming the full incurrence of the new Indebtedness in question) as of the Effective Date.

6.      This Agreement shall be effective on the date (the "**Effective Date**") on which each of the following conditions has been satisfied:

(i)      payment of all fees required to be paid in connection herewith (including, without limitation, any agreed upon up-front, arrangement and/or other fees, if any, owing to the Additional Lenders and the Agent (or any affiliate thereof)) or due and owing to the Agent or the Lenders pursuant to the Credit Agreement;

(ii)      the Agent shall have received (A) an executed counterpart of this Agreement duly executed by the Revolving Borrower prior to the close of business on the Return Date (as defined below), (B) acknowledgements executed by each Guarantor, acknowledging that the Additional Commitments contemplated hereby and all Loans to be incurred pursuant thereto shall be entitled to the benefits of the Security Documents on the same basis as the other Borrowings made pursuant to the Credit Agreement, (C) an opinion or opinions dated as of the Effective Date, in form and substance reasonably satisfactory to the Agent, from counsel to the Borrowers and the Guarantors, covering such matters set forth in the opinions of counsel delivered to the Agent on the Closing Date pursuant to Section 4.2(3) of the Credit Agreement, and such other matters incident to the transactions contemplated hereby as the Agent may reasonably request, and (D)  such other officers' certificates, board of director resolutions and evidence of good standing as the Agent shall  reasonably request.

7.      This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the Province of Ontario and the Laws of Canada applicable therein.

8.      This Agreement shall enure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

9.      This Agreement may be executed in any number of counterparts and delivered by facsimile or pdf formatted attachment to an email and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

10.     The Revolving Borrower may accept this Agreement by signing in the space provided below and returning an executed counterpart hereof to the Agent before the close of business on **[Date]** (the "**Return Date**").  If the Revolving Borrower does not so accept this Agreement by such time, the Additional Commitments set forth in this Agreement shall be deemed cancelled.

11.     After the execution and delivery to the Agent of a copy of this Agreement (including by way of counterparts and by facsimile or pdf email transmission) fully executed by the parties hereto, this Agreement may only be changed, modified or varied in accordance with the requirements for the modification of Loan Documents pursuant to Section 9.2 of the Credit Agreement.  In the event of any conflict between the terms of this Agreement and those of the Credit Agreement, the terms of the Credit Agreement shall control.

[Remainder of this page left intentionally blank.]

Yours truly,

**[NAME OF EACH ADDITIONAL LENDER]**

By: _____
Name:
Title:

**EXHIBIT B**

**FORM OF BORROWING REQUEST**

**TO:**        HSBC Bank Canada

**RE:**        Credit Agreement dated as of November 22, 2016 made between, among others, the
                undersigned (the **"[Term/Revolving] Borrower"**), you, as Administrative Agent, and
                the lenders from time to time party thereto (as amended, supplemented or otherwise
                modified from time to time, the **"Credit Agreement"**)

                We refer to the Credit constituted by the Credit Agreement and we hereby give you
notice that on **[DATE]** we wish to obtain a Borrowing in the aggregate amount of **[Canadian /
U.S.]$[AMOUNT]**.  All capitalized terms used and not otherwise defined herein have the meanings given
to them in the Credit Agreement.

                The Borrowing requested hereby is to take the form of:

        ☐        a B/A Borrowing

        ☐        a Canadian Prime Borrowing

        ☐        a Base Rate Borrowing

        ☐        a LIBO Rate Borrowing

        ☐        a Letter of Credit

                Such Borrowing is a **[rollover/conversion]** of outstanding **[Bankers' Acceptances
(including any BA Equivalent Notes) having Contract Periods ending [DATE]/LIBO Rate Loans
having an Interest Period ending [DATE]/Canadian Prime Loans/Base Rate Loans]** in an aggregate
principal amount of **[Canadian / U.S.]$[AMOUNT].**

                **[The Contract Period in respect of the B/A Borrowing requested hereby is
[NUMBER] days[1].]**

                **[The Interest Period in respect of the LIBO Rate Borrowing requested hereby is
[NUMBER] days[2].]**

                We hereby certify, after due and careful investigation, that[3]:

        (a)        each of the representations and warranties made by the Borrower in the Credit
                Agreement are true and correct on and as of the date hereof except to the extent
                that (i) any change to the representations and warranties has been disclosed to the

---

[1]     This sentence is only required in the context of a Borrowing Request for a B/A Borrowing.

[2]     This sentence is only required in the context of a Borrowing Request for a LIBO Rate Borrowing.

[3]     This certification need not be made on conversions or rollovers.

Administrative Agent and accepted by the Required Lenders, or (ii) any representation and warranty is stated to be made as of a particular time; and

(b)      on and as of the date hereof, no Default has occurred and is continuing.

DATED:  **[MONTH] [DAY], [YEAR]**

**[BORROWER]**

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

**EXHIBIT C**

**COMPLIANCE CERTIFICATE**

**TO:**       HSBC Bank Canada, as administrative agent under the Credit Agreement (the "**Administrative Agent**")

**AND TO:**   The Lenders

Reference is made to the credit agreement dated as of November 22, 2016 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among, *inter alios*, Xiwang Iovate Health Science International Inc. and Iovate Health Sciences International Inc., as borrowers, HSBC Bank Canada,  as administrative agent, and the lenders now or hereafter parties thereto. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The undersigned, the **[Chief Financial Officer]** of the Borrower, in that capacity and not personally, hereby certifies that, as of the date hereof, (a) a review of the Consolidated financial statements of the Term Borrower for the Fiscal Quarter ended **[LAST DAY OF FISCAL QUARTER]**, and of the activities of the Credit Parties during such Fiscal Quarter has been made under the supervision of the undersigned with a view to determining whether the Credit Parties have fulfilled all of their obligations under the Credit Agreement and the other Loan Documents, (b) the Credit Parties have fulfilled their obligations under the Credit Agreement and the other Loan Documents such that no Default or Event of Default has occurred and is continuing, and (c) as at the end of the Fiscal Quarter ended **[LAST DAY OF FISCAL QUARTER]**, the Term Borrower was in compliance with each of the financial tests set forth in Section 5.1(12) of the Credit Agreement[4].  The Borrower's compliance with each of such financial covenants as at the end of such Fiscal Quarter is demonstrated by the figures set out on the financial covenant compliance worksheet attached hereto as Schedule A.

**DATED: [MONTH] [DAY], [YEAR]**

_____

Name:
Title:      **[Chief Financial Officer], Xiwang Iovate Health Science International Inc.**

---

[4]      Or, if there is non-compliance or a misrepresentation, specify same.

## SCHEDULE A TO COMPLIANCE CERTIFICATE
## FINANCIAL COVENANT COMPLIANCE WORKSHEET

RE:          Rolling Period ended **[MONTH] [DAY], [YEAR]**.

A.    **FIXED CHARGE COVERAGE RATIO**

**Requirement:  Maintain a Fixed Charge Coverage Ratio of not less than 1.2:1.0 for each Rolling Period ending after the Closing Date (Section 5.1(12)(a)).**

1.    **Adjusted EBITDA**

(a)       EBITDA[5]                                                    [•]

(b)       Cash Income Tax Expense                            [•]

(c)        Unfunded Capital Expenditures                  [•]

(d)       management fees paid to the Sponsor by the Term Borrower on a
          consolidated basis                                         [•]

(e)       cash dividends, distributions and returns of capital paid by the
          Term Borrower to Holdco                            [•]

(f)        payments made by the Term Borrower to Holdco on account of
          the purchase, redemption,  or other acquisition of any of its
          Equity Securities or any warrants, options or similar rights with
          respect to its Equity Securities.                    [•]

          Adjusted EBITDA:  (a – b – c – d – e - f)    [•] (A)

2.    **Fixed Charges**

(a)       the aggregate amount of all scheduled principal payments on
          Indebtedness made (or required to be made) by any Group Party
          other than (i) to another Group Party, or (ii) where such principal
          amount is refinanced during such period pursuant to
          Indebtedness permitted under Section 6.1(1)    [•]

(b)       Cash Interest Expenses                               [•]

(c)        amortization of debt discount or financing fees without
          duplication of (a), the aggregate amount of all payments made
          on Capital Lease Obligations by the Term Borrower on a
          Consolidated basis                                         [•]

---

[5] See calculation below.

|  | Fixed Charges  (a + b + c) | [●] (B) |

**Fixed Charge Coverage Ratio:  Ratio of (A) to (B)**    [●]

**B.**    **TOTAL LEVERAGE RATIO**

**Requirement:  Maintain a Total Leverage Ratio of not greater than [NUMBER]:1.0 (Section 5.1(12)(b)).**

**1.**    **Net Total Indebtedness**    (A)

| (a) | Total Indebtedness | [●] |
| (b) | Cash Balance[6] | [●] |
|  | Net Total Indebtedness  (a – b) | [●] (A) |

**2.**    **EBITDA**

| (a) | Net Income[7] for the Rolling Period | [●] |
| (b) | any non-cash income and gains (including unrealized mark-to-market gains under Hedging Arrangements), other than any such non-cash items to the extent that it will result in the receipt of cash payments in any future period; | [●] |
| (c) | Interest Expense | [●] |
| (d) | Income Tax Expense | [●] |
| (d) | Depreciation Expense | [●] |
| (e) | non-recurring cash expenses relating to the Transaction and the Initial Acquisition of not more than U.S.$● | [●] |
| (d) | non-recurring cash expenses relating to Permitted Acquisitions other than the Initial Acquisition | [●] |
| (e) | any other non-cash expenses and losses (including compensation issued in Equity Securities and unrealized mark-to-market losses under Hedging Arrangements) | [●] |
| (f) | management fees paid to the Sponsor | |

---

[6] Capped at $20 million

[7] Undistributed RJV Earnings included in Net Income for any period  may not account for more than 5% of EBITDA for such period and shall be capped accordingly

Exhibit C – Page 3

EBITDA: (a – b + c + d + e + f + g)                    [●] (B)

**Total Leverage Ratio:  Ratio of (A) to (B)**                    [●]

**EXHIBIT D**

**FORM OF**
**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This assignment and assumption agreement (the "**Assignment and Assumption**") is dated as of the Effective Date set out below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below  (as amended, supplemented, restated or replaced from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set out in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set out herein in full.

For good and valuable consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (a) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any Letters of Credit and Swingline Loans included in such facilities) and (b) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (a) above (the rights and obligations sold and assigned pursuant to clauses (a) and (b) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:                    _____

2.    Assignee:                   _____

                                            **[and is an Affiliate of [*identify Lender*][8]]**

3.    Borrower:                   _____

4.    Administrative Agent:    HSBC Bank Canada, as the administrative agent under the Credit Agreement

5.    Credit Agreement:        Credit agreement dated as of November 22, 2016 among Xiwang Iovate Health Science International Inc. and Iovate Health Sciences International Inc., as borrowers, HSBC Bank Canada, as administrative agent, and the lenders party thereto.

---

[8]    Select as applicable.

6.      Assigned Interest:

| Facility Assigned[9] | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[10] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____ ____, 20___ [*To be inserted by Administrative Agent and which shall be the effective date of recordation of transfer in the register therefor.*]

The terms set out in this Assignment and Assumption are hereby agreed to:

**[NAME OF ASSIGNOR]**

By: _____
          Name:
          Title:

**[NAME OF ASSIGNEE]**

By: _____
          Name:
          Title:

**[Consented to and]**[11] Accepted:

**HSBC BANK CANADA**, as Administrative Agent

By: _____
          Name:
          Title:

**[Consented to:]**[12]

---

[9]    i.e., Revolving Credit Commitment or Term Credit Commitment

[10]   Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[11]   To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[12]   To be added only if the consent of the Borrower and/or other parties (e.g. Swingline Lender, Issuing Bank) is required by the terms of the Credit Agreement.

**[NAME OF RELEVANT PARTY]**

By: _____

    Name:

    Title:

ANNEX 1

## IOVATE CREDIT AGREEMENT

### STANDARD TERMS AND CONDITIONS FOR
### ASSIGNMENT AND ASSUMPTION

1.    **Assignor**.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries  or Affiliates or any other Person of any of their respective obligations under any Loan Document **[, and (c) attaches the Note(s) held by it evidencing the Assigned Facilities and requests that the Administrative Agent exchange such Note(s) for a replacement Note or Notes payable to the Assignee and (if the Assignor has retained any interest in the Assigned Facilities) a replacement Note or Notes payable to the Assignor in the respective amounts which reflect the assignment being made hereby (and after giving effect to any other assignments which have become effective on the Transfer Effective Date)].**[13] Upon request, the Assignor shall, at the expense of the Administrative Agent (for reimbursement by the Borrower), as promptly as practical, execute and deliver to the Administrative Agent, all such other and further documents, agreements and instruments as the Administrative Agent may reasonably request in order to effect the transfer of the Assigned Interest, including any materials required to discharge the Assignee's interest in and to the Collateral.

2.    **Assignee**.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, and (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.1(a) or (b) thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender; (b) acknowledges the terms and conditions of the Intercreditor Agreement and agrees to be bound thereby as if a party thereto, and (c) agrees that (i) it shall, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it shall perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

3.    **Payments**.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to

---

[13]      Delete bracketed language if Assignor does not hold Note(s).

the Assignee whether such amounts have accrued prior to the Effective Date or accrued subsequent to the Effective Date.  The Assignor and the Assignee shall make all appropriate adjustments in payments by the Administrative Agent for the periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

4.      **General Provisions**.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**EXHIBIT E**

**FORM OF**
**SUBORDINATION AGREEMENT FOR PERMITTED SHAREHOLDER INDEBTEDNESS**

**THIS AGREEMENT** dated as of **[DATE]** is made by **[NAME]** (the "**Junior Creditor**") in favour of the Senior Creditors (as defined below).

For good and valuable consideration, the Junior Creditor agrees as follows:

1.        **Definitions**.  In this Agreement capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Senior Credit Agreement, and the following terms have the following meanings

"**Debtor**" means:

    (a)    prior to the Transaction Amalgamation, Xiwang Iovate Health Science International Inc.; and

    (b)    from and after the Transaction Amalgamation, Iovate Health Sciences International Inc.

"**Enforcement Action**" means (a) the acceleration of the time for payment of any of the Junior Debt (which shall include the making of a demand with respect to any demand obligation), (b) the enforcement of any Junior Security or any action in furtherance thereof, (c) the appointment of a receiver or receiver and manager of the Debtor or any of its assets, (d) the commencement or initiation of any insolvency proceeding with respect to the Debtor, (e) the commencement or initiation of any action or proceeding to recover or receive payment of any of the Junior Debt, (f) the exercise any right of set-off, combination or similar right against the Debtor, or (g) the exercise of any put option or the causing of the Debtor to honour any redemption obligation with respect to its securities; provided that, notwithstanding the foregoing, the following actions shall not constitute an Enforcement Action:

    (a)    the provision by the Junior Creditor of a notice of default to the Debtor;

    (b)    the making of a demand with respect to any Restricted Payment permitted to be made under the Credit Agreement (without any acceleration of the time for payment of any of the Junior Debt);

    (c)    the filing of a proof of claim or similar instrument with respect to the Junior Debt in any insolvency proceeding;

    (d)    the voting of a claim with respect to the Junior Debt in any insolvency proceeding in accordance with the terms of this Agreement;

    (e)    the acceleration of the time for payment of any of the Junior Debt  during any insolvency proceeding or following the acceleration of all of the Senior Debt;

    (f)    the institution of a default rate of interest; and

(g)    the taking of any action required to preserve the validity, efficacy or priority of the Junior Debt, including the commencement or initiation of any action required to comply with statutory limitation periods (provided that such proceeding is then stayed).

"**Junior Debt**" means, collectively, all present and future indebtedness, liabilities and obligations of any and every kind, nature and description whatsoever and howsoever incurred (whether direct or indirect, absolute or contingent, matured or unmatured, whether as principal debtor, guarantor, surety or otherwise) of the Debtor to the Junior Creditor.

"**Junior Payment**" means, with respect to any Junior Debt, (a) any payment or distribution by any party of cash, securities, or other form of property, including by the exercise of a right of set-off or in any other manner, on account of such Junior Debt, or (b) any redemption, purchase or other acquisition of such Junior Debt by any party.

"**Junior Security**" means, collectively, all present and future guarantees and Liens granted by the Debtor to the Junior Creditor as security for all or any part of the Junior Debt.

"**Senior Agent**" means HSBC Bank Canada, in its capacity as administrative agent for the Secured Parties under the Senior Credit Agreement, and includes any successor administrative agent appointed pursuant to the Senior Credit Agreement.

"**Senior Credit Agreement**" means the credit agreement dated as of November 22, 2016 among, *inter alios*, Xiwang Iovate Health Science International Inc. and Iovate Health Sciences International Inc., as borrowers, the Senior Agent, as administrative agent, and the lenders party thereto from time to time, as amended, supplemented, restated or replaced from time to time.

"**Senior Creditors**" means "Secured Parties" as defined in the Senior Credit Agreement.

"**Senior Debt**" means, collectively, all present and future indebtedness, liabilities and obligations of any and every kind, nature and description whatsoever and howsoever incurred (whether direct or indirect, absolute or contingent, matured or unmatured, whether as principal debtor, guarantor, surety or otherwise) of the Debtor to the Senior Creditors or any of them, and any unpaid balance thereof.

**2.**        **Postponement**.  The Junior Debt is hereby postponed and subordinated to, and made subject in right of payment to the prior indefeasible payment in cash of, all Senior Debt.

**3.**        **Payment Restriction**.

(a) Notwithstanding the terms of the Junior Debt, the Debtor (nor any party on its behalf) shall not make and shall not be entitled to make, and the Junior Creditor shall not accept and shall not be entitled to accept, any Junior Payment <u>except as</u> permitted under Section 6.1(9) of the Credit Agreement.

(b) In the event of any dissolution, winding up, liquidation, arrangement, reorganization, adjustment, relief of the Debtor of its debts, whether voluntary or involuntary, in any bankruptcy, insolvency, or other similar law, the Senior Creditors shall be entitled to receive payment in full of the Senior Debt before the Junior Creditor is entitled to receive any payment of, or distribution of any kind or character on account of, all or any of the Junior Debt.

4.         **No Junior Security**.  The Debtor (nor any party on its behalf) shall not grant or provide and shall not be entitled to grant or provide, and the Junior Creditor shall not accept and shall not be entitled to accept, any Junior Security.

5.         **Enforcement Action.**  The Junior Creditor shall not take any Enforcement Action.

6.         **Proceeds Held in Trust**.  If any payment (including any proceeds of realization on the Junior Security) is made to or received by the Junior Creditor contrary to the terms of this Agreement, the Junior Creditor shall hold such payment in trust for the Senior Agent (for its own benefit and for the benefit of the other Secured Creditors) and shall forthwith pay such payment to the Senior Agent for application against the Senior Debt.

7.         **Application of Agreement**.  Subject to Section 8 below, the rights of the Senior Creditors and the priority of the Senior Debt set out in this Agreement shall apply irrespective of any matter or thing.

8.         **Termination of Agreement**. This Agreement shall automatically terminate on the the first date on which (i) all Commitments have expired or been terminated, (ii) the principal of and interest on each Loan and all fees, indemnities and other amounts (other than contingent amounts for which no claim has been asserted) payable under the Senior Credit Agreement shall have been paid in full and (iii) all Letters of Credit shall have either (x) expired or terminated and all LC Disbursements shall have been reimbursed or (y) in the case of contingent Reimbursement Obligations, Letter of Credit Collateralization shall have been provided.

9.         **Governing Law**.  This Agreement shall be governed by, and construed in accordance with, the laws of the Province of Ontario and the laws of Canada applicable in that Province.

10.        **Amendments**. No amendment, supplement, waiver or other modification of this Agreement shall be effective without the prior written consent of each of the parties hereto.


[signatures on the next following page]

**IN WITNESS WHEREOF** the Junior Creditor has executed this Agreement.


**[JUNIOR CREDITOR]**


By: _____
Name:
Title:

**EXHIBIT F**

**FORM OF**
**GROUP GUARANTEE**

This Agreement is made as of **[●]**, 2016.

**TO**:    Name:         HSBC BANK CANADA, as administrative agent
        Address:      70 York Street, Toronto, ON M5J 1S9
        Attention:    Agency Administrator
        Facsimile:    647-788-2185
        E-mail:       cacmbagency2@hsbc.ca

**RECITALS:**

A.    Xiwang Iovate Health Science International Inc., and Iovate Health Sciences International Inc., as borrowers, the financial institutions and other parties thereto from time to time, as lenders, HSBC Bank Canada, as administrative agent, and HSBC Bank Canada and The Toronto-Dominion Bank, as joint lead arrangers and joint bookrunners, are *inter alios* party to a credit agreement dated as of November 22, 2016 (as amended, supplemented, restated or replaced from time to time, the "**Credit Agreement**").

B.    It is in the interests of the Guarantors that the Secured Parties extend credit (or continue to extend credit) to the Credit Parties under and in connection with the Credit Agreement, and each Guarantor is therefore prepared to issue this Agreement to the Agent (for its own benefit and for the benefit of the other Secured Parties) in order to induce them to do so.

     For good and valuable consideration, the receipt and adequacy of which are acknowledged by each Guarantor, each Guarantor, jointly and severally, agrees with and in favour of the Agent (for its own benefit and for the benefit of the other Secured Parties) as follows:

**1.    Definitions**.  In this Agreement capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Credit Agreement, and the following terms have the following meanings:

"**Agent**" means HSBC Bank Canada, in its capacity as administrative agent for the lenders under the Credit Agreement, or any successor administrative agent appointed pursuant to the Credit Agreement.

"**Agreement**" means this agreement, including the exhibits and recitals to this agreement, as it or they may be amended, supplemented, restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this Agreement and not to any particular section or other portion of this Agreement.

"**Credit Agreement**" has the meaning set out in the recitals hereto.

"**Enforcement Event**" means (a) the termination of Commitments and/or (b) the acceleration (in whole or in part) of the Loans, in each case in accordance with Section 7.1 of the Credit Agreement after the occurrence and during the continuance of an Event of Default.

"**Event of Default**" means any "Event of Default" as defined in the Credit Agreement.

"**Fraudulent Transfer Law**" means any applicable U.S. Bankruptcy Law or any applicable U.S. state fraudulent transfer or conveyance law.

"**Guarantor Liabilities**" means, in respect of any Guarantor, all present and future indebtedness, liabilities and obligations of such Guarantor to the Agent under this Agreement. Notwithstanding the foregoing or anything else in any Transaction Document, Excluded Swap Obligations of a Guarantor shall not constitute Guarantor Liabilities for the purposes of this Agreement with respect to such Guarantor.

"**Guarantors**" means the Persons delivering a signature page to this Agreement and any other Person which hereafter delivers a Supplement, in their capacity as guarantor hereunder, and "**Guarantor**" means any one of them in such capacity.

"**Insolvency Proceeding**" means any proceeding seeking to adjudicate a Person an insolvent, seeking a receiving order against such Person under the *Bankruptcy and Insolvency Act* (Canada), or seeking liquidation, dissolution, winding-up, reorganization, compromise, arrangement, adjustment, protection, moratorium, relief or composition of such Person or its debts or a stay of proceedings of such Person's creditors generally (or any class of creditors) or any other relief, under any federal, provincial, territorial or foreign law now or hereafter in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtors (including the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), any U.S. Bankruptcy Law and any similar legislation in any jurisdiction) or at common law or in equity.

"**Intercompany Debt**" means, in respect of any Guarantor, all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) of any other Credit Party to such Guarantor and all guarantees and security therefor.

"**Original Currency**" has the meaning set out in Section 18.

"**Other Currency**" has the meaning set out in Section 18.

"**Organizational Documents**" means, with respect to any Person, such Person's articles or other charter documents, by-laws, unanimous shareholder agreement, partnership agreement or trust agreement, as applicable, and any and all other similar agreements, documents and instruments relative to such Person.

"**Qualified ECP Guarantor**" means in respect of any Swap Obligation, at the time the relevant guarantee (or grant of the relevant security interest, as applicable) becomes effective with respect to such Swap Obligation, each U.S. Guarantor that has total assets exceeding $10,000,000, qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" with respect to such Swap Obligation at such time by entering into a keepwell pursuant to §1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Secured Liabilities**" means all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, mature or unmatured) of the Credit Parties or Limited Recourse Guarantors to the Secured Parties under, in connection with or with respect to the Transaction Documents (including Secured Cash Management Obligations and Secured Hedge Obligations), and any unpaid balance thereof. Notwithstanding the foregoing or anything else in any Transaction Document (including Section 34 hereof), Excluded Swap Obligations of a Guarantor shall not constitute Secured Liabilities for the purposes of this Agreement with respect to such Guarantor.

"**Secured Party**" means the Agent, the Lenders, the Secured Hedge Counterparties and the Secured Cash Management Providers.

"**Security**" means any present or future Lien, or any present or future guarantee or other financial assistance, granted by any Person with respect to any or all of the Secured Liabilities.

"**Supplement**" has the meaning given to it in Section 33.

"**Surety**" means any present or future guarantor or surety of any or all of the Secured Liabilities, other than the Guarantors.

"**U.S. Guarantor**" means a Guarantor that is incorporated or organized under the laws of the United States of America, any state or territory thereof or the District of Columbia.

"**U.S. Bankruptcy Law**" means the United States Bankruptcy Code of 1978 (Title 11 of the United States Code), any other United States federal or state bankruptcy, insolvency or similar law.

**2.**    **Guarantee.**    Each Guarantor hereby unconditionally and irrevocably guarantees the prompt payment and performance to the Agent (for its own benefit and the benefit of the other Secured Parties) of all Secured Liabilities (other than its own) when due in accordance with their terms.  All amounts payable by any Guarantor under this Agreement shall be paid to the Agent (for its own benefit and for the benefit of the other Secured Parties) at the address of the Agent shown above or as otherwise directed in writing by the Agent.  All Guarantor Liabilities shall be payable or performable forthwith upon demand by the Agent, and any which are not so paid shall bear interest from the date of such demand at the rate or rates applicable to the corresponding Secured Liabilities.

**3.**    **Guarantor Liabilities.**    The Guarantor Liabilities of each Guarantor are continuing, absolute, unconditional and irrevocable.  The Guarantor Liabilities of each Guarantor shall remain effective despite, and shall not be released, exonerated, discharged, diminished, subjected to defence, limited or in any way affected by, anything done, omitted to be done, suffered or permitted by any Secured Party, any other Credit Party or any other Person, or by any other matter, act, omission, circumstance, development or other thing of any nature, kind or description, other than the due payment and performance in full of all of the Secured Liabilities and all of the Guarantor Liabilities of such Guarantor.

**4.**    **Guarantee Absolute.**    Without limiting the generality of Section 3, the Guarantor Liabilities of each Guarantor shall remain fully effective and enforceable against such Guarantor and shall not be released, exonerated, discharged, diminished, subjected to defence, limited or in any way affected by, and the rights and remedies of the Agent under this Agreement shall not in any way be diminished or prejudiced by, and each Guarantor hereby consents to or waives, as applicable, to the fullest extent permitted by applicable Law:

(a)    any lack of genuineness, legality, validity or enforceability of any of the Secured Liabilities or of any agreement or arrangement between any Credit Party, or any other Person, and any one or more of the Secured Parties, or any failure by any Credit Party, or any other Person, to carry out any of its obligations under any such agreement or arrangement;

(b)     any change in the existence, name, objects, business, powers, organization, share capital, Organizational Documents, ownership, control, directors or management of any Credit Party or any Surety, the reorganization of any Credit Party or any Surety, any amalgamation or merger by any Credit Party or any Surety with any other Person or Persons, or any continuation of any Credit Party or any Surety under the laws of any jurisdiction;

(c)     any lack or limitation of power, incapacity or disability of any Credit Party or any Surety or of the directors, officers, managers, employees or agents of any Credit Party or any Surety or any other irregularity, defect or informality, or any fraud, by any Credit Party or any Surety or any of their respective directors, officers, managers, employees or agents, with respect to any or all of the Secured Liabilities or any or all of the liabilities and obligations of any Surety;

(d)     any non-compliance with or contravention by such Guarantor of any provision of any corporate statute applicable to such Guarantor relative to guarantees or other financial assistance given by such Guarantor;

(e)     any impossibility, impracticability, frustration of purpose, force majeure or act of Governmental Authority with respect to the performance of any of the Secured Liabilities or Guarantor Liabilities;

(f)     any Insolvency Proceeding affecting, or the financial condition of any Credit Party, any Surety, any Secured Party or any other Person at any time;

(g)     any law, regulation, limitation or prescription period or other circumstance that might otherwise be a defence available to, or a discharge of, any Credit Party in respect of any or all of the Secured Liabilities, or such Guarantor of its Guarantor Liabilities or any Surety in respect of any or all of the liabilities and obligations of any such Surety;

(h)     any loss of, or in respect of, any Security by or on behalf of any Secured Party from any Credit Party, any Surety or any other Person, whether occasioned through the fault of any Secured Party or otherwise, including without limitation any failure of any Secured Party to marshal assets, exhaust any collateral for the Secured Liabilities, to pursue or exhaust any right, remedy, power or privilege it may have against the Borrowers or any other Person, or to take any action whatsoever to mitigate or reduce the liability of any Guarantor under this Agreement, the Secured Parties being under no obligation to take any such action notwithstanding the fact that any of the Secured Liabilities may be due and payable and that the Credit Parties may be in default under the Transaction Documents;

(i)     any loss or impairment of any right of such Guarantor for subrogation, reimbursement or contribution, whether or not as a result of any action taken or omitted to be taken by any Secured Party; or

(j)     any other matter, act, omission, circumstance, development or thing of any and every nature, kind and description whatsoever, whether similar or dissimilar to the foregoing (other than the due payment and performance in full of the Secured Liabilities and its Guarantor Liabilities) that might in any manner (but for the operation of this Section) operate (whether by statute, at law, in equity or otherwise) to release, discharge, diminish, limit, restrict or in any way affect the liability of, or otherwise provide a defence to, a guarantor, a surety, or a principal debtor, even if known by the Agent or any one or more of the other Secured Parties.

**5.     Dealing with Secured Liabilities.** Without limiting the generality of Section 3, the Guarantor Liabilities of each Guarantor shall remain fully effective and enforceable against such Guarantor and shall not be released, exonerated, discharged, diminished, subjected to defence, limited or in any way affected by, and the rights and remedies of the Agent and the other Secured Parties under this Agreement shall not in any way be diminished or prejudiced by, and each Guarantor hereby consents to or waives, as applicable, to the fullest extent permitted by applicable Law:

(a)     any amendment, alteration, novation or variation in any manner and to any extent (and irrespective of the effect of the same on any Guarantor) of any of the Secured Liabilities, any of the liabilities and obligations of any Surety, any Security or any one or more of the Secured Parties' arrangements or agreements with any Guarantor, any Surety or any other Person;

(b)     any limitation, compromise, subordination, postponement or abandonment of any of the Secured Liabilities, any of the Guarantor Liabilities of any Guarantor, any of the liabilities and obligations of any Surety, any Security or any one or more of the Secured Parties' arrangements or agreements with any Credit Party, any Surety or any other Person;

(c)     any grant of time, renewal, extension, indulgence, release, discharge or other course of conduct by any one or more Secured Parties to any Credit Party, any Surety or any other Person;

(d)     the creation of any new or additional Secured Liabilities, the increase or reduction of the rate of interest on any or all of the Secured Liabilities or any other rates or fees payable under or in respect of any or all of the Secured Liabilities;

(e)     any alteration, settlement, compromise, acceleration, extension or change in the time or manner for payment or performance by any Credit Party made or permitted by any one or more Secured Parties of, or by any other Person or Persons liable to any one or more of the Secured Parties with respect to, any or all of the Secured Liabilities;

(f)     the Secured Parties or any of them taking or abstaining from taking Security from any Credit Party, any Surety or any other Person or abstaining from completing, perfecting or maintaining the perfection of any Security;

(g)    the Secured Parties or any of them releasing, substituting or adding one or more Guarantors, Sureties or endorsers, accepting additional or substituted Security, or releasing, subordinating or postponing any Security;

(h)    the Secured Parties or any of them accepting compromises from any Credit Party, any Surety or any other Person;

(i)    the creation or addition of any new Transaction Documents, or the addition of any new Secured Parties pursuant to the provisions of any Transaction Documents;

(j)    the Secured Parties or any of them doing, or omitting to do, anything to enforce the payment or performance of any or all of the Secured Liabilities, any or all of the Guarantor Liabilities of any Guarantor, any or all of the liabilities and obligations of any Surety or any Security;

(k)    the Secured Parties or any of them giving or refusing to give or continuing to give any credit or any financial accommodation to any Credit Party or to any other Person;

(l)    the Secured Parties or any of them proving any claim in any Insolvency Proceeding affecting any Credit Party, any Surety or any other Person as they see fit or refraining from proving any claim or permitting or suffering the impairment of any of the Secured Liabilities in any such Insolvency Proceeding; making any election in any such Insolvency Proceeding; permitting or suffering the creation of secured or unsecured credit or debt in any such Insolvency Proceeding; or permitting or suffering the disallowance, avoidance, or subordination of any of the Secured Liabilities or the obligations of any other debtor with respect to the Secured Liabilities in any such Insolvency Proceeding;

(m)    the Secured Parties or any of them applying any money received from any Credit Party, any Surety, any other Person or any Security upon such part of the Secured Liabilities as the Secured Parties or any of them may see fit or changing any such application in whole or in part from time to time as the Secured Parties or any of them may see fit; or

(n)    the Secured Parties or any of them otherwise dealing with any Credit Party, any Surety, any other Person, the Secured Liabilities, the Guarantor Liabilities of any Guarantor, the liabilities and obligations of any Sureties, and all Security as the Secured Parties or any of them may see fit.

**6.**    **Settlement of Accounts.**  Any account settled or stated between the Agent or any other Secured Party and any Credit Party shall be accepted by each other Guarantor as *prima facie* evidence that the amount thereby appearing due by such Credit Party to the Agent or such other Secured Party is so due absent manifest error.

**7.**    **Indemnity.**  If any or all of the Secured Liabilities are not duly paid or performed by the applicable Credit Party and are not paid or performed by the Guarantors under Section 2 for any reason whatsoever, each Guarantor shall, as a separate and distinct obligation, indemnify and

save each of the Secured Parties harmless from and against all losses, costs, damages, expenses, claims and liabilities that each such Secured Party may suffer or incur in connection with or in respect of any failure by a Credit Party for any reason to pay or perform any of its Secured Liabilities to the extent the Borrower would be required to do so pursuant to Section 9.3 of the Credit Agreement, and shall pay all such amounts to the Agent after demand as herein provided

**8.**     **Guarantors Liable as Principal Debtor.**     If, and to the extent that, any amount in respect of the Secured Liabilities is not recoverable from any Guarantor under this Agreement on the basis of a guarantee or the Secured Parties are not indemnified under Section 7, in each case, for any reason whatsoever, then, notwithstanding any other provision of this Agreement, such Guarantor shall be liable under this Agreement as principal obligor in respect of the due payment of such amount and shall pay such amount to the Agent after demand as herein provided.

**9.**     **Continuing Guarantee.**     This Agreement is a continuing guarantee and is binding as a continuing obligation of each Guarantor and the Secured Liabilities shall be conclusively presumed to have been created in reliance on this Agreement.  A Guarantor may not in any manner terminate this Agreement or the Guarantor Liabilities of such Guarantor other than by the due and punctual payment in full of the Guarantor Liabilities of such Guarantor.

**10.**     **Stay of Acceleration.**     If acceleration of the time for payment, or the liability of any Credit Party to make payment, of any amount specified to be payable by such Credit Party in respect of the Secured Liabilities is stayed, prohibited or otherwise affected upon any Insolvency Proceeding or other event affecting such Credit Party or payment of any of the Secured Liabilities by such Credit Party, all such amounts otherwise subject to acceleration or payment shall nonetheless be deemed for all purposes of this Agreement to be and to have become due and payable by such Credit Party and shall be payable by each Guarantor under this Agreement immediately forthwith on demand by the Agent.

**11.**     **Information.**     Each Guarantor acknowledges and agrees that such Guarantor has not executed this Agreement as a result of, by reason of, or in reliance upon, any promise, representation, statement or information of any kind or nature whatsoever given, or offered to such Guarantor, by or on behalf of the Secured Parties or any other Person whether in answer to any enquiry by or on behalf of such Guarantor or not and the Secured Parties were not prior to the execution by such Guarantor of this Agreement, and are not thereafter, under any duty to disclose to such Guarantor or any other Person any information, matter or thing (material or otherwise) relating to any other Credit Party, its affairs or its transactions with the Secured Parties, including any information, matter or thing which puts or may put any Credit Party in a position which such Guarantor would not naturally expect or any unexpected facts or unusual features which, whether known or unknown to such Guarantor, are present in any transaction between any other Credit Party and the Secured Parties, and the Secured Parties were not and are not under any duty to do or execute any matter, thing or document relating to any other Credit Party, its affairs or its transactions with the Secured Parties. Each Guarantor acknowledges and confirms that it has established its own adequate means of obtaining from the other Credit Parties on a continuing basis all information desired by such Guarantor concerning the financial condition of the other Credit Parties and that such Guarantor will look to the other Credit Parties, and not to the Agent or any other Secured Party, in order for such Guarantor to keep adequately informed of changes in the other Credit Parties' financial condition.

12.    **Reinstatement.**  If, at any time, all or any part of any payment previously applied by the Agent or any other Secured Party to any of the Secured Liabilities is or must be rescinded or returned by the Agent or such other Secured Party for any reason whatsoever (including any Insolvency Proceeding affecting any Credit Party or any other Person), such Secured Liabilities shall, for the purpose of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Agent or such other Secured Party, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Secured Liabilities, all as though such application by the Agent or such other Secured Party had not been made.

13.    **Subrogation.**  Notwithstanding any payment made by any Guarantor under this Agreement or any setoff or application of funds of any Guarantor by any Secured Party, no Guarantor shall have any right of subrogation to, and each Guarantor waives, any right to enforce any remedy which any Secured Party now has or may hereafter have against any other Credit Party, until all of the Secured Liabilities have been indefeasibly paid in full; and until that time, each Guarantor waives any benefit of, and any right to participate in, any Security now or hereafter held by any Secured Party for the Secured Liabilities.

14.    **Assignment and Postponement.**  During an Enforcement Event, each Guarantor hereby postpones all of its Intercompany Debt to the payment in full of its Secured Liabilities.  During an Enforcement Event, all moneys received by any Guarantor in respect of its Intercompany Debt shall be received by such Guarantor in trust for the Agent and, immediately following such receipt, shall be paid over to the Agent.

15.    **Insolvency Proceedings.**  In any Insolvency Proceeding affecting any Credit Party, the Secured Parties shall have the right, in priority to each Guarantor, to receive their full claim in respect of such Insolvency Proceeding for all of the Secured Liabilities.  The Secured Parties shall have the right to include in their claim in any Insolvency Proceeding affecting any Credit Party all or any part of the payments made by each Guarantor under this Agreement and, to prove and rank for, and receive dividends in respect of, all such claims, all of which rights and privileges as they relate and apply to each Guarantor are hereby assigned by such Guarantor to the Agent on behalf of itself and the other Secured Parties.  The provisions of this Section shall be sufficient authority for any Person making payment of any such dividends to pay the same directly to the Agent for the benefit of the Secured Parties.  The Agent shall be entitled to receive for the benefit of the Secured Parties all dividends or other payments in respect of all of the above referenced claims until all of the Secured Liabilities are paid and satisfied in full and each Guarantor shall continue to be liable under this Agreement for any unpaid balance of the Secured Liabilities.  If any amount is paid to any Guarantor under any Insolvency Proceeding affecting any Credit Party when any of the Secured Liabilities remain outstanding, such amount shall be received and held in trust by such Guarantor for the benefit of the Secured Parties and shall be immediately paid to the Agent to be credited and applied against the Guarantor Liabilities of such Guarantor.  In any Insolvency Proceeding affecting any Credit Party, the Secured Parties may in their discretion value as they see fit, or may refrain from valuing, any Security held by or for the benefit of any of them.

16.    **Marshalling.**  Each Guarantor waives to the fullest extent permitted by applicable Law, any right or claim of right to cause a marshalling of a Credit Party's, a Surety's or any other

Person's assets, or to cause any Secured Party to proceed against any other Credit Party, a Surety or any other Person, or any Security, in any particular order.  No Secured Party shall have any obligation to marshall any assets in favour of any other Credit Party, any Surety or any other Person or against or in payment of any of the Secured Liabilities or any of the obligations of any Credit Party, a Surety or any other Person owed to any Secured Party.

**17.    Enforcing Rights Against Guarantors.**    This is a guarantee of payment and performance and not of collection.  The Secured Parties shall not be required to take any action or to exhaust their recourse against any Credit Party, any Surety or any other Person, or to enforce or value any Security, before being entitled to payment from, and to enforce their rights and remedies against, any other Guarantor under this Agreement.  Each Guarantor hereby renounces to the benefits of division and discussion.

**18.    Foreign Currency Guarantor Liabilities.**  Each Guarantor shall make payment relative to any Secured Liabilities in the currency (the "**Original Currency**") in which the applicable Credit Party is required to pay such Secured Liabilities.  If any Guarantor makes payment relative to any Secured Liabilities in a currency (the "**Other Currency**") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment shall constitute a discharge of the Guarantor Liabilities of such Guarantor only to the extent of the amount of the Original Currency which the Agent is able to purchase at Toronto, Ontario with the amount it receives on the date of receipt.  If the amount of the Original Currency which the Agent is able to purchase is less than the amount of such currency originally due to it in respect to the relevant Secured Liabilities, such Guarantor shall indemnify and save the Agent and the other Secured Parties harmless from and against any loss or damage arising as a result of such deficiency.  This indemnity constitutes an obligation separate and independent from the other obligations contained in this Agreement, gives rise to a separate and independent cause of action, applies irrespective of any indulgence granted by the Agent or any other Secured Party and continues in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

**19.    Taxes and Set-Off.**  All payments to be made by any Guarantor hereunder shall be made without set-off, compensation, deduction or counterclaim and without deduction for any taxes, levies, duties, fees, deductions, withholdings, restrictions or conditions of any nature whatsoever, except as required by applicable law.  If at any time any applicable Law requires any Guarantor to make any such deduction or withholding from any such payment, and such deduction or withholding is related to an Indemnified Tax, then the sum due from such Guarantor with respect to such payment shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Agent receives a net sum equal to the sum which it would have received had no deduction or withholding been required.

**20.    Representations and Warranties.**  Each Guarantor represents and warrants, upon each of which representations and warranties each of the Secured Parties relies, that each of the representations and warranties relative to such Guarantor in each of the other Transaction Documents is true and correct when made or deemed made.

**21.    Covenants.**  Each Guarantor shall comply, and shall cause each of its subsidiaries to comply, with all of the provisions, covenants and agreements contained in each of the

Transaction Documents to the extent that such provisions, covenants and agreements apply to such Guarantor or its subsidiaries and shall, and shall cause each of its subsidiaries to, take, or refrain from taking, as the case may be, all actions that are necessary to be taken or not taken so that no violation of any provision, covenant or agreement contained in any of the Transaction Documents, and so that no Default or Event of Default under any of the Transaction Documents, is caused by the actions or inactions of such Guarantor or any of its subsidiaries.

**22.    Communication.**  Any notice or other communication required or permitted to be given under this Agreement shall be made in accordance with the terms of the Credit Agreement.

**23.    Expenses; Indemnity; Waiver.**

(a)    Each Guarantor shall pay to the Agent for the benefit of the Secured Parties (i) all reasonable and documented out-of-pocket expenses incurred by the Secured Parties, including the reasonable and documented fees, charges and disbursements of one primary counsel for the Secured Parties and all applicable taxes, in connection with the preparation and administration of this Agreement, (ii) all reasonable and documented out-of-pocket expenses incurred by the Secured Parties, including the reasonable and documented fees, charges and disbursements of one primary counsel for the Secured Parties and applicable taxes, in connection with any amendments, modifications or waivers of the provisions hereof, and (iii) all out-of-pocket expenses incurred by the Secured Parties, including the fees, charges and disbursements of any counsel for the Secured Parties and all applicable taxes, in connection with the assessment, enforcement or protection of their rights in connection with this Agreement, including their rights under this Section, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Guarantor Liabilities of such Guarantor.

(b)    Each Guarantor shall indemnify the Agent on behalf of the Secured Parties against, and hold the Secured Parties harmless from, any and all losses, claims, cost recovery actions, damages, expenses and liabilities of whatsoever nature or kind and all reasonable out-of-pocket expenses and all applicable taxes to which any Secured Party may become subject arising out of or in connection with (i) the execution or delivery of this Agreement and the performance by such Guarantor of its obligations hereunder, (ii) any actual or prospective claim, litigation, investigation or proceeding relating to this Agreement or the Guarantor Liabilities of such Guarantor, whether based on contract, tort, delict or any other theory and regardless of whether any Secured Party is a party thereto, (iii) any other aspect of this Agreement, or (iv) the enforcement of the Secured Parties' rights hereunder and any related investigation, defence, preparation of defence, litigation and enquiries; in each case to the extent the Borrower would be required to do so pursuant to Section 9.3 of the Credit Agreement.

(c)    No claim may be made by any Guarantor, any Secured Party or any other Person against any party hereto on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages)

Exhibit F – Page 10

arising out of or in connection with, or as a result of, this Agreement or any act, omission or event occurring in connection herewith, and each party hereto hereby waives to the fullest extent permitted by applicable law all such claims, whether or not accrued and whether or not known or suspected to exist in its favour. Each Guarantor irrevocably renounces to any rights it may have to be released from this Agreement under Article 2362 of the *Civil Code of Québec* and agrees to renew its guarantee hereunder at the request of the Agent by executing such documents as the Agent may request from time to time.

(d)     All amounts due under this Section shall be payable to the Agent for the benefit of the applicable Secured Parties not later than 10 Business Days after written demand therefor.

(e)     The indemnifications set out in this Agreement shall survive the payout of the Secured Liabilities and the Guarantor Liabilities of each Guarantor.

**24.     Additional Security.**  This Agreement is in addition to, and not in substitution of, any and all other Security previously or concurrently delivered by any Guarantor or any other Person to any Secured Party, all of which other Security shall remain in full force and effect.

**25.     Alteration.**  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Agent.

**26.     Severability.**  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**27.     Set-off**.  If an Event of Default shall have occurred and be continuing, each Secured Party is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set-off, compensate against or combine and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by such Secured Party or any of its Affiliates and other obligations at any time owing by such Secured Party or any of its Affiliates to or for the credit or the account of any Guarantor against or with any or all of the Guarantor Liabilities of such Guarantor, irrespective of whether or not such Secured Party shall have made any demand under any Transaction Document and although such obligations may be unmatured, provided that, to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation", no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligation of such Guarantor. The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of set-off or combination) which such Secured Party may have.

**28.     Governing Law; Attornment.**  This Agreement shall be governed by and construed in accordance with the Laws of the Province of Ontario. Without prejudice to the ability of the Agent to enforce this Agreement in any other proper jurisdiction, each Guarantor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of such Province. To the

extent permitted by applicable Law, each Guarantor irrevocably waives any objection (including any claim of inconvenient forum) that it may now or hereafter have to the venue of any legal proceeding arising out of or relating to this Agreement in the courts of such Province. Each Guarantor hereby irrevocably consents to the service of any and all process in any such action or proceeding by the delivery of copies of such process to each Guarantor at the address as provided for pursuant to Section 22. Nothing in this Section affects the right of the Agent to serve process in any manner permitted by applicable Law.

29.    **Time.**    Time is of the essence with respect to this Agreement and the time for performance of the obligations of each Guarantor under this Agreement may be strictly enforced by the Agent. The limitation period applicable to any proceeding relating to a claim under, in connection with, or with respect to this Agreement shall be solely as prescribed in sections 15-17 of the *Limitations Act, 2002 (Ontario)*, and any other limitation period in respect of such claim (including that provided for in section 4 of the *Limitations Act, 2002 (Ontario)*) is extended accordingly.

30.    **Interpretation.**    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "or" is disjunctive; the word "and" is conjunctive. The word "shall" is mandatory; the word "may" is permissive. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set out herein), (b) any reference herein to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, replaced or re-enacted from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and (e) all references herein to Sections and Schedules shall be construed to refer to Sections and Schedules to, this Agreement. Section headings are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement. In accordance with the *Property Law Act* (British Columbia), the doctrine of consolidation applies to this Agreement.

31.    **Successors and Assigns.**    This Agreement shall enure to the benefit of, and be binding on, each Guarantor and its successors and assigns, and shall enure to the benefit of, and be binding on, the Agent and its successors and assigns. No Guarantor may assign this Agreement, or any of its rights or obligations under this Agreement. The Agent may assign this Agreement and any of their rights and obligations hereunder to any Person that replaces it in its capacity as such. If any Guarantor or the Agent is an individual, then the term "Guarantor" or "Agent", as applicable, shall also include his or her heirs, administrators and executors.

32.    **Acknowledgment of Receipt.**    Each Guarantor acknowledges receipt of an executed copy of this Agreement.

33.    **Additional Guarantors.**  Additional Persons may from time to time after the date of this Agreement become Guarantors under this Agreement by executing and delivering to the Agent a supplemental agreement (together with all schedules thereto, a "**Supplement**") to this Agreement, in substantially the form attached hereto as Exhibit A.  Effective from and after the date of the execution and delivery by any Person to the Agent of a Supplement such Person shall be, and shall be deemed for all purposes to be, a Guarantor under this Agreement with the same force and effect, and subject to the same agreements, representations, indemnities, liabilities and obligations, as if such Person had been an original signatory to this Agreement as a Guarantor. The execution and delivery of a Supplement by any additional Person shall not require the consent of any other Credit Party and all of the liabilities and obligations of each Guarantor hereunder shall remain in full force and effect, notwithstanding the addition of any new Guarantor to this Agreement.

34.    **Joint and Several Liability.**  Except as expressly provided otherwise hereunder, each Guarantor is jointly and severally liable for all obligations of the other Guarantors under this Agreement; provided that, no Guarantor shall be jointly and severally liable for any Excluded Swap Obligations of the other Guarantors.

35.    **Paramountcy**.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the Credit Agreement then, notwithstanding anything contained in this Agreement, the provisions contained in the Credit Agreement shall prevail to the extent of such conflict or inconsistency and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict or inconsistency, it being understood that the purpose of this Agreement is to add to, and not detract from, the rights granted to the Agent (for its own benefit and for the benefit of the other Secured Parties) under the Credit Agreement.  If any act or omission of a Guarantor is expressly permitted under the Credit Agreement but is expressly prohibited under this Agreement, such act or omission shall be permitted.  If any act or omission is expressly prohibited under this Agreement, but the Credit Agreement does not expressly permit such act or omission, or if any act is expressly required to be performed under this Agreement but the Credit Agreement does not expressly relieve a Guarantor from such performance, such circumstance shall not constitute a conflict or inconsistency between the applicable provisions of this Agreement and the provisions of the Credit Agreement.

**36.**    **Limitations on guarantee under U.S. law.**

(a)    The Guarantors are members of an affiliated group of Persons, and the Guarantors are engaged in related businesses.  The guaranty and surety obligations of each Guarantor pursuant to this Agreement reasonably may be expected to benefit directly or indirectly, it; and each Guarantor has determined that this Agreement is necessary and convenient to the conduct, promotion and attainment of the business of such Guarantor.  Each U.S. Guarantor acknowledges that it has received at least "reasonably equivalent value" (as such phrase is used in any U.S. Bankruptcy Law) and more than sufficient consideration to support its obligations hereunder and as a result of the transactions contemplated by the Transaction Documents (including Borrowings thereunder).

(b)    Notwithstanding anything to the contrary contained herein or in any other Transaction Document, each Secured Party agrees that the maximum liability of each U.S. Guarantor under this Agreement and under the other Transaction Documents shall in no event exceed the amount that can be guaranteed by such U.S. Guarantor under applicable federal and state laws relating to the insolvency of debtors, in each case after giving effect to

    (i)    all other liabilities of such U.S. Guarantor, contingent or otherwise, that are relevant under any Fraudulent Transfer Law (specifically excluding, however, any liabilities of such Guarantor in respect of intercompany indebtedness to the Borrowers to the extent that such Indebtedness would be discharged in an amount equal to the amount paid by such U.S. Guarantor hereunder); and

    (ii)    the value as assets of such U.S. Guarantor (as determined under the applicable provisions of such Fraudulent Transfer Law) of any rights to subrogation, contribution, reimbursement, indemnity or similar rights held by such U.S. Guarantor pursuant to:

        A.    applicable law; or

        B.    any other agreement providing for an equitable allocation among such U.S. Guarantor and the Borrower and other U.S. Guarantors of obligations arising under this Agreement or other guarantees of such obligations by such parties.

**37.**    **Secured Parties.**  The Secured Parties are beneficiaries of this Agreement subject to the terms and conditions of the Credit Agreement.  Subject to Section 27, this Agreement may be enforced only by the action of the Agent acting on behalf of the Secured Parties and no other Secured Party shall have any rights individually to enforce or seek to enforce this Agreement.

**38.**    **Counterparts; Electronic Signature.**  This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed signature page to this Agreement by any

Guarantor by facsimile or other electronic form of transmission shall be as effective as delivery by such Guarantor of a manually executed copy of this Agreement by such Guarantor.

**39.    Keepwell**.    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by any other Guarantor hereunder to honor all of such Guarantor's obligations under this Agreement in respect of Swap Obligations, provided that each Qualified ECP Guarantor shall only be liable under this Section 39 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 39, or otherwise under this Agreement, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount.    The obligations of each Qualified ECP Guarantor under this Section 39 shall remain in full force and effect until the Guarantor Liabilities shall have been indefeasibly paid in full in cash and all other amounts payable under this Agreement shall have been paid in full in cash and all Commitments have terminated or expired or been cancelled.    Each Qualified ECP Guarantor intends that this Section 39 constitute , and this Section 39 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1(a)(18)(A)(v)(II) of the *Commodity Exchange Act*.

[signatures on the next following page]

S-1

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date first written above.

**[DEBTOR]**

By: _____
Name:
Title:

## EXHIBIT A TO GROUP GUARANTEE

## FORM OF SUPPLEMENT
## TO GUARANTEE

**TO**:    Name:         HSBC BANK CANADA, as administrative agent
       Address:      70 York Street, Toronto, ON M5J 1S9
       Attention:    Agency Administrator
       Facsimile:    647-788-2185
       E-mail:       cacmbagency2@hsbc.ca

**WHEREAS:**

A.    Reference is made to the Guarantee (the "**Agreement**") dated as of [●], 2016 entered into by each of the Persons identified under the caption "GUARANTORS" on the signature pages thereto and any other Person which thereafter signs a Supplement, in favour of the Agent (for its own benefit and for the benefit of the other Secured Parties).

B.    Xiwang Iovate Health Science International Inc., and Iovate Health Sciences International Inc., as borrowers, the financial institutions and other parties thereto from time to time, as lenders, HSBC Bank Canada, as administrative agent, and HSBC Bank Canada and The Toronto-Dominion Bank, as joint lead arrangers and joint bookrunners, are *inter alios* party to a credit agreement dated as of November 22, 2016 (as amended, supplemented, restated or replaced from time to time, the "**Credit Agreement**").

C.    Capitalized terms used but not otherwise defined in this Supplement have the respective meanings given to such terms in the Agreement, including the definitions of terms incorporated in the Agreement by reference to other agreements.

D.    Section 33 of the Agreement provides that additional Persons may from time to time after the date of the Agreement become Guarantors under the Agreement by executing and delivering to the Agent a supplemental agreement to the Agreement in the form of this Supplement.

E.    The undersigned (the "**New Guarantor**") has agreed to become a Guarantor under the Agreement by executing and delivering this Supplement to the Agent.

For good and valuable consideration, the receipt and sufficiency of which are acknowledged by the New Guarantor, the New Guarantor agrees with and in favour of the Agent (for its own benefit and for the benefit of the Secured Parties) as follows:

1.    The New Guarantor has received a copy of, and has reviewed, the Agreement and is executing and delivering this Supplement to the Agent pursuant to Section 33 of the Agreement.

2.    Effective from and after the date this Supplement is executed and delivered to the Agent by the New Guarantor, the New Guarantor shall be, and shall be deemed for all purposes to be, a Guarantor under the Agreement with the same force and effect, and subject to the same agreements, representations, indemnities, liabilities and obligations, as if the New Guarantor had been, as of the date of this Supplement, an original signatory to the Agreement as a Guarantor.  In furtherance of the foregoing, the New Guarantor hereby unconditionally and irrevocably guarantees the prompt payment and performance to the Agent of all Secured Liabilities when due in accordance with their terms. The terms and provisions of the Agreement are incorporated by reference in this Supplement.

3.      The New Guarantor represents and warrants to the Agent (for its own benefit and for the benefit of the other Secured Parties) that each of the representations and warranties made or deemed to have been made by it under the Agreement as a Guarantor are true and correct on the date of this Supplement.

4.      Upon this Supplement bearing the signature of any Person claiming to have authority to bind the New Guarantor coming into the possession of the Agent, this Supplement and the Agreement shall be deemed to be finally and irrevocably executed and delivered by, and be effective and binding on, and enforceable against, the New Guarantor free from any promise or condition affecting or limiting the liabilities of the New Guarantor and the New Guarantor shall be, and shall be deemed for all purposes to be, a Guarantor under the Agreement.  No statement, representation, agreement or promise by any officer, employee or agent of the Agent or any Secured Party, unless expressly set forth in this Supplement, forms any part of this Supplement or has induced the New Guarantor to enter into this Supplement and the Agreement or in any way affects any of the agreements, obligations or liabilities of the New Guarantor under this Supplement and the Agreement.

5.      This Supplement may be executed in counterparts.  Each executed counterpart shall be deemed to be an original and all counterparts taken together shall constitute one and the same Supplement.  Delivery of an executed signature page to this Supplement by the New Guarantor by facsimile or other electronic transmission shall be as effective as delivery by the New Guarantor of a manually executed copy of this Supplement by the New Guarantor.

6.      This Supplement shall be governed by and construed in accordance with the laws of the Province of Ontario.

7.      This Supplement and the Agreement shall be binding upon the New Guarantor and its successors.  The New Guarantor shall not assign its rights and obligations under this Supplement or the Agreement or any interest in this Supplement or the Agreement.

[signatures on the next following page]

**IN WITNESS WHEREOF**, the undersigned has executed this Supplement as of the date first above written.

**[FULL LEGAL NAME OF NEW GUARANTOR]**

By: _____
Name:
Title:

**EXHIBIT G**

**FORM OF**
**GSA**

This General Security Agreement is made as of [●], 2016.

**TO**:    Name:        HSBC BANK CANADA, as administrative agent
            Address:      70 York Street, Toronto, ON M5J 1S9
            Attention:    Agency Administrator
            Facsimile:    647-788-2185
            E-mail:       cacmbagency2@hsbc.ca

**RECITALS:**

A.        Xiwang Iovate Health Science International Inc. and Iovate Health Sciences International Inc., as borrowers, the financial institutions and other parties thereto from time to time, as lenders, HSBC Bank Canada, as administrative agent, and HSBC Bank Canada and The Toronto-Dominion Bank, as joint lead arrangers and joint bookrunners, are *inter alios* party to a credit agreement dated as of November 22, 2016 (as amended, supplemented, restated or replaced from time to time, the "**Credit Agreement**").

B.        To secure the payment and performance of its Secured Liabilities, each Debtor has agreed to grant to the Agent (for its own benefit and for the benefit of the other Secured Parties) the Security Interests with respect to its Collateral in accordance with the terms of this Agreement.

For good and valuable consideration, the receipt and adequacy of which are acknowledged by each Debtor, each Debtor severally (and not jointly or jointly and severally) agrees with and in favour of the Agent (for its own benefit and for the benefit of the other Secured Parties) as follows:

1.        **Definitions**.  In this Agreement capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Credit Agreement, and the following terms have the following meanings:

"**Accessions**", "**Account**", "**Chattel Paper**", "**Certificated Security**", "**Consumer Goods**", "**Document of Title**", "**Equipment**", "**Futures Account**", "**Futures Contract**", "**Futures Intermediary**", "**Goods**", "**Instrument**", "**Intangible**", "**Inventory**", "**Investment Property**", "**Money**", "**Proceeds**", "**Securities Account**", "**Securities Intermediary**" "**Security**", "**Security Certificate**", "**Security Entitlement**", and "**Uncertificated Security**" have the meanings given to them in the PPSA.

"**Agent**" means HSBC Bank Canada, in its capacity as administrative agent for the lenders under the Credit Agreement, or any successor administrative agent appointed pursuant to the Credit Agreement.

"**Agreement**" means this agreement, including the exhibits and recitals to this agreement, the Supplements and the Schedules, as it or they may be amended, supplemented, restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this Agreement and not to any particular section or other portion of this Agreement.

"**Books and Records**" means, with respect to any Debtor, all books, records, files, papers, disks, documents and other repositories of data recording in any form or medium, evidencing or relating to the

Personal Property of such Debtor which are at any time owned by such Debtor or to which such Debtor (or any Person on such Debtor's behalf) has access.

"**Collateral**" means, with respect to any Debtor, all of the present and future:

    (a)    undertaking;

    (b)    Personal Property (other than Excluded CFC Securities but including any Personal Property that may be described in any Schedule to this Agreement or any schedules, documents or listings that such Debtor may from time to time provide to the Agent in connection with this Agreement); and

    (c)    real property (including any real property that may be described in any Schedule to this Agreement or any schedules, documents or listings that such Debtor may from time to time provide to the Agent in connection with this Agreement and including all fixtures, improvements, buildings and other structures placed, installed or erected from time to time on any such real property),

of such Debtor, including Books and Records, Contracts, Intellectual Property Rights and Permits, and including all such property in which such Debtor now or in the future has any right, title or interest whatsoever, whether owned, leased, licensed, possessed or otherwise held by such Debtor, and all Proceeds of any of the foregoing, wherever located.

"**Contracts**" means, with respect to any Debtor, all contracts and agreements to which such Debtor is at any time a party or pursuant to which such Debtor has at any time acquired rights, and includes (i) all rights of such Debtor to receive money due and to become due to it in connection with a contract or agreement, (ii) all rights of such Debtor to damages arising out of, or for breach or default with respect to, a contract or agreement, and (iii) all rights of such Debtor to perform and exercise all remedies in connection with a contract or agreement.

"**Control Person**" means a "control person", as such term is defined under applicable Canadian securities laws.

"**Credit Agreement**" has the meaning set out in the recitals hereto.

"**Debtors**" means the Persons delivering a signature page to this Agreement and any other Person which hereafter delivers a Supplement, and "**Debtor**" means any one of them.

"**Excluded CFC Securities**" means, at any time with respect to any Pledged CFC Issuer, those Issuer Voting Securities of such Pledged CFC Issuer representing in excess of 65% of the total combined voting power of each class of its Issuer Voting Securities at such time.

"**Event of Default**" means any "Event of Default" as defined in the Credit Agreement.

"**Exhibits**" means the exhibits to this Agreement.

"**Intellectual Property Rights**" means, with respect to any Debtor, all industrial and intellectual property rights of such Debtor or in which such Debtor has any right, title or interest, including copyrights, patents, inventions (whether or not patented), trade-marks, get-up and trade dress, industrial designs, integrated circuit topographies, plant breeders' rights, know how and trade secrets, registrations and applications for

registration for any such industrial and intellectual property rights, and all Contracts related to any such industrial and intellectual property rights.

"**Issuer**" has the meaning given to that term in the STA.

"**Issuer Voting Securities**" means, at any time, Securities or Securities Entitlements of an Issuer entitled, at such time, to vote for the election of directors of such Issuer.

"**Organizational Documents**" means, with respect to any Person, such Person's articles or other charter documents, by-laws, unanimous shareholder agreement, partnership agreement or trust agreement, as applicable, and any and all other similar agreements, documents and instruments relative to such Person.

"**Permits**" means, with respect to any Debtor, all permits, licences, waivers, exemptions, consents, certificates, authorizations, approvals, franchises, rights-of-way, easements and entitlements that such Debtor has, requires or is required to have, to own, possess or operate any of its property or to operate and carry on any part of its business.

"**Personal Property**" means personal property and includes Accounts, Chattel Paper, Documents of Title, Equipment, Goods, Instruments, Intangibles, Inventory, Investment Property and Money.

"**Pledged Certificated Securities**" means, with respect to any Debtor, any and all Collateral of such Debtor that is a Certificated Security.

"**Pledged CFC Issuer**" means, at any time, any Pledged Issuer with respect to any Debtor which is at such time a CFC or a CFC Holdco of such Debtor.

"**Pledged Futures Contracts**" means, with respect to any Debtor, any and all Collateral of such Debtor that is a Futures Contract.

"**Pledged Futures Accounts**" means, with respect to any Debtor, any and all Collateral of such Debtor that is a Futures Account.

"**Pledged Futures Intermediary**" means, at any time, any Person which is at such time is a Futures Intermediary at which a Pledged Futures Account is maintained.

"**Pledged Futures Intermediary's Jurisdiction**" means, with respect to any Pledged Futures Intermediary, its jurisdiction as determined under section 7.1(4) of the PPSA.

"**Pledged Issuer**" means, with respect to any Debtor at any time, any Person which is an Issuer of, or with respect to, any Pledged Shares of such Debtor at such time.

"**Pledged Issuer's Jurisdiction**" means, with respect to any Pledged Issuer, its jurisdiction as determined under section 44 of the STA.

"**Pledged Securities**" means, with respect to any Debtor, any and all Collateral of such Debtor that is a Security.

"**Pledged Securities Accounts**" means, with respect to any Debtor, any and all Collateral of such Debtor that is a Securities Account.

"**Pledged Securities Intermediary**" means, at any time, any Person which is at such time a Securities Intermediary at which a Pledged Securities Account is maintained.

"**Pledged Securities Intermediary's Jurisdiction**" means, with respect to any Pledged Securities Intermediary, its jurisdiction as determined under section 45(2) of the STA.

"**Pledged Security Certificates**" means, with respect to any Debtor, any and all Security Certificates of such Debtor representing the Pledged Certificated Securities.

"**Pledged Security Entitlements**" means, with respect to any Debtor, any and all Collateral of such Debtor that is a Security Entitlement.

"**Pledged Shares**" means, with respect to any Debtor, all Pledged Securities and Pledged Security Entitlements of such Debtor.

"**Pledged Uncertificated Securities**" means, with respect to any Debtor, any and all Collateral of such Debtor that is an Uncertificated Security.

"**PPSA**" means the *Personal Property Security Act* of the Province referred to in the "Governing Law" section of this Agreement, as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation.

"**Receiver**" means an interim receiver, a receiver, a manager or a receiver and manager.

"**Reporting Pledged Issuer**" means a Pledged Issuer that is a "reporting issuer", as such term is defined under applicable Canadian securities laws.

"**Secured Liabilities**" means, with respect to any Debtor, all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) of such Debtor to the Secured Parties (or any of them) under, in connection with or with respect to the Transaction Documents (including Secured Cash Management Obligations and Secured Hedge Obligations), and any unpaid balance thereof. Notwithstanding the foregoing or anything else in any Transaction Document, Excluded Swap Obligations of a Guarantor shall not constitute Secured Liabilities for the purposes of this Agreement with respect to such Guarantor.

"**Secured Parties**" means, collectively, the Agent, the Secured Cash Management Provider, the Secured Hedge Counterparties, and the Lenders, and "**Secured Party**" means any one of them.

"**Schedules**" means the schedules to this Agreement.

"**Security Interests**" means, with respect to any Debtor, the Liens created by such Debtor in favour of the Agent (for its own benefit and for the benefit of the other Secured Parties) under this Agreement.

"**STA**" means the *Securities Transfer Act* of the Province referred to in the "Governing Law" section of this Agreement, as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation.

"**Subsidiary**" means, with respect to any Person (the "**parent**") at any date, any other Person (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests

are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent.

"**Supplement**" has the meaning given to that term in Section 35.

"**ULC**" means an Issuer that is an unlimited company, unlimited liability corporation or unlimited liability company.

"**ULC Laws**" means the *Companies Act* (Nova Scotia), the *Business Corporations Act* (Alberta), the *Business Corporations Act* (British Columbia) and any other present or future Laws governing ULCs.

"**ULC Shares**" means shares or other equity interests in the capital stock of a ULC.

"**Voting or Equity Securities**" means (a) any "security" (as defined under applicable Canadian securities laws), other than a bond, debenture, note or similar instrument representing indebtedness (whether secured or unsecured), of an issuer carrying a voting right either under all circumstances or under some circumstances that have occurred and are continuing or (b) a security of an issuer that carries a residual right to participate in the earnings of the issuer and, on liquidation or winding up of the issuer, in its assets.

2.      **Grant of Security Interests**.  As general and continuing collateral security for the due payment and performance of its Secured Liabilities, each Debtor pledges, mortgages, charges and assigns (by way of security) to the Agent (for its own benefit and for the benefit of the other Secured Parties), and grants to the Agent (for its own benefit and for the benefit of the other Secured Parties) a security interest in, the Collateral of such Debtor.

3.      **Limitations on Grant of Security Interests**.  If the grant of the Security Interests (i) with respect to any Contract, Intellectual Property Right or Permit under Section 2 would result in the termination or breach of or requires any consent not obtained under such Contract, Intellectual Property Right or Permit, or is otherwise prohibited or ineffective (whether by the terms thereof or under applicable Law), or (ii) with respect to any United States "intent-to-use" trademark applications for which the grant of the Security Interest would impair the validity or enforceability of such "intent-to-use" trademark application, then such Contract, Intellectual Property Right, or Permit or trademark application shall not be subject to the Security Interests but shall be held in trust by the applicable Debtor for the benefit of the Agent (for its own benefit and for the benefit of the other Secured Parties) and, on the exercise by the Agent of any of its rights or remedies under this Agreement following an Event of Default shall be assigned by such Debtor as directed by the Agent; provided that: (a) the Security Interests of such Debtor shall attach to such Contract, Intellectual Property Right or Permit, or applicable portion thereof, immediately at such time as the condition causing such termination or breach is remedied, and (b) if a term in a Contract that prohibits or restricts the grant of the Security Interests in the whole of an Account or Chattel Paper forming part of the Collateral is unenforceable against the Agent under applicable Law, then the exclusion from the Security Interests set out above shall not apply to such Account or Chattel Paper. In addition, the Security Interests do not attach to Consumer Goods or extend to the last day of the term of any lease or agreement for lease of real property.  Such last day shall be held by the applicable Debtor in trust for the Agent (for its own benefit and for the benefit of the other Secured Parties) and, on the exercise by the Agent of any of its rights or remedies under this Agreement following an Event of Default, shall be assigned

by such Debtor as directed by the Agent.  For greater certainty, no Intellectual Property Right in any trade-mark, get-up or trade dress is presently assigned to the Agent by sole virtue of the grant of the Security Interests contained in Section 2.

4.      **Attachment; No Obligation to Advance**.  Each Debtor confirms that value has been given by the Secured Parties to such Debtor, that such Debtor has rights in its Collateral existing at the date of this Agreement or the date of any Supplement, as applicable, and that such Debtor and the Agent have not agreed to postpone the time for attachment of the Security Interests to any of the Collateral of such Debtor.  The Security Interests with respect to the Collateral of each Debtor created by this Agreement shall have effect and be deemed to be effective whether or not the Secured Liabilities of such Debtor or any part thereof are owing or in existence before or after or upon the date of this Agreement or the date of any Supplement, as applicable.  Neither the execution and delivery of this Agreement or any Supplement nor the provision of any financial accommodation by any Secured Party shall oblige any Secured Party to make any financial accommodation or further financial accommodation available to any Debtor or any other Person.

5.      **Representations and Warranties**.  Each Debtor represents and warrants to the Agent (for its own benefit and for the benefit of the other Secured Parties) that, as of the date of this Agreement or the date of any Supplement, as applicable:

(a)     <u>Debtor Information</u>.  All of the information set out in the Schedules and Supplements, as applicable, with respect to such Debtor is accurate and complete.

(b)     <u>Consents and Transfer Restrictions</u>.

(i)     Except for any consent that has been obtained and is in full force and effect, no consent of any Person (including any counterparty with respect to any Contract, any account debtor with respect to any Account, or any Governmental Authority with respect to any Permit) is required, or is purported to be required, for the execution, delivery, performance and enforcement of this Agreement (this representation being given without reference to the exclusions contained in Section 3).  For the purposes of complying with any transfer restrictions contained in the Organizational Documents of any Pledged Issuer, such Debtor hereby irrevocably consents to any transfer of such Debtor's Pledged Securities of such Pledged Issuer.

(ii)    (A) No order ceasing or suspending trading in, or prohibiting the transfer of the Pledged Shares has been issued and no proceedings for this purpose have been instituted, nor does such Debtor have any reason to believe that any such proceedings are pending, contemplated or threatened and (B) the Pledged Shares are not subject to any escrow or other agreement, arrangement, commitment or understanding, prohibiting the transfer of the Pledged Shares, including pursuant to applicable Canadian securities laws or the rules, regulations or policies of any marketplace on which the Pledged Shares are listed, posted or traded.

(c)    <u>No Consumer Goods</u>.  Such Debtor does not own any Consumer Goods which are material in value or which are material to the business, operations, property, condition or prospects (financial or otherwise) of such Debtor.

(d)    <u>Intellectual Property Rights</u>.  All registrations and applications for registration pertaining to any Intellectual Property Rights of owned by such Debtor, all other material Intellectual Property Rights of such Debtor, and the nature of such Debtor's right, title or interest therein, are described in the Schedules and Supplements as applicable, with respect to such Debtor.  Each registration or application of Intellectual Property Rights owned by such Debtor is valid, subsisting, unexpired, enforceable, and has not been abandoned, and to such Debtor's knowledge, is valid and enforceable.  In the case of copyright works of such Debtor, such Debtor has obtained full and irrevocable waivers of all moral rights or similar rights pertaining to such works.  Except as set out in the Schedules and Supplements, as applicable, none of the Intellectual Property Rights owned by such Debtor have been licensed or franchised by such Debtor to any Person on an exclusive basis or, to the best of such Debtor's knowledge, infringed or otherwise misused by any Person in any material respect.  Except as set out in the Schedules and Supplements, as applicable, to such Debtor's knowledge, the exercise of any Intellectual Property Right of such Debtor, or any licensee or franchisee thereof, has not infringed or otherwise misused any intellectual property right of any other Person in any material respect, and such Debtor has not received and is not aware of any written claim of such infringement or other misuse that has not since been resolved.

(e)    <u>Partnerships, Limited Liability Companies</u>.  The terms of any interest in a partnership or limited liability company that is Collateral of such Debtor expressly provide that such interest is a "security" for the purposes of the STA.

(f)    <u>Due Authorization</u>.  The Pledged Securities of such Debtor have been duly authorized and validly issued and are fully paid and non-assessable.

(g)    <u>Warrants, Options, etc.</u>  There are no outstanding warrants, options or other rights to purchase, or other agreements outstanding with respect to, or property that is now or hereafter convertible into, or that requires the issuance or sale of, any Pledged Shares of such Debtor.

(h)    <u>No Required Disposition</u>.  There is no existing agreement, option, right or privilege capable of becoming an agreement or option pursuant to which such Debtor would be required to sell, redeem or otherwise dispose of any Pledged Shares of such Debtor or under which any Pledged Issuer has any obligation to issue any Securities of such Pledged Issuer to any Person.

(i)    <u>Securities Laws</u>.  Such Debtor is not a Control Person with respect to any Pledged Issuer and the Pledged Shares issued by a Reporting Pledged Issuer do not comprise Voting or Equity Securities of any class (or securities convertible into

Voting or Equity Securities of any class) constituting ten per cent or more of the outstanding securities of that class.

6.    **Survival of Representations and Warranties**.  All representations and warranties made by each Debtor in this Agreement (a) are material, (b) shall be considered to have been relied on by the Secured Parties, and (c) shall survive the execution and delivery of this Agreement and any Supplement or any investigation made at any time by or on behalf of any Secured Party and any disposition or payment of the Secured Liabilities until the Lender Termination Date.

7.    **Covenants**.  Each Debtor covenants and agrees with the Agent (for its own benefit and for the benefit of the other Secured Parties) that:

(a)    <u>Further Documentation</u>.  Such Debtor shall from time to time, at the expense of such Debtor, promptly and duly authorize, execute and deliver such further instruments and documents, and take such further action, as the Agent may request, acting reasonably, for the purpose of obtaining or preserving the full benefits of, and the rights and powers granted by, this Agreement (including the filing of any financing statements or financing change statements under any applicable legislation with respect to the Security Interests).  Such Debtor acknowledges that this Agreement has been prepared based on the existing Laws in the Province referred to in the "Governing Law" section of this Agreement and that a change in such Laws, or the Laws of other jurisdictions, may require the execution and delivery of different forms of security documentation.  Accordingly, such Debtor agrees that the Agent shall have the right to require that this Agreement be amended, supplemented, restated or replaced, and that such Debtor shall immediately on request by the Agent authorize, execute and deliver any such amendment, supplement, restatement or replacement (i) to reflect any changes in such Laws, whether arising as a result of statutory amendments, court decisions or otherwise, (ii) to facilitate the creation and registration of appropriate security in all appropriate jurisdictions, or (iii) if such Debtor merges or amalgamates with any other Person or enters into any corporate reorganization, in each case in order to confer on the Agent Liens similar to, and having the same effect as, the Security Interests.

(b)    <u>Maintenance of Records</u>.  Such Debtor shall keep and maintain accurate and complete records of the Collateral of such Debtor, including a record of all payments received and all credits granted with respect to the Accounts and Contracts of such Debtor.  At the written request of the Agent, such Debtor shall mark any Collateral of such Debtor specified by the Agent to evidence the existence of the Security Interests.

(c)    <u>Further Identification of Collateral</u>.  Such Debtor shall promptly furnish to the Agent such statements and schedules further identifying and describing the Collateral of such Debtor, and such other reports in connection with the Collateral of such Debtor, as the Agent may from time to time reasonably request, including an updated list of any motor vehicles or other "serial number" goods owned by

such Debtor and classified as Equipment, including vehicle identification numbers, having a Fair Market Value exceeding U.S.$100,000.

(d)     Instruments; Documents of Title; Chattel Paper.  Promptly upon request from time to time by the Agent, such Debtor shall deliver to the Agent, endorsed and/or accompanied by such instruments of assignment and transfer in such form and substance as the Agent may reasonably request, any and all Instruments, Documents of Title and Chattel Paper of such Debtor having a Fair Market Value exceeding U.S. $1,000,000 included in or relating to the Collateral of such Debtor as the Agent may specify in its request.

(e)     Pledged Certificated Securities.  Such Debtor shall deliver to the Agent any and all Pledged Security Certificates of such Debtor and other materials as may be required from time to time to provide the Agent with control over all Pledged Certificated Securities of such Debtor in the manner provided under section 23 of the STA.  At the request of the Agent, such Debtor shall cause all Pledged Security Certificates of such Debtor to be registered in the name of the Agent or its nominee.

(f)     Pledged Uncertificated Securities.  Such Debtor shall deliver to the Agent any and all such documents, agreements and other materials as may be required from time to time to provide the Agent with control over all Pledged Uncertificated Securities of such Debtor in the manner provided under section 24 of the STA. For the purposes of section 27(1) of the STA, this Agreement shall constitute the Debtor's irrevocable consent to entry by a Pledged Issuer into an agreement of the kind referred to in clause 24(1)(b) of the STA.

(g)     Pledged Security Entitlements.  Such Debtor shall deliver to the Agent any and all such documents, agreements and other materials as may be required from time to time to provide the Agent with control over all Pledged Security Entitlements of such Debtor in the manner provided under section 25 or 26 of the STA.

(h)     Pledged Futures Contracts.  Such Debtor shall deliver to the Agent any and all such documents, agreements and other materials as may be required from time to time to provide the Agent with control over all Pledged Futures Contracts of such Debtor in the manner provided under subsection 1(2) of the PPSA.

(i)     Partnerships, Limited Liability Companies.  Such Debtor shall ensure that the terms of any interest in a partnership or limited liability company that is Collateral of such Debtor shall expressly provide that such interest is a "security" for the purposes of the STA.

(j)     Transfer Restrictions.  If the constating documents of any Pledged Issuer (other than a ULC) restrict the transfer of the Securities of such Pledged Issuer, then such Debtor shall deliver to the Agent a certified copy of a resolution of the directors, shareholders, unitholders or partners of such Pledged Issuer, as applicable, consenting to the transfer(s) contemplated by this Agreement,

including any prospective transfer of the Collateral of such Debtor by the Agent upon a realization on the Security Interests.

(k)     <u>Notices</u>.  Such Debtor shall advise the Agent promptly, in reasonable detail, of:

(i)     (upon knowledge by such Debtor thereof) any change to a Pledged Securities Intermediary's Jurisdiction, Pledged Issuer's Jurisdiction or Pledged Future Intermediary's Jurisdiction;

(ii)    any change in the location of the jurisdiction of incorporation or amalgamation, chief executive office or domicile of such Debtor;

(iii)   any change in the name of such Debtor;

(iv)    any additional jurisdiction in which such Debtor has tangible Personal Property;

(v)     any acquisition of any Intellectual Property Rights which are the subject of a registration or application with any governmental intellectual property or other governing body or registry, or which are material to such Debtor's business;

(vi)    any acquisition of any Instrument, Document of Title or Chattel Paper having a Fair Market Value exceeding U.S. $1,000,000;

(vii)   the Debtor becoming (or if the Debtor could reasonably be determined to have become) a Control Person with respect to any Reporting Pledged Issuer;

(viii)  the issuance of any order ceasing or suspending trading in, or prohibiting the transfer of any Pledged Shares or the institution of proceedings for such purpose, or if such Debtor has any reason to believe that any such proceedings are pending, contemplated or threatened; or

(ix)    any occurrence of any event, claim or occurrence that could reasonably be expected to have a material adverse effect on the value of the Collateral of such Debtor or on the Security Interests.

Such Debtor shall not effect or permit any of the changes referred to in clauses (ii) through (viii) above unless all filings have been made and all other actions taken that are required in order for the Agent to continue at all times following such change to have a valid and perfected first priority Security Interest with respect to all of the Collateral of such Debtor.

8.      <u>Voting Rights</u>.  Unless an Event of Default has occurred and is continuing, each Debtor shall be entitled to exercise all voting power from time to time exercisable with respect to the Pledged Shares of such Debtor and give consents, waivers and ratifications with respect thereto; provided, however, that no vote shall be cast or consent, waiver or ratification given or action taken which would be, or would have a reasonable likelihood of being, prejudicial to the interests

of the Secured Parties or which would have the effect of reducing the value of the Collateral of such Debtor as security for the Secured Liabilities of such Debtor or imposing any restriction on the transferability of any of the Collateral of such Debtor.  Unless an Event of Default has occurred and is continuing, the Agent shall, from time to time at the request and expense of the applicable Debtor, execute or cause to be executed, with respect to all Pledged Securities of such Debtor that are registered in the name of the Agent or its nominee, valid proxies appointing such Debtor as its (or its nominee's) proxy to attend, vote and act for and on behalf of the Agent or such nominee, as the case may be, at any and all meetings of the applicable Pledged Issuer's shareholders or debt holders, all Pledged Securities that are registered in the name of the Agent or such nominee, as the case may be, and to execute and deliver, consent to or approve or disapprove of or withhold consent to any resolutions in writing of shareholders or debt holders of the applicable Pledged Issuer for and on behalf of the Agent or such nominee, as the case may be.  Immediately upon the occurrence and during the continuance of any Event of Default, all such rights of the applicable Debtor to vote and give consents, waivers and ratifications shall cease and the Agent or its nominee shall be entitled to exercise all such voting rights and to give all such consents, waivers and ratifications.

9.      **Dividends; Interest**.  Unless an Event of Default has occurred and is continuing, each Debtor shall be entitled to receive any and all cash dividends, interest, principal payments and other forms of cash distribution on the Pledged Shares of such Debtor which it is otherwise entitled to receive, but any and all stock and/or liquidating dividends, distributions of property, returns of capital or other distributions made on or with respect to the Pledged Shares of such Debtor, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of any Pledged Issuer of such Debtor or received in exchange for such Pledged Shares or any part thereof or as a result of any amalgamation, merger, consolidation, acquisition or other exchange of property to which any Pledged Issuer of such Debtor may be a party or otherwise, and any and all cash and other property received in exchange for any Pledged Shares of such Debtor shall be and become part of the Collateral of such Debtor subject to the Security Interests and with respect to any Security Certificates, if received by such Debtor, shall forthwith be delivered to the Agent or its nominee (accompanied, if appropriate, by proper instruments of assignment and/or stock powers of attorney executed by such Debtor in accordance with the Agent's instructions) to be held subject to the terms of this Agreement; and if any of the Pledged Security Certificates have been registered in the name of the Agent or its nominee, the Agent shall execute and deliver (or cause to be executed and delivered) to such Debtor all such dividend orders and other instruments as such Debtor may request for the purpose of enabling such Debtor to receive the dividends, distributions or other payments which such Debtor is authorized to receive and retain pursuant to this Section.  If an Event of Default has occurred and is continuing, all rights of such Debtor pursuant to this Section shall cease and the Agent shall have the sole and exclusive right and authority to receive and retain the cash dividends, interest, principal payments and other forms of cash distribution which such Debtor would otherwise be authorized to retain pursuant to this Section.  Any money and other property paid over to or received by the Agent pursuant to the provisions of this Section shall be retained by the Agent as additional Collateral hereunder and be applied in accordance with the provisions of this Agreement.

10.     **Rights on Event of Default**.  If an Event of Default has occurred and is continuing, then and in every such case the Security Interests of each Debtor shall become enforceable and the

Agent, in addition to any rights now or hereafter existing under applicable Law may, personally or by agent, at such time or times as the Agent in its discretion may determine, do any one or more of the following:

(a)     Rights under PPSA, etc.  Exercise against any or all Debtors all of the rights and remedies granted to secured parties under the PPSA and any other applicable statute, or otherwise available to the Agent by contract, at law or in equity.

(b)     Demand Possession.  Demand possession of any or all of the Collateral of any or all Debtors, in which event each such Debtor shall, at the expense of such Debtor, immediately cause the Collateral of such Debtor designated by the Agent to be assembled and made available and/or delivered to the Agent at any place designated by the Agent.

(c)     Take Possession.  Enter on any premises where any Collateral of any or all Debtors is located and take possession of, disable or remove such Collateral.

(d)     Deal with Collateral.  Hold, store and keep idle, or operate, lease or otherwise use or permit the use of, any or all of the Collateral of any or all Debtors for such time and on such terms as the Agent may determine, and demand, collect and retain all earnings and other sums due or to become due from any Person with respect to any of the Collateral of any or all Debtors.

(e)     Carry on Business.  Carry on, or concur in the carrying on of, any or all of the business or undertaking of any or all Debtors and enter on, occupy and use (without charge by such Debtor) any of the premises, buildings, plant and undertaking of, or occupied or used by, any or all Debtors.

(f)     Enforce Collateral.  Seize, collect, receive, enforce or otherwise deal with any Collateral of any or all Debtors in such manner, on such terms and conditions and at such times as the Agent deems advisable.

(g)     Dispose of Collateral.  Realize on any or all of the Collateral of any or all Debtors and sell, lease, assign, give options to purchase, or otherwise dispose of and deliver any or all of the Collateral of any or all Debtors (or contract to do any of the above), in one or more parcels at any public or private sale, at any exchange, broker's board or office of the Agent or elsewhere, with or without advertising or other formality, except as required by applicable Law, on such terms and conditions as the Agent may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery.

(h)     Court-Approved Disposition of Collateral.  Obtain from any court of competent jurisdiction an order for the sale or foreclosure of any or all of the Collateral of any or all Debtors.

(i)     Purchase by Agent.  At any public sale, and to the extent permitted by Law on any private sale, bid for and purchase any or all of the Collateral of any or all Debtors offered for sale and, upon compliance with the terms of such sale, hold, retain,

sell or otherwise dispose of such Collateral without any further accountability to any Debtor or any other Person with respect to such holding, retention, sale or other disposition, except as required by Law. In any such sale to the Agent, the Agent may, for the purpose of making payment for all or any part of the Collateral of any Debtor so purchased, use any claim for any or all of the Secured Liabilities of such Debtor then due and payable to it as a credit against the purchase price.

(j)    <u>Collect Accounts</u>. Notify (whether in its own name or in the name of any Debtor) the account debtors under any Accounts of any or all Debtors of the assignment of such Accounts to the Agent and direct such account debtors to make payment of all amounts due or to become due to any or all Debtors with respect to such Accounts directly to the Agent and, upon such notification and at the expense of any such Debtor, enforce collection of any such Accounts, and adjust, settle or compromise the amount or payment of such Accounts, in such manner and to such extent as the Agent deems appropriate in the circumstances.

(k)    <u>Transfer of Collateral</u>. Transfer any Collateral of any or all Debtors that is Pledged Shares into the name of the Agent or its nominee.

(l)    <u>Voting</u>. Vote any or all of the Pledged Shares of any or all Debtors (whether or not transferred to the Agent or its nominee) and give or withhold all consents, waivers and ratifications with respect thereto and otherwise act with respect thereto as though it were the outright owner thereof.

(m)    <u>Exercise Other Rights</u>. Exercise any and all rights, privileges, entitlements and options pertaining to any Collateral of any or all Debtors that is Pledged Shares as if the Agent were the absolute owner of such Pledged Shares.

(n)    <u>Dealing with Contracts and Permits</u>. Deal with any and all Contracts and Permits of any or all Debtors to the same extent as any such Debtor might (including the enforcement, realization, sale, assignment, transfer, and requirement for continued performance), all on such terms and conditions and at such time or times as may seem advisable to the Agent.

(o)    <u>Payment of Liabilities</u>. Pay any liability secured by any Lien against any Collateral of any or all Debtors. Each such Debtor shall immediately on demand reimburse the Agent for all such payments and, until paid, any such reimbursement obligation shall form part of the Secured Liabilities of such Debtor and shall be secured by the Security Interests of such Debtor.

(p)    <u>Borrow and Grant Liens</u>. Borrow money for the maintenance, preservation or protection of any Collateral of any or all Debtors or for carrying on any of the business or undertaking of any or all Debtors and grant Liens on any Collateral of any or all Debtors (in priority to the Security Interests of any or all Debtors or otherwise) as security for the money so borrowed. Each such Debtor shall immediately on demand reimburse the Agent for all such borrowings and, until paid, any such reimbursement obligations shall form part of the Secured

Liabilities of such Debtor and shall be secured by the Security Interests of such Debtor.

(q) <u>Appoint Receiver</u>.  Appoint by instrument in writing one or more Receivers of any or all Debtors or any or all of the Collateral of any or all Debtors with such rights, powers and authority (including any or all of the rights, powers and authority of the Agent under this Agreement) as may be provided for in the instrument of appointment or any supplemental instrument, and remove and replace any such Receiver from time to time.  To the extent permitted by applicable Law, any Receiver appointed by the Agent shall (for purposes relating to responsibility for the Receiver's acts or omissions) be considered to be the agent of any such Debtor and not of the Agent or any of the other Secured Parties.

(r) <u>Court-Appointed Receiver</u>.  Obtain from any court of competent jurisdiction an order for the appointment of a Receiver of any or all Debtors or of any or all of the Collateral of any or all Debtors.

(s) <u>Consultants</u>.  Require any or all Debtors to engage a consultant of the Agent's choice, or engage a consultant on its own behalf, such consultant to receive the full cooperation and support of each such Debtor and its agents and employees, including unrestricted access to the premises of each such Debtor and the Books and Records of each such Debtor; all reasonable fees and expenses of such consultant shall be for the account of each such Debtor and each such Debtor hereby authorizes any such consultant to report directly to the Agent and to disclose to the Agent any and all information obtained in the course of such consultant's employment.

The Agent may exercise any or all of the foregoing rights and remedies without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except as required by applicable Law) to or on any Debtor or any other Person, and each Debtor hereby waives each such demand, presentment, protest, advertisement and notice to the extent permitted by applicable Law.  None of the above rights or remedies shall be exclusive of or dependent on or merge in any other right or remedy, and one or more of such rights and remedies may be exercised independently or in combination from time to time.  Each Debtor acknowledges and agrees that any action taken by the Agent hereunder following the occurrence and during the continuance of an Event of Default shall not be rendered invalid or ineffective as a result of the curing of the Event of Default on which such action was based.

11. **Realization Standards**.  To the extent that applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner and without prejudice to the ability of the Agent to dispose of the Collateral in any such manner, each Debtor acknowledges and agrees that it is not commercially unreasonable for the Agent to (or not to) (a) incur expenses reasonably deemed significant by the Agent to prepare the Collateral of such Debtor for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) fail to obtain third party consents for access to the Collateral of such Debtor to be disposed of, (c) fail to exercise collection remedies against account debtors or other Persons obligated on the Collateral of such Debtor or to remove Liens against the Collateral of such Debtor, (d) exercise collection remedies against account debtors and other Persons obligated on the Collateral of such Debtor directly or through the use of

collection agencies and other collection specialists, (e) dispose of Collateral of such Debtor by way of public auction, public tender or private contract, with or without advertising and without any other formality, (f) contact other Persons, whether or not in the same business of such Debtor, for expressions of interest in acquiring all or any portion of the Collateral of such Debtor, (g) hire one or more professional auctioneers to assist in the disposition of the Collateral of such Debtor, whether or not such Collateral is of a specialized nature or an upset or reserve bid or price is established, (h) dispose of the Collateral of such Debtor by utilizing internet sites that provide for the auction of assets of the types included in such Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) dispose of assets in wholesale rather than retail markets, (j) disclaim disposition warranties, such as title, possession or quiet enjoyment, (k) purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of the Collateral of such Debtor or to provide to the Agent a guaranteed return from the collection or disposition of such Collateral, (l) to the extent deemed appropriate by the Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral of such Debtor, (m) dispose of Collateral of such Debtor in whole or in part, and (n) dispose of Collateral of such Debtor to a customer of the Agent, and (o) establish an upset or reserve bid price with respect to Collateral of such Debtor.

12.    **Grant of Licence**.  For the purpose of enabling the Agent to exercise its rights and remedies under this Agreement when the Agent is entitled to exercise such rights and remedies, and for no other purpose, each Debtor grants to the Agent an irrevocable, non-exclusive licence (exercisable without payment of royalty or other compensation to such Debtor) to use, assign or sublicense any or all of the Intellectual Property Rights of such Debtor, including in such licence reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout of the same, in each case, subject to any Grantor's security policies and obligations of confidentiality; provided, however, that nothing in this Section 12 shall require a Debtor to grant any license that is prohibited by any applicable Law, statute or regulation or is prohibited by, or constitutes a breach or default under or results in the termination of or gives rise to any right of acceleration, modification or cancellation under any contract, license, agreement, instrument or other document evidencing, giving rise to a right to use or therefore granted with respect to such property.  For any trade-marks, get up and trade dress and other business indicia, such licence includes an obligation on the part of the Agent to maintain the standards of quality maintained by such Debtor or, in the case of trade-marks, get-up and trade dress or other business indicia licensed to such Debtor, the standards of quality imposed upon such Debtor by the relevant licence.  For copyright works, such licence shall include the benefit of any waivers of moral rights and similar rights.

13.    **Securities Laws**.  The Agent is authorized, in connection with any offer or sale of any Pledged Shares of any Debtor, to comply with any limitation or restriction as it may be advised by counsel is necessary to comply with applicable Law, including compliance with procedures that may restrict the number of prospective bidders and purchasers, requiring that prospective bidders and purchasers have certain qualifications, and restricting prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account or investment and not with a view to the distribution or resale of such Securities.  In addition to and without limiting Section 11, each Debtor further agrees that compliance with any such limitation or restriction shall not result in a sale being considered or deemed not to have

been made in a commercially reasonable manner, and the Agent shall not be liable or accountable to such Debtor for any discount allowed by reason of the fact that such Pledged Shares are sold in compliance with any such limitation or restriction. If the Agent chooses to exercise its right to sell any or all Pledged Shares of any Debtor, upon written request, such Debtor shall cause each applicable Pledged Issuer to furnish to the Agent all such information as the Agent may request in order to determine the number of shares and other instruments included in the Collateral of such Debtor which may be sold by the Agent in exempt transactions under any Laws governing securities, and the rules and regulations of any applicable securities regulatory body thereunder, as the same are from time to time in effect.

14.    **ULC Shares**.  Each Debtor acknowledges that certain of the Collateral of such Debtor may now or in the future consist of ULC Shares, and that it is the intention of the Agent and each Debtor that neither the Agent nor any other Secured Party should under any circumstances prior to realization thereon be held to be a "member" or a "shareholder", as applicable, of a ULC for the purposes of any ULC Laws.  Therefore, notwithstanding any provisions to the contrary contained in this Agreement, the Credit Agreement or any other Transaction Document, where a Debtor is the registered owner of ULC Shares which are Collateral of such Debtor, such Debtor shall remain the sole registered owner of such ULC Shares until such time as such ULC Shares are effectively transferred into the name of the Agent, any other Secured Party, or any other Person on the books and records of the applicable ULC.  Accordingly, each Debtor shall be entitled to receive and retain for its own account any dividend on or other distribution, if any, with respect to such ULC Shares (except for any dividend or distribution comprised of Pledged Security Certificates of such Debtor, which shall be delivered to the Agent to hold hereunder) and shall have the right to vote such ULC Shares and to control the direction, management and policies of the applicable ULC to the same extent as such Debtor would if such ULC Shares were not pledged to the Agent pursuant hereto.  Nothing in this Agreement, the Credit Agreement or any other Transaction Document is intended to, and nothing in this Agreement, the Credit Agreement or any other Transaction Document shall, constitute the Agent, any other Secured Party, or any other Person other than the applicable Debtor, a member or shareholder of a ULC for the purposes of any ULC Laws (whether listed or unlisted, registered or beneficial), until such time as notice is given to such Debtor and further steps are taken pursuant hereto or thereto so as to register the Agent, any other Secured Party, or such other Person, as specified in such notice, as the holder of the ULC Shares.  To the extent any provision hereof would have the effect of constituting the Agent or any other Secured Party as a member or a shareholder, as applicable, of any ULC prior to such time, such provision shall be severed herefrom and shall be ineffective with respect to ULC Shares which are Collateral of any Debtor without otherwise invalidating or rendering unenforceable this Agreement or invalidating or rendering unenforceable such provision insofar as it relates to Collateral of any Debtor which is not ULC Shares.  Except upon the exercise of rights of the Agent to sell, transfer or otherwise dispose of ULC Shares in accordance with this Agreement, each Debtor shall not cause or permit, or enable a Pledged Issuer that is a ULC to cause or permit, the Agent or any other Secured Party to: (a) be registered as a shareholder or member of such Pledged Issuer; (b) have any notation entered in their favour in the share register of such Pledged Issuer; (c) be held out as shareholders or members of such Pledged Issuer; (d) receive, directly or indirectly, any dividends, property or other distributions from such Pledged Issuer by reason of the Agent holding the Security Interests over the ULC Shares; or (e) act as a shareholder of such Pledged Issuer, or exercise any

rights of a shareholder including the right to attend a meeting of shareholders of such Pledged Issuer or to vote its ULC Shares.

15.    **Application of Proceeds**.  All Proceeds of Collateral of any Debtor received by the Agent or a Receiver shall be applied as set out in the Credit Agreement.

16.    **Continuing Liability of Debtor**.  Each Debtor shall remain liable for any Secured Liabilities of such Debtor that are outstanding following realization of all or any part of the Collateral of such Debtor and the application of the Proceeds thereof.

17.    **Agent's Appointment as Attorney-in-Fact**.  Effective upon the occurrence and during the continuance of an Event of Default, each Debtor constitutes and appoints the Agent and any officer or agent of the Agent, with full power of substitution, as such Debtor's true and lawful attorney-in-fact with full power and authority in the place of such Debtor and in the name of such Debtor or in its own name, from time to time in the Agent's discretion, to take any and all appropriate action and to execute any and all documents and instruments as, in the opinion of such attorney, may be necessary or desirable to accomplish the purposes of this Agreement. Without limiting the effect of this Section, each Debtor grants the Agent an irrevocable proxy to vote the Pledged Shares of such Debtor and to exercise all other rights, powers, privileges and remedies to which a holder thereof would be entitled (including giving or withholding written consents of shareholders, calling special meetings of shareholders and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Shares of such Debtor on the books and records of a Pledged Issuer or Pledged Securities Intermediary, as applicable), upon the occurrence of an Event of Default. These powers are coupled with an interest and are irrevocable until the Lender Termination Date. Nothing in this Section affects the right of the Agent as secured party or any other Person on the Agent's behalf, to sign and file or deliver (as applicable) all such financing statements, financing change statements, notices, verification statements and other documents relating to the Collateral and this Agreement as the Agent or such other Person considers appropriate.  Each Debtor hereby ratifies and confirms, and agrees to ratify and confirm, whatever lawful acts the Agent or any of the Agent's sub-agents, nominees or attorneys do or purport to do in exercise of the power of attorney granted to the Agent pursuant to this Section.

18.    **Performance by Agent of Debtor's Obligations**.  If any Debtor fails to perform or comply with any of the obligations of such Debtor under this Agreement, the Agent may, but need not, perform or otherwise cause the performance or compliance of such obligation, provided that such performance or compliance shall not constitute a waiver, remedy or satisfaction of such failure.  The expenses of the Agent incurred in connection with any such performance or compliance shall be payable by such Debtor to the Agent immediately on demand, and until paid, any such expenses shall form part of the Secured Liabilities of such Debtor and shall be secured by the Security Interests of such Debtor.

19.    **Severability**.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

20.    **Rights of Agent; Limitations on Agent's Obligations**.

(a)    <u>Limitations on Liability of Secured Parties</u>.  Neither the Agent nor any other Secured Party shall be liable to any Debtor or any other Person for any failure or delay in exercising any of the rights of such Debtor under this Agreement (including any failure to take possession of, collect, sell, lease or otherwise dispose of any Collateral of such Debtor, or to preserve rights against prior parties).  Neither the Agent, any other Secured Party, a Receiver, nor any agent thereof (including, in Alberta or British Columbia, any sheriff) is required to take, or shall have any liability for any failure to take or delay in taking, any steps necessary or advisable to preserve rights against other Persons under any Collateral of any Debtor in its possession.  Neither the Agent, any other Secured Party, any Receiver, nor any agent thereof shall be liable for any, and each Debtor shall bear the full risk of all, loss or damage to any and all of the Collateral of such Debtor (including any Collateral of such Debtor in the possession of the Agent, any other Secured Party, any Receiver, or any agent thereof) caused for any reason other than the gross negligence or wilful misconduct of the Agent, such other Secured Party, such Receiver or such agent thereof (or their respective officers, employees or representatives).

(b)    <u>Debtors Remain Liable under Accounts and Contracts</u>.  Notwithstanding any provision of this Agreement, each Debtor shall remain liable under each of the documents giving rise to the Accounts of such Debtor and under each of the Contracts of such Debtor to observe and perform all the conditions and obligations to be observed and performed by such Debtor thereunder, all in accordance with the terms of each such document and Contract.  Neither the Agent nor any other Secured Party shall have any obligation or liability under any Account of any Debtor (or any document giving rise thereto) or Contract of any Debtor by reason of or arising out of this Agreement or the receipt by the Agent of any payment relating to such Account or Contract pursuant hereto, and in particular (but without limitation), neither the Agent nor any other Secured Party shall be obligated in any manner to perform any of the obligations of any Debtor under or pursuant to any Account of such Debtor (or any document giving rise thereto) or under or pursuant to any Contract of such Debtor, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account of such Debtor (or any document giving rise thereto) or under any Contract of such Debtor, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time.

(c)    <u>Collections on Accounts and Contracts</u>.  Each Debtor shall be authorized to, at any time that an Event of Default is not continuing, collect the Accounts of such Debtor and payments under the Contracts of such Debtor in the normal course of the business of such Debtor and for the purpose of carrying on the same.  If required by the Agent at any time, any payments of Accounts of such Debtor or under Contracts of such Debtor, when collected by such Debtor, shall be forthwith

(and, in any event, within two Business Days) deposited by such Debtor in the exact form received, duly endorsed by such Debtor to the Agent if required, in a special collateral account maintained by the Agent, and until so deposited, will be held by such Debtor in trust for the Agent, segregated from the other funds of such Debtor.  All such amounts while held by the Agent (or by such Debtor in trust for the Agent) and all income with respect thereto shall continue to be collateral security for the Secured Liabilities and shall not constitute payment thereof until applied as hereinafter provided.  If an Event of Default has occurred and is continuing, the Agent may apply all or any part of the amounts on deposit with respect to such Debtor in said special collateral account on account of the Secured Liabilities of such Debtor in such order as the Agent may elect.  At the Agent's request, such Debtor shall deliver to the Agent any documents evidencing and relating to the agreements and transactions which gave rise to the Accounts and the Contracts of such Debtor, including all original orders, invoices and shipping receipts.

(d)    <u>Use of Agents</u>.  The Agent may perform any of its rights or duties under this Agreement by or through agents and is entitled to retain counsel and to act in reliance on the advice of such counsel concerning all matters pertaining to its rights and duties under this Agreement.

21.    **Dealings by Agent**.  The Agent shall not be obliged to exhaust its recourse against any Debtor or any other Person or against any other security it may hold with respect to the Secured Liabilities of such Debtor or any part thereof before realizing upon or otherwise dealing with the Collateral of such Debtor in such manner as the Agent may consider desirable.  The Agent and the other Secured Parties may grant extensions of time and other indulgences, take and give up security, accept compositions, grant releases and discharges and otherwise deal with any Debtor and any other Person, and with any or all of the Collateral of any Debtor, and with other security and sureties, as they may see fit, all without prejudice to the Secured Liabilities of any Debtor or to the rights and remedies of the Agent under this Agreement.  The powers conferred on the Agent under this Agreement are solely to protect the interests of the Agent in the Collateral of each Debtor and shall not impose any duty upon the Agent to exercise any such powers.

22.    **Communication**.  Any notice or other communication required or permitted to be given under this Agreement shall be made in accordance with the terms of the Credit Agreement.

23.    **Release of Information**.  Each Debtor authorizes the Agent to provide a copy of this Agreement and such other information as may be requested of the Agent (i) to the extent necessary to enforce the Agent's rights, remedies and entitlements under this Agreement, (ii) to any assignee or prospective assignee of all or any part of its Secured Liabilities, and (iii) as required by applicable Law.

24.    **Expenses; Indemnity; Waiver**.

(a)    The Debtors shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Secured Parties, including the reasonable and documented fees, charges and disbursements of one primary counsel for the Secured Parties and all

applicable taxes, in connection with the preparation and administration of this Agreement, (ii) all reasonable and documented out-of-pocket expenses incurred by the Secured Parties, including the reasonable and documented fees, charges and disbursements of one primary counsel for the Secured Parties and applicable taxes, in connection with any amendments, modifications or waivers of the provisions hereof, and (iii) all out-of-pocket expenses incurred by the Secured Parties, including the fees, charges and disbursements of any counsel for the Secured Parties and all applicable taxes, in connection with the assessment, enforcement or protection of their rights in connection with this Agreement, including its rights under this Section, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations with respect to the Secured Liabilities of such Debtor.

(b)     Each Debtor shall indemnify the Secured Parties against, and hold the Secured Parties harmless from, any and all losses, claims, cost recovery actions, damages, expenses and liabilities of whatsoever nature or kind and all reasonable out-of-pocket expenses and all applicable taxes to which any Secured Party may become subject arising out of or in connection with (i) the execution or delivery of this Agreement and the performance by such Debtor of its obligations hereunder, (ii) any actual or prospective claim, litigation, investigation or proceeding relating to this Agreement or the Secured Liabilities of such Debtor, whether based on contract, tort or any other theory and regardless of whether any Secured Party is a party thereto, (iii) any other aspect of this Agreement, or (iv) the enforcement of the Secured Parties' rights hereunder and any related investigation, defence, preparation of defence, litigation and enquiries, in each case to the extent the Borrowers would be required to do so pursuant to Section 9.3 of the Credit Agreement.

(c)     No claim may be made by any Debtor, any Secured Party or any other Person against any party hereto on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, or in connection with, or as a result of, this Agreement, or any act, omission or event occurring in connection applicable law all such claims, whether or not accrued and whether or not known or suspected to exist in its favour.

(d)     All amounts due under this Section shall be payable to the Agent for the benefit of the applicable Secured Parties not later than three Business Days after written demand therefor.

(e)     The indemnifications set out in this Section shall survive the Lender Termination Date and the release or extinguishment of the Security Interests.

25.    **Release of Debtor**.  Upon the written request of any Debtor given at any time on or after the Lender Termination Date, or as permitted pursuant to the Credit Agreement, the Agent shall at the expense of such Debtor, release such Debtor and the Collateral of such Debtor from the Security Interests and such release shall serve to terminate any licence granted in this Agreement.  Upon such release, and at the request and expense of such Debtor, the Agent shall

execute and deliver to such Debtor such releases and discharges as such Debtor may reasonably request.

26. **Additional Security**.  This Agreement is in addition to, and not in substitution of, any and all other security previously or concurrently delivered by any Debtor or any other Person to any Secured Party, all of which other security shall remain in full force and effect.

27. **Alteration or Waiver**.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Agent.  The Secured Parties shall not, by any act or delay, be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Agent would otherwise have on any future occasion.  Neither the taking of any judgment nor the exercise of any power of seizure or sale shall extinguish the liability of any Debtor to pay the Secured Liabilities of such Debtor, nor shall the same operate as a merger of any covenant contained in this Agreement or of any other liability, nor shall the acceptance of any payment or other security constitute or create any novation.

28. **Environmental Indemnity**.  Each Debtor shall indemnify the Secured Parties and hold the Secured Parties harmless against and from all losses, costs, damages and expenses which any Secured Party may sustain, incur or be or become liable at any time whatsoever for by reason of or arising in connection with any Environmental Liability to the extent the Borrowers would be required to do so pursuant to Section 9.3(2) of the Credit Agreement.  This indemnification shall survive the Lender Termination Date.

29. **Amalgamation**.  If any Debtor is a corporation, such Debtor acknowledges that if it amalgamates or merges with any other corporation or corporations, then (i) the Collateral and the Security Interests of such Debtor shall extend to and include all the property and assets of the amalgamated corporation and to any property or assets of the amalgamated corporation thereafter owned or acquired, (ii) the term "Debtor", where used in this Agreement, shall extend to and include the amalgamated corporation, and (iii) the term "Secured Liabilities", where used in this Agreement, shall extend to and include the Secured Liabilities of the amalgamated corporation.

30. **Governing Law; Attornment**.  This Agreement shall be governed by and construed in accordance with the Laws of the Province of Ontario.  Without prejudice to the ability of the Agent to enforce this Agreement in any other proper jurisdiction, each Debtor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of such province.  To the extent permitted by applicable Law, each Debtor irrevocably waives any objection (including any claim of inconvenient forum) that it may now or hereafter have to the venue of any legal proceeding arising out of or relating to this Agreement in the courts of such Province.

31.    **Interpretation**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "or" is disjunctive; the word "and" is conjunctive.  The word "shall" is mandatory; the word "may" is permissive.  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set out herein), (b) any reference herein to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, restated or re-enacted from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and (e) all references herein to Sections and Schedules shall be construed to refer to Sections and Schedules to, this Agreement, Section headings are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.  Any reference in this Agreement to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Security Interest to any Permitted Lien.   In accordance with the *Property Law Act* (British Columbia), the doctrine of consolidation applies to this Agreement.

32.    **Paramountcy.**  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the Credit Agreement then, notwithstanding anything contained in this Agreement, the provisions contained in the Credit Agreement shall prevail to the extent of such conflict or inconsistency and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict or inconsistency, it being understood that the purpose of this Agreement is to add to, and not detract from, the rights granted to the Agent (for its own benefit and for the benefit of the other Secured Parties) under the Credit Agreement.  If any act or omission of any or all Debtors is expressly permitted under the Credit Agreement but is expressly prohibited under this Agreement, such act or omission shall be permitted.  If any act or omission is expressly prohibited under this Agreement, but the Credit Agreement does not expressly permit such act or omission, or if any act is expressly required to be performed under this Agreement but the Credit Agreement does not expressly relieve any or all Debtors from such performance, such circumstance shall not constitute a conflict or inconsistency between the applicable provisions of this Agreement and the provisions of the Credit Agreement.

33.    **Successors and Assigns**.  This Agreement shall enure to the benefit of, and be binding on, each Debtor and its successors and permitted assigns, and shall enure to the benefit of, and be binding on, the Agent and its successors and assigns.  No Debtor may assign this Agreement, or any of its rights or obligations under this Agreement.  The Agent may assign this Agreement and any of  its rights and obligations hereunder to any Person that replaces it in its capacity as such.  If any Debtor or the Agent is an individual, then the term "Debtor" or "Agent", as applicable, shall also include his or her heirs, administrators and executors.

34.    **Additional Debtors**.  Additional Persons may from time to time after the date of this Agreement become Debtors under this Agreement by executing and delivering to the Agent a supplemental agreement (together with all schedules thereto, a "**Supplement**") to this Agreement, in substantially the form attached hereto as Exhibit A.  Effective from and after the date of the execution and delivery by any Person to the Agent of a Supplement:

(a)    such Person shall be, and shall be deemed for all purposes to be, a Debtor under this Agreement with the same force and effect, and subject to the same agreements, representations, indemnities, liabilities, obligations and Security Interests, as if such Person had been an original signatory to this Agreement as a Debtor; and

(b)    all Collateral of such Person shall be subject to the Security Interest from such Person as security for the due payment and performance of the "Liabilities" of such Person in accordance with the provisions of this Agreement.

The execution and delivery of a Supplement by any additional Person shall not require the consent of any Debtor and all of the Secured Liabilities of each Debtor and the Security Interests granted thereby shall remain in full force and effect, notwithstanding the addition of any new Debtor to this Agreement.

35.    **Acknowledgment of Receipt/Waiver**.    Each Debtor acknowledges receipt of an executed copy of this Agreement and, to the extent permitted by applicable Law, waives the right to receive a copy of any financing statement or financing change statement registered in connection with this Agreement or any verification statement issued with respect to any such financing statement or financing change statement.

36.    **Enforcement by Agent**.  This Agreement and the Security Interests may be enforced only by the action of the Agent acting on behalf of the Secured Parties and no other Secured Party shall have any rights individually to enforce or seek to enforce this Agreement or any of the Security Interests, it being understood and agreed that such rights and remedies may be exercised by the Agent for the benefit of the Secured Parties upon the terms of this Agreement.

37.    **Electronic Signature and Counterparts**.  Delivery of an executed signature page to this Agreement by any Debtor by facsimile or other electronic form of transmission shall be as effective as delivery by such Debtor of a manually executed copy of this Agreement by such Debtor.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

*[signatures on the next following pages]*

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date first written above.

**[DEBTOR]**

By: _____

Name:

Title:

**SCHEDULE A-1 TO GSA**

**DEBTOR INFORMATION**

**Full legal name:**

**Prior names:**

**Predecessor companies:**

**Jurisdiction of incorporation or organization:**

**Address of chief executive office:**

**Jurisdictions in which business is carried on or tangible Personal Property is kept:**

**Addresses of all owned real property:**

**Addresses of all leased real property:**

**Description of all "serial number" goods (i.e. motor vehicles, trailers, aircraft, boats and outboard motors for boats) having a Fair Market Value exceeding U.S. $100,000:**

**Description of all material Permits:**

**Subsidiaries of the Debtor:**

**Instruments, Documents of Title and Chattel Paper of New Debtor having a Fair Market Value exceeding U.S. $100,000,000:**

**Pledged Certificated Securities:**

| Pledged Issuer | Securities Owned | % of issued and outstanding Securities of Pledged Issuer | Security Certificate Numbers | Security Certificate Location |
|---|---|---|---|---|
| [SUBCO] | [100 common shares] | [100%] | [C-1] | [Toronto] |
| | | | | |

**Pledged Securities Accounts:**

| Pledged Securities Intermediary | Securities Account Number | Pledged Securities Intermediary's Jurisdiction | Pledged Security Entitlements |
|---|---|---|---|
| [BROKERAGE | [NUMBER] | [Ontario] | [100 common shares of |

| HOUSE] | | | [COMPANY]] |
|---|---|---|---|
| | | | |

**Pledged Uncertificated Securities:**

| Pledged Issuer | Pledged Issuer's Jurisdiction | Securities Owned | % of issued and outstanding Securities of Pledged Issuer |
|---|---|---|---|
| [LIMITED PARTNERSHIP] | [Ontario] | [100 limited partnership units] | [50% of all limited partnership interests] |
| | | | |

**Pledged Futures Accounts:**

| Pledged Futures Intermediary | Futures Account Number | Pledged Futures Intermediary's Jurisdiction | Pledged Futures Contracts |
|---|---|---|---|
| [BROKERAGE HOUSE] | [NUMBER] | [Ontario] | [*Brief Description of Contract*] |
| | | | |

**Registered trade-marks and applications for trademark registrations:**

| Country | Trade-mark | Application No. | Application Date | Registration No. | Registration Date | Licensed to or by Debtor |
|---|---|---|---|---|---|---|
| | | | | | | [Y/N][14] |
| | | | | | | |

**Patents and patent applications:**

| Country | Title | Patent No. | Application Date | Date of Grant | Licensed to or by Debtor |
|---|---|---|---|---|---|
| | | | | | [Y/N] |
| | | | | | |

---

[14]   If the answer to this or any corresponding column is "yes", describe the particulars of each such licence.

**Copyright registrations and applications for copyright registrations:**

| Country | Work | Application No. | Application Date | Registration No. | Licensed to or by Debtor |
|---|---|---|---|---|---|
| | | | | | [Y/N] |
| | | | | | |

**Industrial designs/registered designs and applications for registered designs:**

| Country | Design | Application No. | Application Date | Registration No. | Issue Date | Licensed to or by Debtor |
|---|---|---|---|---|---|---|
| | | | | | | [Y/N] |
| | | | | | | |

**EXHIBIT A TO GSA**

**FORM OF SUPPLEMENT**
**TO**
**GENERAL SECURITY AGREEMENT**

**TO**:  Name:        HSBC BANK CANADA, as administrative agent
   Address:     70 York Street, Toronto, ON M5J 1S9
   Attention:   Agency Administrator
   Facsimile:   647-788-2185
   E-mail:      cacmbagency2@hsbc.ca

**RECITALS:**

A.   Reference is made to the General Security Agreement (the "**Security Agreement**") dated as of [●], 2016 entered into by Xiwang Iovate Health Science International Inc. in favour of the Agent (for its own benefit and for the benefit of the other Secured Parties).

B.   Capitalized terms used but not otherwise defined in this Supplement have the respective meanings given to such terms in the Security Agreement, including the definitions of terms incorporated in the Security Agreement by reference to other agreements.

C.   Section 35 of the Security Agreement provides that additional Persons may from time to time after the date of the Security Agreement become Debtors under the Security Agreement by executing and delivering to the Agent a supplemental agreement to the Security Agreement in the form of this Supplement.

D.   The undersigned (the "**New Debtor**") has agreed to become a Debtor under the Security Agreement by executing and delivering this Supplement to the Agent.

For good and valuable consideration, the receipt and adequacy of which are acknowledged by the New Debtor, the New Debtor agrees with and in favour of the Agent (for its own benefit and for the benefit of the Secured Parties) as follows:

1.   The New Debtor has received a copy of, and has reviewed, the Security Agreement and is executing and delivering this Supplement to the Agent pursuant to Section 35 of the Security Agreement.

2.   Effective from and after the date this Supplement is executed and delivered to the Agent by the New Debtor:

   (a)   the New Debtor shall be, and shall be deemed for all purposes to be, a Debtor under the Security Agreement with the same force and effect, and subject to the same agreements, representations, indemnities, liabilities, obligations and Security Interests, as if the New Debtor had been, as of the date of this Supplement, an original signatory to the Security Agreement as a Debtor; and

   (b)   all Collateral of the New Debtor shall be subject to the Security Interests granted by the New Debtor as security for the due payment and performance of the Liabilities of the New Debtor in accordance with the provisions of the Security Agreement.

In furtherance of the foregoing, the New Debtor, as general and continuing collateral security for the due payment and performance of its Secured Liabilities, pledges, mortgages, charges and assigns (by way of security) to the Agent (for its own benefit and for the benefit of the other Secured Parties), and grants to the Agent (for its own benefit and for the benefit of the other Secured Parties) a security interest in, the Collateral of the New Debtor. The terms and provisions of the Security Agreement are incorporated by reference in this Supplement.

3.      The New Debtor represents and warrants to the Agent (for its own benefit and for the benefit of the other Secured Parties) that each of the representations and warranties made or deemed to have been made by it under the Security Agreement as a Debtor are true and correct on the date of this Supplement.

4.      All of the information set out in Schedule A to this Supplement with respect to the New Debtor is accurate and complete as of the date of this Supplement.

5.      Upon this Supplement bearing the signature of any Person claiming to have authority to bind the New Debtor coming into the possession of the Agent, this Supplement and the Security Agreement shall be deemed to be finally and irrevocably executed and delivered by, and be effective and binding on, and enforceable against, the New Debtor free from any promise or condition affecting or limiting the liabilities of the New Debtor. No statement, representation, agreement or promise by any officer, employee or agent of the Agent or any Secured Party, unless expressly set forth in this Supplement, forms any part of this Supplement or has induced the New Debtor to enter into this Supplement and the Security Agreement or in any way affects any of the agreements, obligations or liabilities of the New Debtor under this Supplement and the Security Agreement.

6.      Delivery of an executed signature page to this Supplement by the New Debtor by facsimile or other electronic transmission shall be as effective as delivery by the New Debtor of a manually executed copy of this Supplement by the New Debtor.

7.      This Supplement shall be governed by and construed in accordance with the laws of the Province of Ontario, and the laws of Canada applicable therein.

8.      This Supplement and the Security Agreement shall be binding upon the New Debtor and its successors.  The New Debtor shall not assign its rights and obligations under this Supplement or the Security Agreement, or any of its rights or obligations in this Supplement or the Security Agreement.

Dated:          **[MONTH] [DAY], [YEAR]**

                                                    **[NEW DEBTOR]**

                                    By: _____
                                          Name:
                                          Title:

**SCHEDULE A TO GSA**

**DEBTOR INFORMATION**

**Full legal name:**

**Prior names:**

**Predecessor companies:**

**Jurisdiction of incorporation or organization:**

**Address of chief executive office:**

**Jurisdictions in which business is carried on or tangible Personal Property is kept:**

**Addresses of all owned real property:**

**Addresses of all leased real property:**

**Description of all "serial number" goods (i.e. motor vehicles, trailers, aircraft, boats and outboard motors for boats) having a Fair Market Value exceeding U.S. $100,000:**

**Description of all material Permits:**

**Subsidiaries of New Debtor:**

**Instruments, Documents of Title and Chattel Paper of the Debtor having a Fair Market Value exceeding U.S. $100,000,000:**

**Pledged Certificated Securities:**

| Pledged Issuer | Securities Owned | % of issued and outstanding Securities of Pledged Issuer | Security Certificate Numbers | Security Certificate Location |
|---|---|---|---|---|
| [SUBCO] | [100 common shares] | [100%] | [C-1] | [Toronto] |
| | | | | |

**Pledged Securities Accounts:**

| Pledged Securities Intermediary | Securities Account Number | Pledged Securities Intermediary's Jurisdiction | Pledged Security Entitlements |
|---|---|---|---|
| [BROKERAGE | [NUMBER] | [Ontario] | [100 common shares of |

| HOUSE] | | | [COMPANY]] |
|---|---|---|---|
| | | | |

**Pledged Uncertificated Securities:**

| Pledged Issuer | Pledged Issuer's Jurisdiction | Securities Owned | % of issued and outstanding Securities of Pledged Issuer |
|---|---|---|---|
| [LIMITED PARTNERSHIP] | [Ontario] | [100 limited partnership units] | [50% of all limited partnership interests] |
| | | | |

**Pledged Futures Accounts:**

| Pledged Futures Intermediary | Futures Account Number | Pledged Futures Intermediary's Jurisdiction | Pledged Futures Contracts |
|---|---|---|---|
| [BROKERAGE HOUSE] | [NUMBER] | [Ontario] | [*Brief description of Contract*] |
| | | | |

**Registered trade-marks and applications for trademark registrations:**

| Country | Trade-mark | Application No. | Application Date | Registration No. | Registration Date | Licensed to or by Debtor[15] |
|---|---|---|---|---|---|---|
| | | | | | | [Y/N] |
| | | | | | | |

**Patents and patent applications:**

| Country | Title | Patent No. | Application Date | Date of Grant | Licensed to or by Debtor |
|---|---|---|---|---|---|
| | | | | | [Y/N] |
| | | | | | |

**Copyright registrations and applications for copyright registrations:**

| Country | Work | Application No. | Application Date | Registration No. | Licensed to or by Debtor |
|---|---|---|---|---|---|

---

[15] If the answer to this or any corresponding column is "yes", describe the particulars of each such licence.

| | | | | | [Y/N] |
|---|---|---|---|---|---|
| | | | | | |

**Industrial designs/registered designs and applications for registered designs:**

| Country | Design | Application No. | Application Date | Registration No. | Issue Date | Licensed to or by Debtor |
|---|---|---|---|---|---|---|
| | | | | | | [Y/N] |
| | | | | | | |

**SCHEDULE 1.1(A)**
**INITIAL SECURITY DOCUMENTS**

1.      Limited recourse guarantee from Holdco

2.      Pledge agreement from Holdco with respect to its Equity Securities of, and debt owing by, the Term Borrower

3.      Limited recourse guarantee from Vendor

4.      Pledge agreement from Vendor with respect to its Equity Securities of Initial Target

5.      Group Guarantee from Acquisitionco, Opco, Initial Target, Old Iovate International Inc., Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp., Lakeside Innovations Holding Corp. and Northern Innovations Holding Corp.

6.      GSA from Acquisitionco, Opco, Initial Target, Old Iovate International Inc., Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp., Lakeside Innovations Holding Corp. and Northern Innovations Holding Corp.

7.      Security Agreement (NY law) from Iovate Health Sciences U.S.A. Inc.

8.      Pledge Agreement (NY law) from Initial Target

9.      All intellectual property security agreements, stock certificates, instruments and other documents required to be delivered to the Administrative Agent in connection with the aforementioned

**SCHEDULE 1.1(B)**

**<u>EXISTING LIENS</u>**

Nil.

**SCHEDULE 2.1**

**LENDERS AND COMMITMENTS**

| Lender | Revolving Credit Commitment | Term Credit Commitment | Total |
|---|---|---|---|
| HSBC Bank Canada | $7,830,343 | $52,169,657 | $60,000,000 |
| The Toronto-Dominion Bank | $7,830,343 | $52,169,657 | $60,000,000 |
| Bank of China (Canada) | $4,828,711 | $32,171,289 | $37,000,000 |
| Bank of Montreal | $4,828,711 | $32,171,289 | $37,000,000 |
| China Minsheng Banking Corp. Ltd | $4,241,436 | $28,258,564 | $32,500,000 |
| Bank of America, National Association | $4,241,436 | $28,258,564 | $32,500,000 |
| National Bank of Canada | $2,283,850 | $15,216,150 | $17,500,000 |
| Canadian Western Bank | $1,305,057 | $8,694,943 | $10,000,000 |
| ICICI Bank Canada | $1,305,057 | $8,694,943 | $10,000,000 |
| Laurentian Bank of Canada | $1,305,057 | $8,694,943 | $10,000,000 |
| **Total**: | **$40,000,000** | **$266,500,000** | **$306,500,00** |

**SCHEDULE 3.1(3)**

**GOVERNMENTAL APPROVALS; NO CONFLICTS**

Nil.

**SCHEDULE 3.1(5)**

**<u>LITIGATION</u>**

Nil.

**SCHEDULE 3.1(10)**

**REAL PROPERTY**

**Owned Real Property**

Nil.

**Material Leasehold Interest**

1.  Suite 1330 – 1105 North Market Street, Wilmington, Delaware 19801.

2.  Approximately 112,200 square feet of rentable area located at 381 North Service Road West, Oakville, Ontario L6M 0H4.

3.  Lands and building located at 3880 Jeffrey Boulevard, Blasdell, Town of Hamburg, New York 14219.

4.  Approximately 220,218 square feet of rentable area located at 2475 George Urban Blvd. Depew, NY 14043.

**SCHEDULE 3.1(11)**

**PERMITTED LIENS**

| DEBTOR | SECURED PARTY | JURISDICTION | FILE NUMBER | REGISTRATION NUMBER |
|---|---|---|---|---|
| IOVATE HEALTH SCIENCES INC. (NOW OLD IOVATE INTERNATIONAL INC.) | HEWLETT-PACKARD FINANCIAL SERVICES CANADA COMPANY | ONTARIO | 661201407 | 20100507 1457 8077 0801 |

Schedule 3.1(11) – Page 1

**SCHEDULE 3.1(12)**

**<u>PENSION PLANS</u>**

Nil.

## SCHEDULE 3.1(14)

## SUBSIDIARIES

*1) Kerr Investment Holding Corp.*

Authorized capital: unlimited number of Class A common shares and unlimited number of Class B common shares

Issued and outstanding capital:

1.  41 Class A Common Shares by held by Xiwang Iovate Health Science International Inc.

2.  39 Class B Common Shares held by Xiwang Iovate Health Science International Inc.

3.  20 Class B Common Shares held by 2158068 Ontario Inc.

*2) Xiwang Iovate Health Science International Inc.*

Authorized capital: unlimited number of common shares

Issued and outstanding capital: 1 common share held by Holdco.

*3) Iovate Health Sciences U.S.A. Inc.*

Authorized capital: 20,000 common shares

Issued and outstanding capital: 100 common shares held by the Initial Target

*4) Old Iovate International Inc.*

Authorized capital: unlimited number of Class A preferred shares; unlimited number of Class B preferred shares; and unlimited number of Class C common shares

Issued and outstanding capital: 2,000 Class C common shares held by the Initial Target

*5) Old Northern Innovations Corp.*

Authorized capital: unlimited number of class A preferred shares, 100 class E preferred shares; and unlimited number of class C common shares

Issued and outstanding capital: 1,800 class C common shares held by the Initial Target

*6) Infinity Insurance Co. Ltd.*

Authorized capital: unlimited number of common shares

Issued and outstanding capital: 2,000,000 common shares held by the Initial Target

*7) Iovate Health Sciences International Inc.*

Authorized capital: unlimited common shares

Issued and outstanding capital: 1,010 common shares held by Old Iovate International Inc.

*8) Northern Innovations Holding Corp.*

Authorized capital: unlimited number of common shares

Issued and outstanding capital: 1,001,001 common shares held by Old Northern Innovations Corp.

*9) Lakeside Innovations Holding Corp.*

Authorized capital: unlimited number of common shares

Issued and outstanding capital: 1,001,001 common shares held by Iovate Health Sciences International Inc.

*10) HDM Formulations Ltd.*

Authorized capital: unlimited Class A Preferred shares, unlimited Class B Preferred shares, unlimited Class C Common shares

Issued and outstanding capital: 100 Class C Common shares held by Old Iovate International Inc.

*11) HHC Formulations Ltd.*

Authorized capital: 100 Class A Preferred shares, unlimited Class A2 Preferred shares, unlimited Class C Common shares, unlimited Class C2 Common shares

Issued and outstanding capital: 100 C2 Common shares held by Old Iovate International Inc.

**Structure Chart**



**SCHEDULE 3.1(17)**

**ENVIRONMENTAL MATTERS**

Nil.

**SCHEDULE 3.1(18)**

**EMPLOYEE MATTERS**

Nil.

**SCHEDULE 3.1(23)**

**BANK ACCOUNTS**

| Account | Bank | Street | Telephone | City | Prov/State | Postal Code/ZIP | Country | Currency | Account Type | Account # |
|---------|------|--------|-----------|------|------------|-----------------|---------|----------|--------------|-----------|
| Kerr Investment Holdings Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Disbursement | 1625-237 |
| Kerr Investment Holdings Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Receipt | 1625-245 |
| Kerr Investment Holdings Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Disbursement | 4615-551 |
| Kerr Investment Holdings Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Receipt | 4615-578 |
| Iovate Health Sciences International Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Disbursement | 1625-296 |
| Iovate Health Sciences International Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Receipt | 1625-720 |
| Iovate Health Sciences International Inc. | BMO Harris Bank | 111 West Monroe Street 9E | 312-461-8251 | Chicago | Illinois | 60603 | USA | USD | Disbursement | 300-706-9 |

| Account | Bank | Street | Telephone | City | Prov/State | Postal Code/ZIP | Country | Currency | Account Type | Account # |
|---|---|---|---|---|---|---|---|---|---|---|
| Iovate Health Sciences International Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Receipt | 4615-754 |
| Iovate Health Sciences International Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Swingline | 1625-966 |
| Iovate Health Sciences International Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Swingline | 4615-797 |
| Iovate Health Sciences International Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Loan | 4828-215 |
| Iovate Health Sciences International Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Loan | 6526-545 |
| Iovate Health Sciences International Inc. | HSBC | 60 Queen Victoria Street | 7920 081476 | London | | EC4N 4TR | UK | GBP | Receipts | 04155033 |
| Iovate Health Sciences International Inc. | HSBC | 60 Queen Victoria Street | 7920 081476 | London | | EC4N 4TR | UK | GBP | Disbursement | 14154703 |
| Iovate Health Sciences International Inc. | HSBC | 8 Canada Square | 7920 081476 | London | | E14 5HQ | UK | EUR | Both | 73445425 |

| Account | Bank | Street | Telephone | City | Prov/State | Postal Code/ZIP | Country | Currency | Account Type | Account # |
|---------|------|--------|-----------|------|------------|-----------------|---------|----------|--------------|-----------|
| Iovate Health Sciences International Inc. | HSBC | 28 Bridge Street | 61 2 9255 2988 | Sydney | NSW | 2000 | Australia | AUD | Both | 342-011-493921-001 |
| Iovate Health Sciences U.S.A Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Disbursement | 1625-317 |
| Iovate Health Sciences U.S.A Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Receipt | 1625-325 |
| Iovate Health Sciences U.S.A Inc. | BMO Harris Bank | 111 West Monroe Street 9E | 312-461-8251 | Chicago | Illionois | 60603 | USA | USD | Disbursement | 300-705-1 |
| Iovate Health Sciences U.S.A Inc. | BMO Harris Bank | 111 West Monroe Street 9E | 312-461-8251 | Chicago | Illionois | 60603 | USA | USD | Receipt | 325-075-0 |
| Iovate Health Sciences U.S.A. Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Swingline | 4615-770 |
| Iovate Health Sciences U.S.A Inc. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Loan | 4828-223 |
| Northern Innovations Holding Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Disbursement | 1986-016 |
| Northern Innovations Holding Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | CDN | Receipt | 1986-008 |

| Account | Bank | Street | Telephone | City | Prov/State | Postal Code/ZIP | Country | Currency | Account Type | Account # |
|---------|------|--------|-----------|------|------------|-----------------|---------|----------|--------------|-----------|
| Northern Innovations Holding Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Disbursement | 4768-443 |
| Northern Innovations Holding Corp. | Bank of Montreal | 100 King St. West - Main Floor | 416-867-3926 | Toronto | Ontario | M5X 1A3 | Canada | USD | Receipt | 4768-427 |

**SCHEDULE 5.1(8)**

**POST-CLOSING REQUIREMENTS**

| POST-CLOSING REQUIREMENT | DATE BY WHICH TO BE MET |
|---|---|
| 1. Exercise reasonable commercial efforts to deliver to the Administrative Agent a leasehold mortgage over all Material Leasehold Interests | For 90 days following the Closing Date |
| 2. Exercise reasonable commercial efforts to deliver to the Administrative Agent a landlord waiver for each landlord of real property where any material inventory of any of the Credit Parties is located | For 90 days following the Closing Date. |

**SCHEDULE 5.1(11)**

**SECURITY PRINCIPLES**

The Security Principles embody recognition by the Secured Parties and the Credit Parties that there may be certain legal and practical difficulties in obtaining effective guarantees and Liens in jurisdictions in which a Person is organized, conducts business or has assets (the "**Security Jurisdictions**").  In particular:

*General*

        (1)      General statutory limitations, financial assistance, capital maintenance, corporate benefit, fraudulent preference, US fraudulent transfer laws, "thin capitalization" rules, retention of title claims, exchange control restrictions and similar principles may limit the ability of a Person to provide a guarantee or Liens or may require that the guarantee or Liens be limited by an amount or otherwise.

        (2)      No guarantee or Lien shall be taken or Lien perfected to the extent to which it would result in any material cost which is excessive in the context of the benefit of such guarantee or Lien to the Secured Parties or any material negative tax consequence for any Credit Party (including but not limited to material effects on interest deductibility and stamp duty, notarization and registration fees) which is excessive in the context of the benefit of such guarantee or Lien to the Secured Parties.

        (3)      The maximum guaranteed or secured amount may be limited to minimize stamp duty, notarization, registration or other applicable fees, taxes and duties.

        (4)      Where there is material incremental cost involved in creating security over all assets owned by a Person in a particular category (for example, real estate) the principle stated in clause (2) above shall apply.

        (5)      It is acknowledged that in certain jurisdictions it may be either impossible or impractical to create a Lien over certain categories of assets in which event security shall not be taken over such assets.

        (6)      Subject to the anti-assignment provisions under applicable Law, any assets subject to third party arrangements which may prevent those assets from being charged or which would result in the termination (or give rise to a right of termination) or breach of such third party-arrangement shall be excluded from any relevant Security Document.

        (7)      A Person shall not be required to give guarantees or enter into Security Documents if it is not within the legal capacity of such Person or if the same would conflict with the fiduciary duties of the directors (or other officers) of such Person or contravene any legal prohibition or regulatory condition or would result in (or result in a material risk of) personal or criminal liability on the part of any director (or other officer) of any Credit Party provided that such Person shall use reasonable endeavours to overcome any such obstacle.

        (8)      The giving of a guarantee, the granting of a Lien or the perfection of a Lien shall not be required if it would restrict the ability of the relevant Person to conduct its operations and business in the ordinary course as otherwise permitted by the Loan Documents.

        (9)      To the extent possible, all Liens shall be granted in favour of the Administrative Agent and not the Secured Parties individually.

                                             

(10)    To the extent possible, there should be no action required to be taken in relation to the guarantees or Security Documents when any Lender transfers any of its Loans or Commitments to a new Lender.

(11)    No perfection of a Lien shall be required in a jurisdiction other than in Security Jurisdictions.  Notwithstanding the foregoing, a Lien over any material account receivable shall be perfected in the jurisdiction where the account debtor is located where such perfection is necessary under the laws of such jurisdiction to render such Lien enforceable against such account debtor.

(12)    No Lien shall be required over Equity Securities issued by a Restricted Joint Venture where prohibited by the relevant joint venture agreements or arrangements (or legal restrictions).

(13)    No Immaterial Subsidiary, CFC, CFC Holdco or Restricted Joint Venture shall be required to become a Guarantor or to enter into any Security Documents (it being understood that any such Person may become a Guarantor and/or enter into any Security Documents at the discretion of the Term Borrower).

*Equity Securities*

(14)    Subject to advice from relevant local counsel for the Administrative Agent, if a Credit Party charges Equity Securities, the relevant Security Document shall be governed by the law of the jurisdiction of incorporation or organization of the issuer of such Equity Securities (the "**Issuer**") and not by the law of the jurisdiction of incorporation or organization of the charging Credit Party.  However, where an Issuer is not a Credit Party and is not incorporated or organized in a jurisdiction, the law of which governs other Security Documents, then the Security Document charging its Equity Securities shall be governed by the law of the jurisdiction of incorporation or organization of the charging Credit Party.

(15)    Security over Equity Securities shall, where legally possible, automatically charge further Equity Securities issued.

*Real Estate*

(16)    No Lien shall be required over any freehold interest in real property having a book value of less than U.S.$1,000,000.

(17)    No Lien shall be required over any leasehold interest in real property that is not a Material Leasehold Interest.  No Lien shall be required over a Material Leasehold Interest if such a Lien would be prohibited by the terms of the applicable lease and the requisite landlord consent cannot be obtained after the exercise of reasonable commercial efforts.

(18)    A landlord waiver, in form and substance satisfactory to the Administrative Agent, acting reasonably, shall be required from each landlord of real property where any material inventory of any of the Credit Parties is located; provided that no such landlord waiver shall be required if it cannot be obtained after the exercise of reasonable commercial efforts.

(19)    The Administrative Agent shall not accept any Lien from a Credit Party over an interest in real property located in the United States of America unless and until each Lender has confirmed its satisfactory completion of flood insurance due diligence and compliance with respect to such real property.

The above limitations are subject always to exceptions which are standard in the Security Jurisdictions.

**SCHEDULE 6.1(1)**

**EXISTING INDEBTEDNESS**

Nil.

**SCHEDULE 9.1(1)**

**LENDER AND ISSUING BANK CONTACT INFORMATION**

| Name of Lender or Issuing Bank | Address | E-mail Address |
|---|---|---|
| HSBC Bank Canada | Attention: Andrew Sclater<br>70 York Street<br>Toronto, Ontario<br>M5J 1S9<br>Canada | andrew.sclater@hsbc.ca |
| The Toronto-Dominion Bank | Attention: Andrew Maclellan<br>TD West Tower<br>100 Wellington Street West, 26th Floor<br>Toronto, Ontario<br>M5K 1A2<br>Canada | andrew.maclellan@td.com |
| Bank of China (Canada) | Attention: Kai Zhou<br>Suite 600<br>50 Minthorn Blvd.<br>Markham, Ontario<br>L3T 7X8<br>Canada | kaizhou@ca.bocusa.com |
| Bank of Montreal | Attention: Andrew Gouw<br>First Canadian Place<br>100 King Street West<br>18th Floor<br>Toronto, Ontario<br>M5X 1A1<br>Canada | andrew.gouw@bmo.com |
| China Minsheng Banking Corp. Ltd | Attention: Louie Hezhao<br>28, Xirongxian Hutong, Xicheng Dist.,Beijing, 100031, P.R. China | hezhaolu@cmbc.com.cn |

| Name of Lender or Issuing Bank | Address | E-mail Address |
| --- | --- | --- |
| Bank of America, National Association | Attention: Jason Hoogenboom<br>181 Bay St., Suite 400<br>Toronto, Ontario<br>M5J 2V8<br>Canada | jason.hoogenboom@baml.com |
| National Bank of Canada | Attention: Paul Keast | paul.keast@nbc.ca |
| Canadian Western Bank | Attention : Richard Hallson<br>3000, 10303 Jasper Avenue,<br>Edmonton, Alberta<br>T5J 3X6<br>Canada | richard.hallson@cwbank.com |
| ICICI Bank Canada | Attention to: Navendu Dogra<br>ICICI Bank Canada<br>Don Valley Business Park<br>150 Ferrand Drive, Suite 1200<br>Toronto, Ontario<br>M3C 3E5 | navendu.dogra@icicibank.com |
| Laurentian Bank of Canada | Attention to: Umesh Raheja<br>130 Adelaide Street West<br>Suite 300<br>Toronto, Ontario<br>M5H 3P5<br>Canada | Umesh.raheja@laurentianbank.ca |

Schedule 9.1(1) – Page 2