**<u>EXHIBIT D</u>**

Execution Version

# AMENDING AGREEMENT NO. 10

**THIS AMENDING AGREEMENT NO. 10** (this "**Amending Agreement**") is made as of February 28, 2025 between the parties to the Credit Agreement (as hereinafter defined).

**WHEREAS:**

A.        Reference is made to the amended and restated credit agreement dated as of June 30, 2021 between, *inter alios*, Iovate Health Sciences International Inc., as borrower (the "**Borrower**"), HSBC Bank Canada, as administrative agent (the "**Administrative Agent**"), and the financial institutions party thereto, as lenders, as amended by amending agreement no.1 dated as of March 31, 2022, by amending agreement no. 2 dated as of April 14, 2022, by amending agreement no. 3 dated as of December 30, 2022 , amending agreement no.4 dated as of March 7, 2024, amending agreement no. 5 dated as of March 28, 2024, amending agreement no. 6 dated April 30, 2024, the Forbearance Agreement (as hereinafter defined), amending agreement no. 7 dated November 14, 2024, amending agreement no. 8 dated December 24, 2024 and amending agreement no. 9 dated January 31, 2025 (collectively, the "**Credit Agreement**).

B.        Further reference is made to the forbearance agreement dated as of September 24, 2024 between, inter alios, the Borrower, the Administrative Agent, and the financial institutions party thereto as, as lenders, as amended by amending agreement no. 7 dated November 14, 2024, as amended by amending agreement no 8. dated December 24, 2024 and amended by amending agreement no 9. dated January 31, 2025 (collectively, the "**Forbearance Agreement**").

C.        In respect of the Orgain Judgement, a writ of execution was filed on February 6, 2025 with the United States Court for the Central District of California in violation of Section 7.1(s) (the "**New Event of Default**").

D.        The Borrower has requested certain amendments to the Forbearance Agreement, and the Credit Agreement and the Lenders have agreed to same in accordance with the terms and conditions hereof.

**NOW THEREFORE THIS AGREEMENT WITNESSES** that, in consideration of the mutual covenants and agreements contained in this Amending Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

**ARTICLE 1**
**INTERPRETATION**

**1.1      One Amending Agreement**. This Amending Agreement amends the Credit Agreement and the Forbearance Agreement. This Amending Agreement and the Credit Agreement shall be read, interpreted, construed and have effect as, and shall constitute, one agreement with the same effect as if the amendments made by this Amending Agreement had been contained in the Credit Agreement as of the date of this Amending Agreement.  This Amending Agreement and the Forbearance Agreement shall be read, interpreted, construed and have effect as, and shall constitute, one agreement with the same effect as if the amendments made by this Amending

Agreement had been contained in the Forbearance Agreement as of the date of this Amending Agreement.

**1.2    Defined Terms**. In this Amending Agreement, unless something in the subject matter or context is inconsistent:

   (a)    terms defined in the description of the parties or in the recitals have the respective meanings given to them in the description or recitals, as applicable; and

   (b)    all other capitalized terms have the respective meanings given to them in the Credit Agreement as amended by Article 2 of this Amending Agreement (collectively, the "**Amended Credit Agreement**").

**1.3    Headings**. The headings of the Articles and Sections of this Amending Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of this Amending Agreement.

**1.4    References**. All references to Articles, Sections, Exhibits and Schedules, unless otherwise specified, are to Articles, Sections, Exhibits and Schedules of the Credit Agreement.

**ARTICLE 2**
**AMENDMENTS TO THE CREDIT AGREEMENT**

**2.1    Consolidated Credit Agreement.**  Subject to the terms and conditions contained in this Amending Agreement, the Credit Agreement is amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the underlined text (indicated textually in the same manner as in the following example: <u>underlined text</u>) as set forth on the pages of the Credit Agreement and all schedules thereto, attached to this Amending Agreement as Annex A.

**ARTICLE 3**
**AMENDMENTS TO THE FORBEARANCE AGREEMENT**

**3.1    Existing Events of Default**.  The definition of "Existing Events of Default" shall be amended to include the New Event of Default.

**3.2    Forbearance Period**.  Recital C of the Forbearance Agreement is amended by replacing "February 14, 2025" with "January 2, 2026".

**3.3    Consent to Subject Payments**. Section 2.16 of the Forbearance Agreement is amended by deleting (i) "; and" at the end of clause (b), and (ii) clause (c) in its entirety.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES**

**4.1    Confirmation of Representations**. The Borrower represents and warrants that, as at the date of this Amending Agreement and assuming that the amendments made to the Credit Agreement and the Forbearance Agreement by this Amending Agreement have become effective:

(a)     this Amending Agreement and the Confirmation appended hereto has been duly authorized, executed and delivered by each of the signatory Credit Parties;

(b)     each of the Credit Agreement and the Forbearance Agreement, each as amended hereby, constitutes a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditor's rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(c)     no Termination Event (as defined in the Forbearance Agreement, as amended by Article 3 of this Amending Agreement (collectively, the "**Amended Forbearance Agreement**")) has occurred;

(d)     notwithstanding that Sections 5.1(12)(a) and 5.1(12)(c) (as such Sections existed on September 24, 2024) have been amended, the Existing Events of Default (as defined in the Amended Forbearance Agreement) other than that described in clause (iii) of recital B to the Forbearance Agreement have occurred and are continuing; and

(e)     the representations and warranties contained in Article 4 (other than those that are made with respect to a specific date) are true and correct as if made on the date hereof.

## ARTICLE 5
## CONDITIONS

**5.1     Conditions Precedent**. The amendments set out in Article 2 and Article 3 shall become effective if and only if there is receipt by the Administrative Agent of:

(a)     a counterpart of this Amending Agreement executed by the Borrower, the Administrative Agent and the Lenders;

(b)     a counterpart of the Confirmation appended to this Amending Agreement, executed by each Guarantor;

(c)     authorizing resolutions of the board of directors of the Borrower approving this Amending Agreement, together with an officer's certificate from a senior officer of the Borrower;

(d)     a favourable written opinion of counsel to the Borrower acceptable to the Administrative Agent with respect to the Borrower and this Amending Agreement, together with supporting materials consistent with those previously delivered under the Credit Agreement;

(e)     the Perfection Certificate (as defined in the Amended Credit Agreement) with respect to each Credit Party;

- 4 -

(f)     updated financial forecast for the Fiscal Year ending December 31, 2025 for Holdco on a Consolidated basis (setting out all assumptions and including an income statement, balance sheet and cash flow statement) evidencing compliance with the financial covenants set out in Sections 5.1(12) and 5.1(14) as at such date, in form satisfactory to the Lenders;

(g)     payment of an amendment fee to the Administrative Agent (for the pro rata account of each Lender) equal to 25.00 basis points upon the aggregate Commitments of the Lenders as of the date hereof (the "**Amendment Fee**"); and

(h)     payment (or the arrangement for payment satisfactory to the payee) of all reasonable and documented legal fees of the Administrative Agent invoiced to date by its counsel (the "**Legal Fees**" and, together with the Amendment Fee, the "**Fees**").

If such conditions precedent are met, then the effective date of the amendments set out in Article 2 will be as of the date of this Amending Agreement.

**5.2     Payment.**  The Administrative Agent may debit any U.S. Dollar (or in the case of the Legal Fees, Canadian Dollar) operating account maintained by the Administrative Agent in the name of the Borrower in an aggregate amount equal to the sum of the Fees in order to effect the payment thereof; provided that the Borrowers shall have been provided the invoice related to the Fees no less than two Business Days (or such shorter time period as agreed by the Borrower) prior to such debiting and a Responsible Officer of the Borrower has consented in writing to such debiting (which written consent may be by electronic communication).

## ARTICLE 6
## GENERAL

**6.1     Confirmation**. Except as specifically stated herein, the Credit Agreement, the Forbearance Agreement and the other Loan Documents shall continue in full force and effect in accordance with the provisions thereof. In particular, but without limitation:

(a)     the Security Documents and the Liens granted thereunder continue in full force and effect in accordance with their terms notwithstanding this Amending Agreement and the amendments to the Credit Agreement and the Forbearance Agreement effected hereby; and

(b)     the secured liabilities described in the Security Documents include indebtedness, liabilities and obligations arising under or in relation to the Amended Credit Agreement and the Amended Forbearance Agreement, and the Liens granted thereunder extend thereto.

All Secured Liabilities under the Credit Agreement shall be continuing with only the terms thereof being modified as provided in this Amending Agreement, and this Amending Agreement shall not evidence or result in a novation of such Secured Liabilities.

**6.2     Reservation of Rights**.  Except as expressly set forth herein, this Amending Agreement shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of Lenders or Administrative Agent under the Credit Agreement, the Forbearance Agreement or any other Loan Document.  Nothing herein shall be deemed to entitle any Credit Party to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement, the Forbearance Agreement or any other Loan Document in similar or different circumstances. For the avoidance of doubt, nothing herein shall constitute a consent to, or waiver of, the Existing Events of Default.

**6.3     Interpretation**. All references to the "this Agreement", the "Forbearance Agreement" or the "Credit Agreement" and all similar references in any of the other Loan Documents shall hereafter include, mean and be a reference to the Amended Forbearance Agreement or Amended Credit Agreement, as applicable, without any requirement to amend such Loan Documents. This Amending Agreement shall constitute a "Loan Document" under, and as defined in, the Credit Agreement.

**6.4     Binding Nature**. This Amending Agreement shall enure to the benefit of and be binding upon the Borrower, the Administrative Agent and the Lenders and their respective successors and permitted assigns.

**6.5     Severability**.  Any provision of this Amending Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Amending Agreement, all without affecting the remaining provisions of this Amending Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**6.6     Conflicts**. If, after the date of this Amending Agreement, any provision of this Amending Agreement is inconsistent with any provision of the Credit Agreement or the Forbearance Agreement, the relevant provision of this Amending Agreement shall prevail.

**6.7     Governing Law**. This Amending Agreement will be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**6.8     Counterpart and Facsimile**. This Amending Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Amending Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Amending Agreement.

[signatures on the following pages]

S-1

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**ROYAL BANK OF CANADA**, as
Administrative Agent

By:  _Sabrina Wang_ _____
Name: Sabrina Wang
Title:  Deal Manager


By: _____
Name:
Title:

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**ROYAL BANK OF CANADA**, as Lender

By: _Andrew O'Coin_ _____
Name:  Andrew O'Coin
Title:  Senior Director


By: _____
Name:
Title:

S-3

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**THE TORONTO-DOMINION BANK**, as
Lender

By: _____
Name: Daryl Coelho
Title: Director


By: _____
Name: Fola Akinsanya
Title: Associate Director

S-4

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**BANK OF CHINA (CANADA)**, as Lender

By: _____
Name:  XU YANG
Title:  Head of Corporation Banking Department

By: _____
Name:
Title:

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.


**BANK OF MONTREAL**, as Lender

By: _____
Name:  Shehryar Syed
Title:   Director, SAMU National Accounts


By: _____
Name:
Title:

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**NATIONAL BANK OF CANADA**, as
Lender

By: _Sonia de Lorenzi_
Name: Sonia de Lorenzi
Title: Senior Manager

By: _[signature]_
Name: Caroline Podsiadlo
Title: Senior Director

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**CANADIAN WESTERN BANK**, as
Lender

By: _Sonia de Lorenzi_____
Name:    Sonia de Lorenzi
Title:    Senior Manager

By: _____
Name:    Caroline Podsiadlo
Title:    Senior Director

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**THE BANK OF NOVA SCOTIA**, as
Lender

By: _____
Name: Nick Stewart
Title: Director, Special Accounts Management

By: _____
Name:  Neel Chopra
Title: Director, Special Accounts Management

S-9

**IN WITNESS WHEREOF** the undersigned has caused this Amending Agreement to be duly executed as of the date set out on the first page.

**IOVATE HEALTH SCIENCES INTERNATIONAL INC.**

By: _____
Name: Qi Wang
Title: Director

By: _____
Name: Xiyao Michael Liu
Title: Director

# CONFIRMATION

Each undersigned Guarantor acknowledges and irrevocably consents to the terms of the Amending Agreement. Each undersigned Guarantor further represents, warrants, and confirms to the Administrative Agent for the benefit of each Secured Party that:

(a) guarantees and indemnities granted under the Loan Documents continue in full force and effect in accordance with their terms notwithstanding the Amending Agreement and the amendments to the Credit Agreement and the Forbearance Agreement effected thereby;

(b) such guarantees and indemnities extend to the indebtedness, liabilities and obligations of the Borrower under the Amended Credit Agreement and the Amended Forbearance Agreement;

(c) the Security Documents and the Liens granted thereunder continue in full force and effect in accordance with their terms notwithstanding the Amending Agreement and the amendments to the Credit Agreement and the Forbearance Agreement effected thereby;

(d) the secured liabilities described in the Security Documents include indebtedness, liabilities and obligations arising under or in relation to the Amended Credit Agreement and the Amended Forbearance Agreement, and the Liens granted thereunder extend thereto; and

(e) all references to the "this Agreement", the "Forbearance Agreement" or the "Credit Agreement" and all similar references in any of the other Loan Documents shall hereafter mean and be a reference to the Amended Forbearance Agreement or the Amended Credit Agreement, as applicable, without any requirement to amend such Loan Documents.

[signatures on the next following pages]

**IN WITNESS WHEREOF** the undersigned has caused this Confirmation to be duly executed as of the date set out on the first page of the Amending Agreement.

XIWANG IOVATE HOLDINGS COMPANY LIMITED

By: _____
    Name: Di Wang
    Title: Director

By: _____
    Name: Xiyao Michael Liu
    Title: Director

*Iovate Amending Agreement No. 10*

**IN WITNESS WHEREOF** the undersigned has caused this Confirmation to be duly executed as of the date set out on the first page of the Amending Agreement.

**IOVATE HEALTH SCIENCES INTERNATIONAL INC.**

By: _____
    Name: Di Wang
    Title: Director

By: _____
    Name: Xiyao Michael Liu
    Title: Director

*Iovate Amending Agreement No. 10*

**IN WITNESS WHEREOF** the undersigned has caused this Confirmation to be duly executed as of the date set out on the first page of the Amending Agreement.

IOVATE HEALTH SCIENCES U.S.A. INC.

By: _____
Name: Di Wang
Title: Director

By: _____
Name: Xiyao Michael Liu
Title: Director

**IN WITNESS WHEREOF** the undersigned has caused this Confirmation to be duly executed as of the date set out on the first page of the Amending Agreement.

**NORTHERN INNOVATIONS HOLDING CORP.**

By: _____
    Name: Di Wang
    Title: Director

By: _____
    Name: Xiyao Michael Liu
    Title: Director

*Iovate Amending Agreement No. 10*

**IN WITNESS WHEREOF** the undersigned has caused this Confirmation to be duly executed as of the date set out on the first page of the Amending Agreement.

**IOVATE HEALTH SCIENCES AUSTRALIA PTY LTD**

By: _____
Name: Xiyao Michael Liu
Title: Director

By: _____
Name: Tanya Mistry
Title: Director

**ANNEX A**
**[see attached]**

**ANNEX A**

**AMENDED AND RESTATED CREDIT AGREEMENT**

dated as of

**June 30, 2021**

among

**IOVATE HEALTH SCIENCES INTERNATIONAL INC.**

as Borrower

and

**THE LENDERS FROM TIME TO TIME PARTIES HERETO**

as Lenders

and

**ROYAL BANK OF CANADA**

as Administrative Agent, Issuing Bank, Joint Lead Arranger and Joint Bookrunner

and

**THE TORONTO-DOMINION BANK**

as Syndication Agent, Joint Lead Arranger and Joint Bookrunner

and

**BANK OF CHINA (CANADA), BANK OF MONTREAL, THE BANK OF NOVA SCOTIA and NATIONAL BANK OF CANADA**

as Co-Documentation Agents

Reflecting

Amending Agreement no. 2 dated as of April 14, 2022
Amending Agreement no. 3 dated as of December 30, 2022
Amending Agreement no. 4 dated as of March 7, 2024
Amending Agreement no. 5 dated as of March 31~~28~~, 2024
Amending Agreement no. 6 dated as of April 30, 2024
Forbearance Agreement dated as of September 24, 2024
Amending Agreement no. 7 dated as of November 14, 2024
Amending Agreement no. 8 dated as of December 24, 2024
Amending Agreement ~~No~~no. 9 dated as of January 31, 2025
Amending Agreement no. 10 dated as of February 28, 2025

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ........................................................... 1

    1.1    Definitions. ............................................................... 1

"**Adjusted Cash**" means, with respect to any Fiscal Quarter and Holdco on a Consolidated basis, an amount in U.S. Dollars equal to: ............................. 2

"**Available Cash**" means, at any time, the aggregate amount of cash and Cash Equivalents of the Borrower ~~(excluding, for greater certainty, cash or Cash Equivalents which are to be used solely to fund the Brokerage Account as security for the Orgain Bond as advised by the Borrower to the Administrative Agent pursuant to Section 5.1(7)~~)), determined on a Consolidated basis. ............ 6

"**Baseline CFF**" means the CFF for the period from ~~September 7, 2024 to~~ January ~~3~~18, 2025 to April 18, 2025 previously delivered to the Agent and Lenders on ~~September 13~~January 25, ~~2024~~2025, a copy of which is appended as Schedule 1.1(C), as replaced by a Revised Baseline CFF from time to time. ...................... 6

"**Bi-Weekly Date**" means each second Friday commencing with October 4, 2024; provided that if a Bi-Weekly Date is not a Business Day, then the Bi-Weekly Date in question shall be the first immediately preceding Business Day. ............... 7

~~"**Brokerage Account**" means an account to be established with a licensed and reputable brokerage firm or financial institution for the purposes of holding the cash or Cash Equivalents to secure the obligations under the Orgain Bond which is, or, within thirty (30) days of the Revolving Loan referred to in Section 5.1(7)(b) being made, will be, subject to a security interest in favour of the Bonding Company. .~~ ............................................................................. ~~7~~

"**CARES Act**" means the United States *Coronavirus Aid, Relief and Economic Security Act* (together with, and as modified by, the *Paycheck Protection Program Flexibility Act of 2020* and *Paycheck Protection Program and Health Care Enhancement Act*). ........................................................................ 8

"**Excess Cash Flow**" means, with respect to any Fiscal Quarter, an amount equal to: ..... 16

(a)    Adjusted Cash as at the end of such Fiscal Quarter; less .................... 16

(b)    Adjusted Cash as at the end of the immediately preceding Fiscal Quarter. ... 16

"**Excess Cash Flow Available**" means, with respect to any Fiscal Quarter, an amount equal to 25% of: ......................................................................... 16

(a)    Excess Cash Flow with respect to such Fiscal Quarter; less ................. 16

(b)    U.S.$2,000,000. .......................................................... ~~17~~16

"**Floor**" means a rate of interest equal to 0%. ................................ ~~19~~18

"**IRS**" means the .......................................................... ~~25~~24

~~"**Orgain Bond**" means an appeal bond in respect of the Orgain Judgment~~ ........... ~~31~~

"**Orgain Judgment**" means the judgment entered by the court on April 17, 2024 (Doc. 479) in the case of Orgain, Inc. v. Iovate Health Sciences International Inc., et al (Case No. 8:18-cv-01253-JLS-ADS). ............................................ ~~31~~30

## TABLE OF CONTENTS
(continued)

**Page**

"**Orgain Writ**" means the writ of execution filed on February 6, 2025 with the United States Court for the Central District of California in respect of the Settlement Agreement Judgment. ................................................................................ 30

"**Revised Baseline CFF**" means the CFF for each subsequent thirteen calendar week period commencing on the Saturday preceding the last day of the period set out in the Baseline CFF or the then current Revised Baseline CFF, as applicable, in form and substance agreed to by the Lenders. ....................................... 40

"**Total Indebtedness**" means, at any time, the aggregate amount of Indebtedness of Holdco at such time (other than Subordinated Indebtedness or the proceeds of the PPP Loans which are forgiven under the CARES Act and Paycheck Protection Program), determined on a Consolidated basis. ........................... 47

1.2    Classification of Loans and Borrowings. ........................................ 49

1.3    Terms Generally. ..................................................................... ~~50~~49

1.4    Québec Matters. ...................................................................... 50

1.5    Accounting Terms; GAAP. ......................................................... 51

1.6    Time. .................................................................................... 52

1.7    Third Party Beneficiaries. .......................................................... 52

1.8    Amendment and Restatement ...................................................... 52

1.9    Rates. .................................................................................... 53

ARTICLE 2 THE CREDITS ........................................................................ 54

2.1    Commitments. ......................................................................... 54

    (1)    *Revolving Credit* ............................................................ 54

    (2)    *Term Credit* .................................................................. 54

    (3)    *~~Additional Commitments~~[Intentionally Deleted]* .................. 54

2.2    Loans and Borrowings. .............................................................. ~~55~~54

    (1)    *Loans* .......................................................................... ~~55~~54

    (2)    *Composition of Borrowings* ............................................. ~~56~~54

    (3)    *Amount of Borrowings* .................................................... ~~56~~55

2.3    Requests for Borrowings. .......................................................... ~~56~~55

    (1)    *Requesting a Borrowing* .................................................. ~~56~~55

    (2)    *Default Terms* ............................................................... ~~57~~56

    (3)    *Conversion or Rollover of Borrowings* ............................... ~~57~~56

    (4)    *Deemed Election to Convert* ............................................ ~~58~~56

    (5)    ~~58~~57

2.4    Funding of Borrowings. ............................................................. ~~58~~57

    (1)    *Funding* ....................................................................... ~~58~~57

    (2)    *Each Lender's Share of Borrowing* .................................... ~~58~~57

2.5    Interest. ................................................................................. ~~59~~57

    (1)    *Interest* ........................................................................ ~~59~~57

**TABLE OF CONTENTS**

(continued)

**Page**

|   | (2) | *Before and After Judgment Interest* | ~~59~~*Be* 58 |
|   | (3) | *Accrued Interest* | ~~60~~58 |
|   | (4) | *Days Interest Payable* | ~~60~~59 |
|   | (5) | *Yearly Rate of Interest* | ~~60~~59 |
|   | (6) | *Criminal Interest* | ~~60~~59 |
|   | (7) | *Reconciliation for Additional Interest and Fees* | ~~61~~60 |
| 2.6 | | Termination and Reduction of Commitments. | ~~61~~60 |
|   | (1) | *Maturity Dates* | ~~61~~60 |
|   | (2) | *Cancellation of Unused Credit* | ~~61~~60 |
| 2.7 | | Repayment of Loans. | ~~62~~61 |
|   | (1) | *Repayment of Revolving Credit* | ~~62~~61 |
|   | (2) | *Repayment of Term Credit* | ~~62~~61 |
| 2.8 | | Evidence of Debt. | ~~63~~62 |
|   | (1) | *Accounts of Indebtedness* | ~~63~~62 |
|   | (2) | *Account Details* | ~~63~~62 |
|   | (3) | *Accounts Conclusive* | ~~63~~62 |
|   | (4) | *Promissory Notes* | ~~63~~62 |
| 2.9 | | Prepayments. | ~~64~~62 |
|   | (1) | *Currency Fluctuations* | ~~64~~62 |
|   | (2) | *Mandatory Loan Prepayments.* | ~~64~~63 |
|   | (3) | *Voluntary Prepayments* | ~~65~~64 |
|   | (4) | *Notice by Borrower* | ~~66~~64 |
|   | (5) | *Notice by Administrative Agent* | ~~66~~65 |
| 2.10 | | Fees. | ~~66~~65 |
|   | (1) | ~~*Standby Fees*~~    ~~66~~*[Intentionally Deleted]* 65 |
|   | (2) | *Participation and Fronting Fees* | ~~67~~65 |
|   | (3) | *Fees to Administrative Agent* | ~~67~~66 |
|   | (4) | *Payment of Fees* | ~~67~~66 |
| 2.11 | | Inability to Determine Rates. | ~~68~~66 |
| 2.12 | | Rate Fallbacks. | ~~69~~68 |
|   | (2) | *CORR* | ~~74~~73 |
| 2.13 | | Increased Costs; Illegality. | 78 |
|   | (1) | *Compensation for Increased Costs* | 78 |
|   | (2) | *Compensation for Reduced Rate of Return* | 79 |
|   | (3) | *Certificate* | 79 |
|   | (4) | *Illegality* | 80 |
| 2.14 | | Break Funding Payments. | 80 |

## TABLE OF CONTENTS
(continued)

Page

2.15    Taxes. ................................................................................................ 81
    (1)    *Gross-up for Taxes* ...................................................................... 81
    (2)    *Stamp and Other Taxes* ................................................................ 81
    (3)    *Indemnity for Taxes* .................................................................... 81
    (4)    *Evidence of Tax Payments* ........................................................... 81
    (5)    *Certification* ............................................................................. 8182
    (i)    Any Lender that is entitled to an exemption from or reduction of
            withholding Tax with respect to payments made under any Loan
            Document shall deliver to the Borrower, at the time or times reasonably
            requested in writing by the Borrower, such properly completed and
            executed documentation reasonably requested in writing by the
            Borrower as will permit such payments to be made without withholding
            or at a reduced rate of withholding. In addition, any Lender, if
            reasonably requested in writing by the Borrower, shall deliver such other
            documentation prescribed by applicable Law (which, for purposes of this
            Section 2.15, shall include FATCA) or reasonably requested in writing
            by the Borrower as will enable the Borrower to determine whether or not
            such Lender is subject to backup withholding or information reporting
            requirements, provided that notwithstanding any of the foregoing in this
            Section 2.15(5), no Lender shall be required to provide any
            documentation or information of any kind which it is not permitted to
            provide under applicable Law. .................................................. 82
    (ii)    If ......................................................................................... 82
    (6)    *Treatment of Certain Refunds* ....................................................... 82
2.16    Payments Generally; Pro Rata Treatment; Sharing of Set-offs. ................. 83
    (1)    *Payments* ................................................................................ 83
    (2)    *Allocation of Insufficient Funds* ................................................... 83
    (3)    *Allocation of Funds in Event of Default* ......................................... 84
    (4)    *Sharing* ................................................................................. 84
    (5)    *Assumption of Payment; Reimbursement of Agent* ............................ 85
    (6)    *Failure of Lender to Make Payment* .............................................. 85
    (7)    *No Deemed Obligation for Source of Funds* ..................................... 86
2.17    Currency Indemnity. ............................................................................ 86
2.18    Mitigation Obligations; Replacement of Lenders. ..................................... 86
    (1)    *Mitigation* .............................................................................. 86
    (2)    *Replacement of Lender* ............................................................... 87
2.19    Letters of Credit. ................................................................................ 87
    (1)    *General* .................................................................................. 87
    (2)    *Notice of Issuance, Amendment, Renewal, Extension, Certain Conditions* ... 87
    (3)    *Expiration Date* ........................................................................ 88
    (4)    *Participations* .......................................................................... 88

## TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| | (5) | *Reimbursement* | ~~88~~89 |
| | (6) | *Obligations Absolute* | 89 |
| | (7) | *Disbursement Procedures* | 90 |
| | (8) | *Interim Interest* | 90 |
| | (9) | *Replacement of the Issuing Bank* | 90 |
| | (10) | *Cash Collateralization* | 91 |
| 2.20 | | Swingline Loans. | 91 |
| | (1) | *General* | 91 |
| | (2) | ***Overdrafts*** | 92 |
| | (3) | *Participations in Swingline Loans* | 92 |
| 2.21 | | Defaulting Lenders. | 93 |
| ARTICLE 3 REPRESENTATIONS AND WARRANTIES | | | 96 |
| 3.1 | | Representations and Warranties of the Borrower. | 96 |
| | (1) | *Organization; Powers* | 96 |
| | (2) | *Authorization; Enforceability* | 96 |
| | (3) | *Governmental Approvals; No Conflicts* | 97 |
| | (4) | *Financial Condition; No Material Adverse Effect.* | 97 |
| | (5) | *Litigation.* | 98 |
| | (6) | *Compliance with Laws* | 98 |
| | (7) | [Reserved] | 98 |
| | (8) | *No Default* | 98 |
| | (9) | *Taxes* | 98 |
| | (10) | *Titles to Real Property* | 98 |
| | (11) | *Titles to Personal Property* | 99 |
| | (12) | *Pension Plans* | 99 |
| | (13) | [Reserved.] | 99 |
| | (14) | *Subsidiaries* | 100 |
| | (15) | *Insurance* | 100 |
| | (16) | *Solvency* | 100 |
| | (17) | *Environmental Matters* | 100 |
| | (18) | *Employee Matters.* | 101 |
| | (19) | *Fiscal Year* | 102 |
| | (20) | *Intellectual Property Rights* | 102 |
| | (21) | *Residency of Borrower for Tax Purposes* | 102 |
| | (22) | *"Know Your Customer" Information* | 102 |
| | (23) | *Bank Accounts* | 102 |
| | (24) | [Reserved] | 103 |

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| (25) | *Anti-Corruption Laws and Sanctions* | | 103 |
| (30) | *Covered Party.* No Credit Party is a Covered Party. | | 103 |
| (31) | *Accounts Receivable.* | | 103 |
| ARTICLE 4 CONDITIONS | | | 103 |
| 4.1 | Closing Date. | | 103 |
| (1) | *Amended and Restated Credit Agreement* | | 104 |
| (2) | *Initial Security Documents* | | 104 |
| (3) | *Perfection of Liens* | | 104 |
| (4) | *Legal Opinions* | | 104 |
| (5) | *Corporate Certificates* | | 104 |
| (6) | *Fees* | | 105 |
| (7) | *Insurance* | | 105 |
| (8) | *Delivery of Financial Statements* | | 105 |
| (10) | *Compliance Certificate* | | 105 |
| (11) | [Reserved]. | | 105 |
| (13) | *"Know Your Customer" Information* | | 105 |
| 4.2 | Each Credit Event. | | 106 |
| ARTICLE 5 AFFIRMATIVE COVENANTS | | | 106 |
| 5.1 | Covenants. | | 106 |
| (1) | *Financial Statements and Other Information* | | 106 |
| (2) | *Existence; Conduct of Business* | | ~~110~~111 |
| (3) | *Payment of Obligations* | | ~~110~~111 |
| (4) | *Maintenance of Properties* | | ~~110~~111 |
| (5) | *Books and Records; Inspection Rights* | | ~~110~~111 |
| (6) | *Compliance with Laws* | | 111 |
| (7) | *Use of Proceeds and Letters of Credit* | | ~~111~~112 |
| (8) | *Further Assurances.* | | ~~111~~112 |
| (9) | *Insurance.* | | ~~112~~113 |
| (10) | *Operation and Maintenance of Property* | | 114 |
| (11) | *Security Package.* | | 114 |
| (12) | *Financial Covenants* | | 115 |
| (13) | *PPP Loans.* | | ~~117~~116 |
| (14) | *Minimum Liquidity.* | | ~~117~~116 |
| (15) | *SAFE Approval* | | ~~117~~116 |
| ARTICLE 6 NEGATIVE COVENANTS | | | ~~117~~116 |
| 6.1 | Negative Covenants. | | ~~117~~116 |
| (1) | *Indebtedness* | | ~~117~~116 |

TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| (2) | *Liens* | | ~~119~~118 |
| (3) | *Corporate Changes* | | ~~119~~118 |
| (4) | *Permitted Business* | | ~~119~~118 |
| (5) | *Asset Dispositions* | | ~~119~~118 |
| (6) | *Investments* | | 119 |
| (7) | *Acquisitions* | | ~~120~~119 |
| (8) | *Hedge Arrangements* | | ~~120~~119 |
| (9) | *Restricted Payments* | | ~~120~~119 |
| ~~(f)~~ | ~~[Intentionally Deleted].   121~~ | | |
| (f) | the Borrower may pay retention bonuses (including to its chief executive officer) during the Fiscal Year ending December 31, 2025 of not more than $1,264,000 in the aggregate, subject to (x) a 36 month clawback for the chief executive officer and (y) a one-year clawback for all other employees, which clawbacks, in the case of (x) and (y) above, are contained in the retention agreements or employment agreements, as applicable, with the chief executive officer and such employees previously delivered to the Administrative Agent; and | | 120 |
| (g) | the Borrower may pay its chief executive officer an additional $300,000 retention bonus in April 2025, subject to a 36 month clawback contained in the employment agreement with the chief executive officer previously delivered to the Administrative Agent. | | 120 |
| (10) | *Transactions with Affiliates* | | ~~121~~120 |
| (11) | *Pension Plan Compliance* | | 121 |
| (12) | *Capital Expenditures* | | ~~122~~121 |
| (13) | *Issuance of Shares* | | ~~122~~121 |
| (14) | *No Amendments to Constating Documents, etc* | | ~~122~~121 |
| (15) | *Cash Management* | | ~~122~~121 |
| (16) | *Use of Proceeds* | | ~~122~~121 |
| (17) | *Disbursements* | | ~~123~~122 |
| ARTICLE 7 EVENTS OF DEFAULT | | | ~~123~~122 |
| 7.1 | Events of Default. | | ~~123~~122 |
| (q) | the Borrower shall fail to deliver any materials required pursuant to Section 5.1(t), (u) or (v) within two (2) Business Days of the applicable Bi-Weekly Date; ~~or~~ | | ~~127~~ 126 |
| (r) | a negative variance of more than 15% of actual cumulative disbursements vs forecast cumulative disbursements for any Testing Period, as set out in a Historical Variance Report~~,~~; or 126 | | ~~127~~; or 126 |
| ARTICLE 8 THE ADMINISTRATIVE AGENT | | | 127 |
| 8.1 | Appointment of Administrative Agent. | | 127 |
| 8.2 | Secured Parties. | | ~~128~~127 |
| 8.3 | Limitation of Duties of Administrative Agent. | | 128 |

TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| 8.4 | Lack of Reliance on the Administrative Agent. | | ~~129~~128 |
| | (1) | *Independent Investigation* | ~~129~~128 |
| | (2) | *Agents Not Responsible* | ~~129~~128 |
| 8.5 | Certain Rights of the Administrative Agent. | | 129 |
| 8.6 | Reliance by Administrative Agent. | | 129 |
| 8.7 | Indemnification of Administrative Agent. | | ~~130~~129 |
| 8.8 | The Administrative Agent in its Individual Capacity. | | 130 |
| 8.9 | May Treat Lender as Owner. | | 130 |
| 8.10 | Successor Administrative Agent. | | ~~131~~130 |
| | (1) | *Replacement of Administrative Agent* | ~~131~~130 |
| | (2) | *Rights, Powers, etc* | ~~131~~130 |
| 8.11 | No Independent Legal Action. | | 131 |
| 8.12 | Arranger. | | 132 |
| 8.13 | Québec Security. | | 132 |
| 8.14 | Erroneous Payments by the Administrative Agent. | | ~~133~~132 |
| ARTICLE 9 MISCELLANEOUS | | | 136 |
| 9.1 | Notices. | | 136 |
| | (1) | *Method and Contact Information* | 136 |
| | (2) | *Electronic Communications* | 137 |
| | (3) | *Change of Address; When Notice Deemed Given* | ~~138~~137 |
| 9.2 | Waivers; Amendments. | | ~~138~~137 |
| | (1) | *Waiver* | ~~138~~137 |
| | (2) | *Amendments* | 138 |
| 9.3 | Expenses; Indemnity; Damage Waiver. | | ~~140~~139 |
| | (1) | *Expenses* | ~~140~~139 |
| | (2) | *Indemnity* | 140 |
| | (3) | *Lender Responsibility for Unpaid Expenses and Indemnity* | ~~141~~140 |
| | (4) | *Inspections for Administration* | 141 |
| | (5) | *No Representation* | 141 |
| | (6) | *Relationship Between Parties* | 141 |
| | (7) | *Limitation of Liability* | ~~142~~141 |
| | (8) | *Payment of Expenses and Indemnity* | ~~142~~141 |
| 9.4 | Successors and Assigns. | | 142 |
| | (1) | *Successors and Assigns* | 142 |
| | (2) | *Assignment by Lenders* | 142 |
| | (3) | *Register* | 143 |
| | (4) | *Acceptance and Recording of Assignments* | ~~144~~143 |

**TABLE OF CONTENTS**
(continued)

**Page**

(5)    *Participations* ................................................................ ~~144~~143

(6)    *Rights of Participant* ..................................................... 144

(7)    *Lender Pledge of Security* ............................................ 144

(8)    *Borrower's Obligations* ................................................ ~~145~~144

9.5    Anti-Money Laundering Legislation. ......................................... ~~145~~144

9.6    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. ... 145

9.7    Survival. .................................................................. 146

9.8    Counterparts. ............................................................. 146

9.9    Entire Agreement. ......................................................... ~~147~~146

9.10   Severability. ............................................................. 147

9.11   Right of Set Off. ......................................................... 147

9.12   Governing Law. ............................................................ ~~148~~147

9.13   Attornment. ............................................................... ~~148~~147

9.14   Service of Process. ....................................................... 148

9.15   WAIVER OF JURY TRIAL. ..................................................... 148

9.16   Confidentiality. .......................................................... 148

9.17   No Strict Construction. ................................................... 149

9.18   Paramountcy. .............................................................. 149

9.19   Excluded Swap Obligations. ................................................ 150

9.20   LIMITATION OF LIABILITY. .................................................. 150

9.21   Releases of Guarantees and Liens. ........................................ 150

9.22   Acknowledgement Regarding Any Supported QFCs. ............................. ~~151~~150

**TABLE OF CONTENTS**
(continued)

**Page**

**Exhibits:**

| | | |
|---|---|---|
| Exhibit A | - | Form of Additional Commitment Agreement |
| Exhibit B | - | Form of Borrowing Request |
| Exhibit C | - | Form of Compliance Certificate |
| Exhibit D | - | Form of Assignment and Assumption Agreement |
| Exhibit E | - | Form of Subordination Agreement |
| Exhibit F | - | Form of Monthly Compliance Certificate |

**Schedules:**

| | | |
|---|---|---|
| Schedule 1.1(A) | - | Initial Security Documents |
| Schedule 1.1(B) | - | Existing Liens |
| Schedule 2.1 | - | Lenders and Commitments |
| Schedule 3.1(3) | - | Governmental Approvals; No Conflicts |
| Schedule 3.1(5) | - | Litigation |
| Schedule 3.1(10) | - | Real Property |
| Schedule 3.1(11) | - | Permitted Liens |
| Schedule 3.1(12) | - | Pension Plans |
| Schedule 3.1(14) | - | Subsidiaries |
| Schedule 3.1(17) | - | Environmental Matters |
| Schedule 3.1(18) | - | Employee Matters |
| Schedule 3.1(23) | - | Bank Accounts |
| Schedule 5.1(8) | - | Post-Closing Requirements |
| Schedule 5.1(11) | - | Security Principles |
| Schedule 6.1(1) | - | Existing Indebtedness |
| Schedule 9.1(1) | - | Lender and Issuing Bank Contact Information |

## AMENDED AND RESTATED CREDIT AGREEMENT

**THIS AMENDED AND RESTATED CREDIT AGREEMENT** dated as of June 30, 2021 is made among Iovate Health Sciences International Inc., as Borrower, the Lenders from time to time parties hereto, as Lenders, Royal Bank of Canada, as Administrative Agent and Issuing Bank, Royal Bank of Canada and The Toronto-Dominion Bank, as Joint Lead Arrangers and Joint Bookrunners, and Bank of China (Canada), Bank of Montreal, The Bank of Nova Scotia and National Bank of Canada, as Co-Documentation Agents.

## RECITALS

A.   Iovate Health Sciences International Inc. and Xiwang Iovate Health Science International Inc., each as borrower, and Royal Bank of Canada (as successor to HSBC Bank Canada by way of an amalgamation among HSBC Bank Canada and Royal Bank of Canada) as lender, joint lead arranger, administrative agent and issuing bank, among others, entered into a credit agreement dated as of November 22, 2016 as amended by the Amending Agreement No. 1 dated April 27, 2017, the Amending Agreement No. 2 dated January 31, 2019, the Amending Agreement No. 3 dated March 27, 2020, the Amending Agreement No. 4 dated December 11, 2020, the Amending Agreement No. 5 dated December 11, 2020 and the Amending Agreement No. 6 dated March 31, 2021 (collectively, the "**Original Credit Agreement**") for the provision of certain credit facilities in favour of the borrowers.

B.   Following a corporate reorganisation, Iovate Health Sciences International Inc. and Xiwang Iovate Health Science International Inc. amalgamated to form the Borrower and became the borrower under the Original Credit Agreement .

C.   The parties to this Agreement wish to make certain amendments to the Original Credit Agreement, and have agreed to do so by way of an amendment and restatement of the Original Credit Agreement reflecting such amendments.

**NOW THEREFORE** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each party hereto, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1   Definitions.**

In this Agreement:

"**2025 SAFE Approvals**" means all approvals received from the State Administration of Foreign Exchange for the Fiscal Year 2025, as reported by the Borrower to the Administrative Agent on December 12, 2024.

*Iovate Credit Agreement*

1407-5777-6646.13 1407-5777-6646.22

- 2 -

"**Acquisition**" means any transaction, or any series of related transactions, consummated after the Closing Date, by which any Group Party directly or indirectly, by means of a takeover bid, tender offer, amalgamation, merger, purchase of assets or otherwise:

(a)    acquires any business (including any division of a business) or all or substantially all of the assets of any Person engaged in any business;

(b)    acquires control of securities of a Person engaged in a business representing more than 50% of the ordinary voting power for the election of directors or other governing position if the business affairs of such Person are managed by a board of directors or other governing body;

(c)    acquires control of more than 50% of the ownership interest in any Person engaged in any business that is not managed by a board of directors or other governing body; or

(d)    otherwise acquires Control of a Person engaged in a business.

"**Acquisition Notice**" means a notice from the Borrower to the Administrative Agent:

(a)    stating the intention of a Group Party to make an Acquisition;

(b)    stating whether shares or assets (or both) are proposed to be acquired;

(c)    setting forth the name, address and jurisdiction of incorporation or other organization of the Target; and

(d)    executed by a Responsible Officer of the Borrower.

"**Additional Commitment**" has the meaning set out in Section 2.1(3)(a).

"**Additional Commitment Agreement**" means an agreement substantially in the form of Exhibit A or any other form approved by the Administrative Agent, appropriately completed.

"**Additional Lender**" has the meaning set out in Section 2.1(3)(b).

"**Adjusted Cash**" means, with respect to any Fiscal Quarter and Holdco on a Consolidated basis, an amount in U.S. Dollars equal to:

(a)    ~~(a)~~ cash and Cash Equivalents on hand at the end of such Fiscal Quarter; less

(b)    ~~(b)~~ the amount of ~~Cure~~ Special Injection Contributions paid by Holdco to the Borrower during such Fiscal Quarter; adjusted for

(c)    any change (an increase being added, a decrease being deducted) in Working Capital from the first day of such Fiscal Quarter to the last day of such Fiscal Quarter (except to the extent such change was permanent such as by way of (i) a

~~1407-5777-6646.13~~1407-5777-6646.22

- 3 -

paydown of overdue Related Party accounts receivable, (ii) a paydown of overdue accounts receivable in the Middle East North Africa region not previously included in the CFF; or (iii) other events of a non-recurring nature).

"**Adjusted Daily Compounded CORRA**" means, for purposes of any calculation, the rate per annum equal to (a) Daily Compounded CORRA for such calculation plus (b) the Daily Compounded CORRA Adjustment; provided that if Adjusted Daily Compounded CORRA as so determined shall be less than the Floor, then Adjusted Daily Compounded CORRA shall be deemed to be the Floor.

"**Adjusted EBITDA**" means, with respect to any period:

(a)      EBITDA with respect to such period; plus

(b)      non-recurring one-time costs in connection with (i) restructuring expenses, (ii~~)~~ ~~business rationalization expenses (including write-off of packaging and inventory costs and termination costs for existing contracts), (iii)~~ litigation expenses in connection with the existing lawsuit by Orgain, Inc. against certain Group Parties and (~~iv~~iii) consulting ~~expenses not related to Warehouse Transition incurred during such period within 2023~~costs, up to a~~a~~n aggregate maximum (for (i), (ii) and (iii)) of U.S.$~~3,000,000; plus~~1,000,000.

~~(c) non-recurring warehouse expenses incurred during such period within 2023, up to a maximum of U.S.$3,000,000.~~

"**Adjusted Term CORRA**" means, for purposes of any calculation, the rate per annum equal to (a) Term CORRA for such calculation plus (b) the Term CORRA Adjustment; provided that if Adjusted Term CORRA as so determined shall ever be less than the Floor, then Adjusted Term CORRA shall be deemed to be the Floor.

"**Adjusted Term SOFR**" means, for purposes of any calculation, the rate per annum equal to:

(a)      Term SOFR for such calculation; plus

(b)      the Term SOFR Adjustment,

provided that, if Adjusted Term SOFR as so determined is less than the Floor then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" means Royal Bank of Canada (as successor to HSBC Bank Canada by way of an amalgamation among HSBC Bank Canada and Royal Bank of Canada), in its capacity as administrative agent for the Lenders hereunder, or any successor Administrative Agent appointed pursuant to Section 8.10.

- 4 -

"**Administrative Questionnaire**" means an administrative questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with, such Person.

"**Agreement**" means this credit agreement and all the Exhibits and the Schedules attached hereto.

"**AML Legislation**" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), The Patriot Act and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" applicable Laws, whether within Canada or elsewhere, including any regulations, guidelines or orders thereunder.

"**Amortization Payments**" means, collectively, the mandatory repayments of the Term Loans required to be made pursuant to Section 2.7(2).

"**Anti-Corruption Laws**" means all laws, rules and regulations of any jurisdiction applicable to the Group Parties from time to time concerning or relating to bribery or corruption, including without limitation,  the *Criminal Code* (Canada), the *Corruption of Foreign Public Officials Acts* (Canada) and the *U.S. Foreign Corrupt Practices Act*.

"**Applicable Lender**" means, with respect to any Borrowing of (a) Revolving Loans, each Revolving Credit Lender, and (b) Term Loans, each Term Credit Lender.

"**Applicable Margin**" means the applicable rate per annum, expressed as a percentage, set out in the relevant column and row of the table below.  For the avoidance of doubt, on the Tenth Amendment Date the Applicable Margin continues to be based upon Level VII.

| Level | Total Leverage Ratio | CORRA Loan, SOFR Loan or Financial Letter of Credit | Canadian Prime Loan or Base Rate Loan | Non-Financial Letter of Credit | ~~Standby Fee~~ |
|---|---|---|---|---|---|
| I | < 1.75x | 225 bps | 100 bps | 150 bps | ~~56.25 bps~~ |
| II | ≥ 1.75x but < 2.25x | 275 bps | 150 bps | 183.33 bps | ~~68.75 bps~~ |
| III | ≥ 2.25x but < 2.75x | 325 bps | 200 bps | 216.66 bps | ~~81.25 bps~~ |
| IV | ≥ 2.75x but < | 375 bps | 250 bps | 250 bps | ~~93.75 bps~~ |

- 5 -

| | 3.25x | | | | |
|---|---|---|---|---|---|
| V | ≥ 3.25x but < 3.75x | 425 bps | 300 bps | 283.33 bps | ~~106.25 bps~~ |
| VI | ≥ 3.75x but < 4.25 | 475 bps | 350 bps | 316.66 bps | ~~118.75 bps~~ |
| VII | ≥ 4.25x | 525 bps | 400 bps | 350 bps | ~~131.25 bps~~ |

"**Applicable Percentage**" means, in respect of any Lender at any time, with respect to a Credit Facility or all Credit Facilities, the percentage of such Credit Facility or of all Credit Facilities, as the case may be, which such Lender has agreed to make available to the Borrower at such time, determined by dividing such Lender's Commitment in respect of such Credit Facility or of all Credit Facilities, as the case may be, by the aggregate of all of the Lenders' Commitments with respect to such Credit Facility or all Credit Facilities, as the case may be. If any Commitments have terminated or expired, the Applicable Percentages in respect of the terminated or expired Commitments shall be determined based upon the relevant Commitments most recently in effect (prior to their termination or expiry), giving effect to any assignments.

"**Arrangers**" means, collectively, Royal Bank of Canada (as successor to HSBC Bank Canada by way of an amalgamation among HSBC Bank Canada and Royal Bank of Canada) and The Toronto-Dominion Bank.

"**Asset Disposition**" means, with respect to any Person, the sale, lease, license, transfer, assignment or other disposition of, or the expropriation, condemnation, destruction or other loss of, all or any portion of its business, assets, rights, revenues or property, real, personal or mixed, tangible or intangible (including any issuance of Equity Securities to effect a sale, transfer or other disposition of assets, which sale transfer or other disposition would otherwise constitute an Asset Disposition), whether in one transaction or a series of transactions, other than (a) inventory sold in the ordinary course of business upon customary credit terms, (b) sales of worn-out, scrap, surplus or obsolete material or equipment in the ordinary course of business, (c) dispositions of cash or Cash Equivalents in the ordinary course of business, (d) sales, transfers or other dispositions of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business consistent with past practice and not as part of any accounts receivables financing transaction, (e) dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property, (f) dispositions to the extent such disposition constitutes an Investment permitted hereunder, (g) leases of real property or personal property (under which such Person is lessor) entered into in the ordinary course of business to the extent that they do not materially interfere with the business of any Group Party, (h) licenses granted to third parties in the ordinary course of business, (i) the sale,

expiration, abandonment, cancellation, non-renewal or discontinuance of use or maintenance of immaterial intellectual property or rights relating thereto that the Borrower determines in its reasonable judgment to be desirable to the conduct of its business and not materially disadvantageous to the interests of the Lenders and (j) transactions between Group Parties (provided that such carve-out from this definition shall not serve to otherwise excuse compliance with any other provision of this Agreement).

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.4), and accepted by the Administrative Agent, substantially in the form of Exhibit D or any other form approved by the Administrative Agent.

"**Authorization**" means, with respect to any Person, any authorization, order, permit, approval, grant, licence, consent, right, franchise, privilege, certificate, judgment, writ, injunction, award, determination, direction, decree, by-law, rule or regulation of any Governmental Authority having jurisdiction over such Person, whether or not having the force of Law.

"**Available Cash**" means, at any time, the aggregate amount of cash and Cash Equivalents of the Borrower ~~(excluding, for greater certainty, cash or Cash Equivalents which are to be used solely to fund the Brokerage Account as security for the Orgain Bond as advised by the Borrower to the Administrative Agent pursuant to Section 5.1(7)~~), determined on a Consolidated basis.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank Products**" means any services or facilities provided to any Credit Party by any Lender or any Lender Affiliate on account of (a) each Secured Hedge Arrangement, (b) leasing (but only to the extent that the Credit Party furnishing such lease notifies the Administrative Agent in writing that such leases are to be deemed Bank Products hereunder), and (c) factoring arrangements, but excluding Cash Management Services.

"**Baseline CFF**" means the CFF for the period from ~~September 7, 2024 to~~ January ~~3~~18, 2025 to April 18, 2025 previously delivered to the Agent and Lenders on ~~September 13~~January 25, ~~2024~~2025, a copy of which is appended as Schedule 1.1(C), as replaced by a Revised Baseline CFF from time to time.

"**Base Rate**" means, on any day, the annual rate of interest equal to the greater of (a) the annual rate of interest announced by the bank that is the Administrative Agent and in

- 7 -

effect as its base rate at its principal office in Toronto, Ontario on such day for determining interest rates on U.S. Dollar-denominated commercial loans made in Canada, (b) the Federal Funds Effective Rate on such day plus 0.50%, and (c) Adjusted Term SOFR on such day (based upon a one-month Interest Period) plus 1.00%; provided that, if the Base Rate as so determined is less than the Floor, then the Base Rate shall be deemed to be the Floor.

"**Base Rate Borrowing**" means a Borrowing comprised of one or more Base Rate Loans.

"**Base Rate Loan**" means a Loan denominated in U.S. Dollars which bears interest at a rate based upon the Base Rate.

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**BIA**" means the *Bankruptcy and Insolvency Act* (Canada).

"**Bi-Weekly Date**" means each second Friday commencing with October 4, 2024; provided that if a Bi-Weekly Date is not a Business Day, then the Bi-Weekly Date in question shall be the first immediately preceding Business Day.

"~~**Bonding Company**" means a reputable bonding company which will issue the Orgain Bond to the court in order to secure the obligations under the Orgain Judgment.~~

"**Borrower**" means Iovate Health Sciences International Inc., an Ontario corporation, as successor by amalgamation to Iovate Health Sciences International Inc. and Xiwang Iovate Health Science International Inc.

"**Borrowing**" means any availment of any of the Credits, and includes any Loan, the issuance of a Letter of Credit (or any amendment thereto or renewal or extension thereof) and a rollover or conversion of any outstanding Loan.

"**Borrowing Request**" has the meaning set out in Section 2.3(1).

"~~**Brokerage Account**" means an account to be established with a licensed and reputable brokerage firm or financial institution for the purposes of holding the cash or Cash Equivalents to secure the obligations under the Orgain Bond which is, or, within thirty (30) days of the Revolving Loan referred to in Section 5.1(7)(b) being made, will be, subject to a security interest in favour of the Bonding Company.~~

"**Business Day**" means any day that is not (a) a Saturday, Sunday or holiday (as defined in the *Interpretation Act* (Canada)) in Toronto, Ontario, or (b) in the case of any U.S. Dollar-denominated Borrowing, any other statutory holiday in New York, New York; provided that, in the case of a SOFR Borrowing, a "**Business Day**" shall exclude any day that is not a U.S. Government Securities Business Day.

- 8 -

"**Canadian Dollars**" and "**Cdn.$**" refer to lawful money of Canada.

"**Canadian Prime Borrowing**" means a Borrowing comprised of one or more Canadian Prime Loans.

"**Canadian Prime Loan**" means a Loan denominated in Canadian Dollars which bears interest at a rate based upon the Canadian Prime Rate.

"**Canadian Prime Rate**" means, on any day, the annual rate of interest equal to the greater of (a) the annual rate of interest announced by the Administrative Agent and in effect as its prime rate at its principal office in Toronto, Ontario on such day for determining interest rates on Canadian Dollar-denominated commercial loans in Canada, and (b) the annual rate of interest equal to the sum of (i) the one-month Adjusted Term CORRA in effect on such day, plus (ii) 1.00%; provided that if the Canadian Prime Rate is at any time less than zero, the Canadian Prime Rate shall be deemed to be zero for the purpose of this Agreement.

"**Capital Adequacy Guideline**" means the capital adequacy requirements from time to time specified by the Office of the Superintendent of Financial Institutions (or any successor Canadian Governmental Authority performing the functions and exercising the powers performed and exercised by the Office of the Superintendent of Financial Institutions) and published by it as one or more guidelines for Canadian banks.

"**Capital Expenditures**" means, with respect to any Person for any period, all expenditures (whether paid in cash or accrued as a liability, including the portion of Capital Lease Obligations originally incurred during such period that are capitalized) of such Person during such period that, in conformity with GAAP, are included in "capital expenditures", "additions to property, plant or equipment" or comparable items.

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided that, for the avoidance of doubt, any obligations relating to a lease that was accounted for by such Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by such Person shall be accounted for as obligations relating to an operating lease and not as Capital Lease Obligations.

"**CARES Act**" means the United States *Coronavirus Aid, Relief and Economic Security Act* (together with, and as modified by, the *Paycheck Protection Program Flexibility Act of 2020* and *Paycheck Protection Program and Health Care Enhancement Act*).

"**Cash Balance**" means, at any time, the aggregate amount of unrestricted cash and Cash Equivalents at such time held by the Credit Parties with, or subject to a control agreement

1407-5777-6646.22

- 9 -

in favour of, the Administrative Agent, up to a maximum aggregate amount of U.S.$20,000,000.

"**Cash Equivalents**" means any of the following:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the Government of Canada or of any Canadian province (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the Government of Canada or of such Canadian province), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of Canada, any Canadian province, the United States or any state thereof which has a combined capital surplus and undivided profits of not less than U.S.$1,000,000,000;

(c)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the Government of the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the Government of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(d)     commercial paper of an issuer rated at least R-1 (middle) from DBRS, A-1 by S&P or P-1 by Moody's, and maturing within 180 days from the date of acquisition;

(e)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clauses (a) or (c) above and entered into with a financial institution satisfying the criteria described in clause (b) above;

(f)     money market funds that (i) are rated AAA by S&P, Aaa by Moody's or AAA by DBRS, and (ii) have portfolio assets of at least $1,000,000,000;

(g)     interests in any investment company or money market fund that invests 95% or more of its assets in instruments of the type specified in clauses (a) through (f) above; or

(h)     deposits in bank accounts made in the ordinary course of business and otherwise permitted hereunder.

"**Cash Income Tax Expense**" means, with respect to any period, the amount paid in cash during such period on account of Income Tax Expense; provided that Cash Income Tax Expense (i) with respect to the Fiscal Quarter ending September 30, 2020 shall be

1407-5777-6646.131407-5777-6646.22

- 10 -

decreased by an amount equal to the Q3 Refund regardless of when such refund is received by the Borrower and (ii) with respect to the Fiscal Quarter ending December 31, 2020 shall be decreased by an amount equal to the Q4 Refund regardless of when such refund is received by the Borrower.

"**Cash Interest Expense**" means, with respect to any period, the amount paid in cash during such period on account of Interest Expense.

"**Cash Investment Basket Amount**" means, at any time, the aggregate amount of Unfunded Investments made by Group Parties in cash since the Closing Date (other than Investments in Credit Parties or Investments by Non-Credit Party Subsidiaries in other Non-Credit Party Subsidiaries), less the aggregate amount of dividends, distributions, returns of capital, principal paid and Net Proceeds received, in each case in cash, with respect to such Unfunded Investments since the Closing Date.

"**Cash Management Services**" means any one or more of the following types of services or facilities provided to any Credit Party by a Lender or any Lender Affiliate (a) ACH transactions, (b) cash management services, including controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit card processing services, (e) credit or debit cards, and (f) purchase cards (but only to the extent that, prior to the occurrence and continuance of any continuing Default or Event of Default, the Borrower notifies the Administrative Agent in writing that such purchase cards are to be deemed Cash Management Services hereunder).

"**CCAA** means the *Companies' Creditors Arrangement Act* (Canada)."

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holdco**" means a Subsidiary that has no material assets other than equity interests in and/or indebtedness of, each as determined for U.S. federal income tax purposes, one or more Subsidiaries that are CFCs, including the indirect ownership of such equity interests or indebtedness through one or more CFC Holdcos that have no other material assets.

"**CFF**" means, as at any Bi-Weekly Date, a weekly Consolidated cash flow forecast of Holdco for thirteen calendar week period commencing on the immediately preceding Saturday, together with:

(a)    a report (a "**Historical Variance Report**") on actual versus forecast cumulative cash receipts and disbursements for the period from ~~September 7~~January 18, ~~2024~~2025 to the Friday immediately preceding such Bi-Weekly Date (each such period being a "**Testing Period**") with explanations for key variances as against the Baseline CFF, and

- 11 -

(b)    an explanation of the key forecast variances in comparison to the CFF provided at the previous Bi-Weekly Date.

Each CFF shall be in a form consistent with the Baseline CFF.

"**Change in Control**" means (a) any loss of Control of the Borrower by the Permitted Holders or (b) Holdco ceasing to own, legally and beneficially, equity securities representing at least 80% on a fully diluted basis of the aggregate ordinary voting power represented by the issued and outstanding shares of the Borrower. For the avoidance of doubt, but without limitation, a Change in Control shall occur where the Permitted Holders cease to own, directly or indirectly, legally and beneficially, equity securities representing at least 62.5% on a fully-diluted basis of the aggregate ordinary voting power represented by the issued and outstanding shares of Holdco.

"**Change in Law**" means (i) the adoption or taking effect of any new Law after the Closing Date, (ii) any change in any existing Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the Closing Date, or (iii) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law, but in the case of a request, guideline or directive not having the force of law, being a request, guideline or directive with which persons customarily comply) by any Governmental Authority made or issued after the Closing Date.

"**Closing Date**" means June 30, 2021, being the date on which this Agreement is executed and delivered by the parties hereto and the conditions set forth in Section 4.1 are satisfied or waived.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means the property described in and subject to the Liens purported to be created by any Security Document.

"**Commitment**" means, with respect to each Lender, the Revolving Credit Commitment or Term Credit Commitment of such Lender hereunder.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, any successor statute and any regulations promulgated thereunder from time to time.

"**Compliance Certificate**" means a certificate of the Borrower substantially in the form attached hereto as Exhibit C, signed by a Responsible Officer of the Borrower.

"**Consolidated**" means, when used with respect to any financial term, financial covenant, financial ratio or financial statement, such financial term, financial covenant, financial ratio or financial statement calculated, prepared or determined, as applicable, for Holdco

- 12 -

(or, in the case of Subject EBITDA or Subject Net Income, the applicable Person) on a consolidated basis in accordance with GAAP consistently applied.

"**Control**" means, in respect of a particular Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**CORRA**" means the Canadian Overnight Repo Rate Average administered and published by the Bank of Canada (or any successor administrator).

"**CORRA Borrowings**" means Term CORRA Borrowings and Daily Compounded CORRA Borrowings.

"**CORRA Loans**" means Term CORRA Loans and Daily Compounded CORRA Loans.

"**Cover**", when required by this Agreement for LC Exposure, shall be effected by paying to the Administrative Agent in immediately available funds, to be held by the Administrative Agent in a collateral account maintained by the Administrative Agent at its Payment Office and collaterally assigned as security, an amount equal to, as applicable, the maximum amount of LC Exposure available for drawing at such time. Such amount shall be retained by the Administrative Agent in such collateral account until such time as the applicable Letters of Credit shall have expired or matured and Reimbursement Obligations, if any, with respect thereto shall have been fully satisfied; provided that if any such Reimbursement Obligations are not satisfied when due hereunder, the Administrative Agent may apply any amounts in such collateral account against such Reimbursement Obligations.

"**Covered Entity**" means any of the following:

(a)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning set out in Section 9.22.

"**Credit Parties**" means, collectively, the Borrower and the Guarantors, and "**Credit Party**" means any one of them.

"**Credits**" means, collectively, the Revolving Credit and the Term Credit, and "**Credit**" means any one of the Credits.

- 13 -

"~~Cure Contribution~~**Currency Excess Amount**" has the meaning set out in Section ~~5.1(12)(d).~~

~~"**Cure Repayment**" has the meaning set out in Section 5.1(12)(d)(vii).~~

~~"**Currency Excess Amount**" has the meaning set out in Section~~ 2.9(1).

"**Current Assets**" means, at any time, all assets of Holdco determined on a Consolidated basis which, under GAAP, would be classified as current assets, other than cash or Cash Equivalents**.**

"**Current Liabilities**" means, at any time, all liabilities of Holdco at such time determined on a Consolidated basis which, under GAAP, would be classified as current liabilities, other than:

(a)    the current portion of Funded Debt; and

(b)    Revolving Loans (including Swingline Loans).

"**Daily Compounded CORRA**" means, for any day, CORRA with interest accruing on a compounded daily basis, with the methodology and conventions for this rate (which will include compounding in arrears with a lookback) being established by the Administrative Agent in accordance with the methodology and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded CORRA for business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion; and provided that if the administrator has not provided or published CORRA and a Benchmark Replacement Date with respect to CORRA has not occurred, then, in respect of any day for which CORRA is required, references to CORRA will be deemed to be references to the last provided or published CORRA.

"**Daily Compounded CORRA Adjustment**" means, for any calculation with respect to a Daily Compounded CORRA Loan, a percentage per annum as set forth below for the applicable Interest Period therefor:

| Interest Period | Percentage |
|---|---|
| One month | 0.29547 % |
| Three months | 0.32138% |

"**Daily Compounded CORRA Borrowing**" means a Borrowing comprised of one or more Daily Compounded CORRA Loans.

- 14 -

"**Daily Compounded CORRA Loan**" means a Loan denominated in Canadian Dollars that bears interest at a rate based upon Adjusted Daily Compounded CORRA.

"**DBRS**" means Dominion Bond Rating Service Limited, or its successor.

"**Default**" means any event or condition that constitutes an Event of Default or that, upon notice, lapse of time or both, would, unless cured or waived, become an Event of Default.

"**Defaulting Lender**" means any Lender that (a) has failed to fund any portion of the Borrowings or perform its obligations under Section 5.1 within three Business Days of the date it is required to do so, unless the failure has been cured, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it under this Agreement within three Business Days of when due, unless the payment is the subject of a good faith dispute or unless the failure has been cured, (c) has been determined by a court of competent jurisdiction or regulator to be insolvent or is unable to meet its obligations or pay its debts as they generally become due, (d) is the subject of a bankruptcy or insolvency proceeding, (e) is subject to or is seeking the appointment of an administrator, regulator, conservator, liquidator, receiver, trustee, custodian or other similar official over any portion of its assets or business or (f) becomes the subject of a Bail-In Action.

"**Defined Benefit Plan**" means a pension plan registered under the Income Tax Act, the *Pension Benefits* Act (Ontario) or any other applicable pension standards legislation which contains a "defined benefit provision", as such term is defined in subsection 147.1(1) of the Income Tax Act.

"**Depreciation Expense**" means, with respect to any period, the collective depreciation, depletion impairment and amortization expense of Holdco for such period (including amortization of goodwill, other intangibles and financing fees and expenses, all in accordance with GAAP), determined on a Consolidated basis.

"**Disqualified Equity Security**" means any Equity Security that, by its terms (or by the terms of any security or other Equity Security into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Permitted ~~Cure~~Injection Securities), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the occurrence of the Lender Termination Date), (b) is redeemable at the option of the holder thereof (other than solely for Permitted ~~Cure~~Injection Securities and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the occurrence of the Lender Termination Date), in whole or in part, (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Security that would constitute a Disqualified Equity

- 15 -

Security, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"**EBITDA**" means, for any period, an amount equal to Net Income for such period minus, to the extent included in such Net Income (but without duplication):

(a)     any non-cash income and gains (including unrealized mark-to-market gains under Hedge Arrangements), other than any such non-cash items to the extent that it will result in the receipt of cash payments in any future period;

plus, to the extent deducted from such Net Income (but without duplication):

(b)     Interest Expense;

(c)     Income Tax Expense;

(d)     Depreciation Expense;

(e)     [Intentionally Deleted];

(f)     [Intentionally Deleted];

(g)     any other non-cash expenses and losses (including compensation issued in Equity Securities and unrealized mark-to-market losses under Hedge Arrangements);

(h)     [Intentionally Deleted]; and

(i)     [Intentionally Deleted],

all determined on a Consolidated basis; provided that, notwithstanding GAAP, Undistributed RJV Earnings included in Net Income for any period  may not account for more than 5% of EBITDA for such period and shall be capped accordingly;

provided further that if a Material Acquisition or Material Disposition shall have occurred during the relevant period, EBITDA shall be determined as if such Material Acquisition or Material Disposition had been consummated at the beginning of such period.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

- 16 -

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Environmental Laws**" means all applicable Laws relating to the protection of the environment (including with respect to the generation, use, handling, collection, treatment, storage, transportation, recovery, recycling, release, threatened release or disposal of any Hazardous Material), the preservation or reclamation of natural resources, or to the extent relating to exposure to harmful or deleterious substances, the protection of human health and safety.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Credit Party directly or indirectly resulting from or based upon (a) the violation of any Environmental Laws,  including with respect to the generation, use, handling, collection, treatment, storage, transportation, recovery, recycling or disposal of any Hazardous Materials, (b) exposure to any Hazardous Materials, (c) the Release or threatened Release of any Hazardous Materials into the environment, or (d) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Securities**" means, with respect to any Person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting and non-voting) of, such Person's capital, whether outstanding on the Closing Date or issued after the Closing Date, including any interest in a partnership, limited partnership or other similar Person and  any beneficial interest in a trust, and any and all rights, warrants, debt securities, options or other rights exchangeable for or convertible into any of the foregoing.

"**Equivalent Amount**" means, with respect to any specified amount of currency other than United States Dollars, the amount of United States Dollars that may be purchased with such amount of other currency at the spot wholesale transactions buying rate of the Administrative Agent for the purchase of United States Dollars with such other currency in effect as of 11:00 a.m. on the Business Day with respect to which such computation is required for the purpose of this Agreement or, in the absence of such a buying rate on such date, using such other rate as the Administrative Agent may reasonably select. Notwithstanding the foregoing, with respect to any specified amount of Loans and Letters of Credit denominated in Canadian Dollars, the conversion rate shall be based upon the Bank of Canada monthly average rate quoted on the first Business Day of each month with respect to the previous month.

"**Erroneous Payment**" has the meaning assigned to it in Section 8.14(1).

- 17 -

"**Erroneous Payment Deficiency Assignment**" has the meaning assigned to it in Section 8.14(4).

"**Erroneous Payment Impacted Facilities**" has the meaning assigned to it in Section 8.14(4).

"**Erroneous Payment Return Deficiency**" has the meaning assigned to it in Section 8.14(4).

"**Erroneous Payment Subrogation Rights**" has the meaning assigned to it in Section 8.14(4).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Events of Default**" has the meaning set out in Section 7.1.

"**Excess Cash Flow**" means, with respect to any Fiscal Quarter, an amount equal to:

(a)      Adjusted Cash as at the end of such Fiscal Quarter; less

(b)      Adjusted Cash as at the end of the immediately preceding Fiscal Quarter.

"**Excess Cash Flow Available**" means, with respect to any Fiscal Quarter, an amount equal to 25% of:

(a)      Excess Cash Flow with respect to such Fiscal Quarter; <u>less</u>

(b)      U.S.$2,000,000.

"**Excess Special Cure Contribution**" means any Special Cure Contribution made pursuant to Section 5.1(12)(e)(ii).

"**Excluded Swap Obligation**" means, with respect to any Guarantor, (a) any Swap Obligation if, and to the extent that all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a Lien to secure, as applicable, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof), including by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such Lien becomes effective with respect to such Swap Obligation or (b) any other Swap Obligation designated as an "Excluded Swap Obligation" of such Guarantor as specified in any agreement between the Borrower or the relevant Guarantors and the counterparty applicable to such Swap Obligations, and agreed by the Administrative Agent.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion

- 18 -

of such Swap Obligation that is attributable to swaps for which such guarantee or Lien is or becomes illegal.

"**Excluded Taxes**" means, with respect to the recipient (the "**Recipient**") of any payment to be made by or on account of any obligation of a Credit Party hereunder, (i) income, franchise (in lieu of income) or branch profits taxes imposed on (or measured by) its net income, in each case, (a) imposed by the laws of the jurisdiction (or any political subdivision thereof) under which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, or (b) that are imposed as a result of a present or former connection between the Recipient and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein  (other than any such connection arising solely from the Recipient having executed, delivered, become a party to or performed its obligations or received a payment under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced, or sold or assigned an interest in or otherwise in connection with, this Agreement or any other Loan Document), (ii) in the case of a Lender, Taxes that are U.S. federal withholding taxes imposed on amounts payable to a Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date (a) such Lender acquires such interest in the Loan or Commitment or (b) such Lender changes its lending office, except to the extent that such Lender's assignor (if any) was entitled, immediately prior to such assignment, to receive additional amounts or indemnification from a Credit Party with respect to such U.S. federal withholding taxes pursuant to Section 2.15, (iii) Taxes attributable to a Recipient's failure to comply with Section 2.15(5), and (iv) any U.S. federal withholding Taxes imposed under FATCA.

"**Fair Market Value**" means (a) with respect to any asset or group of assets (other than a marketable security) at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, or, if such asset shall have been the subject of a relatively contemporaneous appraisal by an independent third party appraiser, the basic assumptions underlying which have not materially changed since its date, the value set out in such appraisal, and (b) with respect to any marketable security at any date, the closing sale price of such marketable security on the Business Day next preceding such date, as appearing on any nationally recognized securities exchange or, if there is no such closing sale price of such marketable security, the final price for the purchase of such marketable security at face value quoted on such Business Day by a financial institution of recognized standing selected by the Administrative Agent which regularly deals in securities of such type.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into to implement such Sections of

- 19 -

the Code and any laws, fiscal or regulatory legislation, rules, guidance notes and practices adopted by a non-U.S. jurisdiction to effect any such intergovernmental agreement.

"**FCCR Adjusted EBITDA**" means, with respect to any period, an amount equal to:

(a)     Adjusted EBITDA; less

(b)     Cash Income Taxes; less

(c)     Unfunded Capital Expenditures,

in each case for such period.

"**Federal Funds Effective Rate**" means, for any day, the per annum rate equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System of the United States of America arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Board of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.   If such rate is less than zero, then the Federal Funds Effective Rate shall be deemed to be zero.

"**Fee Letter**" means the letter dated as of June 30, 2021 among the Arrangers and Borrower.

"**Financial Letter of Credit**" means a Letter of Credit that serves as a payment guarantee of a Group Party's financial obligations and is treated as a direct credit substitute for the purposes of the Capital Adequacy Guideline.  For the avoidance of doubt, any Letter of Credit which serves as a guarantee of a Group Party's performance obligations (other than financial obligations) and is treated as a transaction-related contingency for purposes of the Capital Adequacy Guideline shall not be a Financial Letter of Credit.

"**Fiscal Quarter**" means any fiscal quarter of Holdco.

"**Fiscal Year**" means any fiscal year of Holdco.

"**Fixed Charge Coverage Ratio**" means, with respect to any period, the ratio of (a) FCCR Adjusted EBITDA to Fixed Charges, in each case for such period.

"**Fixed Charges**" means, with respect to any period, the sum (without duplication) of:

(a)     the aggregate amount of all scheduled principal payments on Indebtedness made (or required to be made) by any Group Party other than (i) to another Group Party, or (ii) where such principal amount is refinanced during such period pursuant to Indebtedness permitted under Section 6.1(1);

- 20 -

(b)        ~~Cash Interest Expense; and~~

(c)        ~~without duplication of (a), the aggregate amount of all payments made on Capital Lease Obligations by Holdco on a Consolidated basis;~~

~~in each case for such period.~~

"**Floor**" means a rate of interest equal to 0%.

"**Forbearance Agreement**" means the forbearance agreement dated as of September 24, 2024 between, *inter alios*, the Borrower, the Administrative Agent, and the financial institutions party thereto as, as lenders (as amended, supplemented or otherwise modified from time to time).

"**Funded Debt**" means, as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrower, Indebtedness in respect of the Loans.

"**GAAP**" means, with respect to any Person, generally accepted accounting principles in Canada as in effect from time to time with respect to such Person, including International Financial Reporting Standards.

"**Governmental Authority**" means the Government of Canada, the United States, any other nation or any political subdivision thereof, whether provincial, state, territorial or local, and any agency, authority, instrumentality, regulatory body, court, central bank, fiscal or monetary authority or other authority regulating financial institutions, and any other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including the Bank Committee on Banking Regulation and Supervisory Practices of the Bank of International Settlements.

"**Group Guarantee**" means the unlimited multi-party guarantee, and dated as of December 21, 2016 in favour of the Administrative Agent with respect to the debts, liabilities and obligations of the Credit Parties under the Transaction Documents.

"**Group Parties**" means, collectively, the Credit Parties and all of their subsidiaries, and "Group Party" means any one of them**.**

"**GSA**" means the multi-party general security agreement (Ontario law) dated as of December 21, 2016 between each Credit Party from time to time party thereto and the Administrative Agent for the benefit of the Secured Parties constituting a first-priority Lien (subject to Permitted Liens) over all present and future property (both real and

- 21 -

personal) of each grantor, including all Equity Securities in which each grantor has any right, title or interest.

"**Guarantee**" of or by any Person (in this definition, the "**guarantor**") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (in this definition, the "**primary credit party**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect:

(a)     to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise);

(b)     to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof;

(c)     to maintain working capital, equity capital solvency, or any other balance sheet, income statement or other financial statement condition or liquidity of the primary credit party so as to enable the primary credit party to pay such Indebtedness or other obligation; or

(d)     as an account party in respect of any letter of credit or letter of guarantee issued to support such Indebtedness or other obligation.

The term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee in respect of Indebtedness shall be deemed to be an amount equal to the stated or determinable amount of the related Indebtedness (unless the Guarantee is limited by its terms to a lesser amount, in which case to the extent of such amount) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guarantor in good faith**.**  The amount of any other Guarantee shall be deemed to be zero unless and until the amount thereof has been (or in accordance with GAAP should be) quantified and reflected or disclosed in the Consolidated financial statements (or notes thereto)) of the guarantor.

"**Guarantor**" means any Person that has entered into, or acceded to, the Group Guarantee, in its capacity as a guarantor thereunder.  On the ~~Closing~~Tenth Amendment Date, the Guarantors ~~shall include~~are the Borrower, Iovate Health Sciences U.S.A. Inc., Northern Innovations Holding Corp.~~and~~, Holdco and Iovate Health Sciences Australia PTY Ltd.

"**Hazardous Materials**" means any substance, product, liquid, waste, pollutant, chemical, contaminant, insecticide, pesticide, gaseous or solid matter, organic or inorganic matter, fuel, micro organism, ray, odour, radiation, energy, vector, plasma, constituent or material which (a) is or becomes listed, regulated or addressed under any Environmental Laws or (b) is, or is deemed to be, alone or in any combination,

- 22 -

hazardous, hazardous waste, toxic, pollutant, a deleterious substance or a contaminant under any Environmental Laws, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes or any nature regulated pursuant to any Environmental Laws.

"**Hedge Arrangement**" means any derivative transaction entered into in connection with protection against, or benefit from, fluctuation in any rate or price.  For the avoidance of doubt, the entry into a Master ISDA Agreement and the schedules thereto shall not in and of themselves constitute a Hedge Arrangement, but each trade documented pursuant to a confirmation entered into thereunder shall.

"**Hedge Exposure**" of a Person means all obligations of such Person arising under or in connection with Hedge Arrangements; provided that:

(a)    when calculating the value of a Hedge Arrangement only any actual amount that is due from such Person as a result of the termination or close-out of such Hedge Arrangement) shall be taken into account; and

(b)    the Hedge Exposure with respect to any counterparty shall be calculated on an aggregate net basis after taking into account all amounts owing by such counterparty to such Person under Hedge Arrangements.

"**HKCo**" means Hong Kong Iovate Sports Nutrition Technology Co., Limited, a corporation existing under the laws of Hong Kong.

"**Holdco**" means Xiwang Iovate Holdings Company Limited, a British Columbia corporation.

"**Holdco Loan**" means Indebtedness owing by Holdco to one or more Group Parties in an aggregate principal amount not exceeding U.S.$1,000,000 at any time.

"**Hostile Acquisition**" means a proposed Acquisition by any Group Party in circumstances in which the Target shall not have, as of the date of the Acquisition Notice in respect of such Acquisition, evidenced its agreement or agreement in principle to such Acquisition by means of (a) a definitive agreement of purchase and sale, (b) a letter of intent in respect thereof, or (c) any other document, instrument, opinion or other writing satisfactory to the Lenders.

"**ICE Benchmark Administration Interest Settlement Rate**" means, with respect to any period, the London interbank offered rate for U.S. Dollar deposits with maturities comparable to such period administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate).

"**Immaterial Subsidiary**" means any Subsidiary which is not a Material Subsidiary.

- 23 -

"**Income Tax Act**" means the *Income Tax Act* (Canada) and the regulations thereunder, as amended from time to time.

"**Income Tax Expense**" means, with respect to any period, the aggregate of all taxes on income of Holdco for such period, whether current or deferred and net of any incentive or similar tax credits, determined on a Consolidated basis.

"**Indebtedness**" of any Person means, without duplication:

(a)     all obligations of such Person for borrowed money or with respect to deposits or advances of any kind;

(b)     all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(c)     all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

(d)     all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business);

(e)     all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed;

(f)     all Guarantees by such Person of Indebtedness of others;

(g)     all Capital Lease Obligations of such Person;

(h)     all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guarantee that would constitute a Financial Letter of Credit if issued hereunder;

(i)     all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

(j)     all Hedge Exposure to the extent due and payable; and

(k)     the liquidation value of all mandatorily redeemable preferred Equity Securities of such Person, to the extent redeemable prior to the Maturity Date.

The Indebtedness of any Person shall (i) include the Indebtedness of any other entity (including any partnership in which such Person is a partner, general partner or limited partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, and (ii) for the avoidance of doubt, not

- 24 -

include reserves for deferred taxes or general contingencies or client advances or deposits, in each case incurred in the ordinary course of business.

"**Indemnified Taxes**" means all Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning specified in Section 9.3(2).

"**Initial Security Documents**" means the materials described in Schedule 1.1(A).

"**Insolvent Defaulting Lender**" means any Defaulting Lender that (a) has been adjudicated as, or determined by an Governmental Authority having regulatory authority over such Person or its assets to be, insolvent, (b) becomes the subject of an insolvency, bankruptcy, dissolution, liquidation or reorganization proceeding, or (c) becomes the subject of an appointment of a receiver, receiver and manager, monitor, trustee or liquidator under the *Bank Act* (Canada) or any applicable bankruptcy, insolvency or similar law now existing or hereafter enacted; provided that a Lender shall not be an Insolvent Defaulting Lender solely by virtue of the ownership or acquisition by a Governmental Authority of an instrumentality thereof of any Equity Securities in such Lender or a parent company thereof.

"**Interest Expense**" means, with respect to any period, the interest expense of Holdco for such period (including the amortization or writeoff of debt discount and debt issuances costs and commissions, discounts and other fees and charges associated with Indebtedness, all in accordance with GAAP), determined on a Consolidated basis.

"**Interest Payment Date**" means, (a) in the case of any Canadian Prime Loan or Base Rate Loan, the first Business Day of each month, and (b) in the case of a SOFR Loan or CORRA Loan, the last day of each Interest Period relating to such SOFR Loan or CORRA Loan, provided that if an Interest Period for any SOFR Loan is of a duration exceeding 90 days, then "**Interest Payment Date**" shall also include each date which occurs at each 90-day interval during such Interest Period.

"**Interest Period**" means, with:

(a)    respect to a SOFR Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one~~, three or six months~~ month thereafter~~, as the Borrower may elect~~;

(b)    respect to a Term CORRA Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one or three months thereafter, as the Borrower may elect; and

(c)    respect to a Daily Compounded CORRA Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one or three months thereafter, as the Borrower may elect;

- 25 -

provided that:

(d)    if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the immediately succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(e)    any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period;

(f)    no Interest Period shall extend beyond any date that any principal payment or prepayment is scheduled to be due unless the aggregate principal amount of (i) Canadian Prime Loans and Base Rate Loans, and (ii) CORRA Borrowings and SOFR Borrowings which have Interest Periods which will expire on or before such date, minus the aggregate amount of any other principal payments or prepayments due during such Interest Period, is equal to or in excess of the amount of such principal payment or prepayment; and

(g)    no Interest Period shall extend beyond the Maturity Date.

For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a converted or continued Borrowing, thereafter shall be the effective date of the most recent conversion or rollover of such Borrowing.

"**Investment**" means, as applied to any Person (the "**investor**"), any direct or indirect:

(a)    purchase or other acquisition by the investor of Equity Securities of any other Person or any beneficial interest therein;

(b)    purchase or other acquisition by the investor of bonds, notes, debentures or other debt securities of any other Person or any beneficial interest therein;

(c)    loan or advance to any other Person, other than (i) advances to employees for expenses incurred in the ordinary course of business, and (ii) accounts receivable arising from sales or services rendered to such other Person in the ordinary course of the investor's business; and

(d)    capital contribution by the investor to any other Person,

provided that an Acquisition shall not constitute an Investment.

The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment _minus_ any amounts (i) realized upon the disposition of assets comprising an Investment (including the value

1407-5777-6646.13 1407-5777-6646.22

- 26 -

of any liabilities assumed by any Person other than a Credit Party in connection with such disposition), (ii) constituting repayments of Investments that are loans or advances or (iii) constituting returns of principal or capital thereon (including any dividend, redemption or repurchase of equity that is accounted for, in accordance with GAAP, as a return of principal or capital).

"**Investment Basket Amount**" means, at any time, the aggregate amount of Investments made by Group Parties since the Original Effective Date (other than those described in Section 6.1(6)(a) to (g), less the aggregate amount of dividends, distributions, returns of capital and principal paid with respect to such Investments since the Original Effective Date.

"**IRS**" means the Internal Revenue Service.

"**Issuing Bank**" means Royal Bank of Canada (as successor to HSBC Bank Canada by way of an amalgamation among HSBC Bank Canada and Royal Bank of Canada), in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.19(9). The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "**Issuing Bank**" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"**Laws**" means all federal, provincial, municipal, foreign and international statutes, acts, codes, ordinances, decrees, treaties, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards or any provisions of the foregoing, including general principles of common and civil law and equity, and all legally binding policies, practices and guidelines of any Governmental Authority binding on the Person referred to in the context in which such word is used (including, in the case of tax matters, any accepted practice or application or official interpretation of any relevant taxation authority); and "**Law**" means any one or more of the foregoing.

"**LC Cover**" (a) in respect of any remaining Currency Excess Amount, shall be effected by paying to the Administrative Agent in immediately available funds, to be held by the Administrative Agent in a collateral account maintained by the Administrative Agent at its Payment Office and collaterally assigned as security, an amount equal to the remaining Currency Excess Amount and (b) in respect of any Letter of Credit maturing on or after the Maturity Date, shall be effected by Letter of Credit Collateralization of such Letter of Credit. Amounts in respect of clause (a) shall be retained by the Administrative Agent in such collateral account until such time as the Revolving Credit Exposure of the Lenders no longer exceeds the aggregate Revolving Credit Commitments and cash collateral provided in respect of clause (b) shall be retained by the Administrative Agent (or such other Person) in such collateral account until the applicable Letter of Credit expires, is terminated or is otherwise backstopped or addressed in a manner satisfactory to the Issuing Bank.

- 27 -

"**LC Disbursement**" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, at any time, the sum of (a) the U.S.$ Amount of the aggregate undrawn amount of all outstanding Letters of Credit at such time, plus (b) the U.S.$ Amount of the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Revolving Credit Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"**Lender Affiliate**" means, (a) with respect to any Lender, (i) an Affiliate of such Lender, or (ii) any Person that is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or an Affiliate of such Lender, and (b) with respect to any Lender that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Lenders**" means the Persons listed as lenders on Schedule 2.1 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption or an Additional Commitment Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption. Unless the context otherwise requires, the term "**Lenders**" includes the Swingline Lender and the Issuing Bank.

"**Lender Termination Date**" means the first date on which:

(a)     all Commitments have expired or been terminated;

(b)     the principal of and interest on each Loan and all fees, indemnities and other amounts payable hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall have been paid in full; and

(c)     all Letters of Credit shall have either (x) expired or terminated and all LC Disbursements shall have been reimbursed or (y) in the case of contingent Reimbursement Obligations, Letter of Credit Collateralization shall have been provided.

"**Letter of Credit**" means any standby or documentary letter of credit or letter of guarantee issued pursuant to this Agreement.

"**Letter of Credit Collateralization**" means, in respect of any Letter of Credit, either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to the Administrative Agent), to be held by the Administrative Agent for the benefit of the Revolving Credit Lenders in an amount equal to 103% of the then existing LC Exposure in respect of such Letter of Credit, (b) delivering to Administrative Agent documentation executed by all beneficiaries under such Letter of Credit, in form and substance

- 28 -

reasonably satisfactory to Administrative Agent and Issuing Bank, terminating all of such beneficiaries' rights under such Letter of Credit, or (c) providing Administrative Agent with a standby letter of credit, in form and substance reasonably satisfactory to Administrative Agent, from a commercial bank reasonably acceptable to Administrative Agent in an amount equal to 103% of the then existing LC Exposure in respect of such Letter of Credit.

"**Lien**" means, (a) with respect to any asset, any mortgage, deed of trust, lien (statutory or otherwise), deemed trust, pledge, hypothec, hypothecation, encumbrance, charge, security interest, royalty interest or right of set-off in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, title retention agreement or consignment agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to any asset, (c) any purchase option, call or similar right of a third party with respect to such assets, and (d)  any other arrangement having the effect of providing security.

"**Limited Credit Party**" means each Credit Party which (a) is incorporated or otherwise organized under the laws of a jurisdiction having foreign exchange controls imposed by a Governmental Authority, including restrictions on the amount of currency that may be imported into or exported out of such jurisdiction, or (b) due to local law limitations and, in accordance with the Security Principles, is unable to provide Liens over its assets, property and undertaking satisfactory to the Administrative Agent, acting reasonably.

"**Liquidity**" means, at any time, an amount equal to the sum of:

(a)      the Cash Balance; and

(b)      the excess amount, if any, of the aggregate Revolving Credit Commitments over the aggregate Revolving Credit Exposure,

in each case determined as at such time.

"**Loan**" means any loan made by the Lenders to the Borrower pursuant to this Agreement.

"**Loan Documents**" means this Agreement, the Security Documents, the Perfection Certificate, the Borrowing Requests, and the Fee Letter, together with any other document, instrument or agreement (other than participation, agency or similar agreements among the Lenders or between any Lender and any other bank or creditor with respect to any indebtedness or obligations of any Credit Party (as applicable) hereunder or thereunder) now or hereafter entered into in connection with this Agreement (excluding any document, instrument or agreement with respect to any Secured Hedge Arrangement and Secured Cash Management Services), as such documents, instruments or agreements may be amended, modified or supplemented from time to time.

"**Material Acquisition**" means any Acquisition or series of related Acquisitions by any Group Party that involves the payment of consideration (including obligations in respect

- 29 -

of deferred purchase price (including obligations under any purchase price adjustment, as estimated in good faith by the Borrower, but excluding earnout, contingent payment or similar payments)) by the Group Parties in excess of U.S.$1,000,000.

"**Material Adverse Effect**" means a material adverse effect on:

(a)     the business, operations, properties, assets, liabilities (actual or contingent) or condition (financial or otherwise) of the Credit Parties taken as a whole;

(b)     the validity or enforceability of any of the Loan Documents or the priority of the Liens created thereby, in each case taken as a whole;

(c)     the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents; or

(d)     the ability of the Credit Parties to perform their material obligations under the Loan Documents.

"**Material Disposition**" means any disposition of property or series of related dispositions of property by any Group Party of (a) assets comprising all or substantially all of an operating unit of a business or that constitutes all or substantially all of the common stock of a Person and (b) where the gross proceeds of the Group Parties in respect thereof (including in respect of deferred sale price (including in respect of any sale price adjustment, as estimated in good faith by the Borrower, but excluding earnout, contingent or similar payments)) exceeds U.S.$1,000,000.

"**Material Indebtedness**" means (a) all Subordinated Indebtedness (regardless of the amount of such Indebtedness), and (b) any other Indebtedness (other than hereunder) of any one or more Group Parties in an aggregate amount exceeding U.S.$7,500,000.

"**Material Intellectual Property**" means any intellectual property or intellectual property right which are, individually or in the aggregate, material to the business of a Group Party, taken as a whole, or is otherwise of material value.

"**Material Leasehold Interest**" means any leasehold interest of a Credit Party in real property that is material to, or necessary in, the manufacturing or production operations of such Credit Party which such Credit Party cannot replace within a reasonable period of time with an alternative lease having comparable commercial terms.

"**Material Subsidiary**" means:

(a)     the Borrower, Iovate Health Sciences U.S.A. Inc. and Northern Innovations Holding Corp.;

(b)     such other Subsidiaries as are required to ensure that:

- 30 -

(i)     the aggregate Subject EBITDA of all Material Subsidiaries for their most recent fiscal years exceeds 95% of EBITDA for the most recent Fiscal Year; and

(ii)    the aggregate assets of all Material Subsidiaries as of the end of the most recent Fiscal Year exceed an amount equal to 95% of the assets of Holdco determined on a Consolidated basis as of the end of the most recent Fiscal Year, and

(c)     any other Subsidiary that holds Equity Securities of a Material Subsidiary.

In determining which Subsidiaries are required to become Material Subsidiaries in order to meet such tests, inclusion shall occur in the order of their respective Subject EBITDA from most to least.  Once a Subsidiary becomes it a Material Subsidiary then it shall remain a Material Subsidiary at all times, regardless of whether it is subsequently required to satisfy such tests. On the Tenth Amendment Date, the Material Subsidiaries are the Borrower, Iovate Health Sciences U.S.A. Inc., Northern Innovations Holding Corp. and Iovate Health Sciences Australia PTY Ltd.

"**Maturity Date**" means February 14January 2, 20252026.

" **Monthly Compliance Certificate"** means a certificate of the Borrower substantially in the form attached hereto as Exhibit F, signed by a Responsible Officer of the Borrower.

"**Moody's**" means Moody's Investors Service, Inc.

"**NCPS Indebtedness**" means unsecured Indebtedness owing by a Credit Party to a Non-Credit Party Subsidiary that is subordinated by its terms in favour of the Secured Parties, provided that payments in respect of NCPS Indebtedness may be made so long as no Default or Event of Default exists or would be caused by its payment.

"**Net Income**" means, with respect to any period, the net income of Holdco for such period, determined on a Consolidated basis, which shall include (without duplication) all amounts received by a Group Party:

(a)     through the PPP Loans, provided that such PPP Loans are forgiven under the CARES Act and the Paycheck Protection Program (for greater certainty, the PPP Loans shall be included in Net Income unless and until such time as any portion of a PPP Loan is ultimately not forgiven, in which case the portion of a PPP Loan nor forgiven shall be included in Total Indebtedness as contemplated in the definition of Total Indebtedness); and

(b)     made available through the Canada Emergency Wage Subsidy program in connection with the COVID-19 pandemic, to the extent that such amounts (i) do not exceed the corresponding operating expenditures of Holdco for the applicable period which the subsidy is meant to offset, and (ii) are not in the form of loans or otherwise subject to any repayment obligation, contingent or otherwise (in the

case of any contingent obligations, unless, until and to the extent that such amounts are finally determined to be non-repayable).

"**Net Proceeds**" means, with respect to any Asset Disposition, the gross amount of cash proceeds received by any Credit Party from such Asset Disposition, including proceeds of any insurance policies received by any Credit Party in connection with such Asset Disposition and amounts received by any Credit Party pursuant to any expropriation proceeding or condemnation proceeding in connection with such Asset Disposition, including any cash received in respect of non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or instalment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, minus the sum of (a) the amount, if any, of all Taxes paid or payable by any Credit Party directly resulting from such Asset Disposition (including the amount, if any, estimated by the Borrower in good faith at the time of such Asset Disposition for Taxes payable by any Credit Party on or measured by net income or gain resulting from such Asset Disposition) assuming the application of any Tax losses or credits available (or to be available) to any Credit Party at the time such Taxes are payable that are not used to offset other income or gains), (b) the reasonable out-of-pocket costs and expenses incurred by any Credit Party in connection with such Asset Disposition (including reasonable brokerage fees paid to a Person other than an Affiliate of any Credit Party, but excluding any fees or expenses paid to an Affiliate of any Credit Party) and (c) amounts required to be applied to repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Disposition (other than any Lien pursuant to a Security Document).

"**Net Total Indebtedness**" means, at any time, an amount equal to Total Indebtedness less the Cash Balance, in each case as at such time.

"**Non-Consenting Lender**" means a Lender that has not provided its consent to a waiver of, or amendment to, any provision of the Loan Documents where requested to do so by Borrower or the Administrative Agent if (a) such waiver or amendment requires the consent of all the Lenders, and (b) the Required Lenders have consented to such waiver or amendment.

"**Non-Credit Party Subsidiary**" means any Group Party other than a Credit Party.

"**Non-Defaulting Lender**" has the meaning set out in Section 2.21(f).

"**Non-Financial Letter of Credit**" means any Letter of Credit other than a Financial Letter of Credit.

"**Non-Party Beneficiary**" means any Secured Party or Indemnitee that is not a Party.

"~~**Orgain Bond**~~" ~~means an appeal bond in respect of the Orgain Judgment in an amount not to exceed U.S.$12,600,000. For the avoidance of doubt, the Orgain Bond shall be permitted pursuant to Section 6.1(1)(h).~~

- 32 -

"**Orgain Judgment**" means the judgment entered by the court on April 17, 2024 (Doc. 479) in the case of Orgain, Inc. v. Iovate Health Sciences International Inc., et al (Case No. 8:18-cv-01253-JLS-ADS).

"**Orgain Writ**" means the writ of execution filed on February 6, 2025 with the United States Court for the Central District of California in respect of the Settlement Agreement Judgment.

"**Original Credit Agreement**" has the meaning set out in the recitals hereto.

"**Original Effective Date**" means November 22, 2016.

"**Original Lenders**" means the Lenders (as defined in the Original Credit Agreement).

"**Participant**" has the meaning set out in Section 9.4(5).

"**Party**" means a party to this Agreement, and reference to a Party includes its successors and permitted assigns and "Parties" means every Party.

"**Paycheck Protection Program**" means the SBA Paycheck Protection Loan Program pursuant to the CARES Act.

"**Payment Office**" means the Administrative Agent's office located at 16 York Street, Suite 500 Box 64, Toronto, ON, M5J 0E6, Attention: Agency Administrator (or such other office or individual as the Administrative Agent may hereafter designate in writing to the other parties hereto).

"**Pension Plan**" means a "registered pension plan", as such term is defined in subsection 248(1) of the Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to, by any Credit Party or under which any Credit Party has or may incur any actual or contingent liability.

"**Perfection Certificates**" means the certificates in substantially the form delivered on the Tenth Amendment Date and identified as such and delivered by the Borrower from time to time hereunder pursuant to which information relevant to the perfection of the Liens granted under the Security Documents is communicated, and "**Perfection Certificate**" means any one of them.

"**Periodic Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Permitted Acquisition**" means any Acquisition by any Group Party:

(a)    with respect to which an Acquisition Notice has been delivered not less than 10 Business Days in advance of such Acquisition;

- 33 -

(b)     where no Default or Event of Default has occurred and is continuing or would be caused thereby;

(c)     which is of a Person carrying on a business which is the same as or related, ancillary or complementary to the business carried on by any Group Party (or if an asset Acquisition, is of assets used or useful in a business which is the same as or related, ancillary or complementary to the business carried on by any Group Party);

(d)     of a Target organized under the laws of, or assets located in, a country that is a member of the Organisation for Economic Co-operation and Development;

(e)     in respect of which the Borrower has provided a copy of the purchase agreement and any other agreements or documents relating to such Acquisition;

(f)     in respect of which the Borrower has provided a third-party financial due diligence report satisfactory to the Administrative Agent, acting reasonably, where the aggregate purchase price (including any deferred purchase price (including obligations under any purchase price adjustment, as estimated in good faith by the Borrower, but excluding earnout, contingent payment or similar payments)) is greater than U.S.$7,500,000;

(g)     in respect of which the Borrower has provided the audited financial statements of the Target for the previous 3 fiscal years that have ended at least 120 days prior to such Acquisition, which audited financial statements shall demonstrate that such Target had normalized positive Subject EBITDA for its most recent fiscal year unless the Total Leverage Ratio (determined both an actual and *pro forma* basis) is less than 2.00 for the two most recent Rolling Periods for which financial statements were delivered to the Administrative Agent pursuant to Section 5.1(1)(a) or (b);

(h)     in respect of which the Target and the other Credit Parties are able to make the representations set out in Section 3.1 immediately following such Acquisition, subject to any updates to Schedule 3.1(12) required to reflect such Acquisition;

(i)     subject to the Security Principles, in respect of which the Lenders will have (within 30 days of such Permitted Acquisition (which date may be extended by the Administrative Agent if it, acting in good faith, believes that the extension will enable the Borrower and the Credit Parties to comply with the requirements of this clause (i) and such extension will not have a material adverse effect upon the Lenders)):

(i)     if such Acquisition is an Acquisition by a Credit Party of assets other than Equity Securities, a first-priority Lien (subject only to Permitted Liens) over such assets; and

- 34 -

(ii)     if such Acquisition is an Acquisition by a Credit Party of Equity Securities of any Person:

    (A)     a full recourse guarantee (by way of accession to the Group Guarantee) from such Person and its subsidiaries;

    (B)     a first-priority Lien (subject only to Permitted Liens) over the assets of, such Person and its subsidiaries; and

    (C)     where less than all of the issued and outstanding Equity Securities of such Person are acquired, a limited recourse guarantee and pledge from all Persons holding the balance of such Equity Securities;

(j)     in respect of which the Borrower has certified that, after giving effect to such Acquisition on a *pro forma* basis, Holdco will be in compliance with the financial covenants in Section 5.1(12) as at the date of such Acquisition;

(k)     which, if such Acquisition is an Acquisition of Equity Securities of any Person, is an Acquisition of not less than 60% of the Voting Equity Securities of such Person;

(l)     which does not cause the (i) consideration paid since the Original Effective Date in respect of Permitted Acquisitions for Equity Securities of a Person that has not become (and, as at the date of determination, is not required hereunder to become) a Guarantor and (ii) without duplication, consideration paid since the Original Effective Date in respect of Permitted Acquisitions for assets acquired by a Non-Credit Party Subsidiary to exceed, in the aggregate, U.S.$15,000,000; and

(m)     for which the consideration of such Acquisition is financed, directly or indirectly, solely through the issuance of Equity Securities of a Group Party;

provided that, notwithstanding the foregoing:

(n)     [Reserved]; and

(o)     a Hostile Acquisition shall not be a Permitted Acquisition.

"**Permitted Cure Indebtedness**" means Subordinated Indebtedness of Holdco owing to one or more Sponsors or Affiliates thereof.

"**Permitted Cure Securities**" means any Equity Securities of Holdco other than Disqualified Equity Securities.

- 35 -

"**Permitted Hedge Payment**" means any cash payment under or in connection with any Secured Hedge Arrangement made when no Event of Default has occurred and is continuing; <u>provided that</u>:

(a)     the payment of any Early Termination Amount (as defined in the applicable Master ISDA Agreement); or

(b)     any other payment of a similar nature or economic effect, whether voluntary or mandatory;

shall cease to be a Permitted Hedge Payment if an Event of Default shall occur within 12 months after the time of such payment, such that it shall become subject to the sharing provisions of Section 2.16(4).

"**Permitted Holdco Reimbursements**" means payments to Holdco to fund:

(a)     fees and expenses required to maintain the existence of Holdco, the customary salary, bonus and other benefits (including indemnification, insurance and insurance premiums) payable to, and indemnities provided on behalf of, officers and directors of Holdco, and the general corporate operating and overhead expenses of Holdco;

(b)     costs (including all professional fees and expenses) incurred by Holdco in connection with reporting obligations under or otherwise incurred in connection with compliance with this Agreement, applicable laws, rules or regulations of any governmental or regulatory body; and

(c)     taxes required to be paid by Holdco as a result of permitted payments made to Holdco in respect of Permitted Shareholder Indebtedness.

"**Permitted Holders**" means the Sponsors and any and all Persons which are directly or indirectly Controlled by either of them or are under common Control with either of them.

"**Permitted Injection Indebtedness**" means Subordinated Indebtedness of Holdco owing to one or more Sponsors or Affiliates thereof.

"**Permitted Injection Securities**" means any Equity Securities of Holdco other than Disqualified Equity Securities.

"**Permitted Intercompany Investments**" means:

(a)     an Investment by a Credit Party in another Credit Party;

(b)     an Investment by a Non-Credit Party Subsidiary in a Credit Party by way of capital contribution or NCPS Indebtedness;

- 36 -

(c)    Any Investment by a Non-Credit Party Subsidiary in another Non-Credit Party Subsidiary; and

(d)    Investments by Credit Parties in Non-Credit Party Subsidiaries in an aggregate outstanding amount not to exceed U.S.$2,500,000 at any time.

"**Permitted Liens**" means:

(a)    Liens in favour of the Administrative Agent for the benefit of the Secured Parties for the obligations of any Credit Party under or pursuant to the Transaction Documents;

(b)    Liens (i) granted by a Group Party in favour of a Credit Party in order to secure any of the Indebtedness of such Group Party to such Credit Party; provided that such Liens are subject to assignment arrangements reasonably satisfactory to the Administrative Agent; provided further that if such Liens are granted by a Credit Party, they are subject to postponement arrangements reasonably satisfactory to the Administrative Agent, and (ii) granted by a Non-Credit Party Subsidiary in favour of another Non-Credit Party Subsidiary in order to secure any of the Indebtedness of such first Non-Credit Party Subsidiary to such other Non-Credit Party Subsidiary;

(c)    Purchase Money Liens securing Indebtedness to the extent permitted by Section 6.1(1)(d) and Liens to secure Capital Lease Obligations to the extent permitted by Section 6.1(1)(d);

(d)    Liens securing Indebtedness to the extent permitted by Section 6.1(1)(n);

(e)    Liens imposed by any Governmental Authority for Taxes not yet due and delinquent or which are being contested in good faith and by appropriate proceedings in compliance with Section 5.1(3), and, during such period during which such Liens are being so contested, such Liens shall not be executed on or enforced against any of the assets of any Credit Party, provided that such Credit Party shall have set aside on its books reserves deemed adequate therefor and not resulting in qualification by auditors;

(f)    carrier's, warehousemen's, mechanics', materialmen's, repairmen's, construction and other like Liens arising by operation of applicable Law, arising in the ordinary course of business and securing amounts (i) which are not overdue for a period of more than 30 days, or (ii) which are being contested in good faith and by appropriate proceedings and, during such period during which amounts are being so contested, such Liens shall not be executed on or enforced against any of the assets of any Credit Party, provided that such Credit Party shall have set aside on its books reserves deemed adequate therefor and not resulting in qualification by auditors;

- 37 -

(g)     undetermined or inchoate Liens and charges arising or potentially arising under statutory provisions which have not at the time been filed or registered in accordance with applicable Law or of which written notice has not been duly given in accordance with applicable Law or which although filed or registered, relate to obligations not due or delinquent, including without limitation statutory Liens incurred, or pledges or deposits made, under worker's compensation, employment insurance and other social security legislation;

(h)     surety bonds issued to secure the performance of obligations incurred in the ordinary course of business, together with any Lien over in the contract under which such obligations arise granted as security for the indemnity obligations under such surety bonds;

(i)     servitudes, easements, rights-of-way, restrictions and other similar encumbrances on real property imposed by applicable Law or incurred in the ordinary course of business and encumbrances consisting of zoning or building restrictions, easements, licenses, restrictions on the use of property or minor imperfections in title thereto which, in the aggregate, are not material, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of any Credit Party;

(j)     Liens arising from Cash Equivalents described in clause (e) of the definition of the term Cash Equivalents;

(k)     judgment Liens in respect of judgments that do not constitute an Event of Default under Section 7.1(j);

(l)     the rights reserved to or vested in Governmental Authorities by statutory provisions or by the terms of leases, licenses, franchises, grants or permits, which affect any land, to terminate the leases, licenses, franchises, grants or permits or to require annual or other periodic payments as a condition of the continuance thereof;

(m)     securities to public utilities or to any municipalities or Governmental Authorities or other public authority when required by the utility, municipality or Governmental Authorities or other public authority in connection with the supply of services or utilities to the Group Parties;

(n)     Liens or covenants restricting or prohibiting access to or from lands abutting on controlled access highways or covenants affecting the use to which lands may be put; provided that such Liens or covenants do not materially and adversely affect the use of the lands by any Credit Party;

(o)     statutory Liens incurred or pledges or deposits made in favour of a Governmental Authority to secure the performance of obligations of any Group Party under Environmental Laws to which any assets of such Group Party are subject;

- 38 -

(p)     banker's liens, rights of setoff or similar rights and remedies as to deposit
accounts or other funds maintained with depository institutions and securities
accounts and other financial assets maintained with a securities intermediary;
provided that such deposit accounts or funds and securities accounts or other
financial assets are not established or deposited for the purpose of providing
collateral for any Indebtedness and are not subject to restrictions on access by any
Group Party in excess of those required by applicable banking regulations;

(q)     Liens granted by any Group Party to a landlord to secure the payment of arrears of
rent in respect of leased properties in the Province of Quebec leased from such
landlord, provided that such Lien is limited to the assets located at or about such
leased properties;

(r)     Liens arising by virtue of Uniform Commercial Code financing statements (or
similar filings under applicable law) regarding operating leases entered into by
any Group Party in the ordinary course of business;

(s)     Liens representing any interest or title of a licensor, lessor, sublicensor or
sublessor, or a licensee, lessee, sublicensee or sublessee, in the property subject to
any lease (other than Capital Lease Obligations), license, sublease, sublicense or
concession agreement permitted by this Agreement;

(t)     in the case of any Restricted Joint Venture, or the Equity Securities of any Person
that is not a Subsidiary, any encumbrance or restriction, including any put and call
arrangements, related to Equity Securities in such Person set forth in the
organization documents of such Person or any related joint venture, shareholders'
or similar agreement;

(u)     Liens solely on any cash money deposits, escrow arrangement or similar
arrangements made by any Group Party in connection with any letter of intent or
purchase agreement for a Permitted Acquisition or other transaction permitted
hereunder;

(v)     Liens that are contractual rights of setoff granted in the ordinary course of
business;

(w)     Liens existing on the Original Effective Date and set forth on Schedule 1.1(B);
provided that (i) such Lien shall not apply to any other asset of any Group Party
and (ii) such Lien shall only secure those obligations that it secures on the
Original Effective Date and extensions, renewals, replacements and refinancings
thereof so long as the principal amount of the obligations being extended,
renewed, replaced or refinanced or, in the case of such obligations constituting
Indebtedness, that are permitted under Section 6.1(1)(n) as Refinancing
Indebtedness in respect thereof;

(x)     Liens ~~on cash or Cash Equivalents in an amount not to exceed U.S.$12,600,000 in
favour of the Bonding Company granted as security for the Orgain Bond~~granted

1407-5777-6646.13 1407-5777-6646.22

- 39 -

by Iovate Health Sciences U.S.A., Inc. in favour of RJW pursuant to a warehouse and logistics services agreement dated as of October 17, 2024 between RJW and Iovate Health Sciences U.S.A., Inc. securing such amounts (i) which are not overdue for a period of more than 30 days, or (ii) which are being contested in good faith and by appropriate proceedings and, during such period during which amounts are being so contested, such Liens shall not be executed on or enforced against any of the assets of Iovate Health Sciences U.S.A., Inc., provided that Iovate Health Sciences U.S.A., Inc. shall have set aside on its books reserves deemed adequate therefor and not resulting in qualification by auditors; and

(y)    any extension, renewal or replacement of any of the foregoing; provided, however, that the Liens permitted hereunder shall not be extended to cover any additional Indebtedness of the Group Parties or their property (other than a substitution of like property), except Liens in respect of Capital Lease Obligations and Purchase Money Liens as permitted by clause (c) of this definition and Liens permitted by clause (d) of this definition.

"**Permitted Restricted Sales**" means Restricted Sales:

(a)    made in accordance with this Agreement prior to September 24, 2024; or

(b)    which:

(i)    have been prepaid in full prior to delivery of the inventory or other property to the Affiliate which is the counterparty to such Restricted Sale where such Restricted Sale is not recognized in revenue prior to such time (excluding any royalty revenues which are recorded as a result of tax and transfer pricing regulations) and

(ii)    do not exceed U.S.$10,400,000 in the aggregate from and after January 1, 2025.

"**Permitted Shareholder Indebtedness**" means Subordinated Indebtedness owing by a Credit Party to Holdco.

"**Person**" includes any natural person, corporation, company, limited liability company, trust, joint venture, association, incorporated organization, partnership, Governmental Authority or other entity.

"**Post-Closing Requirements**" has the meaning set out in Section 5.1(8).

"**PPP Loans**" means one or more SBA loans provided to a Group Party pursuant to the Paycheck Protection Program.

"**Prior ARCA**" means the amended and restated credit agreement dated as of June 30, 2021 between, *inter alios*, the Borrower, the Administrative Agent  and the financial

- 40 -

institutions party thereto, as lenders, as amended by amending agreement no.1 dated as of March 31, 2022 and by amending agreement no. 2 dated as of April 14, 2022.

"**Purchase Money Lien**" means a Lien taken or reserved in personal property to secure payment of all or part of its purchase price (or to secure financing to fund such purchase price), provided that such Lien (a) secures an amount not exceeding the lesser of the purchase price of such personal property and the Fair Market Value of such personal property at the time such Lien is taken or reserved, (b) extends only to such personal property and its proceeds, and (c) is granted prior to or within 270 days after the purchase of such personal property.

"**Q3 Refund**" means the tax refund in the amount of U.S.$7,973,000 to be issued by the IRS to Iovate Health Sciences U.S.A. Inc. in respect of Taxes paid by Iovate Health Sciences U.S.A. Inc. pursuant to the letter from the IRS dated as of July 24, 2019.

"**Q4 Refund**" means the tax refund in the amount of U.S.$454,000 to be issued by various Governmental Authorities in the United States to Iovate Health Sciences U.S.A. Inc. in respect of Taxes paid by Iovate Health Sciences U.S.A. Inc. pursuant to the letter from the IRS dated as of July 24, 2019.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning set out in Section 9.22.

"**Quarterly Date**" means each of the last day of each of March, June, September, and December in each calendar year.

"**Quarterly Report**" has the meaning set out in Section 5.1(1)(k).

"**Reference Date**" means, as of any date, the date of the most recent Quarterly Report (or, prior to the first such Quarterly Report, the Closing Date).

"**Refinancing Indebtedness**" means, in respect of any Indebtedness (the "**Original Indebtedness**"), any Indebtedness that extends, renews or refinances such Original Indebtedness (or any Refinancing Indebtedness in respect thereof); provided that (a) the principal amount (or accreted value, if applicable) of such Refinancing Indebtedness shall not exceed the principal amount (or accreted value, if applicable) of such Original Indebtedness except by an amount no greater than accrued and unpaid interest with respect to such Original Indebtedness and any reasonable fees, premium and expenses relating to such extension, renewal or refinancing and (b) the stated final maturity of such Refinancing Indebtedness shall not be earlier than that of such Original Indebtedness.

"**Register**" has the meaning set out in Section 9.4(3).

- 41 -

"**Reimbursement Obligations**" means, at any date, the obligations of the Borrower then outstanding in respect of the Letters of Credit to reimburse the Issuing Bank for the amount paid by the Issuing Bank in respect of any drawings under the Letters of Credit.

"**Related Non-Party Beneficiaries**" means, with respect to any Party, (i) any Lender Affiliate with respect to such Party, (ii) any other Related Party with respect to such Party, and (iii) any assignee of the Persons identified in (i) or (ii).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Release**" means any discharge, deposit, spill, leak, pumping, pouring, emission, emptying, injection, escape, leaching, seepage or disposal of a Hazardous Material which is in breach of any Environmental Laws.

"**Relevant Agent**" means, with respect to a Group Party, any agent of such Group Party that will act in any capacity in connection with, or benefit from, the Credits.

"**Required Lenders**" means, at any time, Lenders having Revolving Credit Exposures, Term Credit Exposures and unused and uncancelled Commitments representing at least 66⅔% of the sum of the total Revolving Credit Exposures, Term Credit Exposures and unused and uncancelled Commitments at such time; provided that if there are only two Lenders having Revolving Credit Exposures, Term Credit Exposures and unused and uncancelled Commitments at such time, "Required Lenders" shall mean both such Lenders.

"**Responsible Officer**" means, with respect to any Person, the chairman, the president, the chief executive officer or the chief operating officer, and, in respect of financial or accounting matters, any chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**Restricted Joint Venture**" means a Subsidiary (other than a Wholly-Owned Subsidiary) that is prohibited from guaranteeing the Secured Liabilities pursuant to its organizational documents or any unanimous shareholder agreement, partnership agreement or other joint venture agreement binding upon it.

"**Restricted Payment**" means, with respect to any Person, any payment by such Person (whether in cash or in kind, and whether by way of actual payment, set-off, counterclaim or otherwise):

(a)    of any dividend, distribution or return of capital with respect to its Equity Securities;

- 42 -

(b)     on account of the purchase, redemption, retirement or other acquisition of any of its Equity Securities or any warrants, options or similar rights with respect to its Equity Securities;

(c)     of any principal of, or interest or premium on, any Subordinated Indebtedness of such Person**;**

(d)     of any principal of, or interest or premium on, any Indebtedness of such Person (i) to a holder of Equity Securities of such Person or to an Affiliate of a holder of Equity Securities of such Person, or (ii) that is NCPS Indebtedness;

(e)     of any management, consulting or similar fee or any bonus payment or comparable payment, or by way of gift or other gratuity, to

    (i)     any director or officer of such Person (but excluding ordinary course wages and bonuses paid in the ordinary course of business and consistent with past practice (which, for greater certainty does not include any retention bonuses));

    (ii)     any Affiliate of such Person or director or officer thereof; and

    (iii)     any Sponsor or director or officer thereof,

(f)     for the purpose of setting apart any property for a sinking, defeasance or other analogous fund for any of the payments referenced above.

"**Restricted Sale**" means any sale of inventory or other property by a Group Party to an Affiliate of a Group Party organized under the laws of, or otherwise located in, Hong Kong or the People's Republic of China or any political subdivision thereof.

"**Revised Baseline CFF**" means the CFF for each subsequent thirteen calendar week period commencing on the Saturday preceding the last day of the period set out in the Baseline CFF or the then current Revised Baseline CFF, as applicable, in form and substance agreed to by the Lenders.

"**Revolving Credit**" means the U.S.$~~20,000,000~~14,000,000 revolving credit facility established in favour of the Borrower pursuant to the Revolving Credit Commitments of the Revolving Credit Lenders.

"**Revolving Credit Commitment**" means, as to any Lender, its commitment to make Revolving Loans and participate in Swingline Loans and Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Credit Commitment" opposite such Lender's name on Schedule 2.1 or in the Assignment and Assumption or Additional Commitment Agreement pursuant to which Lender shall have assumed or made its Revolving Credit Commitment, as applicable, as

the same may be changed from time to time pursuant to the terms hereof. The initial aggregate amount of the Revolving Credit Commitments is U.S.$~~20,000,000~~14,000,000.

"**Revolving Credit Exposure**" means, with respect to any Lender at any time, the sum of (a) the U.S.$ Amount of the outstanding principal amount of such Lender's Revolving Loans at such time, and (b) such Lender's LC Exposure and Swingline Exposure at such time.

"**Revolving Credit Lender**" means any Lender having a Revolving Credit Commitment hereunder or a Revolving Loan outstanding hereunder.

"**Revolving Loan**" has the meaning set out in Section 2.1(1).

"**RJW**" means, collectively, RJW Transport, LLC, RJW Warehouse, LLC and RJW Logistics, LLC.

"**Rolling Period**" means each Fiscal Quarter taken together with the three immediately preceding Fiscal Quarters.

"**S&P**" means Standard & Poor's Financial Services LLC.

"**Sanctioned Person**" means, at any time, any Person with whom any Party is prohibited or restricted from transacting or otherwise dealing under any Sanction, whether by reason of designation under such Sanction or otherwise.

"**Sanctions**" means, at any time, economic or financial sanctions or trade embargoes imposed, administered or enforced by (i) the Office of Foreign Assets Control of the U.S. Department of Treasury or (ii) any other Governmental Authority that is applicable to any Party at such time.

"**SBA**" means the agency of the federal government of the United States known as the Small Business Administration.

~~"**Second Amendment Date**" means January 31, 2019.~~

"**Secured Cash Management Obligations**" means all indebtedness arising under or in connection with any Secured Cash Management Services.

"**Secured Cash Management Provider**" means any Lender or Lender Affiliate in its capacity as a provider of Cash Management Services. For the avoidance of doubt, a Person that ceases to be a Lender or Lender Affiliate shall cease to be a Secured Cash Management Provider.

"**Secured Cash Management Service**" means any Cash Management Service provided by a Secured Cash Management Provider to a Credit Party.

- 44 -

"**Secured Hedge Arrangement**" means any Hedge Arrangement between a Credit Party and Person that is a Lender or Lender Affiliate at the time such Hedge Arrangement is entered into.  For the avoidance of doubt, (i) any Hedge Arrangement entered into by a Credit Party with a Person after such Person ceases to be a Lender or Lender Affiliate shall not be a Secured Hedge Arrangement, and (ii) as at the Closing Date there are no outstanding Hedge Arrangements between any Credit Party and a Lender or Lender Affiliate.

"**Secured Hedge Counterparty**" means any Person party to Secured Hedge Arrangement other than a Credit Party, in such Person's capacity as a party thereto.  For the avoidance of doubt, (i) a Person shall remain a Secured Hedge Counterparty with respect to a Secured Hedge Arrangement if it ceases to be a Lender or a Lender Affiliate, and (ii) such Secured Hedge Arrangement shall continue to have the benefit of the Security Documents.

"**Secured Hedge Obligations**" means all Hedge Exposure arising under or in connection with Secured Hedge Arrangements; provided that amounts owing to or from a Person under Hedge Arrangements that are not Secured Hedge Arrangements shall not be taken into account in calculating Secured Hedge Obligations.  For the avoidance of doubt, no Guarantor shall be liable for Excluded Swap Obligations of such Guarantor.

"**Secured Liabilities**" means all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, mature or unmatured) of the Credit Parties to the Secured Parties under, in connection with or with respect to the Transaction Documents (including Secured Cash Management Obligations, Secured Hedge Obligations and Erroneous Payment Subrogation Rights), and any unpaid balance thereof.

"**Secured Parties**" means the Administrative Agent**,** the Lenders**,** the Secured Hedge Counterparties and the Secured Cash Management Providers.

"**Security Documents**" means the agreements or instruments described or referred to in Schedule 1.1(A) and Section 5.1(11) (including, to the extent such Section describes an amendment, the agreement or instrument amended thereby) and any and all other agreements or instruments now or hereafter executed and delivered by any Credit Party as security (including by way of guarantee) for the payment or performance of all or part of the Secured Liabilities, as any of the foregoing may have been, or may hereafter be, amended, modified or supplemented.

"**Security Principles**" means the security principles set out in Schedule 5.1(11).

"**Settlement Agreement Judgment**" means the amended judgment entered by the court on November 17, 2024 (Doc. 523) in the case of Orgain, Inc. v. Iovate Health Sciences International Inc., et al (Case No. 8:18-cv-01253-JLS-ADSx).

- 45 -

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Borrowing**" means a Borrowing comprised of one or more SOFR Loans.

"**SOFR Loan**" means a Loan denominated in U.S. Dollars which bears interest at a rate based on Adjusted Term SOFR, other than pursuant to the proviso to the definition of "Base Rate".

"**Special Injection Contribution**" means, collectively, an issuance by Holdco of Permitted Injection Securities and/or Permitted Injection Indebtedness.

"**Sponsors**" means, collectively, Xiwang Foodstuffs (Qingdao) Co. Ltd. and Chunhua Jingxi (Tianjin) Investment Center (Limited Partnership), and "Sponsor" means any one of them.

"**Subject EBITDA**" means, with respect to any Person, an amount equal to "**EBITDA**" with respect to such Person calculated as if such definition and all amounts referred to therein were determined with respect to such Person (as opposed to Holdco) on a Consolidated basis.

"**Subject Flood Property**" means all real property:

(a)     in which a Credit Party has an interest that is subject to a mortgage in favour of the Administrative Agent;

(b)     that is located within the United States; and

(c)     is in an area designated by the Federal Emergency Management Agency as a special flood hazard area.

"**Subject Net Income**" means, with respect to any Person, an amount equal to "**Net Income**" with respect to such Person calculated as if such definition and all amounts referred to therein were determined with respect to such Person (as opposed to Holdco) on a Consolidated basis.

"**Subordinated Indebtedness**" means unsecured Indebtedness of any Credit Party ranking in right of payment subordinate to any liability of such Credit Party under the Loan Documents and subject to a subordination agreement substantially in the form set out in Exhibit E.

"**subsidiary**" means, with respect to any Person (the "**parent**") at any date, any other Person  (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a

- 46 -

partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Subsidiary**" means any subsidiary of Holdco.

"**Supported QFC**" has the meaning set out in Section 9.22.

"**Swap Obligation**" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swingline Accounts**" means the Canadian Dollar and U.S. Dollar bank accounts maintained by the Administrative Agent in the name of the Borrower and designated as such by the Administrative Agent.

"**Swingline Commitment**" has the meaning set out in Section 2.20(1).  For the avoidance of doubt, the Swingline Commitment comprises part of, and is not in addition to, the Commitment of the applicable Revolving Credit Lender.

"**Swingline Exposure**" means, at any time, the U.S.$ Amount of the aggregate principal amount of all Swingline Loans outstanding at such time.  The Swingline Exposure of any Lender at any time shall be its Applicable Percentage of the total Swingline Exposure at such time.

"**Swingline Lender**" means Royal Bank of Canada (as successor to HSBC Bank Canada by way of an amalgamation among HSBC Bank Canada and Royal Bank of Canada), in its capacity as lender of Swingline Loans hereunder.

"**Swingline Loan**" has the meaning set out in Section 2.20(1).

"**Takeout**" means the cash repayment in full of all outstanding Loans and other Secured Liabilities on or before the Maturity Date.

"**Target**" means, with respect to any Acquisition, the Person whose shares or assets (or both) are proposed to be acquired.

"**Taxes**" means all taxes, charges, fees, levies, imposts and other assessments, including all income, sales, use, goods and services, harmonized sales, value added, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, real property and personal property taxes, and any other taxes, customs duties, fees, assessments, or similar charges in the nature of a tax, including Canada Pension Plan and provincial pension plan contributions, employment insurance payments and workers' compensation premiums, together with any instalments with respect thereto, and any interest, fines and penalties with respect thereto, imposed by any Governmental

- 47 -

Authority (including federal, state, provincial, municipal and foreign Governmental Authorities), and whether disputed or not.

"**Tenth Amendment Date**" means February 28, 2025.

"**Term CORRA**" means, for any calculation with respect to a Term CORRA Loan, the Term CORRA Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term CORRA Determination Day**") that is two (2) Business Days prior to the first day of such Interest Period, as such rate is published by the Term CORRA Administrator; provided, however, that if as of 1:00 p.m. (Toronto time) on any Periodic Term CORRA Determination Day the Term CORRA Reference Rate for the applicable tenor has not been published by the Term CORRA Administrator and a Benchmark Replacement Date with respect to the Term CORRA Reference Rate has not occurred, then Term CORRA will be the Term CORRA Reference Rate for such tenor as published by the Term CORRA Administrator on the first preceding Business Day for which such Term CORRA Reference Rate for such tenor was published by the Term CORRA Administrator so long as such first preceding Business Day is not more than three (3) Business Days prior to such Periodic Term CORRA Determination Day.

"**Term CORRA Adjustment**" means, for any calculation with respect to a Term CORRA Loan, a percentage per annum as set forth below for the applicable Interest Period therefor:

| Interest Period | Percentage |
|---|---|
| One month | 0.29547 % |
| Three months | 0.32138% |

"**Term CORRA Administrator**" means Candeal Benchmark Administration Services Inc., TSX Inc., or any successor administrator.

"**Term CORRA Borrowing**" means a Borrowing comprised of one or more Term CORRA Loans.

"**Term CORRA Loan**" means a Loan denominated in Canadian Dollars which bears interest at a rate based on Adjusted Term CORRA.

"**Term CORRA Reference Rate**" means the forward-looking term rate based on CORRA.

"**Term Credit**" means the U.S.$133,149,999.98  term credit established in favour of the Borrower pursuant to the Term Credit Commitments of the Term Credit Lenders.

"**Term Credit Commitment**" means, as to any Lender, the obligation of such Lender, if any, to make Term Loans in a principal amount not to exceed the amount set forth under

- 48 -

the heading "Term Credit Commitment" opposite such Lender's name on Schedule 2.1, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Credit Commitment, as applicable, as the same may be changed from time to time pursuant to the terms hereof.  The initial aggregate amount of the Term Credit Commitments is U.S.$ 133,149,999.98.

"**Term Credit Exposure**" means, with respect to any Lender at any time, the U.S.$ Amount of the outstanding principal amount of such Lender's Term Loans at such time.

"**Term Credit Lender**" means any Lender having a Term Credit Commitment hereunder or a Term Loan outstanding hereunder.

"**Term Loan**" has the meaning set out in Section 2.1(2).

"**Term SOFR**" means:

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; and

(b)    for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**Base Rate Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities

- 49 -

Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"**Term SOFR Adjustment**" means, for any calculation with respect to a Base Rate Loan or a SOFR Loan, a percentage per annum as set forth below for the applicable Type of such Loan and (if applicable) Interest Period therefor:

Base Rate Loans:

| 0.10% |
|---|

SOFR Loans:

| **Interest Period** | **Percentage** |
|---|---|
| One month | 0.10% |
| Three months | 0.15% |

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Termination Event Date**" means the date of occurrence of any Termination Event, as such term is defined in the Forbearance Agreement dated as of September 24, 2024 between the parties to the Credit Agreement.

"**The Patriot Act**" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"**Third Amendment Date**" means December 30, 2022.

"**Total Indebtedness**" means, at any time, the aggregate amount of Indebtedness of Holdco at such time (other than Subordinated Indebtedness or the proceeds of the PPP Loans which are forgiven under the CARES Act and Paycheck Protection Program), determined on a Consolidated basis. For greater certainty, any portion of a PPP Loan which is not forgiven under the CARES Act and the Paycheck Protection Program shall be included in the definition of Total Indebtedness from the date that such portion of the PPP Loan is received by the Borrower.

"**Total Leverage Ratio**" means, at any time, the ratio of (a) Net Total Indebtedness at such time, to (b) EBITDA for the most recently completed Rolling Period for which

- 50 -

financial statements were required to have been delivered pursuant to Section 5.1(1)(a) or (b). By way of example and for the avoidance of doubt, the Total Leverage Ratio as at October 3, 2021 shall be equal to the ratio of (a) Net Total Indebtedness on October 3, 2021, to (b) EBITDA for the Rolling Period ended June 30, 2021 (i.e. the financial statements for September 30, 2021 would not have been delivered yet).

"**Transaction Documents**" means the Loan Documents together with any document, instrument or agreement with respect to any Secured Hedge Arrangement and Secured Cash Management Services, as such documents, instruments or agreements may be amended, modified or supplemented from time to time.

"**Transactions**" means the execution, delivery and performance by the Credit Parties of the Loan Documents, the borrowing of Loans and the use of the proceeds thereof, and the issuance of Letters of Credit.

"**Type**", (a) when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Canadian Prime Rate, the Base Rate, Term SOFR**,** Term CORRA or Daily Compounded CORRA, or whether such Borrowing takes the form of a Letter of Credit and (b) when used with respect to a Letter of Credit refers to whether such Letter of Credit is a Financial Letter of Credit or a Non-Financial Letter of Credit.

"**Undistributed RJV Earnings**" means, with respect to any Rolling Period, an amount equal to:

(a)     the aggregate Subject Net Income of all Restricted Joint Ventures; **less**

(b)     the amount of dividends, distributions, returns of capital and principal repayments made by all Restricted Joint Ventures to Group Parties (other than another Restricted Joint Venture),

in each case with respect to such Rolling Period.

"**Unfunded Capital Expenditures**" means, with respect to any period, Capital Expenditures made during such period by the Group Parties (or the relevant portion thereof) that were not funded directly (subject to intercompany funds flow) with the proceeds of:

(a)     the issuance of Equity Securities or Permitted Shareholder Indebtedness to Holdco by another Credit Party;

(b)     a capital contribution made by Holdco to another Credit Party;

(c)     Indebtedness permitted under Section 6.1(1); or

(d)     Asset Dispositions pursuant to Section 2.9(2)(b).

- 51 -

~~For the avoidance of doubt, Unfunded Capital Expenditures shall not include any Capital Expenditures relating to the Warehouse Transition to the extent funded by a Special Cure Contribution.~~

"**Unfunded Investments**" means, with respect to any period, Investments made during such period by the Group Parties (or the relevant portion thereof) that were not funded directly (subject to intercompany funds flow) with the proceeds of:

(a)     the issuance of Equity Securities or Permitted Shareholder Indebtedness to Holdco by another Credit Party;

(b)     a capital contribution made by Holdco to another Credit Party;

(c)     Indebtedness permitted under Section 6.1(1); or

(d)     Asset Dispositions pursuant to Section 2.9(2)(b).

"**Unfunded Permitted Acquisitions**" means, with respect to any period, Permitted Acquisitions made during such period by the Group Parties (or the relevant portion thereof) that were not funded directly (subject to intercompany funds flow) with the proceeds of:

(a)     the issuance of Equity Securities or Permitted Shareholder Indebtedness to Holdco by any other Credit Party; or

(b)     a capital contribution made by Holdco to any other Credit Party;

"**U.S. Bankruptcy Law**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**U.S. Dollars**" and "**U.S.$**" refer to lawful money of the United States of America.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S.$ Amount**" means, on any day, in relation to any Loans or Letters of Credit, the sum of (a) the amount of all such Loans and Letters of Credit that are denominated in U.S. Dollars, and (b) the Equivalent Amount of all such Loans and Letters of Credit that are expressed in Canadian Dollars.

"**Voting Equity Securities**" means, at any time, Equity Securities of a Person entitled, at such time, to vote for the election of directors of such Person.

"~~**Warehouse Transition**~~" ~~means the transition from the Group Parties' existing warehouse facilities in the United States to either the leasing of new warehouse facilities in the United~~

- 52 -

States and/or the establishment of a third-party logistics provider to manage and/or handle the Group Parties' warehousing requirements in the United States.

"**Wholly-Owned Subsidiary**" of a Person means any subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the equity or 100% of the ordinary voting power or 100% of the general partnership or membership interests are, at the time any determination is being made, owned, controlled or held by such Person or one or more subsidiaries of such Person or by such Person and one or more subsidiaries of such Person.

"**Working Capital**" means, at any time, Current Assets minus Current Liabilities, in each case at such time.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described EU Bail-In Legislation Schedule.

"**WURA**" means *Winding Up and Restructuring Act* (Canada).

## 1.2    Classification of Loans and Borrowings.

For purposes of this Agreement, Loans may be classified and referred to by class (e.g., a "Revolving Loan") or by Type (e.g., a "SOFR Loan") or by class and Type (e.g., a "SOFR Revolving Loan").  Borrowings also may be classified and referred to by class (e.g., a "Revolving Borrowing") or by Type (e.g., a "SOFR Borrowing") or by class and Type (e.g., a "SOFR Revolving Borrowing").

## 1.3    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "or" is disjunctive; the word "and" is conjunctive.  The words "to the knowledge of" means, when modifying a representation, warranty or other statement of any Person, that the fact or situation described therein is known by such Person (or, in the case or a Person other than a natural Person, known by the Responsible Officer of such Person) making the representation, warranty or other statement, or with the exercise of reasonable due diligence under the circumstances (in accordance with the standard of what a reasonable Person in similar circumstances would have done) would have been known by such Person (or, in the case of a Person other than a natural Person, would have been known by such Responsible Officer of such Person).  For the purposes of determining compliance with or measuring status under any cap, threshold or basket hereunder denominated in United States Dollars, reference shall be had to the Equivalent Amount of any portion of the underlying component that is not denominated in United States Dollars. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such

1407-5777-6646.13 1407-5777-6646.22

- 53 -

agreement, instrument or other document as from time to time amended, supplemented, restated or replaced (subject to any restrictions on such modifications set out herein), (b) any reference herein to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, restated or re-enacted from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.  Any reference herein to an action, document or other matter or thing being "satisfactory to the Lenders", "to the Lenders' satisfaction" or similar phrases, shall mean that such action, document, matter or thing must be satisfactory to Lenders constituting the Required Lenders, unless it is described in Section 9.2(2) (a)-(j), hereof, in which case it must be satisfactory to each Lender whose consent is required under the applicable clause.

## 1.4    Québec Matters.

For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim", "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the Uniform Commercial Code or a Personal Property Security Act shall include publication under the *Civil Code of Québec,* (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title"

- 54 -

shall be including "holding title on behalf of an owner as mandatary or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies, as applicable, (w) "leasehold interest" shall include "rights resulting from a lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively. The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated thereunder or relating thereto, including notices, may also be drawn up in the English language only. *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

**1.5    Accounting Terms; GAAP.**

Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP. Except as otherwise expressly provided herein, all calculations of the components of the financial information for the purposes of determining compliance with the financial ratios and financial covenants contained herein shall be made on a basis consistent with GAAP in existence as at the Closing Date and used in the preparation of the Consolidated financial statements of Holdco referred to in Section 5.1(1). In the event of a change in GAAP or adoption of IFRS, the Borrower and the Administrative Agent shall negotiate in good faith to revise (if appropriate) such ratios and covenants to give effect to the intention of the parties under this Agreement as at the Closing Date, and any new financial ratio or financial covenant shall be subject to approval by the Required Lenders. Until the successful conclusion of any such negotiation and approval by the Required Lenders, (a) all calculations made for the purpose of determining compliance with the financial ratios and financial covenants contained herein shall be made on a basis consistent with GAAP in existence immediately prior to such adoption or change, and (b) financial statements delivered pursuant to Section 5.1(1) shall be accompanied by a reconciliation showing the adjustments made to calculate such financial ratios and financial covenants. Any financial ratios required to be maintained by Holdco pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed in this Agreement and rounding the result up or down to the nearest number (with a round-up if there is no nearest number) to the number of places by which such ratio is expressed in this Agreement.

**1.6    Time.**

All time references herein shall, unless otherwise specified, be references to local time in Toronto, Ontario. Time is of the essence of this Agreement and the other Loan Documents.

**1.7    Third Party Beneficiaries.**

(1)    Except as set out in clause (2) below, this Agreement and the Security Documents are for the sole benefit of the Parties and nothing in them, express or implied, is intended to or

1407-5777-6646.13 1407-5777-6646.22

- 55 -

shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement or the Security Documents.

(2)     Each Non-Party Beneficiary shall be entitled to enjoy the benefit of those provisions of this Agreement and the Security Documents that, by their terms, are in favour of such Non-Party Beneficiary (including all Liens granted for its benefit as a Secured Party).   In furtherance thereof, each Party (i) accepts such provisions as agent and trustee for its Related Non-Party Beneficiaries, and (ii) shall be entitled to enforce such provisions on behalf of its Related Non-Party Beneficiaries. For the avoidance of doubt, any reference to a Permitted Lien shall not serve to subordinate or postpone any Lien created by any Security Document to such Permitted Lien.

(3)     Notwithstanding clause (2) above or any other term of this Agreement or any Security Document, the consent of any Non-Party Beneficiary or other Person who is not a Party is not required to amend, modify or supplement this Agreement or any Security Document.

## 1.8     Amendment and Restatement

(1)     This Agreement is an amendment and restatement of the Original Credit Agreement and is not a novation of the Original Credit Agreement.  This Agreement reflects amendments to the Original Credit Agreement that have been agreed upon by the parties thereto, and has been restated solely for the purposes of incorporating such amendments in a consolidated format.

(2)     All references to the "Credit Agreement" or similar references to the Original Credit Agreement in any of the other Loan Documents shall mean and be a reference to this Agreement, as it may be amended, supplement, restated or replaced from time to time, without any requirement to amend such Loan Documents.

(3)     All Secured Liabilities under the Original Credit Agreement shall be continuing with only the terms thereof being modified as provided in this Agreement, and this Agreement shall not evidence or result in a novation of such Secured Liabilities.  Specifically, all "Borrowings" outstanding under the "Revolving Credit" and the "Term Credit" under the Original Credit Agreement as at the Closing Date ("**Pre-Existing Borrowings**", which shall include letters of credit and bankers' acceptances) will be deemed to be Borrowings outstanding under the Revolving Credit and the Term Credit, as applicable, and will be subject to the terms of this Agreement.   Interest and fee pricing with respect to Pre-Existing Borrowings and "Commitments" for any period prior to the Closing Date shall be as set out in the Original Credit Agreement.  Interest and fee pricing with respect to Pre-Existing Borrowings from and after the Closing Date shall be as set out in this Agreement;  provided that that no adjustment shall be made with respect to any acceptance fee collected prior to the Closing Date.

(4)     Immediately after the closing on the Closing Date, the Administrative Agent shall make all usual and customary adjustments to ensure that all "Borrowings" under the Original Credit Agreement are outstanding in accordance with the rateable Commitments of each

1407-5777-6646.131407-5777-6646.22

- 56 -

Revolving Credit Lender and Term Credit Lender as revised hereby, and each Revolving Credit Lender and Term Credit Lender agrees to take all actions as are necessary to give effect to such adjustments, including, without limitation, advancing amounts to the Administrative Agent for the benefit of the Original Lenders.

**1.9    Rates.**

The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Canadian Prime Rate, Base Rate, Term CORRA, Daily Compounded CORRA, the Term SOFR Reference Rate, Term SOFR, (each, a "**Subject Rate**") or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as any Subject Rate or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of the Subject Rate, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any Subject Rate or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service, provided that the Administrative Agent shall be liable to the Borrower, any Lender or any other Person for such damages, costs, losses, expenses or error that arise as a result of the Administrative Agent's gross negligence or wilful misconduct.

**ARTICLE 2**
**THE CREDITS**

**2.1    Commitments.**

(1)    *Revolving Credit*. Subject to the terms and conditions set forth herein, each Revolving Credit Lender commits to make Loans in Canadian Dollars or U.S. Dollars (each such Loan made under this Section 2.1(1), a "**Revolving Loan**") to the Borrower from time to time during the period commencing on the Closing Date and ending on the Maturity Date in an aggregate principal amount outstanding up to the amount of such Lender's Revolving Credit Commitment, provided that a Revolving Credit Lender shall not be required to extend further credit hereunder if such extension would result in (a) such Revolving Credit Lender's Revolving Credit Exposure exceeding such Revolving Credit

- 57 -

Lender's Revolving Credit Commitment, or (b) the aggregate Revolving Credit Exposures exceeding the aggregate Revolving Credit Commitments. ~~Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow Revolving Loans.~~

(2) *Term Credit*.  Subject to the terms and conditions set forth herein, each Term Credit Lender commits to make a Loan in U.S. Dollars (each such Loan made under this Section 2.1(2), a "**Term Loan**") to the Borrower by way of a single advance in an aggregate principal amount equal to the amount of such Lender's Term Credit Commitment.  All Term Loans were fully advanced prior to the Closing Date, and Schedule 2.1 reflects the outstanding principal amount thereof.

~~(3)~~    ~~*Additional Commitments*.~~

~~(a)~~    ~~Subject to the terms and conditions hereof, at any time after the Closing Date, provided that no Default or Event of Default has occurred and is continuing and that Holdco is in pro forma compliance with the financial covenants in Section 5.1(12) (assuming the full incurrence and application of the new Indebtedness in question), the Borrower may request that any Lender or any other Persons provide additional Revolving Credit Commitments or Term Credit Commitments (each, an "**Additional Commitment**") which shall serve to increase the Revolving Credit or Term Credit, such that further Revolving Loans or Term Loans become available thereunder upon identical terms and conditions.~~

~~(b)~~    ~~Any Additional Commitment shall be documented pursuant to an Additional Commitment Agreement and executed by the Borrower, the Person providing the Additional Commitment (the "**Additional Lender**") and the Administrative Agent. Upon satisfaction of the conditions precedent set out therein, the Additional Commitment in question shall become effective, and the Administrative Agent shall promptly notify each Lender as to such agreement.~~

~~(c)~~    ~~Notwithstanding anything to the contrary in this Agreement:~~

~~(i)~~    ~~no Additional Commitment shall require the consent of any Lender other than the Additional Lender in question, but each Additional Lender shall (to the extent the approval of the~~ Administrative Agent would be required ~~for an assignment of Revolving Credit Commitments or Term Credit Commitments to such Additional Lender) require the approval of the Administrative Agent, not to be unreasonably withheld;~~

~~(ii)~~    ~~no Lender shall have any obligation to participate in any Additional Commitment unless it agrees to do so in its sole discretion;~~

~~(iii)~~    ~~no Lender shall have the right to acquire any Additional Commitment or receive prior notice thereof, regardless of the fact that its share in the~~

- 58 -

aggregate Revolving Commitments or Term Commitments is reduced thereby;

(iv)    the aggregate amount of all Additional Commitments shall not exceed U.S.$20,000,000;

(v)    the aggregate amount of all Additional Commitments requested at any one time shall not be less than U.S.$5,000,000; and

(vi)    the Borrower may pay such up-front, arrangement or other fees as may be agreed with any Additional Lender in connection with the provision by such Additional Lender of an Additional Commitment.

(d)    For greater certainty, any Additional Lender shall be entitled to share pro rata in any prepayments made by the Borrower pursuant to Section 2.9, and the obligations of the Credit Parties under any such Additional Commitment shall be secured *pari passu* with the other obligations of the Credit Parties under the Loan Documents.

(3)    *[Intentionally Deleted]*

**2.2    Loans and Borrowings.**

(1)    *Loans*. Each Revolving Loan shall be made as part of a Borrowing by the Borrower consisting of Revolving Loans made by the Revolving Credit Lenders rateably based upon their Applicable Percentages. Each Term Loan shall be made as part of a Borrowing by the Borrower consisting of Term Loans made by the Term Credit Lenders rateably based upon their Applicable Percentages. Each Swingline Loan shall be made in accordance with the procedures set forth in Section 2.20. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and (subject to the reallocation provisions of Section 2.21) no Lender shall be responsible for any other Lender's failure to make Loans as required.

(2)    *Composition of Borrowings*. Subject to Section 2.20, each Revolving Borrowing shall be comprised of Canadian Prime Loans, Base Rate Loans, Term CORRA Loans, Daily Compounded CORRA Loans, SOFR Loans or Letters of Credit as the Borrower may request in accordance herewith. Each Term Loan shall be comprised of Base Rate Loans or SOFR Loans as the Borrower may request in accordance herewith. Each Lender may at its option make any SOFR Loan by causing any domestic or foreign branch or Lender Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not result in any increased costs for the Borrower or affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(3)    *Amount of Borrowings*. At the commencement of each Interest Period for any SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of U.S.$1,000,000. At the time that each Canadian Prime Borrowing or Base Rate

- 59 -

Borrowing is made (other than a Swingline Borrowing), such Borrowing shall be in an aggregate amount that is an integral multiple of Cdn.$1,000,000 or U.S.$1,000,000, as the case may be; provided that a Canadian Prime Borrowing or a Base Rate Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total applicable Commitments or that is required to finance the reimbursement of an LC Disbursement. Borrowings of more than one Type and class may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 CORRA Borrowings and 10 SOFR Borrowings outstanding.

**2.3    Requests for Borrowings.**

(1)    *Requesting a Borrowing.* To request a Borrowing (other than a Swingline Loan), the Borrower shall notify the Administrative Agent of such request in writing substantially in the form of Exhibit B (each, a "**Borrowing Request**") (a) in the case of a SOFR Borrowing or CORRA Borrowing, not later than 11:00 a.m. three Business Days before the date of the proposed Borrowing, or (b) in the case of a Canadian Prime Borrowing or a Base Rate Borrowing, not later than 11:00 a.m. time, one Business Day before the date of the proposed Borrowing; provided that any such notice of a Canadian Prime Borrowing or a Base Rate Borrowing to finance the reimbursement of an LC Disbursement shall not be given later than 10:00 a.m. on the date of the proposed Borrowing. Each Borrowing Request shall be irrevocable. The Administrative Agent and each Lender are entitled to rely and act upon any Borrowing Request given or purportedly given by the Borrower, and the Borrower hereby waives the right to dispute the authenticity and validity of any such request or resulting transaction once the Administrative Agent or any Lender has advanced funds, based on such Borrowing Request. Each Borrowing Request shall specify the following information:

(i)    the aggregate amount of each requested Borrowing, and whether such Borrowing will consist of Revolving Loans or Term Loans;

(ii)    in the case of a Borrowing of Revolving Loans, the currency of such requested Borrowing (which shall be Canadian Dollars or U.S. Dollars);

(iii)    the date of such Borrowing, which shall be a Business Day;

(iv)    whether such Borrowing is to be a Canadian Prime Borrowing, a Term CORRA Borrowing, a Daily Compounded CORRA Borrowing, a Base Rate Borrowing, a SOFR Borrowing or a Letter of Credit;

(v)    in the case of a SOFR Borrowing or CORRA Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "**Interest Period**"; and

(vi)    the location and number of the Borrower's account to which funds are to be disbursed, which shall comply herewith.

- 60 -

(2)     *Default Terms*.  If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be a Canadian Prime Borrowing (if denominated in Canadian Dollars) or a Base Rate Borrowing (if denominated in U. S. Dollars).  If no currency is specified with respect to a Borrowing of Revolving Loans, the Borrowing shall be denominated in U.S. Dollars.  If no Interest Period is specified with respect to any requested SOFR Borrowing or CORRA Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with Section 2.3, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

(3)     *Conversion or Rollover of Borrowings*.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request.  Thereafter, the Borrower may elect to convert a Borrowing to a different Type or to rollover such Borrowing and, in the case of a SOFR Borrowing or CORRA Borrowing, may elect a new Interest Period therefor, all as provided in this Section 2.3(3)   .  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated rateably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.  This Section 2.3(3)   shall not apply to Swingline Borrowings, which may not be converted or continued.  To make an election pursuant to this Section 2.3(3), the Borrower shall notify the Administrative Agent of such election by the time that a Borrowing Request would be required under Section 2.3(1) if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such request shall be irrevocable.  In addition to the information specified in Section 2.3(1), each written Borrowing Request shall specify the Borrowing to which such request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing.  Notwithstanding the foregoing, the Borrower is not entitled to elect a new Interest Period in respect of a SOFR Borrowing or CORRA Borrowing, or to convert a Borrowing of any Type into a SOFR Borrowing or a CORRA Borrowing, if a Default has occurred and is continuing.

(4)     *Deemed Election to Convert*.  In the absence of a timely and proper election with regard to (a) SOFR Borrowings, the Borrower shall be deemed to have elected to convert such SOFR Borrowings to Base Rate Borrowings on the last day of the Interest Period of the relevant SOFR Borrowings, and (b) CORRA Borrowings, the Borrower shall be deemed to have elected to convert such CORRA Borrowings to Canadian Prime Borrowings on the last day of the Interest Period of the relevant CORRA Borrowings.

(5)     *[Intentionally Deleted]*.

**2.4     Funding of Borrowings.**

(1)     *Funding*.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, to the

account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; provided that Swingline Loans shall be made as provided in Section 2.20.  The Administrative Agent shall make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent in Toronto and designated by the Borrower in the applicable Borrowing Request; provided that Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.19 shall be remitted by the Administrative Agent to the Issuing Bank.

(2)     *Each Lender's Share of Borrowing.*  Unless the Administrative Agent has received written notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.4(1) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the Administrative Agent shall seek repayment of such corresponding amount, firstly, from the applicable Lender and, secondly, from the Borrower, if the applicable Lender does not immediately repay such corresponding amount.  The applicable Lender agrees to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at the interest rate applicable to Canadian Prime Loans (if the unpaid amount is denominated in Canadian Dollars) or to Base Rate Loans (if the unpaid amount is denominated in U.S. Dollars).  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  If such Lender's share of such amount is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing, the Administrative Agent shall be entitled to recover such amount with interest thereon at the rate per annum applicable to Revolving Loans that are Canadian Prime Loans (if the unpaid amount is denominated in Canadian Dollars) or to Base Rate Loans (if the unpaid amount is denominated in U.S. Dollars), on demand, from the Borrower. Any payment by the Borrower shall be made without prejudice to any claim the Borrower may have against a Defaulting Lender.

**2.5     Interest.**

(1)     *Interest.*  The Loans comprising each Canadian Prime Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days or 366 days, as the case may be) at a rate per annum equal to the Canadian Prime Rate plus the Applicable Margin from time to time in effect.  The Loans comprising each Base Rate Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days or 366 days, as the case may be) at a rate per annum equal to the Base Rate plus the Applicable Margin from time to time in effect.  The Loans comprising each Term CORRA Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days) at a rate per annum

- 62 -

equal to Adjusted Term CORRA plus the Applicable Margin from time to time in effect. The Loans comprising each Daily Compounded CORRA Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days) at a rate per annum equal to Adjusted Daily Compounded CORRA plus the Applicable Margin from time to time in effect. The Loans comprising each SOFR Borrowing shall bear interest (computed on the basis of the actual number of days in the relevant Interest Period over a year of 360 days) at the Adjusted Term SOFR for the Interest Period in effect for such SOFR Borrowing plus the Applicable Margin.

(2)     *Before and After Judgment Interest*.  Notwithstanding the foregoing, if a Default or an Event of Default shall have occurred and be continuing, the Loans shall bear interest:

(a)     subject to Section 2.5(2)(b), at a rate per annum equal to 2% plus the rate otherwise applicable to such Loan or, in the case of any amount not constituting principal or interest on a Loan, at a rate equal to 2% plus the rate otherwise applicable to, in the case of Canadian Dollar amounts, Canadian Prime Loans, or in the case of U.S. Dollar amounts, Base Rate Loans;

(b)     if (i) a Security Document creates a mortgage on real property or a hypothec on immovables, or (ii) the rate provided for in Section 2.5(2)(a) is otherwise determined to be unenforceable, then, in either case, at a rate per annum equal to the rate otherwise applicable to such Loan or, in the case of any amount not constituting principal or interest on a Loan, at a rate equal to the rate otherwise applicable to, in the case of Canadian Dollar amounts, Canadian Prime Loans, or in the case of U.S. Dollar amounts, Base Rate Loans;

provided that, without limiting the effect of Section 2.5(2)(b)(ii), nothing in Section 2.5(2)(b)(ii) shall preclude the operation of Section 2.5(2) where:

(c)     a Security Document that creates a mortgage on real property or a hypothec on immovables also creates a Lien on other property and assets; or

(d)     the principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is also secured by a Lien other than a mortgage on real property or a hypothec on immovables.

(3)     *Accrued Interest*.  Accrued interest on each Loan shall be payable in arrears on (a) each applicable Interest Payment Date and (b) ~~in~~upon the ~~case of Revolving Loans, upon~~Maturity Date or any other termination of the Commitments; provided that additional interest payable pursuant to Section 2.5(2) shall be payable only upon the Maturity Date or other termination of the ~~Revolving Credit~~ Commitments.  In addition, in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment. Interest on overdue amounts shall be payable upon demand.

(4)     *Days Interest Payable*.  All interest hereunder shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  Any Loan that is repaid

- 63 -

on the same day on which it is made shall bear interest for one day. The applicable Canadian Prime Rate, Base Rate, Adjusted Term CORRA, Adjusted Daily Compounded CORRA and Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(5)     *Yearly Rate of Interest.*

    (a)     For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable. The rates of interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

    (b)     The Borrower acknowledges and confirms that:

        (i)     clause (a) above satisfies the requirements of Section 4 of the *Interest Act* (Canada) to the extent it applies to the expression or statement of any interest payable under any Loan Document; and

        (ii)     each Credit Party is able to calculate the yearly rate or percentage of interest payable under any Loan Document based upon the methodology set out in clause (a) above.

(6)     *Criminal Interest.* If any provision of this Agreement would oblige the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by applicable Law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code* (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

    (a)     first, by reducing the amount or rate of interest to be paid to the affected Lender under Section 2.5; and

    (b)     thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the *Criminal Code* (Canada).

(7)     *Reconciliation for Additional Interest and Fees.* Notwithstanding anything to the contrary contained in this Agreement, if, as a result of any restatement or other adjustment to the financial statements delivered under this Agreement (including any

- 64 -

adjustment to unaudited financial statements as a result of subsequent audited financial statements) or for any other reason, the Borrower or the Lenders determine that the Total Leverage Ratio as of any applicable date was inaccurate and, as a result of such occurrence the Applicable Margins applicable to any Loans or any fees for any period were lower or higher than would otherwise be the case, then (a) in the case where the Applicable Margins were lower, the Borrower shall immediately and retroactively be obligated to pay to the Administrative Agent for the account of the applicable Lenders, promptly on demand by the Administrative Agent (or, if an Event of Default pursuant to Sections 7.1 (f) and (g) shall have occurred and be continuing, automatically and without further action by the Administrative Agent), an amount equal to the excess of the amount of interest and fees that should have been paid by the Borrower for such period over the amount of interest and fees actually paid by the Borrower for such period, plus interest on such amount at the rate otherwise applicable herein and (b) in the case where the Applicable Margins were higher, the Lenders shall be obligated to pay to the Borrower, promptly on demand by the Borrower) an amount equal to the excess of the amount of interest and fees actually paid by the Borrower for such period over the amount of interest and fees that should have been paid by the Borrower for such period, plus interest on such amount at the Base Rate (if such Loans are denominated in U.S. Dollars) or the Canadian Prime Rate (if such Loans are denominated in Canadian Dollars). The Borrower's obligations under this Section 2.5(7) shall survive the termination of the Commitments and the repayment of all Indebtedness hereunder.

**2.6**    **Termination and Reduction of Commitments.**

(1)    *Maturity Dates.*  Unless previously terminated, the Revolving Credit Commitments shall terminate on the Maturity Date.

(2)    *Cancellation of Unused Credit.*  (a) The Borrower may, upon three Business Days prior written notice to the Administrative Agent, permanently cancel any unused portion of the Revolving Credit, without penalty.  The Administrative Agent shall promptly notify each Revolving Credit Lender of the receipt by the Administrative Agent of any such notice. Any such cancellation shall be applied rateably in respect of the Revolving Credit Commitments of each Revolving Credit Lender.  Each notice delivered by the Borrower pursuant to this Section 2.6(2) shall be irrevocable; <u>provided</u> that each such notice may state that such notice is conditioned upon the effectiveness of other credit facilities, incurrence of other Indebtedness or consummation of another transaction (such as a Change in Control), in which case (but subject to Section 2.14) such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(b) The Borrower may, upon three Business Days prior written notice to the Administrative Agent, permanently cancel any unused portion of the Term Credit Commitments, without penalty.  The Administrative Agent shall promptly notify each Term Credit Lender of the receipt by the Administrative Agent of any such notice.  Any such cancellation shall be applied rateably in respect of the Term Credit Commitments of each Term Credit Lender.  Each notice delivered by the Borrower pursuant to this Section

- 65 -

2.6(2) shall be irrevocable; provided that each such notice may state that such notice is conditioned upon the effectiveness of other credit facilities, incurrence of other Indebtedness or consummation of another transaction (such as a Change in Control), in which case (but subject to Section 2.14) such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**2.7    Repayment of Loans.**

(1)    *Repayment of Revolving Credit.*  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Revolving Credit Lenders the outstanding principal amount of the Revolving Loans on the Maturity Date; provided that on each date that a Revolving Borrowing is made, the Borrower shall repay all Swingline Loans then outstanding.

(2)    *Repayment of Term Credit.*  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Term Credit Lenders the outstanding principal amount of the Term Loans in instalments in the amounts and on the dates set forth below (in each case as reduced by the application of any prepayments made pursuant to Section 2.9) with such payments to be applied on a pro rata basis to the Term Loans of each Term Credit Lender based upon its Applicable Percentage at the time of such payment:

| Date | Amount* |
|---|---|
| On March 31, 2025 and June 30, 2025. | $250,000 |
| On ~~June 30, 2024,~~ September 30, ~~2024, and December 31, 2024~~2025. | $~~0~~500,000 |
| ~~On the Termination Event Date if prior to December 31, 2024.~~ | ~~U.S$6,619,654.94~~ |
| On ~~the Termination Event Date if from and after~~ December 31, ~~2024~~2025. | ~~U.S.$9,929,482.42~~$1,500,000 |
| On the Maturity Date. | The remaining unpaid amount of the Term Loans. |

* subject always to Section 2.9(2)

For the avoidance of doubt, the failure of the Borrower to make a principal payment of U.S.$3,276,494.14 on June 30, 2024 is no longer an Event of Default.

- 66 -

**2.8**    **Evidence of Debt.**

(1)    *Accounts of Indebtedness.*  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Borrowing made by such Lender hereunder, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(2)    *Account Details.*  The Administrative Agent shall maintain accounts in which it shall record (a) the amount of each Borrowing made hereunder, the class and Type thereof and, in the cases of SOFR Loans and CORRA Loans, the relevant Interest Period, applicable thereto, (b) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (c) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

*Accounts Conclusive.*  The entries made in the accounts maintained pursuant to Sections 2.8(1) and (2) shall be conclusive evidence (absent manifest error) of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Borrowings in accordance with the terms of this Agreement.  In the event of a conflict between the records maintained by the Administrative Agent and any Lender, the records maintained by the Administrative Agent shall govern.

(3)    *Promissory Notes.*  Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.4) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**2.9**    **Prepayments.**

(1)    *Currency Fluctuations.*  If at any time the Revolving Credit Exposure of any Lender exceeds its Revolving Credit Commitment as notified to the Borrower by the Administrative Agent (any such excess being referred to in this Section 2.9(1) as a "**Currency Excess Amount**"), then the Borrower shall pay to the Administrative Agent, for the account of such Lender, an amount equal to the Currency Excess Amount with respect to such Lender to be applied (a) as a prepayment of the Loans and Reimbursement Obligations outstanding to such Lender, and (b) thereafter as LC Cover to such Lender for its LC Exposure under the Revolving Credit in an amount of such remaining Currency Excess Amount. If any Currency Excess Amount with respect to any

- 67 -

Lender is equal to or greater than 3% of the Revolving Credit Commitment of such Lender, then the repayment of the Currency Excess Amount to such Lender shall be made by the Borrower no later than the third Business Day after the Administrative Agent requests such repayment. If any Currency Excess Amount with respect to any Lender is less than 3% of the Revolving Credit Commitment of such Lender, then the repayment of the Currency Excess Amount to such Lender shall be made no later than the third Business Day after the next Quarterly Date. The Administrative Agent shall request repayment of any Currency Excess Amount forthwith upon request therefor by any Lender, but neither the Administrative Agent nor the Borrower is otherwise required to monitor Currency Excess Amount levels and absent any such request, the Administrative Agent is not required to request repayment thereof and the Borrower is not required to make repayment thereof.

(2)    *Mandatory Loan Prepayments.*

   (a)    On the last day of each Fiscal Quarter, commencing with the Fiscal Quarter ending September 30, 2024 (which payments shall, for the avoidance of doubt but without limitation, be in addition to those set out in Section 2.7(2)) the Borrower shall prepay an aggregate principal amount of Term Loans of U.S.$250,000 as a minimum sweep.  Within 15 days after the delivery of the financial statements under Section 5.1(1)(b) in respect of each Fiscal Quarter, commencing with the Fiscal Quarter ended September 30, 2024, the Borrower shall (x) deliver to the Administrative Agent a certificate signed by a Responsible Officer of the Borrower, setting out in reasonable detail the calculation of Excess Cash Flow Available for such Fiscal Quarter, and (y) prepay an aggregate principal amount of Term Loans equal to the amount, if any, by which Excess Cash Flow Available for such Fiscal Quarter exceeds U.S.$250,000.  Such prepayments under this Section 2.9(2)(a) may be reduced in the sole discretion of the Administrative Agent (on behalf of the Lenders).

   (b)    In the event of an Asset Disposition by any Credit Party, the Borrower shall, within five Business Days of such Asset Disposition, prepay (by payment to the Administrative Agent for the account of the Lenders) an aggregate principal amount of Loans equal to the amount of Net Proceeds; provided that this prepayment requirement shall not apply:

      (i)    to that portion of Net Proceeds which, when aggregated with the Net Proceeds from any other Asset Disposition made in the same Fiscal Year in respect of which payment has not been made pursuant to Section 2.9(2), is less than U.S.$3,000,000; or

      (ii)    to that portion of such Net Proceeds used by a Credit Party to acquire or repair assets useful in a Credit Party's business within 365 days of such Asset Disposition (or 548 days where a binding commitment to purchase or repair such assets is entered into within 365 days of such Asset Disposition) if, within two Business Days of such Asset Disposition, the

- 68 -

Borrower has notified the Administrative Agent of its intention to apply the Net Proceeds in such manner.

(c)     The Borrower shall, within five Business Days of receipt of the net proceeds from any Cure Contribution or an initial public offering of any Credit Party, prepay (by payment to the Administrative Agent for the account of the Lenders) an aggregate principal amount of Loans equal to 100% of the net proceeds therefrom.

(d)     Prepayments of the Loans pursuant to Section 2.9(2)(b) and (c) shall be applied (i) first, to the permanent prepayment of the Amortization Payments required to be made in respect of the Term Credit, in inverse order of maturity, and (ii) second, to the prepayment of amounts outstanding under the Revolving Credit and, in the case of prepayments made pursuant to  Section 2.9(2)(c), the permanent cancellation of a corresponding portion of the Revolving Credit.  In the case of any prepayment pursuant to any of Sections 2.9(2) (a), (b) or (c), the Borrower shall, to the extent practicable, provide to the Administrative Agent written notice of such prepayment at least three Business Days prior to the date such prepayment is to be made; provided that any failure to do so shall not relieve the Borrower of the prepayment obligation in question.

(3)     *Voluntary Prepayments*.  The Borrower may, at its option, at any time and from time to time, prepay the Term Loans, in whole or in part, without premium or penalty (subject to Section 2.14), upon giving three Business Days' prior written notice to the Administrative Agent. The Borrower may, at its option, at any time and from time to time, prepay the Revolving Loans or Swingline Loans, in whole or in part, without premium or penalty (subject to Section 2.14), upon giving three Business Days' prior written notice to the Administrative Agent, provided that no such notice shall be required with respect to any Swingline Loan.  Each such notice shall specify the date and amount of prepayment, whether the Loans to be prepaid are Term Loans or Revolving Loans and whether the prepayment is of Canadian Prime Loans, Base Rate Loans, Term CORRA Loans, Daily Compounded CORRA Loans, SOFR Loans, or any combination thereof, and, in each case if a combination thereof, the principal amount allocable to each.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein.  Prepayment of the Term Loans pursuant to this Section 2.9(3) shall be applied against the Amortization Payments in the inverse order of maturity unless the Total Leverage Ratio, after giving effect to such prepayment, is less than 2.50:1.00, in which case such prepayment shall be applied against the Amortization Payments in the order directed by the Borrower.  Each partial voluntary prepayment of any Canadian Dollar-denominated Loan shall be in a minimum principal amount of Cdn.$1,000,000 and in an integral multiple of Cdn.$1,000,000, and each partial voluntary prepayment of any U.S. Dollar-denominated Loan shall be in a minimum principal amount of U.S.$1,000,000 and in an integral multiple of U.S.$1,000,000.  No such prepayment of a Term Loan may be reborrowed.

(4)     *Notice by Borrower*.  Each notice provided by the Borrower hereunder in respect of any prepayment hereunder shall be irrevocable and shall specify the prepayment date and the

- 69 -

principal amount of each Borrowing or portion thereof to be prepaid; provided that each such notice may state that such notice is conditioned upon the effectiveness of other credit facilities, incurrence of other Indebtedness or consummation of another transaction (such as a Change in Control), in which case (subject to Section 2.14) such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(5)     *Notice by Administrative Agent.*  Upon receipt of a notice of prepayment pursuant to Section 2.9, the Administrative Agent shall promptly notify each Applicable Lender of the contents thereof and of such Lender's share of such prepayment based upon its Applicable Percentage

(6)     *General.*  Any amount required to be prepaid on a date pursuant to Section 2.9 shall be due and payable together with any amount payable pursuant to Section 2.14 and accrued interest to such date on such amount in accordance with Section 2.5(3).  Any prepayment pursuant to Sections 2.9(1) or (2) shall be applied within a Credit in the manner designated by the Borrower.  No prepayment of any <u>Revolving Loan or</u> Term Loan may be reborrowed.

**2.10    Fees.**

(1)     *Standby Fees.*

    (a)     The Borrower shall pay to the Administrative Agent for the account of and distribution to each Revolving Credit Lender a standby fee for the period commencing on the Closing Date to and excluding the Maturity Date (or such earlier date as the Revolving Credit Commitments shall have been terminated entirely) computed at a rate per annum equal to the Applicable Margin on the daily excess amount of the Revolving Credit Commitment of such Revolving Credit Lender over its Revolving Credit Exposure.   Such standby fee shall be payable in arrears in respect of the most recently ended Fiscal Quarter on the third Business Day following each Quarterly Date, commencing on the third Business Day after the first Quarterly Date to occur after the Closing Date, and on the date on which the Revolving Credit Commitments terminate.

    (b)     [Reserved].

    (c)     [Reserved].

    (d)     The standby fees set out in this section 2.10(1) shall be computed daily on the basis of a year of 365 or 366 days, as the case may be, and shall be payable for the actual number of days elapsed (with respect to the standby fee, including the first day of the applicable Fiscal Quarter (or, in respect of the first such payment, the Closing Date) and including the last day of the applicable period).

(1)     *[Intentionally Deleted]*

1407-5777-6646.13<u>1407-5777-6646.22</u>

- 70 -

(2)     *Participation and Fronting Fees.*  The Borrower shall pay:

    (a)     to the Administrative Agent for the account of each Revolving Credit Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the Applicable Margin for Letters of Credit of such Type on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Revolving Credit Commitment terminates and the date on which such Lender ceases to have any LC Exposure; and

    (b)     to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.25% per annum on the daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements and that portion attributable to the LC Issuer) during the period from and including the Closing Date to but excluding the later of the date of termination of the Revolving Credit Commitments and the date on which there ceases to be any LC Exposure, as well as the Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.

Participation fees and fronting fees shall be (a) payable quarterly in arrears in respect of the most recently ended Fiscal Quarter on the third Business Day following each Quarterly Date and on the date on which the Revolving Credit Commitments terminate, and (b) computed daily on the basis of a year of 365 days or 366 days, as the case may be, and shall be payable for the actual number of days elapsed (including the first day of the applicable Fiscal Quarter (or, in respect of the first such payment, the Closing Date) and including the last day of the applicable period). Participation and fronting fees accruing after the date on which the Revolving Credit Commitments terminate shall be payable on demand.

(3)     *Fees to Administrative Agent.*  The Borrower shall pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in the Fee Letter.

(4)     *Payment of Fees.*  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent (or to the Issuing Bank, in the case of fees payable to it) for distribution, in the case of standby and participation fees, to the Lenders. Fees paid shall not be refundable except in the case of manifest error in the calculation of any fee payment.

**2.11    Inability to Determine Rates.**

(1)     Subject to Section 2.12, if, on or prior to the first day of any Interest Period for any SOFR Loan, Term CORRA Loan or Daily Compounded CORRA Loan, as applicable:

    (a)     the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term CORRA", "Adjusted Daily Compounded CORRA", or "Adjusted Term SOFR", as applicable, cannot

1407-5777-6646.13 1407-5777-6646.22

- 71 -

be determined pursuant to the definition thereof, for reasons other than a Benchmark Transition Event, or

(b)     the Required Lenders determine that for any reason in connection with any request for a Term CORRA Loan, Daily Compounded CORRA Loan or SOFR Loan, as applicable, or a conversion thereto or a continuation thereof, that Adjusted Term CORRA, Adjusted Daily Compounded CORRA or Adjusted Term SOFR, as applicable, for any requested Interest Period with respect to a proposed Term CORRA Loan, Daily Compounded CORRA Loan or SOFR Loan, as applicable, does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

the Administrative Agent will promptly so notify the Borrower and each Lender.

(2)     Upon delivery of such notice by the Administrative Agent to the Borrower under Section 2.11(1), any obligation of the Lenders to make Term CORRA Loans, Daily Compounded CORRA Loans or SOFR Loans, as applicable, and any right of the Borrower to continue Term CORRA Loans, Daily Compounded CORRA Loans or SOFR Loans, as applicable, or to convert Canadian Prime Loans to Term CORRA Loans or Daily Compounded CORRA Loans or to convert Base Rate Loans to SOFR Loans, as applicable, shall be suspended (to the extent of the affected Term CORRA Loans, Daily Compounded CORRA Loans or SOFR Loans, as applicable, or affected Interest Periods) until the Administrative Agent (with respect to clause (b), at the instruction of the Required Lenders) revokes such notice.

(3)     Upon receipt of such notice by the Administrative Agent to the Borrower under Section 2.11(1),

(a)     the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term CORRA Loans, Daily Compounded CORRA Loans or SOFR Loans, as applicable, (to the extent of the affected Term CORRA Loans, Daily Compounded CORRA Loans or SOFR Loans, as applicable, or affected Interest Periods);

(b)     in respect of Term CORRA Loans, the Borrower may elect to convert any such request into a request for a Borrowing of or conversion to Daily Compounded CORRA Loans;

(c)     in respect of Term CORRA Loans, the Borrower may elect to convert any outstanding affected Term CORRA Loans at the end of the applicable interest Period, into Daily Compounded CORRA Loans;

(d)     subject to (a) and (b), the Borrower will be deemed to have converted any such request (i) for Term CORRA Loans or Daily Compounded CORRA Loans into a request for a Borrowing of or conversion to Canadian Prime Loans, and (ii) for

- 72 -

SOFR Loans into a request for a Borrower of or conversion to Base Rate Loans, in each case in the amount specified therein;

(e)     subject to (c), any outstanding affected (i) Term CORRA Loans or Daily Compounded CORRA Loans, as applicable, will be deemed to have been converted, at the end of the applicable Interest Period, into Canadian Prime Loans, and (ii) SOFR Loans will be deemed to have been converted, at the end of the applicable Interest Period, into Base Rate Loans, in each case at the end of the applicable Interest Period.

Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.14.

(4)     Subject to Section 2.12(1), if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Base Rate Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate" until the Administrative Agent revokes such determination.

(5)     Subject to Section 2.12(2), if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term CORA" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Canadian Prime Loans shall be determined by the Administrative Agent without reference to clause (b) of the definition of "Canadian Prime Rate" until the Administrative Agent revokes such determination.

## 2.12    Rate Fallbacks.

(1)     *Term SOFR Fallback.*

(a)     *Benchmark Replacement.*  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (i) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (ii) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to,

- 73 -

or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis. A Hedge Arrangement shall be deemed not to be a "Loan Document" for the purposes of this Section 2.12(1).

(b)    *Conforming Changes*.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    *Notices; Standards for Decisions and Determinations*.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (i) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.12(1)(d) and (ii) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.12(1), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section (1).

(d)    *Unavailability of Tenor of Benchmark*.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i)

- 74 -

above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    *Benchmark Unavailability Period*.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

(f)    *Defined Terms*.  As used in this Section 2.12(1) or otherwise with respect to Term SOFR Reference Rate:

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.12(1)(d).

"**Benchmark**" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.12(1)(a).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

- 75 -

(a)     the sum of (i) Daily Simple SOFR and (ii) 0.10% (10 basis points); and

(b)     the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for U.S. Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. Dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) determined and announced by the regulatory

- 76 -

supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate,  any Available Tenor of such Benchmark (or such component thereof); or

- 77 -

(c)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12(1) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section  2.12(1).

"**Conforming Changes**" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Daily Simple SOFR**" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that

| 1407-5777-6646.131407-5777-6646.22

- 78 -

any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"**Relevant Governmental Body**" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

(2)    *CORRA Fallback.*

(a)    *Benchmark Replacement*. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (Toronto time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Adjusted Daily Compounded CORRA, all interest payments will be payable on the last day of each Interest Period.  No Secured Hedge Arrangement shall be deemed to be a "Loan Document" for purposes of this Section 2.12(2).

(b)    *Benchmark Replacement Conforming Changes*. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

- 79 -

(c) *Notices*; *Standards for Decisions and Determinations*. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.12(2)(d) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.12(2) including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.12(2).

(d) *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term CORRA) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e) *Benchmark Unavailability Period*. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Loans, which are of the Type that have a rate of interest determined by reference to the then-current Benchmark, to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to, (i) for a Benchmark Unavailability Period in respect of Term CORRA, Daily Compounded CORRA Loans, and (ii) for a Benchmark

- 80 -

Unavailability Period in respect of a Benchmark other than Term CORRA, Canadian Prime Loans.

(f)    *Definitions.* As used in this Section 2.12(2) or otherwise with respect to CORRA:

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.12(2)(d).

"**Benchmark**" means, initially, the Term CORRA Reference Rate or Daily Compounded CORRA, as the case may be; provided that if a Benchmark Transition Event has occurred with respect to the Term CORRA Reference Rate, Daily Compounded CORRA, or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.12(2)(a).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event:

(a)    where a Benchmark Transition Event has occurred with respect to Term CORRA Reference Rate, Daily Compounded CORRA; and;

(b)    where a Benchmark Transition Event has occurred with respect to a Benchmark other than the Term CORRA Reference Rate, the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

- 81 -

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Canadian Dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

- 82 -

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Bank of Canada, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12(2) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12(2).

"**Conforming Changes**" means, with respect to the use or administration of a Benchmark or the use, administration, adoption or implementation of any

- 83 -

Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Canadian Prime Rate," the definition of "Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of Borrowing Requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Relevant Governmental Body**" means the Bank of Canada, or a committee officially endorsed or convened by the Bank of Canada, or any successor thereto.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

**2.13   Increased Costs; Illegality.**

(1)   *Compensation for Increased Costs.*  If any Change in Law shall:

   (a)   impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

   (b)   impose on any Lender or the Issuing Bank or the London interbank market any other condition affecting this Agreement (including the imposition on any Lender of, or any change to, any Indemnified Tax or other charge with respect to its Loans or any Letter of Credit or participation therein, or its obligation to make Loans or issue or participate in any Letter of Credit); or

   (c)   impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement, Term CORRA Loans, Daily Compounded CORRA Loans or SOFR Loans, as applicable, made by such Lender;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrower shall pay to such

1407-5777-6646.13 1407-5777-6646.22

- 84 -

Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(2)    *Compensation for Reduced Rate of Return.*  If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's holding company or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital or liquidity adequacy and such Lender's desired return on capital), then from time to time the Borrower shall pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered. Notwithstanding anything herein to the contrary, (a) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, and Basel Committee on Banking Supervision (or any successor or similar authority) or by United States, Canadian or foreign regulatory authorities, in each case pursuant to Basel III, and (b) the *Dodd-Frank Wall Street Reform and Consumer Protection Act* (United States) and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a Change in Law for purposes of this Section 2.13(2) regardless of the date enacted, adopted, issued or implemented.

(3)    *Certificate.*  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender as specified in Sections 2.13(1) or (2), together with a brief description of the Change in Law, shall be delivered to the Borrower by such Lender, and shall be conclusive absent manifest error.  In preparing such certificate, a Lender shall be entitled to use averages and to make reasonable estimates, and shall not be required to "match contracts" or to isolate particular transactions. The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof. Notwithstanding anything to the contrary in this Section 2.13, (a) no Lender shall be entitled to receive any compensation pursuant to this Section 2.13 unless it shall be the general policy or practice of such Lender to seek compensation from other similarly situated borrowers in the Canadian syndicated loan market with respect to its similarly affected loans under agreements with the Borrower having provisions similar to this Section 2.13 and (b) the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect.

(4)    *Illegality.*  If any Lender determines that it is unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make or maintain any Loan (or to maintain its obligation to make any Loan), or to participate in, issue

- 85 -

or maintain any Letter of Credit (or to maintain its obligation to participate in or to issue any Letter of Credit), or to determine or charge interest rates based upon any particular rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender with respect to the activity that is unlawful shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. For the avoidance of doubt, such suspension shall occur notwithstanding that the activity in question was unlawful on the Closing Date. Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay (or, if conversion would avoid the activity that is unlawful, convert) any Loans, or take any necessary steps with respect to any Letter of Credit in order to avoid the activity that is unlawful. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted. Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

**2.14    Break Funding Payments.**

In the event of (a) the failure by the Borrower to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered by the Borrower pursuant hereto, (b) the payment or conversion of any CORRA Loan or SOFR Loan other than on the last day of an Interest Period (including as a result of an Event of Default), or (c) the assignment of any Loan (including the assignment of any CORRA Loan or SOFR Loan) other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.18, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a SOFR Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest (excluding the Applicable Margin) which would have accrued on the principal amount of such Loan had such event not occurred, at the applicable Subject Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period and the interest rate which such Lender would bid were it to bid, at the commencement of such period, for U.S. Dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.14 shall be delivered to the Borrower by such Lender and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

**2.15    Taxes.**

(1)    *Gross-up for Taxes.* Any and all payments by or on account of any obligation of the Borrower hereunder or under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes except as required by applicable Laws; provided that if the Borrower or the applicable withholding agent shall be required to deduct or withhold any

- 86 -

Taxes from such payments, then (a) in the case of Indemnified Taxes, the sum payable shall be increased as necessary so that, after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under Section 2.15), the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deduction or withholding been made, (b) the Borrower or the applicable withholding agent shall make such required deduction or withholding, and (c) the Borrower or the applicable withholding agent shall pay to the relevant Governmental Authority the full amount deducted or withheld in accordance with, and within the time limits prescribed by, applicable Law.

(2)    *Stamp and Other Taxes*.  In addition to the payments by the Borrower required by Section 2.15(1), the Borrower shall pay any and all present or future stamp or documentary Taxes or any other similar excise or property Taxes, charges or levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement to the relevant Governmental Authority in accordance with applicable Law.

(3)    *Indemnity for Taxes*.  The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under Section 2.15(5)) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(4)    *Evidence of Tax Payments*.  As soon as practicable after any payment of Indemnified Taxes described in Section 2.15(1) or (2) by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(5)    *Certification*.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower, at the time or times reasonably requested in writing by the Borrower, such properly completed and executed documentation reasonably requested in writing by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested in writing by the Borrower, shall deliver such other documentation prescribed by applicable Law (which, for purposes of this

- 87 -

Section 2.15, shall include FATCA) or reasonably requested in writing by the Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements, provided that notwithstanding any of the foregoing in this Section 2.15(5), no Lender shall be required to provide any documentation or information of any kind which it is not permitted to provide under applicable Law.

(ii)     If a payment made to a Lender under any Loan would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall, in each case, to the extent it is legally entitled to do so, deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.15(5)(ii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(6)     *Treatment of Certain Refunds*.  If any Lender determines in its sole discretion that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.15, it shall pay to the Borrower as promptly as reasonably practicable an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.15 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of such Lender and applicable withholdings and other deductions, as the case may be, and without interest (other than any net after-Tax interest paid by the relevant Governmental Authority with respect to such refund); provided, however, that the Borrower, upon the written request of such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.15(6), in no event will any Lender be required to pay any amount to the Borrower pursuant to this Section 2.15(6) the payment of which would place the Lender in a less favourable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  Nothing in this Section 2.15(6) shall require any Lender to make available its tax returns or any other information that it deems to be confidential or to arrange its affairs in any particular manner.

- 88 -

**2.16    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.**

(1)    *Payments.*  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, amounts payable under any indemnity contained herein, or otherwise hereunder) prior to 12:00 noon, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at the Payment Office, except that payments pursuant to Sections 2.10(2)(b), 2.13, 2.14, 2.15 and 9.3 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension, provided that, in the case of any payment with respect to a SOFR Loan or CORRA Loan, the date for payment shall be advanced to the next preceding Business Day if the next succeeding Business Day is in a subsequent calendar month.  All payments under Section 2.16 in respect of SOFR Loans and Base Rate Loans and in respect of U.S. Dollar denominated LCs shall be made in U.S. Dollars.  All other payments under Section 2.16 shall be made in U.S. Dollars.  The Borrower hereby authorizes the Administrative Agent to debit the general operating bank account of the Borrower which is maintained with the Administrative Agent to effect any payment due to the Lenders or the Administrative Agent pursuant to this Agreement.

(2)    *Allocation of Insufficient Funds.*  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (a) first, towards payment of interest and fees then due hereunder, rateably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (b) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, rateably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(3)    *Allocation of Funds in Event of Default.*  If an Event of Default shall have occurred and be continuing, and the maturity of the Loans shall have been accelerated pursuant to Section 7.1, all payments or proceeds received by the Administrative Agent hereunder or under any other Transaction Document in respect of any of the Secured Liabilities (including, but not limited to, Secured Cash Management Obligations and Secured Hedge Arrangements that are owing to any Secured Cash Management Provider or Secured Hedge Counterparty, as applicable), including, but not limited to all proceeds received by the Administrative Agent in respect of any sale of, any collection from, or other realization upon, all or any part of the Collateral, shall be applied as follows:

- 89 -

    (a)      first, to the payment of all reasonable and documented costs and expenses of such sale, collection or other realization, including reasonable and documented compensation to the Administrative Agent and its agents and outside counsel, and all other reasonable and documented expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith, and all amounts for which the Administrative Agent is entitled to indemnification hereunder or under any other Loan Document (in its capacity as Administrative Agent and not as a Lender), and to the payment of all reasonable and documented costs and expenses paid or incurred by the Administrative Agent in connection with the exercise of any right or remedy hereunder or under any other Loan Document, all in accordance with the terms hereof or thereof;

    (b)      second, to the extent of any excess of such payments or proceeds, to the rateable payment of any accrued interest, fee or commission due but unpaid under this Agreement;

    (c)      third, to the extent of any excess of such payments or proceeds, to the rateable payment of the Loans, Cover for Letters of Credit, the Secured Hedge Obligations and the Secured Cash Management Obligations;

    (d)      fourth, to the extent of any excess of such payments or proceeds, to the payment of any other amount due but unpaid under the Transaction Documents; and

    (e)      fifth, to the extent of any excess of such payments or proceeds, to the payment to or upon the order of the Borrower or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

Notwithstanding the foregoing, in no event shall payments or proceeds received from a Guarantor or in respect of its Collateral be applied against Excluded Swap Obligations of such Guarantor.

(4)     *Sharing.*  If any Secured Party shall obtain payment in respect of any of its Secured Liabilities (including by way of set-off or counterclaim) resulting in such Secured Party receiving payment of a greater proportion of the aggregate amount of its Secured Liabilities than the proportion received by any other Secured Party on its Secured Liabilities, then the Secured Party receiving such greater proportion shall purchase (for cash at face value) participations in the Secured Liabilities owed to other Secured Parties (as applicable) to the extent necessary so that the benefit of all such payments shall be shared by the Secured Parties rateably in accordance with the aggregate amount of their respective Secured Liabilities; provided that (a) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (b) this Section 2.16(4) shall not apply to:

          (i)      any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement;

(ii)     any payment obtained by a Lender as consideration for the assignment of, or sale of a participation in, any of its Loans (including participations in LC Disbursements and Swingline Loans);

(iii)    any payment made by the Borrower under or in connection with any Secured Cash Management Services when no Event of Default has occurred and is continuing;

(iv)    netting under or as between Secured Hedge Arrangements; and

(v)     any Permitted Hedge Payment.

The Borrower hereby consents to the foregoing and agrees, to the extent it effectively does so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower's right of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(5)     *Assumption of Payment; Reimbursement of Agent.*  Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the applicable rate for Revolving Loans that are Canadian Prime Loans (if such amount is denominated in Canadian Dollars) or the applicable rate for Base Rate Loans (if such amount is denominated in U.S. Dollars).

(6)     *Failure of Lender to Make Payment.*  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.16(5), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section 2.16(5) until all such unsatisfied obligations are fully paid.

(7)     *No Deemed Obligation for Source of Funds.*  Nothing in this Agreement shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner

**2.17    Currency Indemnity.**

If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular

- 91 -

currency (the "**Judgment Currency**") any amount  due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given.  For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office in Toronto, Ontario.  In the event that there is a change in the rate of exchange prevailing between the Business Day immediately preceding the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrower shall, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due.  If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrower shall indemnify and save the Administrative Agent and the Lenders harmless from and against all loss or damage arising as a result of such deficiency.  This indemnity shall constitute an obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

**2.18    Mitigation Obligations; Replacement of Lenders.**

(1)     *Mitigation.*  If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Lender Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future, and (b) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The Borrower shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(2)     *Replacement of Lender.*  If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense (including the processing and recording fee contemplated by Section 9.4(2)) and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.4), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment);

- 92 -

provided that (a) if such assignee is not otherwise a Lender, the Borrower shall have received the prior written consent of the Administrative Agent (and, if a Revolving Credit Commitment is being assigned, the Issuing Bank and Swingline Lender), which consent shall not unreasonably be withheld, (b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and (c) in the case of any such assignment resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this Section 2.18(2) may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee, and that the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective.

## 2.19    Letters of Credit.

(1)    *General*.  Subject to the terms and conditions set out herein, the Borrower may request the issuance of Letters of Credit as an availment of the Revolving Credit Commitment, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time up to the Maturity Date.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall govern.

(2)    *Notice of Issuance, Amendment, Renewal, Extension, Certain Conditions*.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (at least five Business Days in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension, the date on which such Letter of Credit is to expire (which shall comply with Section 2.19(3)), the amount and currency (Canadian Dollars and U.S. Dollars only) of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.  If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit, the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal

- 93 -

or extension, (a) the aggregate LC Exposure shall not exceed U.S.$5,000,000, and (b) the aggregate Revolving Credit Exposure shall not exceed the total Revolving Credit Commitments.

(3)    *Expiration Date*.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (a) the date that is one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (b) the date that is five Business Days prior to the Maturity Date; provided that a Letter of Credit for which LC Cover has been provided may expire at any time; provided further that any Letter of Credit may contain automatic renewal provisions agreed upon by the Borrower and the Issuing Bank pursuant to which the expiration date of such Letter of Credit shall automatically be extended for a period of up to 12 months (but, subject to the immediately preceding proviso, not later than the date set forth in clause (b) above), subject to a right on the part of the Issuing Bank to prevent any such renewal from occurring by giving notice to the beneficiary in advance of any such renewal.

(4)    *Participations*.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Revolving Credit Lender, and each Revolving Credit Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Revolving Credit Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Revolving Credit Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.19(5), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.19(4) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(5)    *Reimbursement*.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m. on such date, or, if such notice has not been received by the Borrower prior to 10:00 a.m. on such date, then not later than 12:00 noon on (a) the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m. on the day of receipt, or (b) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to 10:00 a.m. on the day of receipt; provided that the Borrower may, subject to the conditions to borrowing set out herein, request in accordance with Section 2.3 that such payment be financed with a Canadian Prime Borrowing or a Base Rate Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting Canadian Prime

- 94 -

Borrowing, Base Rate Borrowing or Swingline Borrowing.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Revolving Credit Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Revolving Credit Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Revolving Credit Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Revolving Credit Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.19(5), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Revolving Credit Lenders have made payments pursuant to this Section 2.19(5) to reimburse the Issuing Bank, then to such Revolving Credit Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Revolving Credit Lender pursuant to this Section 2.19(5) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of Canadian Prime Borrowings or Base Rate Borrowings as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(6)        *Obligations Absolute*.  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.19(5) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (a) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein or herein, (b) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (c) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (d) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.19, constitute a legal or equitable discharge of, or provide a right of set-off against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the Revolving Credit Lenders nor the Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to indirect, special, punitive or consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or wilful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the Borrower and the Lenders agree that, with respect to

1407-5777-6646.13 1407-5777-6646.22

- 95 -

documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(7)    *Disbursement Procedures*.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed in writing) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Revolving Credit Lenders with respect to any such LC Disbursement.

(8)    *Interim Interest*.  If the Issuing Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate then applicable to Revolving Loans that are Canadian Prime Loans (if in Canadian Dollars) or Base Rate Loans (if in U.S. Dollars).  Interest accrued pursuant to this Section 2.19(8) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Credit Lender pursuant to Section 2.19(5) to reimburse the Issuing Bank shall be for the account of such Revolving Credit Lender to the extent of such payment.

(9)    *Replacement of the Issuing Bank*.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Revolving Credit Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank.  From and after the effective date of any such replacement, (a) the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter, and (b) references herein to the term "**Issuing Bank**" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(10)    *Cash Collateralization*.  If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Lenders with LC Exposure representing greater than 50% of the total LC Exposure) demanding the deposit of Cover, the Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Revolving Credit Lenders, an amount in cash

- 96 -

equal to the LC Exposure as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in Section 7.1(f), 7.1(h), or 7.1(i). Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the Reimbursement Obligations at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Lenders with LC Exposure representing greater than 50% of the total LC Exposure), be applied to satisfy other obligations of the Borrower under this Agreement. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived or the total LC Exposure is reduced to nil.

**2.20    Swingline Loans.**

(1)    *General.*  Subject to the terms and conditions set out herein and as part of its Revolving Credit Commitment, the Swingline Lender commits to make Loans in Canadian Dollars or U.S. Dollars (each such Loan made under this Section 2.20, a "**Swingline Loan**") to the Borrower from time to time during the period commencing on the Closing Date and ending on the Maturity Date (such commitment being the "**Swingline Commitment**"), in an aggregate principal amount at any time outstanding up to U.S.$3,750,000; provided that the Swingline Lender shall not be required to extend further credit hereunder if such extension would result in (a) the Swingline Exposure at such time exceeding the amount of the Swingline Commitment,  (b) the aggregate of the Revolving Credit Exposures exceeding the total Revolving Credit Commitments, or (c) a Swingline Loan refinancing an outstanding Swingline Loan.  Within the foregoing limits and subject to the terms and conditions set out herein, the Borrower may borrow, prepay and reborrow Swingline Loans.

(2)    ***Overdrafts***.  Subject to the terms and conditions set out herein, the Borrower shall be entitled to obtain Swingline Loans by way of overdraft on the Swingline Accounts, and at any given time the US $ amount of the outstanding principal amount of all Swingline Loans shall be equal to the aggregate amount by which the Swingline Accounts are overdrawn.  Swingline Loans shall bear interest at a rate per annum equal to the rate applicable to a Canadian Prime Borrowing (if in Canadian Dollars) or at a rate per annum equal to the rate applicable to a Base Rate Loan (if in U.S. Dollars).  Interest shall be payable on such dates, not more frequent than monthly, as may be specified by the Swingline Lender and in any event on the Maturity Date. The Swingline Lender shall be responsible for invoicing the Borrower for such interest.  The

interest payable on Swingline Loans is solely for the account of the Swingline Lender (subject to Section 2.20(3) below).

(3)      *Participations in Swingline Loans.*  The Swingline Lender may by written notice given to the Administrative Agent not later than 10:00 a.m. on any Business Day require the Revolving Credit Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding.  Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Credit Lenders will participate.  Promptly upon receipt of such notice, the Administrative Agent shall give notice thereof to each Revolving Credit Lender, specifying in such notice such Revolving Credit Lender's Applicable Percentage of such Swingline Loan or Loans.  Each Revolving Credit Lender shall upon receipt of notice as provided above, pay to the Administrative Agent, for the account of the Swingline Lender, such Revolving Credit Lender's Applicable Percentage of such Swingline Loan or Loans.  Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to Section 2.20 is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.  Each Revolving Credit Lender shall comply with its obligation under Section 2.20 by wire transfer of immediately available funds with respect to Loans made by such Revolving Credit Lender, and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Credit Lenders.  The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to Section 2.20, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender.  Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent.  Any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Credit Lenders that shall have made their payments pursuant to Section 2.20 and to the Swingline Lender, as their interests may appear.  The purchase of participations in a Swingline Loan pursuant to Section 2.20 shall not relieve the Borrower of any default in the payment thereof.  Notwithstanding the foregoing, a Revolving Credit Lender shall not have any obligation to acquire a participation in a Swingline Loan pursuant to this Section 2.20 if an Event of Default shall have occurred and be continuing at the time such Swingline Loan was made and such Lender shall have notified the Swingline Lender in writing, at least one Business Day prior to the time such Swingline Loan was made, that such Event of Default has occurred and that such Lender will not acquire participations in Swingline Loans made while such Event of Default is continuing.

**2.21    Defaulting Lenders.**

Notwithstanding any provision of this Agreement to the contrary, if any Lender is a Defaulting Lender, then the following provisions shall apply to such Lender for so long as it remains a Defaulting Lender:

- 98 -

(a)     fees shall cease to accrue pursuant to Section 2.10(1) on the unfunded portion of the Revolving Credit Commitment of such Defaulting Lender;

(b)     the Revolving Credit Exposure and Term Credit Exposure of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.2); provided that any waiver or amendment which affects such Defaulting Lender differently than other Lenders generally shall require the consent of such Defaulting Lender;

(c)     any amount owing by a Defaulting Lender to the Administrative Agent or another Lender that is not paid when due shall bear interest at the interest rate applicable to Canadian Prime Loans or Base Rate Loans under the Revolving Credit, as applicable;

(d)     any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender other than in respect of the assignment of such Defaulting Lender's Loans and Commitments) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated account and, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second, pro rata, to the payment of any amounts owing by such Defaulting Lender to the Issuing Bank or Swingline Lender hereunder, (iii) third, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, (iv) fourth, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement (the amount of such cash collateral not to exceed the Revolving Credit Commitment of such Defaulting Lender minus the outstanding principal amount of such Defaulting Lender's Revolving Loans), (v) fifth, to the payment of any other amounts owing to the Lenders or the Issuing Bank or the Swingline Lender hereunder, (vi) sixth, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and (vii) seventh, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a prepayment of the principal amount of any Loans or Reimbursement Obligations in respect of Letters of Credit with respect to which a Defaulting Lender has funded its participation obligations, such payment shall be applied solely to prepay the Loans of, and Reimbursement Obligations owed to, all Lenders other than Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans, or Reimbursement Obligations owed to, any Defaulting Lender;

- 99 -

(e)      if a Defaulting Lender is an Insolvent Defaulting Lender, any amount payable to such Defaulting Lender hereunder may, in lieu of being distributed pursuant to Section 2.21(d), be retained by the Administrative Agent to collateralize indemnification and Reimbursement Obligations of such Defaulting Lender hereunder in an amount determined by the Administrative Agent, acting reasonably;

(f)      If any Swingline Loans or Letters of Credit are outstanding at the time a Lender becomes a Defaulting Lender, then:

(i)      all or any part of the pro rata share of such Defaulting Lender in respect of the outstanding Swingline Loans and Letters of Credit shall be reallocated among the Revolving Credit Lenders which are not Defaulting Lenders ("**Non-Defaulting Lenders**") in accordance with their respective Revolving Credit Commitments, provided that any such reallocation shall not cause any Non-Defaulting Lender to exceed its Revolving Credit Commitment;

(ii)      if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall within five (5) Business Days following notice by the Administrative Agent (x) first, prepay such outstanding Swingline Loans, and (y) second, cash collateralize for the benefit of the Issuing Bank the Borrower's obligations corresponding to such Defaulting Lender's pro rata share of the outstanding Letters of Credit (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 2.21(h), for so long as such Letters of Credit are outstanding;

(iii)      upon any reallocation pursuant to clause (i) above, the fees payable to the Lenders pursuant to Section 2.10(2)  shall be adjusted in accordance with such Non-Defaulting Lenders' Revolving Credit Commitment; and

(iv)      if all or any portion of such Defaulting Lender's pro rata share of the outstanding Letters of Credit is neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of the Issuing Bank or any other Lender hereunder, all fees payable under Section 2.10(2) with respect to such Defaulting Lender's pro rata share of the outstanding Letters of Credit shall be payable to the Issuing Bank until and to the extent that such LC Exposure is reallocated and/or cash collateralized.

(g)      So long as any Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure and the Defaulting Lender's then outstanding pro rata share of the outstanding Letters of Credit will be 100% covered by the Revolving Credit

- 100 -

Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.21(h), and participating interests in any such newly made Swingline Loan or any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.21(f) (and such Defaulting Lender shall not participate therein);

(h)     If required by Section 2.21(f)(ii), the Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Revolving Credit Lenders, an amount in cash equal to such Defaulting Lender's pro rata share of the outstanding Letters of Credit (after giving effect to any partial reallocation pursuant to Section 2.21(f)(i)). Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the Obligations of the Borrower under the Loan Documents. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the Reimbursement Obligations at such time or, if the maturity of the Loans has been accelerated (and (i) only if, after  giving effect thereto, the remaining cash collateral shall be less than the aggregate LC Exposure of all of the Defaulting Lenders and (ii) subject to the consent of the Issuing Bank) be applied to satisfy other obligations of the Borrower under this Agreement. Such deposit shall be returned to the Borrower as promptly as practicable to the extent that, after giving effect to such return, the Issuing Bank shall not have any exposure in respect of any outstanding Letters of Credit that is not fully covered by the Revolving Credit Commitments of Non-Defaulting Lenders and/or the remaining cash collateral.

(i)      If the Administrative Agent, the Borrower, the Swingline Lender and the Issuing Bank each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure and LC Exposure of the Revolving Credit Lenders shall be readjusted to reflect the inclusion of such Revolving Credit Lender's Commitment and on such date such Revolving Credit Lender shall purchase at par such of the Loans of the other Revolving Credit Lenders (other than the Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Revolving Credit Lender to hold such Revolving Loans in accordance with its Revolving Credit Commitment.

Except as otherwise expressly provided in this Section 2.21, no Revolving Credit Commitment of any other Lender shall be increased or otherwise affected, and performance by the Borrower

1407-5777-6646.13 1407-5777-6646.22

- 101 -

of its obligations hereunder and the other Loan Documents shall not be excused or otherwise modified as a result of any Lender becoming a Defaulting Lender. The rights and remedies against a Defaulting Lender under this Section 2.21 are in addition to other rights and remedies which the Borrower may have against such Defaulting Lender as a result of it becoming a Defaulting Lender and which the Administrative Agent or any other Lender may have against such Defaulting Lender with respect thereto.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

**3.1    Representations and Warranties of the Borrower.**

In order to induce the Administrative Agent and the Lenders to enter into this Agreement, to make any Loans hereunder and to issue any Letters of Credit hereunder, the Borrower represents and warrants to the Administrative Agent and each Lender the following on the date of each Borrowing (other than a rollover or conversion), subject to updates as provided in Section 5.1(1)(k).

(1)    *Organization; Powers*. Each Credit Party (a) is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction) in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and  (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and (to the extent the concept is applicable in such jurisdiction) is in good standing in, every jurisdiction where such qualification is required.

(2)    *Authorization; Enforceability*. The Transactions to be entered into by each Credit Party are within the Credit Parties' corporate or partnership powers and have been duly authorized by all necessary corporate, partner and shareholder action, as applicable. This Agreement and the other Loan Documents have been duly executed and delivered by each Credit Party party thereto and constitute legal, valid and binding obligations of each such Credit Party, enforceable against each such Credit Party in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(3)    *Governmental Approvals; No Conflicts*. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except as disclosed in Schedule 3.1(3) and except for filings necessary to perfect Liens created under the Loan Documents, (b) will not violate any applicable Law or the charter, by-laws or other organizational documents of any Credit Party or any order of any Governmental Authority, except with respect to applicable Law or order of any Governmental Authority and the use of proceeds of Loans, to the extent any such violations would be immaterial, (c) will not violate or result in a default under any indenture or agreement governing Indebtedness or other material instrument binding upon any Credit Party or their respective assets, or give rise to a right thereunder to require any payment to be made by any Credit Party, except to the extent any such

- 102 -

defaults or violations, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect and (d) will not result in the creation or imposition of any Lien on any asset of any Credit Party, except for any Lien arising in favour of the Administrative Agent, for the benefit of the Secured Parties, under the Loan Documents.

(4)    *Financial Condition; No Material Adverse Effect.*

    (a)    The Borrower has furnished to the Lenders the consolidated balance sheets and statements of income, retained earnings and changes in financial position of the Borrower (i) as of and for the Fiscal Year ended December 31, 2020, reported on by its auditors, and (ii) as of and for the Fiscal Quarters and the portion of the Fiscal Year ended March 31, 2021.  Such financial statements present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of the Borrower as of the applicable dates and for the applicable periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited statements.

    (b)    Any subsequent financial statements delivered pursuant to Section 5.1(1) will present fairly, in all material respects, the consolidated financial position and results of operations and cash flows of Holdco as of the applicable dates and for the applicable periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited statements.

    (c)    Since December 31, 2020, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

    (d)    None of the reports, financial statements, certificates or other written information furnished by or on behalf of any Group Party to any Arranger, the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document, included herein or therein or furnished hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made; provided that with respect to forecasts and financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by it to be reasonable at the time so furnished and, if such projected financial information was furnished prior to the Closing Date, as of the Closing Date (it being understood and agreed that any such projected financial information may vary from actual results and that such variations may be material).

(5)    *Litigation.*

    (a)    Except as disclosed in Schedule 3.1(5), and except for environmental-related matters (which are dealt with in Section 3.1(17)), there are no actions, suits or

- 103 -

proceedings (including any Tax-related matter) by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting any of the Group Parties (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than as described in Schedule 3.1(17)), or (ii) that involve this Agreement, any other Loan Document or the Transactions.

(b)    Since December 31, 2020, there has been no change in the status of the matters described in Schedule 3.1(17) that, individually or in the aggregate, has resulted in a Material Adverse Effect.

(6)    *Compliance with Laws*.  Each Group Party is in compliance with all Laws applicable to it or its property except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(7)    [Reserved].

(8)    *No Default*.  No Default has occurred and is continuing.

(9)    *Taxes*.  Each Group Party has filed or caused to be filed when due all material Tax returns and reports required to have been filed and has paid or caused to be paid when due all material Taxes required to have been paid by it (including all instalments with respect to the current period) and has made adequate provision for Taxes for the current period, except Taxes that are being contested in good faith by appropriate proceedings and for which such Group Party, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

(10)    *Titles to Real Property*.  The Group Parties have indefeasible fee simple title to their respective owned real properties, and with respect to leased real properties, good title to the leasehold estate with respect thereto, pursuant to valid and enforceable leases, free and clear of all Liens except Permitted Liens.  Set forth on Schedule 3.1(10) is (a) all real property owned by a Credit Party as of the most recent Reference Date with a Fair Market Value of U.S.$1,000,000 or more and (b) all Material Leasehold Interests as of the most recent Reference Date.

(11)    *Titles to Personal Property*.  The Group Parties have title to their respective owned personal properties, and with respect to leased personal properties, title to the leasehold estate with respect thereto, pursuant to valid and enforceable leases, free and clear of all Liens except Permitted Liens. All registrations listed in Schedule 3.1(11) pertain to Permitted Liens.

(12)    *Pension Plans*.

(a)    Each Pension Plan is duly registered under the Income Tax Act and applicable pension standards legislation and has been administered in all material respects in accordance with applicable Law and the terms of such plan.  All material

1407-5777-6646.13 1407-5777-6646.22

- 104 -

obligations of each Credit Party (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Pension Plans and the funding agreements thereunder have been performed on a timely basis.  There are no outstanding disputes concerning the assets of any Pension Plan and there have been no improper withdrawals of any assets of the Pension Plans.  All assessments owed to the Pension Benefits Guarantee Fund established under the *Pension Benefits Act* (Ontario), or other assessments or payments required under similar legislation in any other jurisdiction have been paid when due in respect of each Pension Plan.

(b)     In respect of each Pension Plan that is a Defined Benefit Plan, (i) with respect to any such Defined Benefit Plan, the plan's name, registration number and jurisdiction of registration are disclosed on Schedule 3.1(12), (ii) a copy of the most recently prepared actuarial valuation report for the plan has been provided by the Borrower to the Administrative Agent and the Lenders, (iii) no changes have occurred since the date of the most recently prepared actuarial valuation report for the plan or are reasonably expected to occur which would materially adversely affect the conclusion set out in the most recently prepared actuarial valuation report, and (iv) no events have occurred which could reasonably be expected to result in a wind-up or termination of the plan, in whole or in part.

(c)     All employee and employer contributions (including special payments and any other payments in respect of any funding deficiencies or shortfalls) or premiums required to have been remitted to the Pension Plans under the terms of the applicable plan and applicable Law have been properly withheld and remitted to the funding arrangement for the plan in a timely manner.

(d)     None of the Credit Parties has incurred any liability with respect to a pension plan subject to Title IV of United States Employee Retirement Income Security Act of 1974, as amended (including as a result of its affiliation with an entity required to be aggregated with any Credit Party pursuant to Section 414(b) of the Code) which could reasonably be expected to result in a Material Adverse Effect.

(13)     [Reserved.]

(14)     *Subsidiaries*.  As of the Closing Date, Schedule 3.1(14) correctly sets forth:

(a)     the legal name of each Group Party and its form of legal entity and jurisdiction of organization;

(b)     the Equity Securities issued and outstanding by each Group Party, and the registered and beneficial owners thereof;

(c)     the Equity Securities owned by each Group Party; and

(d)     a corporate organizational chart of Holdco and its subsidiaries.

- 105 -

Except as described in Schedule 3.1(14), as of the Closing Date, no Group Party owns any Equity Securities or debt securities which are convertible into, or exchangeable for, Equity Securities of any other Person.  Unless otherwise indicated in Schedule  3.1(14), as of the Closing Date, there are no outstanding options, warrants or other rights to purchase Equity Securities of any Group Party, and all such Equity Securities so owned are duly authorized, validly issued and fully paid and non-assessable, and are free and clear of all Liens, except for Permitted Liens.

(15)    *Insurance*.  The Group Parties maintain insurance policies and coverage in compliance with Section 5.1(9).  Such insurance coverage is provided under valid, outstanding and enforceable policies. The certificate of insurance delivered to the Administrative Agent pursuant to Section 4.2(6) contains an accurate and complete description in all material respects of all material policies of insurance owned or held by each Group Party on the Closing Date.

(16)    *Solvency*.  The Group Parties, taken as a whole and after giving effect to the Transactions, are not insolvent on the Closing Date.

(17)    *Environmental Matters*.  Except as disclosed to the Lenders in Schedule 3.1(17):

(a)    *Environmental Laws, Etc*.  Neither any property of the Group Parties nor the Group Parties' operations conducted thereon violate any applicable Environmental Laws, which violation could reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(b)    *Notices, Permits, Etc*.  All notices, permits, licenses or similar authorizations, if any, required to be obtained or filed by the Group Parties in connection with the operation or use of any and all property of the Group Parties, including but not limited to past or present treatment, transportation, storage, disposal or Release of Hazardous Materials into the environment, have been duly obtained or filed, except to the extent the failure to obtain or file such notices, permits, licenses or similar authorizations could not reasonably be expected to have a Material Adverse Effect, or could not reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(c)    *Hazardous Substances Carriers*.  All Hazardous Materials generated at any and all properties of the Group Parties have been treated, transported, stored and disposed of while under the ownership, direction or control of any Credit Party only by carriers maintaining valid permits under Environmental Laws applicable to them, except to the extent the failure to have such Hazardous Materials so transported, treated or disposed of could not reasonably be expected to have a Material Adverse Effect, and only at treatment, storage and disposal facilities maintaining valid permits under applicable Environmental Laws, which carriers

- 106 -

and facilities have been and are operating in compliance with such permits, except to the extent the failure to have such Hazardous Materials treated, transported, stored or disposed of at such facilities, or the failure of such carriers or facilities to so operate, could not reasonably be expected to have a Material Adverse Effect or could not reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(d)     *Hazardous Materials Disposal*.  To the knowledge of the Borrower, no Hazardous Materials have been disposed of or Released and there has been no threatened Release of any Hazardous Materials on or to any property of the Group Parties other than in compliance with Environmental Laws, except to the extent the disposition or Release of such Hazardous Materials could not reasonably be expected to have a Material Adverse Effect or which could not reasonably be expected to result in remedial obligations having a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to the relevant property.

(e)     *No Contingent Liability*.  The Group Parties (to the knowledge of the Borrower in the case of any period prior to the Closing Date) have no material contingent liability by contract or, to the knowledge of the Borrower, by operation of law, in connection with any Release or threatened Release of any Hazardous Materials into the environment except contingent liabilities which could not reasonably be expected to result in a Material Adverse Effect, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Release or threatened Release.

(18)    *Employee Matters.*

(a)     Except as set out in Schedule 3.1(18), as of the most recent Reference Date none of the Credit Parties is party to any collective bargaining agreement with respect to their respective employees.  There are no strikes, slowdowns or work stoppages pending or, to the best knowledge of the Borrower, threatened against the Group Parties, or their respective employees, which could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)     Each of the Group Parties has (to its knowledge in the case of any period prior to the Closing Date) withheld from each payment to each of their respective officers, directors and employees the amount of all Taxes, including income tax, Canada or Quebec Pension Plan contributions, as applicable, employment insurance premiums and other payments and deductions required to be withheld therefrom, and has paid the same to the proper taxation or other receiving authority in accordance with applicable Law, except where the failure to make such withholdings and/or payments would not be material.  No Group Party is subject to any claim by or asserted liability to any of their respective officers, directors or

- 107 -

employees for salary (including vacation pay) or benefits which would rank in whole or in part pari passu with or prior to the Liens created by the Security Documents.

(19)    *Fiscal Year*.  The Fiscal Year ends on  December 31st of each calendar year, and the Fiscal Quarters end on the last day of each of March, June, September and December of each calendar year.

(20)    *Intellectual Property Rights*.  Except as could not reasonably be expected to have a Material Adverse Effect, each Group Party is the registered and beneficial owner of, with good and marketable title, free of all Liens other than Permitted Liens to, or has a valid license to use all patents, patent applications, trade marks, trade mark applications, trade names, service marks, copyrights, industrial designs, integrated circuit topographies, or other proprietary rights with respect to the foregoing and other similar property, necessary for the conduct of its business. Except as could not reasonably be expected to have a Material Adverse Effect, as of the Closing Date, no material claim has been asserted and is pending by any Person with respect to the use by any Group Party of any intellectual property or challenging or questioning the validity, enforceability or effectiveness of any intellectual property necessary for the conduct of the business of any Group Party.   Except as could not reasonably be expected to have a Material Adverse Effect, (a) each Group Party has the exclusive right to use the intellectual property which such Credit Party owns, (b) all applications and registrations for such intellectual property are current, and (c) to the knowledge of the Borrower, the conduct of each Group Party's business does not infringe the intellectual property rights of any other Person.

(21)    *Residency of Borrower for Tax Purposes*.  The Borrower is a resident of Canada for the purposes of the Income Tax Act.

(22)    *"Know Your Customer" Information*. All materials and written information provided to each of the Lenders in connection with applicable "know your customer" and AML Legislation is true and correct in all material respects as of the Closing Date.

(23)    *Bank Accounts*.  Schedule 3.1(23) lists (i) all banks and other financial institutions at which any Credit Party maintains lock boxes, deposit or other accounts as of the most recent Reference Date, and (ii) the complete lock box address or account number therefor and the address and telephone number of each such institution, which in the case of clause (ii) shall be true and correct in all material respects.

(24)    [Reserved]

(25)    *Anti-Corruption Laws and Sanctions*.  Each Group Party has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by such Group Party and its directors, officers and employees with applicable Anti-Corruption Laws and Sanctions. Each Group Party and, to the knowledge of the Borrower, its directors, officers and employees is in material compliance with applicable Anti-Corruption Laws and Sanctions.  No Group Party or, to the knowledge of the Borrower, any of its directors, officers or employees is a Sanctioned Person or is engaged in any activity that would reasonably be expected to result in such Group

- 108 -

Party being designated as a Sanctioned Person.  No Borrowing or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate applicable Anti-Corruption Laws or Sanctions.

(26)    [Reserved]

(27)    *Investment and Holding Company Status.*  No Group Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

(28)    *Margin Stock.*  No Group Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Federal Reserve Board), and no proceeds of any Borrowing will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock in contravention of Regulation U or X of the Federal Reserve Board.

(29)    *EEA Financial Institution.*  No Group Party is an EEA Financial Institution.

(30)    *Covered Party.*  No Credit Party is a Covered Party.

(31)    *Accounts Receivable.*  As of March 31, 2024 the aggregate amount of accounts receivable owing to Credit Parties from Affiliates that are not Group Parties does not exceed U.S.$46,700,000.

**ARTICLE 4**
**CONDITIONS**

**4.1    Closing Date.**

The obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless each of the conditions listed below is satisfied (or waived pursuant to Section 9.2) at or prior to 5:00 p.m. on June 30, 2021, and, in the event such conditions are not so satisfied or waived by such time, the Commitments shall terminate at such time.

(1)    *Amended and Restated Credit Agreement.*  The Administrative Agent, each Lender, and the Issuing Bank shall have received from each party hereto either (a) a counterpart of this Agreement, duly executed on behalf of each party hereto, or (b) written evidence satisfactory to the Administrative Agent (which may include a facsimile or other electronic -transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(2)    *Initial Security Documents.*  The Administrative Agent shall have received the Initial Security Documents.

(3)    *Perfection of Liens.*  The Initial Security Documents shall have been registered or, with respect to the registrations made in connection with the Initial Security Documents delivered pursuant the Original Credit Agreement, such registrations shall be renewed to the extent

- 109 -

reasonably requested by the Administrative Agent, as necessary (or arrangements for registration or renewal of registration satisfactory to the Administrative Agent shall have been made) in all offices in which, in the opinion of the Administrative Agent or its counsel, registration is necessary or of advantage to perfect or render opposable to third parties the Liens intended to be created thereby. The Administrative Agent shall have received and be satisfied with the results of all personal property, pending litigation, judgment, bankruptcy, bulk sale, execution and other searches conducted by the Administrative Agent and its counsel with respect to the Credit Parties in all jurisdictions selected by the Administrative Agent and its counsel.

(4)     *Legal Opinions*. The Administrative Agent shall have received a favourable written opinion of McMillan LLP, Canadian counsel to the Borrower, and local counsel reasonably acceptable to the Administrative Agent, covering such Canadian matters relating to the Credit Parties, this Agreement, the other Loan Documents, or the Transactions as the Lenders shall reasonably request (together with copies of all factual certificates and legal opinions delivered to such counsel in connection with such opinion upon which counsel has relied). The Administrative Agent shall also have received favourable written opinions of Nixon Peabody LLP covering such United States matters relating to the Credit Parties, the Loan Documents or the Transactions as the Lenders shall reasonably request (together with copies of all factual certificates and legal opinions delivered to such counsel in connection with such opinion upon which such counsel has relied). The Borrower hereby requests each such counsel to deliver such opinions and supporting materials. All opinions and certificates referred to in this Section 4.1(4) shall be addressed to the Administrative Agent and the other Secured Parties and dated the Closing Date.

(5)     *Corporate Certificates*. The Administrative Agent shall have received:

(a)     certified copies of the resolutions of the board of directors, general partner, or shareholders, as applicable, of each Credit Party approving, as appropriate, the Loans, this Agreement and the other Loan Documents, and all other documents, if any, to which such Credit Party is a party and evidencing authorization with respect to such documents; and

(b)     a certificate of an officer of each Credit Party, dated as of the Closing Date, and certifying (i) the name, title and true signature of each officer of such Person authorized to execute this Agreement and the other Loan Documents to which it is a party, (ii) the name, title and true signature of each officer of such Person authorized to provide the certifications required pursuant to this Agreement, including certifications required pursuant to Section 5.1(1) and Borrowing Requests, and (iii) that attached thereto is a true and complete copy of the articles of incorporation and bylaws of each Credit Party, as amended to date, and a recent certificate of status, certificate of compliance, good standing certificate or analogous certificate.

(6)     *Fees*. The Administrative Agent, the Lenders, and the Arrangers shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, to the extent

- 110 -

invoiced, reimbursement or payment of all legal fees and other out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(7)    *Insurance*.  The Administrative Agent shall have received a certificate of insurance coverage, dated not more than 30 days prior to the Closing Date, evidencing that the Credit Parties are carrying insurance in accordance with Section 5.1(9) hereof.

(8)    *Delivery of Financial Statements*.  The Administrative Agent and the Lenders shall have received the unaudited Consolidated financial statements in respect of the Borrower with respect to any Fiscal Quarter ending more than 45 days prior to the Closing Date.

(9)    *Financial Projections*.  The Administrative Agent and the Lenders shall have received satisfactory financial projections of the Borrower including income statement, balance sheet, cash flow statement, capital expenditure budget, assumptions and financial covenants calculations (for greater certainty, the financial projections of the Borrower to December 31, 2024 provided to the Administrative Agent are satisfactory).

(10)    *Compliance Certificate*.  The Administrative Agent shall have received a Compliance Certificate prepared on a *pro forma* basis after giving effect to the Loans to be made on the Closing Date and the consummation of the other Transactions.  Such initial Compliance Certificate shall demonstrate in reasonable detail that the Total Leverage Ratio is not more than 4.50:1.00 at such time.

(11)    [Reserved].

(12)    *No Material Adverse Effect*.  The Administrative Agent and the Lenders shall be satisfied that, since December 31, 2020, there has not been a change, event or circumstance which would reasonably be expected to have a Material Adverse Effect.

(13)    *"Know Your Customer" Information*.  The Administrative Agent and the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including AML Legislation and OFAC requested at least 5 Business Days prior to the Closing Date.

(14)    *Execution and Delivery of Documents*.  Each Credit Party shall have duly authorized, executed and delivered all documents required hereunder, all in form and substance satisfactory to the Administrative Agent.

(15)    *Other Documentation*.  The Administrative Agent and the Lenders shall have received such other documents and instruments as are customary for transactions of this type or as they may reasonably request.

All materials required pursuant to this Section 4.1 may be delivered to the Administrative Agent (or its counsel) by way of facsimile or other means of electronic transmission.

- 111 -

**4.2    Each Credit Event.**

The obligation of each Lender to make a Loan on the occasion of any Borrowing, and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    the representations and warranties of the Borrower set out in this Agreement shall be true and on and as of the date of each such Borrowing as if made on such date (except where such representation or warranty is stated to be made as of a particular date);

(b)    at the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing;

(c)    the Administrative Agent shall have received a Borrowing Request in the manner and within the time period required by Section 2.3; and

(d)    after giving effect to any Loan or the issuance of any Letter of Credit and the contemporaneous non-prohibited uses of the proceeds thereof, the Available Cash would not exceed U.S.$7,000,000.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the accuracy of the matters specified in Sections 4.2(a) and (b).  This requirement does not apply on the conversion or rollover of an existing Borrowing provided that the aggregate outstanding Borrowings will not be increased as a consequence thereof.

**ARTICLE 5**
**AFFIRMATIVE COVENANTS**

**5.1    Covenants.**

From (and including) the Closing Date until the Lender Termination Date, the Borrower covenants and agrees with the Lenders as follows:

(1)    *Financial Statements and Other Information*.  The Borrower shall furnish to the Administrative Agent for distribution to each Lender:

(a)    as soon as available and in any event within 120 days after the end of each Fiscal Year, the audited Consolidated balance sheet and related statements of income, retained earnings and changes in financial position of Holdco as of the end of and for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by KPMG LLP or other independent auditors of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit (other than any such exception or explanatory paragraph (but not qualification) that is expressly solely with respect to, or expressly resulting from, (i) an upcoming maturity date of the credit facilities hereunder or other

- 112 -

Indebtedness occurring within one year from the time such report is delivered or (ii) any potential inability to satisfy a financial maintenance covenant on a future date or in a future period)) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of Holdco on a Consolidated basis;

(b)     as soon as available and in any event within 30 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, the unaudited Consolidated balance sheet and related statements of income, retained earnings and changes in financial position of Holdco as of the end of and for such Fiscal Quarter and the then elapsed portion of the Fiscal Year which includes such Fiscal Quarter, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by a Responsible Officer of Holdco as presenting fairly in all material respects the financial condition and results of operations of Holdco on a Consolidated basis, subject to normal year-end audit adjustments and the absence of certain footnotes;

(c)     concurrently with the financial statements required pursuant to Sections 5.1(1)(a) and (b), a Compliance Certificate;

(d)     concurrently with any delivery of financial statements under Section 5.1(1)(a) and (b), a management discussion and analysis that includes a comparison to the budget for the period in question and a comparison of performance for such period to the corresponding period in the prior year;

(e)     promptly after the Borrower learns of the receipt or occurrence of any of the following, a certificate of the Borrower, signed by a Responsible Officer of the Borrower, specifying (i) any event which constitutes a Default or Event of Default, together with a detailed statement specifying the nature thereof and the steps being taken to cure such Default or Event of Default, (ii) the receipt of any notice from, or the taking of any other action by, the holder of any Material Indebtedness of any Credit Party with respect to an actual or alleged default by such Credit Party in respect of such Indebtedness, (iii) [reserved], (iv) the creation, dissolution, merger, amalgamation or acquisition of any Group Party, (v) any event or condition not previously disclosed to the Administrative Agent, which violates any Environmental Laws and which could, in the Borrower's judgment, reasonably be expected to have a Material Adverse Effect, and (vi) any other event, development or condition which may reasonably be expected to have a Material Adverse Effect;

(f)     on or before the 60th day after each Fiscal Year end (commencing with December 31, 2021), an annual budget of Holdco setting forth in reasonable detail and on a quarterly basis the projected Consolidated revenues and expenses of Holdco for the following Fiscal Year (it being recognized by the Lenders that projections as to future results are not to be viewed as fact and that the actual results for the

period or periods covered by such projections may differ from the projected results), which budget shall be accompanied by a certificate of a Responsible Officer stating that such budget is based on reasonable estimates, information and assumptions;

(g)  [Intentionally Deleted]concurrently with the financial statements required pursuant to Sections 5.1(1)(a) and (b), an updated Perfection Certificate if any of the information therein has changed since the last Perfection Certificate delivered hereunder;

(h)  promptly after the occurrence thereof, notice of the institution (or written threat of the institution) of, or any material adverse development in, any action, suit or proceeding or any governmental investigation or any arbitration before any court or arbitrator or any Governmental Authority or official against any Group Party involving a claim of more than U.S$5,000,000;

(i)  concurrently with any delivery of financial statements under Section 5.1(1)(a) or (b) a certificate of a Responsible Officer of Holdco identifying (i)  any change in GAAP or in the application thereof that has occurred since the date of the audited financial statements referred to in Section 5.1(1)(a) that has a material effect on Holdco's financial reporting and specifying the effect of such change on the financial statements accompanying such certificate, (ii) all Subsidiaries acquired or formed since the end of the previous Fiscal Quarter and indicating, for each such Subsidiary, whether such Subsidiary is a Material Subsidiary or an Immaterial Subsidiary and (iii) any interest in real property or improvements thereto with a value exceeding U.S.$1,000,000 that have been acquired by any Credit Party since the end of the previous Fiscal Quarter;

(j)  promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Group Party, or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent may reasonably request;

(k)  concurrently with the delivery of the financial statements under Section 5.1(1)(a) or (b), a report (a "**Quarterly Report**") supplementing each of Schedule 3.1(10), Schedule 3.1(18) and Schedule 3.1(23) with respect to any matter arising since the date of delivery of the most recent Quarterly Report (or, in the case of the first such Quarterly Report, the Closing Date) that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or that is necessary to correct any information in such Schedule (and such Schedule shall be appropriately marked to show the changes made therein);

(l)  concurrently with the delivery of the financial statements under Section 5.1(1)(a), an annual capital expenditure budget of Holdco, which budget shall be

- 114 -

accompanied by a certificate of a Responsible Officer stating that such budget is based on reasonable estimates, information and assumptions;

(m)     prior to 5:00 p.m. on April 30, 2024 and within 10 days of every month end thereafter, (i) a Monthly Compliance Certificate dated as at such date, and (ii) weekly cash flow projections for Holdco on a Consolidated basis for the next 13-week period together with a brief management commentary thereon;

(n)     concurrently with any delivery of financial statements under Section 5.1(1)(b), a report on the Borrower's top five major retailers by revenue, including a comparison of actual to planned revenue per volume;

(o)     prior to 5:00 p.m. on January 30, 2023 and within 30 days of every month end thereafter, a monthly management report on the Adjusted EBITDA (for information purposes) and Holdco's balance sheet, statement of income and cash flow statement;

(p)     90 days prior to the Maturity Date, an annual forecast of Holdco for the Fiscal Year 2026;

(q)     within 5 Business Days of every month end, a fully detailed list of the monthly aged accounts receivable and monthly aged accounts payables of the Borrower which, for greater certainty, shall include all such accounts receivable owing by and accounts payable owing, to any Affiliates.;

(r)     not later than November 1, 2024, an updated restructuring plan for the period from the date of such plan until December 31, 2025 which shall include:

        (i)     a weekly cash flow forecast for the period beginning from the date of such plan until March 31, 2025 reflecting, among other things, the ongoing payment of interest and repayment of the Loans required hereunder when due; and

        (ii)    an updated business plan for the Fiscal Year ending December 31, 2025, prepared on a monthly basis and reflecting margin enhancement and cost cutting initiatives, plan for the repayment of the Loans, an international receivable risk mitigation strategy and revisions to key assumptions contained in the prior business plan delivered to the Administrative Agent

        all in form and substance satisfactory to the Required Lenders;

(s)     not later than November 1, 2024, a contingency plan which shall address (i) any liquidity shortfalls anticipated for the Fiscal Year ending December 31, 2025, (ii) failure to obtain all regulatory approvals from the State Administration of Foreign Exchange in respect of overdue Restricted Sales receivables for the Fiscal Year ending December 31, 2025, and (iii) commodity price risk;

- 115 -

(r)     on each Bi-Weekly Date, a CFF;

(s)     on a date that is not later than 2 calendar weeks prior to the expiry of the period set out in the then current Baseline CFF, the Revised Baseline CFF;

(t)     ~~on each Bi-Weekly Date, a CFF;~~within ten (10) days after the end of each calendar month, a detailed progress report with respect to the Borrower's efforts to achieve Takeout, such report to include (i) the particulars of any refinancing, equity injection, asset sale or other strategic alternative under consideration, and (ii) the dates of all material communications in such regard with third parties and the names thereof, it being understood that the Borrower shall respond promptly with any additional details requested by a Lender.

(u)     ~~within ten (10) days after the end of each calendar month, commencing September 2024, an update report on all developments with respect to ongoing discussions with Kenco Logistic Services LLC ("Kenco"), including updates on (i) treatment of the disputed payments for the Fiscal Year ended December 31, 2023; (b) ongoing issues in respect of the Fiscal Year ending December 31, 2024 and remedies taken to address ongoing issues with Kenco services; and (c) contingency plan being pursued to mitigate concentration risk with Kenco as the sole third party logistics provider;~~not later than September 30, 2025, either:

   (i)    a detailed plan to achieve Takeout, such plan to include (i) the source(s) of all funds and binding commitments with respect thereto, and (ii) a detailed timeline and key milestones; or

   (ii)   a binding engagement letter with a financial advisor of reputable standing providing a mandate to evaluate strategic alternatives and arrange one or more transactions necessary to achieve Takeout;

   such deliverables in all cases to be in form and substance satisfactory to the Required Lenders, acting reasonably;

(v)     within ten (10) days after the end of each calendar month~~, commencing September 2024~~, updates on all developments with respect to ~~ongoing discussions with~~the Orgain ~~Inc. pertaining to any potential settlements and/or proposed payment plans in respect of~~Judgement, the Settlement Agreement Judgment or the Orgain ~~Judgment~~Writ;

(w)     within ten (10) days after the end of each ~~calendar month, commencing September 2024, updates on strategic alternatives being pursued by the Borrower to refinance its business or strategic sales of certain of its divisions or assets; and~~Fiscal Quarter, notice of any changes to the 2025 SAFE Approvals since the end of the immediately preceding Fiscal Quarter;

- 116 -

(x)    promptly upon learning the same, notice of any change to the budget or intentions of Xiwang Foodstuffs (Qingdao) Co., Ltd that could reasonably be expected to impact the ability of Holdco to meets its obligations under Section 5.1(12)(e);

(y)    within thirty (30) days after the end of each of Fiscal Quarter, an updated business plan for the Fiscal Year ending December 31, 2025 and identification of key changes to the previous version, which plan shall include (i) an update on actual performance compared to projections with explanations for key differences, (ii) a discussion of margin enhancement, (iii) a Whey Protein Concentrate 80 (WPC-80) action plan including details by co-manufacturers, and (iv) an action plans regarding selling, general and administrative expenses (including any headcount reductions);

(z)    within thirty (30) days after the end of each of Fiscal Quarter, a third party logistics plan which shall include (i) any penalties or additional fees imposed or threatened in respect of Kenco Logistic Services LLC ("**Kenco**"), and the costs associated thereto, (ii) a ramp down in inventory to Kenco, a ramp up in inventory to RJW, (iii) a transition to RJW, (iv) a timeline, key milestones and estimated savings or costs per activity, and (v) in respect of all plans after the initial plan, a discussion of the actual results relative to the previously issued action plan;

(aa)    on or before April 10, 2025, a detailed and comprehensive strategy to deal with existing aged international accounts receivable, growth in existing international markets and planned expansion into new international markets, such strategy to set out steps being taken to ensure that existing aged international accounts receivable reduce from the levels as at December 31, 2024;

(bb)    within ten days after the end of each calendar month an aged accounts payable report setting out all amounts owing to logistics suppliers, along with evidence of compliance with Section 6.1(18), certified by a Responsible Officer of Holdco; and

(cc)    (x) such additional reporting and information upon the request of the Administrative Agent, from time to time and acting reasonably.

(2)    *Existence; Conduct of Business*.  The Borrower shall, and shall cause each other Group Party to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence (subject only to Section 6.1(3)), and except to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect, obtain, preserve, renew and keep in full force and effect any and all rights, licenses, permits, privileges and franchises material to the conduct of its business.

(3)    *Payment of Obligations*.  The Borrower shall, and shall cause each other Group Party to, pay its material obligations, including material Tax liabilities, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) the Borrower

- 117 -

or such Group Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

(4)    *Maintenance of Properties*.  The Borrower shall, and shall cause each other Group Party to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(5)    *Books and Records; Inspection Rights*.  The Borrower shall, and shall cause each other Group Party to, keep proper books of record and account in which full, true and correct entries in all material respects are made of all dealings and transactions in relation to its business and activities.  The Borrower shall, and shall cause each other Group Party to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times; provided that all such visits, inspections and inquiries shall be co-ordinated through the Administrative Agent; provided further that unless an Event of Default has occurred and is continuing, no more than one such visit or inspection may occur in any Fiscal Year.

(6)    *Compliance with Laws*.

(a)    The Borrower shall, and shall cause each other Group Party to, comply with all Laws and orders of any Governmental Authority applicable to it or its property and with all of its material contractual obligations, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrower shall, and shall cause each other Group Party and its and their respective directors, officers and employees to, comply with all Anti-Corruption Laws and Sanctions applicable thereto.

(7)    *Use of Proceeds and Letters of Credit*.  The proceeds of the Term Loans shall be used to repay Indebtedness of the Credit Parties and the fees, costs, expenses and liabilities incurred in connection with the Transactions, and to make Investments pursuant to Section 6.1(6)(e) of the Credit Agreement. The proceeds of the Revolving Loans shall be used for working capital and other general corporate purposes of the Borrower, including the making of Acquisitions and Investments permitted hereunder. ~~In connection with any Borrowing Request, the Borrower shall (a) advise the Administrative Agent if the requested Revolving Loan is being borrowed to fund the Brokerage Account in connection with the Orgain Bond such that the applicable proceeds are not to be included in the calculation of Available Cash and (b), if the Borrower has advised the Administrative Agent as set out in paragraph (a) above, then (i) use all of the proceeds of such Revolving Loan to fund the Brokerage Account within three (3) Business Days of such Borrowing and (ii) ensure that the Brokerage Account is funded in the full amount of the Orgain Bond upon deposit of the proceeds of such Revolving Loan.~~

- 118 -

(8)    *Further Assurances.*

    (a)    The Borrower shall, and shall cause each other Credit Party to, cure promptly any defects in the execution and delivery of the Loan Documents, including this Agreement.  Upon reasonable request by the Administrative Agent (and subject to the Security Principles), the Borrower shall, at its expense, as promptly as practical, execute and deliver to the Administrative Agent, all such other and further documents, agreements and instruments (and cause each other Credit Party to take such action) in compliance with or performance of the covenants and agreements of the Borrower or any other Credit Party in any of the Loan Documents, including this Agreement, or to further evidence and more fully describe the Collateral, or to correct any omissions in any of the Loan Documents, or more fully to state the security obligations set out herein or in any of the Loan Documents, or to perfect, protect or preserve any Liens created pursuant to any of the Loan Documents, or to make any recordings, to file any notices, or obtain any consents, all as may be necessary or appropriate in connection therewith, in the judgment of the Administrative Agent, acting reasonably.

    (b)    The Borrower shall, and shall cause each of the other Credit Parties to, perform and satisfy to the satisfaction of the Administrative Agent and its counsel each of the requirements (the "**Post-Closing Requirements**") listed in Schedule 5.1(8) on or before the date by which such Post-Closing Requirement is to be required to be performed pursuant thereto.  For greater certainty, the Borrower acknowledges and agrees that the Post-Closing Requirements expressly include the obligation of the Borrower to, and to cause each of the other Credit Parties to, co-operate fully and promptly with the Administrative Agent and its counsel with respect to the completion of each of the Post-Closing Requirements and the provision of all information, documents, matters and things as the Administrative Agent or its counsel, acting reasonably, may deem necessary or advisable (i) to determine what actions must be taken to fulfil each of the Post-Closing Requirements, (ii) to complete and fulfil each of the Post-Closing Requirements, and (iii) to confirm and assess whether all actions necessary to fulfil each of the Post-Closing Requirements have been taken.  The Administrative Agent, by instrument in writing and without any consent from any of the Lenders, may, in its sole and absolute discretion, extend any deadline for completion of a Post-Closing Requirement if the Administrative Agent acting in good faith believes that the extension will enable the Borrower and the Credit Parties to comply with such Post-Closing Requirement and such extension will not have a material adverse effect upon the Lenders.

(9)    *Insurance.*

    (a)    The Borrower shall, and shall cause each other Credit Party to, maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to their respective properties and business against such liabilities, casualties, risks and contingencies and in such types (including business

interruption insurance and flood insurance) and amounts and with deductibles as are customary in the case of Persons engaged in the same or similar businesses and similarly situated and in accordance with any requirement of any Governmental Authority.

(b)       The Borrower shall, and shall cause each other Credit Party to, maintain flood insurance on all Subject Flood Property from such providers, and on such terms and in such amounts, as required by the United States *Flood Disaster Protection Act* of 1973, as amended from time to time.

(c)       The Borrower shall obtain endorsements to the policies pertaining to all physical properties in which the Administrative Agent shall have a Lien under the Loan Documents, naming the Administrative Agent as an additional insured (with respect to liability insurance only) and a loss payee and shall use commercially reasonable efforts to ensure that such endorsements contain (i) provisions that such policies will not be cancelled without 30 days prior written notice having been given by the insurance company to the Administrative Agent, and (ii) a standard non-contributory "mortgagee", "lender" or "secured party" clause, as well as such other provisions as the Administrative Agent may reasonably require to fully protect the Administrative Agent's interest in the Collateral and to any payments to be made under such policies.  All original policies or true copies thereof are to be delivered to the Administrative Agent, premium prepaid.

(d)       In the event the Borrower fails to provide the Administrative Agent with timely evidence, acceptable to the Administrative Agent, of the maintenance of insurance coverage required pursuant to Section 5.1(9), or in the event that any Credit Party fails to maintain such insurance, the Administrative Agent may purchase or otherwise arrange for such insurance, but at the Borrower's expense and without any responsibility on the Administrative Agent's part for:  (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims.  The insurance acquired by the Administrative Agent may, but need not, protect any Credit Party's interest in the Collateral, and therefore such insurance may not pay claims which a Credit Party may have with respect to the Collateral or pay any claim which may be made against a Credit Party in connection with the Collateral.  In the event the Administrative Agent purchases, obtains or acquires insurance covering all or any portion of the Collateral, the Borrower shall be responsible for all of the applicable costs of such insurance, including premiums, interest (at the applicable interest rate for Revolving Loans that are Base Rate Loans), fees and any other charges with respect thereto, until the effective date of the cancellation or the expiration of such insurance.  The Administrative Agent may charge all of such premiums, fees, costs, interest and other charges to the Borrower's bank account. The Borrower hereby acknowledges that the costs of the premiums of any insurance acquired by the Administrative Agent may exceed the costs of insurance which the Borrower may be able to purchase on its own.  In the event

- 120 -

that the Administrative Agent purchases such insurance, the Administrative Agent shall notify the Borrower 10 Business Days prior to said purchase.

(e)     Upon the occurrence and continuance of an Event of Default and notice by the Administrative Agent to the Borrower (and without limiting any other rights of the Administrative Agent or the Lenders hereunder or under any other Loan Document), (i) the Administrative Agent shall, subject to the rights of any holders of Permitted Liens holding claims senior to the Administrative Agent, have the sole right, in the name of the Administrative Agent or any applicable Credit Party, to file claims under any insurance policies in respect of any Collateral, to receive any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection of any claims under any such insurance policies and (ii) all insurance proceeds in respect of any Collateral shall be paid to the Administrative Agent (or, if paid to the applicable Credit Party, held in trust for the Administrative Agent). In such event, the Administrative Agent shall apply such insurance proceeds to the obligations of the Borrower in accordance with Section 2.9(2)(d).

(10)     *Operation and Maintenance of Property*.  The Borrower shall, and shall cause each other Credit Party to, manage and operate its business or cause its business to be managed and operated (a) in accordance with prudent industry practice, and (b) in compliance with all applicable Laws of the jurisdiction in which such businesses are carried on, and all applicable Laws of every other Governmental Authority from time to time constituted to regulate the ownership, management and operation of such businesses, except in each such case where a failure to so manage and operate would not have a Material Adverse Effect.

(11)     *Security Package.*

(a)     *Group Guarantee*.  In accordance with and subject to the Security Principles, the Borrower shall, and shall cause Holdco and each present and future Material Subsidiary to, enter into or accede to the Group Guarantee, such that such Person guarantees in favour of the Administrative Agent, for the benefit of the Secured Parties, all Secured Liabilities of the other Credit Parties.  The obligation of a Person to accede to the Group Guarantee shall arise as soon as reasonably practicable after such Person becomes a Material Subsidiary.

(b)     *Liens*.  In accordance with and subject to the Security Principles, the Borrower shall, and shall cause each present and future Credit Party to, provide at all times in favour of the Administrative Agent, for the benefit of the Secured Parties, a first-priority Lien (subject only to Permitted Liens) over all present and future personal property and real property of such Credit Party as security for its Secured Liabilities, together with such supporting materials as may be required to ensure the perfection or priority of such Lien.  The obligation of a Credit Party to provide any such Lien shall arise as soon as is reasonably practicable following such Person (i) becoming a Credit Party, or (ii) acquiring assets, property or

- 121 -

undertaking that are not already subject to a Lien that complies with the Security Principles.

(c)     *Supporting Materials*.  In connection with the execution and delivery of any Security Document pursuant to Section 5.1(11), the Borrower shall, or shall cause the relevant other Credit Party to, deliver to the Administrative Agent an updated Perfection Certificate together with such corporate resolutions, certificates, legal opinions and such other related documents as shall be reasonably requested by the Administrative Agent and consistent with the relevant forms and types thereof delivered on the Closing Date or as shall be otherwise reasonably acceptable to the Administrative Agent.

(12)   *Financial Covenants*.  The Borrower shall cause Holdco to:

(a)     [Intentionally Deleted].

(b)     [Intentionally Deleted].

(c)     *Adjusted EBITDA.* Maintain Adjusted EBITDA with respect to each ~~Fiscal Quarter listed~~period indicated below of not less than 85% of the amount shown opposite such ~~Fiscal Quarter~~period:

| ~~Fiscal Quarter Ended~~Period | Adjusted EBITDA |
|---|---|
| January 1, 2025 to March 31, 2025 | U.S.$(2,345,000) |
| January 1, 2025 to June 30, 2025 | U.S.$2,915,000 |
| January 1, 2025 to September 30, ~~2024~~2025 | U.S.$~~2,800,000~~9,718,000 |
| January 1, 2025 to December 31, ~~2024~~2025 | U.S.$~~1,600,000~~16,288,000 |

(d)     ~~*Cure Contributions - General.* In the event of a breach of the financial covenants set forth in this Section 5.1(12), such breach may be cured by way of the issuance by Holdco of Permitted Cure Securities and/or Permitted Cure Indebtedness (collectively, a **"Cure Contribution")** and the net proceeds therefrom shall be deemed to be included in the calculation of EBITDA for the most recent Fiscal Quarter, provided that:~~

~~(i)     the amount of any Cure Contribution shall not be greater than the amount required to cause Holdco to re-establish financial covenant compliance;~~

~~(ii)    a Cure Contribution shall increase EBITDA solely for the purposes of determining compliance with the Fixed Charge Coverage Ratio pursuant to Section 5.1(12)(a) as at the end of the applicable period and any subsequent period that includes such period, and shall be disregarded in all~~

other respects under the Loan Documents provided that, an Excess Special Cure Contribution shall also increase EBITDA for the purposes of determining compliance with Section 5.1(12)(e);

(iii)    no more than four Cure Contributions may be made during the term of this Agreement;

(iv)    no more than two Cure Contributions may be made in any Fiscal Year;

(v)    Cure Contributions may not be made in consecutive Fiscal Quarter;

(vi)    the aggregate amount of all Cure Contributions shall not exceed U.S.$50,000,000;

(vii)    the proceeds of any Cure Contribution shall be applied in accordance with Section 2.9(2)(c) (a "**Cure Repayment**"); and

(viii)    a Cure Repayment shall be ignored for purposes of determining the amount of Total Indebtedness until such time that the Cure Contribution ceases to be included in the calculation of EBITDA.

Holdco shall provide written notice (a "**Cure Notice**") to the Administrative Agent of its intention to cause to be made a Cure Contribution on or prior to the date the financial statements are required to be delivered pursuant to Section 5.1(1) and shall make such Cure Contribution no later than 10 Business Days following the date the financial statements are required to be delivered pursuant to Section 5.1(1). If, after giving effect to the recalculations set forth in this Section 5.1(12), Holdco shall then be in compliance with the financial covenants, then the applicable breach or default that had occurred shall be deemed cured for the purposes of this Agreement. For the avoidance of doubt but without limitation, no Loans or Letters of Credit shall be made available hereunder between the time that the Cure Notice is delivered and the time that the corresponding Cure Contribution is made.

(d)    [Intentionally Deleted].

(e)    ~~Cure~~Restriction Contribution—~~Special~~. The Borrower:

(i)    agrees to cause Holdco to make a ~~Cure~~Special Injection Contribution with net cash proceeds of not less than U.S.$2,000,000 on or before each of:

(A)    March 31, 2025;

(B)    ~~(A)~~ June 30, ~~2024~~2025; and

(~~B~~C)    September 30, ~~2024~~2025 and

- 123 -

> (B)    December 31, 2025;

>> and deposit all such proceeds into a bank account of the Borrower which is maintained with the Administrative Agent; and

> (ii)    may at any time make an additional one-time additional ~~Cure~~Special Injection Contribution of up to U.S.$750,000 in an amount not greater than the amount required to cause Holdco to re-establish compliance with Section 5.1(12)(c)~~; and~~

> ~~(each, a "**Special Cure Contribution**").  Notwithstanding Section 5.1(12)(d):~~

> ~~(iii)    no Cure Repayment shall be required in connection with a Special Cure Contribution;~~

> ~~(iv)    Special Cure Contributions may be made in consecutive Fiscal Quarters; and~~

> ~~(v)    Special Cure Contributions shall not count against the limits set out in Sections 5.1(12)(d)(iii), (d)(iv)and (d)(v).~~

~~Notwithstanding anything else contained herein,  the Cure Contribution made by Holdco on September 30, 2022 in the amount of U.S. $2,000,000 shall be deemed to be received during the Fiscal Quarter ending December 31, 2022.~~

(13)    *PPP Loans.* The Borrower shall, and shall cause each other Credit Party to, be in compliance with all applicable Laws in connection with the PPP Loans, including using all proceeds of PPP Loans solely for "allowable uses" under the Paycheck Protection Program, and using commercially reasonable efforts to utilize the proceeds of the PPP Loan, and to otherwise comply with all applicable conditions and requirements under the CARES Act and the Paycheck Protection Program, in a manner that shall maintain eligibility for forgiveness of as much of the principal and interest of the PPP Loans under the CARES Act and the Paycheck Protection Program as is practicable.

(14)    *Minimum Liquidity.* The Borrower shall cause Holdco to maintain Liquidity of not less than ~~(a)~~ U.S.$2,000,000 at all times ~~during the period commencing on April 14, 2022 through to and including May 31, 2023, (b) U.S.$4,500,000 at all times during the period commencing on June 1, 2023 through to and including November 30, 2023, and (c) U.S.$2,000,000 commencing on December 1, 2023 and at all times thereafter.~~

(15)    *SAFE Approval.* Not later than December ~~31~~1, ~~2024~~2025, Holdco shall have received all required approvals from the State Administration of Foreign Exchange ~~to permit~~for the ~~payment of all Restricted Sales receivable then overdue~~Fiscal Year 2026, all certified by a Responsible Officer of Holdco, such deadline as extended by the Required Lenders acting reasonably.

- 124 -

(16)    *Restricted Sales*. Not later than October 31, 2024, the Credit Parties shall have received additional aggregate cash payments in respect of Restricted Sales of not less than U.S.$3,700,000 into bank accounts maintained with the Administrative Agent.

(17)    *RJW Bailee Waiver*.  The Borrower shall make reasonable commercial efforts to obtain as soon as practicable a bailee waiver from RJW Transport, LLC, RJW Warehouse, LLC and RJW Logistics, LLC in form and substance satisfactory to the Administrative Agent, acting reasonably.

ARTICLE 6
NEGATIVE COVENANTS

**6.1    Negative Covenants.**

From (and including) the Closing Date until the Lender Termination Date, the Borrower covenants and agrees with the Lenders as follows:

(1)    *Indebtedness*.  The Borrower shall not, and shall not permit any other Group Party to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    any Indebtedness created hereunder;

(b)    Indebtedness pursuant to Permitted Intercompany Investments;

(c)    any Guarantee by a Group Party of Indebtedness of any other Group Party if such Indebtedness is permitted under this Agreement;

(d)    (i) Capital Lease Obligations and Indebtedness secured by Purchase Money Liens, provided that the aggregate principal amount of Indebtedness permitted by this Section 6.1(1)(d) shall not exceed $1,000,000 at any time and (ii) any Refinancing Indebtedness in respect of Indebtedness incurred or assumed pursuant to clause (i) above;

(e)    Secured Hedge Obligations;

(f)    Secured Cash Management Obligations;

(g)    [Reserved];

(h)    any Indebtedness in respect of performance bonds, surety bonds, appeal bonds, completion guarantees or like instruments incurred in the ordinary course of business;

(i)    Subordinated Indebtedness;

(j)    Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of any Group Party in the ordinary course of

- 125 -

business supporting obligations under (i) workers' compensation, health, disability or other employee benefits, casualty or liability insurance, unemployment insurance and other social security laws and local state and federal payroll taxes, (ii) obligations in connection with self-insurance arrangements in the ordinary course of business and (iii) bids, trade contracts, leases, statutory obligations and obligations of a like nature (provided that such Indebtedness shall be incurred as Letters of Credit under this Agreement to the extent practicable);

(k)     Indebtedness of any Group Party in the form of purchase price adjustments (including in respect of working capital), earnouts, deferred compensation, indemnification or other arrangements representing acquisition consideration or deferred payments of a similar nature incurred in connection with any Permitted Acquisition or other Investments permitted under Section 6.1(6) or asset disposition not prohibited under this Agreement;

(l)     Indebtedness relating to premium financing arrangements for property and casualty insurance plans and health and welfare benefit plans (including health and workers compensation insurance, employment practices liability insurance and directors and officers insurance), if incurred in the ordinary course of business;

(m)     Indebtedness existing on the Original Effective Date and set forth on Schedule 6.1(1) and Refinancing Indebtedness in respect thereof;

(n)     any other Indebtedness in an aggregate principal amount not exceeding U.S.$250,000 at any time outstanding; and

(o)     Indebtedness in respect of the PPP Loans to the extent that such PPP Loans are not forgiven under the CARES Act and the Paycheck Protection Program.

(2)     *Liens*.  The Borrower shall not, and shall not permit any other Group Party to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by the Group Parties except Permitted Liens.

(3)     *Corporate Changes*.  The Borrower shall not, and shall not permit any other Credit Party to, merge into or amalgamate or consolidate with any other Person, or permit any other Person to merge into or amalgamate or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing:

(a)     any Credit Party may merge into, amalgamate or consolidate with any other Credit Party (other than a Limited Credit Party); and

(b)     any Credit Party may liquidate or dissolve if it is a Wholly-Owned Subsidiary of another Credit Party and all of its property passes to such other Credit Party,

- 126 -

provided that any transaction pursuant to Section 6.1(3)(a) shall not be permitted unless the merged, amalgamated or continuing corporation provides written confirmation satisfactory to the Administrative Agent, acting reasonably, that it is liable for the obligations of the relevant Credit Party under the Loan Documents.

(4)      *Permitted Business*.  The Borrower shall not, and shall not permit any other Group Party to, engage to any material extent in any material business other than businesses of the type conducted by the Group Parties on the Closing Date and businesses reasonably related, ancillary or complementary thereto. The Borrower shall not permit Holdco to (a) engage in any business (other than non-operating business and management services, in each case typically conducted by a holding company), (b) own any assets (other than bank accounts and Equity Securities issued by, or, Indebtedness owing by any Group Party or HKCo), (c) incur any Indebtedness (other than the Secured Liabilities or the Holdco Loan), or (d) incur any expenses other than customary and reasonable administrative expenses associated with maintaining its corporate existence.

(5)      *Asset Dispositions*.  The Borrower shall not, and shall not permit any other Group Party to, make any Asset Disposition, except (i) where the Net Proceeds therefrom are dealt with in accordance with Section 2.9(2)(b) and (ii) in respect of Material Intellectual Property, only with the consent of the Required Lenders; provided that no such consent shall be required in respect of the licensing of Material Intellectual Property by a Group Party in the ordinary course of business,  on an arm's-length basis and where the ownership rights thereunder remain at all times with the applicable Group Party.

(6)      *Investments*.  The Borrower shall not, and shall not permit any other Group Party to, make or permit to exist any Investment, except:

(a)      Investments existing as at the Closing Date;

(b)      Investments in Cash Equivalents;

(c)      Permitted Intercompany Investments;

(d)      Investments funded directly (subject to intercompany funds flow) with the proceeds of Equity Securities or Permitted Shareholder Indebtedness issued by a Credit Party to Holdco;

(e)      [Reserve];

(f)      the Holdco Loan;

(g)      Investments for the establishment and maintenance (including the establishment and maintenance of required reserves in an amount not to exceed the reserves reasonably determined by an independent actuary and in any event not less than any amount that may be required from time to time in accordance with applicable

- 127 -

requirements of Law) of a captive insurance program that is reasonable and customary for companies engaged in the same or similar businesses; and

(h)  other Investments that would not cause the Investment Basket Amount to exceed U.S. $250,000.

(7)  *Acquisitions*.  The Borrower shall not, and shall not permit any other Group Party to, make or enter into any Acquisition other than Permitted Acquisitions.

(8)  *Hedge Arrangements*.  The Borrower shall not, and shall not permit any other Group Party to, enter into any Hedge Arrangement, except:

(a)  Hedge Arrangements entered into in order to hedge or mitigate risks to which any Group Party has actual exposure (other than those in respect of Equity Securities); or

(b)  Hedge Arrangements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of any Group Party.

(9)  *Restricted Payments*. The Borrower shall not, and shall not permit any other Group Party to, declare, pay or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that, so long as no Default or Event of Default is continuing or would be caused thereby:

(a)  a Group Party may make Restricted Payments to a Credit Party;

(b)  a Credit Party may make payments upon NCPS Indebtedness;

(c)  a Non-Credit Party Subsidiary may make Restricted Payments to a Non- Credit Party Subsidiary;

(d)  ~~the Credit Parties may pay management fees to the Sponsors of not more than U.S.$250,000 in any one Fiscal Year~~[intentionally deleted];

(e)  a Group Party may pay Permitted Holdco Reimbursements; ~~and~~

(f)  ~~[Intentionally Deleted].~~the Borrower may pay retention bonuses (including to its chief executive officer) during the Fiscal Year ending December 31, 2025 of not more than $1,264,000 in the aggregate, subject to (x) a 36 month clawback for the chief executive officer and (y) a one-year clawback for all other employees, which clawbacks, in the case of (x) and (y) above, are contained in the retention agreements or employment agreements, as applicable, with the chief executive officer and such employees previously delivered to the Administrative Agent; and

(g)  the Borrower may pay its chief executive officer an additional $300,000 retention bonus in April 2025, subject to a 36 month clawback contained in the

- 128 -

employment agreement with the chief executive officer previously delivered to the Administrative Agent.

(10)    *Transactions with Affiliates*.  The Borrower shall not, and shall not permit any other Group Party to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of their Affiliates, except:

(a)    in the ordinary course of business at prices and on terms and conditions not less favourable to the Borrower or such other Group Party than could be obtained on an arm's-length basis from unrelated third parties; provided that, no (including Permitted Restricted Sales are permitted except those (i) made in accordance with this Agreement prior to September 24, 2024, or (ii) which have been prepaid in full prior to delivery of the inventory or other property to the Affiliate which is the counterparty to such Restricted Sale where such Restricted Sale is not recognized in revenue prior to such time, excluding any royalty revenues which are recorded as a result of tax and transfer pricing regulationsthat qualify as such);

(b)    transactions between or among Group Parties involving both Credit Parties and Non-Credit Party Subsidiaries and on terms and conditions not less favourable to the Credit Parties party thereto than could be obtained on an arm's length basis from unrelated parties;

(c)    transactions not involving payments in excess of U.S.$1,000,000;

(d)    transactions between or among Credit Parties (other than Limited Credit Parties) not involving any of their other Affiliates;

(e)    transactions between or among Non-Credit Party Subsidiaries not involving any of their other Affiliates;

(f)    advances to employees for expenses incurred in the ordinary course of business; and

(g)    any Restricted Payment permitted by Section 6.1(9) or Investment permitted by Section 6.1(6).

(11)    *Pension Plan Compliance*.  The Borrower shall not, and shall not permit any other Group Party to, (a) terminate or wind-up or take any other action with respect to any Pension Plan which could reasonably be expected to result in any material liability of any Group Party, (b) fail to make full payment when due of all amounts which, under the terms of any Pension Plan or applicable Law, the Group Party is required to pay as contributions or premiums thereto or (c) establish, sponsor, administer, contribute to, participate in, or assume any liability (including any contingent liability) under any Defined Benefit Plan other than the Defined Benefit Plans listed on Schedule 3.1(12) (as supplemented in connection with a Permitted Acquisition).

- 129 -

(12)    *Capital Expenditures*.  The Borrower shall not, and shall not permit any other Group Party to, make Capital Expenditures in excess of, for the Fiscal Year ending December 31, 2020, U.S.$2,500,000 and, for each Fiscal Year thereafter, 110% of the applicable amount set out in the capital expenditure budget provided to the Administrative Agent and the Lenders pursuant to Section 5.1(1)(l).

(13)    *Issuance of Shares*.  The Borrower shall not, and shall not permit any other Group Party (other than Holdco) to, authorize or issue (other than to effect any asset disposition not prohibited by this Agreement) any Equity Securities other than to another Group Party, such that each Group Party (other than Holdco) shall remain a direct or indirect Wholly-Owned Subsidiary of Holdco.

(14)    *No Amendments to Constating Documents, etc*.  The Borrower shall not, and shall not permit any other Group Party to, amend, its constating documents, by-laws, partnership agreement or operating agreement, as applicable, in a manner that would adversely affect the Administrative Agent or the Lenders or, in the case of any Credit Party, such Credit Party's duty or ability to repay the Secured Liabilities.

(15)    *Cash Management*.  The Borrower shall not, and shall not permit any other Credit Party to, open or maintain any bank or deposit account with any Person that is not the Administrative Agent, unless such Person, the applicable Credit Party and the Administrative Agent enter into a blocked account agreement in form and substance reasonably satisfactory to the Administrative Agent.   This Section 6.1(15) shall not apply with respect to (i) any bank or deposit account which is used solely for payroll, benefits, withholding tax, customs or other fiduciary purposes, in each case funded in the ordinary course of business, (ii) customer, custodial or escrow accounts so long as no funds or other property of any Credit Party is deposited in such account and (iii) any brokerage accounts which solely contain cash or Cash Equivalents subject to any Liens referred to in clause (x) of the definition of Permitted Liens.

(16)    *Use of Proceeds*.  The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that each other Group Party and its and their respective directors, officers, employees and Relevant Agents shall not use, the proceeds of any Borrowing or Letter of Credit to:

    (a)    further an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws;

    (b)    fund, finance or facilitate any prohibited activities, business or transaction of or with any Sanctioned Person; or

    (c)    act in any other manner that would result in the violation of  any applicable Sanctions.

(17)    *Disbursements*. The Borrower shall not, and shall cause each Credit Party and Holdco not to, make any disbursements except on account of line items set out in the Baseline CFF.

1407-5777-6646.13 1407-5777-6646.22

- 130 -

(18)    *Logistics Suppliers.*  The Borrower shall not, and shall not permit any other Credit Party to, have any amounts owing to such Credit Party's logistic supplier which are overdue for a period of more than 30 days unless such amounts are being contested in good faith and by appropriate proceedings and, during such period during which amounts are being so contested, any corresponding Liens shall not be executed on or enforced against any of the assets of such Credit Party, provided further that such Credit Party shall have set aside on its books reserves deemed adequate therefor and not resulting in qualification by auditors

(19)    *Restricted Sales.*  The Borrower shall not, and shall not permit any other Credit Party to, make Restricted Sales other than Permitted Restricted Sales.

**ARTICLE 7**
**EVENTS OF DEFAULT**

**7.1    Events of Default.**

If any of the following events ("**Events of Default**") shall occur:

(a)    a Credit Party shall fail to pay any amount payable under any Transaction Document when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure shall continue unremedied for a period of 3 Business Days after written notice from the Administrative Agent;

(b)    any representation or warranty made or deemed made by or on behalf of any Credit Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed to be made;

(c)    Holdco shall fail to observe or perform any financial covenant in Section 5.1(12) ~~and the Cure Contribution has not been exercised within the allotted period~~;

(d)    a Credit Party shall fail to observe or perform any covenant, condition or agreement contained in Article 6 (or in any comparable provision of any other Loan Document)~~, except for the covenants contained in Sections **Error! Reference source not found.**, 6.1(10)(a)(ii), and 6.1(10)(a)(iii), to which the cure provided for in Section 7.1(e) shall apply~~;

(e)    any Credit Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in Section 7.1(a), (c) or (d)), and such failure shall continue unremedied for a period of 30 days after the earlier of (i) knowledge thereof by

- 131 -

any Credit Party, or (ii) notice thereof from the Administrative Agent to the Borrower (which notice shall be given at the request of any Lender);

(f)    (i) any Credit Party shall fail to make any payment whether of principal or interest, and regardless of amount, in respect of any Material Indebtedness, when as the same shall become due and payable, or (ii) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (in each case after expiration of any applicable grace or cure period set forth in the agreement evidencing or governing such Material Indebtedness); provided that this Section 7.1(f) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness so long as the proceeds of such sale or transfer are sufficient to, and are applied to, reduce such secured Indebtedness to nil or after giving effect to such payment, such Indebtedness no longer constitutes Material Indebtedness;

(g)    any Credit Party:

(i)    admits in writing that it is insolvent or unable to pay its liabilities as they generally become due;

(ii)   commits an act of bankruptcy under the BIA, files a voluntary assignment in bankruptcy under the BIA, makes a proposal (or files a notice of its intention to do so) under the BIA or seeks any other relief in respect of itself under the BIA;

(iii)  institutes any proceedings seeking relief in respect of itself under the CCAA;

(iv)   institutes any proceeding seeking relief in respect of itself under the WURA;

(v)    in addition to the foregoing, institutes any other proceeding, including pursuant to any U.S. Bankruptcy Law, seeking: (a) to adjudicate itself an insolvent person or a bankrupt; (b) to liquidate, dissolve or wind-up its business or assets; (c) to compromise, arrange, adjust or declare a moratorium in respect of the payment of, its debts; (d) to stay the rights of creditors generally (or any class of creditors); (e) any other relief in respect of itself under any federal, provincial or foreign applicable Law now or hereafter in effect relating to bankruptcy, winding-up, insolvency, receivership, restructuring of business, assets or debt, reorganization of business, assets or debt or protection of debtors from their creditors (such applicable Law includes any applicable corporations legislation to the

- 132 -

extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt); or (f) any other relief which provides for plans or schemes of reorganization, plans or schemes of arrangement or plans or schemes of compromise, in respect of itself, to be submitted or presented to creditors (or any class of creditors);

(vi)     applies for the appointment of a receiver (either court or privately appointed), interim receiver, receiver/manager (either court or privately appointed), sequestrator, conservator, custodian, administrator, trustee, liquidator or other similar official in respect of it, or any substantial part of its property; or

(vii)    threatens to do any of the foregoing, or takes any action, corporate or otherwise, to approve, effect, consent to or authorize any of the actions described in this Section 7.1(g);

(h)     any petition is filed, application made or other proceeding instituted, including pursuant to any U.S. Bankruptcy Law, against or in respect of any Credit Party:

(i)      seeking to adjudicate it an insolvent person;

(ii)     seeking a bankruptcy order against it under the BIA;

(iii)    seeking to institute proceedings against it under the CCAA;

(iv)     seeking to institute proceedings against it under the WURA;

(v)      seeking, in addition to the forgoing: (a) to adjudicate it an insolvent person or a bankrupt; (b) to liquidate, dissolve or wind-up its business or assets; (c) to compromise, arrange, adjust or declare a moratorium in respect of the payment of, its debts; (d) to stay the rights of creditors generally (or any class of creditors); (e) any other relief in respect of it under any federal, provincial or foreign applicable Law now or hereafter in effect relating to bankruptcy, winding-up, insolvency, receivership, restructuring of business, assets or debt, reorganization of business, assets or debt, or protection of debtors from their creditors (such applicable Law includes any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt); or (f) any other relief which provides plans or schemes of reorganization, plans or schemes of arrangement or plans or schemes of compromise in respect of it, to be submitted or presented to creditors (or any class of creditors); or

(vi)     seeking the issuance of an order for the appointment of a receiver, interim receiver, receiver/manager, sequestrator, conservator, custodian,

1407-5777-6646.13 1407-5777-6646.22

- 133 -

administrator, trustee, liquidator or other similar official in respect of it or any substantial part of its property,

and such petition, application or proceeding continues undismissed, or unstayed and in effect, for a period of 30 days after the institution thereof, provided that: (a) if the Credit Party fails to contest such petition, application or proceeding the 30 day grace period shall cease to apply;  (b) if any of the relief sought in such proceeding is granted within the 30 day period, such grace period will cease to apply; or (c) if the Credit Party files an answer or other responding materials admitting the material allegations of a petition, application or other proceeding filed against it, such grace period will cease to apply;

any other event occurs which, under the Laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in either of Sections 7.1(g) or (h);

(i)     one or more judgments for the payment of money in a cumulative amount in excess of U.S.$7,500,000 (or its then equivalent in any other currency) in the aggregate is rendered against any one or more of the Group Parties and they have not (i) provided for its discharge in accordance with its terms within 30 days from the date of entry thereof, or (ii) procured a stay of execution thereof within 30 days from the date of entry thereof and within such period, or such longer period during which execution of such judgment has not been stayed, appealed such judgment and caused the execution thereof to be stayed during such appeal, provided that if enforcement or realization proceedings are lawfully commenced in respect thereof in the interim, such grace period shall cease to apply;

(j)     this Agreement or any Security Document or any material obligation hereunder or thereunder at any time for any reason terminates or ceases to be in full force and effect and a legally valid, binding and enforceable obligation of any Credit Party, is declared to be void or voidable or is repudiated, or the validity, binding effect, legality or enforceability hereof or thereof is at any time contested by any Credit Party, or any Credit Party denies that it has any or any further liability or obligation hereunder or thereunder (in each case other than as a result of the release of such Credit Party thereunder in accordance with such Loan Document or this Agreement), or at any time it is unlawful or impossible for any Credit Party to perform any of its material obligations hereunder or thereunder;

(k)     any Lien purported to be created by any Security Document shall cease to be, or shall be asserted by any Credit Party not to be, a valid, perfected, first- priority Lien (subject to Permitted Liens) in Collateral with a Fair Market Value or book value (whichever is greater) in excess, individually or in the aggregate, of U.S.$1,000,000, except as a result of (i) the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents, (ii) the release thereof as provided in the applicable Security Document or this Agreement or (iii) as a result of the Administrative Agent's (A) failure to maintain control of any Collateral delivered to it under the Security Documents or

- 134 -

(B) file Uniform Commercial Code continuation statements or *Personal Property Security Act* renewal statements;

(l)    a Change in Control shall occur;

(m)    Holdco shall fail to make a Special ~~Cure~~Injection Contribution as required under Section5.1(12)(e);

(n)    any Person shall breach any term of a subordination agreement with respect to Subordinated Indebtedness;

(o)    Holdco shall fail to comply with Section 5.1(14) and such failure shall continue for 20 consecutive Business Days;

(p)    the Borrower shall fail to deliver any materials required pursuant to Section 5.1(t), (u) or (v) within two (2) Business Days of the applicable Bi-Weekly Date; ~~or~~

(q)    a negative variance of more than 15% of actual cumulative disbursements vs forecast cumulative disbursements for any Testing Period, as set out in a Historical Variance Report; or

(r)    if any Person takes any steps to collect or enforce the Orgain Judgment or the Settlement Agreement Judgment,

then, (A) and in every such event other than those described in (B), and at any time thereafter during the continuance of such event or any other such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (x) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (y) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind except as set out earlier in this paragraph, all of which are hereby waived by the Borrower, and (B) in the case of any event with respect to the Borrower described in Section 7.1(f), (h) or (i), the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, and Cover for any outstanding Letters of Credit, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. In addition to the foregoing, upon the occurrence of any Event of Default, the Administrative Agent shall, at the direction of any Lender, at the cost of the Borrower, appoint a financial advisor to report to the Administrative Agent and the Lenders on such terms as are acceptable to the Administrative Agent, acting reasonably.

- 135 -

## ARTICLE 8
## THE ADMINISTRATIVE AGENT

**8.1    Appointment of Administrative Agent.**

Each Lender hereby designates Royal Bank of Canada as Administrative Agent to act as herein specified and as specified in the other Loan Documents.  Each Lender hereby irrevocably authorizes the Administrative Agent to take such action on its behalf under the provisions of the Loan Documents and to exercise such powers and to perform such duties thereunder as are specifically delegated to or required of the Administrative Agent by the terms thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its duties hereunder by or through its agents or employees.

**8.2    Secured Parties.**

(a)    The Security Documents shall be in favour of the Administrative Agent for the benefit of the Secured Parties.

(b)    The Secured Hedge Obligations shall be secured by the Liens granted under the Security Documents and rank *pari passu* with the obligations of the Borrower under this Agreement.

(c)    The Secured Cash Management Obligations shall be secured by the Liens granted under the Security Documents and rank *pari passu* with the obligations of the Borrower under this Agreement.

(d)    Notwithstanding such common security, all decisions regarding the administration and enforcement of the Security Documents shall be made by the Lenders alone, and no Secured Hedge Counterparty or Secured Cash Management Provider shall have any voting rights under this Agreement or any other right whatsoever to participate in the administration or enforcement of the Security Documents.  For the avoidance of doubt but without limitation, any or all of the Security Documents or any rights contained therein may be amended or released by the Administrative Agent without the consent of any Secured Hedge Counterparty or Secured Cash Management Provider.

(e)    Each Lender that is or becomes a Secured Hedge Counterparty or Secured Cash Management Provider shall be bound as such by virtue of its execution and delivery of this Credit Agreement or an Assignment and Assumption, as applicable, notwithstanding that such capacity as Secured Hedge Counterparty or Secured Cash Management Provider may not be identified on its signature line. Each Lender shall cause its Related Non-Party Beneficiaries to comply with the terms and conditions of the Transaction Documents applicable to them and pay and perform their debts, liabilities and obligations thereunder.

- 136 -

**8.3    Limitation of Duties of Administrative Agent.**

The Administrative Agent shall have no duties or responsibilities except those expressly set out with respect to the Administrative Agent in this Agreement and as specified in the other Loan Documents.  None of the Administrative Agent, nor any of its Related Parties shall be liable for any action taken or omitted by it as such hereunder or in connection herewith, unless caused by its or their gross negligence or willful misconduct.  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have, by reason of this Agreement or the other Loan Documents, a fiduciary relationship in respect of any Secured Party.  Nothing in this Agreement or the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement except as expressly set out herein.  The Administrative Agent shall be under no duty to take any discretionary action permitted to be taken by it pursuant to this Agreement or the other Loan Documents unless it is requested in writing to do so by the Required Lenders.

**8.4    Lack of Reliance on the Administrative Agent.**

(1)    *Independent Investigation*.  Independently, and without reliance upon the Administrative Agent, each Lender, to the extent it deems appropriate, has made and shall continue to make (a) its own independent investigation of the financial condition and affairs of the Group Parties in connection with the taking or not taking of any action in connection herewith, and (b) its own appraisal of the creditworthiness of the Group Parties, and, except as expressly provided in this Agreement and the other Loan Documents, the Administrative Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the consummation of the Transactions or at any time or times thereafter.

(2)    *Agents Not Responsible*.  The Administrative Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, collectability, priority or sufficiency of this Agreement or the other Loan Documents or the financial condition of the Credit Parties or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or the other Loan Documents, or the financial condition of the Credit Parties, or the existence or possible existence of any Default or Event of Default.

**8.5    Certain Rights of the Administrative Agent.**

If the Administrative Agent shall request instructions from the Lenders or the Required Lenders (as the case may be) with respect to any act or action (including the failure to act) in connection with this Agreement or the other Loan Documents, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received written instructions from the Lenders or the Required Lenders, as applicable, and the Administrative Agent shall not incur liability to any Person by reason of so refraining.

- 137 -

Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting under this Agreement and the other Loan Documents in accordance with the instructions of the Required Lenders, or, to the extent required by Section 9.2, all of the Lenders.

**8.6    Reliance by Administrative Agent.**

The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or facsimile message, electronic mail, cablegram, radiogram, order or other documentary teletransmission or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan or Borrowing that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

**8.7    Indemnification of Administrative Agent.**

To the extent the Administrative Agent is not reimbursed and indemnified by the Borrower, each Lender shall reimburse and indemnify the Administrative Agent, in proportion to its aggregate Applicable Percentage, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent in performing its duties hereunder, in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable to the Administrative Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence (it being acknowledged that ordinary negligence does not necessarily constitute gross negligence) or willful misconduct.

**8.8    The Administrative Agent in its Individual Capacity.**

With respect to its obligations under this Agreement and the Loans made by it, Royal Bank of Canada (as successor to HSBC Bank Canada by way of an amalgamation among HSBC Bank Canada and Royal Bank of Canada) and The Toronto-Dominion Bank, each in its capacity as a Lender hereunder, shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not performing the duties, if any, specified herein; and the terms "Lenders", "Required Lenders", "Revolving Credit Lenders", "Term Credit Lenders" and any similar terms shall, unless the context clearly otherwise indicates, include each of Royal

- 138 -

Bank of Canada and The Toronto-Dominion Bank in its capacity as a Lender hereunder.  The Administrative Agent and the Arrangers may accept deposits from, lend money to, and generally engage in any kind of banking, trust, financial advisory or other business with the Borrower or any Affiliate of the Borrower as if it were not performing the duties, if any, specified herein, and may accept fees and other consideration from the Borrower for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

**8.9    May Treat Lender as Owner.**

The Borrower, the Administrative Agent and the Issuing Bank may deem and treat each Lender as the owner of the Loans recorded on the Register maintained pursuant to Section 9.4(3) for all purposes hereof until a written notice of the assignment or transfer thereof shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who at the time of making such request or giving such authority or consent is the owner of a Loan shall be conclusive and binding on any subsequent owner, transferee or assignee of such Loan.

**8.10    Successor Administrative Agent.**

(1)    *Replacement of Administrative Agent*.  The Administrative Agent may resign at any time by giving written notice thereof to the Lenders, the Issuing Banks and the Borrower.  Upon any such resignation the Required Lenders shall have the right, upon five Business Days' notice to the Borrower, to appoint a successor Administrative Agent (who shall not be a non-resident of Canada within the meaning of the Income Tax Act), subject to the approval of the Borrower where no Default or Event of Default has occurred and is continuing, such approval not to be unreasonably withheld.  If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation of the retiring Administrative Agent, then, upon five Business Days' notice to the Borrower, the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent (subject to approval of the Borrower where no Default of Event of Default has occurred and is continuing, such approval not to be unreasonably withheld), which shall be a financial institution organized under the laws of Canada having a combined capital and surplus of at least U.S.$1,000,000,000 or having a parent company with combined capital and surplus of at least U.S.$1,000,000,000.

(2)    *Rights, Powers, etc*.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Article 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

- 139 -

**8.11    No Independent Legal Action.**

Notwithstanding that any debt arising hereunder to a Lender shall be separate and independent debt, no Lender may take any independent legal action to enforce any obligation of the Borrower hereunder.  Each Lender hereby acknowledges that, to the extent permitted by applicable Law, the Security Documents and the remedies provided thereunder to the Secured Parties are for the benefit of the Secured Parties collectively and acting together and not severally, and further acknowledges that each Secured Party's rights hereunder and under the Security Documents are to be exercised collectively, not severally, by the Administrative Agent upon the decision of the Required Lenders.  Accordingly, notwithstanding any of the provisions contained herein or in the Security Documents, each of the Lenders hereby covenants and agrees that it and its Related Non-Party Beneficiaries shall not be entitled to take any action hereunder or thereunder, including any declaration of default hereunder or thereunder, but that any such action shall be taken only by the Administrative Agent with the prior written agreement of the Required Lenders, provided that, notwithstanding the foregoing, in the absence of instructions from the Lenders (or the Required Lenders) and where in the sole opinion of the Administrative Agent the exigencies of the situation so warrant such action, the Administrative Agent may without notice to or consent of the Lenders (or the Required Lenders) take such action on behalf of the Secured Parties as it deems appropriate or desirable in the interests of the Secured Parties.  Each Lender hereby further covenants and agrees that upon any such written consent being given by the Required Lenders (or, to the extent required by Section 9.2, the Lenders), it and its Related Non-Party Beneficiaries shall co-operate fully with the Administrative Agent to the extent requested by the Administrative Agent, and each Lender further covenants and agrees that all proceeds from the realization of the Security Documents, to the extent permitted by applicable Law, are held for the benefit of all of the Secured Parties and shall be shared among them in accordance with this Agreement, and each Lender acknowledges that all costs of any such realization (including all amounts for which the Administrative Agent is required to be indemnified under the provisions hereof) shall be shared among the Lenders in accordance with this Agreement.  Each Lender covenants and agrees to do, and to cause its Related Non-Party Beneficiaries to do, all acts and things and to make, execute and deliver all agreements and other instruments, so as to fully carry out the intent and purpose of this Section 8.11, and each Lender hereby covenants and agrees that it and its Related Non-Party Beneficiaries shall not (i) from and after the Closing Date, seek, take, accept, receive or maintain any Lien (other than a right of set-off) or Guarantee for any of the Secured Liabilities other than is provided to the Administrative Agent, or (ii) enter into any other agreement with any of the Group Parties relating in any manner whatsoever to the Credits unless all of the Lenders shall at the same time obtain the benefit of any such agreement.  For the avoidance of doubt but subject always to Section 2.16, nothing in this Section 8.11 shall limit or otherwise affect the ability of any Secured Party to separately enforce its rights under any document, instrument or agreement with respect to any Secured Hedge Arrangement or Cash Management Services.

**8.12    Arranger.**

The Arrangers have no duties, liabilities or obligations hereunder.

- 140 -

**8.13    Québec Security.**

For the purposes of the grant of security under the laws of the Province of Quebec which may now or in the future be required to be provided by any Credit Party, the Administrative Agent is hereby irrevocably authorized and appointed by each of the Lenders hereto to act as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Quebec) for all present and future Lenders (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted under the laws of the Province of Quebec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and applicable Laws (with the power to delegate any such rights or duties). The execution prior to the Closing Date by the Administrative Agent in its capacity as the Hypothecary Representative of any deed of hypothec or other security documents made pursuant to the laws of the Province of Quebec, is hereby ratified and confirmed.  Any Person who becomes a Lender or successor Administrative Agent shall be deemed to have consented to and ratified the foregoing appointment of the Administrative Agent as the Hypothecary Representative on behalf of all Lenders, including such Person and any Affiliate of such Person designated above as a Lender.  For greater certainty, the Administrative Agent, acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Administrative Agent in this Agreement, which shall apply mutatis mutandis.  In the event of the resignation of the Administrative Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Administrative Agent, such successor Administrative Agent shall also act as the Hypothecary Representative, as contemplated above.

**8.14    Erroneous Payments by the Administrative Agent.**

(1)     *Clawback*.  If the Administrative Agent notifies a Lender or other Secured Party, or any Person who has received funds on behalf of a Lender or other Secured Party under or pursuant to any of the Loan Documents (any such Lender, other Secured Party or other recipient, a "**Payment Recipient**") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (2)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted or paid to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, other Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or other Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than three Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the

- 141 -

Administrative Agent in same day funds at the greater of (x) in respect of an Erroneous Payment in U.S. Dollars, the Federal Funds Effective Rate, and in respect of an Erroneous Payment in Canadian Dollars or any other currency, at a fluctuating rate per annum equal to the overnight rate at which Canadian Dollars or funds in the currency of such Erroneous Payment, as the case may be, may be borrowed by the Administrative Agent in the interbank market in an amount comparable to such Erroneous Payment (as determined by the Administrative Agent), and (y) a rate determined by the Administrative Agent in accordance with banking industry rules or prevailing market practice for interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this Section 8.14(1) shall be conclusive, absent manifest error.

(2)    *Error Designation*.  Without limiting the immediately preceding Section 8.14(1), each Lender or other Secured Party, or any Person who has received funds on behalf of a Lender or other Secured Party under or pursuant to any of the Loan Documents, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, paid, or received, in error or by mistake (in whole or in part) in each case:

(a)    (i) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent express written confirmation from the Administrative Agent to the contrary), or (ii) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(b)    such Lender or other Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.14(2).

(3)    *Set-off*.  Each Lender or other Secured Party hereby authorizes the Administrative Agent to set-off, net and apply any and all amounts at any time owing to such Lender or other Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or other Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding Section 8.14(1)  or under the indemnification provisions of this Agreement.

(4)    *Assignment*.  In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the

- 142 -

Administrative Agent in accordance with the immediately preceding Section 8.14(1), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its behalf) (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), upon the Administrative Agent's notice to such Lender at any time:

(a)     such Lender shall be deemed to have assigned its Loans (but not any of its Commitments) under any of the applicable Credits with respect to which such Erroneous Payment was made (the "**Erroneous Payment Impacted Facilities**") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not any of its Commitments) of the Erroneous Payment Impacted Facilities, the "**Erroneous Payment Deficiency Assignment**") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption with respect to such Erroneous Payment Deficiency Assignment;

(b)     the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment;

(c)     upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and any of its Commitments which shall survive as to such assigning Lender; and

(d)     the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment.

Subject to Section 9.4, the Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and, upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender under any of the Credits and such Commitments under such Credits shall remain available in accordance with the terms of this Agreement. In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or other Secured Party under the applicable Loan

- 143 -

Documents with respect to each Erroneous Payment Return Deficiency (the "**Erroneous Payment Subrogation Rights**").

(5)    *Indebtedness Satisfaction*. The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Indebtedness owed by the Borrower or any other Credit Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from (i) the Borrower or any other Credit Party or (ii) the proceeds of realization from the enforcement of one or more of the Loan Documents against or in respect of one or more of the Credit Parties; provided that, in each case, such funds were received by the Administrative Agent for the purpose of discharging such Indebtedness.

(6)    *Waiver of Defences*. To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including waiver of any defense based on "discharge for value", "good consideration" for the Erroneous Payment or change of position by such Payment Recipient, any defense that the intent of the Administrative Agent was that such Payment Recipient retain the Erroneous Payment in all events, or any doctrine or defense similar to any of the foregoing.

(7)    *Survival*.  Each party's obligations, agreements and waivers under this Section 8.14 shall survive the resignation or replacement of the Administrative Agent, or any assignment or transfer of rights or obligations by, or the replacement of, a Lender or an Affiliate thereof the termination of the Commitments and/or the repayment, satisfaction or discharge of all Indebtedness (or any portion thereof) under any Loan Document.

(8)    *Affiliates*.  For purposes of this Section 8.14, each Lender:

(a)    agrees it is executing and delivering this Agreement with respect to this Section 8.14 both on its own behalf and as agent for and on behalf of its Affiliates referred to in this Section 8.14 and any Person receiving funds under or pursuant to any of the Loan Documents on behalf of such Lender or any of such Affiliates;

(b)    represents, warrants, covenants and agrees that its Affiliates referred to in this Section 8.14 and any Person receiving funds under or pursuant to any of the Loan Documents on behalf of such Lender or any of such Affiliates are bound by the provisions of this Section 8.14; and

(c)    agrees that any matter or thing done or omitted to be done by such Lender, its Affiliates, or any Person receiving funds under or pursuant to any of the Loan Documents on behalf of such Lender or any of such Affiliates which are the subject of this Section 8.14 will be binding upon such Lender and each Lender does hereby indemnify and save the Administrative Agent and its Affiliates harmless from any and all losses, expenses, claims, demands or other liabilities of

- 144 -

the Administrative Agent and its Affiliates resulting from the failure of such Lender, its Affiliates or such Persons to comply with their obligations under and in respect of this Section 8.14.

(9)      *No Borrower Liability.*  Except pursuant to an Erroneous Payment Deficiency Assignment or the exercise of any Erroneous Payment Subrogation Rights (or any equivalent equitable subrogation rights), the Borrower shall not have any liability to the Administrative Agent for any Erroneous Payment or any interest, loss, cost or damages related there to arising therefrom under any provision of this Agreement or any other Loan document or under any legal principle or theory, whether arising by law or in equity.


## ARTICLE 9
## MISCELLANEOUS

**9.1    Notices.**

(1)      *Method and Contact Information.*  Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 9.1(2)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or e-mail in each case to the addressee, as follows:

(i)      if to the Borrower or any other Credit Party:

Iovate Health Sciences International Inc.
381 North Service Road West
Oakville, ON L6M 0H4
Attention:    Tanya Mistry
E-mail:        tanya.mistry@iovate.com
Facsimile:    905-678-3402


(ii)      if to the Administrative Agent:

Royal Bank of Canada
155 Wellington Street West, 8th Floor
Toronto, Ontario M5V 3K7
Attention: Manager, Agency
E-mail: rbcmagnt@rbccm.com
Facsimile: 416-842-4023

With a copy in the case of each demand, notice, or communication to the Administrative Agent other than drawdown notices, conversion notices, rollover notices and repayment notices, to:

- 145 -

Royal Bank of Canada
~~16 York~~20 King Street West
~~Suite 500 Box 64~~Toronto, ON M5~~J 0E6~~H 1C4
Attention: Andrew ~~Sclater~~O'Coin
E-mail: andrew.~~sclater@rbccm~~ocoin@rbc.com

(iii)    if to any Lender or any Issuing Bank, to it at its address or e-mail address set out opposite its name on Schedule 9.1(1) or in the Assignment and Assumption by which it becomes a Lender.

(2)    *Electronic Communications.*  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communication to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(3)    *Change of Address; When Notice Deemed Given.*  Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto in the manner provided in Section 9.1.  All notices and other communications given to any Party in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

**9.2    Waivers; Amendments.**

(1)    *Waiver.*  No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 9.2(2), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(2)    *Amendments.*  Subject to Section 9.2(3) and 9.2(4), neither this Agreement nor any other Loan Document (or any provision hereof or thereof) may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by each Credit Party to the relevant Loan Document and the Required Lenders or by each Credit Party party to the relevant

- 146 -

Loan Document and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall:

(a)    increase the amount of any Commitment of any Lender;

(b)    extend the expiry date of any Commitment of any Lender;

(c)    reduce the principal amount of any Loan or reduce the rate of interest or any fee applicable to any Loan (provided that the Required Lenders may amend the definition of Total Leverage Ratio or any of its constituent definitions notwithstanding any effect on the Applicable Margin);

(d)    postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable in respect thereof, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment (it being understood that modifications to, or waivers of, the mandatory prepayment provisions of Section 2.9(2) do not fall within this clause (d));

(e)    change Section 2.16 in a manner that would alter the sharing of payments required thereby;

(f)    change any of the provisions of Section 9.2 or the definition of "**Required Lenders**" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder;

(g)    change any of the provisions of Section 2.16(3) in a manner that would alter the order of the application of proceeds set forth therein;

(h)    contractually subordinate the payments obligation of the Credit Parties under the Loan Documents to any other payment obligation of such Credit Party;

(i)    contractually subordinate the priority of any Lien arising under the Security Documents; or

(j)    release any Credit Party from any material obligations under the Security Documents, release or discharge any of the Liens arising under the Security Document, or waive or forgo the delivery of any Security Documents required hereunder,

in each case without the prior written consent of each Lender, or in the case of the matters referred to in Section 9.2(2)(a), (b), (c), (d)and (e), without the prior written consent of each Lender directly affected thereby, and provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Issuing Bank or the Swingline Lender hereunder, as the case may be, without the prior written consent of the Administrative Agent, Issuing Bank or Swingline Lender (as applicable).  Notwithstanding

- 147 -

Section 9.2(2)(j), the Administrative Agent may release and discharge the Liens constituted by the Security Documents or a Guarantor from the Group Guarantee to the extent necessary to enable a Credit Party to complete any Asset Disposition or other sale, transfer, assignment or other disposition which is not prohibited by this Agreement or the other Loan Documents. The Administrative Agent may also subordinate the Liens constituted by the Security Documents to any Lien described in clause (c) of the definition of Permitted Lien. In addition to the forgoing, any increase, extension or renewal of the Credits shall be subject to the Administrative Agent and all U.S. federally regulated Lenders having received, with respect to any mortgaged real property located in the United States, a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination (and if any improvements on such mortgaged real property are located in a special flood hazard area, the Administrative Agent and all U.S. federally regulated Lenders having received (1) a notice about special flood hazard area status and flood disaster assistance duly executed by the applicable Credit Parties and (2) evidence of flood insurance required by Section 5.1(9)(b) of the Credit Agreement in form and substance reasonably satisfactory to them).

(3)     [Reserved].

(4)     *Errors*. The Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document.

**9.3     Expenses; Indemnity; Damage Waiver.**

(1)     *Expenses*.  The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of one primary counsel and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and all applicable Taxes, in connection with the syndication of the credit facilities provided for herein (including all applicable Intralinks fees) and the preparation and administration of this Agreement and the other Loan Documents, (b) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of one primary counsel and, if necessary one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and all applicable Taxes, in connection with any amendments, modifications or waivers of the provisions hereof or of any of the other Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (c) all out-of-pocket expenses incurred by the Administrative Agent, the Arranger or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender and all applicable Taxes, in connection with the assessment, enforcement or protection of their rights in connection with this Agreement, including its rights under Section 9.3, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

- 148 -

(2)      *Indemnity*.  The Borrower shall indemnify the Arrangers, the Administrative Agent and each Lender, as well as each Related Party and each permitted assignee of any of the foregoing Persons (each such Person and each such assignee being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, cost recovery actions, damages, expenses and liabilities of whatsoever nature or kind and all reasonable and documented out-of-pocket expenses, including reasonable and documented fees, charges and disbursements of counsel (limited to reasonable fees, disbursements and other charges of one primary counsel for all Indemnitees, taken as a whole, and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all Indemnitees, taken as a whole (and, in the case of an actual or perceived conflict of interest, where an Indemnitee affected by such conflict informs the  Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for such affected Indemnitee)) and all applicable Taxes (other than Excluded Taxes and consistent with Section 2.15 herein, but including all Taxes representing losses, claims or damages with respect to any non-Tax claim) to which any Indemnitee may become subject arising out of or in connection with (a) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder, and the consummation of the Transactions or any other transactions thereunder, (b) any Loan or Letter of Credit or any actual or proposed use of the proceeds therefrom, including any refusal by the Issuing Bank to honour a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, (c) any Environmental Liability, (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, (e) any other aspect of this Agreement and the other Loan Documents, or (f) the enforcement of any Indemnitee's rights hereunder and any related assessment, investigation, defence, preparation of defence, litigation and enquiries; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence (it being acknowledged that ordinary negligence does not necessarily constitute gross negligence) or wilful misconduct of such Indemnitee, (B) result from a claim brought by any Group Party for a material breach of such Indemnitee's obligations under this Agreement or any other Loan Document if such Group Party has obtained a final and nonappealable judgment by a court of competent jurisdiction in such Group Party's favor on such claim or (C) result from a proceeding that does not involve an act or omission by the Borrower or any of its Affiliates and that is brought by an Indemnitee against any other Indemnitee (other than a proceeding that is brought against the Administrative Agent or an Arranger in its capacity as such).

(3)      *Lender Responsibility for Unpaid Expenses and Indemnity.*  To the extent that the Borrower fails to pay any amount required to be paid under Sections 9.3(1) or (2), each Lender severally agrees to pay to the Administrative Agent, the Issuing Bank or the Swingline Lender (as applicable) such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount;

1407-5777-6646.13 1407-5777-6646.22

- 149 -

provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Issuing Bank or the Swingline Lender, in its capacity as such.

(4)    *Inspections for Administration.*  Any inspection of any property of any Credit Party made by or through the Administrative Agent or any Lender shall be for purposes of administration of the Credits only, and no Credit Party shall be entitled to rely upon the same (whether or not such inspections are at the expense of the Borrower).

(5)    *No Representation.*  By accepting or approving anything required to be observed, performed, fulfilled or given to the Administrative Agent or the Lenders pursuant to the Loan Documents, neither the Administrative Agent nor the Lenders shall be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by the Administrative Agent or the Lenders.

(6)    *Relationship Between Parties.*  The relationship between the Borrower and the Administrative Agent and the Lenders is, and shall at all times remain, solely that of borrowers and lenders.  Neither the Administrative Agent nor the Lenders shall under any circumstances be construed to be partners or joint venturers of the Borrower or its Affiliates.  Neither the Administrative Agent nor the Lenders shall under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with the Borrower or its Affiliates, or to owe any fiduciary duty to the Borrower or its Affiliates.  Neither the Administrative Agent nor the Lenders undertake or assume any responsibility or duty to the Borrower or its Affiliates to select, review, inspect, supervise, pass judgment upon or inform the Borrower or its Affiliates of any matter in connection with their property or the operations of the Borrower or its Affiliates. The Borrower and its Affiliates shall rely entirely upon their own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by the Administrative Agent or the Lenders in connection with such matters shall be solely for the protection of the Administrative Agent and the Lenders, and neither the Borrower nor any other Person shall be entitled to rely thereon.

(7)    *Limitation of Liability.*  The Administrative Agent and the Lenders shall not be responsible or liable to any Person for any loss, damage, liability or claim of any kind relating to injury or death to Persons or damage to property caused by the actions, inaction or negligence of any Credit Party or its Affiliates, and the Borrower hereby indemnifies and holds the Administrative Agent and the Lenders harmless on the terms set out in Section 9.3(2) from any such loss, damage, liability or claim.

(8)    *Payment of Expenses and Indemnity.*  All amounts due under Section 9.3 shall be payable not later than 10 Business Days after written demand therefor.

- 150 -

**9.4    Successors and Assigns.**

(1)    *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (a) the Borrower shall not assign nor otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), and (b) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with Section 9.4. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(2)    *Assignment by Lenders*.  Any Lender may assign to one or more assignees (treating any fund that invests in bank loans and any other fund that invests in bank loans and is managed by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single assignee) all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitments and the Loans at the time owing to it); provided that (a) except in the case of an assignment to a Lender or a Lender Affiliate, the Borrower must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), and (b) except in the case of an assignment of (i) any Revolving Credit Commitment or any Term Credit Commitment prior to the Closing Date to an assignee that is a Lender immediately prior to giving effect to such assignment, the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed); (c) the Borrower's consent shall not be required with respect to any assignment made at any time after the occurrence and during the continuance of an Event of Default, (d) except in the case of an assignment to a Lender or a Lender Affiliate or an assignment of the entire remaining amount of the assigning Lender's Commitment, the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date on which the Assignment and Assumption relating to such assignment is delivered to the Administrative Agent) shall not be less than U.S.$5,000,000, unless each of the Borrower and the Administrative Agent otherwise consent in writing and the amount held by each Lender after each such assignment shall not be less than U.S.$5,000,000, unless each of the Borrower and the Administrative Agent otherwise consent in writing, (e) each partial assignment in respect of a Commitment and the related Loans shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement in respect of such Commitment and the related Loans, (f) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with (except in the case of an assignment to a Lender or a Lender Affiliate) a processing and recordation fee of U.S.$3,500, payable by the assigning Lender, (g) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, and (h) no assignment may be made to a Sponsor, any Group Party, any Affiliate of a Group Party or a Sponsor, or a Defaulting Lender. The Administrative Agent shall provide the Borrower and each Lender with written notice of any change in (or new) address of a Lender disclosed in an Administrative Questionnaire.  Subject to

1407-5777-6646.13 1407-5777-6646.22

- 151 -

acceptance and recording thereof pursuant to Section 9.4(4), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, shall have all of the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, and 2.15 and 9.3).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with Section 9.4 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.4(5).

(3)    *Register.*  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in Toronto, Ontario a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans (with interest rate) and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Issuing Bank, and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(4)    *Acceptance and Recording of Assignments.*  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 9.4(2) and any written consent to such assignment required by Section 9.4(2), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 9.4(4).

(5)    *Participations.*  Any Lender may, without notice to the Borrower or the consent of the Borrower, the Administrative Agent, the Issuing Bank or the Swingline Lender, sell participations to one or more Persons (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitment and the Loans owing to it); provided that (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (c) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that (d) such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender shall not, without the consent of

- 152 -

the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.2(2) that affects such Participant, (e) the Participant shall agree to maintain the confidentiality of Information (as defined in Section 9.16) on terms and conditions substantively similar to those contained in Section 9.16, and (f) no sale of a participation may be made to a Sponsor, any Group Party, any Affiliate of a Group Party or a Sponsor, or a Defaulting Lender. Subject to Section 9.4(6), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.3 (subject to the requirements and limitations therein, including the requirements under Section 2.15(5) (it being understood that any documentation required under Section 2.15(5) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.4(2).  To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 9.11 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.16(4) as though it were a Lender.

(6)     *Rights of Participant.*  A Participant shall not be entitled to receive any greater payment under Sections 2.13, 2.14, 2.15 and 9.3 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(7)     *Lender Pledge of Security.*  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and Section 9.4 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(8)     *Borrower's Obligations.*  Any assignment or grant of a participation pursuant to Section 9.4 shall constitute neither a repayment by the Borrower to the assigning or granting Lender of any Loan included therein, nor a new advance of any such Loan to the Borrower by such Lender or by the assignee or Participant, as the case may be.  The parties acknowledge that the Borrower's obligations hereunder with respect to any such Loans shall continue and shall not constitute new obligations as a result of such assignment or participation.

**9.5     Anti-Money Laundering Legislation.**

(1)     *Information.*  The Borrower acknowledges that, pursuant to AML Legislation, the Lenders and the Administrative Agent may be required to obtain, verify and record information regarding the Borrower, its directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Borrower, and the transactions contemplated hereby.  The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Administrative Agent, or any prospective assignee or participant of a Lender or the Administrative Agent, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

- 153 -

(2)      *Role of Agent.*  If the Administrative Agent has ascertained the identity of the Borrower or any authorized signatories of the Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

(a)      shall be deemed to have done so as an agent for each Lender, and this Agreement shall constitute a "written agreement" in such regard between each Lender and the Administrative Agent within the meaning of applicable AML Legislation; and

(b)      shall provide to each Lender copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Lenders agrees that the Administrative Agent has no obligation to ascertain the identity of the Borrower or any authorized signatories of the Borrower on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from the Borrower or any such authorized signatory in doing so.

**9.6      Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the Parties, each Party acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

- 154 -

**9.7    Survival.**

All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.   Sections 2.13, 2.14, 2.15, 9.3 and Article 8 shall survive and remain in full force and effect, regardless of the consummation of the Transactions, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

**9.8    Counterparts.**

This Agreement and each other Loan Document may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by fax or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement or any other Loan Document shall be deemed to include electronic signatures, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, as in provided Parts 2 and 3 of the *Personal Information Protection and Electronic Documents Act* (Canada), the *Electronic Commerce Act, 2000* (Ontario), the *Electronic Transaction Acts* (British Columbia), the *Electronic Transactions Act* (Alberta), or any other similar laws based on the Uniform Electronic Commerce Act of the Uniform Law Conference of Canada.  The Administrative Agent may, in its discretion, reqfuire that any such documents and signatures executed electronically or delivered by fax or other electronic transmission be confirmed by a manually-signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature executed electronically or delivered by fax or other electronic transmission.

**9.9    Entire Agreement.**

This Agreement (together with the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent), constitutes the entire agreement between the parties pertaining to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written.

- 155 -

There are no conditions, warranties, representations or other agreements between the parties in connection with the subject matter of this Agreement (whether oral or written, express or implied, statutory or otherwise) except as specifically set out in this Agreement or in such other applicable agreements.

**9.10    Severability.**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.11    Right of Set Off.**

If an Event of Default shall have occurred and be continuing, each Secured Party is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Secured Party to or for the credit or the account of any Credit Party against any of and all of the obligations of the Credit Parties now or hereafter existing under the Transaction Documents held by such Secured Party, irrespective of whether or not such Secured Party shall have made any demand under any Transaction Document and although such obligations may be unmatured and regardless of the currency of the deposit; provided that, to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.  The rights of each Secured Party under this Section 9.11 are in addition to other rights and remedies (including other rights of set off) which such Secured Party may have.

**9.12    Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable in that Province and shall be treated, in all respects, as an Ontario contract.

**9.13    Attornment.**

Each party hereto agrees (a) that any action or proceeding relating to this Agreement may (but need not) be brought in any court of competent jurisdiction in the Province of Ontario, and for that purpose now irrevocably and unconditionally attorns and submits to the jurisdiction of such Ontario court, (b) that it irrevocably waives any right to, and shall not, oppose any such Ontario action or proceeding on any jurisdictional basis, including <u>forum</u> <u>non</u> <u>conveniens,</u> and (c) not to oppose the enforcement against it in any other jurisdiction of any judgment or order duly obtained from an Ontario court as contemplated by this Section 9.13.

- 156 -

**9.14    Service of Process.**

Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 9.1.  Nothing in this Agreement shall affect the right of any Party to serve process in any other manner permitted by Law.

**9.15    WAIVER OF JURY TRIAL.**

EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.15.

**9.16    Confidentiality.**

Each of the Administrative Agent, the Issuing Bank and each Lender shall maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to each of their Affiliates, Lender Affiliates (in the case of a Lender) directors, officers, employees, agents and advisors, including accountants, legal counsel and other advisors to the extent necessary to administer or enforce this Agreement and the other Loan Documents (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or other Governmental Authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under any Loan Document or any suit, action or proceeding relating to any Loan Document or the enforcement of rights thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or Participant in any of its rights or obligations under this Agreement, or (ii) any actual or prospective counterparty (or its advisors) to any Hedge Arrangement with a Group Party and its obligations, (g) to their auditors in connection with any audit, (h) with the prior written consent of the Borrower, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 9.16, or (ii) becomes available to the Administrative Agent, the Issuing Bank, or any Lender on a non-confidential basis from a source other than a Group Party. For the purposes of this Section 9.16, "**Information**" means all information received from any Credit Party relating to any Credit Party, any of their subsidiaries or Affiliates, or their respective business, other than any such information that is available to the Administrative Agent, the Issuing Bank, the Arranger, or any Lender on a non-confidential basis prior to disclosure by such

- 157 -

Credit Party.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding the foregoing, the Secured Parties and the Credit Parties agree that Blake, Cassels & Graydon LLP may inform league table services, such as Thomson Financial and Bloomberg, and make mention in its promotional publications and the media generally of its representation of the Secured Parties with respect to the Transactions.  If the Administrative Agent or any Lender is requested or required to disclose any Information (other than by any bank examiner) pursuant to or as required by Law or by a subpoena or similar legal process, the Administrative Agent or such Lender, as applicable, shall use its reasonable commercial efforts (to the extent permitted by Law) to provide the Borrower with notice of such requests or obligation in sufficient time so that the Borrower may seek an appropriate protective order or waive the Administrative Agent's or such Lender's, as applicable, compliance with the provisions of this Section, and the Administrative Agent and such Lender, as applicable, shall, to the extent reasonable, cooperate with the Borrower in the Borrower's obtaining any such protective order.

**9.17    No Strict Construction.**

The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favouring or disfavouring any Party by virtue of the authorship of any provisions of this Agreement.

**9.18    Paramountcy.**

In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any other Transaction Document then, notwithstanding anything contained in such other Transaction Document, the provisions contained in this Agreement shall prevail to the extent of such conflict or inconsistency and the provisions of such other Transaction Document shall be deemed to be amended to the extent necessary to eliminate such conflict or inconsistency, it being understood that the purpose of the other Transaction Documents is to add to, and not detract from, the rights granted to the Administrative Agent (for its own benefit and the benefit of the other Secured Parties) under this Agreement.  If any act or omission of any or all Credit Parties is expressly permitted under this Agreement but is expressly prohibited under any other Transaction Document, such act or omission shall be permitted.  If any act or omission is expressly prohibited under any other Transaction Document, but this Agreement does not expressly permit such act or omission, or if any act is expressly required to be performed under any other Transaction Document but this Agreement does not expressly relieve any or all Credit Parties from such performance, such circumstance shall not constitute a conflict or inconsistency between the applicable provisions of such other Transaction Document and the provisions of the Credit Agreement.

- 158 -

**9.19    Excluded Swap Obligations.**

Notwithstanding anything to the contrary contained herein or in any other Loan Document, any Excluded Swap Obligations of a Guarantor shall be excluded from:

(a)    the definition of "Secured Liabilities" in any Loan Document as it pertains to such Guarantor, and no Lien granted by a such Guarantor under any Loan Document shall secure any Excluded Swap Obligations; and

(b)    the definition of "Debtor Liabilities" in the Group Guarantee as it pertains to such Guarantor, and no Excluded Swap Obligations shall be guaranteed or indemnified by such Guarantor under any Loan Document.

**9.20    LIMITATION OF LIABILITY.**

NO CLAIM MAY BE MADE BY ANY CREDIT PARTY, ANY SECURED PARTY OR ANY OTHER PERSON AGAINST ANY INDEMNITEE ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS RESULT OF, ANY LOAN DOCUMENT, THE TRANSACTIONS, OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH CREDIT PARTY AND SECURED PARTY HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL SUCH CLAIMS, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOUR.

**9.21    Releases of Guarantees and Liens.**

(1)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 9.2) to, and the Administrative Agent shall, take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (a) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 9.2 or (b) under the circumstances described in Section 9.21(2).

(2)    On the Lender Termination Date, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Credit Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

**9.22    Acknowledgement Regarding Any Supported QFCs.**

To the extent that the Loan Documents provide support, through a Guarantee or otherwise, for any Hedge Arrangement or any other agreement or instrument that is a QFC (such

- 159 -

support, "**QFC Credit Support**", and each such QFC, a "**Supported QFC**"), the Parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of, inter alia, the Province of Ontario).  In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the Parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

[signatures on the next following pages]

- S1 -

**IOVATE HEALTH SCIENCES
INTERNATIONAL INC.**, as Borrower

By: _____
    Name:
    Title:

- S2 -

**ROYAL BANK OF CANADA**, as Administrative
Agent, Joint Lead Arranger and Joint Bookrunner

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

- S3 -

**THE TORONTO-DOMINION BANK**, as Joint
Lead Arranger, Joint Bookrunner and Syndication
Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

- S4 -

**ROYAL BANK OF CANADA**, as Lender and
Issuing Bank


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

- S5 -

**THE TORONTO-DOMINION BANK**, as Lender

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

- S6 -

**BANK OF CHINA (CANADA)**, as
Co-Documentation Agent and Lender

By: _____
     Name:
     Title:

- S7 -

**BANK OF MONTREAL**, as Co-Documentation
Agent and Lender

By: _____
     Name:
     Title:

- S8 -

**NATIONAL BANK OF CANADA**, as
Co-Documentation Agent and Lender

By: _____
        Name:
        Title:

- S9 -

**CANADIAN WESTERN BANK**, as Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

- S10 -

**THE BANK OF NOVA SCOTIA**, as
Co-Documentation Agent and Lender


By: _____
     Name:
     Title:

**EXHIBIT A**

**FORM OF**
**ADDITIONAL COMMITMENT AGREEMENT**

Royal Bank of Canada
16 York Street, Suite 500 Box 64
Toronto, ON, M5J 0E6 Canada

Attention:  Agency Administrator

Ladies and Gentlemen:

   Reference is made to the amended and restated credit agreement dated as of June 30, 2021 (as amended, supplemented or restated from time to time, the "**Credit Agreement**", the terms defined therein being used herein as therein defined) among, *inter alios*, Iovate Health Sciences International Inc. (the "**Borrower**"), as borrower, the financial institutions from time to time party thereto, as lenders (the "**Lenders**"), and Royal Bank of Canada, as administrative agent (in its capacity as administrative agent, the "**Agent**").

   1.  Each of the undersigned financial institutions (each, an "**Additional Lender**") hereby severally agrees to provide the Additional Commitment set forth opposite its name on **Annex I** (for each such Additional Lender, its "**Additional Commitment**").  Each Additional Commitment provided pursuant to this letter agreement (this "**Agreement**") shall be subject to all of the terms and conditions set forth in the Credit Agreement, including, without limitation, Section 2.1(3) thereof.  Each Additional Lender agrees that, from and after the Effective Date (as defined below), such Additional Lender shall be obligated to make Loans under the Revolving Credit upon the terms, and subject to the conditions, set forth in the Credit Agreement and in this Agreement.

   2.  Each party to this Agreement acknowledges and agrees that (i) the Additional Commitments provided pursuant to this Agreement shall constitute (and serve to increase) the Revolving Credit Commitments such that further Revolving Loans become available thereunder upon identical terms and conditions, (ii) with respect to the Additional Commitment provided by any Additional Lender pursuant to this Agreement, such Additional Lender shall receive from the Borrower such up-front, arrangement and/or other fees, if any, as may be separately agreed to in writing by the Borrower, the Agent and such Additional Lender, all of which fees shall be due and payable to such Additional Lender on the terms and conditions set forth in each such separate agreement, and (iii) from and after the Effective Date, each Additional Lender shall be a Revolving Credit Lender under and as defined in the Credit Agreement for the purposes of the Credit Agreement and for all of the Loan Documents and shall be bound by the terms, conditions and covenants and shall be entitled to the benefits thereof as if it were an original Revolving Credit Lender  and signatory with a Revolving Credit Commitment equal to such Additional Lender's Additional Commitment (plus, if such Additional Lender is already a Revolving Credit

Lender, such Revolving Credit Lender's Revolving Credit Commitment immediately prior to giving effect to the increase thereof pursuant to this Agreement).

3.      Each Additional Lender, to the extent not already a party to the Credit Agreement as a Lender thereunder, acknowledges and agrees that (i) it is not a Defaulting Lender, (ii) it has received a copy of the Credit Agreement and the other Loan Documents, (iii) it has, independently and without reliance upon the Agent or any other Lender and on the basis of such documents and information as it deems appropriate, made its own credit analysis and decision regarding this Agreement and the Credit Agreement, and (iv) except for documents referred to in the preceding clause (ii) (which it has already received) the Agent shall not have any duty to provide such Additional Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower or any third party, except as specified in the Credit Agreement.

4.      The Borrower acknowledges and agrees that (i) it shall be liable for all indebtedness, obligations and other liabilities ("**Obligations**") with respect to the Additional Commitments provided hereby, including, without limitation, all Loans made pursuant thereto, and (ii) all such Obligations shall be entitled to the benefits of the Security Documents.

5.      The Borrower represents and warrants to the Agent and the Lenders that

(i)      no Default or Event of Default has occurred and is continuing and all of the representations and warranties contained in the Credit Agreement and in the other Loan Documents are true and correct on and as of the Effective Date as though made on and as of the Effective Date (except where made only as of an earlier date or as disclosed to and accepted by the Lenders prior to the Effective Date); and

(ii)     the Borrower is in *pro forma* compliance with the financial covenants contained in Section 5.1(12) of the Credit Agreement (assuming the full incurrence of the new Indebtedness in question) as of the Effective Date.

6.      This Agreement shall be effective on the date (the "**Effective Date**") on which each of the following conditions has been satisfied:

(i)      payment of all fees required to be paid in connection herewith (including, without limitation, any agreed upon up-front, arrangement and/or other fees, if any, owing to the Additional Lenders and the Agent (or any affiliate thereof)) or due and owing to the Agent or the Lenders pursuant to the Credit Agreement;

(ii)     the Agent shall have received (A) an executed counterpart of this Agreement duly executed by the Borrower prior to the close of business on the Return Date (as defined below), (B) acknowledgements executed by each Guarantor, acknowledging that the Additional Commitments contemplated hereby and all Loans to be incurred pursuant thereto shall be entitled to the benefits of the Security Documents on the same basis as the

other Borrowings made pursuant to the Credit Agreement, (C) an opinion or opinions dated as of the Effective Date, in form and substance reasonably satisfactory to the Agent, from counsel to the Borrower and the Guarantors, covering such matters set forth in the opinions of counsel delivered to the Agent on the Closing Date pursuant to Section 4.2(3) of the Credit Agreement, and such other matters incident to the transactions contemplated hereby as the Agent may reasonably request, and (D) such other officers' certificates, board of director resolutions and evidence of good standing as the Agent shall reasonably request.

7.     This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the Province of Ontario and the Laws of Canada applicable therein.

8.     This Agreement shall enure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

9.     This Agreement may be executed in any number of counterparts and delivered by facsimile or pdf formatted attachment to an email and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

10.     The Borrower may accept this Agreement by signing in the space provided below and returning an executed counterpart hereof to the Agent before the close of business on **[Date]** (the "**Return Date**").  If the Borrower does not so accept this Agreement by such time, the Additional Commitments set forth in this Agreement shall be deemed cancelled.

11.     After the execution and delivery to the Agent of a copy of this Agreement (including by way of counterparts and by facsimile or pdf email transmission) fully executed by the parties hereto, this Agreement may only be changed, modified or varied in accordance with the requirements for the modification of Loan Documents pursuant to Section 9.2 of the Credit Agreement.  In the event of any conflict between the terms of this Agreement and those of the Credit Agreement, the terms of the Credit Agreement shall control.

[Remainder of this page left intentionally blank.]

Yours truly,

**[NAME OF EACH ADDITIONAL LENDER]**

By: _____
Name:
Title:

**EXHIBIT B**

**FORM OF BORROWING REQUEST**

**TO:**        Royal Bank of Canada

**RE:**        Amended and Restated Credit Agreement dated as of June 30, 2021 made between, among others, the undersigned (the **"Borrower"**), you, as Administrative Agent, and the lenders from time to time party thereto (as amended, supplemented or otherwise modified from time to time, the **"Credit Agreement"**)

We refer to the Credit constituted by the Credit Agreement and we hereby give you notice that on **[DATE]** we wish to obtain a Borrowing in the aggregate amount of **[Canadian / U.S.]$[AMOUNT]**.  All capitalized terms used and not otherwise defined herein have the meanings given to them in the Credit Agreement.

The Borrowing requested hereby is to take the form of:

☐      a Canadian Prime Borrowing

☐      a Base Rate Borrowing

☐      a Term CORRA Borrowing

☐      Daily Compounded CORRA Borrowing

☐      a SOFR Borrowing

☐      a Letter of Credit

Such Borrowing is a **[rollover/conversion]** of outstanding **[Term CORRA/Daily Compounded CORRA/SOFR**] Loans having an Interest Period ending [DATE]/Canadian Prime Loans/Base Rate Loans] in an aggregate principal amount of **[Canadian / U.S.]$[AMOUNT].**

**[The Interest Period in respect of the [SOFR/Term CORRA/Daily Compounded CORRA] Borrowing requested hereby is [NUMBER] days[1].]**

We hereby certify, after due and careful investigation, that[2]:

(a)      each of the representations and warranties made by the Borrower in the Credit Agreement are true and correct on and as of the date hereof except to the extent that (i) any change to the representations and warranties has been disclosed to the Administrative Agent and accepted by the Required

---

[1]    This sentence is only required in the context of a Borrowing Request for a SOFR or CORRA Borrowing.

[2]    This certification need not be made on conversions or rollovers.

Lenders, or (ii) any representation and warranty is stated to be made as of a particular time; and

(b)     on and as of the date hereof, no Default has occurred and is continuing.

DATED:  **[MONTH] [DAY], [YEAR]**

**IOVATE HEALTH SCIENCES INTERNATIONAL INC.**

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

**EXHIBIT C**

**COMPLIANCE CERTIFICATE**

**TO:**          Royal Bank of Canada, as administrative agent under the Credit Agreement (the "**Administrative Agent**")

**AND TO:**    The Lenders

      Reference is made to the amended and restated credit agreement dated as of June 30, 2021 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among, *inter alios*, Iovate Health Sciences International Inc., as borrower, Royal Bank of Canada, as administrative agent, and the lenders now or hereafter parties thereto. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

      The undersigned, the **[Chief Financial Officer]** of the Borrower, in that capacity and not personally, hereby certifies that, as of the date hereof, (a) a review of the Consolidated financial statements of Holdco for the Fiscal Quarter ended **[LAST DAY OF FISCAL QUARTER]**, and of the activities of the Credit Parties during such Fiscal Quarter has been made under the supervision of the undersigned with a view to determining whether the Credit Parties have fulfilled all of their obligations under the Credit Agreement and the other Loan Documents, (b) the Credit Parties have fulfilled their obligations under the Credit Agreement and the other Loan Documents such that no Default or Event of Default has occurred and is continuing, and (c) as at the end of the Fiscal Quarter ended **[LAST DAY OF FISCAL QUARTER]**, the Borrower was in compliance with each of the financial tests set forth in Section 5.1(12) of the Credit Agreement[3]. The Borrower's compliance with each of such financial covenants as at the end of such Fiscal Quarter is demonstrated by the figures set out on the financial covenant compliance worksheet attached hereto as Schedule A.

      **DATED: [MONTH] [DAY], [YEAR]**

 

| |
|---|
| Name: |
| Title:    **[Chief Financial Officer], Iovate Health Sciences International Inc.** |

---

[3]    Or, if there is non-compliance or a misrepresentation, specify same.

1407-5777-6646.131407-5777-6646.22                    Exhibit C — Page 1

## SCHEDULE A TO COMPLIANCE CERTIFICATE
## FINANCIAL COVENANT COMPLIANCE WORKSHEET

**RE:**        Period ended **[MONTH] [DAY], [YEAR]**.

**A.        FIXED CHARGE COVERAGE RATIO**

**Requirement:  Maintain a Fixed Charge Coverage Ratio of not less than 1.1:1.0 for each of the following periods: January 1, 2023 to March 31, 2023, January 1, 2023 to June 30, 2023, January 1, 2023 to September 30, 2023, January 1, 2023 to December 31, 2023, April 1, 2023 to March 31, 2024, July 1, 2023 to June 30, 2024, October 1, 2023 to September 30, 2024 and January 1, 2024 to December 31, 2024 (Section 5.1(12)(a)).**

**1.        EBITDA[4]**

(a)    Net Income[5] for the period                                                [●]

(b)    any non-cash income and gains (including unrealized
       mark-to-market gains under Hedge Arrangements), other
       than any such non-cash items to the extent that it will result
       in the receipt of cash payments in any future period;        [●]

(c)    Interest Expense                                                              [●]

(d)    Income Tax Expense                                                        [●]

(e)    Depreciation Expense                                                      [●]

(f)    [Intentionally Deleted]                                                     [●]

(g)    any other non-cash expenses and losses (including
       compensation issued in Equity Securities and unrealized
       mark-to-market losses under Hedge Arrangements)            [●]

(h)    [Intentionally Deleted]

       EBITDA: (a − b + (c + d + e + g)                                     [●] (A)

---

[4] A Cure Contribution shall increase EBITDA solely for the purposes of determining compliance with the Fixed Charge Coverage Ratio pursuant to Section Error! Reference source not found. as at the end of the applicable period and any subsequent period that includes such period, and shall be disregarded in all other respects under the Loan Documents provided that, an Excess Special CureInjection Contribution shall also increase EBITDA for the purposes of determining compliance with Section 5.1(12)(c) (see Section 5.1(12)(d)(ii));

[5] Undistributed RJV Earnings included in Net Income for any period  may not account for more than 5% of EBITDA for such period and shall be capped accordingly

**2.     FCCR Adjusted EBITDA**

(a)     Adjusted EBITDA[6]                                                    [●]

(b)     Cash Income Taxes                                                   [●]

(c)     Unfunded Capital Expenditures                              [●]

        FCCR Adjusted EBITDA:  (a –b-c)                          [●] (B)


**3.     Fixed Charges**

(a)     the aggregate amount of all scheduled principal payments
        on Indebtedness made (or required to be made) by any
        Group Party other than (i) to another Group Party, or (ii)
        where such principal amount is refinanced during such
        period pursuant to Indebtedness permitted under Section
        6.1(1)                                                                          [●]

(b)     Cash Interest Expenses                                            [●]

(c)     amortization of debt discount or financing fees without
        duplication of (a), the aggregate amount of all payments
        made on Capital Lease Obligations by Holdco on a
        Consolidated basis                                                       [●]

        Fixed Charges  (a + b + c)                                       [●] (C)

**Fixed Charge Coverage Ratio:  Ratio of (B) to (C)**               [●]


**B.     ADJUSTED EBITDA**

**Requirement:**  Maintain Adjusted EBITDA with respect to each period indicated below of not less than 85% of the amount shown opposite such period **(Section 5.1(12)(c)).**

| Period | Adjusted EBITDA |
|---|---|
| January 1, 20232025 to March 31, 20232025 | U.S.$(4,727,000)2,345,000) |
| January 1, 20232025 to June 30, 20232025 | U.S.$(1,476,000)2,915,000 |

---

[6] See calculation below.

1407-5777-6646.131407-5777-6646.22                                        Exhibit C – Page 3

| | |
|---|---|
| ~~January 1, 2023 to September 30, 2023~~ | ~~U.S.$4,923,000~~ |
| ~~January 1, 2023 to December 31, 2023~~ | ~~U.S.$12,422,000~~ |
| ~~January 1, 2023 to March 31, 2024~~ | ~~U.S.$14,821,000~~ |
| ~~July 1, 2023 to June 30, 2024~~ | ~~U.S.$22,349,000~~ |
| ~~October~~January 1, ~~2023~~2025 to September 30, ~~2024~~2025 | U.S.$~~27,671,000~~9,718,000 |
| January 1, ~~2024~~2025 to December 31, ~~2024~~2025 | U.S.$~~25,881,000~~16,288,000 |

1.    **Adjusted EBITDA**

(a)    EBITDA[76]                                                                    [●☐]

(b)    non-recurring one-time costs in connection with (i) restructuring expenses, (ii~~) business rationalization expenses (including write-off of packaging and inventory costs and termination costs for existing contracts), (iii~~) litigation expenses in connection with the existing lawsuit by Orgain, Inc. against certain Group Parties and (~~iv~~iii) consulting ~~expenses not related to Warehouse Transition incurred during such period within 2023~~costs, up to ~~a~~an aggregate maximum (for (i), (ii) and (iii)) of U.S.$~~3,000,000~~1,000,000                                   [●☐]

(c)    ~~non-recurring warehouse expenses incurred during such period within 2023, up to a maximum of U.S.$3,000,000~~    ~~[●]~~

Adjusted EBITDA:  (a + b ~~+ c~~)                                      [●☐] (A)

---

[76] See calculation above.

**EXHIBIT D**

**FORM OF**
**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This assignment and assumption agreement (the "**Assignment and Assumption**") is dated as of the Effective Date set out below and is entered into by and between [***Insert name of Assignor***] (the "**Assignor**") and [***Insert name of Assignee***] (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, supplemented, restated or replaced from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set out in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set out herein in full.

For good and valuable consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (a) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any Letters of Credit and Swingline Loans included in such facilities) and (b) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (a) above (the rights and obligations sold and assigned pursuant to clauses (a) and (b) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:

2.    Assignee: _____

_____
**[and is an Affiliate of [*identify Lender*][87]]**

3.    Borrower:

_____

---

[87]   Select as applicable.

4.      Administrative Agent:    Royal Bank of Canada, as the administrative agent under the Credit Agreement

5.      Credit Agreement:    Amended and Restated Credit Agreement dated as of June 30, 2021 among Iovate Health Sciences  International Inc., as borrower, Royal Bank of Canada, as administrative agent, and the lenders party thereto.

6.      Assigned Interest:

| Facility Assigned[98] | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[10][9] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____ ____, 20___ [*To be inserted by Administrative Agent and which shall be the effective date of recordation of transfer in the register therefor.*]

The terms set out in this Assignment and Assumption are hereby agreed to:

**[NAME OF ASSIGNOR]**

By: _____
        Name:
        Title:

**[NAME OF ASSIGNEE]**

By: _____
        Name:
        Title:

---

[98] i.e., Revolving Credit Commitment or Term Credit Commitment

[10][9] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

**[Consented to and]**[11][10] Accepted:

**ROYAL BANK OF CANADA**, as Administrative Agent

By: _____
    Name:
    Title:

**[Consented to:]**[12][11]

**[NAME OF RELEVANT PARTY]**

By: _____
    Name:
    Title:

---

[11][10] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[12][11] To be added only if the consent of the Borrower and/or other parties (e.g. Swingline Lender, Issuing Bank) is required by the terms of the Credit Agreement.

ANNEX 1

## IOVATE CREDIT AGREEMENT

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.      **Assignor**.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries  or Affiliates or any other Person of any of their respective obligations under any Loan Document **[, and (c) attaches the Note(s) held by it evidencing the Assigned Facilities and requests that the Administrative Agent exchange such Note(s) for a replacement Note or Notes payable to the Assignee and (if the Assignor has retained any interest in the Assigned Facilities) a replacement Note or Notes payable to the Assignor in the respective amounts which reflect the assignment being made hereby (and after giving effect to any other assignments which have become effective on the Transfer Effective Date)]**.¹³¹² Upon request, the Assignor shall, at the expense of the Administrative Agent (for reimbursement by the Borrower), as promptly as practical, execute and deliver to the Administrative Agent, all such other and further documents, agreements and instruments as the Administrative Agent may reasonably request in order to effect the transfer of the Assigned Interest, including any materials required to discharge the Assignee's interest in and to the Collateral.

2.      **Assignee**.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder and (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.1(a) or (b) thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender; (b) acknowledges the terms and conditions of the Intercreditor Agreement and

---

¹³¹²   Delete bracketed language if Assignor does not hold Note(s).

agrees to be bound thereby as if a party thereto, and (c) agrees that (i) it shall, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it shall perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

3.      **Payments**.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee whether such amounts have accrued prior to the Effective Date or accrued subsequent to the Effective Date.  The Assignor and the Assignee shall make all appropriate adjustments in payments by the Administrative Agent for the periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

4.      **General Provisions**.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**EXHIBIT E**

**FORM OF**
**SUBORDINATION AGREEMENT**

**THIS AGREEMENT** (this "**Agreement")** dated as of **[DATE]** is made by **[NAME]** (the "**Junior Creditor")** in favour of the Senior Creditors (as defined below).

For good and valuable consideration, the Junior Creditor agrees as follows:

1.         **Definitions.** In this Agreement capitalized terms used but not otherwise defined in
this Agreement shall have the meanings given to them in the Senior Credit Agreement, and the following terms have the following meanings

"**Debtor**" means **[Credit Party].**

"**Enforcement Action**" means (a) the acceleration of the time for payment of any of the Junior Debt (which shall include the making of a demand with respect to any demand obligation), (b) the appointment of a receiver or receiver and manager of the Debtor or any of its assets, (c) the commencement or initiation of any insolvency proceeding with respect to the Debtor, (d) the commencement or initiation of any action or proceeding to recover or receive payment of any of the Junior Debt, (e) the exercise any right of set-off, combination or similar right against the Debtor, or (f) the exercise of any put option or the causing of the Debtor to honour any redemption obligation with respect to its securities; provided that, notwithstanding the foregoing, the following actions shall not constitute an Enforcement Action:

(a)        the provision by the Junior Creditor of a notice of default to the Debtor;

(b)        the filing of a proof of claim or similar instrument with respect to the Junior Debt in any insolvency proceeding;

(c)        the voting of a claim with respect to the Junior Debt in any insolvency proceeding in accordance with the terms of this Agreement;

(d)        the acceleration of the time for payment of, or making a demand for payment with respect to, any of the Junior Debt during any insolvency proceeding or following the acceleration of all of the Senior Debt;

(e)        the institution of a default rate of interest; and

(f)        the taking of any action required to preserve the validity, efficacy or priority of the Junior Debt, including the commencement or initiation of any action required to comply with statutory limitation periods (provided that such proceeding is then stayed).

"**Junior Debt**" means, collectively, all present and future indebtedness, liabilities and obligations of any and every kind, nature and description whatsoever and howsoever incurred (whether direct or indirect, absolute or contingent, matured or unmatured, whether as principal debtor, guarantor, surety or otherwise) of the Debtor to the Junior Creditor.

"**Junior Payment**" means, with respect to any Junior Debt, (a) any payment or distribution by any party of cash, securities, or other form of property, including by the exercise of a right of set-off or in any other manner, on account of such Junior Debt, or (b) any redemption, purchase or other acquisition of such Junior Debt by any party.

"**Junior Security**" means, collectively, all present and future guarantees and Liens granted to the Junior Creditor as security for all or any part of the Junior Debt.

"**Senior Agent**" means Royal Bank of Canada, in its capacity as administrative agent for the Secured Parties under the Senior Credit Agreement, and includes any successor administrative agent appointed pursuant to the Senior Credit Agreement.

"**Senior Credit Agreement**" means the amended and restated credit agreement dated as of June 30, 2021 among, *inter alios,* Iovate Health Sciences International Inc., as borrower, the Senior Agent, as administrative agent, and the lenders party thereto from time to time, as amended, supplemented, restated or replaced from time to time.

"**Senior Creditors**" means "Secured Parties" as defined in the Senior Credit Agreement.

"**Senior Debt**" means, collectively, all present and future indebtedness, liabilities and obligations of any and every kind, nature and description whatsoever and howsoever incurred (whether direct or indirect, absolute or contingent, matured or unmatured, whether as principal debtor, guarantor, surety or otherwise) of the Debtor to the Senior Creditors or any of them, and any unpaid balance thereof.

2.        **Postponement.** The Junior Debt is hereby postponed and subordinated to, and made subject in right of payment to the prior indefeasible payment in cash of, all Senior Debt.

3.        **Payment Restriction.**

(a)        Notwithstanding the terms of the Junior Debt, the Debtor (nor any party on its behalf) shall not make and shall not be entitled to make, and the Junior Creditor shall not accept and shall not be entitled to accept, any Junior Payment except as permitted under Section 6.1(9) of the Credit Agreement.

(b)        In the event of any dissolution, winding up, liquidation, arrangement, reorganization, adjustment, relief of the Debtor of its debts, whether voluntary or involuntary, in any bankruptcy, insolvency, or other similar law, the Senior Creditors shall be entitled to receive payment in full of the Senior Debt before the

Junior Creditor is entitled to receive any payment of, or distribution of any kind or character on account of, all or any of the Junior Debt.

**4.**          **No Junior Security.** The Debtor (nor any party on its behalf) shall not grant or provide and shall not be entitled to grant or provide, and the Junior Creditor shall not accept and shall not be entitled to accept, any Junior Security.

**5.**          **Enforcement Action.** The Junior Creditor shall not take any Enforcement Action.

**6.**          **Proceeds Held in Trust.** If any payment (including any proceeds of realization on the Junior Security) is made to or received by the Junior Creditor contrary to the terms of this Agreement, the Junior Creditor shall hold such payment in trust for the Senior Agent (for its own benefit and for the benefit of the other Secured Creditors) and shall forthwith pay such payment to the Senior Agent for application against the Senior Debt.

**7.**          **Application of Agreement.** Subject to Section 8 below, the rights of the Senior Creditors and the priority of the Senior Debt set out in this Agreement shall apply irrespective of any matter or thing.

**8.**          **Junior Debt Transfer.** The Junior Creditor shall not sell, assign, or otherwise transfer, in whole or in part, any of the Junior Debt or any right, title or interest therein to any Person (as defined in the Senior Credit Agreement) unless (a) such action is made expressly subject to this Agreement, and (b) such Person acknowledges the subordination provided for herein and agrees in writing to be bound by all of the terms hereof, such acknowledgement and agreement to be in favour of and in form and substance satisfactory to the Senior Creditor acting reasonably.

**9.**          **Successors and Assigns.** This Agreement shall enure to the benefit of, and be binding on, the Junior Creditor and the Senior Creditors and their respective successors and permitted assigns, which shall include (subject to Section 8) any Person becoming a Senior Creditor or the Junior Creditor after the date of this Agreement.

**10.**          **Senior Agent.** This Agreement may be enforced by the Senior Agent on behalf of the Senior Creditors.

**11.**          **Instrument Legend.** Each instrument creating or evidencing any of the Junior Debt shall have affixed upon it a legend which reads substantially as follows:

> ***This instrument is subject to a subordination agreement dated on or about the date hereof from [NAME], as junior creditor, in favour of certain senior creditors (the "Senior Creditors") of Xiwang Iovate Holdings Company Limited (as amended, supplemented, restated or replaced from time to time, the "Subordination Agreement"). By its acceptance of this instrument, the holder hereof from time to time agrees to be bound as a junior creditor by the provisions of the Subordination Agreement to the same extent that [NAME] and its subsequent assignees are bound.***

**12.**          <u>**Governing Law.**</u> This Agreement shall be governed by, and construed in accordance with, the laws of the Province of Ontario and the laws of Canada applicable in that Province.

**13.**          <u>**Loan Document.**</u> This Agreement constitutes a Loan Document (as defined in the Senior Credit Agreement").

**14.**          <u>**Amendments.**</u> No amendment, supplement, waiver or other modification of this Agreement shall be effective without the prior written consent of each of the parties hereto.

[signatures on the next following page]

**IN WITNESS WHEREOF** the Junior Creditor has executed this Agreement as of the date first written above.


**[JUNIOR CREDITOR]**


By: _____
Name:
Title:

**EXHIBIT F**

**MONTHLY COMPLIANCE CERTIFICATE**

| TO: | Royal Bank of Canada, as administrative agent under the Credit Agreement (the "**Administrative Agent**") |
|---|---|
| AND TO: | The Lenders |

Reference is made to the amended and restated credit agreement dated as of June 30, 2021 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement"),** among, *inter alios,* Iovate Health Sciences International Inc., as borrower, Royal Bank of Canada, as administrative agent, and the lenders now or hereafter parties thereto. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

The undersigned, the **[Chief Financial Officer]** of the Borrower, in that capacity and not personally, hereby certifies that, as of the date hereof, the Borrower is in compliance with the covenants set forth in Section 5.1(14) and Section 6.1(10)(a) of the Credit Agreement2 . The Borrower's compliance with such covenants as at **[INSERT DATE]** is demonstrated by the figures set out on the worksheet attached hereto as Schedule A.

**DATED: [MONTH] [DAY], [YEAR]**

Name: _____

Title:    **[Chief Financial Officer], Iovate Health
           Sciences International Inc.**

## SCHEDULE A TO MONTHLY COMPLIANCE CERTIFICATE
## FINANCIAL COVENANT COMPLIANCE WORKSHEET

### LIQUIDITY

**Requirement: Maintain Liquidity of not less than (a) U.S.$2,000,000 at all times during the period commencing on April 14, 2022 through to and including May 31, 2023, (b) U.S.$4,500,000 at all times during the period commencing on June 1, 2023 through to and including November 30, 2023, and (c) U.S.$2,000,000 commencing on December 1, 2023 and at all times thereafter (Section 5.1(14).**

| | | |
|---|---|---|
| (a) | Consolidated Cash Balance | [ ] |
| (b) | aggregate Revolving Credit Commitments | [ ] |
| (c) | aggregate Revolving Credit Exposure | [ ] |
| **Liquidity** (a + b - c) | | [ ] |

### RESTRICTED SALES

**Requirement: (a)aggregate fair market value of Restricted Sales during applicable period not to exceed U.S.$[THRESHOLD]; (b)aggregate cash payments received by Credit Parties in respect of Restricted Sales during applicable period not less than U.S.$[THRESHOLD]; and (c)aggregate accounts receivable owing in respect of Restricted Sales during applicable period not to exceed U.S.$[THRESHOLD] (Section 6.1(10)(a)).**

| | | |
|---|---|---|
| (a) | Aggregate fair market value of Restricted Sales | [ ] |
| (b) | Aggregate cash payments received by Credit Parties in respect of the Restricted Sales set out in (a) | [ ] |
| (c) | Aggregate accounts receivable owing in respect of the Restricted Sales set out in (a) | [ ] |

## SCHEDULE 1.1(A)
## <u>INITIAL SECURITY DOCUMENTS</u>

1.     Limited recourse guarantee dated as of December 21, 2016 from Holdco

2.     Pledge agreement dated as of December 21, 2016 from Holdco with respect to its Equity Securities of, and debt owing by, the Borrower

3.     Group Guarantee dated as of December 21, 2016  from Xiwang Iovate Health Science International Inc. ("**Acquisitionco**"), Iovate Health Sciences International Inc. ("**Opco**"), Kerr Investment Holdings Corp. ("**Initial Target**"), Old Iovate International Inc., Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp., Lakeside Innovations Holding Corp. and Northern Innovations Holding Corp.

4.     GSA dated as of December 21, 2016 from Acquisitionco, Opco, Initial Target, Old Iovate International Inc., Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp., Lakeside Innovations Holding Corp. and Northern Innovations Holding Corp.

5.     Security Agreement (NY law) dated as of December 21, 2016  from Iovate Health Sciences U.S.A. Inc. and Opco

6.     Pledge Agreement (NY law) dated as of December 21, 2016  from Initial Target

7.     Security interest agreement regarding U.S. trademarks dated as of December 21, 2016 from Northern Innovations Holding Corp.

8.     Security interest agreement regarding U.S. patents dated as of December 21, 2016 from Northern Innovations Holding Corp.

9.     Notice of security interest regarding Canadian intellectual property dated as of December 21, 2016 from Northern Innovations Holding Corp.

10.    Subordination agreement for permitted shareholder indebtedness dated as of December 21, 2016 among Holdco, as junior creditor, and the Senior Creditors (as defined therein)

11.    Landlord Waiver dated April 4, 2017 regarding real property located at 3880 Jeffrey Blvd., Blasdell, NY 14219

12.    Landlord Waiver dated April 4, 2017 regarding real property located at 2475 George Urban Blvd. Depew, NY 14043

13.    Collateral Leasehold Mortgage Agreement dated April 11, 2017 from Opco regarding real property located at 381 North Service Road West, Oakville, ON L6M 0H4

14.    Leasehold Mortgage Agreement dated April 11, 2017 among Opco, as tenant, 1554728 Ontario Inc., as landlord, and the Administrative Agent regarding real property located at 381 North Service Road West, Oakville, ON L6M 0H4

15.     Registered Notice of Charge of Lease dated May 17, 2017 over real property located at 381 North Service Road West, Oakville, ON L6M 0H4

16.     Assumption and confirmation agreement dated January 1, 2018 from Opco

17.     Confirmation agreement dated as of dated April 27, 2017 by Holdco, 2158068 Ontario Inc. ("**Vendor**"), Initial Target, Old Iovate International Inc., Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp., Lakeside Innovations Holding Corp. and Northern Innovations Holding Corp.

18.     Confirmation agreement dated as of dated January 31, 2019 by Holdco, Vendor, Initial Target, Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp. and Northern Innovations Holding Corp.

19.     Confirmation agreement dated as of dated March 27, 2020 by Holdco, Vendor, Initial Target, Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp. and Northern Innovations Holding Corp.

20.     Confirmation agreement dated as of dated December 11, 2020 by Holdco, Vendor, Initial Target, Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp. and Northern Innovations Holding Corp.

21.     Confirmation agreement dated as of dated December 11, 2020 by Holdco, Vendor, Initial Target, Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp. and Northern Innovations Holding Corp.

22.     Supplement to guarantee dated as of March 31, 2021 from Holdco;

23.     Supplement to security agreement dated as of March 31, 2021 from Holdco;

24.     Confirmation agreement dated as of dated March 31, 2021 by Holdco, 1286327 B.C. Ltd. (as successor by name change to Initial Target), Iovate Health Sciences U.S.A. Inc., Old Northern Innovations Corp., Northern Innovations Holding Corp.

25.     Assumption and confirmation agreement dated as of April 2, 2021 by the Borrower;

26.     Assumption and confirmation agreement dated as of April 2, 2021 by Old Northern Innovations Corp.

27.     Confirmation agreement dated as of June 30, 2021 by the Borrower, Holdco, Iovate Health Sciences U.S.A. Inc., and Northern Innovations Holding Corp.

28.     Security interest agreement regarding U.S. trademarks dated as of June 30, 2021 from Northern Innovations Holding Corp.

29.     Security interest agreement regarding U.S. patents dated as of June 30, 2021 from Northern Innovations Holding Corp.

30.    All stock certificates, instruments and other documents required to be delivered to the Administrative Agent in connection with the aforementioned.

**SCHEDULE 1.1(B)**

**EXISTING LIENS**

Nil.

**SCHEDULE 1.1(C)**

**BASELINE CFF**

[see attached]

**Xiwang Iovate Holdings Company Limited (British Columbia) (the "Company")**
**Projected Weekly Cash Flow**
For the 13-week period ending

| | | 18-Apr | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| **Week Ending** | | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb | 28-Feb | 7-Mar | 14-Mar | 21-Mar | 28-Mar |
| (in $USD) | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | |
| Collections | | 4,947,764 | 6,011,974 | 2,072,685 | 4,619,959 | 4,283,377 | 4,017,559 | 5,855,529 | 4,152,442 | 6,389,540 | 4,916,588 |
| Equity Cure Injections | | - | - | - | - | - | - | - | - | - | 2,000,000 |
| Other | | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | | **4,947,764** | **6,011,974** | **2,072,685** | **4,619,959** | **4,283,377** | **4,017,559** | **5,855,529** | **4,152,442** | **6,389,540** | **6,916,588** |
| | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | |
| Operating Expenses | | (4,869,388) | (3,287,811) | (5,237,151) | (3,000,293) | (3,985,042) | (3,591,936) | (3,294,412) | (5,249,732) | (4,664,276) | (5,097,445) |
| Payroll & Benefits | | (307,906) | (307,931) | (307,906) | (1,007,273) | (916,712) | (313,738) | (313,801) | (313,563) | (313,563) | (313,563) |
| Insurance | | - | - | - | (58,200) | - | - | - | (58,200) | - | - |
| Rent & Property Taxes | | - | (100,000) | - | - | - | (100,000) | - | - | - | (100,000) |
| Capital Expenditures | | - | (35,000) | - | - | - | (47,000) | - | - | - | (310,000) |
| Professional Fees | | - | (188,855) | (68,000) | - | (68,000) | - | (68,000) | - | (68,000) | - |
| Taxes | | 26,912 | - | (220,000) | 30,000 | - | (60,000) | - | (20,000) | - | (5,000) |
| Interest | | - | (1,020,428) | - | - | - | (921,677) | - | - | - | - |
| Excess Cash Flow Sweep / Forbear | | - | - | - | - | (2,213,729) | (300,000) | - | - | - | - |
| **Total Disbursements** | | **(5,150,382)** | **(4,940,025)** | **(5,833,057)** | **(4,035,766)** | **(7,183,484)** | **(5,334,351)** | **(3,676,213)** | **(5,641,495)** | **(5,045,839)** | **(5,826,008)** |
| | | | | | | | | | | | |
| **Net Cash Flow** | | **(202,618)** | **1,071,948** | **(3,760,373)** | **584,193** | **(2,900,107)** | **(1,316,792)** | **2,179,316** | **(1,489,053)** | **1,343,701** | **1,090,580** |
| | | | | | | | | | | | |
| **Opening Balance** | | 24,720,535 | 24,517,917 | 25,589,865 | 21,829,492 | 22,413,685 | 19,513,578 | 18,196,787 | 20,376,102 | 18,887,049 | 20,230,750 |
| Net Operating Cash Flows | | (202,618) | 1,071,948 | (3,760,373) | 584,193 | (2,900,107) | (1,316,792) | 2,179,316 | (1,489,053) | 1,343,701 | 1,090,580 |
| **Ending Balance** | | **24,517,917** | **25,589,865** | **21,829,492** | **22,413,685** | **19,513,578** | **18,196,787** | **20,376,102** | **18,887,049** | **20,230,750** | **21,321,331** |
| Minimum Liquidity | | (2,000,000) | (2,000,000) | (2,000,000) | (2,000,000) | (2,000,000) | (2,000,000) | (2,000,000) | (2,000,000) | (2,000,000) | (2,000,000) |
| **Available Liquidity** | | **22,517,917** | **23,589,865** | **19,829,492** | **20,413,685** | **17,513,578** | **16,196,787** | **18,376,102** | **16,887,049** | **18,230,750** | **19,321,331** |

**SCHEDULE 2.1**

**LENDERS AND COMMITMENTS**

| Lender | Revolving Credit Commitment | Term Credit Commitment | Total |
|---|---|---|---|
| Royal Bank of Canada | $~~4,500,896.10~~3,150,627.27 | $~~25,256,892.01~~24,577,148.43 | $~~29,757,788.11~~27,727,775.70 |
| The Toronto-Dominion Bank | $~~4,500,896.10~~3,150,627.27 | $~~25,256,892.02~~24,577,148.44 | $~~29,757,788.12~~27,727,775.71 |
| Bank of China (Canada) | $~~2,414,355.00~~1,690,048.50 | $~~11,878,851.73~~11,559,153.91 | $~~14,293,206.73~~13,249,202.41 |
| Bank of Montreal | $~~2,414,355.00~~1,690,048.50 | $~~11,878,851.73~~11,559,153.91 | $~~14,293,206.73~~13,249,202.41 |
| National Bank of Canada | $~~2,414,355.00~~1,690,048.50 | $~~11,878,851.73~~11,559,153.91 | $~~14,293,206.73~~13,249,202.41 |
| Canadian Western Bank | $~~1,340,787.80~~938,551.46 | $~~6,818,621.53~~6,635,110.66 | $~~8,159,409.33~~7,573,662.12 |
| The Bank of Nova Scotia | $~~2,414,355.00~~1,690,048.50 | $~~11,878,851.73~~11,559,153.91 | $~~14,293,206.73~~13,249,202.41 |
| **Total:** | $~~20,000,000~~14,000,000 | $~~104,847,812.48~~102,026,023.17 | $~~124,847,812.48~~116,026,023.17 |

## SCHEDULE 3.1(3)

## GOVERNMENTAL APPROVALS; NO CONFLICTS

Nil.

**SCHEDULE 3.1(5)**

**LITIGATION**

Orgain Claim

In July 2018, Iovate Health Sciences U.S.A., Inc. (and certain of its affiliates) (collectively, "**Iovate**") received an intellectual property claim filed in the United States District Court for the Central District of California, Southern Division (the "**Court**").  The plaintiff is Orgain, Inc. ("**Orgain**"), a competing manufacturer and distributor of nutritional supplement products.  The plaintiff ~~alleges~~alleged that Iovate's line of Purely Inspired Organic Protein products ~~infringe~~infringed the trademarks and/or trade dress of Orgain's Organic Protein products contrary to federal U.S. law.  The claim also ~~alleges~~alleged unfair competition and false advertising under state law.  The plaintiff ~~claims~~claimed approximately U.S.$30,000,000 in damages, as well as injunctive relief.  Iovate ~~has~~ filed a ~~defence~~defense disputing all of the plaintiff's claims and ~~believes~~believed that the claims are without merit.  Iovate ~~intends to~~ vigorously ~~defend~~defended the claims.  Iovate also ~~disputes~~disputed that Orgain would be entitled to any damages if its claims were successful.  ~~Iovate's expert estimates Orgain's damages, if Orgain were able to establish liability, at approximately $500,000.~~

Both Iovate and Orgain filed Motions for Summary Judgment ("**MSJ**"), which were concurrently heard on September 11, 2020.  The Court granted Iovate's motion to dismiss Orgain's trademark infringement claims but declined to grant either party's motion for summary judgment on Orgain's trade dress infringement claim and related state law claims.  Orgain's subsequent Motions for Reconsideration and Interlocutory Appeal of the Court's MSJ ruling in Iovate's favor were dismissed by the Court.

The trial occurred from August 22 to 31, 2023.  A Jury Verdict was rendered finding Iovate had infringed Orgain's Trade dress and awarded the plaintiff U.S.$10,035,481 in damages from Iovate. Issuance of the trial transcripts were unusually delayed and were finally posted on January 19th, 2024.

Orgain ~~has~~ filed an Equitable Damages Motion in the amount of $27,778,210, disgorgement and treble damages. All briefings on that final motion were done on February 7, 2024.

On April 17, 2024, the Court ~~has~~ finally ruled on Orgain's Equitable Damages Motion and ~~has~~ denied all demands for further damages, to the exception of a permanent injunction on Iovate using the labeling at issue, which was changed more than a year ago. The Court ~~has~~ also entered the final judgement on that same day.

~~Iovate will appeal the final judgement and post the appeal bond accordingly, should settlement discussions not be successful~~

In the spring of 2024, Iovate and Orgain entered into settlement discussions and were working on finalizing a settlement agreement with a payment schedule. The written agreement was never finalized or signed by Iovate, as in May and June of 2024, Iovate was discussing the upcoming breach to the credit agreement with the lenders. On August 30, 2024, Orgain filed a motion to enforce the unsigned settlement agreement agreed to in principle by the parties.

In its Order dated October 31, and entered November 5, 2024, the Court granted the Motion to enforce the terms of settlement agreement set out by email between counsel on May 3rd. The terms are:

1. $12.5 M for full and final resolution;

    a) $7.5 M paid within 30 days of full executed long-form agreement;
    b) $3 M paid on September 1, 2024;
    c) $2 M paid on December 1, 2024.

2. Full 1542 release of all claims, standard terms including mutual confidentiality, mutual non-disparagement, etc. "Peace in the valley" with final resolution. Full written agreement to be finalized and executed swiftly by all parties.

3. The agreement shall carve out the preservation of the injunction on the labeling, meaning that the injunction awarded shall remain in place.

On November 17, 2024, the Court filed an Amended Judgment in this matter and ordered that:

1. Orgain, Inc. is awarded $12,500,000 in satisfaction of Orgain's claims against Iovate. Defendants Iovate Health Sciences International, Inc. and Iovate Health Sciences U.S.A., Inc. are jointly and severally liable for payment of the $12,500,000 award to Orgain; and

2. The injunction set forth by the Court in the First Judgment shall remain in effect.

This amended judgment replaces the original trial judgment. That is true simply by virtue of being an amended judgment, and it is confirmed by the fact that the amended judgment says it is "in satisfaction of Orgain's claims against Iovate."

The automatic stay on execution of the amended judgment expired on December 17, 2024. Orgain may now seek to collect upon the judgment recognizing the settlement agreement; however, the lenders and Administrative Agent would be able to advise the Court of their first priority lien over all of Iovate's assets. Orgain, as an unsecured creditor, cannot leapfrog the lenders' security interest in the assets.

**SCHEDULE 3.1(10)**

**REAL PROPERTY**

**Owned Real Property**

Nil.

**Material Leasehold Interest**

1. Approximately 112,200 square feet of rentable area located at 381 North Service Road West, Oakville, Ontario L6M 0H4.

## SCHEDULE 3.1(11)

## PERMITTED LIENS

| DEBTOR | SECURED PARTY | JURISDICTION | FILE NUMBER | REGISTRATION NUMBER |
|--------|---------------|--------------|-------------|---------------------|
| IOVATE HEALTH SCIENCES INC. | HEWLETT-PACKARD FINANCIAL SERVICES CANADA COMPANY | ONTARIO | 723020778 | 20161201 1549 1590 2386 |

**SCHEDULE 3.1(12)**

**PENSION PLANS**

Nil.

**SCHEDULE 3.1(14)**

**SUBSIDIARIES**

| Legal Name | Type of Entity | Jurisdiction of Organization | Equity Securities Issued | R... Sh... |
|---|---|---|---|---|
| Xiwang Iovate Holdings Company Limited | Corporation | British Columbia | 1,000,000 Common | Xiwa... (Qing... |
| Iovate Health Sciences International Inc. | Corporation | Ontario | 100 Class A Common | Xiv... Holdi... |
| Iovate Health Sciences U.S.A. Inc. | Corporation | Delaware | 100 Common Stock | Xiv... Holdi... |
| Northern Innovations Holding Corp. | Corporation | Ontario | 1,800 Class C common | Xiv... Holdi... |
| Iovate Health Sciences UK INC Ltd. | Corporation | United Kingdom | 100 Ordinary Stock | Xiv... Holdi... |
| Infinity Insurance Co. Ltd. | Corporation | Barbados | 2,000,000 Common Shares | Xiv... Holdi... |
| Iovate Health Sciences | | | | Iovate I... |

| Australia PTY Ltd. | Corporation | Australia | 100 Ordinary Shares | International Inc. |
|---|---|---|---|---|
| Iovate Health Sciences Europe Limited | Corporation | Ireland | 100 Ordinary Shares | Xiwang Iovate Holdings Company Limited |
| Muscletech LLC | Limited Liability Company | Delaware | 100% Membership Interest | Iovate Health Sciences U.S.A. Inc. |
| Conscious Kitchen LLC | Limited Liability Company | Delaware | 100% Membership Interest | Iovate Health Sciences U.S.A. Inc. |
| XP Sports LLC | Limited Liability Company | Delaware | 100% Membership Interest | Iovate Health Sciences U.S.A. Inc. |
| Hydroxycut LLC | Limited Liability Company | Delaware | 100% Membership Interest | Iovate Health Sciences U.S.A. Inc. |
| Six Star Pro Nutrition LLC | Limited Liability Company | Delaware | 100% Membership Interest | Iovate Health Sciences U.S.A. Inc. |
| Purely Inspired LLC | Limited Liability Company | Delaware | 100% Membership Interest | Iovate Health Sciences U.S.A. Inc. |
| Simplevita Nutrition LLC | Limited Liability Company | Delaware | 100% Membership Interest | Iovate Health Sciences U.S.A. Inc. |

**Structure Chart**





**SCHEDULE 3.1(17)**

<u>**ENVIRONMENTAL MATTERS**</u>

Nil.

**SCHEDULE 3.1(18)**

**EMPLOYEE MATTERS**

Nil.

SCHEDULE 3.1(23)

**BANK ACCOUNTS**

| Status | Account | Bank | Street | City | Prov/State | Postal Code/ZIP | Cou... |
|---|---|---|---|---|---|---|---|
| Already subject to BAA required | Iovate Health Sciences International Inc. | HSBC | 60 Queen Victoria Street | London | | EC4N 4TR | UK |
| Already subject to BAA required | Iovate Health Sciences International Inc. | HSBC | 60 Queen Victoria Street | London | | EC4N 4TR | UK |
| Account no longer required | Iovate Health Sciences International Inc. | HSBC | 28 Bridge Street | Sydney | NSW | 2000 | Austi... |
| Already subject to BAA | Iovate Health Sciences Australia Pty | HSBC | 333 George Street | Sydney | NSW | 2000 | Aus... |
| Already subject to BAA | Iovate Health Sciences Australia Pty | HSBC | 333 George Street | Sydney | NSW | 2000 | Aus... |
| Already subject to BAA | Iovate Health Sciences Australia Pty | HSBC | 333 George Street | Sydney | NSW | 2000 | Aus... |
| Now with RBC | Iovate Health Sciences International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Cana... |

1407-5777-6646.131407-5777-6646.22

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Now with RBC | Iovate Health Sciences International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | USD | Current Account | 002-623781-070 |
| Now with RBC | Xiwang Iovate Health Science International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | USD | Current Account | 002-799987-071 |
| Unclear if still open following RBC acquisition due to currency | Xiwang Iovate Health Science International Inc. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CNY | Commercial Savings | 002-799987-270 |
| Now with RBC | Northern Innovations Holding Corp. | HSBC Bank Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 102-1446880-001 |
| Already subject to BAA required | Iovate Health Sciences U.S.A Inc. | HSBC Bank USA | 425 Fifth Avenue | New York | NY | 10018 | USA | 212-525-4641 | USD | Current Account | 104035579 |
| Already subject to BAA required | Iovate Health Sciences U.S.A Inc. | HSBC Bank USA | 425 Fifth Avenue | New York | NY | 10018 | USA | 212-525-4641 | USD | Current Account | 104035587 |
| BAA not required | Iovate Health Sciences International Inc. | Royal Bank of Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 02705-1013721 |
| BAA not required | Iovate Health Sciences International Inc. | Royal Bank of Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | USD | Current Account | 02705-4004149 |
| BAA not required | Northern Innovations | Royal Bank of | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current | 02705-1031426 |

| | Holding Corp. | Canada | | | | | | | | Account | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BAA not required | Xiwang Iovate Health Science International Inc. | Royal Bank of Canada | 16 York Street | Toronto | Ontario | M5J 1S9 | Canada | 855-396-8119 | CDN | Current Account | 02705-4007738 |
| ~~Exempt from BAA requirement~~ | ~~Iovate Health Sciences U.S.A Inc.~~ | ~~Morgan Stanley Private Wealth Management~~ | ~~225 Asylum St. 14th Floor~~ | ~~Hartford~~ | ~~Connecticut~~ | ~~06103~~ | ~~USA~~ | ~~1-860-275-0723~~ | ~~USD~~ | ~~Brokerage Account~~ | ~~612-080418-088~~ |
| Already subject to BAA | Xiwang Iovate Holdings Co. Ltd. | Bank of China (Canada) | Unit 33, 1170 Burnhamthorpe Road West | Mississauga | Ontario | L5C 4E6 | Canada | 905-275-8118 | CNY | RMB Saving Account | 00072-1003002014 54232 |

~~1407-5777-6646.13~~1407-5777-6646.22

**SCHEDULE 5.1(8)**

**POST-CLOSING REQUIREMENTS**

Nil.

## SCHEDULE 5.1(11)

## SECURITY PRINCIPLES

The Security Principles embody recognition by the Secured Parties and the Credit Parties that there may be certain legal and practical difficulties in obtaining effective guarantees and Liens in jurisdictions in which a Person is organized, conducts business or has assets (the "**Security Jurisdictions**").  In particular:

*General*

(1)    General statutory limitations, financial assistance, capital maintenance, corporate benefit, fraudulent preference, US fraudulent transfer laws, "thin capitalization" rules, retention of title claims, exchange control restrictions and similar principles may limit the ability of a Person to provide a guarantee or Liens or may require that the guarantee or Liens be limited by an amount or otherwise.

(2)    No guarantee or Lien shall be taken or Lien perfected to the extent to which it would result in any material cost which is excessive in the context of the benefit of such guarantee or Lien to the Secured Parties or any material negative tax consequence for any Credit Party (including but not limited to material effects on interest deductibility and stamp duty, notarization and registration fees) which is excessive in the context of the benefit of such guarantee or Lien to the Secured Parties.

(3)    The maximum guaranteed or secured amount may be limited to minimize stamp duty, notarization, registration or other applicable fees, taxes and duties.

(4)    Where there is material incremental cost involved in creating security over all assets owned by a Person in a particular category (for example, real estate) the principle stated in clause (2) above shall apply.

(5)    It is acknowledged that in certain jurisdictions it may be either impossible or impractical to create a Lien over certain categories of assets in which event security shall not be taken over such assets.

(6)    Subject to the anti-assignment provisions under applicable Law, any assets subject to third party arrangements which may prevent those assets from being charged or which would result in the termination (or give rise to a right of termination) or breach of such third party-arrangement shall be excluded from any relevant Security Document.

(7)    A Person shall not be required to give guarantees or enter into Security Documents if it is not within the legal capacity of such Person or if the same would conflict with the fiduciary duties of the directors (or other officers) of such Person or contravene any legal prohibition or regulatory condition or would result in (or result in a material risk of) personal or criminal liability on the part of any director (or other officer) of any Credit Party provided that such Person shall use reasonable endeavours to overcome any such obstacle.

(8)    The giving of a guarantee, the granting of a Lien or the perfection of a Lien shall not be required if it would restrict the ability of the relevant Person to conduct its operations and business in the ordinary course as otherwise permitted by the Loan Documents.

(9)    To the extent possible, all Liens shall be granted in favour of the Administrative Agent and not the Secured Parties individually.

(10)    To the extent possible, there should be no action required to be taken in relation to the guarantees or Security Documents when any Lender transfers any of its Loans or Commitments to a new Lender.

(11)    No perfection of a Lien shall be required in a jurisdiction other than in Security Jurisdictions.  Notwithstanding the foregoing, a Lien over any material account receivable shall be perfected in the jurisdiction where the account debtor is located where such perfection is necessary under the laws of such jurisdiction to render such Lien enforceable against such account debtor.

(12)    No Lien shall be required over Equity Securities issued by a Restricted Joint Venture where prohibited by the relevant joint venture agreements or arrangements (or legal restrictions).

(13)    No Immaterial Subsidiary, CFC, CFC Holdco or Restricted Joint Venture shall be required to become a Guarantor or to enter into any Security Documents (it being understood that any such Person may become a Guarantor and/or enter into any Security Documents at the discretion of the Borrower).

### *Equity Securities*

(14)    Subject to advice from relevant local counsel for the Administrative Agent, if a Credit Party charges Equity Securities, the relevant Security Document shall be governed by the law of the jurisdiction of incorporation or organization of the issuer of such Equity Securities (the "**Issuer**") and not by the law of the jurisdiction of incorporation or organization of the charging Credit Party.  However, where an Issuer is not a Credit Party and is not incorporated or organized in a jurisdiction, the law of which governs other Security Documents, then the Security Document charging its Equity Securities shall be governed by the law of the jurisdiction of incorporation or organization of the charging Credit Party.

(15)    Security over Equity Securities shall, where legally possible, automatically charge further Equity Securities issued.

(16)    Notwithstanding the terms of any Loan Document, the delivery of share certificates evidencing Equity Securities issued by a Person other than a Credit Party or the taking of other control steps with respect to such Equity Securities shall  not be required.

### *Real Estate*

(17)    No Lien shall be required over any freehold interest in real property having a book value of less than U.S.$1,000,000.

(18)    No Lien shall be required over any leasehold interest in real property that is not a Material Leasehold Interest.  No Lien shall be required over a Material Leasehold Interest if such a Lien would be prohibited by the terms of the applicable lease and the requisite landlord consent cannot be obtained after the exercise of reasonable commercial efforts.

(19)    A landlord waiver, in form and substance satisfactory to the Administrative Agent, acting reasonably, shall be required from each landlord of real property where any material inventory of any of the Credit Parties is located; provided that no such landlord waiver shall be required if it cannot be obtained after the exercise of reasonable commercial efforts.

(20)    The Administrative Agent shall not accept any Lien from a Credit Party over an interest in real property located in the United States of America unless and until each Lender has confirmed its satisfactory completion of flood insurance due diligence and compliance with respect to such real property.

The above limitations are subject always to exceptions which are standard in the Security Jurisdictions.

**SCHEDULE 6.1(1)**

**EXISTING INDEBTEDNESS**

Nil.

## SCHEDULE 9.1(1)

## LENDER AND ISSUING BANK CONTACT INFORMATION

| Name of Lender or Issuing Bank | Address | E-mail Address |
|---|---|---|
| Royal Bank of Canada | Attention: Andrew ~~Sclater~~ O'Coin<br>~~16 York~~20 King Street~~, Suite 500 Box 64~~ West<br>Toronto, ON<br>M5~~J 0E6,~~H 1C4<br>Canada | andrew.~~sclater@rbccm~~ocoin @rbc.com |
| The Toronto-Dominion Bank | Attention: ~~Andrew Maclellan~~Daryl Coelho<br>TD ~~West~~Bank Tower<br>~~100~~66 Wellington Street West~~, 26~~ 12th Floor<br>Toronto, ~~Ontario~~ON<br>M5K 1A2<br>Canada | ~~andrew.maclellan~~daryl.coelho@td.com |
| Bank of China (Canada) | Attention: David Liang and Gordon Sun<br>50 Minthorn Blvd.<br>Suite 700<br>Markham, ON<br>L3T 7X8<br>Canada | davidl@bankofchina.ca<br>yuchensun@bankofchina.ca, |
| Bank of Montreal | Attention: ~~Andrew Gouw~~Shehryar Syed<br>First Canadian Place<br>100 King Street West<br>~~18~~19th Floor<br>Toronto, Ontario<br>M5X 1A1 | ~~andrew.gouw@bmo.com~~<br><br>shehryar.syed@bmo.com |

| Name of Lender or Issuing Bank | Address | E-mail Address |
|---|---|---|
| | Canada | |
| National Bank of Canada | Attention: Jonathan Khan<br>130 King Street West, Suite 3200<br>Toronto, ON M5X 1J9 | jonathan.khan@nbc.ca |
| Canadian Western Bank | Attention: Stan Seto<br>Suite 100, 12230 Jasper Avenue<br>Edmonton, Alberta<br>T5N 3K3<br>Canada | stan.seto@cwbank.com |
| The Bank of Nova Scotia | Attention to: ~~Aviv Haras~~<u>Nick Stewart, Rocco Fabiano and Neel Chopra</u><br><br>Scotiabank \| ~~National Accounts, Commercial Banking~~ <u>Global Risk Management</u><br>40 King Street West, Scotia Plaza, ~~50~~<u>12</u>th Floor<br>Toronto, ON M5H 1H1<br>Canada | <u>neel.chopra@scotiabank.com</u><br><br><u>rocco.fabiano@scotiabank.com</u><br><br>~~aviv.haras@scotiabank.com~~n<br><u>ick.stewart@scotiabank.com</u> |