**<u>EXHIBIT F</u>**

EXECUTION VERSION

# SECURITY AGREEMENT

SECURITY AGREEMENT dated as of December 21, 2016, between, each of the parties identified under the caption "GRANTORS" on the signature pages hereto and each other entity, if any, that becomes a "Grantor" hereunder as contemplated by Section 5.11 (collectively, the "<u>Grantors</u>"), and HSBC BANK CANADA, as administrative agent for the parties defined as "Secured Parties" under the Credit Agreement referred to below (in such capacity, together with any successor administrative agent appointed pursuant to the Credit Agreement (as defined below), the "<u>Administrative Agent</u>").

WHEREAS, Xiwang Iovate Health Science International ("<u>Xiwang</u>") and Iovate Health Sciences International Inc. ("<u>Iovate</u>" and, together with Xiwang, the "<u>Borrowers</u>"), the lenders from time to time party thereto (the "<u>Lenders</u>") and the Administrative Agent are parties to a Credit Agreement dated as of November 22, 2016 (as modified and supplemented and in effect from time to time, the "<u>Credit Agreement</u>"), providing, subject to the terms and conditions thereof, for extensions of credit (by means of loans, letters of credit and bankers' acceptances) to be made by the Lenders to the Borrowers;

WHEREAS, the Borrowers may from time to time be obligated to the Secured Parties in respect of one or more Secured Hedge Arrangements and Secured Cash Management Services;

WHEREAS, the Borrowers are members of an affiliated group of Persons that includes the Grantors;

WHEREAS, each Grantor will derive substantial direct and indirect benefits from the extensions of credit to the Borrowers pursuant to the Credit Agreement (which benefits are hereby acknowledged by each Grantor); and

WHEREAS, to induce such Lenders to enter into the Credit Agreement and to extend credit thereunder (including credit to be made available by the Borrowers to the Grantors) and under the Secured Hedge Arrangements and the Secured Cash Management Services, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor has agreed to grant a security interest in the Collateral (as so defined) as security for its Secured Obligations (as so defined);

Accordingly, the parties hereto agree as follows:

Section 1.  <u>Definitions, Etc.</u>

1.01    <u>Certain Uniform Commercial Code Terms</u>.  As used herein, the terms "<u>Accession</u>", "<u>Account</u>", "<u>As-Extracted Collateral</u>",  "<u>Chattel Paper</u>", "<u>Commodity Account</u>", "<u>Commodity Contract</u>", "<u>Deposit Account</u>", "<u>Document</u>", "<u>Electronic Chattel Paper</u>", "<u>Equipment</u>", "<u>Farm Products</u>", "<u>Fixture</u>", "<u>General Intangible</u>", "<u>Goods</u>", "<u>Instrument</u>", "<u>Inventory</u>", "<u>Investment Property</u>", "<u>Letter-of-Credit Right</u>", "<u>Manufactured Home</u>", "<u>Payment Intangible</u>", "<u>Proceeds</u>", "<u>Promissory Note</u>", "<u>Record</u>", "<u>Supporting Obligation</u>", "<u>Software</u>" and "<u>Tangible Chattel Paper</u>" have the respective meanings set forth in Article 9 of the NYUCC, and the terms "<u>Certificated Security</u>", "<u>Entitlement Holder</u>", "<u>Financial Asset</u>", "<u>Instruction</u>", "<u>Securities Account</u>", "<u>Security</u>", "<u>Security Certificate</u>", "<u>Security Entitlement</u>" and "<u>Uncertificated Security</u>" have the respective meanings set forth in Article 8 of the NYUCC.

1.02    <u>Additional Definitions</u>.  Capitalized terms used but not otherwise defined herein have the respective meanings set forth in the Credit Agreement.  In addition, as used herein:

<u>Security Agreement</u>

- 2 -

"Bankruptcy Code" means the United States Bankruptcy Code of 1978 (Title 11 of the United States Code).

"Collateral" has the meaning assigned to such term in Section 3.

"Insurance" means all property and casualty insurance policies covering any or all of the Collateral (regardless of whether the Administrative Agent is the loss payee thereof).

"Intellectual Property" means, collectively, the worldwide rights in (a) all copyrights, copyright registrations and applications for copyright registrations, including all renewals and extensions thereof, (b) all patents and patent applications, including the inventions and improvements described and claimed therein together with the reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (c) all trade names, trademarks and service marks, logos, trade-dress, get-up, and other business indicia, trademark and service mark registrations, and applications for trademark and service mark registrations, including all renewals of trademark and service mark registrations, and all rights corresponding thereto throughout the world, together, in each case, with the goodwill of the business connected with the use of, and symbolized by, each such trade name, trademark and service mark, (d) all rights in proprietary information, know-how and trade secrets, and (e) all rights to sue for past, present and future infringements or violations with respect to any of the foregoing.

"Intellectual Property License" means all licenses or user or other agreements granted to any Grantor with respect to any Intellectual Property.

"NYUCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"Pledged Issuer" means, with respect to any Grantor at any time, any Person which is an issuer of, or with respect to, any Pledged Shares of such Grantor at such time.

"Pledged Shares" means, collectively, all Shares of any Person now or hereafter owned by any Grantor, together in each case with (a) all certificates representing the same, (b) all Shares, securities, moneys or other property representing a dividend on or a distribution or return of capital on or in respect of the Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the Pledged Shares or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Shares, and (c) all Shares of any successor entity of any such merger or consolidation.

"Receivable" means all Accounts and any other right to payment for goods or other property sold, leased, licensed or otherwise disposed of or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper or classified as a Payment Intangible and whether or not it has been earned by performance. References herein to Receivables shall include any Supporting Obligation or collateral securing such Receivable.

"Secured Obligations" means, with respect to any Grantor, all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) of such Grantor to the Secured Parties (or any of them) under, in connection with or with respect to the Transaction Documents (including Secured Cash Management Obligations and Secured Hedge Obligations), and any unpaid balance thereof,

#4835-8462-9304v11

- 3 -

in the case of each of the foregoing, including all interest thereon and expenses related thereto (in each case, to the extent payable under the Loan Documents), including any interest, fees, premium or expenses (in each case, to the extent payable under the Loan Documents) accruing or arising after the commencement of any case with respect to any Grantor under the Bankruptcy Code or any other bankruptcy or insolvency law (whether or not such interest, fees, premium or expenses are enforceable, allowed or allowable as a claim in whole or in part in such case). Notwithstanding the foregoing or anything else in any Transaction Document, Excluded Swap Obligations of a Grantor shall not constitute Secured Liabilities for the purposes of this Agreement with respect to such Grantor.

"Shares" means shares of capital stock of a corporation, limited liability company interests, partnership interests and other ownership or equity interests of any class in any Person.

1.03    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "or" is disjunctive; the word "and" is conjunctive. The words "to the knowledge of" means, when modifying a representation, warranty or other statement of any Person, that the fact or situation described therein is known by such Person (or, in the case or a Person other than a natural Person, known by the Responsible Officer of such Person) making the representation, warranty or other statement, or with the exercise of reasonable due diligence under the circumstances (in accordance with the standard of what a reasonable Person in similar circumstances would have done) would have been known by such Person (or, in the case of a Person other than a natural Person, would have been known by such Responsible Officer of such Person). Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or replaced (subject to any restrictions on such modifications set out herein), (b) any reference herein to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, restated or re-enacted from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement. Any reference herein to an action, document or other matter or thing being "satisfactory to the Lenders", "to the Lenders' satisfaction" or similar phrases, shall mean that such action, document, matter or thing must be satisfactory to Lenders constituting the Required Lenders.

Section 2.    Representations and Warranties. Each Grantor represents and warrants to the Secured Parties that:

2.01    Names, Etc. The full and correct legal name, type of organization, jurisdiction of organization, and the chief executive office or sole place of business of each Grantor as of the date hereof are correctly set forth in Annex 1.

Security Agreement

- 4 -

2.02    <u>Changes in Circumstances</u>.  Such Grantor has not (a) within the period of four months prior to the date hereof, changed its location (as defined in Section 9-307 of the NYUCC), (b) within the period of the past five years, except as specified in Annex 1, heretofore changed its name, or (c) changed its identity or corporate structure within the past five years.

2.05    <u>Pledged Shares</u>.  All certificates, agreements or instruments representing or evidencing the Pledged Shares in existence on the date hereof have been delivered to the Administrative Agent in a suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank and (assuming continuing possession by the Administrative Agent of all such Pledged Shares) the Administrative Agent has a perfected first priority security interest therein.

2.06    <u>Warrants, Options, etc</u>.  There are no outstanding warrants, options or other rights to purchase, or other agreements outstanding with respect to, or property that is now or hereafter convertible into, or that requires the issuance or sale of, any Pledged Shares of such Grantor.

2.07    <u>No Required Disposition</u>.  There is no existing agreement, option, right or privilege capable of becoming an agreement or option pursuant to which such Grantor would be required to sell, redeem or otherwise dispose of any Pledged Shares of such Grantor or under which any issuer of Pledged Shares has any obligation to issue any Shares to any Person.

2.08    <u>Intellectual Property</u>.  Annex 2 sets forth a complete and correct list of all copyright registrations, patents, patent applications, trademark registrations and trademark applications owned by the Grantors on the date hereof (or, in the case of any supplement to said Annex 2, as of the date of such supplement).

2.09    <u>Commercial Tort Claims</u>.  No Grantor has any commercial tort claims in existence on the date hereof.

2.10    <u>Letter-of Credit Rights</u>.  As of the date hereof, there are no Letters of Credit issued in favor of any Grantor, as beneficiary thereunder.

2.11    <u>Special Collateral</u>.   As of the date hereof, none of the Collateral constitutes, or is the Proceeds of, (1) Farm Products, (2) As-Extracted Collateral, (3) Manufactured Homes, (4) timber to be cut, (5) health care insurance receivables, (6) Government Receivable or (7) aircraft, aircraft engines, satellites, ships or railroad rolling stock.

2.12    <u>Credit Agreement Representations</u>.  Each Grantor makes the representations and warranties set forth in Article 3 of the Credit Agreement as they relate to the Grantors or to the Loan Documents to which any Grantor is a party, each of which is hereby incorporated herein by reference, and the Secured Parties shall be entitled to rely on each of them as if they were fully set forth herein; <u>provided</u> that each reference in each such representation and warranty to any Borrower's knowledge shall, for the purposes of this Section 2.12, be deemed to be a reference to the applicable Grantor's knowledge.

Section 3.    <u>Collateral</u>.  As collateral security for the payment in full when due (whether at stated maturity, by acceleration or otherwise) of its Secured Obligations, each Grantor hereby pledges and grants to the Administrative Agent for the benefit of the Secured Parties as hereinafter provided a security interest in all of such Grantor's right, title and interest in, to and under the following property, in each case

<u>Security Agreement</u>

- 5 -

whether tangible or intangible, wherever located, and whether now owned by such Grantor or hereafter acquired and whether now existing or hereafter coming into existence (all of the property described in this Section 3 being collectively referred to herein as "Collateral"):

(a)     all Accounts, Receivables and Receivables Records;

(b)     all As-Extracted Collateral;

(c)     all Chattel Paper;

(d)     all Deposit Accounts;

(e)     all Documents;

(f)     all Equipment;

(g)     all Fixtures;

(h)     all General Intangibles;

(i)     all Goods not covered by the other clauses of this Section 3;

(j)     the Pledged Shares;

(k)     all Instruments, including all Promissory Notes;

(l)     all Insurance;

(l)     all Intellectual Property and Intellectual Property Licenses;

(m)     all Inventory;

(n)     all Investment Property, including all Securities, all Securities Accounts and all Security Entitlements with respect thereto and Financial Assets carried therein, and all Commodity Accounts and Commodity Contracts;

(o)     all Letter-of-Credit Rights;

(p)     all Money, as defined in Section 1-201(24) of the NYUCC;

(q)     all commercial tort claims, as defined in Section 9-102(a)(13) of the NYUCC;

(r)     all other tangible and intangible personal property whatsoever of such Grantor; and

(s)     all Proceeds of any of the Collateral, all Accessions to and substitutions and replacements for, any of the Collateral, and all offspring, rents, profits and products of any of the Collateral, and, to the extent related to any Collateral, all books, correspondence,

Security Agreement

- 6 -

credit files, records, invoices and other papers (including all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Grantor),

IT BEING UNDERSTOOD, HOWEVER, that in no event shall the security interest granted under this Section 3 attach to (x) any lease, license, contract, property rights or agreement to which any Grantor is a party (or to any of its rights or interests thereunder) if the grant of such security interest would constitute or result in either (i) the abandonment, invalidation or unenforceability of any right, title or interest of any Grantor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term would be rendered ineffective by Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code as in effect in the relevant jurisdiction) or (y) more than 65% of the voting Equity Securities of any CFC or CFC Holdco. For the avoidance of doubt, in no event shall the security interest granted under this Section 3 extend to any "intent-to-use" trademark application, filed pursuant to Section 1(b) of the Lanham Act, 17 U.S.C. § 1051(b), prior to the filing and acceptance by the United States Patent and Trademark Office of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent that the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application or any registration issuing therefrom.

Section 4. <u>Further Assurances; Remedies</u>. In furtherance of the grant of the security interest pursuant to Section 3, the Grantors hereby jointly and severally agree with the Administrative Agent for the benefit of the Secured Parties as follows:

4.01 <u>Delivery and Other Perfection</u>. Each Grantor shall promptly from time to time give, execute, deliver, file, record, authorize or obtain all such financing statements, continuation statements, notices, instruments, documents, agreements or consents or other papers as may be necessary or, in the reasonable judgment of the Administrative Agent, desirable to create, preserve, perfect, maintain the perfection of or validate the security interest granted pursuant hereto or to enable the Administrative Agent to exercise and enforce its rights hereunder with respect to such security interest, and without limiting the foregoing shall:

(a)    if any of the Pledged Shares, Investment Property or Financial Assets constituting part of the Collateral are received by such Grantor, forthwith (x) deliver to the Administrative Agent the certificates or instruments representing or evidencing the same, duly endorsed in blank or accompanied by such instruments of assignment and transfer in such form and substance as the Administrative Agent may reasonably request, all of which thereafter shall be held by the Administrative Agent, pursuant to the terms of this Agreement, as part of the Collateral and (y) take such other action as the Administrative Agent may reasonably deem necessary or appropriate to duly record or otherwise perfect the security interest created hereunder in such Collateral;

(b)    promptly from time to time deliver to the Administrative Agent any and all Instruments and Chattel Paper having a Fair Market Value exceeding $1,000,000, endorsed and/or accompanied by such instruments of assignment and transfer in such form and substance as the Administrative Agent may request;

(c)    subject to Section 6.1(15) of the Credit Agreement, promptly from time to time enter into such control agreements or consents to assignments of proceeds, each in form and substance reasonably acceptable to the Administrative Agent, as may be requested by the Administrative Agent to perfect the security interest created hereby in any and all (i) Letter-of Credit Rights and Investment Property, in each case with a value of more than $1,000,000 and (ii)

<u>Security Agreement</u>

- 7 -

Deposit Accounts, and Securities Accounts (other than (x) any bank or deposit account which is used solely for payroll, benefits, withholding tax, customs or other fiduciary purposes, in each case funded in the ordinary course of business, and (y) customer, custodial or escrow accounts so long as no funds or other property of any Credit Party is deposited in such account);

(d)     promptly execute and deliver to the Administrative Agent a Trademark Security Agreement, a Patent Security Agreement, and/or a Copyright Security Agreement, in each case in form and substance reasonably satisfactory to the Administrative Agent, as the Administrative Agent may reasonably deem necessary or desirable to record the security interest granted herein to the Administrative Agent for the ratable benefit of the Secured Parties with the United States Patent and Trademark Office, the United States Copyright Office, and any other applicable United States governmental authority, as applicable;

(e)     keep full and accurate books and records relating to the Collateral, and stamp or otherwise mark such books and records in such manner as the Administrative Agent may reasonably require in order to reflect the security interests granted by this Agreement;

(f)     promptly furnish to the Administrative Agent such statements and schedules further identifying and describing the Collateral of such Grantor, and such other reports in connection with the Collateral of such Grantor, as the Administrative Agent may from time to time reasonably request;

(g)     If the constating documents of any issuer of Pledged Shares restrict the transfer of the Shares of such issuer, deliver to the Administrative Agent a certified copy of a resolution of the directors, shareholders, unitholders, partners, or members of such issuer, as applicable, consenting to the transfer(s) contemplated by this Agreement, including any prospective transfer of the Collateral of such Grantor by the Administrative Agent upon a realization upon the Collateral; and

(h)  Advise the Administrative Agent promptly, in reasonable detail, of:

(i)     any change in the location (as defined in Section 9-307 of the NYUCC) of such Grantor;

(ii)     any change in the legal name of such Grantor;

(iii)     any acquisition of any Intellectual Property which is the subject of a registration or application with any governmental intellectual property registry (it being understood that such notification shall be concurrent with the delivery of the next Compliance Certificate after acquisition of such Intellectual Property);

(iv)     any acquisition of any Instrument or Chattel Paper having a Fair Market Value exceeding U.S. $1,000,000 (it being understood that such notification shall be concurrent with the delivery of the next Compliance Certificate after acquisition of such Instrument or Chattel Paper); and

(v)     any occurrence of any event, claim or occurrence that could reasonably be expected to have a material adverse effect on the value of the Collateral of such Grantor or on this Agreement.

Security Agreement

- 8 -

4.02    Control.    No Grantor shall cause or permit any Person other than the Administrative Agent to have "control" (as defined in Section 9 104, 9 105, 9 106 or 9 107 of the NYUCC) of any Deposit Account, Securities Account, Electronic Chattel Paper, Investment Property or Letter-of-Credit Right constituting part of the Collateral.

4.03    Preservation of Rights.    The Administrative Agent shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

4.04    Special Provisions Relating to Certain Collateral.

(a)    Pledged Shares.

(i)    Unless an Event of Default has occurred and is continuing, each Grantor shall be entitled to exercise all voting power from time to time exercisable with respect to the Pledged Shares of such Grantor and give consents, waivers and ratifications with respect thereto; provided, however, that no vote shall be cast or consent, waiver or ratification given or action taken which would be, or would have a reasonable likelihood of being, prejudicial to the interests of the Secured Parties or which would have the effect of reducing the value of the Collateral of such Grantor as security for the Secured Liabilities of such Grantor or imposing any restriction on the transferability of any of the Collateral of such Grantor.  Unless an Event of Default has occurred and is continuing, the Administrative Agent shall, from time to time at the request and expense of the applicable Grantor, execute or cause to be executed, with respect to all Pledged Shares of such Grantor that are registered in the name of the Administrative Agent or its nominee, valid proxies appointing such Grantor as its (or its nominee's) proxy to attend, vote and act for and on behalf of the Administrative Agent or such nominee, as the case may be, at any and all meetings of the applicable Pledged Issuer's shareholders or debt holders, all Pledged Shares that are registered in the name of the Administrative Agent or such nominee, as the case may be, and to execute and deliver, consent to or approve or disapprove of or withhold consent to any resolutions in writing of shareholders or debt holders of the applicable Pledged Issuer for and on behalf of the Administrative Agent or such nominee, as the case may be.  Immediately upon the occurrence and during the continuance of any Event of Default, all such rights of the applicable Grantor to vote and give consents, waivers and ratifications shall cease and the Administrative Agent or its nominee shall be entitled to exercise all such voting rights and to give all such consents, waivers and ratifications.

(ii)    Unless an Event of Default has occurred and is continuing, each Grantor shall be entitled to receive any and all cash dividends, interest, principal payments and other forms of cash distribution on the Pledged Shares of such Grantor which it is otherwise entitled to receive, but any and all stock and/or liquidating dividends, distributions of property, returns of capital or other distributions made on or with respect to the Pledged Shares of such Grantor, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of any Pledged Issuer of such Grantor or received in exchange for such Pledged Shares or any part thereof or as a result of any amalgamation, merger, consolidation, acquisition or other exchange of property to which any Pledged Issuer of such Grantor may be a party or otherwise, and any and all cash and other property received in exchange for any Pledged Shares of such Grantor shall be and become part of the Collateral of such Grantor subject to the Security Interests and with respect to any Certificated Security, if received by such Grantor, shall forthwith be delivered to the Administrative Agent or its nominee (accompanied, if appropriate, by proper instruments of assignment and/or stock powers of attorney executed by such Grantor in accordance with the Administrative Agent's instructions) to be held subject to the terms of this Agreement; and if any of the Pledged Shares that are

Security Agreement

- 9 -

Certificated Securities have been registered in the name of the Administrative Agent or its nominee, the Administrative Agent shall execute and deliver (or cause to be executed and delivered) to such Grantor all such dividend orders and other instruments as such Grantor may request for the purpose of enabling such Grantor to receive the dividends, distributions or other payments which such Grantor is authorized to receive and retain pursuant to this Section. If an Event of Default has occurred and is continuing, all rights of such Grantor pursuant to this Section shall cease and the Administrative Agent shall have the sole and exclusive right and authority to receive and retain the cash dividends, interest, principal payments and other forms of cash distribution which such Grantor would otherwise be authorized to retain pursuant to this Section. Any money and other property paid over to or received by the Administrative Agent pursuant to the provisions of this Section shall be retained by the Administrative Agent as additional Collateral hereunder and be applied in accordance with the provisions of this Agreement.

(b)    Intellectual Property.  For the purpose of enabling the Administrative Agent to exercise rights and remedies under Section 4.05 at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, and at no other time and for no other purpose, each Grantor hereby grants to the Administrative Agent, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by such Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof in each case, subject to any Grantor's security policies and obligations of confidentiality; provided, however, that nothing in this Section 12 shall require a Grantor to grant any license that is prohibited by any applicable law, statute or regulation or is prohibited by, or constitutes a breach or default under or results in the termination of or gives rise to any right of acceleration, modification or cancellation under any contract, license, agreement, instrument or other document evidencing, giving rise to a right to use or therefore granted with respect to such property. For any trade-marks, get up and trade dress and other business indicia, such licence includes an obligation on the part of the Administrative Agent to maintain the standards of quality maintained by such Grantor.  For copyright works, such licence shall include the benefit of any waivers of moral rights and similar rights if available to such Grantor.

4.05    Remedies.

(a)    Rights and Remedies Generally upon Default.  If an Event of Default shall have occurred and is continuing, the Administrative Agent shall have all of the rights and remedies with respect to the Collateral of a secured party under the Uniform Commercial Code (whether or not the Uniform Commercial Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Administrative Agent were the sole and absolute owner thereof (and each Grantor agrees to take all such action as may be appropriate to give effect to such right); and without limiting the foregoing if an Event of Default shall have occurred and is continuing:

(i)    the Administrative Agent in its discretion may, in its name or in the name of any Grantor or otherwise, demand, sue for, collect or receive any money or other property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so;

Security Agreement

- 10 -

(ii)     the Administrative Agent may make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

(iii)     the Administrative Agent may require the Grantors to notify (and each Grantor hereby authorizes the Administrative Agent to so notify) each account debtor in respect of any Account, Chattel Paper or General Intangible, and each Grantor on any Instrument, constituting part of the Collateral that such Collateral has been assigned to the Administrative Agent hereunder, and to instruct that any payments due or to become due in respect of such Collateral shall be made directly to the Administrative Agent or as it may direct (and if any such payments, or any other Proceeds of Collateral, are received by any Grantor they shall be held in trust by such Grantor for the benefit of the Administrative Agent and as promptly as possible remitted or delivered to the Administrative Agent for application as provided herein);

(iv)     the Administrative Agent may require the Grantors to assemble the Collateral at such place or places, reasonably convenient to the Administrative Agent and the Grantors, as the Administrative Agent may direct;

(v)     the Administrative Agent may apply the LC Collateral Account and any money or other property therein to payment of the Secured Obligations, as set out in the Credit Agreement;

(vi)     the Administrative Agent may require the Grantors to cause the Pledged Shares to be transferred of record into the name of the Administrative Agent or its nominee (and the Administrative Agent agrees that if any of such Pledged Shares is transferred into its name or the name of its nominee, the Administrative Agent will thereafter promptly give to respective Grantor (through the Borrowers) copies of any notices and communications received by it with respect to such Pledged Shares); and

(vii)     the Administrative Agent may sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Administrative Agent deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required by applicable statute and cannot be waived), and the Administrative Agent or any other Secured Party or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of the Grantors, any such demand, notice and right or equity being hereby expressly waived and released.  The Administrative Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.

The Proceeds of each collection, sale or other disposition under this Section 4.05, including by virtue of the exercise of any license granted to the Administrative Agent in Section 4.04(b), shall be applied in accordance with Section 4.09.

(b)     Certain Securities Act Limitations.  The Grantors recognize that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable federal, foreign or

Security Agreement

- 11 -

state securities laws, or otherwise, the Administrative Agent may determine that a public sale is impracticable, not desirable or not commercially reasonable and may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Grantors acknowledge that any such private sales may be at prices and on terms less favorable to the Administrative Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agree that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Administrative Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale.

(c)     Other acts. Each Grantor agrees to use its reasonable best efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Pledged Shares pursuant to this Section 4.05 valid and binding and in compliance with all other applicable legal requirements. Each Grantor further agrees that a breach of any covenant contained in this Section 4.05 will cause irreparable injury to the Secured Parties, that the Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 4.05 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defense against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement.

(d)     Notice. The Grantors agree that to the extent the Administrative Agent is required by applicable law to give reasonable prior notice of any sale or other disposition of any Collateral, ten Business Days' notice shall be deemed to constitute reasonable prior notice.

4.06     Deficiency. If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to Section 4.05 are insufficient to cover the costs and expenses of such realization and the payment in full of the Secured Obligations, the Grantors shall remain liable for any deficiency.

4.07     Locations; Names, Etc. Without at least 30 days' prior written notice to the Administrative Agent (or such shorter period as the Administrative Agent may agree), no Grantor shall (i) change its location (as defined in Section 9-307 of the NYUCC), (ii) change its name from the name shown as its current legal name on Annex 1, or (iii) agree to or authorize any modification of the terms of any item of Collateral that would result in a change thereof from one Uniform Commercial Code category to another such category (such as from a General Intangible to Investment Property), if the effect of any such change described in this clause (iii) would be to result in a loss of perfection of, or diminution of priority for, the security interests created hereunder in such item of Collateral, or the loss of control (within the meaning of Section 9-104, 9-105, 9-106 or 9-107 of the NYUCC) over such item of Collateral.

4.08     Private Sale. The Secured Parties shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Section 4.05 conducted in a commercially reasonable manner. Each Grantor hereby waives any claims against the Secured Parties arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Administrative Agent accepts the first offer received and does not offer the Collateral to more than one offeree.

#4835-8462-9304v11

- 12 -

4.09    Application of Proceeds.  Except as otherwise herein expressly provided, the Proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto shall be applied by the Administrative Agent in accordance with the Credit Agreement.

4.10    Attorney-in-Fact.  Without limiting any rights or powers granted by this Agreement to the Administrative Agent while no Event of Default has occurred and is continuing, upon the occurrence and during the continuance of an Event of Default, each Grantor constitutes and appoints the Administrative Agent and any officer or agent of the Administrative Agent, with full power of substitution, as such Grantor's true and lawful attorney-in-fact with full power and authority in the place of such Grantor and in the name of such Grantor or in its own name, from time to time in the Administrative Agent's discretion, to take any and all appropriate action and to execute any and all documents and instruments as, in the opinion of such attorney, may be necessary or desirable to accomplish the purposes of this Agreement, which appointment as attorney-in-fact is irrevocable and coupled with an interest.  Without limiting the effect of this Section, each Grantor grants the Administrative Agent an irrevocable proxy to vote the Pledged Shares of such Grantor and to exercise all other rights, powers, privileges and remedies to which a holder thereof would be entitled (including giving or withholding written consents of shareholders, calling special meetings of shareholders and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Shares of such Grantor), upon the occurrence and during the continuance of an Event of Default.  These powers are coupled with an interest and are irrevocable until the Lender Termination Date.  Nothing herein affects the right of the Administrative Agent as secured party or any other Person on the Administrative Agent's behalf, to sign and file or deliver (as applicable) all such financing statements, financing change statements, notices, verification statements and other documents relating to the Collateral and this Agreement as the Administrative Agent or such other Person considers appropriate.  Each Grantor hereby ratifies and confirms, and agrees to ratify and confirm, whatever lawful acts the Administrative Agent or any of the Administrative Agent's sub-agents, nominees or attorneys do or purport to do in exercise of the power of attorney granted to the Administrative Agent pursuant to this Section.

4.11    Perfection and Recordation.  Each Grantor authorizes the Administrative Agent to file (a) Uniform Commercial Code financing statements describing the Collateral as "all assets" or "all personal property and fixtures" of such Grantor (provided that no such description shall be deemed to modify the description of Collateral set forth in Section 3) and (b) any trademark security agreement, patents security agreement and copyright security agreement, executed by such Grantor, required in order to perfect any Lien granted pursuant to Section 3 in United States Intellectual Property.

4.12    Termination.  On the Lender Termination Date, the Grantor shall be released from the Liens created hereunder, and this Agreement and all obligations of the Grantor under this Agreement shall terminate, all without delivery of any instrument or performance of any act by any Person. Upon the written request of any Grantor given at any time on or after the Lender Termination Date, or as permitted pursuant to the Credit Agreement, the Administrative Agent shall at the expense of such Grantor, execute and deliver to such Grantor such releases and discharges as such Grantor may reasonably request.

4.13    Environmental Indemnity.  Each Grantor shall indemnify the Secured Parties and hold the Secured Parties harmless against and from all losses, costs, damages and expenses which any Secured Party may sustain, incur or be or become liable at any time whatsoever for by reason of or arising in connection with any Environmental Liability to the extent the Borrowers would be required to do so pursuant to Section 9.3(2) of the Credit Agreement.  This indemnification shall survive the Lender Termination Date.

Security Agreement

- 13 -

4.14    _Further Assurances_.  Each Grantor agrees that, from time to time upon the written request of the Administrative Agent, such Grantor will execute and deliver such further documents and do such other acts and things as the Administrative Agent may reasonably request in order fully to effect the purposes of this Agreement.  The Administrative Agent shall release any Lien covering any asset to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 9.2.

Section 5.  _Miscellaneous_.

5.01    _Notices_.  All notices, requests, consents and demands hereunder shall be made in accordance with Section 9.1 of the Credit Agreement.

5.02    _No Waiver_.  No failure or delay by any Secured Party in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Secured Parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by a Grantor therefrom shall in any event be effective unless the same shall be permitted by Section 5.03, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether any Secured Party may have had notice or knowledge of such Default at the time.

5.03    _Amendments, Etc_.  The terms of this Agreement may be waived, altered or amended only by an instrument in writing duly executed by each Grantor and the Administrative Agent (with the consent of the Lenders as specified in Section 9.2 of the Credit Agreement).  Any such amendment or waiver shall be binding upon the Secured Parties and each Grantor.

5.04 _Expenses; Indemnification_.

(a)    The Grantors shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Secured Parties, including the reasonable and documented fees, charges and disbursements of one primary counsel for the Secured Parties and all applicable taxes, in connection with the preparation and administration of this Agreement, (ii) all reasonable and documented out-of-pocket expenses incurred by the Secured Parties, including the reasonable and documented fees, charges and disbursements of one primary counsel for the Secured Parties and applicable taxes, in connection with any amendments, modifications or waivers of the provisions hereof, and (iii) all out-of-pocket expenses incurred by the Secured Parties, including the fees, charges and disbursements of any counsel for the Secured Parties and all applicable taxes, in connection with the assessment, enforcement or protection of their rights in connection with this Agreement, including its rights under this Section, in each case to the extent the Borrowers would be required to do so pursuant to Section 9.3(1) of the Credit Agreement.

(b)    Each Grantor shall indemnify, in each case to the extent required to do so pursuant to Section 9.3 of the Credit Agreement, the Secured Parties against, and hold the Secured Parties harmless from, any and all losses, claims, cost recovery actions, damages, expenses and liabilities of whatsoever nature or kind and all reasonable out-of-pocket expenses and all applicable taxes to which any Secured Party may become subject arising out of or in connection with (i) the execution or delivery of this Agreement and the performance by such Grantor of its obligations hereunder, (ii) any actual or prospective

Security Agreement

- 14 -

claim, litigation, investigation or proceeding relating to this Agreement or the Secured Obligations of such Grantor, whether based on contract, tort or any other theory and regardless of whether any Secured Party is a party thereto, (iii) any other aspect of this Agreement, or (iv) the enforcement of the Secured Parties' rights hereunder and any related investigation, defence, preparation of defence, litigation and enquiries; provided that such indemnity shall not, as to any Secured Party, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence (it being acknowledged that ordinary negligence does not necessarily constitute gross negligence) or wilful misconduct of or material breach of this Agreement by such Secured Party, (y) result from a claim brought by any Group Party for a material breach of such Secured Party's obligations under this Agreement if such Group Party has obtained a final and nonappealable judgment by a court of competent jurisdiction in such Group Party's favor on such claim or (z) result from a proceeding that does not involve an act or omission by a Borrower or any of its Affiliates and that is brought by a Secured Party (or a Related Party thereto) against any other Secured Party (or a Related Party thereto) (other than a proceeding that is brought against the Administrative Agent or an Arranger in its capacity as such).

(c)     No claim may be made by any Grantor, any Secured Party or any other Person against any party hereto on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, or in connection with, or as a result of, this Agreement, or any act, omission or event occurring in connection applicable law all such claims, whether or not accrued and whether or not known or suspected to exist in its favour.

(d)     All amounts due under this Section shall be payable to the Administrative Agent for the benefit of the applicable Secured Party not later than 10 Business Days after written demand therefor.

(e)     The indemnifications set out in this Section shall survive the Lender Termination Date and the release or extinguishment of the Liens created by the Grantors in favour of the Administrative Agent (for its own benefit and for the benefit of the other Secured Parties) under this Agreement.

5.05     Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby except that (a) no Borrower shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Secured Party (and any attempted assignment or transfer by a Borrower without such consent shall be null and void), and (b) no Secured Party may assign or otherwise transfer its rights or obligations hereunder except in accordance with Section 9.4 of the Credit Agreement. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each Secured Party) any legal or equitable right, remedy or claim under or by reason of this Agreement.

5.06     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument.  Counterparts may be executed either in original or faxed or other electronic form and the parties adopt any signatures received by a receiving fax machine or via e-mail as original signatures of the parties.

Security Agreement

- 15 -

5.07    Governing Law; Submission to Jurisdiction; Etc.

(a)    Governing Law.  This Agreement and any right, remedy, obligation, claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

(b)    Submission to Jurisdiction.  Each Grantor hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York sitting in New York County, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any Loan Document to which such Grantor is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any Secured Party or Administrative Agent may otherwise have to bring any action or proceeding relating to this Agreement against any Grantor or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue.  Each Grantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process.  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

5.08    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

5.09    Agents and Attorneys-in-Fact.  The Administrative Agent may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.

Security Agreement

#4835-8462-9304v11

- 16 -

5.10    <u>Severability</u>.    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

5.11    <u>Additional Grantor</u>.    As contemplated by the Security Principles, certain Subsidiaries of the Borrowers, may be required to become a "Grantor" under this Agreement, by executing and delivering to the Administrative Agent a joinder agreement in form and substance reasonably satisfactory to the Administrative Agent. Accordingly, upon the execution and delivery of any such joinder agreement by any such new Subsidiary, such new Subsidiary shall automatically and immediately, and without any further action on the part of any Person, become a "Grantor" under and for all purposes of this Agreement, and each of the Annexes hereto shall be supplemented in the manner specified in such joinder agreement.

5.12    <u>Entire Agreement</u>.    This Agreement (together with the other Loan Documents), constitutes the entire agreement between the parties pertaining to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written. There are no conditions, warranties, representations or other agreements between the parties in connection with the subject matter of this Agreement (whether oral or written, express or implied, statutory or otherwise) except as specifically set out in this Agreement or in such other applicable agreements.

5.13    <u>Paramountcy</u>. In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the Credit Agreement then, notwithstanding anything contained in this Agreement, the provisions contained in the Credit Agreement shall prevail to the extent of such conflict or inconsistency and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict or inconsistency, it being understood that the purpose of this Agreement is to add to, and not detract from, the rights granted to the Administrative Agent (for its own benefit and for the benefit of the other Secured Parties) under the Credit Agreement. If any act or omission of any or all of the Grantors is expressly permitted under the Credit Agreement but is expressly prohibited under this Agreement, such act or omission shall be permitted. If any act or omission is expressly prohibited under this Agreement, but the Credit Agreement does not expressly permit such act or omission, or if any act is expressly required to be performed under this Agreement but the Credit Agreement does not expressly relieve any or all Grantors from such performance, such circumstance shall not constitute a conflict or inconsistency between the applicable provisions of this Agreement and the provisions of the Credit Agreement.

<u>Security Agreement</u>

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed and delivered as of the day and year first above written.

GRANTORS

IOVATE HEALTH SCIENCES U.S.A. INC.

By: Norm Vanderee
Title: Chief Financial Officer

[Signature Page to Security Agreement]

IOVATE HEALTH SCIENCES INTERNATIONAL INC.

By _____

Title: Norm Vanderee
      Chief Financial Officer

HSBC BANK CANADA,
as Administrative Agent

By _Parisa Naguibi_
Title: Authorized Signatory

[Signature Page to Security Agreement]

**ANNEX 1**

### FILING DETAILS

| Legal Name of <u>Grantor</u> | Type of <u>Organization</u> | Other legal names in past five years and <u>dates of change</u> | Changes in identity or corporate structure in past <u>five years</u> | Jurisdiction of <u>Organization</u> | <u>Chief Executive Office or Sole Place of Business</u> |
|---|---|---|---|---|---|
| Iovate Health Sciences U.S.A. Inc. | Corporation | N/A | N/A | Delaware | 381 North Service Road West Oakville, ON L6m0h4 |

<u>Annex 1 to Security Agreement</u>

#4835-8462-9304v11

ANNEX 2

## LIST OF COPYRIGHTS, COPYRIGHT REGISTRATIONS AND
## APPLICATIONS FOR COPYRIGHT REGISTRATIONS

| Owner | Title | Registration Number |
|-------|-------|---------------------|
| N/A   |       |                     |

## LIST OF PATENTS AND PATENT APPLICATIONS

| Owner | Country | Registration or App Number | Patent Title |
|-------|---------|----------------------------|--------------|
| N/A   |         |                            |              |

## LIST OF TRADE NAMES, TRADEMARKS, SERVICES MARKS,
## TRADEMARK AND SERVICE MARK REGISTRATIONS AND
## APPLICATIONS FOR TRADEMARK AND SERVICE MARK REGISTRATIONS

| Owner | Country | Mark | Reg. No. | App. No. | Status |
|-------|---------|------|----------|----------|--------|
| N/A   |         |      |          |          |        |

4835-8462-9304, v. 9

Annex 2 to Security Agreement