# **EXHIBIT A**

4934-5806-4801.2 42848.00001

ksv advisory inc.

**Fourth Report of
KSV Restructuring Inc.
as CCAA Monitor of
Xiwang Iovate Holdings Company
Limited, Iovate Health Sciences
International Inc., Iovate Health
Sciences U.S.A. Inc., Iovate Health
Sciences Australia PTY Ltd and
Northern Innovations Holding Corp.**

**April 9, 2026**

## Contents
Page

1.0    Introduction ................................................................................................. 1

    1.1    Purposes of this Fourth Report ................................................. 4
    1.2    Restrictions .................................................................................. 5
    1.3    Currency ....................................................................................... 5

2.0    Background ................................................................................................. 5

3.0    SISP ............................................................................................................. 6
    3.1    Conduct of the SISP .................................................................. 6
    3.2    Results of the SISP and Selection of Successful Bid ............. 7

4.0    Proposed Transactions ............................................................................. 8
    4.1    Subscription Agreement ............................................................ 8
    4.2    Reverse Vesting Structure ....................................................... 10
    4.3    Related Party Considerations .................................................. 12
    4.4    Proposed Releases .................................................................... 13
    4.5    Monitor's Recommendation ...................................................... 13

5.0    Sealing Order ........................................................................................... 14

6.0    Proposed Distribution ............................................................................. 15
    6.1    Distribution to the Administrative Agent .................................. 15
    6.2    Payments in respect of the Administrative Professionals Charge ........... 16
    6.3    Payment to the Sales Agent ..................................................... 16
    6.4    Payment of the KERP Payment ............................................... 17
    6.5    Monitor's Recommendation ...................................................... 17

7.0    Cash Flow Forecast ................................................................................. 17

8.0    Stay Extension ......................................................................................... 18

9.0    Monitor's Activities .................................................................................. 19

10.0    Conclusion and Recommendation ........................................................ 21

## Appendices

**Appendix**                                                                                              **Tab**

Redacted Subscription Agreement ....................................................................A

Cash Flow Forecast and the Monitor's Report on Cash Flow ...........................B

First Report of the Proposal Trustee dated September 8, 2025 ........................ C

Second Report of the Proposal Trustee dated October 1, 2025........................ D

Third Report of the Proposal Trustee dated October 15, 2025...........................E

Joint Fourth Report of the Proposal Trustee and Report of the Proposed
Monitor dated October 30, 2025 .......................................................................F

First Report of the Monitor dated November 25, 2025 ..................................... G

Supplement to the First Report of the Monitor dated November 27, 2025......... H

Second Report of the Monitor dated December 9, 2025 ....................................I

Third Report of the Monitor dated January 23, 2026.........................................J


**Confidential Appendix**                                                                               **Tab**

Summary of Phase 1 LOIs and Phase 2 Bids......................................................1

Unredacted Subscription Agreement .................................................................2



**ksv advisory inc.**

Court File No. BK-25-03268936-0031

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF XIWANG IOVATE HOLDINGS COMPANY LIMITED, IOVATE HEALTH
SCIENCES INTERNATIONAL INC., IOVATE HEALTH SCIENCES U.S.A. INC.,
IOVATE HEALTH SCIENCES AUSTRALIA PTY LTD, and NORTHERN
INNOVATIONS HOLDING CORP.

**FOURTH REPORT OF THE MONITOR
KSV RESTRUCTURING INC.**

**APRIL 9, 2026**

## 1.0 Introduction

1. On September 5, 2025, Iovate Health Sciences International Inc. ("**Iovate International**"), Iovate Health Sciences U.S.A. Inc. ("**Iovate USA**") and Northern Innovations Holding Corp. ("**Northern Innovations**", and collectively, the "**NOI Applicants**") each filed a Notice of Intention to Make a Proposal (collectively the "**NOIs**", each an "**NOI**") in accordance with the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended (such proceedings, the "**Proposal Proceedings**"), and KSV Restructuring Inc. ("**KSV**") consented to act as proposal trustee (in such capacity, the "**Proposal Trustee**").

2. On October 3, 2025, the Ontario Superior Court of Justice (Commercial List) (the "**Court**") granted an order, among other things, extending the time for the NOI Applicants to file a proposal to November 4, 2025.

3. On October 31, 2025, the Court granted an order (the "**Initial Order**"), that among other things:

   a) granted a stay of proceedings in favour of the NOI Applicants, Xiwang Iovate Holdings Company Limited ("**Iovate Holdings**") and Iovate Health Sciences Australia PTY Ltd ("**Iovate Australia**", collectively, the "**Applicants**") and protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985. c. C-36 (the "**CCAA**" and such proceedings, the "**CCAA Proceedings**"), as amended, to and including December 12, 2025 (the "**Stay Period**");

b) extended the benefit of the stay of proceedings to five related foreign entities (the "**Non-Applicant Stay Parties**"). [1] The Applicants, together with the Non-Applicant Stay Parties are collectively referred to as the "**Iovate Group**";

c) granted certain charges on the Property (as defined in the Initial Order);

d) authorized Iovate International to continue to act as the foreign representative of the NOI Applicants in the Chapter 15 proceedings; and

e) appointed KSV as the monitor of the Applicants (in such capacity, the "**Monitor**").

4. On November 12, 2025, the United States Bankruptcy Court for the Southern District of New York (the "**New York Court**") entered an order amending its prior Order entered on October 28, 2025, and recognizing and enforcing the Initial Order with respect to Iovate International, Iovate USA, Northern Innovations, Muscletech LLC, XP Sports LLC and SimpleVita Nutrition LLC (such proceedings, the "**Chapter 15 Proceedings**").

5. On November 28, 2025, the Court granted:

a) an order (the "**SISP Order**") approving: (i) the sale and investment solicitation process (the "**SISP**") to be conducted by the Monitor, with the assistance of the Applicants and the Sales Agent (as defined below), in consultation with Royal Bank of Canada as agent (the "**Administrative Agent**") for a syndicate of lenders (the "**Lenders**"), and (ii) authorizing and empowering the Monitor and the Sales Agent to implement the SISP pursuant to the terms thereof; and

b) an Amended and Restated Initial Order ("**ARIO**"), among other things:

   i. authorizing the Monitor, *nunc pro tunc*, to the exclusion of all others (including the Applicants and their respective officers and directors) to: (i) negotiate and execute the letter agreement dated November 11, 2025 between the Applicants and Origin Merchant Partners (the "**Sales Agent**") (the "**Engagement Letter**"), on behalf of the Applicants; (ii) cause the Applicants to perform their obligations under the Engagement Letter; and (iii) perform such other functions and duties, and enter into any agreements or incur any obligations on behalf of and in the name of the Applicants, as may be necessary or incidental to the negotiation, execution and performance of the Engagement Letter by the Applicants;

   ii. granting a Sales Agent Charge (as defined in the ARIO) in the maximum amount of CA $1.75 million in respect of a fee if a transaction is agreed to by the Applicants, calculated based on the transaction value, and the Sales Agent's expenses, which charge shall be subordinate only to the Administrative Professionals Charge and Directors' Charge (each as defined in the ARIO); and

   iii. extending the Stay Period to and including January 30, 2026.

---

[1] The Non-Applicant Stay Parties consist of: Infinity Insurance Co. Ltd., Iovate Health Sciences Europe Limited, Muscletech LLC, XP Sports LLC and SimpleVita Nutrition LLC.

6.   On December 12, 2025, the Court granted an order (the "**Enhanced Monitor Powers Order**") for enhanced powers to permit the Monitor to more directly supervise and, where appropriate, manage the Applicants' business in order to ensure the fair and transparent administration of the CCAA Proceedings and the SISP. The enhanced powers granted pursuant to this Order enable the Monitor to exercise any powers which may be properly exercised by a board of directors or any officers of the Applicants.

7.   On January 6, 2026, the Monitor prepared and delivered a governance protocol (the "**Governance Protocol**") to the senior management teams of each of the Applicants. On January 9, 2026, counsel for the Monitor also delivered the Governance Protocol to counsel for Chunhua Jingxi (Tianjin) Investment Center (Limited Partnership), and counsel for the directors and officers of each of Iovate Holdings and Matthew Zauner, a director of Iovate Australia. Among other things, the purpose of the Governance Proposal was to ensure that:

a)   all persons previously reporting to the CEO of the Applicants thereafter report to the Monitor; and

b)   any and all communications regarding the SISP or information requests related to the Business or Property of the Applicants was thereafter directed solely to the Monitor.

8.   On January 29, 2026, the Court granted an order, among other things, extending the Stay Period to and including April 17, 2026, to allow the Monitor, with the assistance of the Applicants and the Sales Agent, to continue to carry out the Court-approved SISP.

9.   On February 2, 2026, the Court granted:

a)   an order (the "**Incentive Payments, KERP and Sealing Order**") approving:

   i.   the payment of certain incentive payments to general and international employees;

   ii.   a key employee retention plan ("**KERP**"); and

   iii.   a charge on the Property in the amount of US $257,000 to secure half of the payment to be made to key employees under the KERP (the "**KERP Charge**"); and

b)   an order (the "**Principal Payments Order**") authorizing the Applicants to make certain principal payments to the Administrative Agent on behalf of the Lenders; subject to certain conditions including the Monitor obtaining a valid security opinion and the Monitor being satisfied that the Applicants have sufficient liquidity to make such principal payment, when due.

## 1.1 Purposes of this Fourth Report

1.  The purposes of this report (the "**Fourth Report**") are to:

    a)  provide the Court with an update on the outcome and results of the SISP;

    b)  summarize the terms of the Subscription Agreement dated April 2, 2026 (the "**Subscription Agreement**") between Iovate Holdings and 1001542267 Ontario Inc. (the "**Purchaser**");

    c)  set out the Monitor's basis for recommending that the Court issue an approval and reverse vesting order (the "**ARVO**"), among other things, to:

        i.  approve the Subscription Agreement and the transactions contemplated therein (the "**Transactions**");

        ii. grant a sealing order in respect the Confidential Appendices (as defined herein) to this Fourth Report; and

        iii. grant a release in favour of the current and former directors, officers, employees, consultants, legal counsel and advisors to an entity to be formed ("**Residual Co.**"), the Monitor, the Monitor's legal counsel, Origin Merchant Partners and the Purchaser and their respective current directors, officers, partners, employees, consultants, legal counsel advisors and assignees;

    d)  recommend that the Court issue an order (the "**Distribution, Stay Extension and Ancillary Relief Order**"), among other things, to:

        i.  authorize and empower the Monitor to retain amounts to fund the Administrative Reserve (defined below);

        ii. authorize and empower the Monitor to make one or more distributions or payments, as applicable, at such times as it deems appropriate, to: (i) the Administrative Agent; and (ii) the parties owed the Priority Amounts (defined below);

        iii. approve the reports filed by the Proposal Trustee and the Monitor from the commencement of the Proposal Proceedings and CCAA Proceedings, respectively and the activities of the Proposal Trustee or Monitor, as applicable, described therein; and

        iv. extend the Stay Period to June 26, 2026;

    e)  report on the Applicants' cash flow projection for the twelve-week period commencing on April 6, 2026 and ending on June 26, 2026 (the "**Cash Flow Forecast**"); and

    f)  provide the Court with an update on the Monitor's activities since the Third Report of the Monitor dated January 23, 2026 ("**Third Report**").

2.  Capitalized terms used but not otherwise defined in this Fourth Report have the meanings given to such terms in the ARIO.

---

### 1.2    Restrictions

1.    In preparing this Fourth Report, the Monitor has relied upon the Applicants' audited and unaudited financial information, the books and records of the Applicants, and discussions with the Applicants' representatives and legal counsel.

2.    The Monitor has not audited or otherwise attempted to verify the accuracy or completeness of the financial information relied on to prepare this Fourth Report in a manner that complies with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants of Canada Handbook and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under the CAS in respect of such information. Any party wishing to place reliance on the financial information should perform its own diligence.

3.    The Monitor has not performed an examination of the Cash Flow Forecast in accordance with the standards for such work as outlined in the Chartered Professional Accountants of Canada Handbook.  Future-oriented financial information relied upon in this Fourth Report is based on the Applicants' assumptions regarding future events; actual results achieved may vary from this information and these variations may be material. The Monitor expresses no opinion or other form of assurance on whether the Cash Flow Forecast will be achieved.

### 1.3    Currency

1.    Unless otherwise noted, all currency references in this Fourth Report are in U.S. Dollars.

## 2.0    Background

1.    The Applicants are part of the Iovate Group, a group of companies engaged in the development, production and sale of health and nutrition products in Canada, the United States and internationally. The Iovate Group's key brands include MuscleTech™, Hydroxycut™, Six Star®, and Purely Inspired®, which are sold in over 90 countries worldwide.

2.    The principal purpose of these CCAA Proceedings was to create a stabilized environment to enable the Applicants to undertake a Court-supervised SISP to either refinance the Applicants' existing debt or enter into a sale or other strategic transaction in respect of the Applicants and/or their assets.

3.    All court materials filed in this matter in respect of the Proposal Proceedings of the NOI Applicants, the CCAA Proceedings of the Applicants and the Chapter 15 Proceedings are available on the Monitor's website at the following link: https://www.ksvadvisory.com/experience/case/Iovate (the "**Case Website**").

---

## 3.0 SISP

### 3.1 Conduct of the SISP

1. The Monitor, with the assistance of the Applicants and the Sales Agent, in consultation with the Administrative Agent, has carried out the SISP in accordance with the SISP Order. The SISP provided for an extensive marketing process to solicit interest in an investment in or acquisition of the Applicants' business.

2. As discussed in the Third Report, to allow for additional negotiations in the interest of maximizing value, the Monitor, in consultation with the Sales Agent and with the consent of the Administrative Agent, extended the SISP milestones as follows:

| Milestone | Original Dates | Revised Dates |
|---|---|---|
| Court approval of SISP | November 28, 2025 | November 28, 2025 |
| SISP Commencement | November 13, 2025 | November 13, 2025 |
| Phase 1 Bid Deadline | January 23, 2026 | February 4, 2026 |
| Phase 1 Bid Assessment and Notification (if any) | January 30, 2026 | February 11, 2026 |
| Phase 2 Qualified Bid Deadline (if applicable) | March 9, 2026 | March 20, 2026 |
| Auction (if applicable) | March 16, 2026 | March 27, 2026 |
| Selection of Successful Bid | March 20, 2026 | April 1, 2026 |
| Approval Order Hearing | April 1, 2026 | April 15, 2026 |
| Outside Date | June 3, 2026 | June 17, 2026 |

3. The SISP was to be conducted in two phases. A summary of Phase 1 of the SISP is as follows:

   a) the Monitor, with the assistance of the Sales Agent, commenced the marketing process for the SISP on November 13, 2025;

   b) commencing on December 4, 2025, the Sales Agent sent an interest solicitation letter outlining the acquisition opportunity (the "**Teaser Letter**") to 196 potential buyers, of which 160 were financial sponsors and 36 were strategic buyers;

   c) 61 potential buyers executed non-disclosure agreements ("**NDAs**"), of which 49 were executed by financial sponsors and 12 were executed by strategic buyers (collectively, the "**Potential Bidders**");

   d) each Potential Bidder was provided: (i) a confidential information memorandum prepared by the Sales Agent, with the assistance of the Monitor, which included a detailed overview of the acquisition opportunity; and (ii) access to a virtual data room populated and managed by the Sales Agent, under the supervision of the Monitor, containing financial details and qualitative information relevant to the acquisition opportunities;

   e) on January 16, 2026, the Sales Agent issued a SISP Process Letter to each Potential Bidder, describing the key terms and requirements of the SISP pursuant to the SISP Order;

   f) pursuant to the revised timelines under the SISP, the deadline for Potential Bidders to submit a letter of intent was February 4, 2026 (the "**LOI Deadline**"); and

g)  ten letters of intent ("**LOIs**") were received on the LOI Deadline, of which seven were advanced to Phase 2 after satisfying the Phase 1 Bid requirements (a "**Phase 1 Qualified Bid**", and such party, a "**Phase 1 Qualified Bidder**"). A summary of such LOIs is included in **Confidential Appendix "1"**. The Monitor's recommendation with respect to sealing this information is provided in Section 5.0 below.

4.  In accordance with the timelines under the SISP, on February 11, 2026, the Sales Agent sent each Phase 1 Qualified Bidder a Phase 2 SISP Process Letter describing the key terms and requirements of the SISP with respect to Phase 2 specifically, pursuant to the SISP Order.

5.  During Phase 2 of the SISP, the Monitor and the Sales Agent worked closely together and with the Applicants' management to address extensive due diligence requests from Phase 1 Qualified Bidders.

## 3.2   Results of the SISP and Selection of Successful Bid

1.  On or around March 20, 2026, the Sales Agent received four offers, of which two were in the form of definitive documents as required by the SISP. A summary of such offers is included in Confidential Appendix "1". The Monitor's recommendation with respect to sealing this information is provided in Section 5.0 below.

2.  As contemplated by the SISP and following consultation with the Administrative Agent, the Monitor and the Sales Agent engaged with each of the interested parties that submitted offers by the Phase 2 Qualified Bid Deadline and subsequently requested those interested parties to improve their bids.

3.  The Monitor, in consultation with the Sales Agent and the Administrative Agent, reviewed the offers received by the Phase 2 Qualified Bid Deadline, including amendments made to certain of those offers following subsequent discussions between the interested parties and the Sales Agent.

4.  On April 1, 2026, the Monitor, in consultation with the Sales Agent and the Administrative Agent, selected the bid submitted by the Purchaser, as the successful bid (the "**Successful Bid**"). The Successful Bid is to be implemented pursuant to a Subscription Agreement, which is more particularly described below. At the time of the selection of the Successful Bid, the Monitor understands that the Purchaser was affiliated with Xiwang Foodstuffs Co. Ltd.

5.  The Monitor understands that following execution of the Subscription Agreement on April 2, 2026, the beneficial ownership of the Purchaser has changed. The Monitor is advised by counsel to the Purchaser that the Purchaser is no longer related to Iovate Holdings (as contemplated by subsections 36(4) and 36(5) of the CCAA).

6. In consultation with the Sales Agent and the Administrative Agent, the Monitor considered whether it would be appropriate to identify and advance a back-up bidder in connection with the SISP. Following those discussions, the Monitor ultimately determined that proceeding without a back-up bidder was appropriate in the circumstances. Advancing a back-up bid would have required additional time and professional fees to negotiate commercially feasible terms and to finalize definitive agreements, which would have delayed seeking Court approval of the Successful Bid. The Monitor therefore determined that it was in the best interests of the stakeholders to proceed expeditiously with seeking approval of the Successful Bid without designating a back-up bidder.

## 4.0 Proposed Transactions[2]

### 4.1 Subscription Agreement

1. The terms of the Transactions are set forth in the Subscription Agreement. A redacted copy of the Subscription Agreement is attached as **Appendix "A"**. The unredacted copy is attached as **Confidential Appendix "2"**.

2. The following table sets out the key terms of the Subscription Agreement and the Transactions:

| Key Terms of the Subscription Agreement | |
| --- | --- |
| Parties | Xiwang Iovate Holdings Company Limited, as the Company.<br><br>1001542267 Ontario Inc., as the Purchaser. |
| Transaction Structure | The Transaction is structured as a reverse vesting transaction whereby:<br>• at Closing, the Purchaser will subscribe for and acquire 100 common shares in the capital of the Company (the "**Purchased Shares**"), free and clear of all Encumbrances (other than Permitted Encumbrances);<br>• the Existing Shares and all related plans, agreements, options, and rights will be terminated and cancelled for no consideration;<br>• the Excluded Assets, Excluded Contracts and Excluded Liabilities will be transferred to and vested in Residual Co. pursuant to the ARVO; and<br>• the Principal Entities (being, the Company, Iovate International, Iovate USA, Northern Innovations and Iovate Australia) will retain the Retained Assets and Retained Liabilities. |
| Purchase Price | • Redacted given commercial sensitivity. The amount of the Purchase Price is provided in the unredacted version of the Subscription Agreement attached as Confidential Appendix "2". |

---

[2] Capitalized terms used in this section but not defined herein have the meaning ascribed to them in the Subscription Agreement.

| | |
|---|---|
| Deposit | The Purchaser has paid to the Monitor a Deposit representing approximately 10% of the Purchase Price. |
| Retained Assets | All assets, properties, Business Intellectual Property, Retained Contracts, undertakings and rights of every kind owned by the Principal Entities as of Closing, as set forth in Schedule 1.1(cccc), and not including the Excluded Assets. |
| Excluded Assets | Excluded Assets include:<br>• tax records and Books and Records relating to Excluded Liabilities;<br>• Excluded Contracts;<br>• the Closing Payment;<br>• rights in favour of Residual Co. under the Subscription Agreement;<br>• assets specifically set forth in Schedule 2.2;<br>• any other assets identified by the Purchaser as Excluded Assets no later than two business days before Closing. |
| Retained Liabilities | The following liabilities shall be retained by the Principal Entities:<br>• all Post-Filing Claims;<br>• all Liabilities under the Retained Contracts arising from and after Closing;<br>• Cure Costs;<br>• Tax Liabilities for any period from and after Closing;<br>• demand promissory notes owing by the Company to Xiwang Foodstuffs (Qingdao) Co., Ltd and Xiwang Foodstuffs Co. Ltd. in the aggregate amount of approximately US $49 million;<br>• certain pre-filing accounts payable as determined by the Purchaser; and<br>• any other Liabilities identified by the Purchaser as Retained Liabilities no later than two business days before Closing. |
| Excluded Liabilities | Excluded Liabilities (set forth in Schedule 2.4) will be transferred to Residual Co. pursuant to the Approval and Reverse Vesting Order. |
| Retained Contracts | The Contracts of the Principal Entities specified in Schedule 1.1(dddd). A detailed list will follow no later than two Business Days prior to the Closing Date; all other Contracts shall be Excluded Contracts. |
| Employee Matters | The Company shall cause the applicable Principal Entity to terminate the employment of each Terminated Employee effective immediately prior to the Closing Time. The Purchaser may designate Terminated Employees no later than (2) days before Closing. |
| "As is, where is" | The Purchaser will subscribe for and purchase the Purchased Shares on an "as is, where is" basis. |

| Court Approvals | The Transactions are subject to obtaining the following orders:<br>• the ARVO; and<br>• an Order of the New York Court in the Chapter 15 Proceedings recognizing and giving effect to the ARVO. |
| --- | --- |
| Releases | Effective at Closing:<br>• the Purchaser releases the Monitor and its affiliates, officers, directors, employees and advisors from all Released Claims; and<br>• the Company releases the Purchaser, the Monitor and their respective affiliates, officers, directors and advisors from all Released Claims. |
| Outside Date | May 29, 2026. |
| Termination | The Subscription Agreement may be terminated:<br>• by either party if Closing does not occur by the Outside Date (provided the terminating party did not cause the failure);<br>• by mutual written consent of the parties, with the consent of the Monitor;<br>• by either party upon issuance of a Final Order prohibiting the Transactions;<br>• by either party upon termination, dismissal or conversion of the CCAA Proceedings;<br>• by the Company upon material breach by the Purchaser that is not cured within 10 days;<br>• by the Purchaser upon material breach by the Company that is not cured within 10 days; and<br>• by either party if the Court declines to grant the ARVO or the New York Court declines to grant the Vesting Recognition Order (provided the terminating party did not cause such non-approval). |

3. The Subscription Agreement does not vest out any of the Liabilities owed by any of the Non-Applicant Stay Parties.

4. The Outside Date in the Subscription Agreement is May 29, 2026. The Monitor understands that the Purchaser is working diligently to be in a position to close the Transactions prior to that date, pending requisite approvals from the Court and the New York Court.

5. In addition to service of the motion record on the service list to the CCAA Proceedings (the "**Service List**"), the Monitor has also served the motion record on the Applicants' known contractual counterparties requiring notice of a change of control.

## 4.2   Reverse Vesting Structure

1. The Transactions contemplated in the Subscription Agreement have been structured as a reverse vesting transaction.

2. The Monitor believes it is necessary and appropriate for the Transactions to be completed pursuant to a reverse vesting order ("**RVO**").

3.  In forming its view, the Monitor considered the issues raised by Canadian Courts in CCAA proceedings when considering granting an RVO, including the considerations articulated in *Harte Gold Corp. (Re)*, 2022 ONSC 653. These considerations are set out below:

    a)  *Why is an RVO necessary in this case?*

    Iovate International possesses two forms of licenses to sell its products in Canada. One license is a Natural Health Products Site License (the "**Site License**") which is required to import goods into Canada. The other license is a Natural Health Product License (the "**Product License**") which is required to sell Iovate International's products in Canada. Iovate International has 25 Product Licenses to cover 34 products (the difference between the number of licenses to products is due to multiple flavours of a product being offered). These licenses cannot be transferred. Iovate International understands that new applications for the Site Licenses can take anywhere from 35-95 days to be granted. New applications for Product Licenses can take from 60-310 days to be granted. Preserving the Site License and the Product Licenses is a key factor driving the Purchaser's requirement that the Transaction be completed through an RVO. The Monitor also understands that the Purchaser is not prepared to acquire the business under an alternative structure.

    Additionally, as of December 31, 2025, Iovate International had approximately US $114 million in non-capital losses available to be carried forward (the "**Tax Losses**"). The value of the Tax Losses cannot be realized by way of an asset sale.

    The Applicants also have significant contracts that will remain with the Applicants pursuant to the Subscription Agreement. An RVO will mitigate substantial delays and costs associated with seeking consents to assignment from contract counterparties or court approval of assignments if such consents cannot be obtained.

    b)  *Does the RVO structure produce an economic result at least as favourable as any other viable alternative?*

    The reverse vesting structure facilitates a more efficient and swift completion of the Transactions, without exposure to the risks, costs or delays of applying for new Health Canada licenses, which are non-transferrable. In addition, the reverse vesting structure preserves the value of the Tax Losses.

    The Monitor also notes that a comprehensive SISP was conducted during these CCAA Proceedings. The Transactions represent, in the Monitor's view, the best economic outcome from the SISP.

    The Monitor is strongly of the view that further time marketing the business for sale will not result in a superior transaction and would be prejudicial to the stakeholders of the Applicants, and in particular, the Lenders.

c) *Is any stakeholder worse off under an RVO structure than they would have been under any other viable alternative?*

Completing the Transactions under a reverse vesting structure will not result in any material prejudice or impairment to any of the Applicants' creditors' rights that they would not otherwise suffer under an asset sale structure. As a result of the SISP, the Monitor is of the view that there would be no amounts available for distribution to any of the Applicants' creditors that are subordinate to the Lenders under any other viable alternative process.

Additionally, the Subscription Agreement contemplates that amounts, if any, that are required to cure monetary defaults of the Applicants under any contract that is a Retained Contract under the Subscription Agreement are Retained Liabilities of the Principal Entities. Thus, this RVO structure does not waive the monetary default amounts that would otherwise by payable pursuant to an assignment of retained or assumed contracts in an asset sale structure.

As at the writing of this Report, the Monitor understands that the Administrative Agent, on behalf of the Lenders, is supportive of the Transaction and the Monitor is not aware of any opposition to the RVO structure.

d) *Does the consideration being paid for the debtor's business reflect the importance and value of the licenses and permits (or other intangible assets) being preserved under the RVO structure?*

An RVO will preserve the Site License, key Product Licenses and the Tax Losses. The consideration being paid by the Purchaser is directly attributable to their importance and value of these attributes, which provides the best available outcome for many of the Applicants' key stakeholders, including the Lenders, and the Applicants' employees, suppliers and customers.

## 4.3   Related Party Considerations

1. Although the Monitor has been advised by the Purchaser's counsel that the Purchaser is no longer related to Iovate Holdings for purposes of section 36 of the CCAA, the Monitor still considered the Transaction on the basis that it did constitute a sale to a related party within the meaning of subsection 36(4), and the Monitor believes that the additional factors set out in subsection 36(4) of the CCAA are satisfied for the following reasons:

   a. the SISP was conducted in a comprehensive manner that allowed the market to be broadly canvassed. The Monitor and the Sales Agent contacted a substantial number of potentially interested parties, including both financial sponsors and strategic buyers not related to the Applicants. The SISP was designed to, and in fact did, solicit interest from parties that were not related to the Applicants as evidenced by the number of LOIs received by the Phase 1 Bid Deadline and the multiple offers received by the Phase 2 Bid Deadline; and

   b. the consideration to be received under the Transaction is superior to any other executable transaction that was received in accordance with the SISP.

### 4.4 Proposed Releases

1. The proposed ARVO includes releases (the "**Releases**") in favour of the current and former directors, officers, employees, consultants, legal counsel and advisors to Residual Co., the Monitor, the Monitor's legal counsel, Origin Merchant Partners and the Purchaser and their respective current directors, officers, partners, employees, consultants, legal counsel, advisors and assignees (collectively, the "**Released Parties**"). The Releases are limited to claims arising in connection with or relating to the Subscription Agreement, the completion of the Transactions and the proposed ARVO (the "**Released Claims**"). The proposed Releases do not release, among other things: (i) fraud or wilful misconduct; (ii) any claim against Residual Co. in respect of the Excluded Assets, Excluded Contracts or Excluded Liabilities transferred pursuant to the Subscription Agreement; (iii) any claim that is not permitted to be released pursuant to section 5.1(2) of the CCAA; (iv) the parties' respective obligations under the Subscription Agreement; or (v) the Purchaser from any liability or obligation to any Debt Financing Source in relation to Debt Financing provided in connection with the Subscription Agreement and the Transactions.

2. The Monitor is of the view that the proposed Releases are appropriate in the circumstances. The Monitor, its counsel and the Sales Agent have facilitated an extensive SISP process and negotiated the Subscription Agreement on behalf of the Applicants. The Releases are essential to the consummation of the Transactions and the orderly wind-down of these CCAA proceedings. The Monitor, having considered the circumstances, believes each of the Released Parties has contributed to the Transactions and the successful restructuring of the Applicants.

3. The proposed Releases are limited in scope to claims relating to the Subscription Agreement, the Transactions and the ARVO, and do not release claims unrelated to the Transactions.

4. Additionally, neither the Applicants nor the Monitor have received any indication from stakeholders intending to assert a claim against any of the Released Parties in respect of claims covered by the Releases.

### 4.5 Monitor's Recommendation

1. The Monitor makes the following observations and expresses the following views with respect to the Transactions:

   a) the Monitor believes that its and the Sales Agent's efforts to market and sell the Applicants' business were reasonable in the circumstances;

   b) the SISP was conducted in a comprehensive manner that allowed the market to be broadly canvassed, including financial sponsors and strategic buyers not related to the Applicants;

   c) the Transactions will achieve a going concern outcome for the Applicants' business; it contemplates the uninterrupted continuation of the Applicants' operations and the continued employment of a substantial portion of the Applicants' employees;

d)      the Transactions represent the best recovery available pursuant to the SISP in the circumstances, and accordingly the best recovery available for the Lenders;

e)      the Monitor is of the view that the Transaction achieves a superior result to a liquidation of the Applicants' business. The Applicants' primary assets include inventory and accounts receivable, which would likely be realized at discounted values in a liquidation. In addition, the Applicants hold intellectual property that derives significant value from its continued use in an operating business and from its position in the relevant markets. The Monitor believes that the value of such intellectual property is likely to be materially impaired in a liquidation, due to market factors and the negative connotation commonly associated with distressed or forced sales. Further, a liquidation of the Applicants would involve significant complexity and cost given the geographic scope of its operations across multiple continents;

f)      For the reasons more particularly set out in Section 4.2 above, the Monitor is of the view that it is necessary and appropriate for the Transactions to be completed pursuant to a RVO structure, including:

   i.   the RVO structure produces an economic result at least as favourable as any other viable alternative; and

   ii.  no stakeholder is worse off under the RVO structure than they would be under any viable alternative; and

g)      the Transactions are the best available going concern transaction for the business and assets of the Applicants and is supported by the Administrative Agent, on behalf of the Lenders, who are the principal economic stakeholders.

## 5.0  Sealing Order

1.      The Monitor recommends that Confidential Appendix "1", being a summary of the Phase 1 LOIs and Phase 2 Bids submitted, and Confidential Appendix "2", being an unredacted version of the Subscription Agreement (the "**Confidential Appendices**"), be filed with the Court on a confidential basis and remain sealed until the Closing (as defined in the Subscription Agreement) of the Transactions.

2.      Confidential Appendix "1" contains commercially sensitive financial information, including the purchase price and deposit of the Subscription Agreement. Confidential Appendix "2" discloses the structure, strategy and results of Phase 1 and Phase 2 bid submissions of the SISP. Disclosure of the Confidential Appendices prior to the Closing of the Transactions would undermine the integrity of any subsequent sale process if the Transactions were not to close.

3.      Accordingly, the Monitor is seeking to seal this information until the Closing of the Transactions. The Monitor is of the view that stakeholders will not be prejudiced by the sealing.

4.      The salutary effects of sealing such information from the public record outweigh the deleterious effects of doing so under the circumstances. The Monitor is of the view that the sealing of the Confidential Appendices is consistent with the decision in *Sherman Estate v. Donovan*, 2021 SCC 25.

5.    Accordingly, the Monitor believes the proposed sealing of the Confidential Appendices is appropriate in these circumstances.

# 6.0 Proposed Distribution

1.    The Applicants are seeking authorization to make one or more distributions to Administrative Agent, on behalf of the Lenders, in an amount or amounts not to exceed the full amount of Iovate International's "Indebtedness" (as such term is defined in the amended and restated credit agreement dated June 30, 2021, the "**Credit Agreement**"), subject to the Monitor retaining a reserve in an amount to be agreed to by the Monitor and the Administrative Agent, acting reasonably (the "**Administrative Reserve**") for payments of: (i) any amounts secured by the Administrative Professionals Charge, Directors' Charge, Sales Agent Charge (each as defined in the ARIO) and the KERP Charge, or as otherwise ordered by the Court (collectively, the "**Priority Amounts**"); (ii) any amounts to facilitate the ongoing administration of these CCAA Proceedings and any bankruptcy proceedings of Residual Co., including the activities of the Applicants and Residual Co.; and (iii) such other amounts that the Monitor and Administrative Agent determine, acting reasonably, are necessary and prudent to be held back by the Monitor.

2.    The Monitor intends to make the following distributions and payments in relation to amounts owing in respect of the following parties on or shortly after the Closing, as more particularly described below:

a)    one or more distributions to the Administrative Agent, as described above; and

b)    the parties owed the Priority Amounts.

## 6.1 Distribution to the Administrative Agent

1.    As detailed in the Third Report, Iovate International entered into a Credit Agreement with the Administrative Agent and the Lenders. The Credit Agreement provides for a revolving credit facility and a term loan facility.

2.    As of August 31, 2025, approximately US $100,606,023 of principal was owing under the term loan facility, US $14,000,000 was owing under the revolving loan facility, and an additional US $1,179,465 of default interest had accrued month-to-date for a total amount owing of US $115,785,488.

3.    As security for the obligations under the Credit Agreement, the NOI Applicants and related affiliates granted the Lenders a comprehensive security package. This included, among other things: (i) a multi-party Group Guarantee by Iovate International, Iovate USA, Northern Innovations and certain of their affiliates; (ii) a Canadian general security agreement granted by Iovate International, Iovate USA, Northern Innovations, Iovate Holdings and certain of their affiliates creating a first priority lien over all present and after-acquired real and personal property; (iii) a US general security agreement granted by Iovate USA and Iovate International (the "**US Security Agreement**"); and (iv) specific security over intellectual property, including trademarks and patents held by Northern Innovations (collectively, the "**Security Documents**").

4. As previously reported to the Court:

a) the Monitor's Canadian counsel, Osler, Hoskin & Harcourt LLP ("**Osler**") delivered an opinion to the Monitor which confirms, subject to the standard qualifications and assumptions customary in rendering security opinions of this nature, that the security granted by the NOI Applicants and Iovate Holdings under the Security Documents constitutes valid and enforceable security perfected by registration in the Province of Ontario; and

b) the Monitor's US counsel, Cole Schotz P.C., delivered an opinion to the Monitor which confirms, subject to the standard qualifications and assumptions customary in rendering security opinions of this nature, that (i) the US Security Agreement is sufficient to create a valid security interest in the personal property (subject to certain exclusions) of Iovate USA and Iovate International under the laws of the State of New York, (ii) the Administrative Agent was properly granted liens on, and duly perfected such liens on, substantially all of the assets of (a) Iovate USA which can be perfected through the filing of a Uniform Commercial Code ("**UCC**")-1 financing statement, and (b) Iovate International located in the US in accordance with the UCC.

## 6.2    Payments in respect of the Administrative Professionals Charge

1. On Closing, the Monitor intends to make payment of the amounts owing to the beneficiaries of the Administrative Professionals Charge as at the Closing Date.

## 6.3    Payment to the Sales Agent

1. As described above, the ARIO approved the engagement of Origin Merchant Partners as the Sales Agent for the SISP, pursuant to the Engagement Letter. The Engagement Letter provided that the following fees be payable to the Sales Agent: (i) a monthly work fee starting in November 2025 (the "**Work Fee**") to be credited against any Transaction Fee; and (ii) if a transaction is agreed to by the Applicants during the term of Origin Merchant Partners' engagement, a transaction fee calculated based on the value of the transaction shall be payable to Origin Merchant Partners on the earlier of Closing or any change of control of the Applicants or ownership of any of their assets (the "**Transaction Fee**").

2. In accordance with the Engagement Letter, the ARIO granted the Sales Agent Charge over the Applicants' property, which pursuant to the Incentive Payments, KERP and Sealing Order, ranks subordinate to the Administrative Professionals Charge and the Directors' Charge.

3. Both the amount of the Work Fee and the Transaction Fee were sealed pursuant to the ARIO, pending further order of the Court.

4. The Transaction Fee will be paid on Closing.

5. The proposed Distribution, Stay Extension and Ancillary Relief Order provides that upon payment of all amounts owing to the Sales Agent under the Engagement Letter, the Sales Agent Charge will be automatically released and terminated without any further action.

**6.4   Payment of the KERP Payment**

1.  Pursuant to the KERP, the KERP Payment is to be paid at the earlier of: (i) two weeks following the closing of a successful transaction resulting from the SISP; and (ii) September 30, 2026.

2.  Pursuant to the Incentive Payments, KERP and Sealing Order, the KERP Charge ranks subordinate to the Administrative Professionals Charge, the Directors' Charge and the Sales Agent Charge.

3.  The proposed Distribution, Stay Extension and Ancillary Relief Order provides that upon payment of the KERP Payment, the KERP Charge will be automatically released and terminated without any further action.

**6.5   Monitor's Recommendation**

1.  The Administrative Agent consents to the proposed distribution and payment scheme.

2.  In the view of the Monitor, the proposed distribution and payment scheme, including the retention of the Administrative Reserve by the Monitor, is reasonable and appropriate in the circumstances.

# 7.0  Cash Flow Forecast

1.  The Applicants, in consultation with the Monitor, have prepared the Cash Flow Forecast for the twelve-week period from April 6, 2026 to June 26, 2026.

2.  A summary of the Cash Flow Forecast is provided below:

| (unaudited; $000s) | April 6, 2026 to June 26, 2026 |
|---|---:|
| *Receipts* | |
| Collections | 34,353 |
| Total Receipts | 34,353 |
| | |
| *Disbursements* | |
| Inventory Purchases | (27,500) |
| Operating Expenses | (7,960) |
| Payroll and Benefits | (2,482) |
| Occupancy Costs | (200) |
| Other Expenses | (761) |
| Total Disbursements | (38,903) |
| Net Cash Flow Before the Undernoted | (4,550) |
| | |
| Professional Fees | (2,997) |
| Principal Repayment | (875) |
| Interest | (2,145) |
| Net Cash Flow | (10,567) |
| | |
| Opening Cash Balance | 12,857 |
| Net Cash Flow | (10,567) |
| Cash adjustment on Closing | (2,290) |
| Closing Cash Balance | - |

3. The Cash Flow Forecast indicated that the Applicants are projected to have sufficient liquidity to operate through the proposed Stay Period (as more particularly described below), if extended. It is anticipated that the Applicants will have sufficient liquidity from cash on hand to fund their operations until the expected closing date of the Transactions, which the Monitor understands is expected to occur before May 29, 2026. Thereafter, the Administrative Reserve, being the US $3,000,000 above, will provide the Applicants with the requisite funding to operate through the Stay Period.

4. The Cash Flow Forecast and the Monitor's statutory report on the Cash Flow Forecast are attached as **Appendix "B"**. The Monitor has not sought the statutory report on the Cash Flow Forecast to be executed by the Applicants given the Enhanced Monitor Powers Order.

## 8.0  Stay Extension

1. The current Stay Period is set to expire on April 17, 2026. The Monitor is requesting an extension of the Stay Period to and including June 26, 2026.

2. The Monitor is requesting an extension of the Stay Period and believes that it is appropriate in the circumstances for the following reasons:

   a) the Applicants are acting in good faith and with due diligence;

   b) the proposed extension would allow the Applicants the necessary time to obtain a recognition order of the ARVO from the New York Court and close the Transactions;

   c) notwithstanding that the Transactions are anticipated to close on or before May 29, 2026, the Applicants will require additional time to attend to post-closing administrative matters, including certain of the proposed distributions, prior to returning to Court;

   d) the Monitor does not believe that any creditor will be materially prejudiced by the proposed extension of the Stay of Proceedings;

   e) the Administrative Agent, on behalf of Lenders, support the extension of the Stay Period;

   f) as of the date of this Fourth Report, the Monitor is not aware of any party opposed to an extension of the Stay of Proceedings; and

   g) the Cash Flow Forecast included in this Fourth Report reflects that the Applicants will have sufficient liquidity to fund their operations and the costs of these CCAA Proceedings through the proposed extension period.

## 9.0 Monitor's Activities

1.  From the commencement of the Proposal Proceedings to the Third Report, the Monitor has:

    a)  engaged with parties with respect to garnishment proceedings and achieved a Court-ordered resolution to ensure the NOI Applicants' access to critical liquidity;

    b)  assisted the NOI Applicants in their negotiation with and performance of a settlement agreement with a logistics provider and lien claimant;

    c)  worked with the NOI Applicants to stabilize their business and operations, including monitoring receipts, disbursements, payroll, and supplier relationships;

    d)  communicated regularly with the NOI Applicants and their financial advisor in connection with the preparation and ongoing assessment of the Cash Flow Forecast;

    e)  reviewed and analyzed the various cash flow forecasts prepared by the NOI Applicants to assess the reasonableness of underlying assumptions and confirm sufficiency of liquidity to fund their operations;

    f)  engaged with the NOI Applicants' former warehouseman to address its lien claims and reach a consensual resolution;

    g)  assisted the NOI Applicants in the performance of the settlement with the NOI Applicants' former warehouseman;

    h)  engaged with creditors and other stakeholders of the Applicants, including suppliers and lenders, to provide updates and respond to inquiries regarding the restructuring process;

    i)  negotiated the Engagement Letter;

    j)  assisted in the preparation and development of the SISP;

    k)  engaged with investment-banking firms to submit proposals in connection with the SISP;

    l)  corresponded regularly with the Applicants' legal counsel and management team and its own counsel regarding all aspects of these CCAA Proceedings, including assisting the Applicants in the operation of their day-to-day business;

    m)  assisted the Applicants in the design of the Incentive Payments and the KERP;

    n)  posted the CCAA notice, list of creditors and other Court materials on the Case Website;

    o)  mailed the CCAA notice to the Applicants' known creditors and filed Forms 1 and 2 with the Office of the Superintendent of Bankruptcy, as required under the CCAA and the Initial Order, as applicable;

---

p)    arranged for notice of these CCAA Proceedings to be published in the Globe and Mail as required under the Initial Order;

q)    assisted the Applicants in the refinement of their cash flows and preparation of cash flow forecasts;

r)    developed and distributed the Governance Protocol;

s)    issued disclaimer notices pursuant to Section 32 of the CCAA in respect of certain contracts of Iovate International;

t)    assisted the Applicants in their discussions with certain suppliers;

u)    assisted an external auditor in commencing an audit of fiscal year 2025;

v)    monitored the Applicants' receipts and disbursements;

w)    coordinated with Canadian and U.S. legal counsel to address cross-border recognition, enforcement, and relief issues arising in connection with the Chapter 15 proceedings; and

x)    with the assistance of legal counsel, prepared the First Report of the Proposal Trustee dated September 8, 2025, the Second Report of the Proposal Trustee dated October 1, 2025, the Third Report of the Proposal Trustee dated October 15, 2025, the Joint Fourth Report of the Proposal Trustee and Report of the Proposed Monitor dated October 30, 2025, the First Report of the Monitor dated November 25, 2025, the Supplement to the First Report of the Monitor dated November 27, 2025, the Second Report of the Monitor dated December 9, 2025 and the Third Report. Copies of the Proposal Trustee's reports and the Monitor's reports, without appendices, are respectively attached as **Appendix "C"** to **Appendix "J"** in order of delivery.

2.    Since the Third Report, the Monitor has engaged in the following activities:

a)    corresponded regularly with the Applicants' management team and its own counsel regarding all aspects of these CCAA Proceedings, including assisting the Applicants in the operation of their day-to-day business;

b)    posted non-confidential materials filed with the Court to the Case Website;

c)    assisted in activities related to the SISP including facilitating and attending management presentations with Phase 1 Qualified Bidders, responding to due diligence inquiries and negotiating the terms of the Subscription Agreement;

d)    assisted an external auditor in completing an audit of fiscal year 2025;

e)    corresponded regularly with the Administrative Agent and its advisors to keep them apprised of all ongoing matters within these proceedings;

f)    assisted the Applicants in preparing the Cash Flow Forecast; and

g)    with the assistance of its legal counsel, drafted this Fourth Report.

## 10.0  Conclusion and Recommendation

1. Based on the foregoing, the Monitor respectfully requests that this Honourable Court grant the relief sought in the proposed ARVO and Distribution, Stay Extension and Ancillary Relief Order.

*    *    *

All of which is respectfully submitted,

*KSV Restructuring Inc.*

**KSV RESTRUCTURING INC.,
IN ITS CAPACITY AS MONITOR OF
XIWANG IOVATE HOLDINGS COMPANY LIMITED,
IOVATE HEALTH SCIENCES INTERNATIONAL INC.,
IOVATE HEALTH SCIENCES U.S.A. INC., IOVATE
HEALTH SCIENCES AUSTRALIA PTY LTD AND
NORTHERN INNOVATIONS HOLDING CORP.
AND NOT IN ITS PERSONAL CAPACITY**