## Exhibit C

**Endorsement**

4898-8675-4978.1 42848.00001



ONTARIO SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

# **COUNSEL/ENDORSEMENT SLIP**

**COURT FILE NO.:** <u>BK-25-03268936-0031</u>                    **DATE: April 16, 2026**

**NO. ON LIST: 3**

**TITLE OF PROCEEDING: Iovate Health Sciences International Inc.**

**BEFORE:   JUSTICE CAVANAGH**

### **PARTICIPANT INFORMATION**

**For Plaintiff, Applicant, Moving Party:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Danish Afroz | Canadian Counsel to the Applicants | <u>dafroz@chaitons.com</u> |

**For Defendant, Respondent, Responding Party:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Ben Muller<br>Laura Culleton | Counsels for KSV Restructuring Inc., in its Capacity as Court-Appointed Monitor | <u>bmuller@osler.com</u><br><u>lculleton@osler.com</u> |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Sean Zweig | Counsel to the Purchaser | <u>zweigs@bennettjones.com</u> |
| Chris Burr<br>Jules Monteyne | Counsel to the Agent of the Syndicate of Secured Lenders | <u>chris.burr@blakes.com</u><br><u>jules.monteyne@blakes.com</u> |
| Marc Wasserman | Counsel to the Monitor | <u>mwasserman@osler.com</u> |
| Jodi Porepa | FA to Lenders, FTI Consulting | <u>jodi.porepa@fticonsulting.com</u> |
| Zechariah Martin | Counsel to Orgain (Creditor) | <u>zmartin@dwpv.com</u> |

## ENDORSEMENT OF JUSTICE CAVANAGH:

[1]     On September 5, 2025, Iovate Health Sciences International Inc. ("Iovate International"), Iovate Health Sciences U.S.A. Inc. ("Iovate USA"), and Northern Innovations Holding Corp. ("Northern Innovations," and collectively, the "NOI Applicants") each filed a notice of intention to make a proposal pursuant to s. 50.4 of the *Bankruptcy and Insolvency Act*, (the "BIA"), commencing the "Proposal Proceedings." KSV Restructuring Inc. ("KSV") consented to act as proposal trustee (the "Proposal Trustee").

[2]     On October 31, 2025, this Court granted an order (the "Initial Order") granting the NOI Applicants, Xiwang Iovate Holdings Company Limited ("Iovate Holdings"), and Iovate Health Sciences Australia PTY Ltd ("Iovate Australia," and collectively, the "Applicants") protection under the *Companies' Creditors Arrangement Act* (the "CCAA"). By the same order, this Court appointed KSV as the monitor of the Applicants (the "Monitor").

[3]     On November 28, 2025, this Court granted an order (the "SISP Order") and an Amended and Restated Initial Order (the "ARIO") approving a sale and investment solicitation process (the "SISP") and granting the Monitor certain powers, which were subsequently expanded by order dated December 12, 2025 (the "Enhanced Monitor Powers Order").

[4]     The extensive SISP generated multiple offers. The Monitor, in consultation with the Sales Agent and Administrative Agent, ultimately selected the bid submitted by 1001542267 Ontario Inc. (the "Purchaser") as the successful bid (the "Successful Bid"). Iovate Holdings and the Purchaser subsequently entered into a Subscription Agreement dated April 2, 2026 (the "Subscription Agreement").

[5]     At the time of the selection of the Successful Bid, the Monitor understands that the Purchaser was affiliated with Xiwang Foodstuffs Co. Ltd. The Monitor understands that following execution of the Subscription Agreement on April 2, 2026, the beneficial ownership of the Purchaser has changed. The Monitor is advised by counsel to the Purchaser that the Purchaser is no longer related to Iovate Holdings (as contemplated by subsections 36(4) and 36(5) of the CCAA).

[6]     The Monitor now seeks:

    a.  an approval and reverse vesting order (the "ARVO"):

        i.  approving the Subscription Agreement and the transactions contemplated therein (the "Transactions");

        ii.  sealing the Confidential Appendices; and

        iii.  granting the Releases; and

    b.  an order (the "Distribution, Stay Extension and Ancillary Relief Order"):

        i.  authorizing and empowering the Monitor to retain amounts to fund the Administrative Reserve;

        ii.  authorizing and empowering the Monitor to make one or more distributions or payments, as applicable, at such times as it deems appropriate, to the Administrative Agent and the parties owed the Priority Amounts;

    iii. approving the reports filed by the Proposal Trustee and the Monitor from the commencement of the Proposal Proceedings and CCAA Proceedings, respectively, and their activities described therein; and

    iv. extending the Stay Period to June 26, 2026.

[7] The facts underlying this motion are more fully set out in the Fourth Report of the Monitor dated April 9, 2026 (the "Fourth Report"). Capitalized terms used but not otherwise defined herein are as defined in the Fourth Report. Unless otherwise noted, all currency references herein are in US Dollars.

### *Should the ARVO be granted?*

[8] In deciding whether to grant an RVO, courts have considered the factors in s. 36 of the CCAA, which addresses court approval of an asset sale outside the ordinary course of business. These include: (a) whether the process leading to the proposed disposition was reasonable in the circumstances; (b) whether the monitor approved the process leading to the proposed disposition; (c) whether the monitor filed with the court a report stating that in their opinion the disposition would be more beneficial to the creditors than a disposition under a bankruptcy; (d) the extent to which the creditors were consulted; (e) the effects of the proposed disposition on the creditors and other interested parties; and (f) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value. See *Just Energy Group Inc. et. al. v. Morgan Stanley Capital Group Inc. et. al.*, 2022 ONSC 6354 at para. 31.

[9] These factors largely correspond to the *Soundair* criteria for approving an asset sale, which remain relevant in evaluating an RVO. These principles are: (a) whether sufficient effort had been made to obtain the best price and that the debtor had not acted improvidently; (b) the interests of all parties; (c) the integrity and efficacy of the process for obtaining offers; and (d) whether there was any unfairness in the working out of the process.

[10] In the RVO context, the court asks additional questions, namely: (a) why the RVO is necessary; (b) whether the RVO structure produces an economic result at least as favourable as any other viable alternative; (c) whether any stakeholder is worse off under the RVO structure than they would have been under any other viable alternative; and (d) whether the consideration reflects the importance and value of the licenses and permits (or other intangible assets) being preserved under the RVO structure. See *Harte Gold Corp (Re)*, 2022 ONSC 653, at para. 38.

[11] I am satisfied that the process leading to the Transactions was reasonable in the circumstances and that the Monitor, with the assistance of the Applicants and the Sales Agent, made sufficient efforts to obtain the best price and did not act improvidently. The SISP was conducted in accordance with the SISP Order. The Monitor was involved in the development of the SISP and supported its approval. There was no unfairness in the working out of the process. The Monitor and the Sales Agent canvassed the market extensively through the two-phase SISP, reached out to 196 potential buyers, and provided access to confidential information regarding the acquisition opportunity. Further, the Monitor consulted with the Administrative Agent (on behalf of the Lenders) in developing the SISP, reviewing the offers received, and selecting the Successful Bid.

[12] I am satisfied that the RVO structure is justified for the following reasons:

    a. The RVO structure is required to preserve certain key licences that cannot be transferred. Iovate International possesses two forms of licenses to sell its products in Canada: (i) a Natural Health Products Site License, which is required to import goods into Canada (the "Site License"); and (ii) 25 Natural Health Product Licenses (the "Product Licenses"), which are required to sell 34 of Iovate International's products in Canada. New applications for Site Licences and Product Licences can take 35-95 and 60-310 days (respectively) to be granted.

b. As of December 31, 2025, Iovate International had approximately US $114 million in non-capital losses available to be carried forward (the "Tax Losses"). The value of the Tax Losses cannot be realized by way of an asset sale.

c. The Subscription Agreement provides that significant contracts will remain with the Applicants. An RVO would mitigate the substantial delays and costs associated with seeking consents to assignment from contract counterparties or (if consents are not obtained) court approval of assignments.

[13]    The RVO structure would reduce potential costs, delay, and execution risk, ensuring the uninterrupted continuation of the Applicants' operations. The Monitor also understands that the Purchaser is not prepared to acquire the business under an alternative structure.

[14]    I am satisfied that the RVO structure produces an economic result that is at least  as favourable as any other viable transaction. I am satisfied that no stakeholder is worse off under the RVO structure than they would be under any other viable alternative. The Monitor is not aware of any opposition to the RVO structure.

[15]    I accept that the consideration is fair and reasonable. The Transactions are the result of a comprehensive SISP that canvassed the market broadly. The consideration also reflects the importance and value of the intangible assets being preserved under the RVO structure. The consideration being paid by the Purchaser reflects the importance and value of the Site License, the Product Licenses, and the Tax Losses being preserved through the proposed ARVO.

[16]    Subsection 36(4) imposes additional criteria that apply where the proposed sale is to a person who is related to the debtor company. The court must be satisfied that: (a) good faith efforts were made to sell the assets to persons who are not related to the company; and (b) the consideration to be received is superior to the consideration that would be received under any other offer made in accordance with the process leading to the proposed sale. This provision requires that the court be "satisfied, overall, that sufficient safeguards were adopted to ensure that a related party transaction is in the best interests of the stakeholders of the Applicants and that the risk to the estate associated with a related party transaction have been mitigated." See *Target Canada Co. (Re)*, 2015 ONSC 2066 at para. 15.

[17]    Although the Monitor has been advised by the Purchaser's counsel that the Purchaser is not related to Iovate Holdings for the purposes of s. 36 of the CCAA, the Monitor still considered the Transactions on the basis that they did constitute a sale to a related party, and concluded that the additional factors in subsection 36(4) of the CCAA were satisfied. The Monitor and the Sales Agent contacted a substantial number of potentially interested parties through the comprehensive SISP, including both financial sponsors and strategic buyers unrelated to the Applicants. The SISP was designed to, and in fact did, solicit interest from parties that were not related to the Applicants, as evidenced by the number of LOIs and offers received during the two-phase SISP. The consideration to be received under the Transactions is superior to any other executable transaction that was received in accordance with the SISP.

[18]    The proposed ARVO grants relief to facilitate the cancellation of the shares of Iovate Holdings, which is incorporated in British Columbia, and the re-issuance of shares to the Purchaser. Similar relief has been granted in other orders involving entities incorporated under the *Business Corporations Act* (British Columbia). See cases cited at footnote 60 of the Monitor's factum. I am satisfied that granting this relief is an appropriate exercise of this Court's jurisdiction under s. 11 of the CCAA.

[19]    The proposed ARVO includes releases (the "Releases") in favour of the current and former directors, officers, employees, consultants, legal counsel and advisors to Residual Co ., the Monitor, the Monitor's legal counsel, the Sales Agent and the Purchaser and their respective current directors, officers, partners, employees, consultants, legal counsel, advisors, and assignees (collectively, the "Released Parties"). The Releases are limited to claims arising in connection with or relating to the Subscription Agreement, the completion of the Transactions,

and the proposed ARVO. I am satisfied that the requested releases should be approved. The *Lydian* factors are satisfied.

[20]     The Monitor requests that Confidential Appendices "1" and "2" to the Fourth Report (the "Confidential Appendices") be filed with the Court on a confidential basis and remain sealed until the Closing (as defined in the Subscription Agreement) of the Transactions pursuant to s. 137(2) of the *Courts of Justice Act*. Confidential Appendix "1," a summary of the Phase 1 LOIs and Phase 2 bids submitted, discloses the structure, strategy, and results of Phase 1 and Phase 2 bid submissions of the SISP. Confidential Appendix "2," an unredacted version of the Subscription Agreement, contains commercially sensitive financial information, including the purchase price and deposit.

[21]     I am satisfied that the requested limited sealing order should be made. The *Sherman Estate* requirements are met.

### Should the Distribution, Stay Extension and Ancillary Relief Order should be made?

[22]     The Applicants seek authorization to make one or more distributions to the Administrative Agent, on behalf of the Lenders, in an amount not to exceed the full amount of Iovate International's "Indebtedness" (as defined in the Credit Agreement), subject to the Monitor retaining a reserve in an amount to be agreed to by the Monitor and the Administrative Agent, acting reasonably (the "Administrative Reserve") for payments of: (i) any amounts secured by the Administrative Professionals Charge, Directors' Charge, Sales Agent Charge, and KERP Charge, or as otherwise ordered by the Court (collectively, the "Priority Amounts"); (ii) any amounts to facilitate the ongoing administration of these CCAA Proceedings and any bankruptcy proceedings of Residual Co.; and (iii) such other amounts that the Monitor and Administrative Agent determine, acting reasonably, are necessary and prudent to be held back by the Monitor. The Monitor intends to make these distributions to the Administrative Agent and payments to the parties owed the Priority Amounts on or shortly after Closing. The Administrative Agent consents to the proposed distribution and payment scheme.

[23]     I am satisfied that the proposed distribution is reasonable and appropriate. The Lenders are the Applicants' only secured creditors. The Monitor has received opinions from its Canadian and US counsel as to the respective validity of the security granted by the applicable Security Documents and the US Security Agreement. As of August 31, 2025, approximately US $100,606,023 of principal was owing under the term loan facility, US $14,000,000 was owing under the revolving loan facility, and an additional US $1,179,465 of default interest had accrued month-to-date, for a total amount owing of US $115,785,488.90 The distributions would not exceed the full amount of the Indebtedness under the Credit Agreement.

[24]     On Closing, the Monitor intends to make payment of the amounts then owing to the beneficiaries of the Administrative Professionals Charge, and will pay an amount not to exceed the total owing to the Sales Agent under the Court-approved Engagement Letter. The Monitor also intends to make the KERP Payment in accordance with the Court-approved KERP, which contemplates that the KERP Payment is to be paid at the earlier of: (i) two weeks following the closing of a successful transaction resulting from the SISP; and (ii) September 30, 2026. Upon payment of the KERP Payment and all amounts owing to the Sales Agent under the Engagement Letter, the KERP Charge and the Sales Agent Charge will be automatically released and terminated without any further action.

[25]     I am satisfied that the activities and reports of the Monitor should be approved.

[26]     The current Stay Period is set to expire on April 17, 2026. The Monitor is requesting an extension of the Stay Period to and including June 26, 2026.101 The stay extension is necessary and appropriate in the circumstances to allow the Applicants the necessary time to obtain a recognition order of the ARVO from the New York Court and close the Transactions.

*Disposition*

[27]    Orders to issue in forms of Orders signed by me today.

_____