**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

In re:                                                                    FOR PUBLICATION

      IOVATE HEALTH SCIENCES                              Chapter 15
      INTERNATIONAL INC., *et al.*,
                                                                          Case No. 25-11958 (MG)


           Debtors in a Foreign Proceeding
------------------------------------------------------------------------x

### MEMORANDUM OPINION GRANTING FOREIGN REPRESENTIVE'S MOTION (I) RECOGNIZING AND ENFORCING THE REVERSE VESTING ORDER; (II) APPROVING THE TRANSFER OF THE DEBTORS' EXCLUDED PROPERTY; AND (III) GRANTING RELATED RELIEF

*A P P E A R A N C E S:*

PACHULSKI STANG ZIEHL & JONES LLP
*Counsel to the Foreign Representative*
1700 Broadway, 36th Floor
New York, New York 10019
By:    Steven W. Golden, Esq.
        Mary F. Caloway, Esq. (admitted *pro hac vice*)

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**


      Pending before the Court is Iovate Health Sciences International's ("Iovate"), in its

capacity as the authorized foreign representative (the "Foreign Representative"), *Motion for

Entry of an Order: (I) Recognizing and Enforcing the Approval and Reverse Vesting Order; (II)

Approving the Transfer of the Debtors' Excluded Property; and (III) Granting Related Relief*

(the "Motion," ECF Doc. # 91).  Two declarations are filed in support of the Motion – (1) the

Declaration of Noah Goldstein ("Goldstein Decl.," ECF Doc. # 92) and (2) the Declaration of

Michael De Lellis ("De Lellis Decl.," ECF Doc. # 93).

The Motion seeks entry of an order that (a) recognizes and enforces the Ontario Superior Court of Justice's (the "Canadian Court") *Approval and Reverse Vesting Order* (the "Reverse Vesting Order" ECF Doc. # 99 Ex. A) approving the *Subscroption Agreement* dated April 2, 2026 (the "Subscription Agreement," Goldstein Decl. Ex. C) between Xiwang Iovate Holdings Company Limited ("Iovate Holdings") and 1001542267 Ontario Inc. (the "Purchaser") and the related transactions contemplated by the Subscription Agreement (the "Transaction"); and approving under sections 363, 1520, and 1521 of the Bankruptcy Code the transfer Iovate, Iovate Health Sciences U.S.A. Inc. ("Iovate US"), and Northern Innovations Holding Corp. ("Northern Innovations" and, together with Iovate and Iovate US, the "Chapter 15 Debtors") right, title, and interest in and to certain "excluded" United States assets, contracts, and liabilities to a newly-formed corporation ("ResidualCo") pursuant to the Reverse Vesting Order, as well as related relief. (Motion at 1-2.)

## I.    BACKGROUND

### A. Case Background

On September 5, 2025, the Chapter 15 Debtors and associated debtors (the "Canadian Debtors") commenced a proceeding under Canada's *Bankruptcy and Insolvency Act* (R.S.C. 1985, c. B-3) (as amended, the "BIA"). (Motion ¶ 3.) Upon the grant of an order from the Canadian Court approving the proceeding and permitting Iovate to act as the Foreign Representative, the Foreign Representative commenced this Chapter 15 case on September 9, 2025. (*Id.* ¶¶ 4-5.)

While initially proceeding under the BIA, the Canadian Debtors soon sought to convert the BIA proceeding into a proceeding under the Canadian Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA"). (*Id.* ¶ 6.) The Canadian Court issued an

2

order on October 31, 2025, granting the Canadian Debtors' Motion to convert the proceeding under the CCAA (the "CCAA Proceeding"), appointing KSV Restructuring Inc. ("KSV" or the "Monitor") as the Monitor, and Iovate remained the Foreign Representative.  (*Id*. ¶ 7.)  This Court, after initially granting provisional relief to the Chapter 15 Debtors under the BIA proceeding (ECF Doc. # 20), later recognized the CCAA Proceeding ("CCAA Recognition Order," ECF Doc. # 86).  (*Id*. ¶ 8.)

### B.  The Sale Process

The Canadian Court granted an order approving a sale and investment solicitation process (the "SISP") to be conducted by the Monitor with assistance of the Canadian Debtors and Origin Merchant partners as sales agent (the "Sales Agent").  (Goldstein Decl. ¶ 4.)  The Canadian Court later granted an order giving the Monitor enhanced power to supervise and manage the Canadian Debtors' business to ensure a fair administration of the CCAA proceeding and SISP. (*Id*. ¶ 5.)  The enhanced powers granted to the Monitor enabled them to exercise any powers that could be properly exercised by a board of debtors of the Canadian Debtors.

The Monitor conducted the SISP in two phases ("Phase 1" and "Phase 2", respectively). (*Id*. ¶ 7.)  The Monitor, with the assistance of the Sales Agent, determined the following SISP milestones:

| | |
|---|---|
| SISP Commencement | November 13, 2025 |
| Court approval of SISP | November 28, 2025 |
| Phase 1 Bid Deadline | February 4, 2026 |
| Phase 1 Bid Assessment and Notification (if any) | February 11, 2026 |
| Phase 2 Qualified Bid Deadline (if applicable) | March 20, 2026 |
| Auction (if applicable) | March 27, 2026 |
| Selection of Successful Bid | April 1, 2026 |
| Approval Order Hearing | April 15, 2026 |
| Outside Date | June 17, 2026 |

3

(*Id.*)  The Monitor received ten (10) letters of intent by the Phase 1 Bid Deadline; from these letters the Sales Agent received four (4) offers with only two (2) in the form as required by the SISP.  (*Id.* ¶¶ 9, 11.)  On April 1, 2026, the Monitor and Sales Agent selected the bid submitted by the Purchaser to be implemented pursuant to the Subscription Agreement.  (*Id.* ¶ 12.)  The Monitor determined that the bid from the Purchaser was superior to all other bids submitted. The table below summarizes the principal terms of the Subscription Agreement:[1]

| Parties | Xiwang Iovate Holdings Company Limited, as the Company. |
|---|---|
| | 1001542267 Ontario Inc., as the Purchaser. |
| Transaction Structure | The Transaction is structured as a reverse vesting transaction whereby:<br>• at Closing, the Purchaser will subscribe for and acquire 100 common shares in the capital of the Company (the "Purchased Shares"), free and clear of all Encumbrances (other than Permitted Encumbrances);<br>• the Existing Shares and all related plans, agreements, options, and rights will be terminated and cancelled for no consideration;<br>• the Excluded Assets, Excluded Contracts and Excluded Liabilities (collectively, the "Excluded Property") will be transferred to and vested in ResidualCo pursuant to the Reverse Vesting Order; and<br>• the Principal Entities (being, the Company, Iovate International, Iovate USA, Northern Innovations and Iovate Australia) |
| Deposit | The Purchaser has paid to the Monitor a Deposit representing approximately 10% of the Purchase Price. |
| Retained Assets | All assets, properties, Business Intellectual Property, Retained Contracts, undertakings and rights of every kind owned by the Principal Entities as of Closing, as set forth in Schedule 1.1(cccc) to the Subscription Agreement, and not including the Excluded Assets. |
| Excluded Assets | Excluded Assets include:<br>• tax records and Books and Records relating to Excluded Liabilities;<br>• Excluded Contracts;<br>• the Closing Payment; |

---

[1]    Capitalized terms not otherwise defined are intended to have the meanings ascribed to them in the Subscription Agreement.

| | |
|---|---|
| | • rights in favor of ResidualCo under the Subscription Agreement;<br>• assets specifically set forth in Schedule 2.2; and<br>• any other assets identified by the Purchaser as Excluded Assets no later than two business days before Closing. |
| Retained Liabilities | The following liabilities shall be retained by the Principal Entities:<br>• all Post-Filing Claims;<br>• all Liabilities under the Retained Contracts arising from and after Closing;<br>• Cure Costs;<br>• Tax Liabilities for any period from and after Closing;<br>• demand promissory notes owing by the Company to Xiwang Foodstuffs (Qingdao) Co., Ltd and Xiwang Foodstuffs Co. Ltd. in the aggregate amount of approximately US $49 million;<br>• certain pre-filing accounts payable as determined by the Purchaser; and<br>• any other Liabilities identified by the Purchaser as Retained Liabilities no later than two business days before Closing. |
| Excluded Liabilities | Excluded Liabilities (set forth in Schedule 2.4 to the Subscription Agreement) will be transferred to ResidualCo pursuant to the Reverse Vesting Order. |
| Retained Contracts | The Contracts of the Principal Entities specified in Schedule 1.1(dddd) to the Subscription Agreement. |
| Employee Matters | The Company shall cause the applicable Principal Entity to terminate the employment of each Terminated Employee effective immediately prior to the Closing Time. The Purchaser may designate Terminated Employees no later than two (2) days before Closing. |
| "As is, where is" | The Purchaser will subscribe for and purchase the Purchased Shares on an "as is, where is" basis. |
| Court Approvals | The Transactions are subject to obtaining the following orders:<br>• the Reverse Vesting Order; and<br>• an Order of this Court in the Chapter 15 Case recognizing and giving effect to the Reverse Vesting Order. |
| Releases | Effective at Closing:<br>• the Purchaser releases the Monitor and its affiliates, officers, directors, employees and advisors from all Released Claims; and<br>• the Company releases the Purchaser, the Monitor and their respective affiliates, officers, directors and advisors from all Released Claims. |
| Outside Date | May 29, 2026 |
| Termination | the Subscription Agreement may be terminated: |

5

| | |
|---|---|
| | • by either party if Closing does not occur by the Outside Date (provided the terminating party did not cause the failure);<br>• by mutual written consent of the parties, with the consent of the Monitor;<br>• by either party upon issuance of a Final Order prohibiting the Transaction;<br>• by either party upon termination, dismissal or conversion of the CCAA Proceeding;<br>• by the Company upon material breach by the Purchaser that is not cured within 10 days;<br>• by the Purchaser upon material breach by the Company that is not cured within 10 days; and<br>• by either party if the Court declines to grant the Reverse Vesting Order or this Court declines to grant the Vesting Recognition Order (provided the terminating party did not cause such non-approval). |
| Use of Proceeds | Per the Ancillary Order, the Monitor is authorized and empowered to make distributions to the Royal Bank of Canada as agent for a syndicate of lenders and the Sales Agent in the amount owing under the Engagement Letter. |

(*Id.* ¶ 13.)  As required by the Purchaser to consummate the Transaction, the Subscription Agreement is structured as a "reverse vesting transaction."  (*Id.* ¶¶ 14-15.)  This is due to Iovate possessing multiple licenses to both import goods and sell its products in Canada that cannot otherwise be transferred.  (*Id.*)  The reverse vesting structure will therefore effectively allow the Purchaser to acquire the Chapter 15 Debtor's business and assets on a "free and clear" basis while still being able to retain the otherwise untransferable licenses.  (De Lilis Decl. ¶ 6.)

On April 16, 2026, the Canadian Court held a hearing on the then-pending Reverse Vesting Order and Ancillary Order.  As explained in its Endorsement, the Canadian Court granted both orders, which approved the Subscription Agreement and the transactions and releases within it.  (Endorsement ¶ 6.)

6

### C. Reverse Vesting Orders, Generally

Before dealing with the Motion itself, we should first examine reverse vesting orders ("RVOs"), a recently developed operation of Canadian insolvency regimes that do not have a parallel under Chapter 11. As the name suggests, an RVO utilizes a 'reverse vesting' structure. The debtor cancels all existing shares and issues new shares to a designated purchaser. The purchaser agrees to accept preferred assets and liabilities, while certain excluded assets and liabilities are vested into a newly formed "ResidualCo." Caitlin McIntyre & Olya Antle, *Potential or Problem? The Prospect of Reverse Vesting Under Chapter 11*, 34 AM. BANKR. INST. J. 34, 34 (2025). The purchased company, holding only the assumed assets and liabilities as desired by the purchaser, may then exit the insolvency proceeding with the ResidualCo being added as a debtor to the proceeding. (De Lellis Decl. ¶ 6.)

RVOs are a relatively recent innovation in CCAA proceedings thanks to the flexibility afforded under the CCAA. While RVOs have become more common, they are still not viewed as the "norm" by Canadian courts – RVOs are not a statutory mechanism and courts in Canada believe that they should not become the standard procedure in CCAA or BIA proceedings. *Harte Gold Corp. (Re)*, 2022 ONSC 653, para. 38 (Can. Ont. S.C.). Nonetheless, they have become quite popular due to their flexibility and ability to allow a purchaser to purchase an entity with only the assets and liabilities that it wishes to retain.[2] Their rise in popularity is

---

[2]     This ability to 'split' the entity through an RVO has brought comparisons with the Texas Two-Step. This Court does not make any pronouncements regarding the Texas Two-Step, but there are a few distinguishing factors that caution any like-to-like comparison. For one, the Texas Two-Step was statutorily enacted through § 10.901 of the Texas Business Organizations Code, compared with the RVO which is a creation of practice and authorized through the CCAA's broad jurisdictional grant under section 11. Additionally, the timing of the Two-Step, a "liability shuffle pre-petition," is markedly different to the RVO which is implemented after the CCAA proceeding begins and proceeds under both the court and independent monitor's supervision. McIntyre, *Potential or Problem?*, *supra*, at 35. The RVO also places greater consideration into the rights and interests of creditors and other stakeholders than a Two-Step, as evident by the adoption of the section 36 factors that are required to approve an order.

evident in the over 25 RVOs that were approved by Canadian Courts in 2024, a fifty-percent increase from the year before and three times the amount that were approved in 2022.  Maziar Peihani, *Rethinking the Case for Reverse Vesting Orders in Canadian Insolvency Law*, 59 UBC L. REV. 251, 267-68 (2026).

The authority for Canadian courts, including the Canadian Court overseeing the CCAA Proceeding, to grant RVOs comes from the wide latitude given to courts under section 11 of the CCAA: "the court, on the application of any person interested in the matter, may, subject to the restrictions set out in [the CCAA], on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances."  R.S.C., 1985, c. C-36, § 11.  Canadian courts then apply the factors enumerated in section 36(3) of the CCAA, factors which a court normally is required to consider when approving an asset sale transaction, to the transaction underlying the RVO.  *See, e.g. Just Energy Group Inc. et al v. Morgan Stanley Capital Group Inc. et al*, 2022 ONSC 6354, paras. 29-33 (Can. Ont. S.C.); *Harte Gold* at para. 37; *Re B+H Architects Corp*, 2026 ONSC 26 at para. 17 (Can. Ont. S.C.).  These factors are:

(a) whether the process leading to the proposed sale or disposition was reasonable in the circumstances;
(b) whether the monitor approved the process leading to the proposed sale or disposition;
(c) whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;
(d) the extent to which the creditors were consulted;
(e) the effects of the proposed sale or disposition on the creditors and other interested parties; and
(f) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

R.S.C., 1985, c. C-36, § 36.  When determining whether to grant an RVO, the reviewing court will ask the following in addition to the section 36(3) factors: (a) why the RVO is necessary; (b) whether the RVO structure produces an economic result at least as favorable as

8

any other viable alternative; (c) whether any stakeholder is worse off under the RVO structure than it would have been under any other viable alternative; and (d) whether the consideration being paid for the debtor's business reflects the importance and value of the licenses and permits (or other intangible assets) being preserved under the RVO structure. *Harte Gold* at para. 38.

As RVOs have become more popular in Canada, debtors in Chapter 15 cases have sought recognition of such orders in U.S. Courts. Though not within the Second Circuit, many courts have recognized RVOs approved in Canada. *See, e.g. In re Voxtur Analytics Corp.*, No. 25-11996 (JKS) (Bankr. D. Del. Feb. 13, 2026); *In re STS Renewables Ltd.*, No. 25-10884 (KBO) (Bankr. D. Del. Oct. 28, 2025); *In re The Lion Elec. Co.*, No. 24-18898 (DDC) (Bankr. N.D. Ill. June 26, 2025); *In re Chesswood Grp.*, No. 24-12454 (CTG) (Bankr. D. Del. Mar. 24, 2025); *In re 9139249 Canada Inc.*, No. 24-19627 (VZ) (Bankr. C.D. Cal. Jan. 10, 2025); *In re Elevation Gold Mining Corp.*, No. 24-06359 (Bankr. D. Ariz. Dec. 30, 2024); *In re VBI Vaccines (Delaware) Inc.*, No. 24-11623 (BLS) (Bankr. D. Del. Nov. 20, 2024); *In re Contract Pharm. Ltd*, No. 24-10915 (BLS) (Bankr. D. Del. May 28, 2024); *In re NextPoint Fin.*, No. 23-10983 (TMH) (Bankr. D. Del., Dec. 11, 2023); *In re Endoceutics Inc.*, No. 22-11641 (Bankr. D. Mass. Oct. 12, 2023); *In re Acerus Pharm. Corp.*, No. 23-10111 (TMH) (Bankr. D. Del., June 13, 2023); *In re Just Energy Grp.*, No. 21-30823 (Bankr. S.D. Tex., Dec. 1, 2022). These orders were entered without accompanying opinions explaining the court's reasoning.

One of the few opinions issued with an order recognizing an RVO was entered in *In re Goli Nutrition Inc.*, 2024 WL 1748460 (Bankr. D. Del. Apr. 23, 2024). The court in *Goli Nutrition* recognized the RVO as granted by the Canadian court largely due to the lack of objection from creditors, but the court cautioned against applying the case as precedent:

> I stated that I would enforce the order as there were no objections to the transaction as a whole or its structure. Notice was provided to

all parties, including shareholders whose stock is being redeemed and cancelled for no consideration and those who may hold liabilities that are being vested out to Residual Co. I must emphasize, however, that I do not know how I would rule on a similar reverse vesting transaction if there were objections. So, I cannot stress enough that the order I enter should not be cited in future motions for the proposition that U.S. courts have unconditionally approved such transactions.

*In re Goli Nutrition*, 2024 WL 1748460, at * 2.

### D. The Canadian Court Approval of the Reverse Vesting Order

On April 16, the Canadian Court approved the Reverse Vesting Order and Ancillary Order. The Canadian Court addressed the section 36 factors noted above, in addition to the factors set out in *Harte Gold*. (Endorsement ¶¶ 8-10.) Ultimately, the Canadian Court determined that the Monitor and Sales Agent acted in accordance with the SISP and that the Transaction was the culmination of efforts to obtain the best price possible. (*Id.* ¶ 11.)

The Canadian Court was satisfied with the reverse vesting nature of the Transaction, convinced that it would "reduce potential costs, delay, and execution risk, ensuring the uninterrupted continuation of the Applicants' operations." (*Id.* ¶ 13.) The Canadian Court noted that the reverse vesting structure was required to preserve licenses that Iovate possesses that could not otherwise be transferred, to allow US $114 million in non-capital losses available to be carried forward that could otherwise not through an asset sale, and would help ensure that contracts remain with the company through an expedited process. (*Id.* ¶ 12.) The Canadian Court was satisfied that approval of the Transaction would provide as positive of an economic result as any other transaction and noted that there was no opposition to the structure of the Reverse Vesting Order. (*Id.* ¶ 14.)

The Canadian Court additionally approved the Releases, noting that they are limited to claims arising in connection with or relating to the Subscription Agreement, Transaction, and

10

proposed Reverse Vesting Order. (*Id.* ¶ 19.) The Releases satisfied the requirements under

Canadian Law. (*Id.* ¶ 17.)

The Canadian Court lastly authorized the Ancillary Order, authorizing the requested

distributions requested by the Monitor, as well as extending the stay to allow the Chapter 15

Debtors to seek approval of the Reverse Vesting Order in this Court. (*Id.* ¶¶ 22-26.)

**E. The Motion**

As noted above, the Foreign Representative seeks entry of an order (i) recognizing and

enforcing the Reverse Vesting Order; (b) approving the transfer of the Chapter 15 Debtors' right,

title, and interest in and to the Excluded Property located within the territorial jurisdiction of the

United States to ResidualCo; and (c) related relief. (Motion ¶ 29.)

1. Recognizing the Reverse Vesting Order

The Foreign Representative argues that the Court should recognize the Reverse Vesting

Order under the Court's authority to grant both "appropriate relief" under section 1521(a) and

"additional assistance" under section 1507 of the Code. 11 U.S.C. §§ 1507, 1521. Regarding its

appropriateness under section 1507, the Foreign Representative notes how the CCAA embodies

a scheme that promises "equitable, orderly, and systemic" distribution to creditors. (Motion ¶ 32

(citing *Allstate Life Ins. v. Linter Grp.*, 994 F.2d 996, 1000 (2d Cir. 1993).)

Additionally, the Foreign Representative claims that creditors and parties in interest have

been treated fairly by being provided with customary notice of the Reverse Vesting Order and

will be given the opportunity to raise objections to the relief requested. (*Id.*) Third, both

preferential and fraudulent transfers are not permitted under the CCAA. (*Id.*) The Foreign

Representative also contends that the Reverse Vesting Order is not manifestly contrary to the

public policy of the United States and therefore complies with section 1506. (*Id.* ¶ 34.) The

11

Foreign Representative argues that the sales process outlined in the SISP is similar to the processes utilized in Chapter 11 cases, and similar RVOs to the Reverse Vesting Order have been recognized by other courts in Chapter 15 cases.  (*Id.*)

### 2.  Approving the Transaction

The Foreign Representative claims that the entering into the Subscription Agreement and consummating the transaction was a prudent exercise of business judgment and should therefore be approved under section 363 as the culmination of the SISP, which was approved by the Canadian Court and conducted by the independent Monitor.  (*Id.* ¶ 38.)  Recognizing that the issuance of stock may not be a sale transaction of under section 363, the Foreign Representative alternatively seeks court approval for the transfer of the Excluded Property from the Chapter 15 debtors to ResidualCo.  (*Id.* ¶ 39.)  The Foreign Representative touts the SISP process as a prudent exercise of the Chapter 15 Debtors' business judgment, noting the extensive negotiations with multiple parties and transparent marketing process undertaken in an attempt to secure the most optimal deal.  (*Id.* ¶ 41.)  Absent approval of the transaction, the Foreign Representative claims that all parties involved will suffer "significant, if not irreparable, harm" by not being able to close the transaction.  (*Id.* ¶ 42.)  The Foreign Representative believes that it has acted with good faith during the process through arms-length negotiations in accordance with the SISP.  (*Id.* ¶ 45.)

The Foreign representative also requests the Purchaser receive the protections set forth in subsections 363(m) and (n) of the Bankruptcy Code.  (Motion ¶ 43.)

### 3.  The Releases

The Foreign Representative additionally seeks recognition and enforcement of the Releases granted by the Canadian Court as they are justified, reasonable, and appropriate in the

circumstances; the releases are limited to claims and causes of action directly connected to the sale process and Transaction. (*Id*. ¶ 48.) The Foreign Representative argues that *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2004), does not prohibit a court in a Chapter 15 case from recognizing and giving effect to nonconsensual third-party releases granted in plenary foreign proceedings. (*Id*. ¶ 49.) The holding in *Purdue* is limited to the statutory construction of section 1123(b)(6) and is *not* based on the public policy of the United States, which means that a non-consensual third-party release is not inherently contrary to the public policy of the United States and does not run afoul of the public policy exception of section 1506. (*Id*. ¶ 51.)

As they are not contrary to public policy, the Foreign Representative points to principles of comity to recognize the Releases. Without given full force and effect in the United States, the Foreign Representative claims that United States-based creditors would have an advantage over Canadian creditors with the ability to bring claims against the Released Parties, in addition to undermining the relief granted by the Canadian Court through the Reverse Vesting Order. (*Id*. ¶ 52.)

### 4. Waiver of Bankruptcy Rule 6004(h)

The Foreign Representative submits that there is cause to waive the 14-day stay under Bankruptcy Rule 6004(h), and that waiver of the stay will not prejudice the Debtors or any party in interest because parties will have notice and an opportunity to be heard in both the Canadian Court and this Court. (*Id*. ¶ 60.)

One limited objection was made in response to the Motion which has since been withdrawn.

13

## II.   LEGAL STANDARD

### A.  Approval of the Reverse Vesting Order

"Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether main or non-main. . . .  The discretion that is granted is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors."  *In re Asbestos Corp. Ltd.*, 674 B.R. 855, 868 (Bankr. S.D.N.Y. 2025) (quoting *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009)).  Section 1521(a)(7) gives bankruptcy courts the authority to "grant[] *any* additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  11 U.S.C. § 1521(a) (emphasis added).  Bankruptcy courts are afforded this broad discretion in the interest of comity and foreign cooperation, and such relief often extends to the recognition of confirmation orders granted by the foreign courts. *See, e.g., In re Cell C Proprietary Ltd.*, 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) ("The recognition and enforcement of the Sanction Order is 'appropriate relief' of a type not specifically enumerated in the nonexhaustive list set forth in section 1521(a)."); *In re Rede Energia S.A.*, 515 B.R. 69, 92-93 (Bankr. S.D.N.Y. 2014) (finding that granting an order that will "enforc[e] a foreign confirmation order, including the request for an injunction of acts in contravention of such order" is relief available under section 1521).  "Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *In re Metcalfe & Mansfield Alt. Invs*., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (quoting *In re Atlas Shipping,* 404 B.R. at 738).

Relief is regularly granted in parallel to the relief granted in the recognized foreign proceeding in the name of comity, but bankruptcy courts can refrain from doing so under

14

"unique circumstances." *In re Cozumel Caribe S.A. de C.V.*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012). ("While it is well recognized that comity should be extended in most instances, bankruptcy courts should also have the discretion to deny granting comity to foreign laws, court orders and judgments—consistent with over a hundred years of comity precedent—when unique circumstances warrant it, so long as 'the interests of the creditors . . . are sufficiently protected.' 11 U.S.C. § 1522(a). Furthermore, courts *must* deny granting comity in exceptional circumstances of fundamental importance, when doing otherwise would be manifestly contrary to the public policy of the United States.") (emphasis original); *see also, In re CGG S.A.*, 579 B.R. 716, 720 (Bankr. S.D.N.Y. 2017). All actions taken under section 1521 must adhere to 1522(a), which requires bankruptcy courts to ensure the interests of creditors are sufficiently protected. Sufficient protection is embodied by "three basic principles: 'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'" *In re Odebrecht Engenharia e Construção S.A. - Em Recuperação Judicia*, 669 B.R. 457, 474 (Bankr. S.D.N.Y 2025) (quoting *In re Atlas Shipping A/S*, 404 B.R. at 741).

Section 1507 provides additional grounds for the Court to grant relief to the foreign representative. Section 1507 reads:

> (a) Subject to the specific limitations stated elsewhere in this chapter the court, if re cognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.
> (b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>   (1) just treatment of all holders of claims against or interests in the debtor's property;

15

> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507.

Finally, any relief, including approval and recognition of the Reverse Vesting Order, must comply with the public policy exception of section 1506: "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Section 1506 has been narrowly construed to ensure claimants are afforded a "fair and impartial proceeding," not that they are afforded all the rights and protections they would otherwise receive in an U.S. court. *See In re Ephedra Prods. Liab. Litig.*, 349 B. R. 333, 337 (S.D.N.Y. 2006) (holding that a foreign proceeding without a jury is not contrary to the public policy of the United States if the same proceeding in the U.S. has a jury trial right: "the Procedure here in issue, as amended, plainly affords claimants a fair and impartial proceeding. Nothing more is required by § 1506 or any other law.")

**B. Approval of The Transaction**

Section 1520 outlines the mandatory relief automatically granted upon recognition of a foreign main proceeding under chapter 15. Once section 1520(a) applies, sections 363, 549 and 552 also apply to any transfer of a debtor's interest in property within the United States. 11 U.S.C. § 1520(a)(2). *In re Atlas Shipping A/S*, 404 B.R. at 739. When considering if section 363

16

review is required in an ancillary U.S. bankruptcy proceeding "when there is a 'foreign main proceeding,' section 1520(a)(2) instructs the bankruptcy court to apply section 363 to a 'transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate.'" *Fairfield Sentry Ltd. v. Farnum Place, LLC (In re Fairfield Sentry Ltd.)*, 768 F.3d 239, 244 (2d Cir. 2014) (quoting 11 U.S.C. § 1520(a)(2)).  A section 363 analysis is not required when the property at issue is not located within the United States.

   1. <u>Asset Sale Pursuant to Section 363 of the Bankruptcy Code</u>

    *a. Sale of Debtor's Assets under Section 363(b)*

 "[T]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.  *See Comm. Of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 144-45 (2d Cir. 1992) (approving sale of assets based on a finding that sound business judgment supported sale because delay in the sale of assets may diminish their value); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071-72 (2d Cir. 1983) (holding that the sale of assets out of the ordinary course of business must be supported by "some articulated business justification, other than appeasement of major creditors" and that "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application").  Once the Trustee articulates a sound business justification, there "is a presumption that in making a business decision the [decision maker] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Official Comm. of*

*Subordinated Bondholders v. Integrated Res., Inc.,* 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992),

*appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (citation omitted).

### b.   Protections to Good Faith Purchasers under 363(m)

Bankruptcy Code section 363(m) states that "The reversal or modification of an appeal or

an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect

the validity of a sale…under such authorization to an entity that purchased . . . such property in

good faith, whether or not such entity knew of the pendency of the appeal, unless such

authorization and such sale . . . were stayed pending appeal."  The Second Circuit has held that

"[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale

proceedings . . . .  A purchaser's good faith is lost by 'fraud, collusion between the purchaser and

other bidders or the trustee, or any attempt to take grossly unfair advantage of other bidders.'"

*Licensing by Paola v. Sinatra (In re Gucci),* 126 F.3d 380, 390 (2d Cir. 1997) (citations omitted).

### C.  Third-Party Releases

Courts in this district have long enforced foreign restructuring plans in Chapter 15 cases

which include nonconsensual third-party releases, most doing so pursuant to sections 1507 and

1521 of the Code.  *See, e.g.*, *In re Ocean Rig UDW Inc*., 570 B.R. 687 (Bankr. S.D.N.Y. 2017)

(recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Sino–*

*Forest Corp*., 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing

third-party releases); *In re Magyar Telecom B.V*., 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11,

2013) (ECF Doc. # 26); *In re Metcalfe & Mansfield Alt. Inv.,* 421 B.R. at 696 (concluding that

"principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel

approval of enforcement in the United States of the third-party non-debtor release and injunction

provisions included in the Canadian Orders, even if those provisions could not be entered in a

plenary chapter 11 case").

While the Supreme Court in *Purdue* held that "the Bankruptcy Code does not authorize a

bankruptcy court to approve, as part of a plan of reorganization under Chapter 11, a release and

injunction that extinguishes claims against non-debtor third parties without the consent of

affected claimants," (603 U.S. at 204) Chapter 15 cases decided since *Purdue* have continued to

recognize nonconsensual third-party releases.  In *In re Credito Real, S.A.B. de C.V., SOFOM,*

*E.N.R.*, 2025 WL 977967 (Bankr. D. Del. Apr. 1, 2025), *aff'd*, 2026 WL 881444 (D. Del. March

21, 2026), the court examined the differences in language between section 1123(b) of the code,

which the *Purdue* court held does not authorize the approval of a nonconsensual third-party

releases, and sections 1521 and 1507.  What the court determined was that section 1521 and

1507 grant bankruptcy courts significantly more power than section 1123(b) through the

allowance of the court to grant "any appropriate relief."  *In re Credito Real*, 2025 WL 977967 at

*9.

> Section 1521 thus differs from section 1123(b), which "simply
> states that a court may include any 'other' chapter 11 plan
> provision that is not "inconsistent with the applicable provisions of
> this title.'"  [*Id.* at *10]  The Supreme Court in *Purdue* read
> "other" as directing courts to look to the other provisions of
> 1123(b) to determine what further relief a court could grant.  But
> "section 1521(a) does not direct courts to look to the 'other'
> provisions"—listed in subsections (a)(1)–(7)—"when providing
> relief under its catchall," instead allowing "courts to grant 'any
> additional relief that may be available to a trustee.'"  *Id.*  The
> limitation in section 1521(a), therefore, is not whether the relief is
> similar to those listed in 1521(a)(1)–(7), but whether the relief is
> available to the trustee.  *Id.*

*In re Odebrecht*, 669 B.R. at 473 (citing *In re Credito Real*, 2025 WL 977967 at *10).  This

same analysis found similar language enumerating the boundaries "unambiguously" in section

19

1507 and therefore determined that section additionally distinct from section 1123(b).  *In re Credito Real*, 2025 WL 977967 at \*12.  Given the distinctions in authority, both the courts in *Credito Real* and *Odebrecht* found that third-party releases could be permitted if they, like all other actions under section 1521, ensured the interests of creditors, the debtor, and other interested entities are "sufficiently protected" under section 1522(a).  *In re Odebrecht*, 669 B.R. at 474.  They do not run afoul of section 1506 public policy exception.  *Id*. at 475-76 ("As the Second Circuit has previously stated, "deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States." *United JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V*., 412 F.3d 418, 424 (2d Cir. 2005). So long as these guidelines are respected, a long string of caselaw indicates that bankruptcy courts may, acting as ancillaries to foreign proceedings, extinguish claims that would be available in plenary actions in the U.S. in the name of comity.")

### D.  Waiver of Bankruptcy Rules 6004(h)

Bankruptcy Rule 6004(h) provides that "an order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the Court orders otherwise."  FED. R. BANKR. P. 6004(h).  The rule is intended to provide time for an objecting party to appeal a sale order or the assignment of an executory contract before such order can be implemented.  *See* Advisory Committee Notes to FED. R. BANKR. P. 6004(h).

Collier suggests that because the purpose of the rules is to "protect the rights of an objecting party," a court should eliminate the 14-day stay period and allow the sale or the assignment, as applicable, to close immediately in all cases where there has been no objection to the procedure.  10 COLLIER ON BANKRUPTCY § 6004.10 (16th 2019) (discussing Bankruptcy Rule 6004(h)).

### III.   DISCUSSION

#### A.  The Reverse Vesting Order

As discussed above, few courts have been tasked with recognizing a RVO, with most granting recognition without an accompanying opinion.  The one instance of a court issuing an opinion accompanying recognition of a RVO, *In re Goli Nutrition*, saw the court recognize and enforce the RVO largely on the basis of the lack of objection from parties after adequate notice was provided to all parties, "including shareholders whose stock is being redeemed and cancelled for no consideration and those who may hold liabilities that are being vested out to Residual Co." *In re Goli Nutrition*, 2024 WL 1748460 at * 2.  While the sole objection received has since been withdrawn, the Court will still continue with an analysis of the Reverse Vesting Order before granting recognition.

A bankruptcy court has an "exceedingly broad" power to grant appropriate, discretionary relief under section 1521 and 1507 of the Code (*In re Asbestos Corp.*, 674 B.R. at 868), which can extend to the recognition of foreign confirmation orders.  This Court is not limited in granting potential relief by the bounds of relief that would otherwise be available if this was proceeding under Chapter 11, "provided that such assistance is consistent with the principles of comity and satisfies fairness considerations set forth in Section 1507(b)," (*In re Rede Energia S.A.*, 515 B.R. at 90) or the sufficient protection considerations of Section 1522.

The Court recognizes the Reverse Vesting Order, with its rationale grounded by considerations of comity.  U.S. Bankruptcy courts regularly approve transactions and plans involving Chapter 15 debtors in CCAA proceedings that have been approved through orders in the Canadian court.  *See*, e.g. *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 612 (Bankr. S.D.N.Y. 2017) (approving of a plan and underling transaction already approved by the Canadian court

21

Canadian Court "[b]ased on the principles of international comity."); *see also In re Oak and Fort Corp.*, 25-11282-mg (Bankr. S.D.N.Y. Jan. 22, 2026) (ECF Doc. # 46) (order recognizing the Sanction Order granted in Canadian court for Chapter 15 debtor post-recognition of the case); *Cornfeld v. Investors Overseas Servs., Ltd.,* 471 F.Supp. 1255, 1259 (S.D.N.Y.1979) ("The fact that the foreign country involved is Canada is significant.  It is well-settled in New York that the judgments of the Canadian courts are to be given effect under principles of comity.  Trustees in bankruptcy appointed by Canadian courts have been recognized in actions commenced in the United States. More importantly, Canada is a sister common law jurisdiction with procedures akin to our own, and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings.") (internal citations omitted).

Beyond general considerations of comity, the Reverse Vesting Order will sufficiently protect the interests of creditors.  The Canadian Court determined in granting the Reverse Vesting Order that "no stakeholder is worse off under the [reverse vesting] structure than they would be under any other viable alternative." (Endorsement ¶ 14.)  The assurance that all holders of claims or interests in the debtor's property have been treated justly is further supported by independent Monitor leading the process under the SISP and ultimately selecting the winning bid.  "There are a number of protections within the CCAA Proceeding absent in Chapter 11, chief among which is the Monitor, the independent officer appointed by the Canadian Court to *provide objective oversight and ensure the restructuring is fair and impartial to all stakeholders*." *In re Asbestos Corp. Ltd.*, 674 B.R. at 875-76 (emphasis added).  Importantly under the Reverse Vesting Order, no creditor's claim is extinguished; creditor claims will either continue against the Principal Entities if the claim is retained or be against ResidualCo if they are expunged through the Transaction "with the same nature and priority as they had

22

immediately prior to the Transactions, as if the Transactions had not occurred." (Reverse Vesting Order ¶¶ 8, 12.) Finding creditors to be sufficiently protected and thus satisfying the requirements of section 1522, the Court does not need to determine if the Reverse Vesting Order is appropriate under section 1507. Recognizing the Reverse Vesting Order is an appropriate grant of "additional relief" under section 1521(a)(7).

In addition, the recognition of the Reverse Vesting Order is not manifestly contrary to the public policy of the United States. As noted above, the public policy exception has been construed as extraordinarily narrow, applying only to instances that implicate the "most fundamental policies of the United States." *In re Ephedra*, 349 B.R. at 336 (citing H.R.Rep. No. 109–31(I), at 109, *as reprinted in* 2005 U.S.C.C.A.N. 88, 172). Here, while the reverse vesting structure is different than how a debtor would proceed under Chapter 11, the rights of creditors and other stakeholders have been protected. The SISP was adopted by the independent Monitor to implement procedures that would enhance competitive bidding, limit any possibility of preferential treatment of bidders, and to ensure the maximization of value for the bankruptcy estate. If the denial of a jury trial right, as was the issue in *Ephedra*, can be found to not be contrary to U.S. public policy when the Canadian court otherwise offered "claimants a fair and impartial procedure" (*In re Ephedra*, 349 B.R. at 337), then the reverse vesting order structure, which still ensures the protection of claimants, is certainly not as well.

### B. Approval of the Transaction

While the Transaction might have been completed in the exercise of the Chapter 15 Debtor's sound business judgment, the Court cannot not review the Subscription Agreement and Transaction under section 363. As the *Goli Nutrition* court determined, it is not proper to review the entire transaction contemplated by the RVO under section 363 as "the issuance of stock in a

debtor company is not a sale transaction under section 363.  Goli Canada is not selling an asset, it is issuing stock.  Second, even if it were, the new stock, which is stock in a Canadian company is not the 'transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States.'"  *In re Goli Nutrition*, 2024 WL 1748460 at * 2 (citing 11 U.S.C. § 1520(a)(2)).

The Reverse Vesting Order authorized Iovate to "terminat[e] and cancel[] all Existing Shares (as defined in the Subscription Agreement), for no consideration," and "authoriz[es] and direct[s] the Company to issue the Purchased Shares to the Purchaser free and clear of any Encumbrances[.]"  (Reverse Vesting Order at 1-2.)  This is not a 'stock sale,' which would be subject to approval under section 363 as that involves a debtor selling already issued stock to a third party.  *See, e.g. In re New York Trap Rock Corp.*, 155 B.R. 871 (Bankr. S.D.N.Y. 1993), *aff'd,* 160 B.R. 876 (S.D.N.Y. 1993), *aff'd in part, vacated in part*, 42 F.3d 747 (2d Cir. 1994) (where the court conducted a section 363 analysis of the sale of already issued stock in the debtor's subsidiary).  The issuance of new stock is not the sale of property of the debtor and therefore does not implicate section 363.  The Court does not need to determine if the stock issue involved a transfer of property within the territorial jurisdiction of the United States.

The Foreign Representative alternatively seeks approval of the Excluded Property being transferred from the Chapter 15 Debtors to ResidualCo.  (Motion ¶ 39.)  The court's actions in *Goli Canada* can again be instructive.  The court, confronted with the transfer of an excluded asset that would "not be free and clear of liabilities and will be subject to claims" after being vested out to a Residual Co, relied on *Fairfield Sentry* to determine that the court *was* required to apply the section 363 standard to the transfer (dependent on a question of property ownership that is not as issue presently before this Court).  *In re Goli Nutrition*, 2024 WL 1748460 at * 5.

24

The transfer of the Excluded Property to ResidualCo would implicate section 363 *if* the Excluded Property was within the territorial jurisdiction of the United States. The Foreign Representative has yet to determine what will ultimately constitute the extent of the Excluded Property – according to the Subscription Agreement, a detailed list of the excluded assets and contracts will "follow no later than two (2) Business Days prior to the Closing Date." (Subscription Agreement, Schedules 1.1(DDDD); 2.2). During the May 6, 2026 hearing, the Foreign Representative indicated to the Court that physical assets currently located in the United States will *not* constitute any of the Excluded Property. Recording of Hearing at 28:30-29:30, *In re Iovate Health Sciences Int'l. Inc.*, 25-MG-11958 (Bankr. S.D.N.Y. May 6, 2026). As none of what will be transferred as part of the Excluded Property will include a "transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States," the Court does not need to examine the factors of section 363 with respect to any part of the transaction. 11 U.S.C. § 1520(a).

The Court does find that the Purchaser acted in good faith and should be granted protections under section 363(m) as needed. The Monitor was informed that the Purchaser is not related to Iovate per section 36 of the CCAA, which would have required satisfaction of a more stringent criteria before the Canadian Court could grant the Reverse Vesting Order if there was a connection.[3] (Goldstein Decl. ¶ 12.) The Monitor nonetheless still conducted the analysis under section 36 and found that its factors were satisfied. (*Id*.) The sales process conducted via the

---

[3]   Subsection 36(4) of the CCAA provides that "[i]f the proposed sale or disposition is to a person who is related to the company, the court may, after considering the factors referred to in subsection (3), grant the authorization only if it is satisfied that (a) good faith efforts were made to sell or otherwise dispose of the assets to persons who are not related to the company; and (b) the consideration to be received is superior to the consideration that would be received under any other offer made in accordance with the process leading to the proposed sale or disposition." In turn, subsection 36(5) of the CCAA defines "a person who is related to the company" as including "(a) a director or officer of the company; (b) a person who has or has had, directly or indirectly, control in fact of the company; and (c) a person who is related to a person described in paragraph (a) or (b)."

SISP ensured a broad canvassing of the market, and the Foreign Representative has no knowledge of any party, including the Purchaser, of engaging in conduct to suggest fraud or collusion.  (*Id.* ¶ 17.)

### C.  Approval of the Releases

The Court recognizes the requested releases.  As discussed above, while releases such as the ones included in the Reverse Vesting Order might be impermissible if granted by this Court in a Chapter 11 proceeding, this Court has the authority to recognize such releases already approved by the Canadian Court if the interests of creditors, the debtor, and other interested entities are "sufficiently protected" under section 1522(a).  *In re Odebrecht*, 669 B.R. at 474. The releases are properly tailored to ensure sufficient protection and the just treatment of all claimants, limited in scope to any claims against the Released Parties arising in connection with or relating to the Subscription Agreement, the completion of the Transactions, and the Reverse Vesting Order.  (Endorsement ¶ 19.)  The Releases do not cover claims constituting fraud or willful misconduct.  (Reverse Vesting Order ¶ 23.)  The releases are in kind with those approved by the Court in *Odebrecht*, where relevant parties were released from liability in relation to the plan and foreign court order except for liability arising from gross negligence, fraud, willful misconduct or professional malpractice.  *In re Odebrecht*, 669 B.R. at 463-64.

### D.  Waiver of Bankruptcy Rules 6004(h)

Given the withdrawal of the sole objection, the Court will waive Bankruptcy Rule 6004(h).  *See, c.f.* 10 COLLIER ON BANKRUPTCY § 6004.10 (16th 2019) (discussing how a waiver of the 14-day stay under Bankruptcy Rule 6004(h) is appropriate where "*there has been no objection to the procedure*" (emphasis added)).

26

## IV.   CONCLUSION

As noted above, the Court

**RECOGNIZES** the Reverse Vesting Order,

**DECLINES TO REVIEW** the Transaction under section 363;

**APPROVES** the 363(m) protections for the Purchaser;

**RECOGNIZES** the Releases; and

**GRANTS** the Waiver of Bankruptcy Rules 6004(h).

A separate order granting the requested relief has already been entered.  (ECF Doc. #

107.)


Dated:   May 12, 2026
New York, New York


_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge